# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ARIZONA

In re

EUROFRESH, INC. *et al*.

Debtors.

Case No. 2:-09-bk-07970-CGC
(Jointly Administered)

Chapter 11

**FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION**

---

**IMPORTANT DATES:**

| | |
|---|---|
| Voting Record Date: | **July 31, 2009** |
| Date by which objections to Confirmation of the Plan must be filed and served: | **September 24, 2009** |
| Date by which Ballots must be received (and deadline to participate in New Money Investment): | **September 24, 2009** |
| Initial Hearing on Confirmation of the Plan: | **September 28, 2009, 1:30 p.m. M.S.T.** |
| Final Hearing on Confirmation of the Plan: | **October 13, 2009, 9:00 a.m. M.S.T.** |

---

Craig D. Hansen (AZ Bar No. 007405) chansen@ssd.com
Bradley A. Cosman (AZ Bar No. 026223) bcosman@ssd.com
SQUIRE, SANDERS & DEMPSEY L.L.P.
Two Renaissance Square, Suite 2700
40 North Central Avenue
Phoenix, Arizona 85004-4498
(602) 528-4000

and

Kristin E. Richner (OH Bar No. 0078582) krichner@ssd.com
Nicholas J. Brannick (OH Bar No. 0079642) nbrannick@ssd.com
SQUIRE, SANDERS & DEMPSEY L.L.P.
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-2700

Counsel to Debtors and Debtors-In-Possession

## THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT, AND THE DEBTORS ARE NOT YET SOLICITING VOTES ON THEIR PLAN UNTIL AFTER THIS DISCLOSURE STATEMENT IS APPROVED BY THE BANKRUPTCY COURT

## Exhibits

**EXHIBIT A –  Debtors' First Amended Joint Plan of Reorganization**

**EXHIBIT B - Liquidation Analysis**

**EXHIBIT C - Financial Projections**

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION AND SUMMARY ................................................................ 1
   A.  Overview.......................................................................................... 1
   B.  Rules of Interpretation ................................................................... 3
   C.  Purpose of the Plan......................................................................... 4
   D.  Summary of Classification and Treatment of Claims and Interests Under the Plan ................................................................. 5
   E.  Substantive Consolidation ............................................................ 11
   F.  Voting on the Plan ........................................................................ 11
       1.  Who May Vote ................................................................... 11
       2.  Voting of Disputed Claims or Interests............................... 11
       3.  Voting Procedures and Instructions..................................... 12
   G.  Acceptance or Rejection of a Plan ............................................... 13
   H.  Confirmation Hearing; Objections ............................................... 13
   I.  Reorganized Eurofresh, Reorganized EPL and the Post-Confirmation Estate ................................................................ 13

II.  BACKGROUND AND SUMMARY OF DEBTORS' BUSINESS ........................... 14
   A.  Business Overview ....................................................................... 14
       1.  General Discussion ............................................................. 14
       2.  Competition ........................................................................ 15
   B.  Properties ..................................................................................... 16
   C.  Pre-Petition Debt Structure .......................................................... 16
       1.  Existing Credit Agreement.................................................. 16
       2.  Capital Lease ...................................................................... 16
       3.  11½% Senior Notes Due 2013 ............................................. 17
       4.  14½% Senior Subordinated Discount Notes Due 2014 ......... 17
       5.  Unsecured Claims ............................................................... 17
   D.  Prepetition Corporate Capital Structure ....................................... 18
   E.  Directors ...................................................................................... 18
   F.  Executive Officers ........................................................................ 19
   G.  Directors of Reorganized Eurofresh ............................................. 20
   H.  Employees..................................................................................... 20

|  |  |  |  |  |
|---|---|---|---|---|
|  | 1. | Union and Non-Union Employees | 20 |
|  | 2. | Employee Benefit Plans | 20 |
| III. | EVENTS LEADING UP TO THE CHAPTER 11 FILINGS | 21 |
| | A. | Excessive Leverage | 21 |
| | B. | Diseases and Infestations | 22 |
| | C. | Labor Shortages | 23 |
| IV. | SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASES | 24 |
| | A. | Commencement of the Bankruptcy Cases | 24 |
| | B. | First-Day Orders | 25 |
| | C. | Retention of Professionals | 25 |
| | D. | Official Committee of Unsecured Creditors | 25 |
| | E. | Cash Collateral | 27 |
| | F. | Schedules and Statements of Financial Affairs | 27 |
| | G. | The Claims Bar Date | 28 |
| | H. | Employee Matters | 28 |
| | | 1. | Payment of Certain Pre-Petition Obligations to Employees | 28 |
| | | 2. | Key Employee Retention Plan | 28 |
| | I. | Payment of Essential Vendors and PACA Claims | 29 |
| | J. | Dispute and Negotiation with Southwest Gas Corporation | 29 |
| | K. | The IPSA and the Plan Process | 30 |
| | | 1. | Execution of the IPSA and Effect of JB Participation in the New Money Investment | 30 |
| | | 2. | The Special Committee and Other Potential Investors | 31 |
| | L. | The 11 U.S.C. § 505 Proceeding | 33 |
| | M. | The Motion of WFF With Regard to the Capital Lease | 33 |
| V. | DESCRIPTION OF THE REORGANIZATION PLAN | 33 |
| | A. | Overview of the Plan | 33 |
| | | 1. | Brief Explanation of Chapter 11 Reorganization | 33 |
| | | 2. | Solicitation of Acceptances of the Plan | 34 |
| | | 3. | Administrative and Priority Claims | 35 |

| | | |
|---|---|---|
| 4. | Classification of Classes and Interests | 35 |
| 5. | Treatment of Claims and Interests | 37 |
| 6. | Recoveries | 40 |
| 7. | Sources of Consideration for Plan Distributions | 40 |
| 8. | Preservation of Causes of Action | 47 |
| 9. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 48 |
| 10. | Indemnification Obligations | 51 |
| 11. | Distributions | 51 |
| 12. | Conditions to Confirmation | 53 |
| 13. | Conditions Precedent to Consummation | 53 |
| 14. | Releases and Exculpation | 54 |
| 15. | Permanent Injunction | 56 |
| B. | Transactions Contemplated by the Plan | 57 |
| 1. | Generally | 57 |
| 2. | New First Lien Loan and the Term Loan B or New Credit Facility | 58 |
| VI. | ACCEPTANCE AND CONFIRMATION OF THE PLAN | 61 |
| A. | Acceptance of the Plan | 61 |
| B. | Confirmation | 61 |
| 1. | Confirmation Hearing | 61 |
| 2. | Statutory Requirements for Confirmation of the Plan | 62 |
| 3. | Confirmation Without Acceptance by All Impaired Classes | 64 |
| VII. | PLAN VALUATION AND FEASIBILITY | 65 |
| A. | Valuation of Reorganized Eurofresh as of the Effective Date and Projected Financial Information | 65 |
| 1. | Projected Financial Statements | 65 |
| 2. | Valuation | 67 |
| 3. | Valuation Methodologies | 70 |
| VIII. | OTHER AVAILABLE FINANCIAL INFORMATION | 71 |
| IX. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES | 71 |

A. Certain U.S. Federal Income Tax Consequences to the Holders of Claims and Interests ................................................................................................ 73

1. Consequences to Holders of Existing Credit Agreement Claims and Capital Lease Claims ..................................................................... 73

2. Consequences to Holders of Allowed Miscellaneous Secured Claims ........................................................................................... 75

3. Consequences to Holders of Allowed Convenience Claims and Allowed General Unsecured Claims....................................................... 75

4. Consequences to Holders of Allowed Senior Noteholder Claims........... 76

5. Accrued But Untaxed Interest ................................................................ 78

6. Market Discount .................................................................................. 79

7. Consequences to Holders of Discount Noteholder Claims, Subordinated Claims and Interests ......................................................... 79

8. Information Reporting and Backup Withholding .................................. 80

B. Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Eurofresh ......................................................................................... 80

1. Cancellation of Debt and Reduction of Tax Attributes ........................ 80

2. Limitation of NOL Carry Forwards and Other Tax Attributes .............. 81

3. Alternative Minimum Tax...................................................................... 83

X. RISK FACTORS ............................................................................................... 83

A. General Risks ........................................................................................... 84

B. Risks Associated with Securities of Reorganized Eurofresh............................. 84

C. Risks Related to the Reorganized Eurofresh's Business and Financial Condition ................................................................................................ 86

D. Certain Bankruptcy-Related Considerations ................................................. 88

XI. EXEMPTION FROM SECURITIES ACT REGISTRATION ................................... 88

XII. ALTERNATIVES TO THE PLAN AND CONSEQUENCES OF REJECTION .......... 89

A. Alternative Plans ...................................................................................... 89

B. Chapter 7 Liquidation ................................................................................. 90

XIII. RESERVATION OF RIGHTS.............................................................................. 90

XIV. RECOMMENDATIONs AND CONCLUSION...................................................... 90

# I.  INTRODUCTION AND SUMMARY

## A.      Overview

On April 21, 2009, Eurofresh, Inc. ("**EFI**") and Eurofresh Produce, Ltd. ("**EPL**" and together with EFI, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the District of Arizona (the "**Bankruptcy Court**").  On June 12, 2009, the Debtors filed their Joint Plan of Reorganization with the Bankruptcy Court and related Disclosure Statement.  Contemporaneously with the filing of this First Amended Disclosure Statement (the "**Disclosure Statement**"), the Debtors have filed their First Amended Plan (the "**Plan**").

The purpose of this Disclosure Statement is to provide the Holders of Claims and Interests and other parties in interest with adequate information to make an informed judgment about the Plan.  This information includes, among other matters, a brief history of the Debtors, a summary of the Chapter 11 Cases, a description of Debtors' assets and liabilities, a description of the terms under which Reorganized Eurofresh and Reorganized EPL will emerge from chapter 11 and how Claims and Interests will be treated, as well as other matters relating to how the Plan will function.

It is important that Holders of Claims and Interests read and carefully consider this Disclosure Statement and the Plan (and the related exhibits and schedules), and that such Holders vote promptly on the acceptance of the Plan.  The Debtors believe that the transactions contemplated by the Plan will yield a recovery to creditors greater than could be achieved through other restructuring alternatives, including through liquidation under chapter 7 of the Bankruptcy Code and, therefore, recommend that you vote in favor of the Plan.

**YOU SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.   THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN TERMS OF THE PLAN, BUT THE PLAN ITSELF IS THE GOVERNING DOCUMENT.   IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN WILL CONTROL.**

**A SUMMARY DESCRIPTION OF THE CLASSIFICATION OF YOUR CLAIM OR INTEREST AND THE TREATMENT PROPOSED UNDER THE PLAN IS CONTAINED IN ARTICLE I.D OF THIS DISCLOSURE STATEMENT.  <u>EXHIBIT A</u> TO THIS DISCLOSURE STATEMENT IS A COMPLETE COPY OF THE PLAN AND IS BEING SERVED UPON YOU IN COMPLIANCE WITH THE BANKRUPTCY CODE AND BANKRUPTCY RULES.**

The Debtors reserve the right to amend, modify, or supplement the Plan at any time before the confirmation of the Plan, without resoliciting votes on the Plan, provided that such amendments or modifications do not materially alter the treatment of, or distributions to Holders of Claims or Interests under the Plan.

UNDER THE PLAN, REORGANIZED EUROFRESH WILL ISSUE THE NEW COMMON STOCK, PIK PREFERRED STOCK AND THE SUBORDINATED PIK NOTES

(COLLECTIVELY THE "**SECURITIES**"). THE SECURITIES WILL NOT BE REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER ANY STATE SECURITIES LAWS. THE SECURITIES WILL BE ISSUED IN RELIANCE UPON CERTAIN EXEMPTIONS FROM REGISTRATION OR QUALIFICATION, INCLUDING AS PROVIDED IN SECTION 4(2) OF THE SECURITIES ACT AND REGULATION D PROMULGATED THEREUNDER AND, TO THE EXTENT APPLICABLE, SECTION 1145 OF THE BANKRUPTCY CODE. THE SECURITIES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES LAWS OR UNLESS EXEMPTIONS FROM REGISTRATION ARE AVAILABLE. ARTICLE XI OF THIS DISCLOSURE STATEMENT, ENTITLED EXEMPTION FROM SECURITIES ACT REGISTRATION, DESCRIBES THE SECURITIES, EXEMPTIONS FROM REGISTRATION AND RESTRICTIONS ON RESALE IN MORE DETAIL.

THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT REPRESENT THE DEBTORS' ESTIMATES OF FUTURE EVENTS BASED ON CERTAIN ASSUMPTIONS MORE FULLY DESCRIBED BELOW, SOME OR ALL OF WHICH MAY NOT BE REALIZED. NONE OF THE FINANCIAL ANALYSES CONTAINED IN THIS DISCLOSURE STATEMENT IS CONSIDERED TO BE A "FORECAST" OR "PROJECTION" AS DEFINED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE USE OF THE WORDS "FORECAST," "PROJECT," OR "PROJECTION" WITHIN THIS DISCLOSURE STATEMENT RELATE TO THE BROAD EXPECTATIONS OF FUTURE EVENTS OR MARKET CONDITIONS AND QUANTIFICATIONS OF THE POTENTIAL RESULTS OF OPERATIONS UNDER THOSE CONDITIONS.

ALL FINANCIAL INFORMATION PRESENTED IN THIS DISCLOSURE STATEMENT WAS PREPARED BY THE DEBTORS AND/OR PROFESSIONALS RETAINED BY THE DEBTORS IN THE CHAPTER 11 CASES.

Certain statements, projections of future operating results, valuation estimates and the like contained in this Disclosure Statement are statements that the Debtors believe constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements often include the words "may," "could," "would," "should," "believes," "expects," "anticipates," "estimates," "intends," "plans," "targets," "potentially," "probably," "projects," "outlook," or similar expressions. Such forward-looking statements involve known and unknown risks, uncertainties and other important factors that could cause the actual results, performance or achievements of Reorganized Eurofresh to differ materially from any future results, performance or achievements expressed or implied by such forward-looking statements. Such risks, uncertainties and other important factors include, among others: general economic and business conditions; the availability, terms and deployment of capital; the availability and terms of key raw materials; adverse determinations in any future litigation or regulatory proceedings; and any other factors referenced in this Disclosure Statement or otherwise. See Article X, "RISK FACTORS."

- 2 -

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR THE CONFIRMATION OF THE PLAN WILL CREATE ANY IMPLICATION UNDER THE CIRCUMSTANCES THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF OR THAT THE DEBTORS WILL BE UNDER ANY OBLIGATION TO UPDATE SUCH INFORMATION IN THE FUTURE.

THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF THE DEBTORS' CREDITORS, INTEREST HOLDERS AND OTHER PARTIES IN INTEREST, AND FOR THE SOLE PURPOSE OF ASSISTING THEM IN MAKING AN INFORMED DECISION ABOUT THE PLAN. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS IN CONJUNCTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT OR IN THE BALLOTS. IF GIVEN OR MADE, ANY SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION TO PERMIT A CREDITOR TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

CAPITALIZED TERMS USED BUT NOT DEFINED IN THIS DISCLOSURE STATEMENT HAVE THE DEFINITIONS GIVEN TO THEM IN THE PLAN.

### B. Rules of Interpretation

The following rules for interpretation and construction shall apply to the Disclosure Statement: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference in the Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference in the Disclosure Statement to an existing document, schedule, or exhibit, whether or not Filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that

Entity's successors and assigns; (5) unless otherwise specified, all references in the Disclosure Statement to Articles are references to Articles of the Disclosure Statement; (6) unless otherwise specified, all references in the Disclosure Statement to exhibits are references to exhibits to the Plan; (7) the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure Statement; (9) unless otherwise set forth in the Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form in the Disclosure Statement that is not otherwise defined in the Disclosure Statement or Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to such term in the Bankruptcy Code or Bankruptcy Rules, as applicable; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, unless otherwise stated; (13) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; (14) unless otherwise specified, all references in the Disclosure Statement to monetary figures shall refer to currency of the United States of America; and (15) unless otherwise specified, references in the Disclosure Statement to the Debtors, Reorganized Eurofresh or Reorganized EPL shall mean the Debtors, Reorganized Eurofresh and Reorganized EPL, as applicable to the extent the context requires.

### C.    Purpose of the Plan

After careful review of their current business operations and various liquidation and recovery scenarios, as well as financing and investment alternatives, the Debtors have concluded that the recovery of all Holders of Allowed Claims and Interests will be maximized by the Debtors' continued operation as a going concern pursuant to the restructuring described in the Plan.  The Debtors believe that their business and assets have significant value that would not be realized in a liquidation scenario, either in whole or in substantial part.

In general, under the Plan:

(i)    Class 1A and Class 1B will be treated as follows:

(a) If Class 1A and Class 1B <u>Accept</u> the Plan:  Holders of Class 1A Existing Credit Agreement Claims and Class 1B Capital Lease Claims shall receive together $35,000,000 of the New Money Investment to pay down the Existing Credit Documents Claim (in accordance with the terms of the AAL), and a rollover of all remaining obligations under the Existing Credit Documents, to the extent Allowed, into the Term Loan B; or

(b) If Class 1A and/or Class 1B <u>Reject</u> the Plan:  Holders of Class 1A Existing Credit Agreement Claims and Class 1B Capital Lease Claims shall receive together $10,000,000 of the New Money Investment to pay down the Existing Credit Documents

Claim (in accordance with the terms of the AAL), and a rollover of all remaining obligations under the Existing Credit Documents, to the extent Allowed, into the New Credit Facility;

(ii)     Holders of Class 1C Miscellaneous Secured Claims will, on the Effective Date or as soon thereafter as practicable, either be Reinstated, paid in full in Cash or satisfied by the return of collateral;

(iii) Holders of Allowed Class 2 Convenience Claims will receive the lesser of the Allowed General Unsecured Claims of such Holder or $1,000 paid in Cash;

(iv) Holders of Allowed Class 3 General Unsecured Claims will receive Cash payments in an amount equal to such Holder's pro rata share of the General Unsecured Claim Fund; and

(v) Holders of Allowed Class 4 Senior Noteholder Claims will receive their pro rata share of (1) $10,000,000 in face amount of PIK Preferred Stock; and (2)(a) if Class 1A and Class 1B Accept the Plan, two million shares of New Common Stock, or (b) if Class 1A and/or Class 1B Reject the Plan, one million shares of New Common Stock, and certain proceeds of Reserved Shares under certain circumstances.

The Debtors do not anticipate any distribution to Holders of Class 5 Discount Noteholder Claims, Class 6 Subordinated Claims or Class 7 Interests.

The Debtors believe that the Plan provides the best recoveries possible for Holders of Allowed Claims and Interests and strongly recommend that, if such Holders are entitled to vote, they vote to accept the Plan.  As discussed further below, the Debtors believe that any alternative to confirmation of the Plan, such as liquidation, could result in significant delays, litigation, additional costs and, ultimately, lower recoveries to all parties in interest.

### D.     Summary of Classification and Treatment of Claims and Interests Under the Plan[1]

As described more fully in this Disclosure Statement, the Plan provides for significant distributions on account of prepetition indebtedness in the form of Cash and the Securities that will be available as a result of various Plan-related transactions.

The Plan divides all Claims and Interests into Classes and sets forth the treatment afforded to each Class.  The classification of Claims and the Distributions to be made under such classification takes into account the relative priorities of Claims and Interests.  The Debtors believe that all Claims and Interests are classified in compliance with the provisions of section 1122 of the Bankruptcy Code.

---

[1] This summary contains only a brief and simplified description of the classification and treatment of Claims and Interests under the Plan.  This summary does not describe every provision of the Plan.  You should refer to the entire Disclosure Statement (including exhibits) and the Plan, including the Plan Supplement, for a complete description of the classification and treatment of Claims and Interests.

If the Plan is confirmed by the Bankruptcy Court, each holder of an Allowed Claim will receive the same treatment as all Holders of other Allowed Claims in the same Class, regardless of whether a particular Holder voted to accept the Plan. Moreover, upon confirmation, the Plan will be binding on all Holders of Claims and Interests regardless of whether such Holders voted to accept the Plan.

The table below sets forth the specific classification and treatment under the Plan of each of the Classes of Allowed Claims against, and Interests in, the Debtors. In addition, Section 2 of the Plan provides for the Payment of Administrative Expenses, Professional Fees, Priority Tax Claims and Other Priority Claims as unclassified Claims.

| Class | Type of Allowed Claim or Interest | Treatment | Status | Estimated Recovery |
|---|---|---|---|---|
| 1A & 1B | Existing Credit Agreement Claims <u>and</u> Capital Lease Claims | <u>Class 1A and Class 1B are Impaired</u>. In full settlement, release and discharge of all Class 1A Claims and all Class 1B Claims, on the Effective Date or as soon thereafter as practicable, holders of Class 1A Allowed Secured Claims and Class 1B Allowed Secured Claims shall receive the following:<br><br>1. Upon <u>Acceptance</u> of the Plan by Class 1A and Class 1B:<br><br>    <u>Cash Principal Reduction</u>. Class 1A and Class 1B together shall receive $35,000,000 of the New Money Investment to pay down the Existing Credit Documents Claim (in accordance with the terms of the AAL), together with the unpaid interest, fees and other charges payable under the terms of the Existing Credit Documents, but only to the extent allowed under sections 502 and 506 of the Bankruptcy Code to be paid as determined by Final Order of the Bankruptcy Court; <u>provided, however</u>, that any make-whole premium, pre-payment premium, default interest or any other similar fee, charge or penalty alleged by the Existing Lenders to be due or payable under the Existing Credit Documents shall not be paid.<br><br>    <u>Rollover of Secured Claim</u>. The remaining principal amount owing under the Existing Credit Documents, along with any allowed accrued and unpaid interest, fees and other charges under the Existing Credit Documents , but excluding therefrom any make-whole premium, pre-payment premium, default interest or any other similar fee, charge or penalty, shall be repaid, to the extent allowed under section 506 of the Bankruptcy Code, under the terms of the Term Loan B which, <u>inter alia</u>, shall replace and supersede the Existing Credit Documents in their entirety. | The Holders of Existing Credit Agreement Claims in Class 1A and Capital Lease Claims in Class 1B are Impaired under the Plan and are entitled to vote to accept or reject the Plan. | 100% |

COLUMBUS/705058.4

| Class | Type of Allowed Claim or Interest | Treatment | Status | Estimated Recovery |
|---|---|---|---|---|
| | | 2. Upon <u>Rejection</u> of the Plan by Class 1A or Class 1B:<br><br><u>Cash Principal Reduction</u>. Class 1A and Class 1B together shall receive $10,000,000 of the New Money Investment to pay down the Existing Credit Documents Claim (in accordance with the terms of the AAL), together with unpaid interest, fees and other charges payable under the terms of the Existing Credit Documents, but only to the extent allowed under sections 502 and 506 of the Bankruptcy Code to be paid as determined by Final Order of the Bankruptcy Court; <u>provided, however</u>, that any make-whole premium, pre-payment premium or any other similar fee, charge or penalty alleged by the Existing Lenders to be due or payable under the Existing Credit Documents shall not be paid.<br><br><u>Rollover of Secured Claim</u>. The remaining principal amount owing under the Existing Credit Documents, along with any allowed accrued and unpaid interest, fees and other charges under the Existing Credit Documents, but excluding therefrom any make-whole premium, pre-payment premium, default interest or any other similar fee, charge or penalty, shall be repaid, to the extent allowed under section 506 of the Bankruptcy Code, under the terms of the New Credit Facility which shall replace and supersede the Existing Credit Documents in their entirety.<br><br>3. <u>No Waiver of Claims</u>. Notwithstanding a determination made by the Bankruptcy Court regarding the Allowed amount of the Existing Credit Documents Claims, if either Class 1A or Class 1B does not Accept the Plan within the meaning of section 1126(c) of the Bankruptcy Code, the Senior Noteholders reserve any and all rights and Claims against the Holders of Class 1A Claims and Class 1B Claims, including, without limitation, the right to seek an equitable lien on assets that are purportedly secured by the Existing Credit Documents Claims, in connection with alleged breaches of the Senior Note Indenture. | | |
| 1C | Miscellaneous Secured Claims | <u>Class 1C is not Impaired</u>. Each holder of a Class 1C Claim shall be treated as though such holder comprises a separate Class hereunder. In full settlement, release and discharge of all Class 1C Claims, on the Effective Date or as soon thereafter as practicable, each holder of a Class 1C Allowed Claim shall be: (i) Reinstated; (ii) paid in full in Cash; or (iii) satisfied in full by a return to such holder of the collateral securing such Allowed Miscellaneous Secured Claim. | The Holders of Miscellaneous Secured Claims in Class 1C are not Impaired under the Plan and are not entitled to vote to accept or reject the Plan. | 100% |

| Class | Type of Allowed Claim or Interest | Treatment | Status | Estimated Recovery |
|---|---|---|---|---|
| 2 | Convenience Claims | Class 2 is not Impaired. In full settlement, release and discharge of all Class 2 Claims, on the Effective Date or as soon thereafter as practicable, each holder of a Class 2 Allowed Claim shall be paid the lesser of (i) the Allowed General Unsecured Claims of such Holder; and (ii) $1,000, in Cash. | The Holders of Convenience Claims in Class 2 are not Impaired under the Plan and are not entitled to vote to accept or reject the Plan. | 100% |
| 3 | General Unsecured Claims | Class 3 is Impaired. In full satisfaction, release and discharge of all Class 3 Claims, on the Effective Date or as soon thereafter as practicable, Holders of Class 3 Allowed Claims shall receive their pro rata share of the General Unsecured Claim Fund. | The Holders of General Unsecured Claims in Class 3 are Impaired under the Plan and are entitled to vote to accept or reject the Plan. | 5% |
| 4 | Senior Noteholder Claims | Class 4 is Impaired. In full settlement, release and discharge of all Class 4 Claims, on the Effective Date or as soon thereafter as practicable, the Senior Notes shall be cancelled (subject to the provisions of Section 5E of the Plan) and the Senior Note Indenture Trustee shall receive the following distribution (collectively, the "**Class 4 Distribution**") for distribution to Senior Noteholders in accordance with the provisions of the Senior Note Indenture: (i) $10.0 million in face amount of PIK Preferred Stock; and (ii) (a) if Class 1A and Class 1B Accept the Plan, two million shares of New Common Stock, or (b) if Class 1A and/or Class 1B Reject the Plan, one million shares of New Common Stock and certain proceeds of Reserved Shares as more particularly described in Section 5.B.4 of the Plan. | The Holders of Senior Notes in Class 4 are Impaired under the Plan and are entitled to vote to accept or reject the Plan. | 6% |
| 5 | Discount Noteholder Claims | Class 5 is Impaired. In full settlement, release and discharge of all Class 5 Claims, on the Effective Date or as soon thereafter as practicable, the Discount Notes shall be cancelled and Holders of Class 5 Allowed Claims shall receive no Distribution on account of such Allowed Claims. | The Holders of Discount Noteholder Claims in Class 5 are Impaired and are not entitled to vote to accept or reject the Plan because they are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. | 0% |

COLUMBUS/705058.4

| Class | Type of Allowed Claim or Interest | Treatment | Status | Estimated Recovery |
|---|---|---|---|---|
| 6 | Subordinated Claims | <u>Class 6 is Impaired</u>.  Any Holders of Class 6 Allowed Claims shall receive no Distribution on account of such Allowed Claims. | The Holders of any Subordinated Claims in Class 6 are Impaired and are not entitled to vote to accept or reject the Plan because they are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. | 0% |
| 7 | Equity | <u>Class 7 is Impaired</u>.  In full settlement, release and discharge of all Class 7 Interests, on the Effective Date or as soon thereafter as practicable, the Interests shall be cancelled and Holders of Class 7 Allowed Interests shall receive no Distribution on account of such Allowed Interests. | Holders of Interests in Class 7 are Impaired and are not entitled to vote to accept or reject the Plan because they are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. | 0% |

COLUMBUS/705058.4

E.    **Substantive Consolidation**

The Plan provides for the substantive consolidation of the Estates of EFI and EPL into a single Estate for all purposes associated with Confirmation and Consummation of the Plan. If substantive consolidation is ordered, then on and after the Effective Date, all assets and liabilities of the Debtors shall be treated as though they were merged into the Estate of EFI for all purposes associated with Confirmation and Consummation, and all guarantees by any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor shall be treated as one collective obligation of the Debtors.

EPL is a defunct entity and the Debtors believe that EPL has no direct creditors. Rather than dissolve EPL, however, the Debtors intend to keep EPL as a shell corporation for potential future business operations. Substantive consolidation shall not affect the legal and organizational structure of Reorganized Eurofresh, Reorganized EPL or their separate corporate existences or any prepetition or postpetition guarantees, Liens, or security interests that are required to be maintained under the Bankruptcy Code, under the Plan, or, in connection with contracts or leases that were assumed or entered into during the Chapter 11 Cases. Any alleged defaults under any applicable agreement with the Debtors or Reorganized Eurofresh arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.

F.    **Voting on the Plan**

1.    Who May Vote

Under the Bankruptcy Code, impaired classes of claims and interests are entitled to vote on a plan of reorganization. A class that is not impaired under a plan is deemed to have accepted the plan and does not vote. A class is "impaired" under the Bankruptcy Code unless the legal, equitable, and contractual rights of the holders of claims or interests in that class are not modified or altered. For purposes of the Plan, Holders of Claims in Classes 1A, 1B, 3, and 4 are "impaired" and are entitled to vote on the Plan. Holders of Claims in Classes 1C and 2 are unimpaired under the Plan and are deemed to have accepted the Plan without voting pursuant to section 1126(f) of the Bankruptcy Code. Holders of Claims and Interests in Classes 5, 6 and 7 are impaired, are not expected to receive any distribution under the Plan and, therefore, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and will not be entitled to vote on the Plan.

2.    Voting of Disputed Claims or Interests

If a Claim or Interest that has been included on the Debtors' Schedules or for which a proof of claim or interest has been timely filed is marked on the proof of claim as contingent, unliquidated or disputed, such Claim or Interest will be temporarily allowed for voting purposes only and not for purposes of allowance or distribution, in an amount equal to $1.00.

If the Debtors have served an objection to a Claim or Interest by the date of the Order approving the Disclosure Statement, such Claim or Interest will be temporarily disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and

in the manner as may be set forth in the objection, and subject to requests for temporary allowance under the Bankruptcy Rules.

3.     Voting Procedures and Instructions

This Disclosure Statement is accompanied by, among other things, copies of the following: (a) the Plan, attached as <u>Exhibit A</u> to this Disclosure Statement; (b) an Order of the Bankruptcy Court (the "**Disclosure Statement Approval Order**") approving (i) this Disclosure Statement under section 1125 of the Bankruptcy Code; (ii) procedures to be employed by the Debtors in soliciting votes regarding the Plan; (iii) the forms of Ballots to be used for voting on the Plan; and (iv) the notice of, and fixing the time for, submitting Ballots and the Confirmation Hearing; (c) a Ballot or Master Ballot, as applicable, to accept or reject the Plan; and (d) the statement of the Committee urging all Holders of Claims to vote in favor of the Plan.

All votes to accept or reject the Plan must be cast by using the appropriate form of Ballot or Master Ballot, as applicable, enclosed with this Disclosure Statement. Votes not evidenced by properly completed and signed Ballots or Master Ballots will not be counted, except to the extent the Bankruptcy Court orders otherwise. The Bankruptcy Court has set July 31, 2009, as the Voting Record Date. The Voting Record Date is the date for the determination of record holders of Claims and/or Interests entitled to receive a copy of this Disclosure Statement and vote, using appropriate Ballots or Master Ballots, to accept or reject the Plan. All Ballots or Master Ballots, as appropriate, must be actually received by (a) the Claims & Solicitation Agent at the address set forth on the Ballot or Master Ballot by the Voting Deadline, or (b) in the case of Ballots for Class 4 Senior Noteholder Claims, delivered to the Nominee sufficiently in advance of the Voting Deadline to permit the Nominee to deliver the Master Ballot, unless the Bankruptcy Court extends such date before such time. Ballots returned by facsimile or email are not valid and will not be counted.

**For your vote to count, your Ballot or Master Ballot must be properly completed according to the voting instructions thereon and received by the Claims & Solicitation Agent no later than the Voting Deadline.**

For questions about the Plan, the voting procedures, or the packet that you received, please contact:

> Kristin E. Richner, Esq.
> Nicholas J. Brannick, Esq.
> SQUIRE, SANDERS & DEMPSEY L.L.P.
> 2000 Huntington Center
> 41 South High Street
> Columbus, OH 43215
> Telephone: 614.365.2700
> Facsimile: 614.365.2499

For questions regarding the amount of your Claim, please contact:

> Travis Vandell

KURTZMAN CARSON CONSULTANTS LLC
2335 Alaska Ave
El Segundo, CA 90245
Telephone: 866.381.9100

## G.    Acceptance or Rejection of a Plan

Under the Bankruptcy Code, a voting class of claims is deemed to have accepted a plan if it is accepted by creditors in such class who vote on the plan and who hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class. A voting class of interests is deemed to have accepted a plan if it is accepted by holders of interests who hold at least two-thirds in amount of the interests of such class that have actually voted on the plan.

If the Plan is not accepted by all Impaired Classes of Allowed Claims, the Plan may still be confirmed by the Bankruptcy Court under section 1129(b) of the Bankruptcy Code if: (a) the Plan has been accepted by at least one Impaired Class of Claims and (b) the Bankruptcy Court determines, among other things, that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each non-accepting Impaired Class (the "**Cramdown Provisions**"). If the Plan is not accepted by all Impaired Classes of Allowed Claims or Interests, the Debtors reserve the right to ask the Bankruptcy Court to confirm the Plan under the Cramdown Provisions.

## H.    Confirmation Hearing; Objections

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan. Under section 1128 of the Bankruptcy Code and Rule 3017(c) of the Bankruptcy Rules, the Bankruptcy Court has scheduled the initial Confirmation Hearing before the Honorable Charles G. Case II, United States Bankruptcy Judge, at the United States Courthouse, 230 N. First Ave, Courtroom 601, Phoenix, AZ 85003, for September 28, 2009, at 1:30 p.m., local time, with a final evidentiary hearing, to the extent necessary, on October 13, 2009 at 9:00 a.m. local time. A notice (the "**Confirmation Hearing Notice**") setting forth the time and date of the Confirmation Hearing has been included along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of such adjourned hearing date by the Bankruptcy Court in open court at such hearing.

