Craig D. Hansen (AZ Bar No. 007405) chansen@ssd.com
Bradley A. Cosman (AZ Bar No. 026223) bcosman@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
Two Renaissance Square, Suite 2700
40 North Central Avenue
Phoenix, Arizona 85004-4498
(602) 528-4000

and

Kristin E. Richner (OH Bar No. 0078582) krichner@ssd.com
Nicholas J. Brannick (OH Bar No. 0079642) nbrannick@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-2700

Counsel to Debtors and Debtors-In-Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Case No. 2:09-bk-07970-CGC |
| | (Jointly Administered) |
| EUROFRESH, INC. *et al* | |
| | Chapter 11 |
| Debtors. | |
| | **NOTICE OF FILING OF SECOND PLAN SUPPLEMENT** |

  **PLEASE TAKE NOTICE THAT** EUROFRESH, INC. and EUROFRESH PRODUCE, LTD., (the "**Debtors**"), debtors and debtors-in-possession in the above-captioned Chapter 11 cases, hereby file their Second Supplement (the "**Second Plan Supplement**") in conjunction with the "Debtors' First Amended Joint Plan Of Reorganization under Chapter 11 of the United States Bankruptcy Code" [Docket No. 379] (the "**Plan**") and the "First Amended Disclosure Statement in Support of Debtors' First Amended Joint Plan Of Reorganization" [Docket No. 380] (the "**Disclosure Statement**"). An final evidentiary hearing on confirmation of the Plan is scheduled for October 14, 2009 at 8:00 a.m. MST or such other time as determined by the Court.

The Second Plan Supplement includes the following documents (as these terms are defined in the Plan):

| | |
|---|---|
| Exh. 1 | Additional List of To-Be-Rejected Executory Contracts and Unexpired Leases |
| Exh. 2 | Additional List of To-Be-Assumed Executory Contracts and Unexpired Leases |
| Exh. 3 | Proposed New Board of Directors |
| Exh. 4 | Amended and Restated Certificate of Incorporation of Eurofresh, Inc. (redline version) |
| Exh. 5 | Stockholders Agreement (redline version) |

Counter-parties to executory contracts or unexpired leases set forth on Exhibits 1 and 2 will receive this Notice and Exhibits 1 and 2. Other Parties wishing to view the Second Plan Supplement may access the Debtors' web-site at http://www.kccllc.net/EuroFresh. If you are a registered PACER user, the Second Plan Supplement may be obtained electronically at www.azb.uscourts.gov. Should you have any additional questions or concerns, please contact Kurtzman Carson Consultants LLC ("**KCC**"), the Debtors' proposed claims, noticing and solicitation agent, toll-free at 866-381-9100.

Dated this 7th day of October, 2009.

**SQUIRE, SANDERS & DEMPSEY L.L.P.**

By:   */s/ Craig D. Hansen*
       Craig D. Hansen
       Bradley A. Cosman
Two Renaissance Square
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004-4498
(602) 528-4000

- and -

Kristin E. Richner (OH Bar No. 0078582)
Nicholas J. Brannick (OH Bar No. 0079642)
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215

*Counsel to Debtors and Debtors-in-Possession*

EXHIBIT 1

# Additional List of To-Be-Rejected Executory Contracts and Unexpired Leases

| | | | | | |
|---|---|---|---|---|---|
| Dwight Ferguson | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Frank van Straalen | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Mark Cassius | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Brian McLaughlin | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| David Godfrey | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Aida Luz Amaya Valenzuela | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Alan Sergio Camacho Penaflor | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Alberto Garcia-Irabien | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Alonso Portillo | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Ambra Burnside | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Ambrosio Camargo-Vasquez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Amy Whitfield | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Ana Beatriz Ruiz-Guzman | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Ana Cristina Ante | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Anabel Pena Rodriguez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Andres Fimbres | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Angel Durazo | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |

| Name | Address | City | State | Zip | Type |
|---|---|---|---|---|---|
| Angelita Peralta | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Ann Maurer O'Neill | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Anthony C Stevens | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Anthony Romero | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Antonio Garay | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Armando Barbachan | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Armando Felix | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Brian D. Sandin | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Carlos A Palazuelos | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Carlos Eduardo Gonzalez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Charles C Shumway | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Christian Valera | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Christian Vizcarra | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Christie Goodman | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Clifford Davis | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Cornelis Rodenburg | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Cosme Solis-Moreno | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Craig E. Boudie | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Dalila Perez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Daniel B McNerney | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |

| Name | Address | | City | State | Zip | Type |
|---|---|---|---|---|---|---|
| Daniel K King | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| Daniel Lopez Maldonado | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| Daniel Ramirez-Rodriguez | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| David Alan Kelley | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| David John Leitch | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| David Juan Avila | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| David Madrid Valenzuela | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| Dayl B Seigfried | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| Deann Rupert | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| Deborah D. Brewer | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| Dennis Brewer | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| Dennis Wade Feigler | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| Diana M. Ibarra | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| Diane Therese Beecroft | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| Dolora D Sillman | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| Donovan Scott Zuspan | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| Edgar C Condes | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| Efren Gerardo Garcia Valenzuela | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| Efren Ruiz Quintana | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |
| Elias Torres Villegas | 26050 S. Eurofresh Ave. | | Willcox | AZ | 85643 | Employment Contract |

| Enimia B Gonzalez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
|---|---|---|---|---|---|
| Enrique Ramirez Jr. | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Enrique Ramirez-Grijalva | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Espie Cruz | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Esteban Alberto Maiz | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Esteban Morales Escalante | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Evaristo G Rodarte | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Felix Enrique Peralta-Garibaldi | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Fernando Alonso Hernandez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Fons Aldenzee | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Fons J.F.M. Aldenzee | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Francisca Guerrero Perez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Francisco Javier Jimenez Perez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Gonzalo Garcia | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Grace A Gatti | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Gregory L Shearer | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Guadalupe Saucedo Gonzalez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Hector Lugo Franco | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Hector Ruiz-Aguilar | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Heidi Harris | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |

| Heliodoro Puga | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Hendrikus Esser | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Henri van den Bos | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Herb Raymond Bates Jr. | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Heriberto C Werneburg Fonseca | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Holly L Draper | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Hugo Cantu | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Iliana Juanita Segura | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Isaac Salazar Rodarte | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Ismael Bautista Coronado | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| J. Christopher Myers | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Jacobo Yanes Caballero | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| James M D'Amato | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Jan de Kok | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Jan van Ingen | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Jason Waseman | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Javier DeLoera | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Jeff Reising | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Jessica Spring Albright | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Jessie J. Newton | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |

| | | | | | |
|---|---|---|---|---|---|
| Jesus David Coronado | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Jesus P Gomez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Jesus Roberto Ibarra-Juvera | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Jesus V Rodriguez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Joann Berniece Scheffer | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Joe Henry Gonzales | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Joel G Gonzalez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| John Arthur Nihof | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| John Hilton | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| John Rhodes | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Jon Robert Fisher | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Jorge Fernando Escobar Juanz | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Jose Antonio Garcia Castro | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Jose Antonio Yanez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Jose Conrado Montano | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Jose Paredes | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Jose Pedro Ysea | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Joseph A. Robles | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Josue Avila Guerrero | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Juan Diego Camacho | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |

| Name | Address | | City | State | Zip | Type |
|---|---|---|---|---|---|---|
| Juan Gerardo Fillmore | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Juan Pablo Cordova | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Juana B Coronado | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Julian Pimienta Dominguez | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Justin Anthony Brewer | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Karin M. Tift | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Karla Elena Roque-Miramon | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Karla Jasmin Hendrick | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Katherine L. Penn | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Kathleen L Williams | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Kevin Jensen | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Kevin Partida | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Lendon James Whetten | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Lirio Guadalupe Navarro Ortega | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Lisa K Sanchez | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Lisa Marie Delligatti | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Lorenzo Castillo | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Lorenzo Sanchez Avila | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Luis Francisco Martinez Rascon | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |
| Luis L Ruiz | 26050 S. Eurofresh | Ave. | Willcox | AZ | 85643 | Employment Contract |

| | | | | |
|---|---|---|---|---|
| Manuel Becerra Rivera | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Manuel Viramontes Vergara | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Marco A Navarro | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Marco Antonio Leyva | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Maria C Cain | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Maria E Hernandez M | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Mario Benitez Camacho | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Mark Anthony Estrada | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Martin Gurney | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Melodie A Overton | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Michael R Spiceland | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Michelle Leann Bowen | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Miguel A Palazuelos | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Miguel Angel Clark Puebla | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Miguel Barraza | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Miguel Castillo Demoss | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Miguel Rios | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Nathan Steinbeigle | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Nicolas Meier Bermudez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Nicole Marie Richins | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |

| Name | Address | City | State | Zip | Type |
|---|---|---|---|---|---|
| Noe De Jesus Valle Gaxiola | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Norena S Durazo | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Octavio Ramirez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Orval John Larsen | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Oscar Gerardo Corrales Garcia | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Oscar Rodarte M | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Pablo Zambrano-Torres | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Paul Waitkus | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Pedro Martinez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Rafael Encinas | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Rafael G. Aguirre | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Ramon Enrique Martinez Ruiz | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Ramon Pando | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Ray Tollian Haynes | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Rebeca Aldana Peraza | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Remijio Castillo M. | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Rene Rodriguez-Lopez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Ricardo Bracamonte | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Ricardo M Paredes | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Richard B Sharma | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |

| Name | Address | City | State | Zip | Type |
|---|---|---|---|---|---|
| Rigoberto Tona | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Rita Adriana Gutierrez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Robert Erwin | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Robert Erwin | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Robert Hartmann | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Robert Lopez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Roberto C. Ibarra | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Roberto Pulido | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Rodrigo Guzman Pacheco | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Roel Boers | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Roman Badillo | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Rosa Soto Velasquez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Rosalba Lopez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Rowdy D Chambers | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Ruben Vicencio | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Salvador Estrada Jr | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Salvador Gomez-Ortega | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Sandra Deanna Moran | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Santos Durazo | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Sarah Melissa Duvall | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |

