Craig D. Hansen (AZ Bar No. 007405) chansen@ssd.com
Bradley A. Cosman (AZ Bar No. 026223) bcosman@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
Two Renaissance Square, Suite 2700
40 North Central Avenue
Phoenix, Arizona 85004-4498
(602) 528-4000

and

Kristin E. Richner (OH Bar No. 0078582) krichner@ssd.com
Nicholas J. Brannick (OH Bar No. 0079642) nbrannick@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-2700

Counsel to Debtors and Debtors-In-Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

|  |  |
|---|---|
| In re<br><br>EUROFRESH, INC. *et al.*<br><br>                    Debtors. | Case No. 2:-09-bk-07970-CGC<br>(Jointly Administered)<br><br>Chapter 11<br><br>**DECLARATION OF EMMETT O. BERGMAN IN SUPPORT OF DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**<br><br>**Hearing Date: October 14, 2009**<br>**Hearing Time: 8:00 a.m.** |

EMMETT O. BERGMAN, swearing the following to be true under penalty of perjury, declares:

1.     I am a Managing Director of Alvarez & Marsal Holdings, LLC ("**A&M-NA**"), one of the largest financial restructuring firms in the world.   A&M-NA was retained by the debtors and debtors-in-possession Eurofresh, Inc. and Eurofresh Produce, Ltd. (collectively, the "**Debtors**") as financial advisor in their Chapter 11 bankruptcy proceedings.   I have been working directly with the Debtors' management since late February 2009 and spent a significant amount of time working with the Debtors' management at the Debtors' facility in Willcox, Arizona.   I am very familiar with the Debtors' operations, budgets, and forecasts.

2.     I make this declaration (this "**Declaration**") on personal knowledge in my capacity as financial advisor to the Debtors in connection with the Debtors' voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, filed on April 21, 2009 (the "**Petition Date**").   The statements set forth below are true to the best of my knowledge and if called to testify to those statements, I would do so competently.

3.     I am providing this declaration voluntarily pursuant to 28 U.S.C. § 1746 and understand that it is being provided to the United States Bankruptcy Court for the District of Arizona (the "**Court**") in support of confirmation of the *Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (as amended, modified and supplemented, the "**Plan**") [Docket No. 379][1] filed by the Debtors on August 14, 2009 in the above-captioned, jointly administered Chapter 11 cases.

4.     I earned my bachelor's degree in economics from the University of California-Santa Barbara in 1990, and my Masters of Business Administration from the Johnson School at Cornell University in 1994.   My previous assignments include serving as Chief Financial Officer and Chief Restructuring Officer of Port Townsend Paper, Restructuring Officer of US Gen New England, Inc., and numerous other interim management and financial advisory positions.   In

---

[1] Capitalized terms not identified herein shall have the same meaning as attributed to them in the Plan.

total, I have over fifteen years of financial management experience. Prior to joining A&M-NA, I spent four years in the restructuring groups of Deloitte and Touche and Arthur Andersen, and prior to that I spent four years in senior management positions operating and restructuring a group of privately held companies.

5.      During the course of my career, I have had significant involvement in Chapter 11 proceedings by assisting clients in formulating and executing pre-bankruptcy and post bankruptcy financial, operational and organizational strategies, advising companies as to their forecasting processes and methodologies, analyzing business plans and their risks, and providing significant testimony relating to feasibility.

## PART I

## BASIS FOR OPINIONS AND CONCLUSIONS

6.      On June 9, 2009, the Court entered a final order [Docket No. 196] authorizing the Debtors to retain A&M-NA as financial advisor. A&M-NA has been involved primarily in (i) preparing the Debtors' revised business plan and operating plan, including cash flow forecasts; (ii) identifying cost reduction and cash conversion opportunities; (iii) developing a revised cash management process; (iv) assisting with creditor and customer issues; (v) assisting with bankruptcy reporting and filing requirements; and (vi) assisting in the development of the Plan, the *Plan Supplement* (the "**Plan Supplement**") [Docket No. 434], the *Second Plan Supplement* (the "**Second Plan Supplement**") filed contemporaneously herewith, the *First Amended Disclosure Statement in Support of Debtors' First Amended Joint Plan of Reorganization* (as amended, modified and supplemented, the "**Disclosure Statement**") [Docket No. 380], and all relevant exhibits and appendices to the Plan, the Plan Supplement and the Disclosure Statement.

7.      In addition to the Debtors' management at all levels, A&M-NA and I have had direct access to the other professionals retained or utilized by the Debtors, including the Debtors' investment banker, legal counsel and valuation expert.

8.      The statements and opinions contained herein are based either on my own personal knowledge or upon information that I have received in the course of this engagement as more fully described above.  As to the latter, this information is of the type that I have relied on during my fifteen years of financial management and advisory services experience.

## PART II

## COMPLIANCE WITH SECTION 1129 REQUIREMENTS

9.      After consulting with Squire, Sanders & Dempsey L.L.P., restructuring counsel for the Debtors, I am aware that Section 1129 of the Bankruptcy Code establishes requirements that must be met in order for a court to confirm a reorganization plan.  The actions taken by the Debtors to comply with the requirements of Section 1129 of the Bankruptcy Code are addressed individually in the paragraphs that follow.

### Section 1129(a)(1)

10.      Section 1129(a)(1) of the Bankruptcy Code requires that a plan of reorganization comply with the applicable provisions of the Bankruptcy Code, which, in turn, requires that a plan comply with requirements of Sections 1122 and 1123 of the Bankruptcy Code.  In short, Debtors have drafted the Plan and related documentation, including but not limited to the Plan Supplement, to comply with applicable provisions of the Bankruptcy Code, including adequate classification of claims against and interest in the Debtors and the provision of no relief beyond what is permissible under the Bankruptcy Code.

### Section 1122

11. Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

12. The Plan establishes nine separate classes for holders of Claims against the Debtors, as follows: (i) Class 1A [Existing Credit Agreement Claims]; (ii) Class 1B [Capital Lease Claims]; (iii) Class 1C [Miscellaneous Secured Claims]; (iv) Class 2 [Convenience Claims]; (v) Class 3 [General Unsecured Creditors]; (vi) Class 4 [Senior Noteholder Claims]; (v) Class 5 [Discount Noteholder Claims]; (vi) Class 6 [Subordinated Claims]; and (vii) Class 7 [Interests] (each a "**Class**" and together the "**Classes**").

13. Each of the Classes differs from the others in a legal or factual nature or based on other relevant criteria. Secured debt has been classified separately from the unsecured debt. The secured debt has been further subdivided and classified based upon the nature of the debt and relationships between certain of the secured creditors.