Any objection to confirmation of the Plan must be in writing, must comply with the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, and must be filed and served as required in the Confirmation Hearing Notice.

## I.    Reorganized Eurofresh, Reorganized EPL and the Post-Confirmation Estate

As provided in the Plan, EFI and EPL shall continue to exist after the Effective Date as Reorganized Eurofresh and Reorganized EPL, respectively, each a corporate entity with all the powers of a corporation pursuant to the law in the State of Delaware and pursuant to their certificates of incorporation and bylaws in effect prior to the Effective Date, except to the extent

the certificates of incorporation and bylaws are amended or restated by the Plan or otherwise, and to the extent such documents are amended or restated, such documents are deemed to be pursuant to the Plan and require no further action or approval. The Debtors intend that Reorganized EPL remain a dormant entity after the Effective Date.

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by the Debtors pursuant to the Plan shall vest in Reorganized Eurofresh, free and clear of all Liens, Claims, charges or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, Reorganized Eurofresh and Reorganized EPL may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## II. BACKGROUND AND SUMMARY OF DEBTORS' BUSINESS

### A. Business Overview

#### 1. General Discussion

EFI is engaged in the hydroponic growing of tomatoes and cucumbers, selling premium quality, certified pesticide-free tomatoes and cucumbers. EFI's products include tomatoes on the vine, as well as roma, campari, beefsteak and grape tomatoes and long English and "mini" cucumbers. EFI grows these tomatoes and cucumbers in seven state-of-the-art greenhouse facilities with over 318 acres under glass. EFI markets its products directly to major U.S. food retailers and to food wholesalers under the label "Eurofresh Farms" and "Sweet Star". Six of EFI's greenhouses, covering 274 acres, are located in Willcox, Arizona (the "**Willcox Facility**") and one greenhouse covering 44 acres is located in Snowflake, Arizona (the "**Snowflake Facility**" and together with the Willcox Facility, the "**Facilities**"). EFI also operates a small wholesaling business under the label "Garden Fresh Selections" out of a facility in Nogales, Arizona that imports various types of produce from Mexico, packages that produce and then sells that produce through brokers into various wholesale channels, as well as a small maquiladora facility in Agua Prieta, Mexico where some of EFI's products are packaged. EPL has no current business operations and was included as a debtor in the Chapter 11 Cases because it is a guarantor of the Existing Credit Agreement and Capital Lease. Additional information regarding EFI's products is available at http://www.eurofresh.com/. EPL is currently a dormant entity that the Debtors intend to utilize post-petition.

Since 2005, EFI has experienced consistent increases in revenues, from approximately $123.268 million in 2005, to $146.5 million in 2006, $171.6 million in 2007 and $177.1 million in 2008.[2] During these same periods, gross profits[3] declined from approximately $46.195 million in 2005, to $40.5 million in 2006, $35.67 million in 2007 and $23 million in 2008.

---

[2] All data are audited except fiscal year 2008.

[3] Sales less cost of sales.

Earnings before interest, taxes, depreciation and amortization were $29.7 million in 2006, $22.8 million in 2007 and $21.4 million in 2008.

2.    Competition

Despite growing a premium product, EFI faces significant competition within the hydroponic tomato industry from entities within the United States and from Canada and Mexico. Industry estimates of greenhouse tomato sales in the United States total approximately $365 million. It is estimated that approximately 17% of all U.S. fresh tomato supply comes from domestic greenhouse production. Of the greenhouse tomato supply which is imported to the U.S., approximately 46% is imported from Canada and approximately 45% is imported from Mexico.[4] In addition to competition, EFI is subject to fluctuations in the price of its products within the marketplace, based on the seasonality of available supply within the market, as well as consumer demand.[5] As indicated in the table below, the average price per pound for EFI's various products has varied significantly since 2006.

**Price Per Pound - All Products, 2006, 2007 and 2008**



---

[4] *See* Getachew Abate, *The Market for Greenhouse-Grown Tomatoes*, The Strategic Marketing Institute Working Paper, Michigan State University, June 2006, *available at* http://www.productcenter.msu.edu/documents/Working/Hydroponic%20tomatoes%20market.pdf (last viewed April 30, 2009).

[5] *See* Roberta Cook and Linda Calvin, *Greenhouse Tomatoes Change the Dynamics of the North American Fresh Tomato Industry*, U.S. Dept. of Agr., Econ. Research Rep. No. 2 (Apr. 2005) at pp. 2-11 *available at* http://www.ers.usda.gov/publications/err2/ (last viewed May 22, 2009) (discussing seasonality and competition in industry).

### B. Properties

The Debtors' principal assets consist of the personal and real property that comprise the Facilities. The Willcox Facility consists of five parcels of real property totaling 786 acres, of which approximately 274 are under glass. EFI operates six sites at the Willcox Facility, each with its own packaging facility. The Snowflake Facility consists of two parcels of real property totaling 165 acres, of which approximately 44 acres are under glass. Each individual "site" includes a service building that encompasses a packing area, irrigation and tank rooms, boiler rooms, maintenance facilities and offices, in addition to the greenhouse area. The Debtors have approximately $13.6 million in accounts receivable and approximately $16.6 million in inventory and crop development costs.

### C. Pre-Petition Debt Structure

#### 1. Existing Credit Agreement

On March 25, 2008, the Debtors entered into the Existing Credit Agreement among the Debtors, various Existing Lenders and Silver Point Finance, LLC ("**Silver Point Finance**") as administrative agent, collateral agent, syndication agent, documentation agent and lead arranger. Pursuant to the Existing Credit Agreement, the Existing Lenders provided credit facilities to the Debtors in the aggregate amount of $69.9 million consisting of: (i) $42.5 million in Tranche A Term Loans (the "**Term A Loans**"); (ii) $9.9 million in Tranche B Term Loans (the "**Term B Loans**"); and (iii) up to $17.5 million under a revolving credit facility (the "**Revolving Loan**"). The Existing Credit Agreement also provides for a letter of credit sublimit (the "**L/C Subfacility**") of up to $2.5 million under the Revolving Loan.

All of the Debtors' obligations under the Existing Credit Agreement are secured by a blanket lien on substantially all of the Debtors' assets pursuant to a Security Agreement dated March 25, 2008 between the Debtors and Silver Point Finance, as collateral agent.

As of the Petition Date, the amount outstanding under the Term A Loans was $42.5 million, the amount outstanding under the Term B Loans was $9.9 million, the Debtors had no outstanding balance on the Revolving Loan and letters of credit in the amount of approximately $2.1 million issued under the L/C Subfacility. As of the Petition Date, the interest rate on the Term A Loans, Term B Loans and Revolving Loan was 12.75%, including default interest of 2%.

#### 2. Capital Lease

Also on March 28, 2008, EFI entered into a sale-leaseback arrangement with SP Eurofresh LLC ("**SPE**"), an Affiliate of SP, whereby EFI sold all of the physical plant comprising the Snowflake Facility (the "**Snowflake Assets**") to SPE for approximately $15 million. Pursuant to this arrangement, EFI agreed to lease the real property underlying the Snowflake Facility to SPE and then sublease the same real property from SPE. EFI also entered into the Capital Lease, pursuant to which EFI agreed to lease the Snowflake Assets from SPE through July 15, 2012 (the "**Capital Lease Term**"). The Capital Lease is designed such that EFI will pay $15 million in "Fixed Rent" over the Capital Lease Term, plus interest in the form of

"Variable Rent." EFI has a purchase option to acquire the Snowflake Assets at the end of the Capital Lease Term for $1.00.[6] EPL is a guarantor of EFI's obligations under the Capital Lease.

The Debtors' obligations under the Capital Lease are secured by a blanket lien on substantially all of the Debtors' assets pursuant to a Guaranty and Security Agreement dated March 25, 2008 between the Debtors and SP, as collateral agent.

As of the Petition Date, the principal amount payable under the Capital Lease (calculated based on the amount of Fixed Rent remaining to be paid over the Capital Lease Term) was $14,494,500. The interest rate, represented by the "Variable Rent" payable under the Capital Lease was 12.75%.

3.       11½% Senior Notes Due 2013

In December of 2005, as part of a comprehensive recapitalization of EFI (the "**Recapitalization**"), EFI issued $170,000,000 in principal amount of the Senior Notes. The Senior Notes are unsecured. U.S. Bank National Association serves as the indenture trustee pursuant to the Senior Note Indenture on behalf of holders of the Senior Notes. Interest-only payments on the Senior Notes are due on January 15 and July 15 of each year (an "**Interest Payment Date**"). Interest paid on each Interest Payment Date has totaled approximately $9,750,000.

As of the Petition Date, the principal amount outstanding under the Senior Notes was $170 million and interest due but not paid totaled approximately $10,078,799, including interest accrued on the missed Interest Payment at the default rate of 12½% per annum.

4.       14½% Senior Subordinated Discount Notes Due 2014

Also in December of 2005, as part of the Recapitalization, EFI issued $44,147,000 in principal amount of the Discount Notes, receiving gross proceeds of $25,000,000. As of the Petition Date, the accreted value of the Discount Notes was $39,562,388. The Discount Notes are unsecured and are subordinated to the Senior Notes. Following the Petition Date, U.S. Bank National Association resigned as indenture trustee with regard to the Discount Notes. HSBC Bank USA, N.A. currently serves as the Discount Note Indenture Trustee. No payments are due on the Discount Notes until January 15, 2010.

5.       Unsecured Claims

As of the Petition Date, the Debtors estimated that there were approximately $11.6 million in General Unsecured Claims pending against the Debtors. However, during the course of these Chapter 11 Cases, the Debtors believe that the total amount of estimated General Unsecured Claims has been reduced through payments under the Essential Vendor Procedures and to PACA claimants by approximately $3.1 million. The Debtors also believe that they will

---

[6] The Debtors anticipate that the Capital Lease will be treated as a financing rather than a true lease under the Uniform Commercial Code and other applicable bankruptcy and non-bankruptcy law.

make payments on account of §503(b)(9) Claims and Cure claims of approximately $3.1 million. After considering Claims filed against the Debtors, the Debtors estimate that there could be as much as $5.6 million in additional General Unsecured Claims pending against the Debtors. Thus, the Debtors currently estimate that General Unsecured Claims pending against their estates are approximately $11 million.

The Senior Notes, the Discount Notes and holders of General Unsecured Claims are all *pari passu*, except that any recovery payable on account of the Discount Notes is payable directly to the Senior Notes.

### D.  Prepetition Corporate Capital Structure

EFI is a privately held Delaware corporation with three series of equity securities: (i) 53,000 issued shares of Series A Preferred Stock (the "**Preferred Shares**"); (ii) 4,730,229.48 issued shares of Class A Common stock (the "**Class A Shares**") and (iii) 503,328.56 issued shares of Class B Common stock (the "**Class B Shares**"). In addition there are 224,234.90 issued warrants to purchase Class A Shares. A total of 833,611 of the Class B Shares have been allocated under the Second Amended and Restated Eurofresh 2005 Long-Term Equity Incentive Plan (the "**2005 Incentive Plan**"). On a fully diluted basis, the prepetition common ownership of EFI was divided as follows: (i) approximately 30.38% owned by BRS Tomato Acquisition, LLC; [7] (ii) approximately 25.77% owned by Bank of America Capital Investors; (iii) approximately 22.60% owned by Bio Dynamics;[8] (iv) approximately 13.25% held as part of the 2005 Incentive Plan; (v) approximately 3.08% held by JB; and (vi) approximately 4.92% held by current or former managers of EFI. The Preferred Shares, Class A Shares and Class B Shares will be extinguished pursuant to the Plan.

EPL is a Delaware corporation, 100% of the common stock of which is owned by EFI.

### E.  Directors

Set forth below is a listing of the directors of EFI who have served during some or all of the Chapter 11 Cases, along with a brief biographical summary of the directors of EFI. The biographical summaries include each director's age, principal occupation and the year of commencement of their term as a director of EFI.

| Name | Biographical Summary |
| --- | --- |
| Dwight Ferguson | Dwight E. Ferguson, age 52, has been a director of EFI since 2004. Mr. Ferguson is currently the Chief Executive Officer and President of EFI. Prior to joining EFI, Mr. Ferguson was President, CEO and a director of Flrimax International BV. |

---

[7] BRS Tomato Acquisition, LLC is an Affiliate of New York based investment fund Bruckmann, Rosser, Sherrill & Co. II, L.P.

[8] Bio Dynamics is a Luxembourg entity Affiliated with JB.

| | |
|---|---|
| Johan van den Berg | Johan van den Berg, age 52, is EFI's founder and Chairman. He is the former Chief Executive Officer of EFI and owns 25.68% of the equity in EFI through Bio Dynamics. Mr. van den Berg's current term as a director began on December 27, 2001. |
| John Shimp | John Shimp, age 44, was appointed a director of EFI in 2005. Mr. Shimp is a Partner at Bank of America Capital Investors. |
| Travis Hain | Travis Hain, age 50, was appointed a director of EFI in 2005. Mr. Hain is the Managing Partner and one of the founders of Bank of America Capital Investors. |
| Scott Komar | Scott E. Komar, age 47, was appointed a director of EFI in 2008. Mr. Komar is currently the Vice President of Operations of Organicgirl, LLC and NewStar Fresh Foods, LLC, where he is responsible for agricultural operations, manufacturing, logistics, engineering, demand management, and forecasting. |

On May 5, 2009, the board of directors of EFI formed a special restructuring committee of the board of directors (the "**Special Committee**"). The Special Committee is empowered to review, analyze and direct EFI with respect to alternatives for restructuring EFI's debts and assets. In connection therewith, the Special Committee has reviewed and approved the Plan and related documents. The Special Committee also has the authority to evaluate any alternative transaction proposals. John Shimp, Travis Hain and Scott Komar are the members of the Special Committee.

### F. Executive Officers

Set forth below is a listing of each of the current executive officers of EFI (other than those previously described in Section II.E above), along with a brief biographical summary of executive officers for EFI. The biographical summary includes the name and age of each officer, their offices held and recent business experience.

| Name | Position | Biographical Summary |
|---|---|---|
| Dwight Ferguson | Chief Executive Officer/ President | See Above |
| Frank van Straalen | Executive Vice President of Operations | Frank van Straalen, age 48, was appointed Executive Vice President of Operations in 2008. Prior to that, he was EFI's Chief Financial Officer. |
| Mark Cassius | Vice President of Sales | Mark Cassius, age 44, was appointed Vice President of Sales in May of 2004. Prior to that, Cassius held numerous senior level sales and marketing positions for Del Monte Fresh Produce from 1994 to 2004. Mr. Cassius was Vice President of the Southwest Division for Del Monte Fresh based in Dallas, Texas. Mr. Cassius received a BS in Purchasing and Logistics Management from Arizona State University. |
| Brian McLaughlin | Chief Financial Officer | Brian McLaughlin, age 54, was appointed Chief Financial Officer in 2008. Prior to that, he was the CFO at Driscoll's Strawberry Associates form 2006 through 2007, and prior to that, CFO at Fresh Express Farms from 1996 to 2006, and a |

| | | Director at Fresh Express from 1988 to 2002. Mr. McLaughlin also spent roughly 20 years at First Interstate Bank in various corporate banking positions. |
|---|---|---|
| David Godfrey | Vice President of Human Resources | David P. Godfrey, age 53, was appointed Vice President, Human Resources in November, 2006. Prior to that he was Vice President, Human Resources for Chemtura Corporation based in Middlebury, CT from 2002 through 2005 where he was responsible for the global Human Resources function. He also spent more than 22 years with Millennium Chemicals, Inc. as Director, Human Resources – North and South America and other various senior level Human Resources positions |

### G.    Directors of Reorganized Eurofresh

Pursuant to the terms of the Plan, the Debtors anticipate that the identities of the directors of Reorganized Eurofresh, along with biographical summaries include each director's age, principal occupation and a description of any relationship between such director and the Debtors prior to the Petition Date, will be included in the Plan Supplement.

### H.    Employees

#### 1.    Union and Non-Union Employees

As of the Petition Date, EFI employed approximately 706 employees (collectively, the "**Employees**"). Of these Employees, approximately 146 are salaried and approximately 560 are hourly (the "**Hourly Employees**"). The Debtors also utilize approximately 286 individuals provided pursuant to a farm labor contractor service agreement between EFI and Pacheco Brothers Services (the "**Labor Contract**"). In addition, the Debtors utilize approximately 351 inmates pursuant to an inmate work contract (the "**Inmate Contract**") between EFI and the Arizona Department of Corrections (the "**ADC**"). Approximately 496 of the Hourly Employees are covered by a collective bargaining agreement (the "**CBA**") between the EFI and the United Food and Commercial Workers Union, Local 99. The Debtors anticipate that each of the Labor Contract, the Inmate Contract and the CBA will be assumed under the Plan.

#### 2.    Employee Benefit Plans

As of the Filing Date, EFI had the following material employee benefit plans in place, among others:

##### a.    *401(k) Plan*

EFI offers Employees not covered by the CBA the opportunity to participate in the a 401(k) plan (the "**401(k) Plan**"). EFI is the plan administrator under the 401(k) Plan, which is administered through Fidelity Management Trust Company ("**Fidelity**"). Fidelity serves as the trustee of the 401(k) Plan. EFI withholds Employee contributions during each pay period (the "**Employee Contributions**") and remits those Employee Contributions to Fidelity monthly. EFI matches the Employee Contributions by 100% up to the first three percent (3%) of the Employee's eligible compensation and by 50% up to the next two percent (2%) of the Employee's eligible compensation (the "**Matching Contributions**"). The Matching

Contribution is determined each pay period by each participant's contribution election. The participant contribution election can rage from 1% to 90% up to the maximum allowed by the Internal Revenue Service ("**IRS**") in any Plan year. However, EFI will only match up to first 5% of the participant's contribution election in the manner set forth above. Matching Contributions are remitted to Fidelity within five (5) days of the payroll cycle. Reorganized Eurofresh intends to continue the 401(k) Plan.

In October of 2008, EFI discovered that an error had been made by which EFI failed to either withhold Employee Contributions and to make Matching Contributions to the 401(k) Plan on account of bonuses paid to employees for tax years 2004 through 2008. EFI is currently in the process of working with the IRS to determine the exact amount that must be paid into the 401(k) Plan to correct this error (the "**401(k) Catch Up Payment**"). EFI has agreed with the Committee that, to the extent that EFI seeks to make the 401(k) Catch Up Payment prior to the Effective Date, EFI will seek authority of the Court before so doing.

b.   *Health and Welfare Benefits*

EFI provides all Employees who are not covered by the CBA with health insurance pursuant to a plan (the "**Health Insurance Plan**") that is fully self-funded by EFI and administered through BlueCross BlueShield of Arizona ("**BCBSAZ**"). EFI is obligated to satisfy all claims arising under the Health Insurance Plan, up to $75,000 per eligible participant per contract year, pursuant to a stop-loss agreement between EFI and BCBSAZ. The aggregate stop-loss coverage (the "**Aggregate Stop-Loss**") is calculated by multiplying anticipated claims for all eligible participants in any given month by 110%. Reorganized Eurofresh anticipates assuming its contract with BCBSAZ under the Plan.

Pursuant to the CBA, EFI is obligated to make contributions to Plan 501-D of the UFCW and Employers Arizona Health and Welfare Trust (the "**CBA Health Insurance Plan**"), through which employees subject to the CBA receive health insurance. Under the terms of the CBA, EFI makes monthly contributions to the CBA Health Insurance Plan of $233.06 per eligible employee covered by the CBA, or $120,000 in the aggregate. Effective November 1, 2009, the Debtors will make a monthly contribution to the CBA Health Insurance Plan of $256.37 per eligible employee covered by the CBA, or $131,000 in the aggregate.

As part of the assumption of the CBA, Reorganized Eurofresh will continue to contribute to the CBA Health Insurance Plan.

## III.  EVENTS LEADING UP TO THE CHAPTER 11 FILINGS

No single event led the Debtors to seek relief under Chapter 11 of the Bankruptcy Code. Rather, the Debtors have experienced several events and circumstances that, when combined with the fact that the Debtors are significantly over-leveraged, have made reorganization of the Debtors' capital structure through the Chapter 11 process necessary.

### A.   <u>Excessive Leverage</u>

The Recapitalization undertaken by the Debtors in 2005 left the Debtors with a significant amount of debt and little margin for error in executing the Debtors' business plan. As

part of the Recapitalization, the Debtors assumed $60 million in new secured debt and approximately $214.15 million in funded unsecured debt. Some of this new debt allowed the Debtors to expand their operations, with production capacity growing from 220 acres in 2005 to 318 acres in 2008, resulting in an increase in greenhouse-related revenues from $114.6 million to $148.7 million. Unfortunately, the amount of debt incurred by the Debtors following the Recapitalization could not be sustained by the Debtors' operations, particularly following the financial impact of the diseases, infestations and labor shortages described below.

The Debtors failed to make an interest payment on the Senior Notes on January 15, 2009. The Senior Note Indenture provides for a grace period of 30 days with regard to the payment of any Interest Payment before the failure to make such Interest Payment constitutes an Event of Default. The Senior Note Indenture also provides that a majority in aggregate principal amount of the then-outstanding Senior Notes may direct the enforcement of any remedies under the Senior Note Indenture. On February 13, 2009, holders of a majority of the Senior Notes entered into a forbearance agreement (the "**Noteholder Forbearance**") pursuant to which these noteholders agreed to forbear from directing the Senior Note Indenture Trustee to exercise any of the remedies provided for under the Senior Note Indenture upon an event of default until March 18, 2009. On March 18, 2009, the Noteholder Forbearance was extended through April 17, 2009.

On March 31, 2009, the Debtors failed to make a scheduled interest payment under the Existing Credit Agreement in the amount of approximately $1,626,583.33 as well as commitment fees related to the Revolving Loan totaling approximately $10,272.76 and letter of credit fees related to the L/C Subfacility totaling approximately $17,191.47. The failure to pay these amounts constituted an Event of Default under the Existing Credit Agreement. Various non-monetary defaults related to the Debtors' financial performance also existed under the Existing Credit Agreement. Also on March 31, 2009, the Debtors failed to make a scheduled payment under the Capital Lease comprised of approximately $449,933.44 in Variable Rent and approximately $168,500 in Fixed Rent. As a result of these defaults under the Existing Credit Agreement and Capital Lease, on April 1, 2009, the Debtors entered into a forbearance agreement (the "**SP Forbearance Agreement**") with SP and the Existing Lenders whereby SP, with the consent of the Existing Lenders, would forbear from exercising its remedies under the Existing Credit Agreement or Capital Lease until April 15, 2009.

## B.    Diseases and Infestations

Tomatoes grown in greenhouses are particularly prone to certain types of disease and infestation.  **These diseases and infestation present no risk to humans**.  Rather, the diseases generally cause damage to either the tomato plant or fruit that either causes the plant to die, causes the fruit to whither, stunts the growth of the fruit or makes the fruit unsightly and unsellable.

In 2006, EFI began seeing crops with significant infections of clavibacter michiganensis subsp. michiganensis, or CMM, a type of bacterial canker that attacks primarily the fruit of the tomato plant, resulting in small dark spots on the fruit surrounded by a white halo and yellowing or browning on the inside of the fruit. EFI estimates that the presence of CMM in its greenhouses resulted in a crop loss of 3.1 million pounds, 2.6 million pounds and 2.1 million pounds of fruit in 2006, 2007 and 2008, respectively, and lost revenue of $3.1 million, $2.6

million and $2.2 million in 2006, 2007 and 2008 respectively. EFI believes that it has largely contained the spread of CMM in its greenhouses through a program of continuous scouting, controlled labor movement and removal of infected plants.

During the second quarter of 2007, EFI experienced an outbreak of whitefly, an insect that feeds on the leaves and fruit of the tomato plant, resulting in withering of the plant and destruction of the fruit and making the plant more susceptible to other diseases. The result of the whitefly infestation was a crop loss of 5 million pounds of fruit and lost revenue in 2007 of approximately $5 million. However, EFI believes that it has contained the whitefly infestation primarily through improved utilization of a natural predator program using wasps.

Also during the second quarter of 2007, EFI experienced its first major outbreak of tomato chlorotic dwarf viroid (TCDVd), or "viroid." Viroid is a plant pathogen similar to a prion and smaller than a virus that is distinguishable from a virus by its lack of any protein coating. Viroids are the smallest "organisms" known to cause plant diseases. The viroid uses the nucleolus of the plant cell to replicate and then spreads from plant cell to plant cell, accumulating in the cells of the plant. Within three to six weeks of infection, the infection results in yellowing of the leaves of the tomato plant and progresses to stunted growth and eventually plant death. Once detected, the plant must be removed. The viroid first appeared in Canada in 1996 and has been discovered in numerous tomato greenhouses in North America and Holland. Very little is known about the pathology of the viroid, particularly the factors leading to the presentment of the disease in tomato plants, and there are only a handful of pathologists spending significant time studying the viroid. However, it is known that viroid is easily transmitted by contact with contaminated pruning tools, equipment, clothing and neighboring plants. The only effective method for eradicating the viroid from an infected greenhouse is to clear the greenhouse of all plants and sanitize the greenhouse.

Historically EFI has maintained an edge over its competitors by "interplanting" their tomato crops, or planting a new crop alongside an old crop approximately eight weeks before the life-cycle of an old crop is about to end. Interplanting allowed EFI to avoid the lag between crop life cycles. However, EFI has been forced to scale back interplanting due to the viroid, as viroid spreads easily from one plant to another and interplanting places older plants in close contact with younger plants. The loss of fruit due to viroid, delayed planting and delayed productivity due to cleanouts as well as the inability to interplant 100% of crops has resulted in significant loss of production and increased costs. EFI estimates that in 2007, viroid resulted in a loss of 6.3 million pounds of fruit and $6.2 million in revenues and that in 2008, viroid resulted in a loss of 24.5 million pounds of fruit and $26.2 million in revenues.

EFI estimates that the combined effects of CMM, whitefly and viroid reduced operating profit by $2.6 million in 2006, $11.2 million in 2007 and $23.6 million in 2008.

C.      **Labor Shortages**

EFI has faced significant challenges in obtaining sufficient labor, particularly at the Willcox Facility, due to its relative remoteness. EFI has, in the past, relied on guest workers in the United States pursuant to H2A visas, as well as labor contractors, and also experimented with a program of busing refugees from Tucson, Arizona to the Willcox Facility in 2007. EFI began

to experience a labor shortage in 2006 and 2007 as changes in immigration policy made it more difficult for the Debtors to retain their legal immigrant labor pool as the pool of illegal immigrant labor in the area surrounding the Facilities shrank, creating higher overall demand for legal immigrant labor. This labor shortage has, in the past, caused serious disruption to EFI's ability to harvest its crops, plant new crops and combat various diseases that have attacked the crops. Between 2005 and 2008, pounds produced per greenhouse hour declined from 147.6 to 93.1 - a decline of almost 37% - while labor cost per pound produced increased from approximately 13 cents to 18.5 cents - an increase of almost 30%.

By increasing its use of inmates and finding a larger and more reliable provider of contract labor, EFI believes that it is beginning to better control labor costs, increase productivity and contain plant diseases.

Since July of 2006, EFI has been the subject an ongoing investigation by U.S. Immigration and Customs Enforcement ("**ICE**") and the U.S. Department of Justice ("**DOJ**") over EFI's alleged employment of unauthorized workers. EFI, ICE and the DOJ have engaged in extensive negotiations regarding the liability, if any, of EFI arising as a result of these allegations. Those negotiations are ongoing.

EFI is also currently the subject of an investigation by the U.S. Department of Labor (the "**DOL**"). For a period of time EFI relied upon a mix of both H-2A guest workers and contract labor to overcome labor shortages, particularly at the Willcox Facility. EFI was informed that the DOL was investigating whether EFI violated the restrictions of the H-2A program under 8 U.S.C. § 1188 et seq. by (a) giving preferential treatment to H-2A workers over U.S. workers, (b) failing to honor the 3/4 guarantee of providing work or pay, (c) taking illegal deductions from workers that were not specified in the H-2A paperwork submitted by EFI, (d) not providing employees with a copy of the contract, and (e) illegally terminating the employment of U.S. workers without notifying the State Workforce Agency. The DOL alleges that it will have a General Unsecured Claim of $4,664,644.46 million for back wages, an Other Priority Claim of $1,523,631 for back wages, and a $245,000 claim for civil money penalties. For numerous and various reasons, EFI believes that the DOL's interpretation of the law is mistaken and that the DOL will have a General Unsecured Claim of not more than $206,000 for back wages. On or about July 23, 2009, the Debtors filed their "Motion for Estimation of Claim of the Department of Labor Pursuant to 11 U.S.C. § 502(c)(1)" (the "**Estimation Motion**") in order to estimate the amount of the DOL claim for purposes of voting and distribution under the Plan. The Debtors note in their Estimation Motion that, to the extent the DOL claim is allowed as General Unsecured Claim, the size of that claim could significantly alter the amount of Cash the Debtors must contribute to the General Unsecured Claim Fund to meet the anticipated dividend of 5% and therefore could threaten the Debtors' ability to confirm this Plan.

## IV.  SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASES

### A.  <u>Commencement of the Bankruptcy Cases</u>

On April 21, 2009, in furtherance of their restructuring efforts, the Debtors filed the Chapter 11 Cases. The Chapter 11 Cases were assigned to the Honorable Charles G. Case II, United States Bankruptcy Judge for the District of Arizona. Since the Filing Date, the Debtors

have continued to operate their businesses and manage their properties as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code. No trustee has been appointed in the Chapter 11 Cases.

## B.     First-Day Orders

Shortly after the Petition Date, the Bankruptcy Court entered several orders authorizing the Debtors to pay various pre-petition claims and granting other relief necessary to help the Debtors stabilize day-to-day business operations. These orders were designed to allow the Debtors to continue business operations with minimum disruptions and dislocations, and to ease the strain on the Debtors' relationships with employees and other parties. Included among the orders entered by the Bankruptcy Court were orders authorizing the Debtors to: (a) pay wages, salaries, employment taxes, employee benefit payments, and workers compensation payments; (b) maintain certain bank accounts, cash management systems and business forms; (c) ensure continued utility service; (d) pay the pre-petition claims of certain essential trade vendors; (e) continue to employ, in the ordinary course of its business, certain attorneys, accountants, consultants and other professionals; and (f) utilize the cash collateral of the Existing Lenders.

## C.     Retention of Professionals

Shortly after the Filing Date, the Bankruptcy Court entered orders authorizing the Debtors to retain: (a) Squire, Sanders & Dempsey L.L.P. as bankruptcy and reorganization counsel; (b) Alvarez & Marsal North America, LLC ("**A&M-NA**") as financial advisor; (c) Mooney, Wright & Moore PLLC as special real property tax counsel; and (d) Kurtzman Carson Consultants, LLC as claims, noticing and balloting agent. The Debtors also sought to retain Alvarez and Marsal Securities, LLC ("**A&M-S**") as investment banker, and on June 19, 2009 filed an amended application for its retention that provided for, inter alia, a lower monthly fee, modifications to the transaction and success fees, elimination of the alternative dispute resolution procedures and modification of the indemnification provisions. The Committee objected to the retention of A&M-S on the amended terms, but the Committee and the Debtors agreed to the terms for A&M-S' retention. On July 28, 2009, the Court overruled the objection of Silver Point Finance, LLC and authorized the Debtors to retain A&M-S.

## D.     Official Committee of Unsecured Creditors

On May 1, 2009, the United States Trustee appointed the Committee representing the unsecured creditors of the Debtors. The current members of the Committee are listed below, and include the Debtors two largest trade creditors:

| | |
|---|---|
| U.S. Bank Association,<br>Indenture Trustee for 11½% Senior Notes<br>Attn:  Diana Jacobs<br>PD-WA-T7CT<br>1420 5th Ave., 7th Floor<br>Seattle, WA 98101 | Apollo Investment Corporation<br>Attn: Gerald Girardi<br>9 W. 57th Street, 37th Floor<br>New York, NY 10019 |

| | |
|---|---|
| Barclays Bank PLC<br>Attn: Holly Kim<br>1620 26th Street, #2000N<br>Santa Monica, CA 90404<br>**Committee Chair** | John Christner Trucking<br>Attn: Daniel Christner<br>P.O. Box 1900<br>Sapulpa, OK 74067 |
| Southwest Gas Corporation<br>Attn: Randy Gabe<br>LVB-106<br>P.O. Box 98510<br>Las Vegas, NV 89193-8510 | |

Pursuant to orders entered by the Bankruptcy Court on May 26, 2009, the Committee retained Stutman, Treister & Glatt P.C. ("**Stutman**") as counsel, and Lewis & Roca L.L.P. as co-counsel. Stutman, Treister & Glatt P.C. also served as counsel to certain Holders of Senior Notes prior to the Petition Date, including Barclays Bank PLC and Apollo Investment Corporation. During a prior revision of the Plan, at the request of the Committee, the Debtors increased the Distribution to Class 3 General Unsecured Claims from $75,000 on a pro rata basis to a fixed 5% distribution for all Class 3 Claimants in order to provide for fair treatment to Class 3 Claimants as against Class 4 Claimants. With this revision, the Committee now unanimously supports confirmation of the Plan.

On July 6, 2009, the Court entered an order authorizing the *Motion of Official Committee of Unsecured Creditors of Eurofresh, Inc. and Eurofresh Produce, Ltd. Pursuant to 11 U.S.C. 105(a), 107(b), 1102(b)(3)(A) and 1103(c) Clarifying Requirement to Provide Access to Confidential or Privileged Information of the Debtors*, which sets forth the standards for providing confidential or privileged information about the Debtors to the Debtors' unsecured creditors.

Barclays Bank PLC ("**Barclays**") and Apollo Investment Corporation ("**Apollo**") are parties to the Amended and Restated Investment and Plan Support Agreement, and Barclay's would be the largest of the Investing Noteholders under that agreement. However, Apollo is not a New Investor under that Agreement and will not be participating in the New Money Investment. In addition, Stutman served as counsel to Barclays and Apollo in negotiating the terms of the original investment agreement and, based upon a review of Stutman's fee statements in these cases, Stutman, while serving as Committee counsel, has devoted material amounts of time to the Amended and Restated Investment and Plan Support Agreement, as well as to the Plan, the Disclosure Statement and other documents relating to or described in the Plan.