12

| Name | Address | City | State | Zip | Type |
|---|---|---|---|---|---|
| Silvestre Alberto Encinas | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Socorro Garay | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Stephanus W van Haren | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Steven R Lunt | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Susan K. Rogge | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Tanya Renae Manuz | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Teresa Cuevas | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Theo D Sigon | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Timothy Alan Logan | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Todd R Heaton | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Tom Noels | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Vicente Castorena Reyna | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Victor Manuel Vazquez Gomez | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Victor Valera | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Roel Boers | 26050 S. Eurofresh Ave. | Willcox | AZ | 85643 | Employment Contract |
| Robert Erwin | 26051 S. Eurofresh Ave. | Willcox | AZ | 85643 | Option Contract/Supplemental agreement |
| Kees Rodenburg | 26052 S. Eurofresh Ave. | Willcox | AZ | 85643 | Option Contract/Supplemental agreement |
| JC Myers | 26053 S. Eurofresh Ave. | Willcox | AZ | 85643 | Option Contract/Supplemental agreement |
| Robert Hartmann | 26054 S. Eurofresh Ave. | Willcox | AZ | 85643 | Option Contract/Supplemental agreement |
| David Leitch | 26055 S. Eurofresh Ave. | Willcox | AZ | 85643 | Option Contract/Supplemental agreement |

| Name | Address | City | State | Zip | Document |
|------|---------|------|-------|-----|----------|
| Jeff Reising | 26056 S. Eurofresh Ave. | Willcox | AZ | 85643 | Option Contract/Supplemental agreement |
| Edgar Condes | 26057 S. Eurofresh Ave. | Willcox | AZ | 85643 | Option Contract/Supplemental agreement |
| Kevin Partida | 26058 S. Eurofresh Ave. | Willcox | AZ | 85643 | Option Contract/Supplemental agreement |
| Ann O'Neill | 26059 S. Eurofresh Ave. | Willcox | AZ | 85643 | Option Contract/Supplemental agreement |
| Jan van Ingen | 26060 S. Eurofresh Ave. | Willcox | AZ | 85643 | Option Contract/Supplemental agreement |
| Tony Stevens | 26061 S. Eurofresh Ave. | Willcox | AZ | 85643 | Option Contract/Supplemental agreement |
| Henk Esser | 26062 S. Eurofresh Ave. | Willcox | AZ | 85643 | Option Contract/Supplemental agreement |
| Martin Gurney | 26063 S. Eurofresh Ave. | Willcox | AZ | 85643 | Option Contract/Supplemental agreement |
| Fons Aldenzee | 26064 S. Eurofresh Ave. | Willcox | AZ | 85643 | Option Contract/Supplemental agreement |
| Steve Lunt | 26065 S. Eurofresh Ave. | Willcox | AZ | 85643 | Option Contract/Supplemental agreement |
| Kevin Jensen | 26066 S. Eurofresh Ave. | Willcox | AZ | 85643 | Option Contract/Supplemental agreement |

# EXHIBIT 2

## Additional List of To-Be-Assumed Executory Contracts and Unexpired Leases

| Counter-Party | Nature of Contract/Lease | Proposed Cure |
|---|---|---|
| BMO Capital Markets | Nondisclosure Agreement | **proposed cure:** $0 |
| GE Corporate Financial Services, Inc. | Nondisclosure Agreement | **proposed cure:** $0 |
| CIC II, LP | Nondisclosure Agreement | **proposed cure:** $0 |
| Wachovia Bank, NA | Nondisclosure Agreement | **proposed cure:** $0 |
| The CIT Group/Business Credit, Inc. | Nondisclosure Agreement | **proposed cure:** $0 |
| Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., "Rabobank Nederland" New York Branch | Nondisclosure Agreement | **proposed cure:** $0 |
| Merrill Lynch Commercial Finance Corp. | Nondisclosure Agreement | **proposed cure:** $0 |
| Goldman Sachs Speciality Lending Group, LP | Nondisclosure Agreement | **proposed cure:** $0 |
| Bank of Montreal | Nondisclosure Agreement | **proposed cure:** $0 |
| Ableco Finance, LLC | Nondisclosure Agreement | **proposed cure:** $0 |
| Wells Fargo Foothill | Nondisclosure Agreement | **proposed cure:** $0 |
| Jan de Kok | Deferred Compensation Agreement | **proposed cure:** $0 |

# EXHIBIT 3

## List of Proposed Directors for Reorganized Debtor

**Directors:**

| Name | Biographical Summary |
|------|---------------------|
| Johan van den Berg | Johan van den Berg, age 52, is EFI's founder and current Chairman of the Board.  He is the former Chief Executive Officer of EFI and owns 25.68% of the equity in EFI through Bio Dynamics.  Mr. van den Berg is a New Investor in Reorganized Eurofresh. |
| Scott E. Komar | Scott E. Komar, age 47, was appointed a director of EFI in 2008.  Mr. Komar is currently the Vice president of Operations of Organicgirl, LLC and NewStar Fresh Goods, LLC, where he is responsible for agricultural operations, manufacturing, logistics, engineering, demand management and forecasting. |
| Charles T. Lanktree | Charles T. Lanktree, age 56, is currently the President and CEO of Egglands' Best, Inc.  Mr. Lanktree has been an executive of Egglands since 1990 and President since 1997.  Mr. Lanktree also has significant experience in corporate turnarounds. |
| David R. Jessick | David R. Jessick, age 55, served Rite Aid Corporation as Senior Executive Vice President, Chief Administrative Officer from December 1999 to July 2002.  He then served as a consultant to Rite Aid's CEO and senior management from July 2002 until February 2005.  Mr. Jessick has more than 30 years of retail experience, and was named to the Rite Aid Board in April 2009 with a term through June 2010. |
| Scott W. Meader, **Chairman** | Scott W. Meader, age 47, held the position of President and Chief Executive Officer of Milnot Holding Corporation for nine years, a $220 million food company privately-held by Madison Dearborn Partners, Inc. and management, from 1997 through 2006 (departing six months after the successful sale of the company).  Mr. Meader is currently is Chairman of the Board of Nellson Nutraceuticals, LLC, a $260 million food manufacturer. |

* With regard to post-Confirmation compensation of the directors, each director will be compensated $40,000 per year, except the Chairman shall receive $75,000 per year.

** With regard to post-Confirmation compensation of the officers, such compensation will not exceed the compensation currently being provided to the officers.

<u>EXHIBIT 4</u>

Amended and Restated Certificate of Incorporation of Eurofresh, Inc. (redline version)

**CERTIFICATE OF**

**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

**OF**

**EUROFRESH, INC.**

Brian McLaughlin, being the duly elected Secretary of Eurofresh, Inc., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (the "Corporation"), does hereby certify as follows:

1.    That the Corporation filed its original Certificate of Incorporation with the Delaware Secretary of State on January 24, 1992 (the "Original Certificate").

2.    That the original name of the Corporation was Bonita Nurseries, Inc.

3.    That the Corporation amended, restated or otherwise modified the Original Certificate and filed such amended, restated and modified certificates with the Delaware Secretary of State on each of December 27, 2001, May 14, 2004, December 1, 2005, and December 21, 2005 (collectively, the "Amended Certificate").

4.    That the Board of Directors of the Corporation, pursuant to Sections 141, 242 and 245 of the General Corporation Law of the State of Delaware, adopted resolutions authorizing the Corporation to amend, integrate and restate the Corporation's Amended Certificate in its entirety to read as set forth in Exhibit A attached hereto and made a part hereof (the "Third Amended and Restated Certificate").

IN WITNESS WHEREOF, the undersigned, being the Secretary hereinabove named, for the purpose of amending and restating the Certificate of Incorporation of the Corporation pursuant to the General Corporation Law of the State of Delaware, under penalties of perjury does hereby declare and certify that this is the act and deed of the Corporation and the facts stated herein are true, and accordingly has hereunto signed this Certificate of Amended and Restated Certificate of Incorporation this [_____] day of [_____], 2009.

By: _____
          Brian McLaughlin
          Secretary

**THIRD AMENDED AND RESTATED**

**CERTIFICATE OF INCORPORATION**

**OF EUROFRESH, INC.**

**ARTICLE ONE**

The name of the corporation is Eurofresh, Inc. (hereinafter called the "Corporation").

**ARTICLE TWO**

The address of the Corporation's registered office in the state of Delaware is 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is Corporation Service Company.