14. In each instance of separate classification, the Plan classifies claims based upon their different rights and attributes. As such, valid business, factual, and legal reasons exist for classifying separately the various Classes of claims and interests created under the Plan. Additionally, each of the claims or interests in each particular Class is substantially similar to the other claims or interests in such Class. In this way, the Debtors have classified claims under the Plan so as to satisfy section 1122 of the Bankruptcy Code.

**Section 1123**

15. Section 1123(a) of the Bankruptcy Code mandates that a reorganization plan: (a) designate classes of claims and interests; (b) specify unimpaired classes of claims and interests; (c) specify treatment of impaired classes of claims and interests; (d) provide the same treatment

COLUMBUS/712575.4

for each claim or interest of a particular class, unless the holder of a particular claim agrees to a less favorable treatment of such particular claim or interest; (e) provide adequate means for the plan's implementation; (f) provide for the prohibition of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and (g) contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors.

16.     In Sections 3 and 4 of the Plan, the Debtors sought to comply with section 1123 of the Bankruptcy Code by designating classes of claims and interests (Section 1123(a)(1)), specifying the classes of claims and interests that are unimpaired under the Plan (Section 1123(a)(2)), and specifying the treatment of each class of claims and interests that is impaired (Section 1123(a)(3)).  The Debtors sought to comply with Section 1123(a)(4) of the Bankruptcy Code in that the treatment of each claim or interest within a Class is the same as the treatment of each other claim or interest in that Class, unless the holder of a claim or interest agrees to less favorable treatment on account of its claim or interest.

17.     In Section 5 of the Plan, the Debtors have further sought to comply with Section 1123(a)(5) of the Bankruptcy Code by providing adequate means for the Plan's implementation. The provisions of Section 5 relate to, among other things: (a) sources of consideration for Plan Distributions; (b) the continued corporate existence of the Debtors; (c) reorganization of the Debtors; (d) cancellation of securities, instruments and agreements; (e) effectiveness of new securities, instruments, agreements and documents; (f) the officers and directors of the Reorganized Debtors; (g) the MIP; and (h) the preservation of Causes of Action.

18.     In Section 5.I of the Plan, the Debtors sought to comply with Section 1123(a)(6) of the Bankruptcy Code by prohibiting the issuance of nonvoting equity securities in the Reorganized Debtors.  Finally, by their chosen manner for selecting officers and directors of the Reorganized Debtors consistent with law, the Bankruptcy Code, and the interests of creditors, equity security holders and public policy, the Debtors sought to comply with Section 1123(a)(7) of the Bankruptcy Code.

**Section 1129(a)(2)**

19.     As Plan proponent, the Debtors sought to comply with Section 1129(a)(2) of the Bankruptcy Code by conducting themselves in accordance with Chapter 11 of the Bankruptcy Code, including without limitation: (a) conducting the solicitation of votes on the Plan in a manner consistent with the Solicitation Order and with Bankruptcy Code Section 1126 of the Bankruptcy Code; (b) complying with all orders of the Court; and (c) operating their businesses within the confines established by the Bankruptcy Code and Orders of the Court.

**Section 1129(a)(3)**

20.     Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be "proposed in good faith and not by any means forbidden by law."

21.     Here, the Debtors have proposed the Plan in good faith, with the legitimate and honest purposes of reorganizing the Debtors' ongoing business and maximizing the value of each of the Debtors and the recovery to creditors and shareholders.  The Plan gives effect to many of the Debtors' restructuring initiatives, including rejection and assumption of executory contracts and unexpired leases, de-leveraging of the Debtors' balance sheet, revising the Debtors' capital structure, and issuing new equity in the Reorganized Debtors to various new investors and creditors.  Moreover, using the Debtors' comprehensive business plan as the platform, the Plan

provides a blueprint for satisfying all Claims and enabling the Reorganized Debtors to emerge from Chapter 11 as a going concern. In these and other ways, the Debtors have attempted to structure the proposed Plan in good faith under the Bankruptcy Code in order to achieve results consistent with the Code's objectives and purposes.

**Section 1129(a)(4)**

22.     Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses ("**Professional Claims**") paid by the Plan proponent, by the Debtors, or by a person issuing securities or acquiring property under the Plan, be subject to approval of the Court as reasonable.

23.     To comply with Section 1129(a)(4) of the Bankruptcy Code, the Debtors have provided that all payments made or to be made by the Debtors for services or for costs or expenses in connection with the Chapter 11 Cases have been approved by, or are subject to approval of the Court as reasonable. In particular, Section 2.A of the Plan provides for the payment of Allowed Administrative Claims, which includes Professional Claims, within ten days after becoming Allowed. Final requests for the payment of Professional Claims must be filed with the Court within forty-five days after the Effective Date. In these ways, the Debtors sought to fully comply with the requirements of Section 1129(a)(4) of the Bankruptcy Code.

**Section 1129(a)(5)**

24.     Section 1129(a)(5)(A) of the Bankruptcy Code requires that, prior to confirmation, the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors and that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy. In addition, Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan

proponent to disclose the identity of any "insider" to be employed or retained by the reorganized debtor and the "nature of any compensation for such insider."

25.     To comply with Section 1129(a)(5)(A) of the Bankruptcy Code, Section 5.K of the Plan provides that the initial board of directors and officers of the Reorganized Debtors will consist of persons that have been identified in supplements to the Plan.  Accordingly, the Plan Supplement lists the executive officers for Reorganized Eurofresh and the Second Plan Supplement lists the anticipated directors of Reorganized Eurofresh.

26.     I believe that the continuance in office of the executive officers is consistent with the interests of creditors and equity interest holders, and with public policy, and will benefit creditors by facilitating a smooth transition from bankruptcy.  Further, I believe that the placement of the directors on the board of Reorganized Eurofresh will greatly enhance the Debtors' business.

27.     To comply with Section 1129(a)(5)(B) of the Bankruptcy Code, the Debtors have provided a list of the insiders in the Second Plan Supplement.

**Section 1129(a)(6)**

28.     Section 1129(a)(6) of the Bankruptcy Code requires governmental and regulatory approval of any rate change implemented under the terms of the Plan.

29.     I do not believe that this provision is applicable to the Debtors' businesses because the Debtors do not charge consumers rates for goods or services subject to governmental or regulatory oversight.

**Section 1129(a)(7)**

30.     Section 1129(a)(7) of the Bankruptcy Code requires a determination that the Plan is in the best interests of the holders of impaired claims that have not voted to accept the Plan.

31.     The Debtors' actions to comply with Section 1129(a)(7) of the Bankruptcy Code are addressed in detail below, in Part VI, which is entitled "Best Interests of the Creditors."