SP alleges that the interests of Barclays and Apollo as parties to the Amended and Restated Investment and Plan Support Agreement may not be aligned with the interests of the general unsecured creditor body that the Committee is charged with representing. In addition, SP alleges that Stutman's role as Committee counsel may conflict with duties and obligations arising from its relationships with Barclays, Apollo and the other parties to the Amended and Restated Investment and Plan Support Agreement. While the Debtors and the Committee disagree with all such characterizations, SP further asserts that these alleged potential conflicts of interest may be proven to have tainted the plan confirmation process. The Debtors believe that

SP will likely object to confirmation of the Plan on the grounds that the Plan has not been proposed in good faith as required under Bankruptcy Code section 1129(a)(3). The Debtors and the Committee do not believe that such an objection is valid.

E.      **Cash Collateral**

Section 363 of the Bankruptcy Code provides that a debtor must either obtain the consent of any party asserting an interest in the debtor's cash (the "**Cash Collateral**") or seek an order of the Bankruptcy Court authorizing the use of such Cash Collateral over the objection of such parties. On the Petition Date, the Debtors filed a motion (the "**Cash Collateral Motion**") pursuant to section 363 of the Bankruptcy Code seeking entry of an order (the "**Cash Collateral Order**") agreed upon between the Debtors and the Existing Lenders allowing the Debtors to continue using the Existing Lenders' Cash Collateral to fund the Debtors' operations.

Pursuant to the Cash Collateral Order, the Debtors acknowledged their indebtedness to the Existing Lenders in the amount of $54,490,855 plus accrued interest, fees and other charges with regard to the Existing Credit Agreement and in the amount of $14,494,500 for Fixed Rent (as defined in the Cash Collateral Order) and $536,006.90 for Variable Rent (as defined in the Cash Collateral Order) plus accrued interest, fees, costs and other charges with regard to the Capital Lease. By the Cash Collateral Order, the Debtors also acknowledged the extent, priority and validity of the Existing Lenders' Liens (the "**Existing Liens**") on the Debtors' assets pursuant to the pre-petition security agreements related to the Existing Credit Agreement and Capital Lease. The right of the Debtors, the Committee and any other party in interest to challenge the Existing Liens was preserved for ninety days following the appointment of the Committee. The Bankruptcy Court entered an interim Cash Collateral Order on April 24, 2009 that provided for the use of Cash Collateral through May, a second interim Cash Collateral Order on May 28, 2009 that provided for the use of Cash Collateral through July 6, 2009, and a third interim Cash Collateral Order on July 9, 2009 that provided for the use of Cash Collateral through August 11, 2009. On August 4, 2009 the Debtors filed a second renewed motion for the continued interim use of Cash Collateral through September 27, 2009. On or about August 11, 2009, the Bankruptcy Court approved the second renewed motion.

As adequate protection against diminution in the value of the Cash Collateral, the Debtors agreed to provide the Existing Lenders with replacement liens on all of the Debtors' assets, a super-priority claim pursuant to section 507(b) of the Bankruptcy Code to the extent of any diminution in the value of the Existing Lenders' collateral and weekly adequate protection payments equal to the amount of interest accrued on the obligations outstanding under the Existing Credit Agreement and the Capital Lease totaling approximately $160,000 per week.

F.      **Schedules and Statements of Financial Affairs**

Bankruptcy Rule 1007 requires a debtor in a voluntary chapter 11 case to file its Schedules and Statements of Financial Affairs ("**SOFAs**") by no later than 15 days after the date it files its petition for relief, unless the Bankruptcy Court grants an extension of that deadline. The Schedules and SOFAs set forth the assets, liabilities and other financial data of each Debtor, as reflected in its accounting records on the Petition Date.

- 27 -

On April 24, 2009, the Bankruptcy Court entered an order extending the date by which the Debtors were required to file their Schedules and SOFAs by an additional 15 days, to May 21, 2009. The Debtors filed their Schedules and SOFAs on May 21, 2009, Docket No. 115.

## G.    The Claims Bar Date

By order entered May 28, 2009, the Bankruptcy Court entered an order fixing July 6, 2009 (the "**Bar Date**") as the deadline for all entities except government entities to file proofs of claim against the Debtors, including all claims arising under section 503(b)(9) of the Bankruptcy Code. Pursuant to section 502(b)(9) of the Bankruptcy Code, the bar date for government entities is October 18, 2009 (the "**Government Bar Date**"). Notice of the Bar Date and Government Bar Date was made by publication and sent by mail to every person and entity that (i) was listed as a creditor of the Debtors in the books and records, or (ii) to the Debtors' knowledge, had had any business relationship with the Debtors before the Petition Date, regardless of whether such person or entity was listed as a creditor in the Debtors' books and records. Creditors were not required to file a proof of claim if they were listed in the Schedules as having a Claim against the Debtors and (i) that Claim was not designated as "contingent," "unliquidated," "disputed" or "undetermined;" and (ii) the creditor did not dispute the scheduled Claim amount or priority. Holders of Interests in the Debtors that did not assert a Claim against the Debtors were not required to file a proof of claim. A creditor that was required to file a proof of claim, and that failed to do so by the Bar Date or Government Bar Date, is barred from voting on the Plan and participating in distributions under the Plan.

## H.    Employee Matters

### 1.    Payment of Certain Pre-Petition Obligations to Employees

Pursuant to the *Order: (A) Authorizing the Debtors to Continue to Pay and Honor Certain Prepetition Claims for (I) Wages, Salaries and Other Compensation, (II)Withholdings and Deductions and (III) Reimbursable Employee Expenses; (B) Authorizing the Debtors to Continue to Provide Employee Benefits in the Ordinary Course of Business; (C) Authorizing the Debtors to Pay All Related Costs and Expenses; (D) Authorizing the Debtors to Satisfy Certain Obligations Under Contracts by which the Debtors Obtain Labor; and (E) Directing Banks to Receive, Honor and Pay All Checks and Electronic Payment Requests Related to the Foregoing* Docket No. [186], entered by the Bankruptcy Court on June 3, 2009 (the "**Employee Compensation Order**"), the Bankruptcy Court authorized the Debtors to pay certain pre-petition obligations owed to the Employees arising from (i) wages, salaries, and compensation expenses, (ii) 401(k) contributions, (iii) health and welfare benefits, (iv) vacation benefits, (v) business expense reimbursement plans, and (vi) miscellaneous payroll deductions. The Employee Compensation Order also allowed the Debtors to pay pre-petition amounts arising under the Inmate Contract and Labor Contract.

### 2.    Key Employee Retention Plan

Pursuant to the *Order Approving Key Employee Retention Plan for Non-Insider Employees of the Debtors and Certain Related Relief* Docket No. 171, entered by the Bankruptcy Court on May 28, 2009 (the "**KERP Order**"), the Bankruptcy Court approved the

- 28 -

payment of bonuses to certain critical employees upon confirmation of the Plan of between 5% and 6.67% of such employee's annual compensation. The maximum amount payable under the KERP Order would be $147,870. The critical employees do not include any executives or insiders of the Debtors.

## I.     Payment of Essential Vendors and PACA Claims

On the Petition Date, the Debtors filed a *Motion for Interim and Final Orders: (A) Authorizing, but not Directing, the Debtors to Pay Pre-Petition Claims of Essential Vendors and PACA Claimants and (B) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Claims* (the "**Essential Vendor/PACA Motion**"). The relief requested by the Essential Vendor/PACA Motion was granted by two separate orders entered by the Bankruptcy Court on May 28, 2009.

Pursuant to the *Order (A) Authorizing the Debtor to Pay Pre-Petition Claims of Essential Vendors; and (B) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Claims*, Docket No. 151, the Debtors were authorized to pay up to $2.75 million on account of the prepetition Claims of certain vendors deemed "Essential Vendors" pursuant to certain procedures (the "**Essential Vendor Procedures**"). Pursuant to this order and the Essential Vendor Procedures, the Debtors have paid approximately $1.55 million to Essential Vendors, thereby reducing the amount of General Unsecured Claims by that amount.

Pursuant to the *Order (A) Authorizing the Debtor to Pay Pre-Petition PACA Claims; and (B) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Claims*, Docket No. 152, the Debtors were authorized to pay Claims arising under the Perishable Agricultural Commodities Act ("**PACA**"). PACA imposes a trust on perishable commodities sold within the United States and the proceeds from those commodities. As such, neither the commodities nor their proceeds are part of the bankruptcy estate that arises upon the filing of a bankruptcy petition. Pursuant to this order, the Debtors have paid $1.7 million to holders of pre-petition Claims arising under PACA.

## J.     Dispute and Negotiation with Southwest Gas Corporation

EFI is a party to two contracts with Southwest Gas Corporation ("SWG"). Under one contract (the "Supply Agreement"), the Debtors purchase gas from SWG for the Willcox Facility. Under the other contract (the "Pipeline Agreement"), the Debtors have posted security in the form of a letter of credit (the "Letter of Credit") intended to ensure that a minimum amount of gas is transported through a pipeline built by SWG to the Willcox Facility. The Letter of Credit currently has a face amount of $1,940,855.00, with the face amount declining each year according to a schedule attached to the Pipeline Agreement.

Among the first day motions filed by the Debtors was a motion (the "Utility Motion") to establish procedures for the determination of adequate assurance deposits required to be provided to utilities pursuant to § 366 of the Bankruptcy Code. The Debtors proposed providing SWG with a deposit of $431,769.80. SWG responded, stating that it was entitled to an additional deposit. In addition to the disparity between the Debtors' adequate assurance deposit proposal and SWG's demand, numerous other disputed issues exist between the Debtors and SWG,

including (i) the potential application of any proceeds from the Letter of Credit; (ii) the Debtors' assumption or rejection of the Supply Agreement and the Pipeline Agreement; and (iii) SWG's termination of the Supply Agreement. On June 23, 2009, the Debtors and SWG filed the *Notice of Filing of Adequate Assurance Agreement with Southwest Gas Corporation and of Agreement to Defer Issues Relating to Assumption of Southwest Gas Agreements*, whereby the parties resolved their differences regarding the adequate assurance deposit. As of the date of this Disclosure Statement, the Debtors and SWG are engaged in negotiations intended to address the disputed issues between the parties and hope to enter into a memorandum of understanding regarding the Supply Agreement and the Pipeline Agreement. However, there can be no assurance that any agreement will be reached.

### K. The IPSA and the Plan Process

1. Execution of the IPSA and Effect of JB Participation in the New Money Investment

Pursuant to the IPSA, JB and the IPSA Holders (as defined in the IPSA) have agreed to support the confirmation of the Plan, subject to certain *conditions* as further described under the IPSA. JB is Johan van den Berg, the founder and a current 29.62% shareholder of EFI. JB is also chairman of the board of directors of EFI and a consultant to EFI. JB, through his Affiliated entity, Bio Dynamics, will contribute the Bio Dynamics Purchase Price (as defined in the IPSA) as part of the New Money Investment. The IPSA Holders are comprised of Barclays Bank PLC, Scoggin Capital Management, JP Morgan Investment Management, Credit Suisse Alternative Capital, Inc., and Apollo Investment Corporation. Barclays Bank PLC and Apollo Investment Corporation are members of the Committee and Barclays Bank PLC is the chair of the Committee. Barclays Bank PLC's Initial Percentage (as defined in the IPSA) of the Investing Noteholder Investment (as defined in the IPSA) is 46.4%. Apollo Investment Corporation is not participating in the Investing Noteholder Investment.

SP has repeatedly alleged that, because Mr. van den Berg and the IPSA Holders will be participating in the New Money Investment, the plan is a so-called "new value" plan under the United States Supreme Court's decision in *Bank of America Nat'l Trust & Savings Ass'n v. 203 N. LaSalle St. P'shp*, 526 U.S. 434 (1999) and, therefore the Amended Plan cannot be confirmed. The *LaSalle* decision held that, where a debtor sought to "cram-down" a plan on a dissenting unsecured creditor class and that plan provided the exclusive right to pre-petition interest holders of the debtor to acquire interests in the reorganized debtor, the plan could not satisfy the requirements of 1129(b)(2)(B)(ii). Section 1129(b)(2)(B)(ii), the so-called "absolute priority rule" provides that junior claim or interest holders cannot retain an interest in the debtor on account of those pre-petition claims or interests if senior unsecured claims are not satisfied in full.

First, the Debtors do not believe that SP is in a position to raise a *LaSalle* objection to the Plan because SP is fully secured and the Amended Plan satisfies the requirements of § 1129(b)(2)(A) by providing that SP will retain its liens in the Debtors' assets and that SP will receive deferred cash payments in the full value of its Claims should SP Reject the Amended Plan. Only a dissenting class of unsecured claims is entitled the protections afforded by § 1129(b)(2)(B) of the Bankruptcy Code.

Second, the Debtors disagree with the proposition that *LaSalle* applies to the Amended Plan at all because neither Mr. van den Berg nor the IPSA Holders possess an exclusive right to acquire an equity interest in Reorganized Eurofresh. Indeed, under the Amended Plan and IPSA (a) the right to acquire equity interests in Reorganized Eurofresh through participation in the New Money Investment has been provided to all Holders of Senior Notes, and (b) under the IPSA, the Debtors are expressly authorized to consider—and have already considered—competing proposals from potential alternative plan sponsors holding no Claims or Interests in the Debtors.

Finally, even if the Plan is a "new value" plan, the Ninth Circuit has long recognized the so-called "new value corollary," which provides that an existing junior claim or equity interest holder may obtain an interest in the reorganized debtor if those holders contribute money or money's worth equivalent to the value of the interests obtained and that capital contribution is necessary to the successful reorganization of the debtor. In such cases, the interest in the reorganized debtor obtained by the junior claim or interest holder is not on account of such junior claim or interest, but on account of the money invested. *See In re Bonner Mall P'shp*, 2 F.3d 899, 910-16 (9th Cir. 1993). The Bankruptcy Court, among other courts, has held that the debtor can satisfy the requirement of showing that the interest in the reorganized debtor are being acquired at the "value" of those interests by **either** allowing for the right for third parties to bid for equity in the reorganized debtor under the plan **or** allowing third parties to propose competing plans of reorganize. *See In re Davis*, 262 B.R. 791, 799 (Bankr. D. Ariz. 2001).

Through the efforts of A&M-S, the Debtors believe that they have conducted a process designed to obtain alternative competing offers to acquire the equity of Reorganized Eurofresh. The results have been a significant improvement in the offer provided by JB and the IPSA Holders as evidenced by the Amended Plan. Therefore, the Debtors believe that—even if *LaSalle* applies to the Amended Plan—the requirements of the "new value corollary" have been satisfied and the Amended Plan may be confirmed.

SP disagrees with this analysis and the Debtors believe that SP may challenge whether the Debtors' marketing process was undertaken in good faith or in a manner that satisfies the "market test" required by *LaSalle* and its progeny. SP asserts that discovery will show that the process was insufficient to adequately test the market for the Debtors' business, that the parties who expressed interest in the business were not provided sufficient access or time to fully pursue their interest, and were placed under artificial time constraints and given inaccurate information that discouraged their pursuit of an investment opportunity in the Debtors' business. The Debtors and the Committee wholly disagree with SP's characterization of the Debtors' marketing efforts.

2.    The Special Committee and Other Potential Investors

On May 5, 2009, the board of directors of EFI formed the Special Committee to review, analyze and direct EFI with respect to alternatives for restructuring EFI's debts and assets. In connection therewith, the Special Committee has reviewed and approved the Plan, the IPSA, this Disclosure Statement and related documents. The Special Committee also has the authority to evaluate any alternative transaction proposals. The Special Committee is comprised entirely of

- 31 -

independent directors. John Shimp, Travis Hain and Scott Komar are the members of the Special Committee.

Prior to the Debtors entering into the IPSA, the Special Committee directed A&M-S to solicit alternative transaction proposals. The IPSA contains a "window shop" provision whereby the Special Committee is permitted to enter into discussions with any Person that presents a bona fide alternative transaction proposal. The IPSA also provides a "fiduciary out" for the Special Committee to terminate the IPSA, without penalty, in the event it determines in good faith that approval of such an alternative transaction is required for the board of directors of EFI to comply with its fiduciary duties.

Subsequent to the Debtors filing of the original Plan, IPSA and Disclosure Statement on June 12, 2009, the Special Committee received, reviewed and analyzed two competing offers to the Plan. The first such offer was submitted by a private equity firm on June 23, 2009. This proposal provided for a $32.5 million new money investment in EFI, with $17.5 million going to pay down the Existing Credit Facility and $15.0 million to be used as working capital for Reorganized Eurofresh. The proposal was non-binding and subject to a diligence contingency. The second proposal was submitted on June 30, 2009 by a strategic buyer in association with a private capital source. The proposal provided for a total new money investment of $33.0 million, with $17.0 million going to pay down the Existing Credit Facility, $10.0 million in equity securities to the Senior Noteholders, and $6.0 million to be used as working capital for Reorganized Eurofresh. The proposal was non-binding and subject to a diligence contingency, and the parties were unable to agree on an acceptable confidentiality agreement regarding the Debtors' privileged and confidential proprietary information. Confidentiality obligations prevent the Debtors from disclosing the actual identity of the parties to such proposals.

The Special Committee reviewed and analyzed both of the competing proposals and directed A&M-S to negotiate with each of the two new bidders and with JB and the Investing Noteholders in order to obtain the best possible proposal for the Debtors and their creditors. As a result, JB and the Investing Noteholders agreed to increase the amount of the New Money Investment from the $12.5 million set forth in the original Plan and IPSA to the $45.0 million reflected in the Plan, IPSA and this Disclosure Statement. The other two bidders declined to increase their respective offers in response to the increased JB/Investing Noteholder offer and after significant consideration the Special Committee determined that the increased JB/Investing Noteholder offer was in the best interests of the Debtors and their creditors. SP alleges that discovery may show that the other two bidders may have been placed under artificial and unnecessarily abbreviated time deadlines and provided with inaccurate and/or misleading information that had the effect of discouraging their interest in further developing their proposals. SP further asserts that, given full and fair access and a reasonable timeline, the interested parties may well have submitted higher and better proposals than the JB/Investing Noteholder offer.

On July 31, 2009, Silver Point Finance, LLC ("**Silver Point**") provided the Debtors with a term sheet for a plan of reorganization that SP would support. The Debtors immediately provided the term sheet to the Special Committee and after a meeting of the Special Committee, responded to Silver Point by indicating the specific adjustments to the term sheet that would have to made in order for the Debtors to consider the Silver Point offer a higher and better offer

than the current deal with the Investing Noteholders and JB. The Debtors received a revised term sheet on August 5, 2009, and the Special Committee again immediately reviewed the revised proposal. The Debtors made an additional request to Silver Point to align the term sheet with the Debtors' requirements for a higher and better offer, and upon Silver Point's failure to do so, the Debtors determined to proceed with the deal with the Investing Noteholders and JB. In the meantime, the Investing Noteholders and JB further enhanced their proposal so that, as set forth in the Plan, the Debtors will have access to $15 million in working capital as opposed to $10 million.

## L.    The 11 U.S.C. § 505 Proceeding

On June 23, 2009, the Debtors filed their *Complaint for (I) Determination of Tax Liability Pursuant to 11 U.S.C. § 505 and (II) Determination of Amount, Priority or Validity of Related Tax Claims and Alleged Liens* with regard to its property located in Graham County, Arizona. An answer is due from Graham County on or before July 24, 2009. The Debtors believe that the assessed value of their property located in Graham County is too high, and further believe that significant amounts of personal property have incorrectly been characterized as real property. At the time of the filing of this Disclosure Statement, there is no indication regarding the outcome of this litigation. Graham County asserts that they hold a Miscellaneous Secured Claim on account of real property taxes owed by the Debtors; the Debtors' dispute whether Graham County has any Claim against the Debtors. On July 24, 2009, Graham County filed its answer and a motion for dismissal or abstention by the Bankruptcy Court. The Debtors filed their response to Graham County's motion on or about August 7, 2009. As of the time of this disclosure statement, no decision had been issued on Graham County's motion.

## M.    The Motion of WFF With Regard to the Capital Lease

On June 15, 2009, WFF filed the *Motion for Order Pursuant to Fed. R. Bankr. P. Rule 3001(e)(3)(I) Designating WFF as the Transferee of the Capital Lease Claim; and (II) Authorizing WFF to Exercise All Voting Rights and Otherwise Participate as the Transferee of the Capital Lease Claim*. On July 9, 2009, Silver Point Finance, LLC and SP Eurofresh, LLC objected to the motion. On or about July 31, 2009, the Bankruptcy Court granted the motion and as a result, WFF is the only claimant entitled to vote any Class 1B Claims.

## V.  DESCRIPTION OF THE REORGANIZATION PLAN

## A.    Overview of the Plan

A copy of the Plan accompanies this Disclosure Statement as <u>Exhibit A</u>. The following is a summary of the material provisions of the Plan. This summary is qualified in its entirety by the specific provisions of the Plan, including the Plan's definitions of certain terms used below, and any conflict between this summary and the terms of the Plan will be resolved in favor of the Plan.

### 1.    Brief Explanation of Chapter 11 Reorganization

Chapter 11 of the Bankruptcy Code is the principal reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the

benefit of itself and its creditors and equity holders. Confirmation of a plan of reorganization is the principal objective of a chapter 11 case.

In general, a chapter 11 plan of reorganization (a) divides claims and interests into separate classes, (b) specifies the property that each class is to receive under the plan, and (c) contains other provisions necessary to the reorganization of the debtor. A chapter 11 plan may specify that certain classes of claims or interests are either to be paid in full upon the effective date of the plan, reinstated, or their legal, equitable and contractual rights are to remain unchanged by the reorganization effectuated by the plan. Such classes are referred to under the Bankruptcy Code as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the holders of claims or interest in such classes. A chapter 11 plan also may specify that certain classes will not receive any distribution of property. Such classes are deemed to reject the plan.

All other classes of claims and interests contain "impaired" claims and interests entitled to vote on the plan. As a condition to confirmation, the Bankruptcy Code generally requires that each impaired class of claims or interests votes to accept a plan. Acceptances must be received (a) from the holders of claims constituting at least two-thirds in dollar amount and more than one-half in number of the allowed claims in each impaired class of claims that have voted to accept or reject the plan, and (b) from the holders of at least two-thirds in amount of the allowed interests in each impaired class of interest that have voted to accept or reject the plan. If any class or classes of claims or interests entitled to vote with respect to the plan rejects the plan, upon request of the plan proponents, the Bankruptcy Court may nevertheless confirm the plan if certain minimum treatment standards are met with respect to such class or classes.

Chapter 11 of the Bankruptcy Code does not require each holder of a claim or interest to vote in favor of a plan of reorganization in order for the bankruptcy court to confirm the plan. However, the Bankruptcy Court must find that the plan of reorganization meets a number of statutory tests (other than the voting requirements described in this section) before it may confirm, or approve, the plan of reorganization. Many of these tests are designed to protect the interest of holders of claims or interest that do not vote to accept the plan of reorganization but who will nonetheless be bound by the plan's provisions if it is confirmed by the Bankruptcy Court.

2.      Solicitation of Acceptances of the Plan

The Debtors are seeking acceptances of the Plan from holders of Allowed Claims classified in Classes 1A, 1B, 3 and 4 under the Plan, which are the Classes entitled to vote under the Plan. If the requisite acceptances are received, the Debtors will use the acceptances as evidenced by Ballots solicited in accordance with this Disclosure Statement and the Disclosure Statement Approval Order to seek confirmation of the Plan under chapter 11 of the Bankruptcy Code.

If any Impaired Class is determined to have rejected the Plan in accordance with section 1126 of the Bankruptcy Code, the Debtors may use the provisions of section 1129(b) of the Bankruptcy Code to satisfy the requirements for confirmation of the Plan. See Article VI.B.3 of this Disclosure Statement.

The Debtors believe that this Disclosure Statement complies with applicable bankruptcy and non-bankruptcy law. This Disclosure Statement and the Plan are being transmitted to all known holders of Impaired Claims and Interests. The Debtors believe that this Disclosure Statement contains adequate information for all holders of Impaired Claims and Interests to cast an informed vote to accept or reject the Plan. Furthermore, the Debtors believe that holders of Impaired Claims and Interests will obtain a greater recovery under the Plan than they would otherwise obtain if the Debtors' assets were liquidated under chapter 7 of the Bankruptcy Code.

If the Plan is confirmed by the Bankruptcy Court, each holder of an Impaired Claim will receive the same pro rata consideration as other holders of Claims in the same Class, whether or not such holder voted to accept the Plan. Moreover, upon confirmation by the Bankruptcy Court, the Plan will bind all Holders of Claims and Interests, regardless of whether or not such Holders of Claims or Interests voted to accept the Plan.

### 3. Administrative and Priority Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, 503(b)(9) Claims and Other Priority Claims have not been classified and thus are excluded from the Classes of Claims set forth in SECTION 3 of the Plan.

Administrative Claims. Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Administrative Claim, each Holder thereof shall be paid in full in Cash on the Effective Date or within ten days of becoming Allowed, or in accordance with the terms of the applicable contract, if any, or as otherwise agreed by the Debtors and the holder of such Allowed Administrative Claim.

Priority Tax Claims. In full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, unless otherwise agreed, each Holder thereof shall be paid in full in Cash on the Effective Date or within ten days of becoming Allowed pursuant to sections 511 and 1129(a)(9)(C) of the Bankruptcy Code, or within the timeframe otherwise permitted by applicable non-bankruptcy law.

503(b)(9) Claims. In full satisfaction, settlement, release, and discharge of and in exchange for each Allowed 503(b)(9) Claim, unless otherwise agreed, each Holder thereof shall be paid in full in Cash on the Effective Date or within ten days of becoming Allowed.

Other Priority Claims. In full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, unless otherwise agreed, each Holder thereof shall be paid in full in Cash on the Effective Date or within ten days of becoming Allowed pursuant to section 1129(a)(9)(B) of the Bankruptcy Code.

### 4. Classification of Classes and Interests

All Claims and Interests, except Administrative Claims, Priority Tax Claims, 503(b)(9) Claims, Other Priority Claims and any other unclassified Claims are placed in the Classes as set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, 503(b)(9) Claims, and Other Priority Claims have not been classified, and the respective treatments of such unclassified Claims are set forth in SECTION 2 of the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in another Class or Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date. The value of any Distributions received by Holders of Claims in satisfaction of interest-bearing obligations shall be allocated first to the full satisfaction of the principal of such interest-bearing obligations and second in satisfaction of any accrued and unpaid interest, except as otherwise provided in the New Credit Facility.

    a.    <u>Secured Claims</u>. Secured Claims shall be classified in the following Classes:

    (i)    <u>Class 1A</u>. Class 1A shall consist of Existing Credit Agreement Claims.

    (ii)    <u>Class 1B</u>. Class 1B shall consist of Capital Lease Claims.

    (iii)    <u>Class 1C</u>. Class 1C shall consist of Miscellaneous Secured Claims.

    b.    <u>Unsecured Claims</u>. Unsecured Claims shall be classified in the following Classes:

    (i)    <u>Class 2: Convenience Claims</u>. Class 2 shall consist of Convenience Claims.

    (ii)    <u>Class 3: General Unsecured Claims</u>. Class 3 shall consist of General Unsecured Claims.

    (iii)    <u>Class 4: Senior Noteholder Claims</u>. Class 4 shall consist of Senior Noteholder Claims.

    (iv)    <u>Class 5: Discount Noteholder Claims</u>. Class 5 shall consist of Discount Noteholder Claims.

    (v)    <u>Class 6: Subordinated Claims</u>. Class 6 shall consist of all Subordinated Claims.

    c.    <u>Interests</u>. Class 7 shall consist of the Interests.

5. <u>Treatment of Claims and Interests</u>

a. <u>Treatment of Existing Credit Agreement Claims (Class 1A) and Capital Lease Claims (Class 1B)</u>. The Holders of Existing Credit Agreement Claims in Class 1A and Capital Lease Claims in Class 1B are Impaired under the Plan and are entitled to vote to Accept or Reject the Plan. In full settlement, release and discharge of all Class 1A Claims and all Class 1B Claims, on the Effective Date or as soon thereafter as practicable, Holders of Class 1A Allowed Secured Claims and Class 1B Allowed Secured Claims, in accordance with the terms of the AAL, shall receive the following:

(i) <u>Upon Acceptance of the Plan by Class 1A and Class 1B</u>:

<u>Cash Principal Reduction</u>. Class 1A and Class 1B together shall receive $35,000,000 of the New Money Investment to pay down the Existing Credit Documents Claim (in accordance with the terms of the AAL), together with the unpaid interest, fees and other charges payable under the terms of the Existing Credit Documents, but only to the extent allowed under sections 502 and 506 of the Bankruptcy Code to be paid as determined by Final Order of the Bankruptcy Court; <u>provided, however</u>, that any make-whole premium, pre-payment premium, default interest or any other similar fee, charge or penalty alleged by the Existing Lenders to be due or payable under the Existing Credit Documents shall not be paid.

<u>Rollover of Secured Claim</u>. The remaining principal amount owing under the Existing Credit Documents, along with any allowed accrued and unpaid interest, fees and other charges under the Existing Credit Documents, but excluding therefrom any make-whole premium, pre-payment premium, default interest or any other similar fee, charge or penalty, shall be repaid, to the extent allowed under section 506 of the Bankruptcy Code, under the terms of the Term Loan B which, <u>inter alia</u>, shall replace and supersede the Existing Credit Documents in their entirety.

(ii) <u>Upon Rejection of the Plan by Class 1A or Class 1B</u>:

<u>Cash Principal Reduction</u>. Class 1A and Class 1B together shall receive $10,000,000 of the New Money Investment to pay down the Existing Credit Documents Claim (in accordance with the terms of the AAL), together with unpaid interest, fees and other charges payable under the terms of the Existing Credit Documents, but only to the extent allowed under sections 502 and 506 of the Bankruptcy Code to be paid as determined by Final Order of the Bankruptcy Court; <u>provided, however</u>, that any make-whole premium, pre-payment premium or any other similar fee or penalty alleged by the Existing Lenders to be due or payable under the Existing Credit Documents shall not be paid.

<u>Rollover of Secured Claim</u>. The remaining principal amount owing under the Existing Credit Documents, along with any allowed accrued and unpaid interest, fees and other charges under the Existing Credit Documents, but excluding therefrom any make-whole premium, pre-payment premium, default interest or any other similar fee, charge or penalty, shall be repaid, to the extent allowed under section 506 of

the Bankruptcy Code, under the terms of the New Credit Facility which shall replace and supersede the Existing Credit Documents in their entirety.

(iii) <u>No Waiver of Claims</u>. Notwithstanding a determination made by the Bankruptcy Court regarding the Allowed amount of the Existing Credit Documents Claims, if either Class 1A or Class 1B does not Accept the Plan within the meaning of section 1126(c) of the Bankruptcy Code, the Senior Noteholders reserve any and all rights and Claims against the Holders of Class 1A Claims and Class 1B Claims, including, without limitation, the right to seek an equitable lien on assets that are purportedly secured by the Existing Credit Documents Claims, in connection with alleged breaches of the Senior Note Indenture.

(iv) "<u>Make Whole</u>". Both the Existing Credit Documents and the Capital Lease purport to provide SP and/or SPE with the right to demand a "make whole" premium under certain circumstances. In their proofs of claim against the Debtors, SP has asserted a make-whole claim totaling $9,689,943.20 pursuant to the Existing Credit Documents and SPE has asserted a make-whole claim totaling $2,004,339.87 pursuant to the Capital Lease. Section 11.B.5 of the Plan provides, as a condition precedent to Consummation, the Bankruptcy Court shall have entered an order (which may be the Confirmation Order), adjudging that the Allowed Existing Credit Documents Claims shall not include any make-whole premiums, pre-payment premium or any other similar fee or penalty alleged by the Existing Lenders to be due or payable under the Existing Credit Documents. The Debtors, Committee, JB and Designating IPSA Holders may waive this condition precedent. The Debtors intend to file an objection to the make-whole claims of SP and SPE and believe that these claims should be disallowed in their entirety.

b. <u>Treatment of Miscellaneous Secured Claims (Class 1C)</u>. The Holders of Miscellaneous Secured Claims in Class 1C are not Impaired under the Plan and are not entitled to vote to accept or reject the Plan. Each holder of a Class 1C Claim shall be treated as though such holder comprises a separate Class hereunder. In full settlement, release and discharge of all Class 1C Claims, on the Effective Date or as soon thereafter as practicable, each holder of a Class 1C Allowed Claim shall be: (i) Reinstated; (ii) paid in full in Cash; or (iii) satisfied in full by a return to such holder of the collateral securing such Allowed Miscellaneous Secured Claim.

c. <u>Treatment of Convenience Claims (Class 2)</u>. The Holders of Convenience Claims in Class 2 are not Impaired under the Plan and are not entitled to vote to accept or reject the Plan. In full settlement, release and discharge of all Class 2 Claims, on the Effective Date or as soon thereafter as practicable, each holder of a Class 2 Allowed Claim shall be paid the <u>lesser</u> of (i) the Allowed General Unsecured Claims of such Holder; and (ii) $1,000, in Cash.

d. <u>Treatment of General Unsecured Claims (Class 3)</u>. The Holders of General Unsecured Claims in Class 3 are Impaired under the Plan and are entitled to vote to accept or reject the Plan. In full satisfaction, release and discharge of all Class 3 Claims, on the

Effective Date or as soon thereafter as practicable, Holders of Class 3 Allowed Claims shall receive their pro rata share of the General Unsecured Claim Fund.