**ARTICLE THREE**

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

**ARTICLE FOUR**

A.     AUTHORIZED SHARES.

The total number of shares of capital stock which the Corporation has authority to issue is 25,000,000, consisting of:

1.     20,000,000 shares of common stock, par value $0.001 per share (the "Common Stock"); and

2.     5,000,000 shares of preferred stock, par value $0.001 per share (the "Preferred Stock").

The shares of the preferred stock of the Corporation authorized in this Section A(2) may be issued from time to time in one or more series, each of which series shall have such distinctive designations and number of shares as shall be fixed by the board of directors of the Corporation prior to the issuance of any shares thereof. Each such series of preferred stock shall have such voting powers, full or limited, and such preferences and relative, participating, optional or other special rights, and such qualifications, limitations or restrictions, as shall be stated in such resolution or resolutions providing for the issue of such series of preferred stock as may be adopted from time to time by the board of directors of the Corporation prior to the issuance of any shares thereof pursuant to the authority hereby expressly vested in it, all in

accordance with the laws of the State of Delaware. In no event shall the Corporation issue any series of non-voting capital stock.

3. In addition to any other consent or approval which may be required pursuant to this Certificate of Incorporation or by law, no amendment or waiver of any provision of this Article Four shall be effective without the prior approval of the holders of a majority of the then outstanding Common Stock, voting as a single class. For purposes of votes on amendments and waivers to this Section A(3), each share of capital stock shall be entitled to one vote.

## ARTICLE FIVE

The name and mailing address of the Corporation is as follows:

Eurofresh, Inc.
26050 South Eurofresh Avenue
Willcox, Arizona 85643

## ARTICLE SIX

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors of the Corporation is expressly authorized to adopt, make, repeal, alter, amend and rescind the by-laws of the Corporation, except as may otherwise be provided in such by-laws.

## ARTICLE SEVEN

The Corporation expressly elects not to be governed by Section 203 of the General Corporation Law of the State of Delaware.

## ARTICLE EIGHT

The Corporation shall indemnify each person identified in Section 145(a) and (b) of the Delaware General Corporation Law, as the same exists or may hereafter be amended, to the fullest extent permissible under those subsections or the indemnification provisions of any successor or amended statute or to such greater extent as provided in the Bylaws of the Corporation or by agreement.

## ARTICLE NINE

To the fullest extent permitted by the Delaware General Corporation Law, as the same exists or may hereafter be amended, a director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for a breach of fiduciary duty as a director. This Article Nine shall not eliminate or limit the liability of a director for any conduct described in Section 102(b)(7)(i) through (iv) of the Delaware General Corporation Law. Any repeal or modification of this Article Nine shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification and shall not increase the

liability of a director of the Corporation arising out of acts or omissions occurring before the repeal or modification becomes effective.

## ARTICLE TEN

The Board of Directors of the Corporation initially shall be comprised of five (5) members, which number may be amended and altered from time to time as provided in the Bylaws of the Corporation.

## ARTICLE ELEVEN

The Corporation reserves the right to amend or repeal any provisions contained in this Certificate of Incorporation from time to time and at any time in the manner now or hereafter prescribed by the laws of the State of Delaware, and all rights conferred upon stockholders and directors are granted subject to such reservation.

<u>EXHIBIT 5</u>

Stockholders Agreement (redline version)

**STOCKHOLDERS AGREEMENT**

**THIS STOCKHOLDERS AGREEMENT** (the "*Agreement*") is made as of this ___ day of _____, 2009, by and among Eurofresh, Inc., a Delaware corporation (together with any successor thereto, the "*Company*"), JB (as defined below), the Investing Noteholders (as defined below), and any other Person, including any holder of New Common Stock upon confirmation of the Plan, who from time to time becomes a party to this Agreement by execution of a Joinder Agreement in substantially the form attached hereto as <u>Exhibit A</u> (each, an "*Investor*" and collectively, the "*Investors*").

**WHEREAS**, the Company and the New Investors have entered into an Investment Plan and Support Agreement, dated as of _____, 2009 (the "*Support Agreement*"), pursuant to which the New Investors have agreed to contribute certain funds (the "*New Money Investment*") to the Company in exchange for, among other things, shares of the Company's New Common Stock (as defined below), in accordance with the terms and conditions contained therein;

**WHEREAS**, the execution and delivery of this Agreement is a condition precedent to the acquisition by the New Investors of the New Common Stock and other securities under the Support Agreement; and

**WHEREAS**, after the delivery of the shares of New Common Stock in respect of the New Money Investment and the settlement of claims pursuant to the Company's Plan of Reorganization (the "*Plan*"), the New Investors will hold the number of shares of New Common Stock set forth opposite their names on <u>Exhibit B</u>.

**NOW THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

**ARTICLE I**
**<u>DEFINITIONS</u>**

**Section 1.1    <u>Certain Definitions</u>.**   The following capitalized terms, as used in this Agreement, shall have the meanings set forth below.

["*7.5% Holder*" shall mean an Investor that holds more than 7.5% of the outstanding New Common Stock.]

"*Affiliate*," with respect to any Person, shall mean a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with the first mentioned Person.  A Person shall be deemed to control another Person if such first Person possesses directly or indirectly the power to direct, or cause the direction of, the management and policies of the second Person, whether through the ownership of voting securities, by contract or otherwise.

"*Bankruptcy Code*" means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases.

"**_Board of Directors_**" shall mean the Board of Directors of the Company.

"**_Initial Public Offering_**" shall mean the Company's first underwritten public offering on a firm commitment basis by a nationally recognized investment banking organization or organizations, pursuant to an effective registration statement under the Securities Act covering the offer and sale of shares of the Company's New Common Stock and with respect to which such New Common Stock is listed for trading on either the New York Stock Exchange or the Nasdaq National Market (or any successor thereto).

"**_Investing Noteholders_**" means those investors set forth on Exhibit C hereto.

"**_JB_**" means Johan van den Berg or his Affiliate, as applicable.

"**_Majority Interest_**" means the holders of (i) at least 66-2/3% of the outstanding New Common Stock during the period from the date hereof until the third anniversary of the date hereof, and (ii) more than 50% of the outstanding New Common Stock thereafter.

"**_New Common Stock_**" means 20,000,000 shares, or such other number of shares that may be authorized from time to time, of common stock of the Company as reorganized and reconstituted pursuant to the Plan and the Support Agreement, and any common stock obtained in any stock split, combination, reorganization, recapitalization, reclassification, stock distribution, stock dividend or similar event affecting the common stock of the Company.

"**_New Investors_**" shall mean JB and the Investing Noteholders.

"**_Person_**" shall mean an individual, a corporation, a partnership, a joint venture, a limited liability company, an estate, a trust, an unincorporated organization, and any other entity or organization, governmental or otherwise.

"**_Plan_**" shall mean the Joint Plan of Reorganization of the Company and Eurofresh Produce, Ltd., a Delaware corporation and wholly-owned subsidiary of the Company, under section 1121(a) of the Bankruptcy Code, as may be amended, modified, or restated.

"**_PIK Preferred_**" shall mean the Company's 10.0% Series A Preferred Stock, par value $0.001 per share.

"**_Registration Expenses_**" shall mean all expenses incurred by the Company in complying with Sections 2.1 or 2.2 hereof, including, without limitation, all registration and filing fees (exclusive of underwriting discounts and commissions), printing expenses, fees and disbursements of counsel for the Company, reasonable fees and disbursements of a single special counsel for the Investors, blue sky fees and expenses and the expense of any special audits incident to or required by any such registration.

"**_Sale Event_**" shall mean a bona fide negotiated transaction with a non-Affiliate in which (i) the Company merges or consolidates with or into another corporation or entity (except a merger or consolidation in which the holders of capital stock of the Company immediately prior to such merger or consolidation continue to hold at least a majority of the voting power of the surviving or resulting corporation or entity following such merger or consolidation), (ii) the

Company sells, leases, licenses or transfers all or substantially all of its assets, or (iii) the Company engages in any other transaction in which the holders of capital stock of the Company immediately prior to such transaction hold less than a majority of the voting power of the surviving or resulting corporation or entity following such transaction.

"*Securities Act*" shall mean the Securities Act of 1933, as amended, or any similar successor federal statute, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder, all as the same shall be in effect at the time.

"*Selling Expenses*" shall mean all underwriting discounts, selling commissions and stock transfer taxes applicable to the sale of New Common Stock and fees and disbursements of counsel for any Investor (other than the fees and disbursements of counsel included in the Registration Expenses).

"*Subsidiary*" means any corporation more than 50% of the outstanding voting securities of which, or any partnership, joint venture or other entity more than 50% of the voting equity interests of which are, directly or indirectly owned by the Company or any other entity otherwise controlled by or under common control with the Company.

"*Third-Party Buyer*" shall mean the surviving or resulting corporation or entity in clause (i) of the definition of "Sale Event" and the buyer or buyers in clauses (ii) or (iii) of the definition of "Sale Event."

"*Transfer*" means any direct or indirect transfer, donation, sale, assignment, pledge, hypothecation, grant of a security interest in or other disposal or attempted disposal of all or any portion of a security or of any rights. "Transferred" means the accomplishment of a Transfer, and "Transferee" means the recipient of a Transfer.