**Section 1129(a)(8)**

32.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.  An unimpaired class is conclusively presumed to accept a reorganization plan.

33.     The following Classes of creditors are unimpaired under the Plan: (i) Class 1C [Miscellaneous Secured Claims]; and (ii) Class 2 [Convenience Claims].  These Classes are therefore conclusively presumed to have accepted the Plan.

34.     The following Classes of creditors are impaired under the Plan: (i) Class 1A [Existing Credit Agreement Claims]; (ii) Class 1B [Capital Lease Claims]; (iii) Class 3 [General Unsecured Creditors]; (iv) Class 4 [Senior Noteholder Claims]; (v) Class 5 [Discount Noteholder Claims]; (vi) Class 6 [Subordinated Claims]; and (vii) Class 7 [Interests].  Classes 1A, 1B, 3 and 4 are entitled to vote to accept or reject the Plan.

35.     On September 28, 2009, Kurtzman Carson Consultants tallied the votes cast regarding the Plan and summarized the voting on a class-by-class basis (the "**Voting Agent Dec.**"), which was attached as an exhibit to the *Ballot Report for Debtors' First Amended Joint Plan of Reorganization* (the "**Ballot Report**"), filed before this Court on September 28, 2009. Based on the Voting Agent Dec., the following Classes voted to accept of the Plan: Classes 1B, 3 and 4.[2]  Accordingly, the Plan is fair and equitable as to these Classes of impaired claims.

36.     The only Class to vote against the Plan was Class 1A, and Classes 5, 6 and 7 are deemed to reject the Plan without voting.  As explained in Paragraphs 48 - 54 ("Section

---

[2] Based on new developments at the time of the filing of this Declaration, I am uncertain as to whether Class 1B is withdrawing its support in favor of the Plan.  However, I still believe that the Plan satisfies all criteria set forth in the Bankruptcy Code for achieving confirmation.

COLUMBUS/712575.4

1129(b)(1) and (2)") of this Part of this Declaration and also in Part VI ("Best Interests of the Creditors"), below, I believe the Plan is in the best interests of Classes 1A, 5, 6 and 7.

**Section 1129(a)(9)**

37.     Section 1129(a)(9) of the Bankruptcy Code requires that persons holding claims entitled to priority under Section 507(a) of the Bankruptcy Code receive specified cash payments under the plan.  Unless the holder of a particular claim agrees to a different treatment with respect to such claim, section 1129(a)(9) of the Bankruptcy Code generally requires the plan to satisfy administrative and priority tax claims in full in cash.

38.     To comply with Section 1129(a)(9) of the Bankruptcy Code, Section 2.A of the Plan provides that each holder of an Allowed Administrative Claim will be paid in full in Cash on the Effective Date, within ten days of becoming Allowed, or in accordance with the terms of the applicable contract, if any, or as otherwise agreed by the Debtors and the holder of such Allowed Administrative Claim.

39.     With respect to Other Priority Claims, in order to comply with Section 1129(a)(9) of the Bankruptcy Code, Section 2.D of the Plan provides that each holder of an Allowed Other Priority Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Priority Claim, shall be paid in full in Cash on the Effective Date or within ten days of becoming Allowed.

40.     With respect to Priority Tax Claims, in order to comply with Section 1129(a)(9) of the Bankruptcy Code, Section 2.B of the Plan provides that each holder of an Allowed Priority Tax Claim shall be paid in full in Cash on the Effective Date or within ten days of becoming Allowed, or within the timeframe otherwise permitted by applicable non-bankruptcy law.

**Section 1129(a)(10)**

41.     Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an Impaired Class of Claims, at least one Impaired Class of Claims must accept the plan, excluding acceptance by any Insider.

42.     Based on the Ballot Report, the following impaired classes voted to accept the Plan: Class 1B [Capital Lease Claims]; Class 3 [General Unsecured Claims]; and Class 4 [Senior Noteholder Claims].   The only impaired class to vote against the Plan is Class 1A [Existing Credit Agreement Claims], while Class 5 [Discount Noteholder Claims]; Class 6 [Subordinated Claims] and Class 7 [Interests] are deemed to reject the Plan without voting.   As a result of the voting results, the requirement of Section 1129(a)(10) of the Bankruptcy Code appears to be met because at least one impaired class of claims, excluding insiders, has accepted the Plan.

**Section 1129(a)(11)**

43.     Section 1129(a)(11) of the Bankruptcy Code requires the Court to conclude that the Plan is "feasible," in that confirmation of the Plan is not likely to be followed by the liquidation or need for further reorganization of the Debtors, and that the Plan has a reasonable probability of success.

44.     The Debtors' actions to comply with Section 1129(a)(11) are addressed in detail below, in Part V of this Declaration, which is entitled "Plan Feasibility."

**Section 1129(a)(12)**

45.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930.  The Debtors attempted to comply with Section 1129(a)(12) of the Bankruptcy Code by providing in Section 14.D of the Plan that the appropriate sum in fees shall be paid to the United States Trustee.

**Section 1129(a)(13)**

46.     Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue to be paid post-confirmation at any levels established in accordance with Section 1114 of the Bankruptcy Code.

47.     I do not believe that this provision is applicable to the Debtors' businesses since the Debtors do not have any retiree benefit obligations.

**Section 1129(b)(1) and (2)**

48.     Section 1129(b)(1) and (2) of the Bankruptcy Code provide that a plan may be confirmed even if an impaired class votes to reject the plan, provided that the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that has rejected the plan.

49.     With respect to the holder of a secured claim, a plan is fair and equitable if it permits the holder of a secured claim to retain the lien securing its claim to the extent of the allowed amount of such claim, and if the holder of such claim shall receive deferred cash payments totaling at least the allowed amount of such claim, as of the Effective Date, or at least the value of such holder's interest in the estate's interest in such property.

50.     With respect to the holder of an unsecured claim, a plan is fair and equitable if it provides that the holder of an unsecured claim receive or retain property of a value, as of the Effective Date, equal to the allowed amount of such claim or that the holder of a junior claim or interest will not receive or retain any property on account of such junior claim or interest.

51.     Classes 1A [Existing Credit Agreement Claims], 5 [Discount Noteholder Claims], 6 [Subordinated Claims] and 7 [Interests] are impaired classes that have either voted against the Plan or are deemed to reject the Plan without voting.  I believe that the treatment of these four classes under the Plan complies with the requirements of Section 1129(b)(1) and (2).