The five percent (5%) recovery for Holders of Allowed Class 3 General Unsecured Claims has been calculated as follows: under the Plan, Holders of Allowed Class 4 Senior Noteholder Claims will receive their pro rata share of $10.0 million in face amount of PIK Preferred Stock, and either two million shares of New Common Stock (should Class 1A and Class 1B Accept the Plan) or one million shares of New Common Stock and certain proceeds of Reserved Shares (should Class 1A and/or Class 1B Reject the Plan). The total amount of Allowed Class 4 Claims is $185,333,953.16. The estimated value of the two million shares of New Common Stock is approximately $1.8 million (and one million shares of New Common Stock is estimated at $.9 million). Thus, the estimated total value of the stock distributed to Holders of Allowed Class 4 Claims is between $10.9-11.8 million (depending on whether Class 1A and Class 1B Accept the Plan or Reject the Plan), assuming the face value of the PIK Preferred Stock, which divided by the Allowed Class 4 Claims results in each Holder of an Allowed Class 4 Claim receiving approximately 6% of their Allowed Claim. Further, the operation of the subordination provisions in the Discount Notes, which run in favor of the Senior Notes (but not the Class 3 General Unsecured Claims) is such that the ratable share of any distribution that would otherwise be distributed to the Discount Notes on a pure pro rata basis must be reallocated to the Senior Notes. Accordingly, the Senior Notes are entitled to a somewhat higher percentage recovery on their claims that the Class 3 General Unsecured Claims due to this reallocation. Accordingly, the Debtors have determined that, in order to provide equal treatment to Holders of General Unsecured Claims and Senior Noteholder Claims while giving effect to the reallocation terms of the Discount Notes, the Plan must provide for Holders of Allowed Class 3 General Unsecured Claims to receive a 5% distribution.

    e.     <u>Treatment of Senior Noteholder Claims (Class 4)</u>. The Claims of Holders of Senior Notes in class 4 shall be deemed Allowed. The Holders of Senior Notes in Class 4 are Impaired under the Plan and are entitled to vote to accept or reject the Plan. In full settlement, release and discharge of all Class 4 Claims, on the Effective Date or as soon thereafter as practicable, the Senior Notes shall be cancelled (subject to the provisions of Section 5E) and the Senior Note Indenture Trustee shall receive the following distribution (collectively, the "**Class 4 Distribution**") for distribution to Senior Noteholders in accordance with the provisions of the Senior Note Indenture: (i) $10,000,000 in face amount of PIK Preferred Stock; and (ii) (a) two million shares of New Common Stock if Class 1A and Class 1B Accept the Plan, or (b) one million shares of New Common Stock and certain proceeds of Reserved Shares as more particularly described in Article V.A.7.d(iv) below if Class 1A and/or Class 1B Reject the Plan.

    f.     <u>Treatment of Discount Noteholder Claims (Class 5)</u>. The Holders of Discount Noteholder Claims in Class 5 are Impaired and are not entitled vote to accept or reject the Plan because they are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. In full settlement, release and discharge of all Class 5 Claims, on the Effective Date or as soon thereafter as practicable, the Discount Notes shall be cancelled and Holders of Class 5 Allowed Claims shall receive no Distribution on account of such Allowed Claims.

g.　　Treatment of Subordinated Claims (Class 6).　The Holders of any Subordinated Claims in Class 6 are Impaired and are not entitled to vote to accept or reject the Plan because they are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.　Any Holders of Class 6 Allowed Claims shall receive no Distribution on account of such Allowed Claims.

h.　　Treatment of Interests (Class 7).　The Holders of Interests in Class 7 are Impaired and are not entitled to vote to accept or reject the Plan because they are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.　In full settlement, release and discharge of all Class 7 Interests, on the Effective Date or as soon thereafter as practicable, the Interests shall be cancelled and Holders of Class 7 Allowed Interests shall receive no Distribution on account of such Allowed Interests.

6.　　Recoveries

The table set forth below identifies the projected recovery for Holders of Claims in all Classes.　The projected recoveries are based upon the valuation of Reorganized Eurofresh to be included in the Plan Supplement, the estimated amount of any Existing Credit Documents Claim, estimation of Administrative Claims, Priority Tax Claims and Other Priority Claims, estimation of Allowed Claims within each Class and other assumptions.　Taking into account all of these factors, the recovery model to be included in the Plan Supplement calculates the value of the consideration to be Distributed under the Plan to Holders of Claims in Classes 1A, 1B, 1C, 2, 3 and 4.

The Debtors currently estimate that the reasonable ranges of recoveries among the various Classes of Claims and Interests will be as follows:

| Class | Type of Claim or Interest | Estimated Recovery |
|---|---|---|
| 1A | Existing Credit Agreement Claims | 100% |
| 1B | Capital Lease Claims | 100% |
| 1C | Miscellaneous Secured Claims | 100% |
| 2 | Convenience Claims | 100% |
| 3 | General Unsecured Claims | 5% |
| 4 | Senior Noteholder Claims | 6% |
| 5 | Discount Noteholder Claims | 0% |
| 6 | Subordinated Claims | 0% |
| 7 | Interests | 0% |

7.　　Sources of Consideration for Plan Distributions.

Reorganized Eurofresh shall fund distributions under the Plan with Cash on hand, the New Money Investment, existing assets, the issuance of PIK Preferred Stock, and the issuance of New Common Stock.

a.　　New First Lien Loans, Term Loan B and New Credit Facility.

- 40 -

(i)     If Class 1A and Class 1B vote to Accept the Plan, on the Effective Date, Reorganized Eurofresh and Reorganized EPL shall enter into the New First Lien Loans and the Term Loan B. The New First Lien Loans will be new first lien, senior secured loans with a four year term and a one year extension at the option of the lenders. The Term Loan B will be a second lien term loan that in effect rolls over Allowed Claims remaining under the Existing Credit Documents and the indebtedness thereunder, once $35,000,000 of the New Money Investment is applied to reduce the principal amount of the indebtedness under the Existing Credit Documents (as limited by Sections 4.A.1.a and 4.A.2.a of the Plan). Term Loan B will be junior to the New First Lien Loans, bear interest at the same rate as currently set forth in the Existing Credit Documents, and have the same covenants and maturity as set forth in Term Loan A; provided, however, that in the event the lenders under Term Loan A agree to extend the maturity of the Term Loan A from four years to five years, the maturity of Term Loan B will also be automatically extended by one year, provided no event of default has occurred and is continuing under the Term Loan A or the Term Loan B. The Term Loan B will be interest only (cash pay) during its term with a balloon payment of the principal at maturity. Confirmation of the Plan shall be deemed approval of the Term Loan B (including the transactions contemplated thereby and all actions to be taken, undertakings to be made, and obligations to be incurred by Reorganized Eurofresh and Reorganized EPL in connection therewith, including the payment of all fees and expenses provided for therein) and authorization for Reorganized Eurofresh and Reorganized EPL to enter into and execute the Term Loan B documents as well as the New First Lien Loan documents and such other documents as the Debtors or Reorganized Eurofresh may deem reasonably necessary to effectuate the treatment afforded to lenders pursuant to the New First Lien Loans and the Term Loan B.

(ii)    If Class 1A and/or Class 1B vote to Reject the Plan, on the Effective Date, Reorganized Eurofresh and Reorganized EPL shall enter into the New Credit Facility, which in effect will roll over Allowed Claims remaining under the Existing Credit Documents and the indebtedness thereunder, as further described in Section V.B.2, once $10,000,000 of the New Money Investment is applied to reduce the principal amount of the indebtedness under the Existing Credit Documents (as limited by Sections 4.A.1.a and 4.A.2.a of the Plan). Confirmation of the Plan shall be deemed approval of the New Credit Facility (including the transactions contemplated thereby and all actions to be taken, undertakings to be made, and obligations to be incurred by Reorganized Eurofresh and Reorganized EPL in connection therewith, including the payment of all fees and expenses provided for therein) and authorization for Reorganized Eurofresh and Reorganized EPL to enter into and execute the New Credit Facility documents and such other documents as the Debtors or Reorganized Eurofresh may deem reasonably necessary, in consultation with the Committee and Bio Dynamics, to effectuate the treatment afforded to such lenders pursuant to the New Credit Facility.

(iii) <u>Financial Covenants for New First Lien Loans, Term Loan B and New Credit Facility</u>. The following are financial covenants that the Debtors expect to be part of the New First Lien Loans, Term Loan B or New Credit Facility, as applicable:

(a) <u>Capital Expenditures</u>. The financial covenants will include a limitation on capital expenditures covenant that sets a maximum amount of aggregate capital expenditures made in a trailing twelve month period to be measured quarterly. Such maximum amount shall be determined based on conservative operating projections for Reorganized Eurofresh. In the event that the aggregate amount of capital expenditures made in any fiscal year is less than the maximum amount permitted a portion of such shortfall may be added to amount of capital expenditures permitted in the immediately succeeding fiscal year.

(b) <u>Maximum Total Leverage</u>. The financial covenants will include a maximum total leverage covenant that sets a maximum ratio of the amount of total indebtedness of Reorganized Eurofresh (net of cash on hand) at the measurement date to the consolidated EBITDA, adjusted for select non-cash and / or non-recurring items, for the trailing twelve month period as of the measurement date. Such maximum ratio shall be determined based on conservative operating projections for Reorganized Eurofresh. This covenant will be measured quarterly. In the event that Reorganized Eurofresh fails to comply with the maximum total leverage ratio covenant, it shall have the right to issue new Subordinated PIK Notes or equity in an amount necessary to "cure" this failure. Pursuant to the exercise of this cure right, the consolidated EBITDA used in calculating the total leverage ratio shall be increased for such annual period by the amount of any new Subordinated PIK Notes or equity issued.

(c) <u>Waiver</u>. The aforementioned financial covenants may be waived by lenders having more than 50% of the sum of all new Working Capital Facility outstanding, unused Working Capital Facility, letter of credit exposure (if any), new Term Loan A or New Credit Facility. A waiver under Term Loan A may also effect a waiver under Term Loan B.

b. <u>New Money Investment</u>. $15,000,000 of the New Money Investment will be available as working capital for the Debtors, including the satisfaction of obligations under the Plan.

(i) Each Senior Noteholder shall have the opportunity to participate in the New Money Investment as an Investing Noteholder in accordance with the terms set forth in the Amended and Restated Investment and Plan Support Agreement and by the execution and delivery to the Nominee by the Voting Deadline of the Ballot, the Joinder Agreement and the Accredited Investor Questionnaire, all of which will be provided to Senior Noteholders in the solicitation packages.

(ii)     Certain Senior Noteholders and Bio Dynamics executed the Amended and Restated Investment and Plan Support Agreement and have already, consistent with the terms thereof, agreed to participate in the New Money Investment.

(iii)     Each Investing Noteholder shall receive:

(a) its pro rata share of 40% (4 million shares) of New Common Stock;

(b) if and only if Class 1A and/or Class 1B Reject the Plan, its pro rata allocation of the amounts which Investing Noteholders are entitled to receive from the proceeds of the 10% (1 million shares) of New Common Stock to be held as Reserved Shares pursuant to the terms of the Reserved Shares Trust;

(c) if and only if Class 1A and/or Class 1B Reject the Plan, its pro rata share of the Subordinated PIK A Notes in the principal amount of $2.5 million; and

(d) either (i) in the event Class 1A and Class 1B Accept the Plan, its interest in the New First Lien Loans or (ii) in the event Class 1A and/or Class 1B Reject the Plan, its pro rata share of the Subordinated PIK Notes, in each case determined based on its proportionate share of the Investing Noteholders Investment.

(iv)     Bio Dynamics shall receive:

(a) 40% (4 million shares) of New Common Stock;

(b) if and only if Class 1A and/or Class 1B Reject the Plan, Subordinated PIK A Notes in the principal amount of $2.5 million; and

(c) (i) 12,000,000 of the Subordinated PIK Notes and $3,000,000 principal amount of Term Loan A if Class 1A and Class 1B Accept the Plan or (ii) its share of the 20,000,000 of the Subordinated PIK Notes determined based on its share of the New Money Investment if Class 1A and/or Class 1B Reject the Plan.

(v)     The offering, issuance and distribution of the New Common Stock and the Subordinated PIK Notes to Bio Dynamics and each Investing Noteholder (as applicable) is being offered and sold in reliance upon federal and state exemptions for transactions not involving any public offering and shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of the New Common Stock and Subordinated PIK Notes.

- 43 -

c.      PIK Preferred Stock.      On the Effective Date, Reorganized Eurofresh shall issue $10,000,000 in PIK Preferred Stock on a pro rata basis to Senior Noteholders, based on each Senior Noteholder's proportionate share of the Senior Noteholder Claims, on account of their respective pre-petition Allowed Claims against the Debtors.

d.      New Common Stock.      On the Effective Date, Reorganized Eurofresh shall issue 10,000,000 shares of New Common Stock of a single class, for distribution as follows:

(i)      40% (4 million shares) of New Common Stock to be issued to Bio Dynamics in exchange for its share of the New Money Investment;

(ii)      40% (4 million shares) of New Common Stock to be issued to the Investing Noteholders in exchange for their respective share of the New Money Investment;

(iii)      (a) 20% (2 million shares) of New Common Stock to be issued to the Senior Noteholders on account of their respective pre-petition Allowed Claims against the Debtors if and only if Class 1A and Class 1B Accept the Plan; or

(b) if Class 1A and/or Class 1B Reject the Plan:

(i) 10% (1 million shares) of New Common Stock to be issued to the Senior Noteholders on account of their respective pre-petition Allowed Claims against the Debtors, and

(ii) 10% (1 million shares) to be held as Reserved Shares in the Reserved Shares Trust and allocated between Senior Noteholders and Investing Noteholders, which rights, title, claims and interests in such shares will be represented by trust certificates in the Reserved Shares Trust. The proceeds or distributions received on or on account of the Reserved Shares upon a Disposition shall be allocated between the Investing Noteholders and the Senior Noteholders pursuant to the following mechanism, as more fully set forth in the agreement governing the Reserved Shares Trust:

(a)      Such proceeds and distributions shall first be distributed to the Investing Noteholders in such amount, if any, as is necessary so that, when added to the distributions and proceeds received by the Investing Noteholders on account of (a) the New First Lien Loans (if applicable), (b) the Subordinated PIK Notes (as applicable) and (c) New Common Stock issued to the Investing Noteholders, the Investing Noteholders will have received distributions and proceeds with an aggregate value equal to the product of multiplying 2.5 by the amount of the Investing Noteholder Investment.      The distribution to the Investing

- 44 -

Noteholders pursuant to the foregoing shall be made on a ratable basis based on a fraction, the numerator of which is the amount of each Investing Noteholder's Investing Noteholder Investment, and the denominator of which is the total amount of the Investing Noteholder Investment.

(b) Any residual proceeds or distributions on account of the Reserved Shares shall be distributed to the Senior Noteholders via distribution to the holders of the trust certificates.

(iv) 750,000 shares of unissued New Common Stock shall be reserved for management stock options under a MIP.

e. <u>MIP</u>. 750,000 shares of unissued New Common Stock shall be reserved for issuance pursuant to the terms of the MIP.

f. <u>Capital Stock of Reorganized EPL</u>. On the Effective Date, Reorganized EPL shall issue 100 shares of common stock of a single class, 100% of which shall be held by Reorganized Eurofresh.

g. <u>Resulting Capital Structure of Reorganized EPL</u>.

The following table summarizes the capital structure of Reorganized EPL on the Effective Date, provided that Class 1A and Class 1B Accept the Plan.

| Parties | Nature of Interest | Amount |
|---|---|---|
| New Investors | Term Loan A | $23,000,000 |
| Barclays Bank PLC | Working Capital Facility | $15,000,000 |
| SP | Term Loan B | Existing Credit Facility less $35,000,000 |
| Bio Dynamics | Subordinated PIK Notes | $12,000,000 |
| Senior Noteholders | PIK Preferred Stock | $10,000,000 |
| Bio Dynamics | New Common Stock | 4,000,000 shares |
| Investing Noteholders | New Common Stock | 4,000,000 shares |
| Senior Noteholders | New Common Stock | 2,000,000 shares |

The following table summarizes the capital structure of Reorganized EPL on the Effective Date, provided that Class 1A and/or Class 1B Reject the Plan.

| Parties | Nature of Interest | Amount |
|---|---|---|
| SP | New Credit Facility | Existing Credit Facility less $10,000,000 |
| Investing Noteholders | Subordinated PIK A Notes | $2,500,000 |
| Bio Dynamics | Subordinated PIK A Notes | $2,500,000 |
| New Investors | Subordinated PIK Notes | $20,000,000 |
| Senior Noteholders | PIK Preferred Stock | $10,000,000 |
| Bio Dynamics | New Common Stock | 4,000,000 shares |
| Investing Noteholders | New Common Stock | 4,000,000 shares |
| Senior Noteholders | New Common Stock | 1,000,000 shares |

- 45 -

| | New Common Stock | 1,000,000 shares |
|---|---|---|
| Reserved Shares Trust - for the benefit of the Investing Noteholders and the Senior Noteholders | | |

Additional financial disclosures, including a summary of the treatment of Class 1A and Class 1B Claims, a summary of the sources of consideration for Distributions under the Plan, a summary of the initial participants in the New First Lien Loans (as applicable), a summary of the initial participants of the New Subordinated PIK Notes (as applicable) and summary of the pro forma capital structure under the Plan are set forth below:

**Summary Treatment of Existing Credit Agreement Claims (Class 1A) and Capital Lease Claims (Class 1B)**

| Distributions | Acceptance of Plan by Class 1A and 1B | Rejection of Plan by Class 1A and/or 1B |
|---|---|---|
| Cash Principal Reduction | $35.00 million | $10.00 million |
| New Credit Facility | N / A | $61.14 million |
| Term Loan B | $36.14 million | N / A |
| Total | $71.14 million | $71.14 million |

**Summary of Sources of Consideration for Plan Distributions**

| Distributions | Acceptance of Plan by Class 1A and 1B | Rejection of Plan by Class 1A and/or 1B |
|---|---|---|
| New First Lien Loans | $38.00 million | N / A |
| New Credit Facility | N /A | $61.14 million |
| Term Loan B | $36.14 million | N / A |
| Subordinated PIK Notes | $12.00 million | $25.00 million |
| PIK Preferred Stock | $10.00 million | $10.00 million |
| Total | $96.14 million | $96.14 million |

**Initial Participants of New First Lien Loans – Acceptance of Plan by Class 1A and 1B**

| Entity | Working Capital Facility | Term Loan A | Total New First Lien Loans |
|---|---|---|---|
| Bio Dynamics | | $3.00 million | $3.00 million |
| Barclay Bank PLC [1] | $15.00 million | $1.24 million | $16.24 million |
| Scoggin Capital Management [1] | | $6.65 million | $6.65 million |
| J.P. Morgan Investment Management [1] | | $8.47 million | $8.47 million |
| Credit Suisse Alternative Capital, Inc. [1] | | $3.64 million | $3.64 million |
| Total | $23.00 million | $38.00 million | |

[1] For purposes of developing the table above, it is assumed that the non-Biodynamics New First Lien Loans will be provided by the Initial Investing Noteholders (as defined in the Amended Investment and Plan Support Agreement) only. Each Senior Noteholder shall have the opportunity to participate in the New Money Investment in accordance with the terms set forth in the Amended and Restated Investment and Plan Support Agreement. In the event any Senior Noteholder that is not an Initial Investing Noteholder elects to participate in the New Money Investment, the amounts of the New First Lien Loans provided by Barclay Bank PLC, Scoggin Capital Management, J.P. Morgan Investment Management and Credit Suisse Alternative Capital, Inc. set forth in the table above may change; however the total amount of the New First Loan Loans will not change.

**Initial Participants of the Subordinated PIK A Notes and Subordinated PIK Notes – Rejection of Plan by Class 1A and/or 1B**

| Entity | Sub. PIK A Notes | Sub. PIK Notes | Total |
|---|---|---|---|
| Bio Dynamics | $2.50 million | $10.00 million | $12.50 million |
| Barclay Bank PLC [1] | $1.16 million | $4.64 million | $5.80 million |
| Scoggin Capital Management [1] | $0.48 million | $1.90 million | $2.38 million |
| J.P. Morgan Investment Management [1] | $0.61 million | $2.42 million | $3.03 million |
| Credit Suisse Alternative Capital, Inc. [1] | $0.26 million | $1.04 million | $1.30 million |
| Total | $5.00 million | $20.00 million | $25.00 million |

[1] For purposes of developing the table above, it is assumed that the non-Bio Dynamics issued Subordinated PIK A Notes and Subordinated PIK Notes will be provided to the Initial Investing Noteholders only. Each Senior Noteholder shall have the opportunity to participate in the New Money Investment in accordance with the terms set forth in the Amended and Restated Investment and Plan Support Agreement. In the event any Senior Noteholder that is not an Initial Investing Noteholder elects to participate in the New Money Investment, the amounts of the Subordinated PIK A Notes and Subordinated PIK Notes provided to Barclay Bank PLC, Scoggin Capital Management, J.P. Morgan Investment Management and Credit Suisse Alternative Capital, Inc. set forth in the table above may change; however the total amount of such Notes will not change.

**Summary of Pro Forma Capital Structure Under the Plan** [1]

| | Acceptance of Plan by Class 1A and 1B | Rejection of Plan by Class 1A and/or 1B |
|---|---|---|
| Outstanding Under Working Capital Facility | $9.27 million | N / A |
| New First Lien Loans | $23.00 million | N / A |
| New Credit Facility | N /A | $61.14 million |
| Term Loan B | $36.14 million | N / A |
| Subordinated PIK A Notes and Subordinated PIK Notes | $12.00 million | $25.00 million |
| Total Debt | $80.41 million | $86.14 million |
| | | |
| PIK Preferred Stock | $10.00 million | $10.00 million |
| Common Equity | $8.76 million | $8.76 million |
| Total Capitalization | $99.17 million | $104.90 million |

[1] Does not include capitalized leases related to certain equipment.

8.     <u>Preservation of Causes of Action</u>.

In accordance with section 1123(b) of the Bankruptcy Code, Reorganized Eurofresh and Reorganized EPL shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and Reorganized Eurofresh's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. Reorganized Eurofresh may pursue such Causes of Action, as appropriate, in accordance with the best interests of Reorganized Eurofresh and Reorganized EPL. **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that Reorganized Eurofresh will not pursue any and all available Causes of Action against them. Reorganized Eurofresh expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan**. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released,

compromised, or settled in the Plan or a Final Order, Reorganized Eurofresh expressly reserves all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Conformation or Consummation.

Reorganized Eurofresh reserves and shall retain the foregoing Causes of Action notwithstanding the rejection of any executory contract or unexpired lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in Reorganized Eurofresh. Reorganized Eurofresh, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. Reorganized Eurofresh shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

9.  Assumption and Rejection of Executory Contracts and Unexpired Leases.

Except as otherwise provided in the Plan, the Debtors' executory contracts or unexpired leases listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement or not assumed or rejected pursuant to a Bankruptcy Court order prior to the Effective Date shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except for those executory contracts or unexpired leases: (1) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement; (2) that are the subject of a motion to assume or reject pending on the Effective Date (in which case the such assumption or rejection and the effective date thereof shall remain subject to a Bankruptcy Court order); (3) that are subject to a motion to reject with a requested effective date of rejection after the Effective Date; or (4) that are otherwise expressly assumed or rejected pursuant to the Plan (including Section 6 as set forth below). Entry of the Confirmation Order shall constitute a Final Order approving the assumption or rejection of such executory contracts or unexpired leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of such executory contracts and unexpired leases in the Plan are effective as of the Effective Date. Each such executory contract and unexpired lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party prior to the Effective Date shall revest in and be fully enforceable by Reorganized Eurofresh in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, Reorganized Eurofresh reserves the right to alter, amend, modify, or supplement the schedules of executory contracts or unexpired leases identified in SECTION 6 and in the Plan Supplement at any time through and including fifteen days after the Effective Date.

a.  Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

(i)  Designation of Cure Amount. With respect to each of the Debtors' executory contracts or unexpired leases listed on the schedule of

"Assumed Executory Contracts and Unexpired Leases," the Debtors shall have designated a proposed Cure Amount, and the assumption of such executory contract or unexpired lease may be conditioned upon the disposition of all issues with respect to Cure in a manner satisfactory to the Debtors or Reorganized Eurofresh. Any provision or terms of the Debtors' executory contracts or unexpired leases to be assumed pursuant to the Plan that are or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure.

(ii)     <u>Disagreement with Cure Amount</u>.  Except with respect to executory contracts and unexpired leases for which the Debtors and the applicable counterparties have stipulated in writing to payment of a Cure Amount, all requests for payment of Cure that differ from the amounts proposed by the Debtors must be Filed with the Claims and Solicitation Agent on or before the Cure Bar Date.  Any request for a Cure Payment that is not timely Filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against Reorganized Eurofresh or Reorganized EPL, without the need for any objection by Reorganized Eurofresh or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors of the amounts listed on the Debtors' proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent Reorganized Eurofresh from paying any Cure Amount despite the failure of the relevant counterparty to File such request for payment of such Cure.  Reorganized Eurofresh also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

(iii)     <u>Resolution of Cure Amount</u>.  If Reorganized Eurofresh or Reorganized EPL objects to any requested Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Cure Amount and any related issues.  If there is a dispute regarding such Cure Amount, the ability of Reorganized Eurofresh or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by Reorganized Eurofresh and the counterparty to the executory contract or unexpired lease.  Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption of any executory contract or unexpired lease will be deemed to have consented to such assumption. Reorganized Eurofresh reserves the right either to reject or nullify the assumption of any executory contract or unexpired lease no later than thirty days after a Final Order determining the Cure Amount or any request for adequate assurance of future performance required to assume such executory contract or unexpired lease or any other matter relating to assumption.

(iv)     Claims Related to Cure.  Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption.  Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice, other than notice to the other party to such contract or lease of such disallowance and expungement, or action, order, or approval of the Bankruptcy Court.

b.     Claims Based on Rejection of Executory Contracts and Unexpired Leases.  Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Debtors' executory contracts and unexpired leases pursuant to the Plan or otherwise must be Filed with the Claims and Solicitation Agent no later than thirty days after the later of the Effective Date or the date of any notice of rejection.  Any Proofs of Claim arising from the rejection of the Debtors' executory contracts or unexpired leases that are not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against Reorganized Eurofresh or Reorganized EPL without the need for any objection by Reorganized Eurofresh or Reorganized EPL or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  All Allowed Claims arising from the rejection of the Debtors' executory contracts and unexpired leases shall be classified as Rejection Damages Claims and shall be treated in accordance with SECTION 4.D. of the Plan.

c.     Modification of Executory Contracts and Unexpired Leases Containing Equity Ownership Restrictions.  All executory contracts and unexpired leases to be assumed under the Plan pursuant to section 365 and 1123 of the Bankruptcy Code shall be deemed so assumed, without giving effect to any provisions contained in such executory contracts or unexpired leases restricting the change in control or ownership interest composition of any or all of the Debtors, and upon the Effective Date (1) any such restrictions shall be deemed of no further force and effect and (2) any breaches that may arise thereunder as a result of Confirmation or Consummation shall be deemed waived by the applicable non-Debtor counterparty.

d.     Modifications, Amendments, Supplements, Restatements, or Other Agreements.  Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and all executory contracts and unexpired leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

- 50 -

Modifications, amendments, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

10.     Indemnification Obligations.

Each Indemnification Obligation shall be assumed by the Debtors effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, to the extent such Indemnification Obligation is executory, unless such Indemnification Obligation previously was rejected by the Debtors pursuant to a Bankruptcy Court order, is the subject of a motion to reject pending on the Effective Date, or is listed on the schedule of "Rejected Indemnification Obligations for Former Employees" in the Plan Supplement. Notwithstanding the foregoing, an Indemnification Obligation to any Person who as of the Petition Date no longer was a director, officer, or employee of the Debtors, shall terminate and be discharged pursuant to section 502(e) of the Bankruptcy Code or otherwise, as of the Effective Date; provided, however, that Reorganized Eurofresh reserves the right to honor or reaffirm Indemnification Obligations other than those terminated by this Section, whether or not executory, in which case such honoring or reaffirmation shall be in complete satisfaction, discharge, and release of any Claim on account of such Indemnification Obligation. Each Indemnification Obligation that is assumed, deemed assumed, honored, or reaffirmed shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, regardless of when such obligation arose.

11.     Distributions

a.     Distributions on Account of Claims Allowed as of the Effective Date. Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, initial Distributions under the Plan on account of Claims Allowed on or before the Effective Date shall be made on the Distribution Date; provided, however, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims, unless otherwise agreed, shall be paid in accordance with SECTION 2.B of the Plan.

b.     Distribution on Account of Claims Allowed after the Effective Date.

(i)     Payments and Distributions on Disputed Claims. Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, Distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the Periodic Distribution Date that is at least thirty days after the Disputed Claim becomes an Allowed Claim; provided, however, that (a) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the

Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business or industry practice, and (b) Disputed Priority Tax Claims become Allowed Priority Tax Claims after the Effective Date, unless otherwise agreed, shall be paid in accordance with SECTION 2.B of the Plan.

(ii)     <u>Special Rules for Distributions to Holders of Disputed Claims</u>.  Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties:  (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and all Claims of such Holder have been Allowed; <u>provided,</u> <u>however</u>, that Reorganized Eurofresh shall make Distributions to Holders of Allowed Miscellaneous Secured Claims on account of the Allowed portion of such Holders' Claims.  In the event that there are Disputed Claims requiring adjudication and resolution, Reorganized Eurofresh shall establish appropriate reserves for potential payment of such Claims.  Subject to SECTION 10.A.6 of the Plan, all Distributions made pursuant to the Plan on account of an Allowed Claim shall be made together with any dividends, payments, or other Distributions made on account of, as well as any obligation arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates Distributions were previously made to Holders of Allowed Claims included in the applicable Class.

(iii)    <u>Reserve of Funds for Payment of Disputed Claims</u>.  On the Effective Date, after calculating Distributions to Holders of Allowed Claims and potential Distributions to Holders of Disputed Claims under the Plan, Reorganized Eurofresh shall retain and set aside in a reserve fund an amount in cash sufficient to make all payments and Distributions which may be subsequently required for payment to Holders of Disputed Claims.  As Disputed Claims are Allowed, Reorganized Eurofresh shall distribute, in accordance with the terms of the Plan, Cash to Holders of Allowed Claims, and the reserve fund shall be adjusted.  Reorganized Eurofresh may (but is not required to) request estimation for any Disputed Claim that is contingent or unliquidated, as set forth in SECTION 7.C of the Plan.

(iv)    <u>Limits on Distributions</u>.  **Notwithstanding anything in the applicable Holder's Proof of Claim or otherwise to the contrary, the Holder of a Claim shall not be entitled to receive or recover a Distribution under the Plan on account of a Claim in excess of the amount:  (a) stated in the Holder's Proof of Claim, if any, as of the Distribution Record Date, plus interest thereon to the extent provided for by the Plan; (b) if the Claim is**

denominated as contingent or unliquidated as of the Distribution Record Date, the amount that the Debtors, in consultation with the Committee, elect to reserve on account of such Claim and set forth in the Plan Supplement, or such other amount as may be estimated by the Bankruptcy Court prior to the Confirmation Hearing; or (c) if a Claim has been estimated, the amount reserved to satisfy such claim after such estimation.

12.     Conditions to Confirmation.

The following are conditions precedent to Confirmation that must be satisfied or waived in accordance with SECTION 11.C of the Plan:

a.     The Bankruptcy Court shall have approved the Disclosure Statement, in a manner acceptable to the Debtors, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

b.     The proposed Confirmation Order shall be in form and substance acceptable to the Debtors, the Committee, JB and the Designating ISPA Holders.

13.     Conditions Precedent to Consummation.

The following are conditions precedent to Consummation that must be satisfied or waived in accordance with SECTION 11.C of the Plan:

a.     The Bankruptcy Court shall have authorized the assumption and rejection of executory contracts and unexpired leases by the Debtors as contemplated by SECTION 6 of the Plan.

b.     The New Credit Facility shall have been executed and delivered by all of the Entities that are parties thereto and the Confirmation Order shall provide that the New Credit Facility is binding upon and enforceable against all of the parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof.

c.     The funds pursuant to the New Money Investment shall have been received in full by or on behalf of the Debtors.

d.     The Bankruptcy Court shall have entered an order (which may be the Confirmation Order) adjudging that any Claim of the Department of Labor, shall be deemed Allowed only as a General Unsecured Claim.

e.     The Bankruptcy Court shall have entered an order (which may be the Confirmation Order) adjudging that the Allowed Existing Credit Documents Claims shall not include any make-whole premiums, pre-payment premium or any other similar fee or penalty alleged by the Existing Lenders to be due or payable under the Existing Credit Documents.

- 53 -

f.     The Confirmation Order shall not be stayed by any court order or otherwise.

g.     The most current version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein (including the Reorganized Eurofresh Bylaws, the Reorganized Eurofresh Charter, the Reorganized EPL Bylaws and the Reorganized EPL Charter) shall have been Filed in form and substance acceptable to the Debtors, the Committee and JB.

h.     The Confirmation Date shall have occurred.

i.     There has been no default under or termination of the Investment and Plan Support Agreement, and all conditions to the obligation of the New Investors to provide the New Money Investment shall have been satisfied or waived in accordance with the terms of such Agreement.

The Debtors or Reorganized Eurofresh, as applicable, jointly with the Committee, JB and the Designating IPSA Holders may waive any of the conditions to Confirmation or Consummation set forth in SECTION 11 of the Plan at any time, without any notice to parties-in-interest and without further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan; provided, however, that the conditions set forth in Section 11.B.1 of the Plan may be waived by the Debtors or Reorganized Eurofresh without the consent of the Committee, JB and Designating IPSA Holders, and provided, further, that the conditions set forth in SECTION 11.B.4 and SECTION 11.B.5 of the Plan may be waived by the Debtors or Reorganized Eurofresh only with the consent of the Designating IPSA Holders and the Committee. A failure to satisfy or waive any condition to Confirmation or Consummation may be asserted as a failure of Confirmation or Consummation regardless of the circumstances giving rise to such failure (including any action or inaction by the party asserting such failure). The failure of the Debtors, Reorganized Eurofresh, the Committee, JB or the Designating IPSA Holders, as applicable, to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

14.     <u>Releases and Exculpation</u>

a.     <u>Discharge of Claims and Termination of Interests</u>.  Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Distributions, rights, and treatments that are provided in the Plan shall be in complete satisfaction, discharge, and release, as of the Effective Date, of all Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on such Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise

- 54 -

from a termination of employment or a termination of any employee benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed Cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

b. <u>Releases by the Debtors</u>. Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, Reorganized Eurofresh, Reorganized EPL and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, Reorganized Eurofresh, Reorganized EPL or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a failure to perform the duty to act in good faith, with the care of an ordinarily prudent person and in a manner the Released Party reasonably believed to be in the best interests of the Debtors (to the extent such duty is imposed by applicable non-bankruptcy law) where such failure to perform constitutes willful misconduct or gross negligence.

c. <u>Exculpation</u>. Except as otherwise specifically provided in the Plan, including any obligation, claim, cause of action, or liability arising expressly under the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Claim, obligation, Cause of Action, or liability to one another or to any Exculpating Party for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely

upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors (and each of their respective agents, directors, officers, employees, advisors, and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

        d.   <u>Releases by Holders of Claims and Interests</u>. Except for any obligation, claim, cause of action, or liability arising expressly under the Plan or reserved by any Entity pursuant to the Plan, on and after the Effective Date, Holders of Claims and Interests shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, Reorganized Eurofresh, Reorganized EPL and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Debtors' Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date with respect to any of the foregoing, other than Claims or liabilities arising out of or relating to any act or omission of a Debtor, Reorganized Eurofresh, Reorganized EPL or a Released Party that constitutes a failure to perform the duty to act in good faith, with the care of an ordinarily prudent person and in a manner the Debtor, Reorganized Eurofresh, Reorganized EPL or the Released Party reasonably believed to be in the best interests of the Debtors (to the extent such duty is imposed on such Released Party by applicable non-bankruptcy law) where such failure to perform constitutes willful misconduct or gross negligence.