## ARTICLE II
## REGISTRATION RIGHTS

**Section 2.1** **Demand Registration**.

**(a)** Subject to the conditions of this Section 2.1, if the Company shall receive a written request from a Majority Interest (the "*Initiating Investors*") that the Company file a registration statement under the Securities Act covering the registration of New Common Stock, then the Company shall, within thirty (30) days of the receipt thereof, give written notice of such request to all Investors and, subject to the limitations of this Section 2.1, use its reasonable commercial efforts to effect, as soon as practicable, the registration under the Securities Act of all New Common Stock that the Investors request to be registered.

**(b)** If the Initiating Investors intend to distribute the New Common Stock covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to this Section 2.1 and the Company shall include such information in the written notice referred to in Section 2.1(a). In such event, the right of any Investor to include its New Common Stock in such registration shall be conditioned upon such Investor's participation in such underwriting and the inclusion of such Investor's New Common Stock in the underwriting to the extent provided herein (unless otherwise mutually agreed by a

Majority Interest and such Investor).  All Investors proposing to distribute their securities through such underwriting shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by a Majority Interest (which underwriter or underwriters shall be reasonably acceptable to the Company).  Notwithstanding any other provision of this Section 2.1, if the underwriter advises the Company that marketing factors require a limitation of the number of shares of new Common Stock to be underwritten, then the Company shall so advise all Investors whose New Common Stock would otherwise be underwritten pursuant hereto, and the number of shares that may be included in the underwriting shall be allocated to such Investors on a *pro rata* basis based on the number of shares of New Common Stock held by all such Investors (including the Initiating Investors).  Any New Common Stock excluded or withdrawn from such underwriting shall be withdrawn from the registration.

(c)     The Company shall not be required to effect a registration pursuant to this Section 2.1:

(i)     until the Company has completed its Initial Public Offering;

(ii)     during the period starting with the date of filing of, and ending on the date 180 days following the effective date of the registration statement pertaining to the Company's Initial Public Offering;

(iii)     if the Company shall furnish to the Initiating Investors a certificate signed by the Chairman of the Board stating that, in the good faith judgment of a majority of the Directors of the Company, it would be seriously detrimental to the Company and its stockholders for such registration statement to be effected at such time, in which event the Company shall have the right to defer such filing for a period of not more than sixty (60) days after receipt of the request of the Initiating Investors; provided that such right to delay a request shall be exercised by the Company not more than once in any twelve (12) month period; or

(iv)     after the Company has effected two (2) such registrations, and such registrations have been declared or ordered effective.

**Section 2.2     <u>Piggyback Registrations</u>**.

(a)     The Company shall notify all Investors in writing at least thirty (30) days prior to the filing of any registration statement under the Securities Act for purposes of a public offering of securities of the Company (including, but not limited to, registration statements relating to secondary offerings of securities of the Company, but excluding registration statements relating to the Company's Initial Public Offering, employee benefit plans or with respect to corporate reorganizations or other transactions under Rule 145 of the Securities Act) and will afford each such Investor an opportunity to include in such registration statement all or part of the New Common Stock held by such Investor.  Each Investor desiring to include in any such registration statement all or any part of the New Common Stock held by it shall, within ten (10) days after the receipt of the above-described notice from the Company, so notify the Company in writing.  Such notice shall state the intended method of disposition of the New Common Stock held by such Investor.  If an Investor decides not to include all of its New

Common Stock in any registration statement thereafter filed by the Company, such Holder shall nevertheless continue to have the right to include any New Common Stock in any subsequent registration statement or registration statements as may be filed by the Company with respect to offering of its securities, all upon the terms and conditions set forth herein.

(b)     If the registration statement under which the Company gives notice under this Section 2.2 is for an underwritten offering, the Company shall so advise the Investors.  In such event, the right of any such Investor to be included in a registration pursuant to this Section 2.2 shall be conditioned upon such Investor's participation in such underwriting and the inclusion of such Investor's New Common Stock in the underwriting to the extent provided herein.    All Investors proposing to distribute their New Common Stock through such underwriting shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Company.    Notwithstanding any other provision of the Agreement, if the underwriter and/or the Company determine in good faith that marketing factors require a limitation of the number of shares to be underwritten, the number of shares that may be included in the underwriting shall be allocated first to the Company, and then to Investors, on a *pro rata* basis based on the total number of New Common Stock held by the Investors.  In no event will shares of any other stockholder be included in such registration that would reduce the number of shares that may be included by the Investors without the prior written consent of a Majority Interest.  In no event will the Company be required to reduce the number of shares it desires to sell to accommodate Investors.

(c)     Upon an affirmative vote of a majority of the directors of the Company, the Company shall have the right to terminate or withdraw any registration initiated by it under this Section 2.2 prior to the effectiveness of such registration whether or not any Investor has elected to include securities in such registration.  The Registration Expenses of such withdrawn registration shall be borne by the Company in accordance with Section 2.3 hereof.

Section 2.3     **Expenses of Registration**.    All Registration Expenses incurred in connection with any registration, qualification or compliance pursuant to Section 2.1 or 2.2 shall be borne by the Company.  All Selling Expenses incurred in connection with any registrations hereunder, shall be borne by the Investors of the securities so registered *pro rata* on the basis of the number of shares so registered.

Section 2.4     **Obligations of the Company**.  Whenever required by the provisions of this Agreement to effect the registration of any New Common Stock, the Company shall, as expeditiously as reasonably possible:

(a)     Prepare and file with the SEC a registration statement with respect to such New Common Stock and use all reasonable efforts to cause such registration statement to become effective, and, upon the request of the holders of a majority of the New Common Stock registered thereunder, keep such registration statement effective for up to ninety (90) days or, if earlier, until the they have completed the distribution related thereto; provided, however, that if the registration is on Form S-3, the Company shall use reasonable efforts to cause it to remain effective for so long as (i) shares of New Common Stock remain unsold under the registration statement and (ii) the Company is eligible to use Form S-3 and the time period for the registration has not expired.

**(b)** Subject to Section 2.6 hereof, prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement.

**(c)** Furnish to the Investors such number of copies of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of the New Common Stock owned by them.

**(d)** Use all reasonable efforts to register and qualify the New Common Stock under such other securities or Blue Sky laws of such jurisdictions as shall be reasonably requested by the Investors, provided that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

**(e)** In the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing underwriter(s) of such offering. Each Investor participating in such underwriting shall also enter into and perform its obligations under such an agreement.

**(f)** Notify each Investor covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing.

**(g)** Cause all such New Common Stock to be listed on each securities exchange or automated quotation system on which similar securities issued by the Company are then listed.

**(h)** Promptly provide a transfer agent and registrar for all such New Common Stock not later than the effective date of the registration statement.

**(i)** Furnish, at the request of holders of a majority of the New Common Stock being registered, on the date that such shares of New Common Stock are delivered to the underwriters for sale, if such securities are being sold through underwriters, or, if such securities are not being sold through underwriters, on the date that the registration statement with respect to such securities becomes effective, (i) an opinion, dated as of such date, of the counsel representing the Company for the purposes of such registration, in form and substance as is customarily given to underwriters in an underwritten public offering and reasonably satisfactory to the holders of a majority of the New Common Stock being registered, addressed to the underwriters, if any, and to the holders of New Common Stock requesting registration and (ii) a letter dated as of such date, from the independent certified public accountants of the Company, in form and substance as is customarily given by independent certified public accountants to

underwriters in an underwritten public offering and reasonably satisfactory to the holders of a majority of the New Common Stock being registered, addressed to the underwriters, if any, and if permitted by applicable accounting standards, to the holders of New Common Stock requesting registration of New Common Stock.

(j) Promptly following the effectiveness of such registration statement, notify each Investor of the effectiveness of such registration statement and thereafter, notify each Investor of any request by the SEC for the amending or supplementing of such registration statement or prospectus.

**Section 2.5** **Termination of Registration Rights**. All registration rights granted under this Article II shall terminate, and be of no further force and effect, upon the earliest to occur of (i) the five year anniversary date of the closing of the Company's Initial Public Offering, (ii) a Sale Event, (iii) the date on which all New Common Stock held by the Investors may immediately be sold in any three-month period without registration pursuant to Rule 144 under the Securities Act, or (iv) a dissolution or liquidation of the Company.

**Section 2.6** **Delay of Registration; Furnishing Information**.

(a) No Investor shall have any right to obtain or seek an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Article II.

(b) It shall be a condition precedent to the obligations of the Company to take any action pursuant to Section 2.1 or 2.2 that the selling Investors shall furnish to the Company such information regarding themselves, the New Common Stock held by them and the intended method of disposition of such securities as shall be required to effect the registration of their New Common Stock.

(c) If the Company shall notify Investors pursuant to Section 2.4(f) of this Agreement that a prospectus required to be delivered includes an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing, the Investors shall not make any sales of New Common Stock using such prospectus; *provided, however*, that the Company must furnish the Investors with a prospectus that may be used to sell New Common Stock within thirty (30) days after notifying the Investors pursuant to Section 2.4(f) hereof, and *provided further*, that the Company may not delay the Investors' ability to sell New Common Stock pursuant to this Section 2.6(c) for more than sixty (60) days in any twelve month period.