52.     As described in more detail in Part VI of this Declaration ("Best Interests of the Creditors"), Class 1A voted against the Plan, which means that the Holders of Class 1A and Class 1B Claims will together, and in accordance with the terms of the AAL, receive a $10,000,000 Distribution from the New Money Investment and a rollover of the remaining principal amount owing under the Existing Credit Documents into a New Credit Facility. Section 1129(b)(2)(A) of the Bankruptcy Code provides two requirements to "cram down" a plan on a dissenting class of creditors: 1) the secured party must retain its lien; and 2) the secured party must receive deferred cash payments which have a present value equal to the secured creditor's claim.  Pursuant to Section 4.A of the Plan, Class 1A is afforded this treatment.  Under the Plan, Class 1A retains all of its liens in precisely the same priority as the Holders of Class 1A Claims had under the Existing Credit Documents and the AAL, and also receives the present value of its claim in full (100%).  Therefore, the Plan meets the best interests of the creditors test under Section 1129(a)(7) of the Bankruptcy Code.

53.     Under the Plan, based upon the absolute priority rule, Classes 5, 6 and 7 represent junior claims and will receive no distribution from the Debtors in satisfaction – whether in full or in part – of such claims.  As further described in Part VI below, even were the Debtors to proceed to Chapter 7 liquidation, Classes 5, 6 and 7 would remain junior claims and would likewise also receive no distribution from the Debtors' estate.

54.     Based on the foregoing, I believe that the Plan is fair and equitable with respect to Classes 5, 6 and 7 and that the Debtors have therefore satisfied the requirements of Sections 1129(b)(1) and (2) of the Bankruptcy Code.

## PART III

## OVERVIEW OF PRE-PETITION
## CAPITAL STRUCTURE AND CREDIT FACILITIES

## Capital Structure

55.     EFI is a privately held Delaware corporation with three series of equity securities: (i) 53,000 issued shares of Series A Preferred Stock (the "**Preferred Shares**"); (ii) 4,730,229.48 issued shares of Class A Common stock (the "**Class A Shares**") and (iii) 503,328.56 issued shares of Class B Common stock (the "**Class B Shares**").  In addition there are 224,234.90 issued warrants to purchase Class A Shares.  A total of 833,611 of the Class B Shares have been allocated under the Second Amended and Restated Eurofresh 2005 Long-Term Equity Incentive Plan (the "**2005 Incentive Plan**").  On a fully diluted basis, the prepetition common ownership of EFI was divided as follows:  (i) approximately 30.38% owned by BRS Tomato Acquisition, LLC; [3] (ii) approximately 25.77% owned by Bank of America Capital Investors; (iii) approximately 22.60% owned by Bio Dynamics;[4] (iv) approximately 13.25% held as part of the 2005 Incentive Plan; (v) approximately 3.08% held by JB; and (vi) approximately 4.92% held by current or former managers of EFI.  The Preferred Shares, Class A Shares and Class B Shares will be extinguished pursuant to the Plan.

## Secured Debt Structure

### *Existing Credit Agreement*

56.     On March 25, 2008, the Debtors entered into the Existing Credit Agreement among the Debtors, various Existing Lenders and Silver Point Finance, LLC ("**Silver Point Finance**") as administrative agent, collateral agent, syndication agent, documentation agent and lead arranger.  Pursuant to the Existing Credit Agreement, the Existing Lenders provided credit facilities to the Debtors in the aggregate amount of $69.9 million consisting of:  (i) $42.5 million

---

[3] BRS Tomato Acquisition, LLC is an Affiliate of New York based investment fund Bruckmann, Rosser, Sherrill & Co. II, L.P.
[4] Bio Dynamics is a Luxembourg entity Affiliated with JB.

in Tranche A Term Loans (the "**Term A Loans**"); (ii) $9.9 million in Tranche B Term Loans (the "**Term B Loans**"); and (iii) up to $17.5 million under a revolving credit facility (the "**Revolving Loan**"). The Existing Credit Agreement also provides for a letter of credit sublimit (the "**L/C Subfacility**") of up to $2.5 million under the Revolving Loan.

57. All of the Debtors' obligations under the Existing Credit Agreement were secured by a blanket lien on substantially all of the Debtors' assets pursuant to a Security Agreement dated March 25, 2008 between the Debtors and Silver Point Finance, as collateral agent.

58. As of the Petition Date, the amount outstanding under the Term A Loans was $42.5 million, the amount outstanding under the Term B Loans was $9.9 million, the Debtors had no outstanding balance on the Revolving Loan and letters of credit in the amount of approximately $2.1 million issued under the L/C Subfacility. As of the Petition Date, the interest rate on the Term A Loans, Term B Loans and Revolving Loan was 12.75%, including default interest of 2%.

*Capital Lease*

59. Also on March 28, 2008, EFI entered into a sale-leaseback arrangement with SP Eurofresh LLC ("**SPE**"), an Affiliate of SP, whereby EFI sold all of the physical plant comprising the Snowflake Facility (the "**Snowflake Assets**") to SPE for approximately $15 million. Pursuant to this arrangement, EFI agreed to lease the real property underlying the Snowflake Facility to SPE and then sublease the same real property from SPE. EFI also entered into the Capital Lease, pursuant to which EFI agreed to lease the Snowflake Assets from SPE through July 15, 2012 (the "**Capital Lease Term**"). The Capital Lease is designed such that EFI will pay $15 million in "Fixed Rent" over the Capital Lease Term, plus interest in the form of

"Variable Rent." EFI has a purchase option to acquire the Snowflake Assets at the end of the Capital Lease Term for $1.00. EPL is a guarantor of EFI's obligations under the Capital Lease.

60.     The Debtors' obligations under the Capital Lease were secured by a blanket lien on substantially all of the Debtors' assets pursuant to a Guaranty and Security Agreement dated March 25, 2008 between the Debtors and SP, as collateral agent.

61.     As of the Petition Date, the principal amount payable under the Capital Lease (calculated based on the amount of Fixed Rent remaining to be paid over the Capital Lease Term) was $14,494,500. The interest rate, represented by the "Variable Rent" payable under the Capital Lease was 12.75%.

## PART IV

## OVERVIEW OF CAPITAL STRUCTURE AND CREDIT FACILITIES UNDER THE PLAN

### Capital Structure

62.     The reorganization provided in the Debtors' Plan will improve the Reorganized Debtors' capital and debt structure. Because Class 1A voted to reject the Plan, the treatment of Classes 1A and 1B is governed by Section 4.A.2 and 5.B.1.b of the Plan ("**Option B**"). The Reorganized Debtors and Silver Point will enter into the Amended and Restated Credit Agreement, pursuant to which Silver Point will provide term loans to the Reorganized Debtors in an aggregate amount of $57,521,000, and WFF will also make a loan to Reorganized Eurofresh in the principal amount of $3,551,000, which will be evidenced by the First Lien Mortgage Note.