        15.   <u>Permanent Injunction</u>. Except as otherwise expressly provided in the Plan, including any obligation, claim, cause of action, or liability arising expressly under the Plan or reserved by any Entity pursuant to the Plan, all Entities who have held, hold, or may hold Claims against the Debtors, Released Claims against the Released Parties and the Exculpated Parties, and all Entities holding Interests, are permanently enjoined, from and after the Effective Date, from: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Released Claims or Interests, as applicable; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against the Debtors, Reorganized Eurofresh or Reorganized EPL, such Released Parties and Exculpated Parties on account of or in connection with or with respect to any such Claims, Released Claims or Interests, as applicable; (3) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, Reorganized Eurofresh or Reorganized EPL, such Released Parties and Exculpated Parties or the property or

estates of the Debtors, Reorganized Eurofresh or Reorganized EPL, such Released Parties and Exculpated Parties on account of or in connection with or with respect to any such Claims, Released Claims and Interests, as applicable; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors, such Released Parties and Exculpated Parties or against the property or Estates of the Debtors, Reorganized Eurofresh or Reorganized EPL, such Released Parties and Exculpated Parties on account of or in connection with or with respect to any such Claims, Released Claims or Interests, as applicable, unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Released Claims or Interests released or settled pursuant to the Plan.

## B.    Transactions Contemplated by the Plan

### 1.    Generally

On the Effective Date, the Existing Equity will be cancelled and Reorganized Eurofresh will enter into either (a) the New First Lien Loans and the Term Loan B or (b) the New Credit Facility.

If Class 1A and Class 1B Accept the Plan, then Reorganized Eurofresh will enter into the New First Lien Loans and the Term Loan B and apply $35,000,000 of the New Money Investment to reduce the principal amount owing under the Existing Credit Documents in accordance with the provisions of the AAL. In addition, $15,000,000 of the New Money Investment will be available as a Working Capital Facility for Reorganized Eurofresh. Reorganized Eurofresh will also issue $12,000,000 in Subordinated PIK Notes to Bio Dynamics.

If Class 1A and/or Class 1B Reject the Plan, then Reorganized Eurofresh will enter into the New Credit Facility and apply $10,000,000 of the New Money Investment to reduce the principal amount owing under the Existing Credit Documents in accordance with the provisions of the AAL. In addition, $15,000,000 of the New Money Investment will be available as working capital for Reorganized Eurofresh. Reorganized Eurofresh will also issue $20,000,000 in Subordinated PIK Notes to the New Investors and $5,000,000 in Subordinated PIK A Notes to the New Investors ($2,500,000 of which shall be issued to Bio Dynamics and $2,500,000 of which shall be issued to the Investing Noteholders. in proportion to their respective Investing Noteholder Investments).

Under either scenario set forth above, Reorganized Eurofresh will issue $10,000,000 in PIK Preferred Stock on a pro rata basis to the Senior Noteholders on account of their pre-petition Allowed Claims against the Debtors, and 10.0 million shares of New Common Stock to be distributed among Bio Dynamics, the Investing Noteholders, and the Senior Noteholders (of which 1.0 million shares may be held as Reserved Shares should Class 1A and/or Class 1B Reject the Plan). In addition, 750,000 shares of New Common Stock will be reserved for management stock options under the MIP.

With regard to Holders of Class 4 Senior Noteholder Claims, in order to participate in the New Money Investment, each Class 4 Holder must: (i) carefully review the Plan, this Disclosure Statement and the IPSA, including the Joinder Agreement and the Accredited Investor Questionnaire attached thereto; (ii) check the box to participate in the New Money Investment on the Ballot and fully complete the remainder of, and execute, the Ballot; (iii) complete and execute the Joinder Agreement and the Accredited Investor Questionnaire; and (iv) send the completed Ballot, Joinder Agreement and Accredited Investor Questionnaire to its Nominee sufficiently in advance of the Voting Deadline. Upon receipt of the completed Ballot, Joinder Agreement and Accredited Investor Questionnaire from such Nominee, a Debtors' representative will contact the Class 4 Holder to make arrangements for closing and payment of the purchase price for the New Money Investment. Once the Class 4 Holder elects to participate in the New Money Investment, it will be obligated to participate regardless of whether Classes 1A and/or 1B vote to Accept or Reject the Plan and therefore, whether the total New Money Investment is $50,000,000 or $25,000,000. In the event Classes 1A and 1B accept the Plan, the Investing Noteholders' (as defined in the IPSA) portion of the $50,000,000 New Money Investment will be $35,000,000, of which the Class 4 Holder will be obligated to contribute its pro rata share (the principal amount of its Senior Note debt divided by $170,000,000). In the event Classes 1A and/or 1B reject the Plan, the Investing Noteholders' portion of the $25,000,000 New Money Investment will be $12,500,000, of which the Class 4 Holder will be obligated to contribute its pro rata share.

The equity in Reorganized Eurofresh shall be allocated as follows: 10,000,000 shares of New Common Stock will be issued such that Bio Dynamics and the Investing Noteholders (on a pro-rata basis) will each own 40% of Reorganized Eurofresh, the Senior Noteholders (on a pro-rata basis) will own either 20% of Reorganized Eurofresh (if Class 1A and Class 1B Accept the Plan) or 10% of Reorganized Eurofresh with the remaining 10% of Reorganized Eurofresh allocated between the Investing Noteholders and the Senior Noteholders in accordance with Section 5.B.4.c of the Plan. 750,000 shares of New Common Stock will be reserved for issuance under to the MIP.

On the Effective Date or as soon as reasonably practicable thereafter, Reorganized Eurofresh, Reorganized EPL and the officers and members of the Board of Directors thereof, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) execution and delivery of all documents required for (a) the New First Lien Loans and the Term Loan B or the New Credit Facility (as applicable) and (b) the New Money Investment; (4) issuance of new Securities pursuant to the Plan; and (5) all other actions that Reorganized Eurofresh determines are necessary or appropriate, in the name of and on behalf of Reorganized Eurofresh or Reorganized EPL, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

2.    <u>New First Lien Loan and the Term Loan B or New Credit Facility</u>

Prior to the Effective Date, the Bankruptcy Court shall determine the Allowed amount of the Class 1A Existing Credit Agreement Claims and the Class 1B Capital Lease Claims, representing the Debtors' obligations under the Existing Credit Documents pursuant to sections 502 and 506 of the Bankruptcy Code, including any unpaid interest, fees and charges payable thereon.

a. <u>Acceptance of the Plan by Class 1A and Class 1B</u>:

On the Effective Date, provided that Class 1A and Class 1B Accept the Plan, Reorganized Eurofresh will apply $35,000,000 of the New Money Investment to the principal amount of the Existing Credit Agreement as determined by the Bankruptcy Court, <u>provided, however</u>, that any make-whole premium, pre-payment premium, default interest or similar fee, charge or penalty alleged by the Existing Lenders to be due or payable under the Existing Credit Documents shall be disallowed and not be paid from the New Money Investment. The remaining principal amount, along with any Allowed accrued and unpaid interest, fees and other charges under the Existing Credit Documents shall be repaid, to the extent allowed under Section 506 of the Bankruptcy Code, under the terms of the Term Loan B, which shall replace and supersede the Existing Credit Documents.

1. The credit documents to be executed in connection with the New First Lien Loans shall include the following provisions:

a. The maturity date of the indebtedness shall be four years with a one year extension at the option of the lenders;

b. The New First Lien Loans shall be first lien, senior secured loans;

c. The financial covenants will conform to conservative operating projections for Reorganized Eurofresh;

d. The New First Lien Loans shall bear interest at LIBOR plus 600 basis points with a 2% floor; and

e. Reorganized Eurofresh will make annual principal payments commencing on the first anniversary of the Effective Date and continuing on each subsequent anniversary of the Effective Date until maturity, equal to 50% of "excess cash flow" as that term will be defined in the Term Loan A.

2. The credit agreement to be executed in connection with the Term Loan B shall include the following provisions:

a. The maturity date of the indebtedness and the covenants under the Term Loan B shall be the same as set forth in the Term Loan A;

b.     The Term Loan B shall be junior to the New First Lien Loans;

c.     No new letters of credit will be issued under the Term Loan B and it will not include any revolving credit facility.  Any existing letters of credit (the "**Existing Letters of Credit**") outstanding under the Existing Credit Agreement will remain outstanding until drawn upon or expiration. If any amount is drawn under the Existing Letters of Credit at any time, the amount of such draw shall be added to the principal balance of the Existing Credit Documents Claims or the indebtedness under the Term Loan B, as applicable, and shall be subject to the terms of the Term Loan B;

d.     The interest rate(s) under the Term Loan B shall be equal to the non-default interest rate(s) under the Existing Credit Agreement; and

e.     Reorganized Eurofresh will make interest only payments (cash pay) during the term of the Term Loan B with a balloon payment of the principal at maturity.

b.     Rejection of the Plan by Class 1A and/or Class 1B:

Alternatively, on the Effective Date, should Class 1A and/or Class 1B Reject the Plan, Reorganized Eurofresh will apply $10,000,000 of the New Money Investment to the principal amount of the Existing Credit Agreement as determined by the Bankruptcy Court, provided, however, that any make-whole premium, pre-payment premium or similar fee or penalty alleged by the Existing Lenders to be due or payable under the Existing Credit Documents shall be disallowed and not be paid from the New Money Investment.  The remaining principal amount, along with any Allowed accrued and unpaid interest, fees and other charges under the Existing Credit Documents shall be repaid, to the extent allowed under Section 506 of the Bankruptcy Code, under the terms of the New Credit Facility, which shall replace and supersede the Existing Credit Documents.

The Amended and Restated Credit Agreement to be executed in connection with the New Credit Facility shall include the following and be in accordance with Section V.A.7.a. hereof:

1.     The maturity date of the indebtedness under the New Credit Agreement shall be five years after the Effective Date of the Plan;

2.     The representations and warranties in the Existing Credit Agreement shall be modified to ensure that they are accurate as of the Effective Date;

3.     The financial covenants shall include those set forth in Section V.A.7.a. hereof and shall conform to conservative operating projections for Reorganized Eurofresh, as well as include a "cash cure" of any defaults with new money investment in the form of additional Subordinated PIK Notes or additional equity;

- 60 -

4.      No new letters of credit will be issued under the New Credit Facility and it will not include any revolving credit facility. Any existing letters of credit (the "**Existing Letters of Credit**") outstanding under the Existing Credit Agreement will remain outstanding until drawn upon or expiration. If any amount is drawn under the Existing Letters of Credit at any time, the amount of such draw shall be added to the principal balance of the Existing Credit Documents Claims or the indebtedness under the New Credit Facility, as applicable, and shall be subject to the terms of the New Credit Facility;

5.      The interest rate the interest rate on the indebtedness under the New Credit Facility shall be fixed at the five year treasury bill rate plus 500 basis points or the minimum rate as is necessary to comply with section 1129(b) of the Bankruptcy Code or as determined by the Bankruptcy Court and agreed to by the Investing Noteholders and the Debtors; and

6.      Reorganized Eurofresh (i) will make annual principal payments, commencing on the first anniversary of the Effective Date, equal to 50% of "excess cash flow," as that term shall be defined in the New Credit Facility, and (ii) will have the right to prepay the indebtedness under the New Credit Facility, in whole or in part, at any time, without fee, charge or penalty of any kind.

## VI. ACCEPTANCE AND CONFIRMATION OF THE PLAN

The following is a brief summary of the provisions of the Bankruptcy Code relevant to acceptance and confirmation of a plan of reorganization. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code with their own attorneys.

### A.      Acceptance of the Plan

This Disclosure Statement is provided in connection with the solicitation of acceptances of the Plan. The Bankruptcy Code defines acceptance of a plan of reorganization by a class of claims as acceptance by holders of a least two-thirds in dollar amount, and more than one-half in number, of the allowed claims of that class that have actually voted or are deemed to have voted to accept or reject a plan. The Bankruptcy Code defines acceptance of a plan of reorganization by a class of interests as acceptance by at least two-thirds in amount of the allowed interests of that class that have actually voted or are deemed to have voted to accept or reject a plan.

If one or more Impaired Classes rejects the Plan, the Debtors may, in their discretion, nevertheless seek confirmation of the Plan if the Debtors believe that it will be able to meet the requirements of section 1129(b) of the Bankruptcy Code for confirmation of the Plan (which are summarized below), despite the lack of acceptance by all Impaired Classes.

### B.      Confirmation

1.      Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Notice of the Confirmation Hearing regarding the Plan has been

provided to all known holders of Claims and Interests or their respective representatives along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform with the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, must set forth the name of the objecting party, the nature and amount of Claims or Interests held or asserted by that party against the Debtors' estates or property, and the specific basis for the objection. Such objection must be Filed with the Bankruptcy Court, with a copy forwarded directly to the chambers of the Bankruptcy Judge, together with a proof of service, and served on all parties by the date set forth on the notice of the Confirmation Hearing.

2.      Statutory Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Debtors will request that the Bankruptcy Court determine that the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. If the Bankruptcy Court so determines, the Bankruptcy Court will enter an order confirming the Plan. The applicable requirements of section 1129 of the Bankruptcy Code are as follows:

(a)      The Plan must comply with the applicable provisions of the Bankruptcy Code;

(b)      The Debtors must have complied with the applicable provisions of the Bankruptcy Code;

(c)      The Plan must have been proposed in good faith and not by any means forbidden by law;

(d)      Any payment made or promised to be made by the Debtors under the Plan for services or for costs and expenses in, or in connection with, the Bankruptcy Cases, or in connection with the Plan, must have been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan must be reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment must be subject to the approval of the Bankruptcy Court as reasonable;

(e)      The Debtors (i) have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the debtor participating in a joint plan with the Debtors, or a successor to the Debtors under the plan and the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and (ii) have disclosed the identity of any insider that will be employed or retained by Reorganized Eurofresh, and the nature of any compensation for such insider;

- 62 -

(f)     *Best Interests of Creditors Test:*  With respect to each Class of Impaired Claims or Interests, either each holder of a Claim or Interest of such Class must have accepted the Plan, or must receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code.  In a chapter 7 liquidation, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no lower class receiving any payments until all amounts due to senior classes have either been paid in full or payment in full is provided for:  (i) first to secured creditors (to the extent of the value of their collateral), (ii) next to priority creditors, (iii) next to unsecured creditors, (iv) next to debt expressly subordinated by its terms or by order of the Bankruptcy Court, and (v) last to holders of interests. Attached as <u>Exhibit B</u> hereto is a liquidation analysis prepared by the Debtors and their professionals which indicates that, after consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) substantial increases in claims which are likely to arise in a liquidation, the Debtors have determined that Confirmation of the Plan will provide each Holder of an Allowed Claim or Interest with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  As such, thus, the Plan satisfies the Best Interests Test of section 1129(a)(7) of the Bankruptcy Code;

(g)     Each Class of Claims or Interests must have either accepted the Plan or not be impaired under the Plan;

(h)     Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Allowed Administrative and Allowed Priority Claims (other than Allowed Priority Tax Claims) will be paid in full on the Effective Date;

(i)     Unless otherwise agreed, Allowed Priority Tax Claims shall be paid in full in Cash on the Effective Date or within ten days of becoming Allowed pursuant to sections 511 and 1129(a)(9)(C) of the Bankruptcy Code, or within the timeframe otherwise permitted by applicable non-bankruptcy law

(j)     At least one impaired Class of Claim must have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class;

(k)     *Feasibility:*  Confirmation of the Plan must not be likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors.  Attached as <u>Exhibit C</u> hereto are projections for the fiscal years ending December 31, 2009, 2010 and 2011, all of which demonstrate that, given estimated expenses and income, and taking into account cash reserves, the Debtors will be able to satisfy its obligations under the Plan; and

(l)     All fees payable under 28 U.S.C. § 1930, as determined by the Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the Effective Date of the Plan.

3.     <u>Confirmation Without Acceptance by All Impaired Classes</u>

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan, even if such plan has not been accepted by all impaired classes entitled to vote on such plan, provided that such plan has been accepted by at least one impaired class.  If any impaired class rejects or is deemed to have rejected the Plan, the Debtors reserve their rights to seek the application of the requirements set forth in section 1129(b) of the Bankruptcy Code for confirmation of the Plan, despite the lack of acceptance by all impaired classes.

Section 1129(b) of the Bankruptcy Code provides that notwithstanding the failure of an impaired class to accept a plan or reorganization, the plan must be confirmed, on request of the plan proponent, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of impaired claims or interests that has not accepted the plan.

The condition that a plan be "fair and equitable" with respect to a rejecting class of secured claims includes the requirements that (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan, and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a rejecting class of unsecured claims includes the requirement that either (a) such class receive or retain under the plan property of a value as of the effective date of the plan equal to the allowed amount of such claim or (b) if the class does not receive such amount, no class junior to the non-accepting class will receive a distribution under the plan.

The condition that a plan be "fair and equitable" with respect to a rejecting class of interests includes the requirements that either (a) the plan provides that each holder of an interest in such class receive or retain under the plan, on account of such interest, property of a value, as of the effective date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which

such holder is entitled, or (iii) the value of such interest, or (b) if the class does not receive such amount, no class of interests junior to the rejecting class will receive a distribution under the plan.

As stated above, Classes 5, 6 and 7 are deemed to have rejected the Plan. Accordingly, in order to confirm the Plan, the Debtors will have to satisfy the cramdown requirements of section 1129(b) of the Bankruptcy Code in order to achieve confirmation. The Debtors believe that such requirements are satisfied with respect to the deemed rejected Classes. The Plan does not discriminate unfairly against these Classes and is fair and equitable. Not only is there no unfair discrimination, there is no discrimination at all against these Classes. Holders of Class 5 Discount Note Claims are being treated the same as all other similarly situated creditors of the Debtors. Holders of Class 6 Subordinated Claims have contractually or otherwise agreed to subordinate their Claims to those of Holders of Claims in other Classes. The value of the Debtors' assets after the payment of all senior claims is insufficient to make any distribution to creditors in Classes 5 and 6. The same is true for the Class 7 Interests. There is no discrimination as all holders of Interests of EFI are being treated identically.

As required by section 1129(b)(ii) of the Bankruptcy Code, the absolute priority rule is observed and no junior creditor or Interest Holder will receive anything under the Plan. Accordingly, the Debtors believe that the cramdown requirements of section 1129(b) of the Bankruptcy Code are met and confirmation of the Plan is warranted.

## VII. PLAN VALUATION AND FEASIBILITY

A. <u>**Valuation of Reorganized Eurofresh as of the Effective Date and Projected Financial Information**</u>

THE VALUATION INFORMATION CONTAINED IN THIS SECTION WITH REGARD TO REORGANIZED EUROFRESH IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.

1. <u>Projected Financial Statements</u>

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. This standard is referred to as "feasibility." In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management has analyzed the ability of the Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct business.

The projections, which are set forth in <u>Exhibit C</u> to this Disclosure Statement (the "**Projections**"), should be read in conjunction with Section X below entitled "RISK FACTORS" and with the assumptions, qualifications and footnotes to tables containing the Projections (which include projected income statements, projected balance sheets, and projected statements of cash flows).

The Projections assume an Effective Date of October 31, 2009 with Allowed Claims treated as described in the Plan.  Claims Allowed as of the Effective Date will be paid within five business days of the Effective Date.  Except as otherwise provided in the Plan, expenses incurred as a result of the Bankruptcy Cases are assumed to be paid substantially contemporaneously with the Effective Date.  If the Debtors do not emerge from chapter 11 as currently scheduled, additional Administrative Claims will be incurred until such time as a plan of reorganization is confirmed and becomes effective.  These additional Administrative Claims could significantly impact the Debtors' cash flows if the Effective Date is materially later than the Effective Date assumed in these Projections.

It is important to note that the Projections and estimates of common stock equity values for Reorganized Eurofresh may differ from the actual realized performance and are highly dependent on significant assumptions concerning the future operations of Reorganized Eurofresh. These assumptions include pricing for the Debtors' products, volume, growth of the business, labor and other operating costs, regulatory environment, inflation, foreign exchange rates, and the level of investment required for capital expenditures and working capital.  Please refer to SECTION X, below, for a discussion of many of the factors that could have a material effect on the information provided in this section.

The estimate of common stock equity value for Reorganized Eurofresh is not intended to reflect the values that may be attainable in public or private markets.  They also are not intended to be appraisals or reflect the value that may be realized if assets are sold.

**THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THE DEBTORS' INDEPENDENT ACCOUNTANT HAS NOT REVIEWED THE ACCOMPANYING PROJECTIONS TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO. THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS.  ACCORDINGLY, THE DEBTORS DO NOT INTEND TO, AND DISCLAIM ANY OBLIGATION TO, (I) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS PRIOR TO THE EFFECTIVE DATE, OR (II) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.**

**THE PROJECTIONS PROVIDED IN CONNECTION WITH THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED EXCLUSIVELY BY THE DEBTORS' INTERNAL ACCOUNTING STAFF, AND DEBTORS' MANAGEMENT.  THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL.  THE DEBTORS**

CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE MATERIAL ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.  FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER.  THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  FINALLY, THE PROJECTIONS INCLUDE ASSUMPTIONS AS TO THE ENTERPRISE VALUE OF THE DEBTORS, THE FAIR VALUE OF THEIR ASSETS, AND THEIR ACTUAL LIABILITIES AS OF THE EFFECTIVE DATE.

2.  Valuation

THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS.  THE COMMON STOCK EQUITY VALUE ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET OR TRADING VALUE.  SUCH MARKET OR TRADING VALUE, IF ANY MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZATION VALUE RANGE ASSOCIATED WITH THE VALUATION ANALYSIS.

A&M-NA has advised the Debtors with respect to the reorganization value of Reorganized Eurofresh on a going concern basis.  Solely for purposes of the Plan and subject to the qualifications herein, the estimated range of reorganization value of Reorganized Eurofresh was assumed to be $93 million to $112 million (with a midpoint value of 102.5 million) as of June 30, 2009, with an Effective Date of October 31, 2009.  A&M-NA's estimate of a range of enterprise values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ESTIMATED RANGE OF THE REORGANIZATION VALUE, AS OF JUNE 30, 2009, WITH AN EFFECTIVE DATE OF OCTOBER 31, 2009 REFLECTS WORK PERFORMED BY A&M-NA ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF DEBTORS AVAILABLE TO A&M-NA AS OF AUGUST 5, 2009.  IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT A&M-NA'S CONCLUSIONS, A&M-NA DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATE.

Based upon the estimated range of the reorganization value of Reorganized Eurofresh of between $93 million and $112 million, A&M-NA has estimated the range of common stock equity value for Reorganized Eurofresh between approximately $0 million and $18.0 million, with a mid-point common stock equity value of $9.0 million.

The foregoing estimate of the reorganization value of Reorganized Eurofresh is based on a number of assumptions, including a successful reorganization of the Debtors' businesses and finances in a timely manner, the implementation of Reorganized Eurofresh's business plan, the achievement of the forecasts reflected in the Projections, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

A&M-NA's estimate of a range of reorganization values assumes that Debtors' Projections will be achieved by Reorganized Eurofresh in all material respects, including revenue growth, and improvements in operating margins, earnings and cash flow. Certain of the results forecasted by the management of Debtors are better than the recent historical results of operations of Debtors. As a result, to the extent that the estimate of enterprise values is dependent upon Reorganized Eurofresh performing at the levels set forth in the Projections, such analysis must be considered speculative. If the business performs at levels below those set forth in the Projections, such performance may have a material impact on the Projections and on the estimated range of values derived therefrom.

IN ESTIMATING THE RANGE OF THE REORGANIZATION VALUE AND COMMON STOCK EQUITY VALUE OF REORGANIZED EUROFRESH, A&M-NA:

- REVIEWED CERTAIN HISTORICAL FINANCIAL INFORMATION OF DEBTORS FOR RECENT YEARS AND INTERIM PERIODS;

- REVIEWED CERTAIN INTERNAL FINANCIAL AND OPERATING DATA OF DEBTORS, INCLUDING THE PROJECTIONS, WHICH WERE PREPARED AND PROVIDED TO A&M-NA BY DEBTORS' MANAGEMENT AND WHICH RELATE TO DEBTORS' BUSINESS AND ITS PROSPECTS;

- MET WITH CERTAIN MEMBERS OF SENIOR MANAGEMENT OF DEBTORS TO DISCUSS DEBTORS OPERATIONS AND FUTURE PROSPECTS;

- REVIEWED PUBLICLY AVAILABLE FINANCIAL DATA AND CONSIDERED THE MARKET VALUE OF PUBLIC COMPANIES THAT A&M-NA DEEMED GENERALLY COMPARABLE TO THE OPERATING BUSINESS OF DEBTORS;

- CONSIDERED RELEVANT PRECEDENT TRANSACTIONS IN THE DEBTORS' INDUSTRY;

- • CONSIDERED CERTAIN ECONOMIC AND INDUSTRY INFORMATION RELEVANT TO THE OPERATING BUSINESS; AND

- • CONDUCTED SUCH OTHER STUDIES, ANALYSIS, INQUIRIES, AND INVESTIGATIONS AS IT DEEMED APPROPRIATE.

ALTHOUGH A&M-NA CONDUCTED A REVIEW AND ANALYSIS OF THE DEBTORS' BUSINESS, OPERATING ASSETS AND LIABILITIES AND REORGANIZED EUROFRESH' BUSINESS PLAN, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY DEBTORS, AS WELL AS PUBLICLY AVAILABLE INFORMATION. IN ADDITION, A&M-NA DID NOT INDEPENDENTLY VERIFY MANAGEMENT'S PROJECTIONS IN CONNECTION WITH SUCH ESTIMATES OF THE REORGANIZATION VALUE AND COMMON STOCK EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH.

ESTIMATES OF THE REORGANIZATION VALUE AND COMMON STOCK EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.

IN THE CASE OF REORGANIZED EUROFRESH, THE ESTIMATES OF THE REORGANIZATION VALUE PREPARED BY A&M-NA REPRESENT THE HYPOTHETICAL REORGANIZATION VALUE OF REORGANIZED EUROFRESH. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED REORGANIZATION ENTERPRISE VALUE OF REORGANIZED EUROFRESH THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF REORGANIZED EUROFRESH SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. SUCH ESTIMATES ARE INHERENTLY SUBJECT TO

UNCERTAINTIES AND ACTUAL OUTCOMES AND RESULTS MAY DIFFER MATERIALLY FROM THOSE SET FORTH HEREIN. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES.

### 3. Valuation Methodologies

A&M-NA performed a variety of analyses and considered a variety of factors in preparing the valuation of Debtors. Several generally accepted valuation techniques for estimating Debtors' enterprise value were considered. A&M-NA primarily relied on two methodologies: comparable public company analysis and discounted cash flow analysis. A&M-NA made judgments as to the significance of each analysis in determining Debtors' indicated enterprise value range and relied primarily on comparable public company analysis and discounted cash flow analysis. A&M-NA's valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to Debtors' enterprise value.

The following summary does not purport to be a complete description of the analyses and factors undertaken to support A&M's conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized.

### (a) Comparable Public Company Analysis

A comparable public company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company. It establishes a benchmark for asset valuation by deriving the value of "comparable" assets, standardized using a common variable such as revenues, earnings, and cash flows. The analysis includes a detailed multi-year financial comparison of each company's income statement and balance sheet. In addition, each company's performance, profitability, margins, leverage and business trends are examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses (in this case, produce companies), business risks, target market segments, location of markets, network affiliation, growth prospects, market presence, size, and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. However, the

underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining fair value.

(b)     Discounted Cash Flow Approach

The discounted cash flow ("**DCF**") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to the Debtors. The expected future cash flows have two components: the present value of the projected unlevered after-tax free cash flows for a determined period and the present value of the terminal value of cash flows (representing value beyond the time horizon of the Projections).

This approach relies on the company's ability to project future cash flows with some degree of accuracy. Because the Debtors' Projections reflect significant assumptions made by the Debtors' management concerning anticipated results, the assumptions and judgments used in the Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized. A&M-NA cannot and does not make any representations or warranties as to the accuracy or completeness of the Debtors' Projections.

THE ESTIMATES OF THE REORGANIZATION VALUE AND COMMON STOCK EQUITY VALUE DETERMINED BY A&M-NA REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE REORGANIZATION EQUITY VALUE OF REORGANIZED EUROFRESH ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. ANY SUCH VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE REORGANIZATION EQUITY VALUE RANGE FOR REORGANIZED EUROFRESH ASSOCIATED WITH A&M-NA'S VALUATION ANALYSIS.

## VIII.  OTHER AVAILABLE FINANCIAL INFORMATION

The Debtors have filed periodic financial reports during the Chapter 11 Cases. Such reports are available for review and copying in the office of the Clerk of the Bankruptcy Court, United States Courthouse, 230 N. First Ave, Suite 101, Phoenix, AZ 85003.

## IX.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES

**IRS CIRCULAR 230 LEGEND. TO COMPLY WITH U.S. TREASURY REGULATIONS, WE ADVISE YOU THAT ANY U.S. FEDERAL TAX ADVICE INCLUDED IN THIS COMMUNICATION (1) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, TO AVOID ANY U.S. FEDERAL TAX PENALTIES, AND (2) WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTION OR MATTERS ADDRESSED BY THIS COMMUNICATION. ANY**

**TAXPAYER RECEIVING THIS COMMUNICATION SHOULD SEEK ADVICE FROM AN INDEPENDENT TAX ADVISOR BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES.**

The following is a summary of certain U.S. federal income tax consequences of the Plan to Debtors and certain Holders, including Holders of Existing Credit Agreement Claims, Capital Lease Claims, Miscellaneous Secured Claims, Convenience Claims, General Unsecured Claims, Senior Noteholder Claims, Discount Noteholder Claims, Subordinated Claims and Interests. This summary is based on the Internal Revenue Code, Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of the Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling from the Internal Revenue Service ("**IRS**") as to any of the tax consequences of the Plan discussed below. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to Holders that are not United States persons (as such term is defined in the Internal Revenue Code) or that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, and any other taxpayer using mark to market accounting). Unless otherwise specifically noted, the following discussion assumes that Holders of Existing Credit Agreement Claims, Capital Lease Claims, Miscellaneous Secured Claims, Convenience Claims, General Unsecured Claims, Senior Noteholder Claims, Discount Noteholder Claims, Subordinated Claims and Interests hold such Claims and Interests as "capital assets" within the meaning of section 1221 of the Internal Revenue Code. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors and Holders of Existing Credit Agreement Claims, Capital Lease Claims, Miscellaneous Secured Claims, Convenience Claims, General Unsecured Claims, Senior Noteholder Claims, Discount Noteholder Claims, Subordinated Claims and Interests based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, or foreign tax law.

**The following summary is not a substitute for careful tax planning based on the particular circumstances of each Holder, including Holders of Existing Credit Agreement Claims, Capital Lease Claims, Miscellaneous Secured Claims, Convenience Claims, General Unsecured Claims, Senior Noteholder Claims, Discount Noteholder Claims, Subordinated Claims and Interests. Each Holder is urged to consult his, her, or its own tax advisors as to the U.S. federal income tax consequences, as well as other tax consequences, including under any applicable state, local, and foreign law, of the restructuring described in the Plan.**

A. **Certain U.S. Federal Income Tax Consequences to the Holders of Claims and Interests.**

1. Consequences to Holders of Existing Credit Agreement Claims and Capital Lease Claims.

If Class 1A and Class 1B Accept the Plan, the Holders of Existing Credit Agreement Claims and Capital Lease Claims will together be paid $35,000,000 in Cash in accordance with the provisions of the AAL, and the remainder of the Allowed Existing Credit Documents Claims will roll over and become a new secured obligation of Reorganized Eurofresh subject to the terms of the Term Loan B. If Class 1A and/or Class 1B Reject the Plan, the Holders of Existing Credit Agreement Claims and Capital Lease Claims will together be paid $10,000,000 in Cash in accordance with the provisions of the AAL, and the remainder of the Allowed Existing Credit Documents Claims will roll over and become a new secured obligation of Reorganized Eurofresh subject to the terms of the New Credit Facility. If the terms of the new secured obligation subject to the terms of the Term Loan B or the New Credit Agreement differ significantly (as described in Treasury Regulations Section 1.1001-3) from the Existing Credit Documents, the substitution may be characterized as an exchange of debt instruments for U.S. federal income tax purposes. If an exchange of debt instruments is deemed to occur, the U.S. federal income tax consequences to Holders of Existing Credit Agreement Claims and Capital Lease Claims depends on whether: (i) the Existing Credit Agreement Claims and Capital Lease Claims and the new secured obligation under the terms of the Term Loan B or New Credit Agreement will qualify as "securities" for purposes of the reorganization provisions of the Internal Revenue Code; and (ii) the Debtors' restructuring qualifies as a tax-free reorganization.