**Section 2.7** **Indemnification**. In the event any New Common Stock are included in a registration statement under Sections 2.1 or 2.2:

(a) To the extent permitted by law, the Company will indemnify and hold harmless each Investor, the partners, managers, officers, directors and legal counsel of each Investor, any underwriter (as defined in the Securities Act) for such Investor and each person, if any, who controls such Investor or underwriter within the meaning of the Securities Act or the Exchange Act, against any losses, claims, damages, or liabilities (joint or several) to which they may become subject under the Securities Act, the Exchange Act or other federal or state law,

insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any of the following statements' omissions or violations (each a "Violation") by the Company: (i) any untrue statement or alleged untrue statement of a material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, (ii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading, (iii) any violation or alleged violation by the Company of the Securities Act, the Exchange Act, any state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any state securities law in connection with the offering covered by such registration statement, or (iv) any breach of the terms of any underwriting agreement, placement agency agreement or other similar contract or arrangement; and the Company will reimburse each such Investor, partner, officer or director, underwriter or controlling person for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action; *provided, however*, that the Company shall not be liable in any such case for any such loss, claim, damage, liability or action to the extent that it arises solely out of or is based solely upon a Violation which occurs in reliance upon and in conformity with written information furnished expressly for use in connection with such registration by such Investor, partner, officer, director, underwriter or controlling person of such Investor.

      **(b)**     To the extent permitted by law, each Investor will, if New Common Stock held by such Investor is included in the securities as to which such registration qualifications or compliance is being effected, severally and not jointly, indemnify and hold harmless the Company, each of its directors, its officers, and legal counsel and each person, if any, who controls the Company within the meaning of the Securities Act, any underwriter and any other Investor selling securities under such registration statement or any of such other Investor's partners, directors or officers or any person who controls such Investor, against any losses, claims, damages or liabilities (joint or several) to which the Company or any such director, officer, controlling person, underwriter or other such Investor, or partner, director, officer or controlling person of such other Investor may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereto) arise out of or are based upon any Violation, in each case to the extent (and only to the extent) that such Violation occurs in reliance upon and in conformity with written information furnished by such Investor under an instrument duly executed by such Investor (or its authorized agent) and stated to be specifically for use in connection with such registration; and each such Investor will reimburse any legal or other expenses reasonably incurred by the Company or any such director, officer, controlling person, underwriter or other Investor, or partner, officer, director or controlling person of such other Investor in connection with investigating or defending any such loss, claim, damage, liability or action if it is finally judicially determined that there was such a Violation; *provided, however*, in no event shall any indemnity under this Section 2.7 exceed the net proceeds from the offering received by such Investor.

      **(c)**     Promptly after receipt by an indemnified party under this Section 2.7 of notice of the commencement of any action (including any governmental action), such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this Section 2.7, deliver to the indemnifying party a written notice of the commencement

thereof and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume the defense thereof with counsel mutually satisfactory to the parties; *provided, however*, that an indemnified party shall have the right to retain its own counsel, with the fees and expenses to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such proceeding. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action, if materially prejudicial to its ability to defend such action, shall relieve such indemnifying party of any liability to the indemnified party under this Section 2.7, but the omission so to deliver written notice to the indemnifying party will not relieve it of any liability that it may have to any indemnified party otherwise than under this Section 2.7.

(d) If the indemnification provided for in this Section 2.7 is held by a court of competent jurisdiction to be unavailable to an indemnified party with respect to any losses, claims, damages or liabilities referred to herein, the indemnifying party, in lieu of indemnifying such indemnified party thereunder, shall to the extent permitted by applicable law contribute to the amount paid or payable by such indemnified party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and of the indemnified party on the other in connection with the Violation(s) that resulted in such loss claim, damage or liability, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and of the indemnified party shall be determined by a court of law by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission; provided, that in no event shall any contribution by an Investor hereunder exceed the proceeds from the offering received by such Investor.

(e) The obligations of the Company and Investor under this Section 2.7 shall survive completion of any offering of New Common Stock in a registration statement. No indemnifying party, in the defense of any such claim or litigation, shall, except with the consent of each indemnified party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation. No indemnifying party shall be liable to any indemnified party in respect of any amounts due in settlement of any claim or litigation without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld.

Section 2.8 **Limitation on Subsequent Registration Rights**. After the date of this Agreement, the Company shall not, without the prior written consent of a Majority Interest, enter into any agreement with any Person that would grant such Person registration rights senior to those granted to the Investors hereunder.

Section 2.9 **"Market Stand-Off" Agreement**. Each Investor that is an officer or director of the Company or that owns greater than ten percent (10%) of the Company's

outstanding New Common Stock, hereby agrees that it will not, without the prior written consent of the underwriters, during the period commencing on the effective date of a registration statement relating to any registered public offering of the Company's New Common Stock and ending on the date specified by the Company and the underwriters (such period not to exceed 180 days in the case of the Company's Initial Public Offering and 90 days in the case of all other offerings) (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right, or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of New Common Stock or any securities convertible into or exercisable or exchangeable for New Common Stock or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the New Common Stock, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of New Common Stock or other securities, in cash, or otherwise. The foregoing provisions of this Section 2.9 shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, and shall be applicable only if all officers, directors and stockholders individually owning more than one percent (10%) of the Company's outstanding New Common Stock are subject to the same restrictions. The underwriters in connection with the offering are intended third-party beneficiaries of this Section 2.9 and shall have the right, power, and authority to enforce the provisions hereof as though they were a party hereto. Each Investor further agrees to execute such agreements as may be reasonably requested by the underwriters in the offering that are consistent with this Section 2.9 or that are necessary to give further effect thereto.

**ARTICLE III**
**OWNERSHIP AND TRANSFER RESTRICTIONS**

**Section 3.1** **Limitation on Ownership**. No Investor shall be permitted to own more than 44.9% of the Company's outstanding New Common Stock, without the prior written consent of a Majority Interest.

**Section 3.2** **Prohibited Transfers**. If any Transfer is made or attempted contrary to the provisions of this Agreement, such purported Transfer shall be void *ab initio*; the Investors shall have, in addition to any other legal or equitable remedies that they may have, the right to enforce the provisions of this Agreement by actions for specific performance (to the extent permitted by law); and the Company shall have the right to refuse to recognize any Transferee as one of its stockholders for any purpose. Without limitation of the foregoing, each of the Investors further agrees that the provisions of Section 8.7 shall apply in the event of any violation or threatened violation of this Agreement.

**Section 3.3** **Restrictions on Transfer**. Each Investor agrees that he, she or it will not Transfer all or any portion of the shares of New Common Stock now owned or hereafter acquired by it, him or her, except in connection with, and strictly in compliance with the conditions of, any of the following:

(a) Transfers by an Investor effected pursuant to Section 3.4 or Section 3.5 hereof, as applicable, in each case made strictly in accordance with the procedures set forth therein;

**(b)** Transfers by an Investor to an Affiliate;

**(c)** Transfers in which Investors are selling their New Common Stock on a pro rata basis; or

**(d)** ~~Transfers by Investors that are not 7.5% Holders.~~

Any permitted transferee described in the preceding clauses shall be referred to herein as a "***Permitted Transferee***." Notwithstanding anything to the contrary in this Agreement or any failure to execute a Joinder Agreement as contemplated hereby, Permitted Transferees shall take any shares of New Common Stock so Transferred subject to all provisions of this Agreement as if such shares were still held by the transferor, whether or not they so agree with the transferor and/or the Company.

**Section 3.4** **Right of First Refusal**. In the event that any ~~7.5% Holder~~ (a "***Transferring Stockholder***"), receives a bona fide offer to purchase all or any portion of the shares of New Common Stock held by such Transferring Stockholder (a "***ROFR Proposed Transaction***") from a Person other than a Permitted Transferee (a "***Proposed Transferee***"), such Transferring Stockholder may, subject to the provisions of Section 3.5 hereof, Transfer such shares pursuant to and in accordance with the following provisions of this Section 3.4:

**(a)** Such Transferring Stockholder shall deliver written notice (the "***ROFR Offer Notice***") of its desire to consummate the ROFR Proposed Transaction to the other ~~7.5% Holders~~ (with a copy to the Company), and shall otherwise comply with the provisions of this Section 3.4 and, if applicable, Section 3.5. The ROFR Offer Notice shall specify (i) the number of share of New Common Stock held by the Transferring Stockholder that are subject to the ROFR Proposed Transaction (the "***ROFR Offered Shares***"), (ii) the consideration per share that the Proposed Transferee has firmly committed to pay for the ROFR Offered Shares (which shall be stated in cash), and (iii) all other material terms and conditions of the ROFR Proposed Transaction. The Transferring Stockholder's ROFR Offer Notice shall constitute an irrevocable offer to sell all such ROFR Offered Shares to the other ~~7.5% Holders~~ on the terms set forth below.