63.     Reorganized Eurofresh will issue: (a) $5 million in principal amount of Subordinated PIK A Notes to (i) each Investing Noteholder according to its pro rata share of the principal amount of $2.5 million and (ii) Bio Dynamics in the principal amount of $2.5 million; and (b) $20 million in principal amount of Subordinated PIK Notes to (i) each Investing

Noteholder according to its proportionate share of the Investing Noteholders Investment and (ii) Bio Dynamics according to its proportionate share of its of the New Money Investment.

64.     Reorganized Eurofresh will also issue $10 million in PIK Preferred Stock on a pro rata basis to Senior Noteholders, based on each Senior Noteholder's proportionate share of the Senior Noteholder Claims.

65.     Finally, Reorganized Eurofresh will issue 10,000,000 shares of New Common Stock as follows:  (a) 4,000,000 shares to Bio Dynamics in exchange for its share of the New Money Investment, (b) 4,000,000 shares to the Investing Noteholders in exchange for their respective share of the New Money Investment, (c) 1,000,000 to Senior Noteholders on account of their respective Allowed Claims, and (d) 1,000,000 shares to be held as Reserved Shares in the Reserved Shares Trust, pursuant to the Reserved Shares Trust Agreement.  750,000 shares of New Common Stock will be reserved for issuance under the MIP.

66.     The new capital structure under Option B will provide Reorganized Eurofresh with $15 million in working capital.  Reorganized Eurofresh's capital structure will consist of total debt under Option B of $86.1 million, $10 million in PIK Preferred Stock and $8.8 million in New Common Stock, for a total capitalization of approximately $104.9 million (depending upon entry of final fresh start accounting entries).

67.     All of the securities to be issued will, when issued, be duly authorized, validly issued, fully paid, and non-assessable.  The securities will have such rights with respect to distributions, liquidation, voting, and other matters as are set forth in the Third Amended and Restated Certificate of Incorporation for Reorganized Eurofresh, the Amended and Restated Certificate of Incorporation for Reorganized EPL, the Amended and Restated Bylaws of Reorganized Eurofresh, the Amended and Restated Bylaws of Reorganized

EPL, the Certificate of Designation for the PIK Preferred Stock, and the Subordinated PIK Note Purchase Agreement, respectively, and as provided under applicable law.

**Credit Facilities**

68.     Upon emergence, the outstanding amount of the Existing Credit Document Claims under the Existing Credit Documents will be reduced to approximately $61.1 million, and such reduced obligations will be replaced with the New Credit Facility, with definitive terms set forth in the loan documentation dated as of the Effective Date and executed among Reorganized Eurofresh and the parties to the Existing Credit Documents:

**Silver Point**

a.     Under the Amended and Restated Credit Agreement, Silver Point will provide term loans (the "**Loans**") to Reorganized Eurofresh in the aggregate principal amount of $57,521,000. The Loans will mature five years after the Effective Date, and will accrue interest at the Base Rate (5-year Treasury) plus 5%.

b.     Under the Amended and Restated Credit Agreement, Reorganized Eurofresh will agree that it will not, among other things, incur additional indebtedness, other than permitted indebtedness, which includes (i) capital leases and purchase money indebtedness, in an aggregate amount not to exceed $4,000,000, (ii) mark-to-market exposure of rate management agreements in an amount not to exceed $4,000,000, (iii) other subordinated indebtedness in an aggregate amount not to exceed $45,000,000, and (iv) other unsecured indebtedness in an amount not to exceed $1,000,000.

c.     Reorganized Eurofresh will be required to maintain a Total Leverage Ratio that does not exceed 5:1. Reorganized Eurofresh must not make any consolidated capital expenditures that exceed $7,000,000 in any fiscal year. If Reorganized Eurofresh

fails to comply with a financial covenant, it has the right to issue additional subordinated indebtedness, PIK Preferred Stock or other capital stock, in an amount sufficient to cure such non-compliance.

d.      Under the Amended and Restated Credit Agreement, Reorganized Eurofresh may make voluntary prepayments at any time without penalty.  It must make mandatory prepayments of the Loans upon any Asset Sale which results in Net Asset Sale Proceeds in excess of $1,500,000 or receipt of Net Insurance/Condemnation Proceeds in excess of $1,500,000.  Reorganized Eurofresh must also prepay the Loans upon issuance of any capital stock, in a prepayment amount equal to 50% of the proceeds of the sale of such capital stock, and upon the issuance of any debt, in a prepayment amount equal to 100% of the net proceeds of such debt.  If there is Consolidated Excess Cash Flow in any fiscal year, Reorganized Eurofresh must make a prepayment in amount equal to 50% of such Consolidated Excess Cash Flow but only to the extent that, after giving effect to such payment, Reorganized Eurofresh will maintain Cash and Cash Equivalents of not less than $10 million.  Upon any mandatory prepayment under the Amended and Restated Credit Agreement, Reorganized Eurofresh must also make a prepayment under the First Lien Mortgage Note in a proportionate amount based on the obligations owing under each of the Amended and Restated Credit Agreement and First Lien Mortgage Note (discussed below).

e.      The Amended and Restated Credit Agreement and First Lien Mortgage Note are cross-defaulted.

**WFF**

a.      Under the First Lien Mortgage Note, WFF will provide a loan (the "**WFF Loan**") to Reorganized Eurofresh in the principal amount of $3.55 million.  The Loans will mature five years after the Effective Date, and will accrue interest at the Base Rate (5-year Treasury) plus 5%.

b.      Under the First Lien Mortgage Note, Reorganized Eurofresh may make voluntary prepayments at any time without penalty.  It must make mandatory prepayments of the WFF Loan upon any Asset Sale which results in New Snowflake Personal Property Proceeds in the amount of such proceeds or of receipt of Net Snowflake Personal Property Insurance/Condemnation Proceeds in the amount of such proceeds.  Upon any mandatory prepayment under the Amended and Restated Credit Agreement, Reorganized Eurofresh must also make a prepayment under the First Lien Mortgage Note in a proportionate amount based on the obligations owing under each of the Amended and Restated Credit Agreement and First Lien Mortgage Note.

**Assessment of New Capital Structure and Credit Facilities**

69.      Taking into account the foregoing, and based upon my experience and the work described more fully above, it is my opinion that the capital structure and credit facilities of the Reorganized Debtors will provide a more stable capital and debt structure and likely enable the Reorganized Debtors to meet their financial commitments under the Plan and to implement their business model going forward.