Whether an instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the term-length of a debt instrument at issuance is an important factor in determining whether such an instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including, among others: the security for payment; the creditworthiness of the obligor; the subordination or lack thereof to other creditors; the right to vote or otherwise participate in the management of the obligor; convertibility of the instrument into an equity interest of the obligor; whether payments of interest are fixed, variable, or contingent; and whether such payments are made on a current basis, or accrued.

If an exchange of debt instruments for U.S. federal income tax purposes is deemed to have occurred, and if the Existing Credit Agreement Claims or a Capital Lease Claims and the new secured obligation under the terms of the Term Loan B or the New Credit Agreement qualify as "securities" under the reorganization provisions of the Internal Revenue Code, then the exchange of the Existing Credit Agreement Claims and Capital Lease Claims for the new secured obligation under the terms of the Term Loan B or the New Credit Agreement should be treated as a recapitalization and, therefore, a tax-free organization. In such case, each Holder of an Existing Credit Agreement Claims and Capital Lease Claims should not recognize any gain or loss on the exchange, except that a Holder of an Existing Credit Agreement Claims or a Capital

- 73 -

Lease Claims may recognize ordinary income to the extent that the new secured obligation under the terms of the Term Loan B or New Credit Agreement is treated as received in satisfaction of accrued by untaxed interest on such Allowed Existing Credit Agreement Claims and Allowed Capital Lease Claims. *See* Article IX.A.5 below for further information.

If the exchange is treated as a recapitalization, subject to the exception discussed below, each Holder of an Allowed Existing Credit Agreement Claim and Allowed Capital Lease Claim should obtain an aggregate tax basis in the new secured obligation under the Term Loan B or New Credit Agreement received by such Holder equal to the tax basis of the Allowed Existing Credit Agreement Claim or Allowed Capital Lease Claim surrendered in exchange therefor. In addition, each Holder of an Allowed Existing Credit Agreement Claim or Allowed Capital Lease Claim should have a holding period in the new secured obligation under the Term Loan B or the New Credit Agreement that includes the holding period of the Allowed Existing Credit Agreement Claim or Allowed Capital Lease Claim exchanged by such Holder therefore in the recapitalization. Notwithstanding the above discussion, the tax basis of any portion of the new secured obligation under the Term Loan B or the New Credit Agreement treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period in any such portion should begin on the day following the Effective Date.

To the extent that a debt exchange is deemed to occur for federal income tax purpose, and either the Allowed Existing Credit Agreement Claim or Allowed Capital Lease Claim or the new secured obligation under the terms of the Term Loan B or the New Credit Agreement does not qualify as a "security" under the reorganization provisions of the Internal Revenue Code, each Holder of an Allowed Existing Credit Agreement Claim or Allowed Capital Lease Claim will be treated as exchanging its Allowed Existing Credit Agreement Claim or Allowed Capital Lease Claim for the new secured obligation under the terms of the Term Loan B or the New Credit Agreement in a taxable exchange under section 1001 of the Internal Revenue Code. Accordingly, subject to the discussion regarding accrued but untaxed interest below, each Holder of such an Allowed Existing Credit Agreement Claim or Allowed Capital Lease Claim should recognize gain or loss equal to the difference between: (i) the adjusted issue price of the Holder's new secured obligation under the terms of the Term Loan B or the New Credit Agreement, and (ii) such Holder's tax basis in the Allowed Existing Credit Agreement Claim or Allowed Capital Lease Claim exchanged therefor. Such gain or loss should be capital in nature so long as the Allowed Existing Credit Agreement Claim or Allowed Capital Lease Claim was held by the Holder thereof as a capital asset (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Holder has a holding period for the Allowed Existing Credit Agreement Claim or Allowed Capital Lease Claim of more than one year. A Holder of an Allowed Existing Credit Agreement Claim or Allowed Capital Lease Claim may recognize ordinary income to the extent that the new secured obligation under the terms of the Term Loan B or the New Credit Agreement is treated as received in satisfaction of accrued untaxed interest on such Allowed Existing Credit Agreement Claim or Allowed Capital Lease Claim. *See* Article IX.A.5 below for further information. A Holder's tax basis in the new secured obligation under the terms of the Term Loan B or the New Credit Agreement that was received in a taxable exchange for an Allowed Existing Credit Agreement Claim or Allowed Capital Lease Claim should equal the fair market value of the new secured obligation under the terms of the Term Loan B or the New Credit Agreement exchanged therefor as of the date of

exchange, and the Holder's holding period for the new secured obligation under the terms of the Term Loan B or the New Credit Agreement should begin on the day following the Effective Date.

2.      Consequences to Holders of Allowed Miscellaneous Secured Claims.

Pursuant to the Plan, each Allowed Miscellaneous Secured Claim will either be Reinstated, paid in full in Cash or have all collateral securing such Allowed Miscellaneous Secured Claim returned.  If a Holder of an Allowed Miscellaneous Secured Claim receives Cash or has all collateral securing such Claim returned in satisfaction of its Allowed Claim, the satisfaction should be treated as a taxable exchange under Section 1001 of the Internal Revenue Code, and the Holder should recognize capital gain or loss (which capital gain or loss should be long-term capital gain or loss if the Holder has held its Allowed Miscellaneous Secured Claim for more than one year) (subject to the "market discount" rules described below) equal to the difference between (x) the amount of Cash or the fair market value of other property received in exchange for its Allowed Miscellaneous Secured Claim, and (y) the Holder's tax basis in its Allowed Miscellaneous Secured Claim.  The Holder of an Allowed Miscellaneous Secured Claim that receives collateral in exchange therefor will have a tax basis in such collateral equal to the collateral's fair market value at the time of the exchange, and a holding period in the collateral that begins on the day after the Effective Date.  To the extent that Cash or property received in the exchange is allocable to accrued interest that has not already been taken into income by the Holder, the Holder may recognize ordinary interest income.  *See* Article IX.A.5 below for further information.  If an Allowed Miscellaneous Secured Claim is Reinstated, the Holder of such Claim should not recognize gain or loss except to the extent collateral securing such Claim is changed, and the change in collateral constitutes a "significant modification" of the Allowed Miscellaneous Secured Claim within the meaning of Treasury Regulations promulgated under section 1001 of the Internal Revenue Code.

3.      Consequences to Holders of Allowed Convenience Claims and Allowed General Unsecured Claims.

Pursuant to the Plan, the Holders of both Allowed Convenience Claims and Allowed General Unsecured Claims will be paid a pro rata portion of their Allowed Claims in Cash.  If a Holder of an Allowed Convenience Claim or Allowed General Unsecured Claim receives Cash in satisfaction of its Allowed Claim, the receipt of such Cash should be treated as a taxable exchange under section 1001 of the Internal Revenue Code, and the Holder should recognize gain or loss equal to the difference between (x) the amount of Cash received for its Allowed Claim, and (y) the Holder's tax basis in its Allowed Convenience Claim or Allowed General Unsecured Claim.  Depending upon the manner in which the Allowed Convenience Claim or Allowed General Unsecured Claim arose, such gain or loss may be either capital or ordinary in nature.  If the gain or loss is capital, it would qualify as long-term capital gain or loss if the Holder held the Allowed Convenience Claim or Allowed General Unsecured Claim for more than one year, but such capital gain or loss (whether long-term or short-term) would be subject to the "market discount" rules described below.  To the extent that the Cash received in the exchange is allocable to accrued interest that has not already been taken into income by the

Holder, the Holder of the Allowed Convenience Claim or Allowed General Unsecured Claim may recognize ordinary interest income. *See* Article IX.A.5 below for further information.

4.      <u>Consequences to Holders of Allowed Senior Noteholder Claims</u>.

Pursuant to the Plan, Allowed Senior Noteholder Claims will be exchanged for (a) a pro rata share of both the PIK Preferred Stock and 10% of the New Common Stock, and (b) the New Common Stock to be held as Reserved Shares in the Reserved Shares Trust (as applicable), the proceeds of a disposition of which will be allocated among the Senior Noteholders (who are not Investing Noteholders) and Investing Noteholders as provided in the Plan. The U.S. federal income tax consequences to Holders of Allowed Senior Noteholder Claims depend on: (i) whether Senior Noteholders are treated as the owners of the Reserved Shares held in the Reserved Shares Trust for federal income tax purposes as of the Effective Date, (ii) whether the Allowed Senior Noteholder Claims are treated as "securities" of EFI for purposes of the reorganization provisions of the Internal Revenue Code; and (iii) whether the Debtors' restructuring qualifies as a tax-free reorganization. For a general discussion of what constitutes a "security," *see* Article IX.A.1.a.

The position of the IRS is that post-confirmation liquidating trusts are taxed as grantor trusts with the creditors treated as grantors and deemed owners of the trust. In these situations, the debtor is treated as having transferred the trust assets to the creditors in exchange for the release of indebtedness, and the creditors are then are treated as having transferred the trust assets to the liquidating trust. Although it is not entirely clear, provided the Reserved Shares Trust's only purpose is to ensure that the Allowed Senior Noteholders Claims are satisfied upon a disposition of the Reserved Shares (as applicable), the Reserved Shares Trust arguably should be considered a liquidating trust. In any event, if the Reserved Shares Trust were not considered a liquidating trust, the rationale of the administrative rulings underlying the IRS's position with respect to liquidating trusts should apply to cause the Reserved Shares Trust to be treated as a grantor trust with the Senior Noteholders treated as the owners of such trusts (as applicable). Accordingly, consistently with the IRS's position with respect to liquidating trusts, for federal income tax purposes, the New Common Stock that may be held as Reserved Shares in the Reserved Shares Trust (as applicable) should be treated as having been transferred to the Holders of Allowed Senior Noteholders Claims at the time the Reserved Shares are placed in the Reserved Shares Trust, and the Holders of Allowed Senior Noteholders Claims should be treated as the owners of the Reserved Shares Trust.

To the extent that all or some of the Allowed Senior Noteholder Claims are treated as securities of EFI, then the exchange of such Allowed Senior Noteholder Claims so treated for PIK Preferred Stock and New Common Stock (including the Reserved Shares, as applicable) pursuant to the Plan should be treated as a recapitalization and, therefore, a tax-free organization. In such case, each Holder of such Allowed Senior Noteholder Claims that is treated as securities of EFI should not recognize any gain or loss on the exchange, except as noted in the following paragraph.

A Holder of such Allowed Senior Noteholder Claims will recognize ordinary income to the extent that either the PIK Preferred Stock or New Common Stock (including the Reserved

Shares as applicable) is treated as received in satisfaction of accrued but untaxed interest on such Allowed Senior Noteholder Claims. *See* Article IX.A.5 below for further information. In addition, if the PIK Preferred Stock constitutes "nonqualifed preferred stock" within the meaning of the reorganization provisions of the Internal Revenue Code, the PIK Preferred Stock would be treated as "other property" under section 356 of the Internal Revenue Code. Accordingly, the Holders of Allowed Senior Noteholder Claims may recognize gain on the exchange of the Allowed Senior Noteholder Claims for the PIK Preferred Stock and New Common Stock (including the Reserve Shares as applicable) in an amount not to exceed the aggregate fair market value of the PIK Preferred Stock that is treated as nonqualified preferred stock, and such gain may be treated as capital gain or ordinary income depending upon the facts and circumstances at the time of distribution.

If the PIK Preferred Stock is not characterized as nonqualifed preferred stock, subject to the exception discussed below, each Holder of an Allowed Senior Noteholder Claim should obtain an aggregate tax basis in the New Common Stock (including the Reserved Shares as applicable) and PIK Preferred Stock received by such Holder equal to the tax basis of the Allowed Senior Noteholder Claim surrendered in exchange therefor. In addition each Holder of an Allowed Senior Noteholder Claim should have a holding period in the New Common Stock (including the Reserved Shares as applicable) and PIK Preferred Stock (that is not characterized as nonqualified preferred stock) that includes the holding period of the Allowed Senior Noteholder Claim exchanged therefor. Subject to the exception discussed below, a Holder of an Allowed Senior Noteholder Claim that receives PIK Preferred Stock that is characterized as nonqualified preferred stock, will receive (a) a tax basis (i) in the New Common Stock (including the Reserved Shares as applicable) equal to the tax basis of the Allowed Senior Noteholder Claim surrendered in exchange therefor increased by the amount of gain, if any, recognized by such Allowed Senior Noteholder and reduced by the fair market value of the PIK Preferred Stock, and (ii) in the PIK Preferred Stock that equals the fair market value of such PIK Preferred Stock, and (b) a holding period (i) in the New Common Stock (including the Reserved Shares as applicable) that includes the holding period of the Allowed Senior Noteholder Claim exchanged therefor, and (ii) in the PIK Preferred Stock that begins the day after the Effective Date. Notwithstanding the above discussion, the tax basis of any share (or portion thereof) of the PIK Preferred Stock and/or New Common Stock (including the Reserved Shares as applicable) that is treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period of any such share (or portion thereof) should begin on the day following the Effective Date.

To the extent that Allowed Senior Noteholder Claims are not treated as securities of EFI, the Holders of such Allowed Senior Noteholder Claims will be treated as exchanging their Allowed Senior Noteholder Claims for PIK Preferred Stock and New Common Stock (including the Reserved Shares as applicable) in a taxable exchange under section 1001 of the Internal Revenue Code. Accordingly, subject to the discussion regarding accrued but untaxed interest below, each Holder of such an Allowed Senior Noteholder Claim should recognize gain or loss equal to the difference between: (i) the aggregate fair market value of (a) the PIK Preferred Stock (as of the date the stock is distributed to the Holder), (b) the New Common Stock (as of the date the stock is distributed to the Holder) and (c) Reserved Shares (as of the date the Reserved Shares are deemed to have been distributed to the Holder), received in exchange for such

Holder's Allowed Senior Noteholder Claim, and (ii) such Holder's tax basis in the Allowed Senior Noteholder Claim. Such gain or loss should be capital in nature so long as the Allowed Senior Noteholder Claim was held by the Holder thereof as a capital asset (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Holder has a holding period for the Allowed Senior Noteholder Claim of more than one year. A Holder of an Allowed Senior Noteholder Claim will recognize ordinary income to the extent that either the PIK Preferred Stock and/or New Common Stock (including the Reserved Shares as applicable) is treated as received in satisfaction of accrued but untaxed interest on such Allowed Senior Noteholder Claim. *See* Article IX.A.5 below for further information. A Holder's tax basis in PIK Preferred Stock and New Common Stock (including the Reserved Shares as applicable) should equal the fair market value thereof as of the date such assets are distributed to the Holder (or in the case of Reserved Shares, the date such shares are transferred to the Reserved Shares Trust). A Holder's holding period for the PIK Preferred Stock and New Common Stock (including the Reserved Shares as applicable) should begin on the day following the Effective Date.

Dividends on the PIK Preferred Stock will be paid in kind until the New First Lien Loans and the Term Loan B or the New Credit Facility and the Subordinated PIK A Notes and Subordinated PIK Notes have been paid in full and the Board of Directors of Reorganized Eurofresh adopts a resolution authorizing the payment of such dividends in cash. The PIK feature may result in actual or deemed distributions by the Reorganized Eurofresh to Holders of the PIK Preferred Stock under section 305 of the Code. Holders of the PIK Preferred Stock would have to include the amount of such actual or deemed distributions in income as dividends to the extent of the current or accumulated earnings and profits of the Reorganized Eurofresh. The amount of any such actual or deemed distributions in excess of the earnings and profits of Reorganized Eurofresh will be treated first as a return of capital to the extent of the Holder's basis in the PIK Preferred Stock and then as gain from the sale or exchange of such PIK Preferred Stock.

5.    Accrued But Untaxed Interest.

It is expected that a portion of the consideration received under the Plan by Holders of Existing Credit Agreement Claims, Capital Lease Claims, Miscellaneous Secured Claims, Convenience Claims, General Unsecured Claims, and Senior Noteholder Claims may be attributable to accrued but untaxed interest. The accrued interest should be taxable to the recipient thereof as interest income upon receipt of the new consideration if such accrued interest has not been previously included in the recipient's gross income for U.S. federal income tax purposes.

Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such Holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes. The IRS could take the position, however, that the consideration received by a Holder should be allocated in some way other than as provided in the

Plan. Holders of Allowed Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

      6.    <u>Market Discount</u>.

Holders of Existing Credit Agreement Claims, Capital Lease Claims, Miscellaneous Secured Claims, Convenience Claims, General Unsecured Claims and Senior Noteholder Claims who dispose of their Allowed Claims in a taxable exchange under section 1001 of the Internal Revenue Code may be affected by the "market discount" provisions of sections 1276 through 1278 of the Internal Revenue Code. Under these rules, some or all of the gain realized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Allowed Claim.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Internal Revenue Code, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if such excess is less than a statutory de minimis amount (equal to 0.25 percent of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder as the result of the taxable disposition of an Allowed Existing Credit Agreement Claim, Capital Lease Claim, Miscellaneous Secured Claim, Convenience Claim, General Unsecured Claim or Senior Noteholder Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Existing Credit Agreement Claim, Capital Lease Claim, Miscellaneous Secured Claim, Convenience Claim, General Unsecured Claim and Senior Noteholder Claim was considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the Allowed Existing Credit Agreement Claim, Capital Lease Claim, Miscellaneous Secured Claim, Convenience Claim, General Unsecured Claim or Senior Noteholder Claim was acquired with market discount is exchanged in a tax-free transaction for other property (as may occur here), any market discount that accrued on the Allowed Existing Credit Agreement Claim, Capital Lease Claim, Miscellaneous Secured Claim, Convenience Claim, General Unsecured Claim or Senior Noteholder Claim but was not recognized by the Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property is treated as ordinary income to the extent of such accrued market discount.

      7.    <u>Consequences to Holders of Discount Noteholder Claims, Subordinated Claims and Interests</u>.

Pursuant to the Plan, the Holders of Discount Noteholder Claims, Subordinated Claims and Interests will not receive any consideration in exchange for their Claims or Interests. Accordingly, each Holder of a Discount Noteholder Claim, Subordinated Claim or Interest should recognize a loss equal to the Holder's tax basis in its Discount Noteholder Claim, Subordinated Claim or Interest. Depending upon the manner in which a Holder's Discount Noteholder Claim or Subordinated Claim arose, such loss may be either capital or ordinary in nature. The Holder of an Interest should recognize a capital loss. If the loss recognized by a Holder of a Discount Noteholder Claim, Subordinated Claim or Interest is capital, it would be characterized as a long-term capital loss if the Holder held the Discount Noteholder Claim, Subordinated Claim or Interest for more than one year.

8.    Information Reporting and Backup Withholding.

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the Internal Revenue Code.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S PARTICULAR CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

**B.    Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Eurofresh**

1.    Cancellation of Debt and Reduction of Tax Attributes.

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, and (y) the fair market value of any new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income under section 108 of the Internal Revenue Code. In general, tax attributes will be reduced in the following order: (a) net operating losses ("**NOLs**"); (b) most tax credits and capital loss carryovers; (c) tax basis in assets; and (d) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets under section 108(b)(5) of the Internal Revenue Code.

Because the Plan provides that Holders of Allowed Senior Noteholder Claims will receive PIK Preferred Stock and New Common Stock (including the Reserved Shares as applicable) in exchange for their Allowed Senior Noteholder Claims, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend in part on the fair market value of the PIK Preferred Stock and New Common Stock (including the Reserved Shares as applicable) exchanged for the Allowed Senior Noteholder Claims. The aggregate fair market value of the PIK Preferred Stock and New Common Stock (including the Reserved Shares as applicable) cannot be known until after the Effective Date. However, because not all Claims are expected to be fully satisfied, it is likely that the Debtors will trigger COD Income. Accordingly, it is likely that a reduction of the Debtor's tax attributes will be required.

2.      Limitation of NOL Carry Forwards and Other Tax Attributes.

The precise amount of NOL carryovers that will be available to Reorganized Eurofresh at emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available NOLs include: the amount of NOLs incurred by the Debtors during 2009; the value of the New Common Stock (including the Reserved Shares as applicable) and PIK Preferred Stock; and the amount of COD Income incurred by the Debtors in connection with Consummation. Although the Debtors presently have NOL carryovers, the Debtors believe that the amount of COD Income triggered as a result of the restructuring occurring under the Plan will exceed the sum of (a) the Debtors' NOL carryovers into 2009, and (b) the NOLs triggered by the Debtors during 2009.

In the event that the Debtors have NOL carryovers or other tax attributes after such NOL carryovers and other tax attributes have been reduced by the COD Income triggered as a result of the restructuring occurring under the Plan, the Debtors anticipate that any remaining NOL carryovers or other tax attributes of the Debtors allocable to periods prior to the Effective Date

(collectively, "**Pre-Change Losses**") may be subject to limitation under section 382 of the Internal Revenue Code as a result of an "ownership change" of the Debtors by reason of the transactions occurring pursuant to the Plan.

Under section 382 of the Internal Revenue Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future federal taxable income generally is subject to an annual limitation. As discussed more fully below, the Debtors anticipate that the issuance of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that Reorganized Eurofresh's use of the Debtor's NOL carryovers, if any, will be subject to limitation unless an exception to the general rules of section 382 of the Internal Revenue Code applies.

a.      General Section 382 Annual Limitation.

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the "ownership change" occurs (4.61% as of May 2009). Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

b.      Special Bankruptcy Exceptions.

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "**382(1)(5) Exception**"). Under the 382(1)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. However, if a debtor utilizes the 382(1)(5) Exception and then undergoes another "ownership change" within two years after the first ownership change, then the debtors' Pre-Change Losses are effectively eliminated.

Where the 382(1)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(1)(5) Exception), a second special rule will generally apply (the "**382(1)(6) Exception**"). When the 382(1)(6) Exception applies, a debtor corporation that undergoes an "ownership change" generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(1)(6) Exception also differs from the 382(1)(5) Exception in that under it the debtor corporation is not required to reduce its NOLs by the amount of interest deductions claimed within the prior three plus year period, and the debtor may undergo a second change of

ownership within two years of the first ownership change without triggering the elimination of its Pre-Change Losses.

The IRS has announced rules that make it beneficial for certain debtors to utilize the 382(l)(6) Exception. Under these rules, a corporation whose assets generally have a fair market value greater than their tax basis (a "**net unrealized built-in gain**") is permitted to increase its annual section 382 limitation during the five years immediately after the "ownership change" by an amount equal to the depreciation deductions that a hypothetical purchaser of such debtor's assets would have been permitted to claim if it had acquired the debtor's assets in a taxable transaction.

      3.    <u>Alternative Minimum Tax</u>.

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in 2001 and 2002, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. The effect of this rule could cause Reorganized Eurofresh to owe a modest amount of federal and state income tax on taxable income in future years even if there were regular tax NOL carryforwards available to offset that taxable income. Additionally, under section 56(g)(4)(G) of the Internal Revenue Code, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the tax basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under section 382(h) of the Internal Revenue Code, immediately before the ownership change.

## X.  RISK FACTORS

The restructuring of the Debtors involves a degree of risk, and this Disclosure Statement and certain of its exhibits and exhibits to be included in the Plan Supplement contain forward-looking statements that involve risks and uncertainty. Reorganized Eurofresh's actual results could differ materially from those anticipated in such forward-looking statements as a result of a variety of factors, including those set forth in the following risk factors and elsewhere in this Disclosure Statement.

**HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSIDER CAREFULLY THE FOLLOWING FACTORS, IN ADDITION TO THE OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, BEFORE SUBMITTING A VOTE TO ACCEPT OR REJECT THE PLAN.**

A.     **General Risks**

The Debtors caution that there are various important factors that could cause actual events to differ materially from those indicated in the forward-looking statements; accordingly, there can be no assurance that such indicated events will occur.  Among such factors are: general economic and business conditions; demand for Reorganized Eurofresh's products; changes in the general agricultural industry or the greenhouse industry; the ability to maintain sufficient liquidity; the availability and cost of key raw materials and labor; industry trends, including product pricing and competition; currency fluctuations; the loss of any significant customers; availability of qualified personnel;  major equipment failure; changes in, or the failure or inability to comply with, government regulation, including, without limitation, federal immigration and labor regulations; and the outcome of legal matters.  By making these forward-looking statements, the Debtors do not undertake to update them in any manner except as may be required by the Securities and Exchange Commission under federal law.

B.     **Risks Associated with Securities of Reorganized Eurofresh**

1.     *Reorganized Eurofresh and Reorganized EPL May Not Be Able to Achieve Their Projected Financial Results*.  Reorganized Eurofresh and Reorganized EPL may not be able to meet their projected financial results or achieve the revenue or cash flow that Reorganized Eurofresh and Reorganized EPL have assumed in projecting their future business prospects.  If Reorganized Eurofresh and Reorganized EPL do not achieve these projected revenue or cash flow levels, Reorganized Eurofresh and Reorganized EPL may lack sufficient liquidity to continue operations as planned after the Effective Date.  The Projections represent management's view based on currently known facts and hypothetical assumptions about their future operations.  The Projections do not, however, guarantee the future performance of Reorganized Eurofresh or Reorganized EPL.

2.     *The Plan Exchanges Senior Securities for Junior Securities*.  If the Plan is confirmed and Consummated, Holders of Allowed Senior Noteholder Claims in Class 4 will receive, in part, shares of New Common Stock.  Thus, in agreeing to the Plan, certain of such Holders will be consenting to the exchange of their interests in senior debt, which has, among other things, a stated interest rate, maturity date and a liquidation preference over equity securities, for shares of New Common Stock, which will be subordinate to all future Claims against Reorganized Eurofresh.

3.     *A Liquid Trading Market for New Common Stock, PIK Preferred Stock, Subordinated PIK A Notes and Subordinated PIK Notes Will Not Exist*.  The New Common Stock, PIK Preferred Stock, Subordinated PIK A Notes and Subordinated PIK Notes will not be listed on a national exchange and will not be registered under the Securities Act, by reason of certain exemptions from the registration provisions of the Securities Act.  The New Common Stock, PIK Preferred Stock, Subordinated PIK A Notes and Subordinated PIK Notes will be "restricted securities" under applicable U.S. federal and state securities laws and, pursuant to these laws, must be held indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available.  Reorganized Eurofresh will have no obligation to register or qualify the New Common Stock, PIK Preferred Stock, Subordinated PIK A Notes and

Subordinated PIK Notes for resale. If an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the New Common Stock, PIK Preferred Stock, Subordinated PIK A Notes and Subordinated PIK Notes and on requirements relating to Reorganized Eurofresh which Reorganized Eurofresh is under no obligation and may not be able to satisfy.

4. *There Will Be No Market Data for the Value of the New Common Stock, PIK Preferred Stock, Subordinated PIK A Notes and Subordinated PIK Notes Following the Effective Date*. As privately-held securities that are not listed on a national exchange and with restrictions on transferability, the New Common Stock, PIK Preferred Stock, Subordinated PIK A Notes and Subordinated PIK Notes will not be publicly traded and there will be no market data for the value of such securities.

5. *Significant Holders*. Following Consummation of the Plan certain Holders of Allowed Claims and the New Investors will hold a majority of the New Common Stock and may be in a position to control the outcome of actions requiring shareholder approval, including election of directors.

6. *The Debtors' Financial Projections are Subject to Inherent Uncertainty Due to the Numerous Assumptions on Which They Are Based*. The Projections are based on numerous assumptions including: timely Confirmation and Consummation pursuant to the terms of the Plan; the anticipated future performance of Reorganized Eurofresh; pricing for the Debtors' products; the anticipated agricultural output of Reorganized Eurofresh's operations; fluctuations in raw material costs and general business and economic conditions and other matters, many of which are beyond the control of Reorganized Eurofresh and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date that the Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of Reorganized Eurofresh's operations. These variations may be material and may adversely affect the ability of Reorganized Eurofresh to make payments with respect to indebtedness following Consummation. Because the actual results achieved throughout the periods covered by the Projections may vary from the projected results, the Projections should not be relied upon as an assurance of the actual results that will occur.

Except with respect to the Projections and except as otherwise specifically and expressly stated, the Disclosure Statement does not reflect any events that may occur subsequent to the date of the Disclosure Statement. Such events may have a material impact on the information contained in the Disclosure Statement. Neither the Debtors nor Reorganized Eurofresh intend to update the Projections. The Projections, therefore, will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.

7. *The Actual Amount of Allowed Claims May Differ from the Estimated Claims and Adversely Affect the Percentage Recovery of Claims*. The estimated Claims set forth in the Disclosure Statement are based on various assumptions, and the actual amount of Allowed Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual amount of Allowed Claims may vary from the estimated Claims contained in the Disclosure Statement. Such differences may

materially and adversely affect, among other things: (a) the percentage recoveries to Holders of Allowed Claims under the Plan; (b) Reorganized Eurofresh's ability to Consummate the Plan; (c) the Projections; and (d) Reorganized Eurofresh's need to raise additional debt or equity financing.

8.      *The Valuation Analysis of Reorganized Eurofresh and the Estimated Recoveries to Holders of Claims Are Not Intended to Represent the Trading Value of the Securities*.   The Valuation Analysis is based on the Projections developed by the Debtors' management and professionals and on certain generally accepted accounting principles.   It is not intended to represent the trading value of any of the Securities in public or private markets.   The Valuation Analysis is based on numerous assumptions (the realization of many of which are beyond the Debtors' and Reorganized Eurofresh's control), including Reorganized Eurofresh's successful reorganization, an assumed Effective Date on or about October 31, 2009, Reorganized Eurofresh's ability to achieve the operating and financial results included in the Projections, Reorganized Eurofresh's ability to maintain adequate liquidity to fund operations and the assumption that capital and equity markets remain consistent with current conditions.   Even if Reorganized Eurofresh achieves the Projections, the trading market values for the Securities could be adversely impacted by the lack of any public trading market for the Securities.

9.      *Reorganized Eurofresh Does Not Expect to Pay Cash Dividends on the New Common Stock for the Foreseeable Future*.   Due to the existence of the secured obligations under the New First Lien Loans and the Term Loan B or the New Credit Facility and restrictions on dividends payable to holders of New Common Stock related to the PIK Preferred Stock, Subordinated PIK A Notes and Subordinated PIK Notes, the Debtors will be unable to pay dividends on account of the New Common Stock for the foreseeable future.

10.     *The New Common Stock is Subject to Ongoing Dilution*.   Upon a liquidation event, the holders of PIK Preferred Stock will receive distributions prior to and in preference to the holders of New Common Stock.   In addition, Reorganized Eurofresh will reserve 750,000 shares of New Common Stock for management stock options under the MIP.   If such options are issued and exercised, the ownership percentages of the holders of New Common Stock will be diluted.   Also, the additional shares of New Common Stock that are authorized but not issued as of the Effective Date may subsequently be issued by the Board of Directors of Reorganized Eurofresh.   If such additional shares of New Common Stock are issued, the ownership percentages of New Common Stock will be diluted.

C.      **Risks Related to the Reorganized Eurofresh's Business and Financial Condition**

1.      *Reorganized Eurofresh's Degree of Leverage May Limit Its Financial and Operating Activities*.   Despite significantly reducing their debt obligations through the Plan, Reorganized Eurofresh will continue to have substantial indebtedness that could adversely impact its financial health and performance in the future.   Much of this continued indebtedness will be secured by all or substantially all of Reorganized Eurofresh's assets.   The term of the New Credit Facility expires four years after the Effective Date with a one year option to extend and there can be no assurance that Reorganized Eurofresh will be able to find new financing to replace the New Credit Facility.

2. *The Covenants in the New First Lien Loans and the Term Loan B or New Credit Facility, as Applicable, Will Restrict Reorganized Eurofresh's Activities and Require Them to Meet or Maintain Various Financial Ratios*. The New First Lien Loans and the Term Loan B or the New Credit Facility, as applicable, will restrict Reorganized Eurofresh's ability to incur additional indebtedness, create or permit liens on assets and property of Reorganized Eurofresh, pay dividends or distributions to any class of stock of Reorganized Eurofresh, and make certain investments. The New First Lien Loans and the Term Loan B or the New Credit Facility, as applicable, will also require that Reorganized Eurofresh maintain certain debt and earnings ratios and will limit certain capital expenditures.

3. *Reorganized Eurofresh's Financial Results May be Volatile and May Not Reflect Historical Trends*. As indicated elsewhere in this Disclosure Statement, the Debtors operate in a highly competitive market in which they are, essentially, "price takers." The price for the Debtors' products are seasonal and sensitive to changes in overall economic conditions and consumer preferences and competition. As a result of these and other factors, including volatility in the price of raw materials and transportation costs, upon emergence from Chapter 11, the amounts reported in the Debtors' financial statements may materially change relative to historical financial statements.

4. *Reorganized Eurofresh May Not Be Able to Successfully Prevent or Eradicate the Various Diseases and Infestations Affecting Its Tomato Crops*. As indicated elsewhere in this Disclosure Statement, the Debtors have recently experienced several diseases and infestations that have materially negatively impacted their tomato production and financial performance. While the Debtors believe that they have developed strategies to ameliorate or overcome these diseases and infestations, there can be no assurance that these efforts will be entirely successful, that additional efforts will not be necessary which may adversely affect fruit production or sales or that Reorganized Eurofresh will not experience new and as-yet unknown diseases and infestations.

5. *Reorganized Eurofresh May Not Be Able to Sustain Its Labor Force*. As indicated elsewhere in this Disclosure Statement, the Debtors have recently faced significant disruptions to their labor pool. The Debtors are reliant upon labor provided through various contracts, including the Inmate Contract and the Labor Contract. Any disruption to Reorganized Eurofresh's labor force could dramatically impact Reorganized Eurofresh's operations and financial performance.

6. *Investigations by Various Agencies and Departments of the United States Government*. As indicated elsewhere in this Disclosure Statement, the Debtors are the subject of ongoing investigation regarding hiring, compensation and immigration practices. While the Debtors believe that certain of these investigations are without merit and that any civil claims arising from or related to these investigations are dischargeable, there can be no assurance that Reorganized Eurofresh will not face civil penalties or criminal fines that may not be dischargeable. Such civil penalties and criminal fines would materially impact Reorganized Eurofresh's financial performance and could lead to significant variance from the Projections.

7. *Competition*. As noted elsewhere in this Disclosure Statement, the market for premium greenhouse-grown produce is highly competitive. In addition to other domestic and

foreign greenhouse producers, Reorganized Eurofresh will compete with producers of field-grown tomatoes. Competition from producers in Mexico has increased due to the increased environmental compliance costs in the United States and Canada relative to Mexico and also as a result of the North American Free Trade Agreement. These factors may allow producers in Mexico to sell their products at prices lower than those of Reorganized Eurofresh, which will negatively impact Reorganized Eurofresh's business.