**(b)** The other ~~7.5% Holders~~ shall have the right (the "***Right of First Refusal***") to accept the offer to purchase the number of ROFR Offered Shares which is equal to the product obtained by multiplying (i) the total number of shares subject to the ROFR Transaction by (ii) a fraction, the <u>numerator</u> of which is the total number of shares of New Common Stock held by such ~~7.5% Holder~~ on the date of the ROFR Offer Notice and the <u>denominator</u> of which is the total number of shares of New Common Stock then held by all ~~7.5% Holders~~, excluding the Transferring Stockholder, on such date. To the extent one or more ~~7.5 Holders~~ do not exercise their Right of First Refusal, then the rights of the other ~~7.5% Holders~~ (who exercise their Right of First Refusal) to purchase shares shall be increased proportionately based on their relative holdings by the full amount of shares which the non-electing ~~7.5% Holders~~ were entitled to purchase pursuant to this Section 3.4.

**(c)** Each ~~7.5% Holder~~ shall have the right to exercise its Right of First Refusal by giving notice of such exercise to the Transferring Stockholder within twenty (20)

days after its receipt of the ROFR Offer Notice (the "***Right of First Refusal Period***").  Such written election to purchase shall constitute a valid, legally binding and enforceable agreement for the purchase by the [7.5% Holder] of the ROFR Offered Shares.

(d)     The closing for any purchase of ROFR Offered Shares hereunder shall take place no later than twenty (20) days after the expiration of the Right of First Refusal Period.

(e)     In the event that the other [7.5% Holders] do not elect to exercise their Right of First Refusal with respect to all of the ROFR Offered Shares, the Transferring Stockholder may sell the ROFR Offered Shares on the terms and conditions set forth in the ROFR Offer Notice, subject to compliance with the provisions of Section 3.5.  If the Transferring Stockholder's Transfer to the Proposed Transferee is not consummated in accordance with the terms of the ROFR Proposed Transaction within sixty (60) days after the later of the expiration of the Right of First Refusal Period and the Co-Sale Option Period set forth in Section 3.5, the ROFR Proposed Transaction shall be deemed to lapse, and any Transfers of shares pursuant to this Section 3.4 shall be deemed to be in violation of the provisions of this Agreement unless the other [7.5% Holders] are once again afforded a Right of First Refusal provided for herein with respect to any ROFR Proposed Transaction.

**Section 3.5**     <u>Co-Sale Option</u>.  In the event that the Transferring Stockholder proposes to Transfer shares of New Common Stock where the Right of First Refusal under Section 3.4 above is not exercised with respect to all of the shares proposed to be Transferred [and such Transfer would cause the Proposed Transferee to hold 40% or more of the outstanding New Common Stock], such Transferring Stockholder may Transfer such shares only pursuant to and in accordance with the following provisions of this Section 3.5:

(a)     The Transferring Stockholder shall notify the other [Investors][7.5% Holders] in writing (with a copy to the Company) (the "***Co-Sale Notice***") that such [Investors][7.5% Holders] have the opportunity to participate in the proposed transaction (the "***Co-Sale Transaction***").  Each [Investor][7.5% Holder] shall have the right to participate in such Co-Sale Transaction on the terms and conditions herein stated (the "***Co-Sale Option***") by delivering written notice (the "***Acceptance Notice***") to the Transferring Stockholder within ten (10) days after his, her or its receipt of the Co-Sale Notice ("***Co-Sale Option Period***").  The Acceptance Notice shall indicate the maximum number of shares such [Investor][7.5% Holder] wishes to sell (including the number of shares it would sell if one or more Investors do not elect to participate in the sale) on the terms and conditions stated in the Co-Sale Notice.

(b)     Each such [Investor][7.5% Holder] shall have the right to sell a portion of his, her or its shares pursuant to the Co-Sale Transaction which is equal to or less than the product obtained by multiplying (i) the total number of shares subject to the Co-Sale Transaction by (ii) a fraction, the <u>numerator</u> of which is the total number of shares of New Common Stock held by such [Investor][7.5% Holder] on the date of the Acceptance Notice and the <u>denominator</u> of which is the total number of shares of New Common Stock then held by all [Investors][7.5% Holders] on the date of the Acceptance Notice.  To the extent one or more [Investors][7.5% Holders] do not exercise their Co-Sale Option, then the rights of the other [Investors][7.5% Holders] (who exercise their Co-Sale Option) to sell shares shall be increased proportionately

based on their relative holdings by the full amount of shares which the non-electing [Investors]~~[7.5% Holders]~~ were entitled to sell pursuant to this Section 3.5.

(c)     Within ten (10) days after the expiration of the Co-Sale Option Period, the Transferring Stockholder shall notify each participating [Investor]~~[7.5% Holder]~~ of the number of shares of New Common Stock held by such [Investor]~~[7.5% Holder]~~ that will be included in the sale and the date on which the Co-Sale Transaction will be consummated, which shall be no later than twenty (20) days after the expiration of the Co-Sale Option Period.

(d)     Any [Investor]~~[7.5% Holder]~~ may effect its participation in any Co-Sale Transaction hereunder by delivery to the Proposed Transferee, or to the Transferring Stockholder for delivery to the Proposed Transferee, of one or more instruments or certificates, properly endorsed for Transfer, representing the shares it elects to sell therein, <u>provided</u>, that each of the [Investors]~~[7.5% Holders]~~ exercising such Co-Sale Option undertakes all obligations undertaken by the Transferring Stockholder in connection with the Co-Sale Transaction, including, without limitation, all indemnification and escrow obligations, on a pro rata basis based upon the distribution of proceeds in the Co-Sale Transaction. At the time of consummation of the Co-Sale Transaction, the Proposed Transferee shall remit directly to each such participating [Investor]~~[7.5% Holder]~~ that portion of the sale proceeds to which such [Investor]~~[7.5% Holder]~~ is entitled by reason of his, her or its participation therein.

(e)     Promptly after such sale, the Transferring Stockholder shall notify each participating [Investor]~~[7.5% Holder]~~ of the consummation thereof and shall furnish such evidence of the completion and time of completion of such sale and of the terms thereof as may reasonably be requested by any such [Investor]~~[7.5% Holder]~~. In the event that the Co-Sale Transaction is not consummated within the period required by Section 3.5(c) above or the Proposed Transferee fails timely to remit to each such [Investor]~~[7.5% Holder]~~ its portion of the sale proceeds, the Co-Sale Transaction shall be deemed to lapse, and any Transfers of shares pursuant to such Co-Sale Transaction shall be deemed to be in violation of the provisions of this Agreement unless the Transferring Stockholder once again complies with the provisions of Section 3.4 and this Section 3.5 with respect to any such Transfers of shares.

~~(f)     [In the event that the Transferring Stockholder proposes to Transfer shares of New Common Stock where the Right of First Refusal under Section 3.4 above is not exercised with respect to all of the shares proposed to be Transferred and such Transfer would cause the Proposed Transferee to hold 40% or more of the outstanding New Common Stock, the Co-Sale Option provided by this Section 3.5 shall be available to all Investors on a pro rata basis.]~~

**Section 3.6     <u>Drag-along Right</u>**.

(a)     In the event of a Sale Event, the Investors (other than the Investors who constitute the Majority Interest exercising the Drag Along Right (as defined below)) (collectively, the "***Dragged Stockholders***") shall upon the written request of a Majority Interest be obligated to: (i) sell, transfer and deliver, or cause to be sold, transferred and delivered, to the Third-Party Buyer a pro rata portion of his, her or its shares of New Common Stock on substantially the same terms as are applicable to the Majority Interest; and (ii) execute and deliver such instruments of conveyance and transfer and take such other action, including voting

such shares of capital stock in favor of any Sale Event proposed by a Majority Interest and executing (on similar terms as the Majority Interest) any purchase agreements, merger agreements, indemnity agreements, escrow agreements or related documents, as such Majority Interest or the Third-Party Buyer may reasonably require in order to carry out the terms and provisions of this Section 3.6 (the right of the Majority Interest to effect such transaction, the "*Drag-Along Right*").

(b) Not less than twenty (20) days prior to the date proposed for the closing of any Sale Event, the Majority Interest shall give notice to each of the Dragged Stockholders setting forth in reasonable detail the name or names of the Third-Party Buyer, the terms and conditions of the Sale Event, including the purchase price or other consideration for the shares of New Common Stock (which terms and conditions, including price, shall be the same in all material respects for the Dragged Stockholders and the Majority Interest) and the proposed closing date. In furtherance of the provisions of this Section 3.6, each of the Dragged Stockholders hereby (i) irrevocably appoints the designee of the Majority Interest, as its agent and attorney-in-fact (the "*Agent*") (with full power of substitution) to execute all agreements, instruments and certificates and take all actions necessary or desirable to effect any transaction hereunder; and (ii) grants to the Agent a proxy to vote the shares of New Common Stock held by the Dragged Stockholders in favor of any Sale Event hereunder.

(c) [In the event of a Sale Event in which the Majority Interest does not exercise its Drag-Along Right set forth in Section 3.6(a) above, each of the other Investors shall have the right to require the Majority Interest to include such Investors' shares of New Common Stock in the Sale Event on the same economic terms and conditions as the shares of New Common Stock held by the Majority Interest (the "*Tag-Along Right*"); provided, that each of the Investors exercising such Tag-Along Right undertakes all obligations undertaken by the Majority Interest in connection with the Sale Event, including, without limitation, all indemnification and escrow obligations on a pro rata basis based upon the distribution of proceeds in the Sale Event.]