**PART V**

**PLAN FEASIBILITY**

70.      Section 1129(a)(11) of the Bankruptcy Code requires the Court to conclude that the Plan is "feasible," in that confirmation of the Plan is not likely to be followed by the

liquidation or need for further reorganization of the Debtors, and that the Plan has a reasonable probability of success.

71.     The Debtors developed a suitable business plan and financial projections for fiscal years 2009 through 2011 (the "**Financial Projections**"), which are attached as Exhibit C to the Disclosure Statement.  In order to ascertain the Plan's feasibility, the Debtors analyzed the Financial Projections in the context of their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources to sustain their business operations.

72.     The Financial Projections assume that the Plan will be implemented in accordance with its stated terms and that the Plan will be confirmed and consummated on or about October 31, 2009.  In addition, the Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other things, changes in the competitive environment, pricing, viroid, and/or a variety of other factors, including those factors listed in the Plan and the Disclosure Statement.  The key drivers in the Financial Projections are production volumes, production mix and yields, interplanting, disease and pest control, product mix, sales channel mix, selling prices, growing costs, and other operating costs.  The estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to significant business, economic and competitive uncertainties.  However, all of the key drivers discussed above, and all of the risks to the projections that the Debtors felt were significant were analyzed, reviewed or discussed and were, in my professional opinion, properly balanced against the opportunities, or potential upsides to the projections.  To be specific, a great deal of time, effort, management resources, and retained professionals were utilized in preparing the Financial Projections — much more so than the Debtors' prior budget forecasts, and this forecast was prepared with the specific intention of having it satisfy the criteria for obtaining confirmation of

the Plan. Moreover the projections were developed over the course of several months and revised periodically as new information and data were received and as actual results provided additional and more recent data.

a. In the *Objection of Silver Point to Confirmation of First Amended Joint Plan of Reorganization For the Debtors Under Chapter 11 of the Bankruptcy Code* (the "**Objection**"), Silver Point asserts that the Debtors missed their last four annual EBITDA projections. This is factually untrue, and the Debtors are ahead of their most recent EBITDA projections (contained in the Financial Projections). The Debtors' managers are reasonably optimistic that they will exceed these projections for 2009. In fact, management currently estimates that the Financial Projections may be several million pounds conservative compared to current operating forecasts of production. This could have a significant positive impact on Q4 2009, and on December 2009 in particular. Additionally, the cost of natural gas, which is one of EFI's largest costs, has decreased since the Financial Projections were filed (by more than $1/MMBTU, or approximately 14%) and this should contribute more than $500,000 dollars of cost savings and EBITDA in 2009 when compared to the Financial Projections.

b. In the Objection, Silver Point notes that the 2009 Projection is unreasonable because it depends on profit levels in the latter part of the year that were higher than those recorded in 2008. This observation is overly general and is most likely incorrect. Q4 2009 results may be significantly better than Q4 2008 for a few significant reasons. First, the cleanout of Site 5 was performed in mid 2009 and this had the effect of accelerating cleanouts otherwise scheduled for Q4 and

thereby minimizing unproductive acreage in Q4 and increasing the amount of production expected in Q4. Additionally, the Debtors currently have a more favorable product mix than it did in Q4 2008, growing costs have declined moderately, and transport costs have been decreased through achieving more favorable pricing.

c. In the Objection, Silver Point notes a number of operational problems that the Debtors have encountered since 2006. All of these problems were known to Silver Point prior to their loans to the Debtors in 2008 and all of them have been appropriately factored into the Financial Projections. Specifically, Silver Point lists disease and pest infestation, diminished use of the interplanting method, and labor shortages as issues affecting the Financial Projections. These factors are properly incorporated into the Financial Projections, which do not assume that any of these issues are completely resolved. Losses related to CMM, for instance, are factored into the projections already based on recent results. If the Debtors are able to reduce the impact of CMM further, actual results would exceed the Financial Projections, all other things being equal. Similarly, since recent impacts due to white fly are already included in the projections, any improvements in fighting white fly would result in better profitability. And on the contrary, there is no expectation that white fly impacts will increase in the future. Moreover, the Debtors are pursuing means of potentially improving several of these factors such as using interplanting more extensively, and lowering the impact of disease and pest infestation. The Debtors could significantly exceed the Financial Projections if these plans are successful. For example, eliminating or

~24~

significantly reducing the impact of the viroid through site cleanouts and other preventative measures could increase annual sales revenue by at least $15 million and annual EBITDA by at least $5 - $10 million; however, this very significant opportunity is not included in the Financial Projections. I believe that the Objection misses the mark with respect to interplanting and viroid risks. While the reduced use of interplanting due to the viroid has had a negative impact on the Debtors since 2007, the impact of the reduced interplanting is already factored into the Financial Projections. As discussed, such increased interplanting could result in a huge benefit to the Debtors, but is not factored into the Financial Projections. Similarly, Silver Point continues to assert that the Financial Projections relied on an increase in interplanting from 35% to 50%, despite my sworn testimony that this is not the case – no such large increase in interplanting is assumed in the Financial Projections. Deposition of Emmett Bergman, Sept. 17, 2009 at pp. 92-96.

d. Similarly, the Objection points to past labor problems as a barrier to Plan feasibility. Past labor issues have been generally resolved by accessing additional and separate pools of labor that are more expensive (i.e. farm labor contractors) than past forms of labor utilized by the Debtors (i.e. political refugees and foreign workers). These more expensive sources of labor have already been included in the Financial Projections, and these specific labor risks have been eliminated. If a cheaper labor pool becomes available in the future, then again, the Debtors could achieve more positive results. In fact, current changes in operations both now and continuing through the first quarter of 2010 are actually expected to provide the

Debtors with *significant labor savings* in 2010 and 2011. However, these potential labor savings were not incorporated into the Financial Projections.

e. With regard to Silver Point's complaints regarding the Category Leadership Initiative, again, Silver Point is mistaken in its conclusion that "the Debtors hope to replace interplanting as its main growth driver with the 'Category Leadership Initiative'". To the extent that the Category Leadership Initiative is ultimately successful, the Debtors could experience very substantial growth in revenue and profit, regardless of the success of the Debtors' interplanting. However, success of the Category Leadership Initiative is not presumed in the Financial Projections.

f. Other potential benefits that were not known at the time of the preparation of the Financial Projections are also substantial. Specifically, natural gas costs and transportation costs are now estimated to be significantly lower than those contained in the Financial Projections. This is the result of negotiations and achievement of better pricing with the Debtors' main transportation vendor and due to favorable changes in the natural gas markets. These costs savings are currently estimated to be between $2 and $3 million annually. These cost savings are not, however, included in the Financial Projections.