### D. Certain Bankruptcy-Related Considerations

1. *Risk That the Plan Will Not Be Confirmed*. Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications of the Plan will not be required for confirmation, that such negotiations would not adversely affect the holders of Allowed Claims and Interests, or that such modifications would not necessitate the re-solicitation of votes.

2. *Risks Arising Out of Potential for Non-Consensual Confirmation*. If any impaired class of Claims or Interests does not accept a plan of reorganization, the Bankruptcy Court may nevertheless confirm such a plan of reorganization at the proponent's request if at least one impaired class has accepted the plan of reorganization (without including the acceptance of any "insider" in such class) and, as to each impaired class that has not accepted the plan of reorganization, the Bankruptcy Court determines that the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to rejecting impaired classes. If any Impaired Class of Claims or Interests fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Debtors reserve the right to request nonconsensual confirmation of the Plan in accordance with section 1129(b) of the Bankruptcy Code.

## XI. EXEMPTION FROM SECURITIES ACT REGISTRATION

The Plan contemplates the issuance of the Securities to certain holders of Allowed Senior Noteholder Claims in Class 4 and the New Investors. The Securities shall be distributed in accordance with the Plan. On the Effective Date, simultaneous with the elimination of the Old Capital Stock held by Holders of Class 7 Interests, Reorganized Eurofresh shall issue and transfer (i) ten million (10,000,000) shares of New Common Stock to Bio Dynamics, the Investing Noteholders, Holders of Class 4 Claims and, to the extent applicable, on account of the Reserve Shares, as well as reserving an additional 750,000 shares of New Common Stock allocable to the MIP; (ii) either $12,000,000 in Subordinated PIK Notes to JB or $20,000,000 in Subordinated PIK Notes to the New Investors, as applicable; (iii) as applicable, $5,000,000 in Subordinated PIK A Notes to the New Investors; and (iv) $10,000,000 million in PIK Preferred Stock to the holders of Class 4 Claims in accordance with the Plan.

THE SECURITIES WILL NOT BE REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT, OR UNDER ANY STATE SECURITIES LAWS. ALTHOUGH SECTION 1145 OF THE BANKRUPTCY CODE MAY EXEMPT THE OFFER AND SALE BY REORGANIZED EUROFRESH OF THE SECURITIES FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, REORGANIZED EUROFRESH INTENDS TO RELY ON THE EXEMPTION FROM REGISTRATION PROVIDED BY SECTION 4(2)

OF THE SECURITIES ACT AND/OR REGULATION D PROMULGATED THEREUNDER. THE SECURITIES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES LAWS OR UNLESS EXEMPTIONS FROM REGISTRATION ARE AVAILABLE. THERE IS NO PUBLIC MARKET FOR THE SECURITIES AND IT IS POSSIBLE THAT NONE WILL EVER DEVELOP. AS A RESULT, HOLDERS OF CLASS 4 CLAIMS AND THE NEW INVESTORS MAY BE REQUIRED TO RETAIN OWNERSHIP OF THE SECURITIES AND BEAR THE ECONOMIC RISK OF THE INVESTMENT IN THE SECURITIES FOR AN INDEFINITE PERIOD. HOLDERS OF CLASS 4 CLAIMS AND THE NEW INVESTORS SHOULD VIEW THE SECURITIES AS A LONG TERM INVESTMENT.

The Securities will only be issued to "Accredited Investors", as defined in Rule 501(a) of Regulation D. Each recipient of any of the Securities will be required to provide Reorganized Eurofresh with a letter containing certain representations and agreements, including that such recipient is an Accredited Investor.

THE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS PLAN OR THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**The foregoing summary discussion is general in nature and has been included in this Disclosure Statement solely for informational purposes. The Debtors make no representations concerning, and do not provide any opinion or advice with respect to, the securities law matters described above. The Debtors encourage Holders of Claims in Class 4 and the New Investors eligible to receive the Securities pursuant to the Plan to consider carefully, and consult with their own attorneys with respect to, securities and bankruptcy law and related matters.**

## XII. ALTERNATIVES TO THE PLAN AND CONSEQUENCES OF REJECTION

Among the possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan are the following: (a) an alternative plan could be proposed or confirmed; or (b) the Bankruptcy Cases could be converted to a liquidation case under chapter 7 of the Bankruptcy Code.

### A. Alternative Plans

As discussed above, the Debtors and their professional advisors have explored various alternative scenarios and believe that the Plan enables the holders of Claims and Interests to realize the maximum recovery under the circumstances. The Debtors believe that the Plan is the best plan that can be proposed and served the best interests of the Debtors and other parties in interest.

### B.    Chapter 7 Liquidation

For a discussion of a chapter 7 liquidation, see Article VI.B.2 of this Disclosure Statement.

## XIII.  RESERVATION OF RIGHTS

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

Neither the filing nor Confirmation of the Plan shall be interpreted or deemed to waive the Debtors' or Reorganized Eurofresh's rights under the Bankruptcy Code or other applicable law to assert any Causes of Action or to otherwise seek relief, including, but not limited to, any avoidance actions to recover funds or property transferred during the ninety (90) day period immediately preceding the Petition Date  to various unsecured creditors, and funds or property transferred during the one (1) year period immediately preceding the Petition Date to insiders of the Debtors as set forth on the exhibits to each of the Debtor's Schedules filed in these Chapter 11 Cases pursuant to transfers that may be preferential, fraudulent or otherwise avoidable under Chapter 5 of the Bankruptcy Code or applicable law.

Reorganized Eurofresh reserves the right and shall be entitled to file and prosecute and/or continue the prosecution of any Causes of Action as provided in the Plan prior to the closing of the Chapter 11 Cases, subject only to the limitations set forth in section 546 of the Bankruptcy Code.  Reorganized Eurofresh's right to commence, prosecute and/or continue the prosecution of Causes of Action shall not be abridged or materially altered in any manner by reason of Confirmation of the Plan.  No defendant party to any Causes of Action shall be entitled to assert any defense based, in whole or in part, upon Confirmation of the Plan, and the Plan's Confirmation shall not have any *res judicata* or collateral estoppel effect upon the commencement, prosecution and/or continuation of any Cause of Action.

## XIV.  RECOMMENDATIONS AND CONCLUSION

The Debtors and their professional advisors have analyzed different scenarios and believe that the Plan will provide for a larger distribution to holders of Claims and Interests than would otherwise result under if an alternative restructuring plan were proposed or the Debtors' assets were liquidated.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in potentially smaller distributions to the holders of Claims and Interests.  Accordingly, the Debtors recommend confirmation of the Plan and urge all holders of Impaired Claims and Interests to vote to accept the Plan, and to indicate that acceptance by returning their signed Ballots and Master Ballots so as to be received by no later than the Voting Deadline.

Additionally, the Committee also recommends confirmation of the Plan and urges all holders of Impaired Claims and Interests to vote to accept the Plan, and to indicate that

acceptance by returning their signed Ballots and Master Ballots so as to be received by no later than the Voting Deadline.

Date:   Phoenix, Arizona
August 7, 2009

**EUROFRESH, INC.**                    **EUROFRESH PRODUCE, LTD.**

By: */s/ Dwight Ferguson*             By: */s/ Dwight Ferguson*
Name: Dwight Ferguson                  Name: Dwight Ferguson
Title:  Chief Executive Officer        Title:  Chief Executive Officer

**SQUIRE, SANDERS & DEMPSEY L.L.P.**

Craig D. Hansen (AZ Bar No. 007405)
Bradley A. Cosman (AZ Bar No. 026223)
Two Renaissance Square
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004-4498
(602) 528-4000

- and -

Kristin E. Richner (OH Bar No. 0078582)
Nicholas J. Brannick (OH Bar No. 0079642)
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
*Counsel to the Debtors and Debtors-in-Possession*

## EXHIBIT A

## Debtors' First Amended Joint Plan of Reorganization

[to be attached]

## **EXHIBIT B**

## **Liquidation Analysis**

As described in the Plan, the Debtors believe that the Plan as proposed, whereby the Debtors are reorganized under Chapter 11 of the Bankruptcy Code as a going concern with continuing operations, yields the best result for the Debtors, their customers, employees and creditors. Based upon the following hypothetical analysis (the "**Liquidation Analysis**"), the Debtors believe that the Plan meets the "best interest of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code (described in SECTION VI of the Disclosure Statement), and that each Holder of an Impaired Claim will receive under the Plan value on the Effective Date that is not less than the value such Holder would receive if the Debtors were to be liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date. The Debtors believe the Liquidation Analysis and the conclusions set forth herein are fair and accurate, and represent management's best judgment with regard to the results of a liquidation of the Debtors under Chapter 7.

The analysis was prepared solely to assist the Bankruptcy Court in making this determination, and should not be used for any other purpose. Collateral values discussed herein may be different than amounts referred to in the Plan. This liquidation analysis is not an admission with regard to any claim, whether expressly identified or estimated through the use of the data provided in this liquidation analysis. This analysis is predicated upon various assumptions regarding the amount and the classification of claims that will ultimately be Allowed against the Debtors, and represents what the Debtors believe to be a conservative approach to claims analysis and classification. As such, any statements herein regarding amount and classification of claims are not binding on the Debtors, and the Debtors reserve all rights to dispute the amount and classification of all claims.

The hypothetical Liquidation Analysis is shown on a consolidated basis for EFI and EPL. The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation-related costs that would be realized if the Debtors were to be liquidated under Chapter 7 of the Bankruptcy Code. Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by management of the Debtors and by the Debtors' professionals, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors and management, and are also based upon assumptions with respect to certain liquidation decisions which could be subject to change. The Liquidation Analysis has not been examined or reviewed by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants. THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

Management of the Debtors prepared this Liquidation Analysis with the assistance of A&M. The Liquidation Analysis is based on EFI's projected balance sheet as of October 31, 2009, and is predicated on the assumption that the Debtors would commence liquidation under Chapter 7 on or around August 31, 2009. The projected balance sheet is the best approximation of the Debtors' assets to be liquidated if the Debtors were to be liquidated in accordance with Chapter 7 of the Bankruptcy Code, regardless of whether Classes 1A and 1B opt to Accept or Reject the Plan.

The Liquidation Analysis is based, *inter alia*, upon the assumptions discussed below.

1. The Liquidation Analysis assumes that the liquidation of the Debtors' estate would commence on or around August 31, 2009 and would be substantially completed within a four month period. If the implementation of the liquidation plan were to be delayed, there is a possibility that the Debtors would sustain additional administrative costs during the delay period, thus adversely impacting the net liquidation value of the estates.

2. It is also assumed that the liquidation of the Debtors would commence under the direction of a Chapter 7 trustee and would continue for a period of four months, during which time all of the Debtors' assets would be sold as a going concern to a third party buyer with the cash proceeds, net of liquidation-related costs, being distributed to creditors.

3. The Liquidation Analysis assumes that liquidation proceeds would be distributed in accordance with section 726 of the Bankruptcy Code. In any liquidation there is a general risk of unanticipated events, which could have a significant impact on the projected cash receipts and disbursements. These events include changes in the general economic condition, changes in consumer preferences, and changes in the market value of the Debtors' assets.

4. The Liquidation analysis further assumes that in order for a sale of the operations to occur on a timely basis, the sales price would be at a discount to the enterprise value of the business that may be otherwise attainable under more favorable conditions. It is implicit in this assumption that unless the operations were sold on a timely basis, the business may generate insufficient liquidity and cash flow to fund operations and the admin costs of liquidating the estate. Given the nature and amount of the existing secured debt currently on the balance sheets of the Debtors, it would be difficult to obtain additional liquidity.

5. Due to the nature of the Debtors' assets, greenhouses, and property, and the contingent liabilities that would be created due to substantial potential remediation, it is assumed that a sale of the ongoing operations of the Debtors' would yield substantially more recoveries to the Estate than would a sale of the Debtors' individual, machines, plants, equipment, and other assets.

In addition to these assumptions and the specific assumptions listed in the notes to the Liquidation Analysis, there are significant areas of uncertainty that exist with respect to this Liquidation Analysis:

1. The Liquidation Analysis necessarily contains an estimate of the amount of Claims that will ultimately become Allowed Claims. Estimates for various classes of Claims were prepared based on the proofs of claim filed as of the Bar Date and the Debtors' analysis of such proofs of claim based on their books and records. Such Claims have not been determined by the Bankruptcy Court and, accordingly, the final amount of Allowed Claims against the Estates may differ from the Claim amounts used to complete this analysis. The Claims estimated in the Liquidation Analysis are consistent with the estimated Claims reflected in the Plan with certain modifications as described herein.

2. The liquidation itself would likely trigger certain priority payments that otherwise would not be due in the ordinary course of business. These priority payments would be made in full before any distribution of proceeds to pay Unsecured Claims or to make distributions in

respect of equity interests. The liquidation would likely prompt certain other events to occur, including the rejection of remaining executory contracts, unexpired leases and other agreements and defaults under agreements with customers and suppliers. Such events would likely create a much larger number of unsecured creditors and would subject the Chapter 7 estates to considerable additional claims. No attempt has been made to estimate additional Unsecured Claims that may result from liquidation under Chapter 7.

3. The Liquidation Analysis assumes that the amount of contingent litigation claims against the Debtors is *de minimis*. However, due to general uncertainties with respect to the outcome of contingent litigation matters, the actual value of such claims remains uncertain. Accordingly, the estimated recovery percentages could be impacted by the outcome of such contingent litigation matters.

The Liquidation Analysis assumes that there will be $250,000 of net recoveries from the pursuit of any potential preferences, fraudulent conveyances, or other causes of action.

This Liquidation Analysis is also based upon assumptions with regard to liquidation decisions that are subject to change. Accordingly, there can be no assurances that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

## NOTES

### Proceeds

- Enterprise value under the Chapter 11 Plan of Reorganization ("Plan") has been estimated based on an amount needed to ensure the waterfall calculation nets to zero.

- The value of Willcox and Snowflake facilities have been estimated under a Chapter 7 liquidation scenario to be approximately 90% of the most recent asset appraisal that was conducted as of January 28, 2008 by AccuVal Associates Incorporated ("AccuVal Appraisal").

- In the Chapter 11 Plan scenario there are no remaining assets, as all operating assets are included in the Enterprise Value and any post filing accounts payable/accrued expenses are assumed by Reorganized Eurofresh. As for the Chapter 7 Liquidation, the AccuVal Appraisal did not take into account inventory, accounts receivable, or any IT/office related costs not associated with the green houses. For the purposes on this analysis, recoveries of accounts receivable, inventory and IT/office related assets have been assumed to essentially offset post-filing trade accounts payable and accrued expenses.

- Under both the Chapter 11 Plan and Chapter 7 liquidation scenarios, it is forecast that the Company will not have any excess cash; in fact, it is forecast that administrative claims relating to professional fees and goods/services supplied post filing will need to be paid (see Administrative Claims detail).

- The Chapter 11 Plan does not include a preference recovery, but in a liquidation, it is assumed that recoveries could approach $250,000.

**Super Priority**

- The Company is in the final stages of negotiating a settlement with the U.S. Department of Justice for approximately $600,000. The amount shown represents the Debtors' estimate, based on extensive negotiations, of the amount required to be paid in settlement of a regulatory enforcement claim that is assumed to be categorized as a criminal forfeiture entitled to super priority treatment for this analysis. This classification is not binding on the Debtors.

**Administrative Claims**

- Professional fees for the Chapter 11 Plan have been estimated at $1.5 million, consistent with amounts forecast to be paid subsequent to October 31, 2009. Professional fees in the liquidation analysis have been estimated at $1.5 million (as noted above) plus estimated trustee fees of 2% of the Total Proceeds for a total of approximately $3.0 million.

- 503(b)(9) claims have been estimated at approximately $0.7 million based on claims filed, adjusted for any pre-filing amounts paid according to the Essential Vendor/PACA Motion which was included as part of the first day pleadings.

- Contract cure amounts have been estimated based on the Company's records and is consistent with the Revised Cash Flow. Included in this amount is contracts relating to freight, energy, pack house operations, and seeds

**Secured Claims**

- Amount is based on recent actual balance and projected principal payments through October 31, 2009 and property tax claims as filed.

**Priority Claims**

- Priority claims include the Debtors' estimate of an alleged priority claim to the Department of Labor (DOL) and small amounts owing relating to sales and use taxes. In a liquidation, no assets would be available to this class.

**Unsecured Claims**

- Based on the Chapter 7 liquidation analysis waterfall, there would be no assets available for any of the Unsecured Claims discussed below as there would not be enough assets to satisfy the Secured Claims.

- Convenience Claims in the Chapter 11 Plan includes all creditors with claims under $1,000 and any other creditors that wish to reduce their claim to $1,000. For the purposes of this analysis, we have also assumed that all creditors with valid claims under $20,000 elect to be included in the Class of Convenience Claims and receive $1,000 for the settlement of their entire claim. No recovery would be available to this Class based on the liquidation analysis.

- General Unsecured Claims are estimated based on the Company's records, reduced for creditors with valid claims under $20,000 that elect to participate in the Class of Convenience Claims. Based on the Chapter 11 Plan these creditors would receive approximately $535,000 in total to be distributed pro rata. No recovery would be available to this Class based on the liquidation analysis.

- Senior Noteholder Claims would receive the $10 million PIK Preferred Stock plus two million shares of New Common Stock according to the Chapter 11 Plan. No recovery would be available to this class based on the liquidation analysis.

- Discount Noteholder Claims would not receive anything under either the Chapter 11 Plan or the liquidation scenario.

In 000's USD

| | FMV | Chapter 11 POR [3] | Recovery % | Chapter 7 Liquidation | Recovery % |
|---|---|---|---|---|---|
| **Proceeds** | | | | | |
| Enterprise Value | 102,500 | 102,500 | | - | |
| Willcox Facility Sale Price [1] | - | - | | 57,633 | |
| Snowflake Facility Sale Price [1] | - | - | | 9,358 | |
| Remaining Assets - Net (Inv, A/R, IT, A/P) [2] | - | - | | - | |
| Preference Recoveries | 250 | - | | 250 | |
| **Total Proceeds / Enterprise Value** | **102,750** | **102,500** | | **67,242** | |
| | | | | | |
| **Super Priority** | | | | | |
| Department of Justice [4] | 600 | 600 | | 600 | |
| | 600 | 600 | | 600 | |
| | | | | | |
| **Administrative Claims** | | | | | |
| Professional fees | | 1,500 | 100% | 2,845 | 100% |
| 503(b)(9) claims | 682 | 682 | 100% | 682 | 100% |
| Contract Cure amounts | 2,467 | 2,467 | 100% | 2,467 | 100% |
| **Total Administrative Claims** | **3,148** | **4,648** | 100% | **5,993** | 100% |
| | | | | | |
| **Net Proceeds after DOJ/Admin claims** | **99,002** | **97,252** | | **60,649** | |
| | | | | | |
| **Secured Claims** | | | | | |
| Class 1A [5] | 57,503 | 57,503 | 100% | 45,597 | 79% |
| Class 1B [5] | 13,645 | 13,645 | 100% | 10,820 | 79% |
| Class 1C | 4,232 | 4,232 | 100% | 4,232 | 100% |
| **Total Secured Claims** | **75,380** | **75,380** | 100% | **60,649** | 80% |
| | | | | | |
| **Net Proceeds after Secured Claims** | **23,622** | **21,872** | | **-** | |
| | | | | | |
| **Priority Claims** | 458 | 458 | 100% | - | 0% |
| | | | | | |
| **Net Proceeds after Admin & Priority Claims** | **23,164** | **21,414** | | **-** | |
| | | | | | |
| **Unsecured Claims** | | | | | |
| Convenience Claims | 142 | 142 | 100% | - | 0% |
| General Unsecured Claims | 10,699 | 535 | 5% | - | 0% |
| Senior Noteholder Claims [6] | 185,334 | 11,800 | 6% | - | 0% |
| Discount Noteholder Claims | 39,870 | - | 0% | - | 0% |
| Subordinated Debt Securities Claims | - | - | | - | |
| **Total Unsecured Claims** | **236,045** | **12,477** | **5%** | **-** | **-** |

**Notes**

1 - Orderly liquidation value according to an appraisal conducted by AccuVal Associates Incorporated as at January 28, 2008 ("AccuVal Appraisal") and discounted by 10% due to the assumption that a liquidation sale would be need to be accomplished in an extremely expedited fashion.

2 - According to the AccuVal Appraisal; inventory, accounts receivable and selected computer hardware/software were excluded from the report. For the purposes of this analysis, any recoveries from A/R, inventory and selected hardware/software in the Chapter 7 Liquidation analysis are assumed to be offset by post-filing accounts payable and accruals (i.e. administrative expenses)

3 - Estimation and classification of claims as presented in this analysis are not binding upon the debtor.

4 - The amount shown represents the Debtors' estimate, based on extensive negotiations, of the amount required to be paid in settlement of a regulatory enforcement claim that is categorized as a criminal forfeiture entitled to super priority treatment.

5 - Class 1A Claims are assumed to be paid in a liquidation after full recovery is paid to Class 1B Claims per the AAL and therefore have a lower recovery.

6 - Under the scenario whereby Class 1A or 1B Reject the Plan, Senior Noteholer Claims would receive approximatley $11m in value not $11.8m due to a reduction in New Common Stock

**EXHIBIT C**

**Financial Projections**

COLUMBUS/705058.4

# PROJECTED FINANCIAL STATEMENTS

## EUROFRESH, INC. ("EFI")

For purposes of developing the Plan and evaluating its feasibility, EFI prepared the following two sets of Projections (as defined in the Disclosure Statement) reflecting its estimate of Reorganized Eurofresh's expected consolidated income statements, balance sheets, and cash flows for the years 2009 – 2011 for each of the two scenarios: 1) In the event Class 1A and Class 1B Accept the Plan, and 2) In the event Class 1A or 1B Reject the Plan. These consolidated Projections include the operations of both the Reorganized Debtors. Accordingly, the Projections reflect EFI's judgment, as of the date of this Disclosure Statement, of expected future operating and business conditions, which are subject to change.

All estimates and assumptions shown in the Projections were developed by EFI. The assumptions disclosed herein are those that EFI believes to be significant to the projections. Although EFI is of the opinion that these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, such as (i) the cost of growing or purchasing its product; (ii) the demand in the marketplace for its various products; (iii) the pricing of its products in the marketplace; (iv) the efficiencies of its operations; (v) the costs required to run its operations and liquidity to meet capital expenditure requirements; and (vi) similar to any agricultural business, environmental variations and effects from weather or pests, viruses and the like. Despite EFI's efforts to foresee and plan for these uncertainties, EFI cannot predict their impact with certainty. Consequently, actual financial results could vary significantly from projected results.

**THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY EFI OR ANY OTHER PERSON AS TO THE ACCURACY OF THE PROJECTIONS OR THAT ANY PROJECTIONS SET FORTH HEREIN WILL BE REALIZED.**

**THE PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN.**

**THE PROJECTIONS WERE PREPARED BY EFI; THEY HAVE NOT BEEN AUDITED OR REVIEWED BY INDEPENDENT ACCOUNTANTS. CERTAIN OF THE SIGNIFICANT ASSUMPTIONS USED IN THE PREPARATION OF THE PROJECTIONS ARE STATED BELOW.**

EFI has assumed, for the purpose of the Projections that the Plan will be confirmed and that Effective Date and the initial distributions will take place on or about October 31, 2009.

Please note that the reorganization may not be wholly accounted for in accordance with "fresh start" accounting rules as per the American Institute of Certified Public Accountant's Statement of Position 90-7, therefore the Projections do not reflect all "fresh start" adjustments.

The following Financial Information is included herein:

➢ Historical Consolidated Statements of Income of EFI for each month from January 2009 to June 2009.

➢ Actual and Projected Consolidated Statements of Income of Reorganized EFI for each of the fiscal years ending December 31 for the period from 2006 through 2011.

➢ Actual and Projected Consolidated Balance Sheets of Reorganized EFI as of December

31 for each of the fiscal years from 2006 through 2011.

➢ Actual and Projected Consolidated Statements of Cash Flow of Reorganized EFI for each of the fiscal years ending December 31 for the period from 2006 through 2011.

The Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below and with the historical consolidated financial statements for the fiscal years ended December 31, 2006, 2007, and 2008 contained herein.

**WHILE EFI BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT ANY PROJECTIONS WILL BE REALIZED.**

### FYE 2009 – 2011 PLAN PROJECTIONS - MAJOR ASSUMPTIONS

The Projections assume certain economic and business conditions for the 2009 – 2011 period, with assumptions based upon management estimates of product pounds, pricing and related growing costs to match expected demand and production with considerations given for product mix, channel mix and inflationary cost pass through.

**Volume and Product Mix**

- 2009 assumes a slight mix shift toward specialty products in the second half of 2009 and a full cleanout of Site 5 with a larger than usual number of crops being replanted in the 2nd half of 2009
- 2010-2011 assumes a "stay the course" production model which includes a clean out strategy based on compartment by compartment, with selective inter-planting (approximately 50% of total plantings).
- Non-producing acreage percentages decline from 2008 and 2009 levels (18.7%-18.8%) down to 17.0% in 2010. This is a result of continued progress against the viroid, the implementation of the Site 5 cleanout, and the relatively high number of re-plantings done in late 2009. Overall yields will also increase slightly due to the use of certain new product varieties and mix changes.
- Continued progress against the viroid and improvement in non-producing acreage percentages is very feasible, but have not been factored into the projections beyond 2010.
- Due to the foregoing, 2010-2011 volumes recover from approximately 134 million pounds in 2009 to 148.9 million pounds and 148.0 million pounds in 2010 and 2011, respectively.

**Product Pricing**

- Blended full year 2010 and 2011 pricing is expected to improve to $1.05 and $1.11,

respectively, as a result of four factors:

1. Sustained improvement in the Company's channel mix and go-to-market strategies;
2. A shift in product mix away from lower priced product toward higher priced products;
3. A rebound in the price of certain products away from the lows seen in 2009 and back toward pricing seen in recent years, and;
4. A shift in customer channel mix away from wholesale customers.

- Tomato on the Vine ("TOV") pricing expected to improve due to increased demand for fewer pounds produced by the Company.
- Club/Retail penetration for specialty varieties expected to increase demand and pricing for these products through 2011.

**Growing Costs**

- 2010-2011 growing costs include modest inflationary increases (approx. 2%) year over year with the exception of Natural Gas: Forecast NYMEX rate of $6.25 and $6.38 were used for 2010 and 2011 respectively.
- Biological control costs were forecasted to increase by 20% in 2009 from 2008 but some positive variance are occurring YTD in 2009. These costs are projected to return to normal increases of 2% in 2010 and 2011.
- The labor situation is assumed to remain relatively stable with no significant increases or reduction in total costs.

**Transportation Costs**

- Freight costs have been estimated at $0.115 per pound for the remainder of 2009 with slight increases to $0.117 and $0.12 per pound in 2010 and 2011, respectively.
- EFI expects to achieve positive variances versus these budgeted costs through reaching agreements on lower freight costs, but those agreements are not yet in place.

**Other Income/Expenses Costs**

- Interest expense has been calculated based on the applicable rates associated with the New First Lien Loans, the Term Loan B or New Credit Facility (as applicable), and dividends associated with the PIK Preferred Stock.
- No restructuring costs or management fees are assumed beyond October 31, 2009 (closing of the transaction), although payment of certain bankruptcy related costs are assumed to occur in the fourth quarter of calendar 2009 due to the court calendar and timing of fee applications.
- Other expenses are based on Management estimates.

**Taxes**

- Cash taxes are assumed to be paid at 40% on pre-tax income assuming certain tax depreciation estimates and without the benefit of deducting interest or dividends on PIK Preferred Stock.

**Working Capital**

- Accounts receivable and inventory are based on historical relationships to sales and cost

of goods sold.
- Accounts payable and accrued liabilities increase from October 31, 2009 (assumed emergence date) to normalized levels by the fourth quarter of 2010.

**Capital Expenditures**
- Capital expenditures have been estimated at $3.3 million for 2009, $3.0 million for 2010 and $5.0 million for 2011.

**Balance Sheet and Other Assumptions**
- A full and complete analysis of the effects of fresh start accounting per SOP 90-7 has not been completed but major components have been reflected in the pro forma balance sheet information. An enterprise value of approximately $102.5 million and a new common stock equity value of approximately $8.8 million have been assumed, given long term funded debt/preferred stock of approximately $93.7 million at exit.
- Senior Noteholder Claims are converted to equity at exit and General Unsecured Claims are paid at exit along with Cure Amounts, 503(b)(9) Claims, Administrative Claims, Priority Tax Claims and Other Priority Claims.
- In the scenario whereby Class 1A and 1B Accept the Plan, the Working Capital Facility is assumed to be necessary to enable Reorganized EFI to fund part of the distributions under the Plan and, if necessary, working capital and operating needs, while in the scenario whereby Class 1A or 1B Reject the Plan, the funds required for working capital and operating needs are provided via Subordinated PIK Notes.
- A detailed development of the exit financing package under both scenarios is available in Section V of the Disclosure Statement.

# Assumes Classes 1A & 1B Accept the Plan

Eurofresh Inc. Consolidated Income Statement
Assumes Classes 1A & 1B Accept the Plan
USD

| | Actual 2006 | Actual 2007 | Actual 2008 | Actual/Forecast 10-Mo's Oct 2009 | Forecast 2-Mo's Dec 2009 | Reorganized Eurofresh Inc. Forecast 2009 [1] | Forecast 2010 | Forecast 2011 |
|---|---|---|---|---|---|---|---|---|
| SALES | $ 146,502,711 | $ 171,608,048 | $ 177,104,462 | $ 132,692,041 | $ 30,092,841 | $ 162,784,882 | $ 178,524,276 | $ 186,178,803 |
| COST OF SALES: | 106,001,185 | 135,938,297 | 153,621,362 | 109,954,156 | 20,896,392 | 130,850,548 | 140,778,278 | 142,464,626 |
| GROSS PROFIT FROM OPERATIONS | 40,501,526 | 35,669,751 | 23,483,099 | 22,737,885 | 9,196,449 | 31,934,334 | 37,745,997 | 43,714,177 |
| | 27.6% | 20.8% | 13.3% | 17.1% | 30.6% | 19.6% | 21.1% | 23.5% |
| OPERATING EXPENSES: | | | | | | | | |
| Selling expenses | 2,782,360 | 2,964,124 | 2,919,516 | 2,578,097 | 572,000 | 3,150,097 | 3,213,099 | 3,277,361 |
| General and administrative expenses | 9,668,902 | 12,668,757 | 10,525,453 | 8,604,779 | 1,862,667 | 10,467,446 | 10,125,995 | 10,328,515 |
| Depreciation | 9,974,843 | 12,344,525 | 13,073,569 | 10,904,060 | 2,198,059 | 13,102,119 | 13,086,890 | 13,475,610 |
| | 22,426,105 | 27,977,405 | 26,518,538 | 22,086,937 | 4,632,726 | 26,719,662 | 26,425,985 | 27,081,486 |
| Insurance recovery | | (3,750,000) | | | | | | |
| INCOME FROM OPERATIONS | 18,075,421 | 11,442,346 | (3,035,439) | 650,948 | 4,563,723 | 5,214,671 | 11,320,013 | 16,632,691 |
| OTHER INCOME (EXPENSE): | | | | | | | | |
| Interest expense | (25,328,617) | (29,135,860) | (35,965,571) | (27,901,447) | (1,136,912) | (29,038,359) | (7,912,487) | (7,645,950) |
| Interest expense, preferred stock | (7,979,925) | (9,148,371) | (10,456,646) | (12,028,294) | | (12,028,294) | - | - |
| Interest Income | - | - | - | 97,099 | 5,050 | 102,148 | 158,384 | 97,493 |
| Reorganization items | | | | (7,632,000) | (992,000) | (8,624,000) | - | - |
| Management fee | (600,000) | (600,000) | (450,000) | | | | | |
| Other income (expense) | 250,185 | (189,471) | 371,861 | (25,041) | (20,000) | (45,041) | (120,000) | (120,000) |
| | (33,658,357) | (39,011,245) | (46,500,356) | (47,489,684) | (2,143,863) | (49,633,546) | (7,874,103) | (7,668,457) |
| INCOME BEFORE INCOME TAXES | (15,582,936) | (27,568,899) | (49,535,795) | (46,838,735) | 2,419,860 | (44,418,875) | 3,445,910 | 8,964,234 |
| PIK Preferred Stock Dividend | | | | | | | (1,000,000) | (1,115,278) |
| PROVISION FOR INCOME TAXES | 2,874,537 | 6,577,573 | 2,416,819 | | | | (1,381,106) | (3,585,694) |
| NET INCOME | $ (12,708,399) | $ (20,991,326) | $ (47,118,976) | $ (46,838,735) | $ 2,419,860 | $ (44,418,875) | $ 1,064,803 | $ 4,263,262 |
| NET INCOME(LOSS) | $ (12,708,399) | $ (20,991,326) | $ (47,118,976) | $ (46,838,735) | $ 2,419,860 | $ (44,418,875) | $ 1,064,803 | $ 4,263,262 |
| Depreciation | 9,974,843 | 12,344,525 | 13,073,569 | 10,904,060 | 2,198,059 | 13,102,119 | 13,086,890 | 13,475,610 |
| Interest | 33,308,542 | 38,284,231 | 46,422,217 | 39,832,642 | 1,131,863 | 40,964,505 | 7,754,103 | 7,548,457 |
| PIK Preferred Stock Dividend | | | | | | | 1,000,000 | 1,115,278 |
| Management Fee | 600,000 | 600,000 | 450,000 | | | | | |
| Taxes | (2,874,537) | (6,577,573) | (2,416,819) | | | | 1,381,106 | 3,585,694 |
| Other | 1,349,628 | 1,501,816 | 11,098,961 | 511,278 | 120,745 | 632,023 | | |
| Reorganization Items | | | | 7,632,000 | 992,000 | 8,624,000 | | |
| ADJUSTED EBITDA | $ 29,650,077 | $ 25,099,216 | $ 21,508,952 | $ 12,041,245 | $ 6,862,526 | $ 18,903,771 | $ 24,286,903 | $ 29,988,300 |

Notes

Forecast 2009 amounts include actual results for the period January1, 2009 through June 30, 2009.