**ARTICLE IV**
**RIGHTS TO PURCHASE**

**Section 4.1** **Right to Participate in Certain Sales of Additional Securities**. The Company agrees that it will not sell or issue, or agree to sell or issue: (a) any shares of capital stock of the Company, or (b) any securities (including any options, warrants or other rights) convertible into or exercisable or exchangeable for capital stock of the Company, unless the Company first submits a written notice (the "*Pre-Emptive Rights Notice*") to each Investor, identifying the terms of the proposed sale (including proposed purchasers, price, number of securities to be sold, and all other material terms), and offers to each Investor who is an "accredited investor," as such term is defined in Rule 501 under the Securities Act (each, an "*Eligible Person*"), the opportunity to purchase his, her or its Pro Rata Allotment (as defined below) of the offered securities (subject to increase if one or more Eligible Persons do not fully exercise their rights hereunder) on terms and conditions, including price, not less favorable than those on which the Company proposes to sell such securities to proposed purchasers thereof. The Company's offer pursuant to this Section 4.1 to sell such securities to the Eligible Persons shall remain open and irrevocable for a period of twenty (20) days following receipt by the Eligible Persons of such Pre-Emptive Rights Notice.

**Section 4.2** __Eligible Person Acceptance__. Each Eligible Person shall have the right to purchase its Pro Rata Allotment by giving written notice of his, her or its intent to do so (the "***Pre-Emptive Rights Acceptance Notice***") to the Company within twenty (20) days after such Eligible Person's receipt of the Pre-Emptive Rights Notice (the "***Pre-Emptive Rights Acceptance Period***"). Each Pre-Emptive Rights Acceptance Notice shall indicate the maximum number of securities subject thereto that such Eligible Person wishes to purchase, including the number of securities it would purchase if one or more other Eligible Persons do not elect to participate in the sale on the terms and conditions stated in the Pre-Emptive Rights Notice.

**Section 4.3** __Calculation of Pro Rata Allotment__. Each Eligible Person's "***Pro Rata Allotment***" of the securities to be sold by the Company shall be equal to the ratio that the number of shares of New Common Stock owned by such Eligible Person bears to all of the issued and outstanding shares of New Common Stock as of the date of the applicable Pre-Emptive Rights Notice. If one or more Eligible Persons do not elect to purchase their respective Pro Rata Allotments, each of the participating Eligible Persons may purchase a portion of each such non-participating Eligible Person's allotment (taking into account the maximum number of securities each desires to purchase) on a pro rata basis, based on the relative holdings of shares of New Common Stock of each of the participating Eligible Persons.

**Section 4.4** __Sale to Third Party__. Any securities that the Company offers for sale that Eligible Persons do not elect to purchase pursuant to the offer delivered by the Company pursuant to Section 4.1 above may be sold by the Company, but only on terms and conditions not more favorable to the purchasers than those set forth in the Pre-Emptive Rights Notice, at any time after five (5) days but within sixty (60) days following the termination of the above-referenced 20-day period, but may not be sold to any other Person or on terms and conditions, including price, that are more favorable to the purchasers than those set forth in such Pre-Emptive Rights Notice or after such 60-day period without renewed compliance with this Article IV.

**Section 4.5** __Exceptions to Pre-Emptive Rights__. Notwithstanding the foregoing, the right to purchase granted under this Article IV shall not apply to: (a) the issuance of shares of New Common Stock in connection with, or upon the exercise of, options or other awards granted or to be granted to Persons under any stock option or other equity incentive plan of the Company that has been approved by the Board of Directors of the Company or any compensation committee thereof, (b) securities issued as a result of or in connection with any stock split, stock dividend, combination, reclassification, reorganization or similar event with respect to the Company's capital stock, (c) securities issued upon the conversion, exercise or exchange of securities issued in a transaction effected in compliance with this Article IV, (d) securities issued as consideration for the purchase of stock or assets in any acquisition or merger that is approved by the Board of Directors, (e) the issuance of shares of PIK Preferred (f) the issuance of other securities issued with the approval of a Majority Interest; provided, that such securities are issued to Persons who are not Investors or Affiliates of any Investor.

# ARTICLE V
## BOARD OF DIRECTORS AND RELATED MATTERS

**Section 5.1**   **Board Composition**.

   **(a)**   Each Investor agrees to vote all of his, her or its shares of New Common Stock in connection with the election of directors of the Company and to take such other actions as are necessary so as to fix the number of members of the Board of Directors at not more than five (5) and to elect and continue in office as directors the following:

   (i)   Two individuals nominated by the Investing Noteholders, who shall initially be _____ (the "***Noteholder Directors***");

   (ii)   Two individuals nominated by JB, who shall initially be JB and _____ (the "***JB Directors***");

   (iii)   One individual nominated by the Investing Noteholders and JB or, if they cannot agree on a nominee, by the other four directors.

   In the event JB's or the Investing Noteholders' ownership of the outstanding New Common Stock drops below 20% of such outstanding stock, JB or the Investing Noteholders, as applicable, shall be entitled to select one director, the other selected director shall resign and the vacancy shall be filled by the remaining directors.   In the event JB's or the Investing Noteholders' ownership of the outstanding New Common Stock drops below 10% of such outstanding stock, JB or the Investing Noteholders, as applicable, shall not be entitled to select a director, the director(s) selected shall resign and the vacancy shall be filled by the then sitting board.   Any director selected to fill any vacancy as a result of JB' or the Investing Noteholders' ownership of the outstanding New Common Stock decreasing as per above shall serve the unexpired term of the director such new director replaces, and may be nominated for an additional term.   JB and the Investing Noteholders shall only be required to vote for the election (A) of persons selected by the other as provided above and (B) only for the fifth director for so long as each party has a right to select two directors.

   **(b)**   Each Investor agrees to vote all of his, her or its shares of New Common Stock for the removal of any director upon the request of the party nominating such director under Section 5.1(a)(i) above or Section 5.1(a)(ii) above and for the election to the Board of Directors of a substitute nominated by such party in accordance with the provisions of Section 5.1(a) hereof.   Each Investor further agrees to vote all of his, her or its shares of New Common Stock in such manner as shall be necessary or appropriate to ensure that any vacancy on the Board of Directors occurring for any reason shall be filled only in accordance with the provisions of this Article V.

   **Section 5.2**   **Committees of the Board**.   The composition of any committee to the Board of Directors shall be apportioned in a similar fashion as set forth in Section 5.1.   JB shall serve on any executive committee or similar committee of the Company.

**Section 5.3**    **Officers**.  The Board of Directors may delegate to the Company's officers the authority to carry out the Company's day-to-day functions, pursuant to the direction and policies established by the Board of Directors.

**Section 5.4**    **Actions Requiring Prior Approval from the Board of Directors**. Notwithstanding any other provisions of this Agreement, the Company shall not take any action on any of the following matters without the prior written consent of a majority of the members of the Board of Directors:

     **(a)**    approval of the appointment of the members of any committee established by the Board of Directors;

     **(b)**    approval of, and material change to, annual operating and capital expenditure budgets, provided that management may operate under any proposed budget pending Board approval, which approval may not be unreasonably or untimely withheld;

     **(c)**    adoption of any pension plan, employee welfare plan or policy that will impose material costs, and granting of any options, restricted stock or similar rights;

     **(d)**    any transaction between the Company and any stockholder, officer, director or Affiliate of the Company, or any representative or relative thereof, other than normal compensation agreements, customary intercompany arrangements, and agreements involving less than $100,000 annually;

     **(e)**    amendment of the Company's charter or the Company's bylaws; provided that no such amendment may materially disproportionately affect any holder of New Common Stock;

     **(f)**    merger into or with or acquisition of all or part of the business of another Person involving a purchase price over $5,000,000;

     **(g)**    sale, lease, transfer, or other disposition of all or substantially all of the assets of the Company or a Subsidiary;

     **(h)**    liquidation, dissolution, winding up or voluntary bankruptcy of the Company or a Subsidiary;

     **(i)**    declaration of dividends or other distributions;

     **(j)**    issuance, purchase or redemption by the Company of any of its securities and any change, increase or reduction in its capitalization; or

     **(k)**    entering into any material debt financings, except working capital financings, financings associated with permitted capital expenditures, and refinancings.

**Section 5.5**    **Board Observer**.  Any Investing Noteholder holding 10% or more of the New Common Stock may elect to send a non-director representative to attend meetings of the Board or any committee thereof (the "***Observer***").  No Observer will be compensated for any

services provided by such Observer to the Company. The Observer will receive all notices and other information regarding and will be permitted to attend, all meetings he or she would be permitted to attend as a member of the Board, but will not have any of the duties or liabilities of a member of the Board. The Observer may be excluded from meetings, or portions of meetings, of the Board or any committee thereof as necessary to protect the attorney-client privilege.

**Section 5.6** **Charter and Bylaws; Insurance**. The Certificate of Incorporation and By-laws of the Company will provide for exculpation and indemnification of the Directors and limitations on the liability of the Directors to the fullest extent permitted under applicable state law. The Company shall obtain and maintain insurance coverage under an errors and omissions insurance policy, a director and officer liability insurance policy, and an employment practices liability insurance policy, each effective as of the date hereof and each covering occurrences during the period beginning on the date hereof and ending at least one year after the date on which no nominee of an Investor serves on the Board of Directors, for the benefit of directors, managers and employees of the Company, in an amount of not less than $5 million per occurrence and otherwise containing limits, deductibles, coverages and other features reasonably satisfactory to the Investors.