73. Under the Plan, the Debtors estimate the following aggregated Financial Projections as derived from the Financial Projections attached to the Disclosure Statement:

| Projections ($ in 000's) | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|
| **Balance Sheet** | | | |
| Total Assets | 125,764 | 118,940 | 122,869 |

| | | | |
|---|---:|---:|---:|
| Total Liabilities | 104,259 | 95,633 | 94,185 |
| Stockholders Equity [1] | 21,505 | 23,307 | 28,684 |
| **Total Liabilities & Equity** | **125,764** | **118,940** | **122,869** |
| **Cash Flows ("CF")** | | | |
| CF from Operations | 2,077 | 22,629 | 20,151 |
| CF from Investing Activity | (3,229) | (3,000) | (5,000) |
| Free CF Available for Debt Service | (1,152) | 19,629 | 15,151 |
| CF from Debt Service | 314 | (14,306) | (8,210) |
| Net CF | (838) | 5,323 | 6,941 |
| **Ending Cash Balance** | **9,041** | **14,365** | **21,305** |
| **Operations** | | | |
| Gross Profit | 31,934 | 37,746 | 43,714 |
| EBITDA | 18,904 | 24,287 | 29,988 |

(1) - includes new PIK preferred stock

## Assessment of Feasibility

74.     The Financial Projections demonstrate that the Reorganized Debtors will have sufficient liquidity and Cash on hand as of the Effective Date to make, on the Effective Date, all payments to Creditors payable on the Effective Date, and sufficient Cash on hand to satisfy all remaining obligations under the Plan to all Creditors in all Classes.  Furthermore, even if the Debtors are not able to achieve these Financial Projections in their entirety, there exists a very substantial margin for error.  In order for the Reorganized Debtors to not be able to properly service the debt owing under the New Credit Facility, the Debtors would need to fall woefully short of their projections.  By example, if the Debtors fell fifteen million pounds short of its projected annual production plans (which is a huge and unprecedented level of shortfall), and with all other things being equal, the Debtors could still service their debt and repay their secured lenders as set forth in the Plan.

75.     Based upon my experience and the work described more fully above, it is my opinion that the Financial Projections, and the underlying assumptions, are reasonable, and that,

based on such, there is a reasonable likelihood that the Reorganized Debtors will be capable of making the payments under the Plan. It is also my opinion that confirmation of the Plan is not likely to be followed by the liquidation or further Chapter 11 filing of the Reorganized Debtors.

76.     I also believe that the feasibility of the Plan is supported by the market— the overwhelming majority of Class 4 Senior Noteholders elected to invest new cash in the Debtors on a junior basis, which would be wiped out if Reorganized Eurofesh ultimately liquidated. Stated more simply, sophisticated Senior Noteholders clearly believe in the feasibility of the Plan, proven not only by overwhelmingly accepting the Plan, but also by agreeing to convert their claims into equity and reinvest new cash.

77.     Separate and apart from the Financial Projections, the Debtors monthly revise a production plan which consists of detailed compartment by compartment records of exactly what product variety is planted where and in what quantity. In the ordinary course of daily business, the production forecast is updated as plantings are completed or as schedules change, and as information regarding yields for individual products and sites are collected. Approximately monthly, the production forecast document (an excel document), is renamed, and a new version number is created. This is done in the ordinary course for accounting purposes and for version control. Thus, even if the adjustments are relatively minor, a new production plan will be created on a monthly basis.

## PART VI

## BEST INTERESTS OF THE CREDITORS

78.     Section 1129(a)(7) of the Bankruptcy Code requires a determination that the Plan is in the best interests of the holders of impaired claims that have not voted to accept the Plan (the "**Best Interests Test**"). To assist the Court in ascertaining whether the best interests of

impaired claims are served by the Plan, the Debtors' management, together with A&M-NA, prepared a liquidation analysis (the "**Liquidation Analysis**"). I have reviewed and am familiar with the Liquidation Analysis attached as Exhibit B to the Disclosure Statement. In fact, I was involved in the preparation of the Liquidation Analysis.

**Explanation**

79.     As discussed briefly above, the Best Interests Test can be satisfied by showing that either: (i) all members of an impaired class of claims have accepted the Plan; or (ii) the Plan will provide a member of an impaired dissenting class property of a value, as of the Effective Date, that is not less than the amount such holder would recover if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

80.     To calculate the probable distribution to members of each impaired class of holders of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

81.     The amount of liquidation value available to unsecured creditors would be reduced by: (1) the claims of any secured creditors to the extent of the value of their collateral; and (2) the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its bankruptcy case (such as compensation of attorneys, financial

advisors, and restructuring consultants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation also would prompt the rejection of a large number of executory contracts and unexpired leases and thereby create a higher amount of unsecured claims.

82.     Once a court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If the probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then the plan is not in the best interests of creditors and equity security holders.

**Application to Liquidation Analysis**

83.     From the outset, it must be recognized that any liquidation analysis is, by nature, an estimate. For example, the Liquidation Analysis necessarily contains an estimate of the amount of Claims that will ultimately become Allowed Claims. In preparing the Liquidation Analysis, the projected amount of Allowed Claims is based upon a review of the scheduled and filed proofs of claim. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtors projected a range for the amount of Allowed Claims with the low end of the range the lowest reasonable amount of

Claims and the high end of the range the highest reasonable amount of the Claims, thus allowing assessment of the most likely range of Chapter 7 liquidation dividends to the holders of the Allowed Claims.

84.     The Liquidation Analysis also assumes that liquidation would be performed over a period of four months commencing as of August 31, 2009, the projected date of conversion to a hypothetical Chapter 7 liquidation.

**Impaired Creditors: Creditor Classes That Have Accepted the Plan**

85.     The following Classes of Claims are impaired under the Plan: (i) Class 1A [Existing Credit Agreement Claims]; (ii) Class 1B [Capital Lease Claims]; (iii) Class 3 [General Unsecured Claims]; (iv) Class 4 [Senior Noteholder Claims]; (v) Class 5 [Discount Noteholder Claims]; (vi) Class 6 [Subordinated Claims]; and (vii) Class 7 [Interests].  Classes 1A, 1B, 3 and 4 are entitled to vote to accept or reject the Plan.  Based on the Ballot Report, the following classes voted in favor of the Plan: Classes 1B, 3 and 4.  Accordingly, the Plan is fair and equitable as to these classes of impaired claims.