**Eurofresh Inc. Consolidated Balance Sheet**
**Assumes Classes 1A & 1B Accept the Plan**
**In USD**

**Assumes Classes 1A & 1B Accept the Plan**

| | Actual 12/31/06 | Actual 12/31/2007 | Actual 12/31/08 | Forecast 10/31/09 | Plan/Fresh Start Adjustments | Pro Forma Forecast 10/31/09 | Forecast 12/31/09 | Reorganized Eurofresh Inc. Forecast 12/31/10 | Forecast 12/31/11 |
|---|---|---|---|---|---|---|---|---|---|
| CURRENT ASSETS: | | | | | | | | | |
| Cash | $ 16,992 | $ 10,452,540 | $ 3,199,147 | $ 1,076,099 | $ 953,745 | $ 2,029,844 | $ 1,000,000 | $ 4,874,642 | $ 13,535,227 |
| Trade receivables | 11,868,372 | 13,230,668 | 13,338,239 | 11,216,165 | — | 11,216,165 | 12,724,842 | 11,384,708 | 13,704,829 |
| Other receivables | 620,292 | 7,513 | 17,330 | | | — | — | — | — |
| Inventories | 4,064,054 | 4,650,001 | 5,006,633 | 4,401,598 | — | 4,401,598 | 4,653,765 | 4,243,210 | 5,078,390 |
| Crop development costs | 22,217,267 | 22,116,634 | 10,904,473 | 10,713,678 | — | 10,713,678 | 13,299,620 | 12,799,819 | 15,308,034 |
| Prepaid expenses | 724,803 | 424,068 | 767,044 | 5,899,291 | — | 5,899,291 | 6,705,103 | 6,895,399 | 6,695,837 |
| Current taxes receivable | 283,137 | 32,337 | 1,119 | | | — | — | — | — |
| Deferred tax asset | 817,093 | 1,137,433 | 1,401,621 | 1,402,000 | (1,402,000) | — | — | — | — |
| Total Current Assets | 40,612,009 | 52,051,194 | 34,635,606 | 34,708,831 | (448,255) | 34,260,576 | 38,383,330 | 40,197,778 | 54,322,317 |
| PROPERTY AND EQUIPMENT: | | | | | | | | | |
| Property and equipment, net | 157,199,753 | 150,496,985 | 145,098,865 | 136,948,541 | (56,051,398) | 80,897,143 | 79,339,084 | 69,252,193 | 60,776,584 |
| OTHER ASSETS | 12,319,265 | 11,846,020 | 16,326,143 | 14,233,862 | (14,233,862) | — | — | — | — |
| Total Assets | $ 210,131,027 | $ 214,394,199 | $ 196,060,614 | $ 185,891,233 | $ (70,733,515) | $ 115,157,718 | $ 117,722,414 | $ 109,449,972 | $ 115,098,901 |
| CURRENT LIABILITIES: | | | | | | | | | |
| Current portion of long-term debt | $ 508,000 | $ 1,394,151 | $ 674,000 | $ — | $ — | $ — | $ — | $ — | $ — |
| Revolving line of credit | 22,600,000 | 33,350,000 | | | 9,273,745 | 9,273,745 | 6,987,038 | — | — |
| Accounts payable | 9,580,303 | 13,825,485 | 11,309,833 | 11,647,098 | (5,294,000) | 6,353,098 | 7,673,363 | 8,821,734 | 10,684,847 |
| Accrued interest | 10,058,421 | 10,092,802 | 9,324,899 | 25,616,667 | (25,616,667) | — | 1,070,037 | 877,006 | 877,006 |
| Accrued expenses | 4,402,240 | 7,419,390 | 8,203,939 | 10,452,021 | (4,147,401) | 6,304,620 | 6,715,236 | 6,464,831 | 6,554,961 |
| Capital lease obligations, current | | | 1,822,556 | | | — | — | — | — |
| Total Current Liabilities | 47,148,963 | 66,081,828 | 30,840,228 | 47,715,786 | (25,784,323) | 21,931,463 | 22,445,674 | 16,163,570 | 18,116,814 |
| Long-term debt, net of current portion | 218,760,968 | 221,697,890 | 274,400,497 | 283,926,284 | (283,926,284) | — | — | — | — |
| Mandatorily Redeemable Preferred Stock | 58,250,607 | 67,398,978 | 77,855,624 | 87,790,980 | (87,790,980) | — | — | — | — |
| New Term Loan A | | | | | 23,000,000 | 23,000,000 | 23,000,000 | 17,214,614 | 13,456,248 |
| New Term Loan B | | | | | 36,138,317 | 36,138,317 | 36,138,317 | 36,138,317 | 36,138,317 |
| New Subordinated PIK Notes | | | | | 12,000,000 | 12,000,000 | 12,000,000 | 13,800,000 | 15,913,125 |
| Deferred tax liabilities - noncurrent | | | | 1,402,000 | (1,402,000) | — | — | 1,130,244 | 2,362,743 |
| Capital lease obligations, long-term | 9,748,394 | 3,490,312 | 2,956,430 | 3,325,806 | — | 3,325,806 | 2,956,430 | 1,756,430 | 486,318 |
| Total Liabilities | 333,908,932 | 358,669,008 | 387,454,399 | 424,160,857 | (327,765,270) | 96,395,586 | 96,540,422 | 86,203,176 | 86,473,565 |
| New PIK Preferred | | | | | 10,000,000 | 10,000,000 | 10,000,000 | 11,000,000 | 12,115,278 |
| SHAREHOLDERS' EQUITY: | | | | | | | | | |
| Common stock | 11,651 | 11,651 | 11,651 | 11,651 | 8,750,481 | 8,762,132 | 8,762,132 | 8,762,132 | 8,762,132 |
| Treasury Stock | (92,685,368) | (92,685,368) | (92,685,368) | (92,685,368) | 92,685,368 | — | — | — | — |
| Additional paid-in capital | 3,562,273 | 4,056,696 | 4,056,696 | 4,056,696 | (4,056,696) | — | — | — | — |
| Accumulated other comprehensive income | (34,666,461) | (55,657,787) | (102,776,764) | (149,652,602) | 149,652,602 | — | — | — | — |
| Retained earnings | (123,777,906) | (144,274,809) | (191,393,785) | (238,269,623) | 247,031,755 | 8,762,132 | 2,419,860 | 3,484,664 | 7,747,926 |
| Total Shareholders' Equity | (123,777,906) | (144,274,809) | (191,393,785) | (238,269,623) | 247,031,755 | 8,762,132 | 11,181,992 | 12,246,796 | 16,510,058 |
| Total Liabilities and Shareholders' Equity | $ 210,131,027 | $ 214,394,199 | $ 196,060,614 | $ 185,891,233 | $ (70,733,515) | $ 115,157,718 | $ 117,722,414 | $ 109,449,972 | $ 115,098,901 |

**Eurofresh Inc. Consolidated Cash Flow**
**Assumes Classes 1A & 1B Accept the Plan**
In USD

# Assumes Classes 1A & 1B Accept the Plan

| | Actual 12 Months 12/31/06 | Actual 12 Months 12/31/2007 | Actual 12 Months 12/31/08 | Actual/Forecast 10 Months 10/31/09 | Reorganized Eurofresh Inc. Forecast 2 Months 31-Dec-09 | Reorganized Eurofresh Inc. Forecast 12 Months 31-Dec-10 | Reorganized Eurofresh Inc. Forecast 12 Months 31-Dec-11 |
|---|---|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | | | | |
| Net income | $ (12,708,399) | $ (20,991,326) | $ (47,118,976) | $ (46,838,735) | $ 2,419,860 | $ 1,064,803 | $ 4,263,262 |
| Adjustments to reconcile net income (loss) to net cash provided by Operating activities: | | | | | | | |
| Depreciation | 9,974,843 | 12,344,525 | 13,073,569 | 10,904,060 | 2,198,059 | 13,086,890 | 13,475,610 |
| Loss (gain) on sale of assets | 7,478 | - | 650 | - | - | - | - |
| Stock-based compensation expense | 310,000 | 494,423 | - | - | - | - | - |
| Amortization of debt issuance costs | 904,213 | 912,073 | 2,896,198 | 2,092,914 | - | - | - |
| Accretion of bond discount | 3,766,704 | 4,331,988 | 4,982,107 | 4,607,970 | - | - | - |
| Unpaid interest on mandatorily redeemable preferred stock | 7,979,925 | 9,148,371 | 10,456,646 | 9,935,380 | - | - | - |
| Deferred income taxes | (2,875,387) | (6,578,423) | (2,352,879) | 100 | - | - | - |
| Insurance recovery for replacement of property, plant and equipment | - | (1,004,507) | - | - | - | - | - |
| Unpaid Dividends on New PIK Preferred Stock | - | - | - | - | - | 1,130,244 | 1,232,499 |
| Unpaid interest on New Subordinated PIK Notes | - | - | - | - | - | 1,000,000 | 1,115,278 |
| Accrued interest | 9,462,052 | 34,382 | (767,903) | 18,893,484 | 1,070,037 | 1,800,000 | 2,113,125 |
| Changes in Working Capital | (3,298,699) | 7,682,409 | 8,919,600 | 186,960 | (3,421,718) | (193,030) | (3,510,710) |
| Net Cash Provided By Operating Activities | 13,522,729 | 6,373,914 | (9,910,987) | (217,868) | 2,266,239 | 2,958,159 | 18,689,063 |
| **CASH FLOWS USED IN INVESTING ACTIVITIES:** | | | | | | | |
| Proceeds from sale of property, plant and equipment | 7,500 | - | (1,300) | - | - | - | - |
| Expenditures for property and equipment | (33,587,690) | (5,641,757) | (1,874,276) | (2,589,000) | (640,000) | (3,000,000) | (5,000,000) |
| Insurance recovery for replacement of property, plant and equipment | - | 1,004,507 | - | - | - | - | - |
| Net Cash Used In Investing Activities | (33,580,190) | (4,637,250) | (1,875,576) | (2,589,000) | (640,000) | (3,000,000) | (5,000,000) |
| **CASH FLOWS PROVIDED BY FINANCING ACTIVITIES:** | | | | | | | |
| Proceeds from revolving line of credit | 31,000,000 | 41,500,000 | - | - | - | - | - |
| Repayment of revolving line of credit | (10,400,000) | (30,750,000) | (33,350,000) | - | (2,286,707) | (6,987,038) | - |
| Proceeds from issuance of long-term debt | 58,507,692 | - | 67,400,000 | 1,642,000 | - | - | - |
| Repayment of long-term debt | (8,397) | (508,915) | (20,399,651) | - | - | (5,785,386) | (3,758,367) |
| Change in restricted cash | - | - | (1,516,538) | - | - | - | - |
| Capital Lease Obligations | - | - | - | (958,180) | (369,376) | (1,200,000) | (1,270,112) |
| Redemption of Class A common stock | (31,689,855) | - | (7,600,641) | - | - | - | - |
| Redemption of Class B common stock | (12,131,749) | - | - | - | - | - | - |
| Payment for debt issuance costs | (398,515) | (325,650) | - | - | - | - | - |
| Redemption of Series A junior preferred stock | (5,054,136) | - | - | - | - | - | - |
| Redemption of Series B preferred stock | (9,631,953) | - | - | - | - | - | - |
| Increase (decrease) in outstanding checks in excess of cash balances | (118,636) | (1,216,553) | - | - | - | - | - |
| Net Cash (Used In) Provided By Financing Activities | 20,074,453 | 8,698,883 | 4,533,170 | 683,820 | (2,656,083) | (13,972,424) | (5,028,479) |
| NET INCREASE (DECREASE) IN CASH | 16,992 | 10,435,548 | (7,253,393) | (2,123,048) | (1,029,844) | 3,874,642 | 8,660,585 |
| CASH BALANCE, BEGINNING OF PERIOD | - | 16,992 | 10,452,540 | 3,199,147 | 2,029,844 | 1,000,000 | 4,874,642 |
| PF Adjustment - Cash Provided for Working Capital | - | - | - | 953,745 | - | - | - |
| CASH BALANCE, END OF PERIOD | $ 16,992 | $ 10,452,540 | $ 3,199,147 | $ 2,029,844 | $ 1,000,000 | $ 4,874,642 | $ 13,535,227 |

**Assumes Classes 1A & 1B Accept the Plan**

**Summary of Cash Sources and Uses**

| | |
|---|---|
| Projected Beginning Cash Balance - Pre-Confirmation 10/31/09 | $1,076,099 |
| Drawing on New Working Capital Facility | $9,273,745 |
| Restructuring / Transaction Closing Costs | $ (3,620,000) |
| Contract Assumptions/503(b)(9) Claims | (3,170,000) |
| General Unsecured Creditors | (600,000) |
| Other Admin/Priority | (930,000) |
| Total Cash to Fund Administrative/Priority Claims | (8,320,000) |
| Net Plan Adjustments to Cash | $953,745 |
| Cash Balance - Reorganized Balance Sheet 10/31/2009 | $2,029,844 |

**Eurofresh Inc. Consolidated Income Statement**
USD

| | Actual Jan-09 | Actual Feb-09 | Actual Mar-09 | Actual Apr-09 | Actual May-09 | Actual Jun-09 |
|---|---|---|---|---|---|---|
| SALES | $ 15,716,091 | $ 12,840,510 | $ 15,242,331 | $ 15,604,582 | $ 14,655,656 | $ 14,916,106 |
| COST OF SALES: | | | | | | |
| Growing costs | 5,060,912 | 4,720,579 | 4,723,191 | 6,523,604 | 6,740,392 | 7,176,645 |
| Packaging and transportation costs | 3,404,140 | 2,991,530 | 3,737,072 | 4,236,981 | 4,338,306 | 4,620,774 |
| Purchased product | 2,607,499 | 1,935,227 | 1,766,386 | 2,074,944 | 2,000,848 | 1,731,065 |
| | 11,072,551 | 9,647,335 | 10,226,650 | 12,835,529 | 13,079,546 | 13,528,484 |
| GROSS PROFIT FROM OPERATIONS | 4,643,540 | 3,193,175 | 5,015,681 | 2,769,053 | 1,576,111 | 1,387,622 |
| | 29.5% | 24.9% | 32.9% | 17.7% | 10.8% | 9.3% |
| OPERATING EXPENSES: | | | | | | |
| Selling expenses | 227,926 | 248,172 | 240,567 | 290,857 | 243,966 | 315,440 |
| General and administrative expenses | 825,403 | 822,043 | 1,104,429 | 932,754 | 828,494 | 683,582 |
| Depreciation | 1,104,580 | 1,102,923 | 1,107,108 | 1,105,583 | 1,107,899 | 1,108,440 |
| Insurance recovery | - | - | - | - | - | - |
| | 2,157,909 | 2,173,138 | 2,452,104 | 2,329,194 | 2,180,359 | 2,107,462 |
| INCOME FROM OPERATIONS | 2,485,631 | 1,020,037 | 2,563,577 | 439,859 | (604,249) | (719,840) |
| OTHER INCOME (EXPENSE): | | | | | | |
| Interest expense | (3,115,907) | (3,056,940) | (3,434,696) | (2,518,030) | (837,699) | (880,499) |
| Interest expense, preferred stock | (974,610) | (880,293) | (982,017) | (691,707) | - | - |
| Reorganization items | - | - | - | (2,556,292) | (1,198,806) | (1,880,153) |
| Management fee | (42,000) | (42,000) | (16,000) | (30,000) | - | - |
| Other income (expense) | 7,279 | 9,680 | 23,356 | 1,022 | (9,198) | (15,830) |
| | (4,125,238) | (3,969,553) | (4,409,357) | (5,795,007) | (2,045,703) | (2,776,482) |
| INCOME BEFORE INCOME TAXES | (1,639,607) | (2,949,516) | (1,845,780) | (5,355,148) | (2,649,952) | (3,496,322) |
| PROVISION FOR INCOME TAXES | - | - | - | - | - | - |
| NET INCOME | $ (1,639,607) | $ (2,949,516) | $ (1,845,780) | $ (5,355,148) | $ (2,649,952) | $ (3,496,322) |
| NET INCOME/(LOSS) | $ (1,639,607) | $ (2,949,516) | $ (1,845,780) | $ (5,355,148) | $ (2,649,952) | $ (3,496,322) |
| Depreciation | 1,104,580 | 1,102,923 | 1,107,108 | 1,105,583 | 1,107,899 | 1,108,440 |
| Interest | 4,090,517 | 3,937,233 | 4,416,713 | 3,209,736 | 837,699 | 880,499 |
| Management Fee | 42,000 | 42,000 | 16,000 | 30,000 | | |
| Taxes | - | - | - | - | | |
| Reorganization & Other Items | 60,660 | 57,440 | 80,279 | 2,616,043 | 1,239,026 | 1,850,732 |
| ADJUSTED EBITDA | $ 3,658,150 | $ 2,190,080 | $ 3,774,320 | $ 1,606,214 | $ 534,872 | $ 343,349 |

# Assumes Classes 1A or 1B Reject the Plan

Eurofresh Inc. Consolidated Income Statement
Assumes Classes 1A or 1B Reject the Plan
USD

| | Actual 2006 | Actual 2007 | Actual 2008 | Actual/Forecast 10-Mos Oct 2009 | Forecast 2-Mos Dec 2009 | Reorganized Eurofresh Inc. Forecast 2009 [1] | Reorganized Eurofresh Inc. Forecast 2010 | Reorganized Eurofresh Inc. Forecast 2011 |
|---|---|---|---|---|---|---|---|---|
| **SALES** | $ 146,502,711 | $ 171,608,048 | $ 177,104,462 | $ 132,692,041 | $ 30,092,841 | $ 162,784,882 | $ 178,524,276 | $ 186,178,803 |
| **COST OF SALES:** | 106,001,185 | 135,938,297 | 153,621,362 | 109,954,156 | 20,896,392 | 130,850,548 | 140,778,278 | 142,464,626 |
| **GROSS PROFIT FROM OPERATIONS** | 40,501,526 | 35,669,751 | 23,483,099 | 22,737,885 | 9,196,449 | 31,934,334 | 37,745,997 | 43,714,177 |
| | 27.6% | 20.8% | 13.3% | 17.1% | 30.6% | 19.6% | 21.1% | 23.5% |
| **OPERATING EXPENSES:** | | | | | | | | |
| Selling expenses | 2,782,360 | 2,964,124 | 2,919,516 | 2,578,097 | 572,000 | 3,150,097 | 3,213,099 | 3,277,361 |
| General and administrative expenses | 9,668,902 | 12,668,757 | 10,525,453 | 8,604,779 | 1,862,667 | 10,467,446 | 10,125,995 | 10,328,515 |
| Depreciation | 9,974,843 | 12,344,525 | 13,073,569 | 10,904,060 | 2,198,059 | 13,102,119 | 13,086,890 | 13,475,610 |
| | 22,426,105 | 27,977,405 | 26,518,538 | 22,086,937 | 4,632,726 | 26,719,662 | 26,425,985 | 27,081,486 |
| Insurance recovery | | (3,750,000) | | | | | | |
| **INCOME FROM OPERATIONS** | 18,075,421 | 11,442,346 | (3,035,439) | 650,948 | 4,563,723 | 5,214,671 | 11,320,013 | 16,632,691 |
| **OTHER INCOME (EXPENSE):** | | | | | | | | |
| Interest expense | (25,328,617) | (29,135,860) | (35,965,571) | (27,901,447) | (835,447) | (28,736,894) | (8,569,242) | (7,837,717) |
| Interest expense, preferred stock | (7,979,925) | (9,148,371) | (10,456,646) | (12,028,294) | | (12,028,294) | | |
| Interest Income | | | | 97,099 | 26,099 | 123,197 | 372,457 | 287,291 |
| Reorganization items | (600,000) | (537,543) | (450,000) | (7,632,000) | (992,000) | (8,624,000) | | |
| Management fee | 250,185 | (189,471) | 371,861 | | | | | |
| Other income (expense) | | | | (25,041) | (20,000) | (45,041) | (120,000) | (120,000) |
| **INCOME BEFORE INCOME TAXES** | (15,582,936) | (27,568,899) | (49,535,795) | (46,838,735) | 2,742,375 | (44,096,361) | 3,003,228 | 8,962,264 |
| PIK Preferred Stock Dividend | | | | | | | (1,000,000) | (1,115,278) |
| PROVISION FOR INCOME TAXES | 2,874,537 | 6,577,573 | 2,416,819 | | | | (1,201,250) | (3,584,906) |
| **NET INCOME** | $ (12,708,399) | $ (20,991,326) | $ (47,118,976) | $ (46,838,735) | $ 2,742,375 | $ (44,096,361) | $ 801,978 | $ 4,262,081 |
| **NET INCOME(LOSS)** | $ (12,708,399) | $ (20,991,326) | $ (47,118,976) | $ (46,838,735) | $ 2,742,375 | $ (44,096,361) | $ 801,978 | $ 4,262,081 |
| Depreciation | 9,974,843 | 12,344,525 | 13,073,569 | 10,904,060 | 2,198,059 | 13,102,119 | 13,086,890 | 13,475,610 |
| Interest | 33,308,542 | 38,284,231 | 46,422,217 | 39,832,642 | 809,348 | 40,641,991 | 8,196,785 | 7,550,426 |
| PIK Preferred Stock Dividend | 600,000 | 537,543 | 450,000 | | | | 1,000,000 | 1,115,278 |
| Management Fee | (2,874,537) | (6,577,573) | (2,416,819) | | | | | |
| Taxes | 1,349,628 | 1,501,816 | 11,098,961 | 511,278 | 120,745 | 632,023 | 1,201,250 | 3,584,906 |
| Other | | | | | | | | |
| Reorganization Items | | | | 7,632,000 | 992,000 | 8,624,000 | | |
| **ADJUSTED EBITDA** | $ 29,660,077 | $ 25,099,216 | $ 21,508,952 | $ 12,041,245 | $ 6,862,526 | $ 18,903,771 | $ 24,286,903 | $ 29,988,300 |

Notes

Forecast 2009 amounts include actual results for the period January 1, 2009 through June 30, 2009.

# Assumes Classes 1A or 1B Reject the Plan

**Eurofresh Inc. Consolidated Balance Sheet**
**Assumes Classes 1A or 1B Reject the Plan**
**In USD**

| | Actual 12/31/06 | Actual 12/31/2007 | Actual 12/31/08 | Forecast 10/31/09 | Plan/Fresh Start Adjustments | Pro Forma Forecast 10/31/09 | Reorganized Eurofresh Inc. Forecast 12/31/09 | Reorganized Eurofresh Inc. Forecast 12/31/10 | Reorganized Eurofresh Inc. Forecast 12/31/11 |
|---|---|---|---|---|---|---|---|---|---|
| **CURRENT ASSETS:** | | | | | | | | | |
| Cash | $ 16,992 | $ 10,452,540 | $ 3,199,147 | $ 1,076,099 | $ 6,680,000 | $ 7,756,099 | $ 9,041,896 | $ 14,364,538 | $ 21,305,117 |
| Trade receivables | 11,868,372 | 13,230,668 | 13,338,239 | 11,216,165 | | 11,216,165 | 12,724,842 | 11,384,708 | 13,704,829 |
| Other receivables | 620,292 | 7,513 | 17,330 | | | | | | |
| Inventories | 4,064,054 | 4,650,001 | 5,006,633 | 4,401,598 | | 4,401,598 | 4,653,765 | 4,243,210 | 5,078,390 |
| Crop development costs | 22,217,267 | 22,116,634 | 10,904,473 | 10,713,678 | | 10,713,678 | 13,299,620 | 12,799,819 | 15,308,034 |
| Prepaid expenses | 724,803 | 424,068 | 767,044 | 5,899,291 | | 5,899,291 | 6,705,103 | 6,895,399 | 6,695,837 |
| Current taxes receivable | 283,137 | 32,337 | 1,119 | | | | | | |
| Deferred tax asset | 817,093 | 1,137,433 | 1,401,621 | 1,402,000 | (1,402,000) | | | | |
| Total Current Assets | 40,612,009 | 52,051,194 | 34,635,606 | 34,708,831 | 5,278,000 | 39,986,831 | 46,425,226 | 49,687,674 | 62,092,207 |
| **PROPERTY AND EQUIPMENT:** | | | | | | | | | |
| Property and equipment, net | 157,199,753 | 150,496,985 | 145,098,865 | 136,946,541 | (56,051,398) | 80,897,143 | 79,339,084 | 69,252,193 | 60,776,584 |
| **OTHER ASSETS** | 12,319,265 | 11,846,020 | 16,326,143 | 14,233,862 | (14,233,862) | | | | |
| Total Assets | $ 210,131,027 | $ 214,394,199 | $ 196,060,614 | $ 185,891,233 | $ (65,007,260) | $ 120,883,973 | $ 125,764,310 | $ 118,939,867 | $ 122,868,790 |
| **CURRENT LIABILITIES:** | | | | | | | | | |
| Current portion of long-term debt | $ 508,000 | $ 1,394,151 | $ 674,000 | $ | $ | $ | $ | $ | $ |
| Revolving line of credit | 22,600,000 | 33,350,000 | | | | | | | |
| Accounts payable | 9,580,303 | 13,825,485 | 11,309,833 | 11,647,098 | (5,294,000) | 6,353,098 | 7,673,363 | 8,821,734 | 10,684,847 |
| Accrued interest | 10,058,421 | 10,092,802 | 9,324,899 | 25,616,667 | (25,616,667) | | 776,457 | 678,267 | 678,267 |
| Accrued expenses | 4,402,240 | 7,419,390 | 8,203,939 | 10,452,021 | (4,147,401) | 6,304,620 | 6,715,236 | 6,464,831 | 6,554,961 |
| Capital lease obligations, current | | | 1,327,556 | | | | | | |
| Total Current Liabilities | 47,148,963 | 66,081,828 | 30,840,228 | 47,715,786 | (35,058,068) | 12,657,718 | 15,165,056 | 15,964,831 | 17,918,075 |
| Long-term debt, net of current portion | 218,760,968 | 221,697,890 | 274,400,497 | 283,926,284 | (283,926,284) | | | | |
| Mandatorily Redeemable Preferred Stock | 58,250,607 | 67,398,978 | 77,855,624 | 87,790,980 | (87,790,980) | | | | |
| New Credit Facility | | | | | 61,138,317 | 61,138,317 | 61,138,317 | 53,406,878 | 46,466,299 |
| New Subordinated PIK Notes | | | | | 25,000,000 | 25,000,000 | 25,000,000 | 23,375,000 | 26,954,297 |
| Deferred tax liabilities - noncurrent | | | | 1,402,000 | (1,402,000) | | | 1,130,244 | |
| Capital lease obligations, long-term | 9,748,394 | 3,490,312 | 2,956,430 | 3,325,806 | | 3,325,806 | 2,956,430 | 1,756,430 | 486,318 |
| Total Liabilities | 333,908,932 | 358,669,008 | 387,454,399 | 424,160,857 | (322,039,015) | 102,121,842 | 104,259,803 | 95,633,383 | 94,184,947 |
| New PIK Preferred | | | | | 10,000,000 | 10,000,000 | 10,000,000 | 11,000,000 | 12,115,278 |
| **SHAREHOLDERS' EQUITY:** | | | | | | | | | |
| Common stock | 11,651 | 11,651 | 11,651 | 11,651 | 8,750,481 | 8,762,132 | 8,762,132 | 8,762,132 | 8,762,132 |
| Treasury Stock | (92,685,368) | (92,685,368) | (92,685,368) | (92,685,368) | 92,685,368 | | | | |
| Additional paid-in capital | 3,562,273 | 4,056,696 | 4,056,696 | 4,056,696 | (4,056,696) | | | | |
| Accumulated other comprehensive income | | | | | | | | | |
| Retained earnings | (34,666,461) | (55,657,787) | (102,776,794) | (149,652,602) | 149,652,602 | | 2,742,375 | 3,544,353 | 7,806,433 |
| Total Shareholders' Equity | (123,777,906) | (144,274,809) | (191,393,785) | (238,269,623) | 247,031,755 | 8,762,132 | 11,504,506 | 12,306,484 | 16,568,565 |
| Total Liabilities and Shareholders' Equity | $ 210,131,027 | $ 214,394,199 | $ 196,060,614 | $ 185,891,233 | $ (65,007,260) | $ 120,883,973 | $ 125,764,310 | $ 118,939,867 | $ 122,868,790 |

**Eurofresh Inc. Consolidated Cash Row**
**Assumes Classes 1A or 1BReject the Plan**
**In USD**

| | Actual 12 Months 12/31/06 | Actual 12 Months 12/31/2007 | Actual 12 Months 12/31/08 | Actual/Forecast 10 Months 10/31/09 | Reorganized Eurofresh Inc. Forecast 2 Months 31-Dec-09 | Forecast 12 Months 31-Dec-10 | Forecast 12 Months 31-Dec-11 |
|---|---|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | | | | |
| Net income | $ (12,708,399) | (20,991,326) | (47,118,976) | $ (46,838,735) | $ 2,742,375 | $ 801,978 | $ 4,262,081 |
| Adjustments to reconcile net income (loss) to net cash provided by | | | | | | | |
| Operating activities: | | | | | | | |
| Depreciation | 9,974,843 | 12,344,525 | 13,073,569 | 10,904,060 | 2,198,059 | 13,086,890 | 13,475,610 |
| Loss (gain) on sale of assets | 7,478 | | 650 | | | | |
| Stock-based compensation expense | 310,000 | 494,423 | 2,896,198 | 2,092,914 | - | - | - |
| Amortization of debt issuance costs | 904,213 | 912,073 | | | | | |
| Accretion of bond discount | 3,766,704 | 4,331,988 | 4,982,107 | 4,607,970 | | | |
| Unpaid interest on mandatorily redeemable preferred stock | 7,979,925 | 9,148,371 | 10,456,646 | 9,935,380 | | | |
| Deferred income taxes | (2,875,387) | (6,578,423) | (2,352,879) | 100 | | (98,189) | |
| Insurance recovery for replacement of property, plant and equipment | | (1,004,507) | | | | | |
| Unpaid Dividends on New PIK Preferred Stock | | | | | 776,457 | 1,130,244 | 1,229,715 |
| Unpaid interest on New Subordinated PIK Notes | | | | | | 1,000,000 | 1,115,278 |
| Accrued interest | 9,462,052 | 34,382 | (767,903) | 18,893,484 | (3,421,718) | 3,750,000 | 3,579,297 |
| Changes in Working Capital | (3,298,699) | 7,682,409 | 8,919,600 | 186,960 | | 2,958,159 | (3,510,710) |
| Net Cash Provided By Operating Activities | 13,522,729 | 6,373,914 | (9,910,987) | (217,868) | 2,295,173 | 22,629,082 | 20,151,270 |
| **CASH FLOWS USED IN INVESTING ACTIVITIES:** | | | | | | | |
| Proceeds from sale of property plant and equipment | 7,500 | | (1,300) | | | | |
| Expenditures for property and equipment | (33,587,690) | (5,641,757) | (1,874,276) | (2,589,000) | (640,000) | (3,000,000) | (5,000,000) |
| Insurance recovery for replacement of property, plant and equipment | | 1,004,507 | | | | | |
| Net Cash Used In Investing Activities | (33,580,190) | (4,637,250) | (1,875,576) | (2,589,000) | (640,000) | (3,000,000) | (5,000,000) |
| **CASH FLOWS PROVIDED BY FINANCING ACTIVITIES:** | | | | | | | |
| Proceeds from revolving line of credit | 31,000,000 | 41,500,000 | 33,350,000 | | | | |
| Repayment of revolving line of credit | (10,400,000) | (30,750,000) | | | | | |
| Proceeds from issuance of long-term debt | | 67,400,000 | | | | | |
| Repayment of long-term debt/New Credit Facility | (8,397) | (67,400,000) | (20,399,651) | | | (7,731,440) | (6,940,579) |
| New Subordinated PIK Notes | | | | 1,642,000 | | (5,375,000) | |
| Change in restricted cash | 58,507,692 | (508,915) | (1,516,538) | | | | |
| Capital Lease Obligations | (31,689,855) | | | (958,180) | (369,376) | (1,200,000) | (1,270,112) |
| Redemption of Class A common stock | (12,131,749) | | | | | | |
| Redemption of Class B common stock | (398,515) | (325,650) | (7,600,641) | | | | |
| Payment for debt issuance costs | (5,054,136) | | | | | | |
| Redemption of Series A junior preferred stock | (9,631,953) | | | | | | |
| Redemption of Series B preferred stock | (118,636) | (1,216,553) | | | | | |
| Increase (decrease) in outstanding checks in excess of cash balances | | | | | | | |
| Net Cash (Used In) Provided By Financing Activities | 20,074,453 | 8,698,883 | 4,533,170 | 683,820 | (369,376) | (14,306,440) | (8,210,691) |
| NET INCREASE (DECREASE) IN CASH | 16,992 | 10,435,548 | (7,253,393) | (2,123,048) | 1,285,797 | 5,322,642 | 6,940,579 |
| CASH BALANCE, BEGINNING OF PERIOD | | 16,992 | 10,452,540 | 3,199,147 | 7,756,099 | 9,041,896 | 14,364,538 |
| PF Adjustment - Cash Provided for Working Capital | | | | 6,680,000 | | | |
| CASH BALANCE, END OF PERIOD | $ 16,992 | 10,452,540 | 3,199,147 | 7,756,099 | 9,041,896 | 14,364,538 | $ 21,305,117 |

**Assumes Classes 1A or 1B Reject the Plan**

**Summary of Cash Sources and Uses**

| | |
|---|---|
| Projected Beginning Cash Balance - Pre-Confirmation 10/31/09 | $1,076,099 |
| Cash Provided by New Money Investment | $15,000,000 |
| Restructuring / Transaction Closing Costs | $ (3,620,000) |
| Contract Assumptions/503(b)(9) Claims | (3,170,000) |
| General Unsecured Creditors | (600,000) |
| Other Admin/Priority | (930,000) |
| Total Cash to Fund Administrative/Priority Claims | (8,320,000) |
| Net Plan Adjustments to Cash | $6,680,000 |
| Cash Balance - Reorganized Balance Sheet 10/31/2009 | $7,756,099 |