**ARTICLE VI**
**STOCKHOLDER APPROVALS**

**Section 6.1** **Actions Requiring Prior Approval from the Stockholders**. Notwithstanding any other provisions of this Agreement, the Company shall not take any action on any of the following matters without the prior written consent of a Majority Interest:

**(a)** amendment of the Company's charter or the Company's bylaws; provided that no such amendment may materially disproportionately affect any holder of New Common Stock;

**(b)** merger into or with or acquisition of all or part of the business of another Person involving a purchase price over $5,000,000;

**(c)** sale, lease, transfer, or other disposition of all or substantially all of the assets of the Company or a Subsidiary;

**(d)** liquidation, dissolution, winding up or voluntary bankruptcy of the Company or a Subsidiary;

**(e)** declaring of dividends or other distributions;

**(f)** issuance, purchase or redemption by the Company of any of its securities and any change, increase or reduction in its capitalization; and

**(g)** entering into any material debt financings, except working capital financings, financings associated with permitted capital expenditures, and refinancings.

# ARTICLE VII
## OTHER AGREEMENTS

**Section 7.1**    **Information Rights**.  The Company shall deliver to each of the Investors the following:

**(a)**    Within 120 days after the end of each fiscal year of the Company or within five days after the approval of such audited financial statements by the Board of Directors, if earlier, a consolidated balance sheet of the Company and any Subsidiary as of the end of such fiscal year and the related consolidated statements of income, stockholders' equity and cash flows for such fiscal year, prepared in accordance with U.S. generally accepted accounting principles and audited by a firm of independent certified public accountants selected by the Board of Directors; and

**(b)**    Within 60 days after the end of each fiscal quarter of the Company or within five days after the approval of such interim financial statements by the Board of Directors, if earlier, a consolidated balance sheet of the Company and any Subsidiary as of the end of such fiscal quarter and the related consolidated statements of income and cash flows for such fiscal quarter, unaudited but prepared in accordance with U.S. generally accepted accounting principles.

# ARTICLE VIII
## GENERAL

**Section 8.1**    **Amendments, Waivers and Consents**.    For the purposes of this Agreement, no course of dealing between or among any of the parties hereto and no delay on the part of any party hereto in exercising any rights hereunder or thereunder shall operate as a waiver of the rights hereof and thereof.  This Agreement may not be amended or modified or any provision hereof waived without the joint written consent of the Company and a Majority Interest; provided, that any party may waive any provision hereof intended for its benefit by written consent; and, provided, further, that any amendment or modification that would adversely affect a party hereto in a manner different than the parties hereto seeking to approve such amendment or modification shall require the prior written consent of each adversely affected party.

**Section 8.2**    **Legend on Securities**.  The Company, each of the Investors and each of the Stockholders acknowledge and agree that substantially the following legend shall be typed on each certificate evidencing any of the securities issued hereunder held at any time by an Investor or a Stockholder:

THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO THE PROVISIONS OF A STOCKHOLDERS AGREEMENT BETWEEN THE COMPANY AND CERTAIN STOCKHOLDERS OF THE COMPANY, INCLUDING THEREIN CERTAIN RESTRICTIONS ON TRANSFER.  A COMPLETE AND CORRECT COPY OF THIS AGREEMENT IS AVAILABLE FOR INSPECTION AT THE PRINCIPAL OFFICE OF THE

COMPANY AND WILL BE FURNISHED UPON WRITTEN REQUEST AND WITHOUT CHARGE.

**Section 8.3** **Governing Law**.  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without regard to the principles thereof relating to conflict of laws.

**Section 8.4** **Section Headings and Gender**.  The descriptive headings in this Agreement have been inserted for convenience only and shall not be deemed to limit or otherwise affect the construction of any provision hereof.  The use in this Agreement of the masculine pronoun in reference to a party hereto shall be deemed to include the feminine or neuter, and vice versa, as the context may require.

**Section 8.5** **Counterparts**.  This Agreement may be executed simultaneously in any number of counterparts, each of which when so executed and delivered shall be taken to be an original; but such counterparts shall together constitute but one and the same document.  This Agreement may be executed by facsimile.

**Section 8.6** **Notices and Demands**.  Any notice or demand which is required or provided to be given under this Agreement shall be deemed to have been sufficiently given and received for all purposes when delivered by hand, telecopy, telex or other method of facsimile, or five (5) days after being sent by certified or registered mail, postage and charges prepaid, return receipt requested, or two (2) days after being sent by overnight delivery providing receipt of delivery, to the addresses provided by the parties in the Support Agreement.

**Section 8.7** **Remedies; Severability**.  It is specifically understood and agreed that any breach of the provisions of this Agreement by any Person subject hereto will result in irreparable injury to the other parties hereto, that the remedy at law alone will be an inadequate remedy for such breach, and that, in addition to any other remedies which they may have, such other parties may enforce their respective rights by actions for specific performance (to the extent permitted by applicable law).  The Company may refuse to recognize any unauthorized Transferee as one of its stockholders for any purpose, including, without limitation, for purposes of dividend and voting rights, until the relevant party or parties have complied with all applicable provisions of this Agreement.  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be deemed prohibited or invalid under such applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, and such prohibition or invalidity shall not invalidate the remainder of such provision or the other provisions of this Agreement.

**Section 8.8** **Integration**.  This Agreement constitutes the entire agreement, and supersedes all other prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof.

**Section 8.9** **Adjustment**.  All references to share amounts and prices herein shall be equitably adjusted to reflect any stock split, combination, reorganization, recapitalization, reclassification, stock distribution, stock dividend or similar event affecting the capital stock of the Company.

**Section 8.10    Term**.  Unless otherwise set forth herein, the provisions contained in Articles III, IV, V, VI and VII hereof shall terminate upon the earliest to occur of (i) an Initial Public Offering, (ii) a Sale Event or (iii) a dissolution or liquidation of the Company.

**Section 8.11    Joinder**.  Upon confirmation of the Plan, any holder of New Common Stock that is not a New Investor shall have the right to become a party to this Agreement by executing a Joinder Agreement in substantially the form attached hereto as Exhibit A and returning the certificate representing such holder's New Common Stock for the affixation of the legend described in Section 8.2 above to such certificate.  Notice of this right shall be distributed by the Company to such holders with the notice of issuance of the New Common Stock.

**Section 8.12    Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the parties hereto as contemplated herein, and any successor to the Company by way of merger or otherwise shall specifically agree to be bound by the terms hereof as a condition of such succession.  The rights of the Investors hereunder shall be binding upon and inure to the benefit of Permitted Transferees.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, the parties have executed this Stockholders Agreement as of the date first above written.

<u>**COMPANY**</u>:

Eurofresh Inc.

By:_____
Name:
Title:

<u>**INVESTING NOTEHOLDERS**</u>:

J.P. Morgan Investment Management Inc., as discretionary investment manager for Noteholders who are clients of its Cincinnati High Yield Group

By: _____
    Name:
    Title:

Scoggin Capital Management, LP II
By:  S&E Partners LP Its: General Partner
By:  Scoggin Inc. Its: General Partner

By: _____
    Name:
    Title:

Scoggin International Fund Ltd.
By: Scoggin LLC Its: Investment Manager

By: _____
    Name:
    Title:

Scoggin Worldwide Fund Ltd.
By: Old Bellows Partners LP Its: Investment Manager
By:  Old Bell Associates Its: General Partner


By: _____
     Name:
     Title:


Barclays Bank PLC


By: _____
     Name:
     Title:


Credit Suisse Syndicated Loan Fund
   By: Credit Suisse Alternative Capital, Inc. as Agent (Subadvisor) for Credit Suisse Asset Management (Australia) Limited, the Responsible Entity for Credit Suisse Syndicated Loan Fund


By: _____
     Name:
     Title:


Credit Suisse High Yield Fund
   By: Credit Suisse Alternative Capital, Inc. as Agent (Subadvisor) for Credit Suisse Asset Management (Australia) Limited, the Responsible Entity for Credit Suisse High Yield Fund


By: _____
     Name:
     Title:

**<u>JB</u>:**

Bio Dynamics B.V./S.a.r.L.


By:_____
Name:
Title:

## EXHIBIT A

## Form of Joinder Agreement

The undersigned hereby agrees, effective as of the date hereof, to become a party to that certain Stockholders Agreement (the "**Agreement**") dated as of _____ __, 2009 by and between Eurofresh, Inc. (the "**Company**") and the other parties named therein, and for all purposes of the Agreement, the undersigned shall be included within the term "Investor" (as defined in the Agreement).  The address and facsimile number to which notices may be sent to the undersigned is as follows:

_____

Facsimile No. _____.


_____

**[NAME OF UNDERSIGNED]**

# EXHIBIT B

## New Investor Ownership Table

## EXHIBIT C

## Investing Noteholders

Barclays Bank PLC
Scoggin Capital Management
JP Morgan Investment Management
Credit Suisse Alternative Capital, Inc.