**Impaired Creditors: The Plan Compared to Chapter 7 Liquidation**

86.     Determination of the second prong of the best interest test requires an analysis of the probable distributions that would be made to creditors if the Debtors' assets were liquidated by means of a forced sale by a Chapter 7 trustee.

87.     The Debtors estimate the following aggregated Liquidation Analysis, derived from the Liquidation Analysis attached to the Disclosure Statement:

| Estimated Liquidation Value<br><br>($ in 000's) | Estimated Value<br><br>CH 11 POR | Estimated Value<br><br>CH 7 Liquidation |
|---|---|---|
| Gross Liquidation Proceeds | 102.5 | 67.2 |
| Less: Costs of Liquidation [1] | (5.7) | (6.6) |

| Net Liquidation Proceeds Available for Distribution | 96.8 | 60.6 |
|---|---|---|

(1) - Includes priority claims

| Estimated Chapter 7 Liquidation Recovery | | | | | |
|---|---|---|---|---|---|
| | | **CH 11 POR** | | **CH 7** | |
| **Class**<br>**($ in 000's)** | **Estimated Claims** | **Recovery ($)** | **Recovery (%)** | **Recovery ($)** | **Recovery (%)** |
| 1A – Existing Credit Agreement Claims | 57.5 | 57.5 | 100% | 45.6 | 79% |
| 1B – Capital Lease Claims | 13.6 | 13.6 | 100% | 10.8 | 79% |
| 1C – Miscellaneous Secured Claims | 4.2 | 4.2 | 100% | 4.2 | 100% |
| 2 – Convenience Claims | 0.1 | 0.1 | 100% | - | 0% |
| 3 – General Unsecured Claims | 10.7 | 0.5 | 5% | - | 0% |
| 4 – Senior Noteholder Claims | 185.3 | 11.7 | 6% | - | 0% |
| 5 – Discount Noteholder Claims | 39.9 | - | 0% | - | 0% |
| 6 – Subordinated Claims | - | - | 0% | - | 0% |
| 7 – Equity | - | - | 0% | | 0% |
| **Total:** | **311.3** | **87.7** | **28%** | **60.6** | |

## Assessment of Best Interest of the Creditors

88.     As stated in more detail in the Liquidation Analysis, the Liquidation Analysis was prepared in order to demonstrate what likely recoveries would be under a liquidation scenario. Due to the relatively low value of greenhouse assets that are not being utilized to grow crops, it was assumed that the highest attainable value in a liquidation would be through the sale of operations either separately for the two locations or together.  Because the Debtors do not have sufficient capital to operate indefinitely in bankruptcy and because the risk of customer loss in a sale scenario would be great, it was assumed that this sale of the assets would need to occur as rapidly as possible.  Viewing this scenario as optimistically as possible, we assumed Gross Liquidation Proceeds of approximately $68 million from the sale of the assets.  Based on the

waterfall of claims, we estimated that these proceeds would therefore provide a recovery of approximately 79% to Classes 1A and 1B (depending on the exact allocation of proceeds as directed by the AAL, to which the Debtors are not a party). This 79% recovery is substantially less than what is estimated for these classes under the Plan.

89.     Notwithstanding the difficulties in quantifying recoveries to creditors with precision, I believe that, taking into account the Liquidation Analysis, the Plan will meet the Best Interests Test of Section 1129(a)(7) of the Bankruptcy Code. The only class to vote against the Plan was Class 1A, and Classes 5, 6 and 7 are deemed to reject the Plan without voting. I believe that, with respect to these four classes, and as discussed above, each member of such Class will receive at least as much under the Plan as it would in a liquidation or in a hypothetical Chapter 7 case. Creditors will receive a better recovery through the distributions contemplated by the Plan because: (i) distribution of $10,000,000 of the New Money Investment to the Existing Lenders will reduce amounts owing under the Existing Credit Documents and (ii) the reorganization of the Debtors' business with positive cash flow, rather than a forced liquidation, will allow the realization of more value for the Debtors' assets. Further, there are increased costs attending a Chapter 7 liquidation, including statutory Chapter 7 trustee fees and trustee's counsel fees, to name only a few additional expenses not present under the Plan. Moreover, creditors such as the Debtors' employees would retain their jobs and most likely make few if any other claims against the estates if the Debtors' are reorganized rather than liquidated. Finally, in the event of liquidation, the aggregate amount of unsecured claims would no doubt increase significantly, and such claims would be subordinated to additional priority claims that would be created. For example, employees would file claims for wages and other benefits, some of which

would be entitled to priority.  The resulting increase in both general unsecured and priority claims would further negatively impact recovery to unsecured creditors of the Debtors.

90.    In March of 2008, the Debtors had two series of unsecured notes outstanding: (i) $170,000,000 of 11½% Senior Notes due January 15, 2013 (the "**Senior Notes**") and (ii) $44,174,000 of 14½% Discount Notes due January 15, 2014 (the "**Discount Notes**").  In March of 2008 the Debtors were paying approximately $19.6 million annually in interest payments under the Senior Notes.  The Discount Notes were sold at a discount to their face value and accrued interest through July 15, 2010, at which point the Debtors were obligated to begin paying approximately $6.4 million in annual interest payments, followed by a lump-sum payment of the face amount of the bonds on January 15, 2014.  Under the Plan, the Debtors will issue $5 million in Subordinated PIK A Notes to the New Money Investors that will mature in March of 2010.  The interest accrued on these Subordinated PIK A Notes will be approximately $312,500.

91.    Accordingly, for the reasons stated above, I believe that the Plan passes the Best Interests Test as required by Section 1129(a)(7) of the Bankruptcy Code.

## PART VII

## CONCLUSION

92.    In summary, and without limiting any of the conclusions and opinions expressed above, based upon my education, experience and analysis, the Financial Projections (with underlying assumptions), Liquidation Analysis (together with the underlying assumptions), and the research described above, it is my opinion that:

a.  In the drafting of the Plan and Disclosure Statement and in the course of the reorganization proceedings generally, the Debtors have endeavored to comply fully with the requirements of Section 1129 of the Bankruptcy Code;

b.  Confirmation of the Plan will provide a stable capital and debt structure that will likely enable the Reorganized Debtors to meet their financial commitments under the Plan and to implement their business model going forward;

c.  The Plan is feasible as that term is defined in Section 1129(a)(11) of the Bankruptcy Code; and

d.  The Plan satisfies the best interests of the creditors, as that concept is treated in Section 1129(a)(7) of the Bankruptcy Code, and is not likely to be followed by the liquidation or further bankruptcy filing of the Debtors.

Made this 7th day of October, 2009 under penalty of perjury.

*/s/ Emmett Bergman*
Emmett Bergman

COLUMBUS/712575.4