Craig D. Hansen (AZ Bar No. 007405) chansen@ssd.com
Bradley A. Cosman (AZ Bar No. 026223) bcosman@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
Two Renaissance Square, Suite 2700
40 North Central Avenue
Phoenix, Arizona 85004-4498
(602) 528-4000

and

Kristin E. Richner (OH Bar No. 0078582) krichner@ssd.com
Nicholas J. Brannick (OH Bar No. 0079642) nbrannick@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-2700

Counsel to Debtors and Debtors-In-Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>EUROFRESH, INC. *et al.*<br><br>            Debtors. | Case No. 2:-09-bk-07970-CGC<br>(Jointly Administered)<br><br>Chapter 11<br><br>**DECLARATION OF MARC LIEBMAN IN SUPPORT OF DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**<br><br>**Hearing Date:  October 14, 2009**<br>**Hearing Time:  8:00 a.m.** |

MARC LIEBMAN, under penalty of perjury, states:

      1.      I am a Managing Director and co-founder of Alvarez & Marsal Securities, LLC

("**A&M-S**") having offices at 2355 East Camelback Rd., Suite 805, Phoenix, AZ 85016.

A&M-S was retained by the debtors and debtors-in-possession Eurofresh, Inc. and Eurofresh Produce, Ltd. (collectively, the "**Debtors**" or the "**Company**") in December 2008 to provide financial advisory services relating to a financial restructuring, financing and/or sale transactions. A&M-S has worked diligently on the matters for which it was engaged, and led the negotiations that resulted in a New Money Investment[1], which is the basis for the current Plan. This New Money Investment, through the IPSA, involves participation of the Investing Noteholders and Johan van den Berg, with the full support of the Debtors.

2.     I make this declaration (this "**Declaration**") on personal knowledge in my capacity as investment banker to the Debtors. The statements set forth below are true to the best of my knowledge and if called to testify to those statements, I would do so competently.

3.     I am providing this declaration voluntarily pursuant to 28 U.S.C. § 1746 and understand that it is being provided to the United States Bankruptcy Court for the District of Arizona (the "**Court**") in support of confirmation of the *Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 379] filed by the Debtors on August 14, 2009 in the above-captioned, jointly administered Chapter 11 cases.

4.     I earned my bachelor's degree in Business Administration, with a concentration in accounting, from the University of Notre Dame in 1996, and a master's degree in business administration, specializing in finance, from the University of Chicago in 2001. During the course of my career, I have had significant involvement in the development and execution of restructuring and recapitalization strategies for companies and their creditors. I have assisted clients, both out-of-court and under Chapter 11 protection, to develop, negotiate and execute capital structure restructurings, raise capital, monetize assets and manage stakeholder relationships. My previous restructuring assignments include AMERCO (U-Haul), Washington

---

[1] Capitalized terms not identified herein shall have the same meaning as attributed to them in the Plan.

Group, World Kitchen, Top-Flite Golf, California Coastal Communities, Nellson Nutraceuticals and Telogy. Prior to joining A&M-S, I was an investment banker with Donaldson Lufkin & Jenrette and Credit Suisse First Boston, and was responsible for executing a variety of corporate finance transactions for primarily financial sponsor and stressed/distressed clients. These transactions included exit financings, bank and high-yield debt offerings, public equity offerings (initial public offerings and follow-on) and exclusive sale assignments.

**Part I**
**Scope of Engagement**

5.      In early December 2008, the Debtors retained A&M-S to provide the them with financial advisory services relating to a financial restructuring, financing and/or sale transactions. Specifically, A&M-S was engaged to focus on and evaluate strategic alternatives to the Company's capital structure. Ultimately, the Debtors engaged A&M-S to provide investment banking services and the Court approved such retention.

6.      Pursuant to the terms of the Engagement Letter, A&M-S has performed the following services:

i.   reviewed the Debtors' business, operations, financial projections, business plans/strategies, asset/business value and financial position;

ii.  analyzed existing direct and contingent liabilities of the Debtors (including debt obligations and other liabilities;

iii. assisted the Debtors in ascertaining the debt servicing capability of the Debtors and any additional funding requirement;

iv.  assisted with the formulation, evaluation and implementation of various options for a capital structure restructuring, financing, reorganization, merger, or sale of the Debtors, or their assets or businesses, including, in the case of a restructuring, the value of securities, if any, that may be issued to certain creditors or equity holders thereunder;

v.   assisted the Debtors in the preparation of solicitation materials with respect to a restructuring and any securities to be issued in connection therewith;

vi.   assisted the Debtors in negotiations with creditors, bondholders, shareholders and other appropriate parties-in-interest;

vii.  provided investment banking services to the Debtors in connection with developing, seeking approval for, a restructuring plan under chapter 11 of the Bankruptcy Code;

viii. managed and negotiated incoming inquiries related to alternative recapitalization proposals, including the preparation of information materials for select parties which signed confidentiality agreements as part of the process and managed and coordinated inquires by prospective parties;

ix.   extensively analyzed alternative restructuring and capital structure scenarios as impacted by financial performance, liquidity situation, case developments, etc. and analyzed competing proposals that were received by the special committee;

x.    prepared reports and presentations for management and the special committee related to the restructuring process, case developments and alternative recapitalization process, and participated in discussion related to such;

xi.   provided strategic advice and negotiated with existing secured creditors related to new secured financing intended to be issued in connection with a plan of reorganization;

xii.  interfaced with creditors, bondholders, shareholders and other parties in interest, as well as advisors to these constituent groups;

xiii. reviewed and commented related to definitive documentation supporting the restructuring; and

xiv.  engaged management in discussions regarding monthly financial performance and implication of pro forma liquidity situation and capital needs of the business, prepared member of management for creditor discussions, case status updates, organizational meetings and other discussions as appropriate;

A copy of the Engagement Letter is located at Exhibit 1 in the Exhibit Binder.

7.    As set forth more fully below, I have concluded that the New Money Investment, as set forth in the Plan, which contemplates a $25.0 million investment by the Senior Noteholders and Johan van den Berg — $10.0 million of which will go to pay down the Existing Credit Documents Claim and $15 million of which will be infused as working capital —

represents the highest and best restructuring proposal submitted to the Debtors for several reasons. First, the New Money Investment contemplates a sizeable pay-down of the Existing Lenders while also providing a full recovery to the Existing Lenders and significant value and recovery to junior creditor constituents. Second, the New Money Investment has the current support of at least two consenting impaired classes this it is the most executable of any proposal submitted and it is binding, with no due diligence considerations or other contingencies at issue. Third, the New Money Investment infuses $15 million of working capital into the Company and includes the extinguishment of over $210 million of bond debt securities to ensure a viable capital structure and liquidity situation post-confirmation.

8.      In connection with A&M-S' engagement, I have supervised the A&M-S team of professionals responsible for providing restructuring advice and other investment banking services to the Debtors. My team has been primarily responsible for gathering, reviewing, summarizing, and analyzing much of the data that underlies my opinions and conclusions. I have also relied on first-hand observations and my own work product. This type of information is of the type that I typically rely upon in carrying out my duties as Managing Director with A&M-S and that I have used in my prior work in the financial restructuring, recapitalization, and advisory services industry.

**Part II**
**Restructuring Proposals and Marketing Process**

**A.      Due Diligence and Assessment of Restructuring Options**

9.      Immediately following its retention, A&M-S began its due diligence work to gain an understanding of the Debtors' historical and projected financial performance. As part of the due diligence process A&M-S performed the following tasks, among others:

- Reviewed the Company's three-year base case business plan;

- Assessed the Company's liquidity through the remainder of 2009 and throughout the business plan forecast horizon;
- Performed a preliminary valuation of the Company based on the base case business plan;
- Assessed the Company's debt capacity based on its base case plan;
- Reviewed the Company's credit agreements and indentures to assess the relative rights and priorities of the Company's capital providers;
- Prepared numerous due diligence-related reports and analyses for the benefit of the Company's existing capital structure participants;
- Assisted the Company in negotiating forbearance extensions with the Senior Noteholders; and
- Advised the Company with respect to the alternatives available to proactively address the Company's capital structure.

10.    During our assignment A&M-S held numerous discussions with representatives from Apollo Investment Corporation ("**Apollo**") and Barclays Bank PLC ("**Barclays**"), the Debtors' two largest holders of the Senior Notes, as well as Silver Point Finance, LLC "("**Silver Point**") and Wells Fargo Foothill, LLC ("**WFF**"), collectively the Debtors' existing secured lenders **("Existing Secured Lenders")** under the Existing Credit Documents.  Discussion topics with the Existing Secured Lenders, Apollo and Barclay included gaining an understanding of the objectives of each party, the Debtors' financial performance, projections and capital structure related issues.  Apollo and Barclays entered into confidentiality agreements so they could gain access to the Debtors' confidential and proprietary information in order to conduct their own due diligence process.

11.    During the course of these initial discussions, Silver Point informed me that its objective was to be completely taken out of the capital structure and that it had no interest in

providing incremental capital to the Company. I was also made aware by Silver Point that it was in the process of extensively shopping its debt position to a number of third parties.

**B.      Initial Recommendation to Board of Directors**

12.      On March 9, 2009, I made a presentation to the Board of Directors ("**BOD**") generally concerning Debtors' financial performance, the efforts undertaken by A&M-S to evaluate the Debtors' base case plan, A&M-S observations of the base case plan and recommendations going forward. A copy of the March 9, 2009 Presentation to the Board of Directors is located at Exhibit 2 in the Exhibit Binder.

13.      Specifically, in this presentation, I set forth the following primary objectives for the Debtors to consider in assessing potential restructuring alternatives: (i) to maximize the overall enterprise value for all of the Debtors' stakeholders; (ii) to develop an optimal capital structure; and (iii) to minimize disruptions to company operations.

14.      I informed the BOD that A&M-S' preliminary valuation of the business indicated that the Existing Lenders were covered at full-value from an enterprise valuation perspective, that given the Debtors free cash flow generation the Existing Credit Documents obligations could be serviced by the Debtors at the contract rates and that the value of the enterprise indicated that there was value in the Senior Noteholders' claim and they could be the fulcrum security (i.e. the security entitled to step into an equity position). Further, I indicated that all of the unsecured bonds in the capital structure should be completely equitized or extinguished and that a new money investment should be pursued to assist with working capital needs and to pay down the Existing Credit Documents obligations. I suggested that the Company pursue a consensual arrangement with both the Existing Lenders and the Senior Noteholders.

15.     In determining the best course for the Company, A&M-S considered the options of a sale of the Company or raising new debt financing as part of a restructuring; but we determined, based in part of the Company's over-leveraged capital structure and the upheaval in the market generally, that these alternatives were unavailable, prohibitively expensive and/or may result in significantly diminished recoveries to creditor constituents (secured and unsecured) as compared to the recoveries to such parties implied by A&M-S' contemplated restructuring and A&M-S' view of the intrinsic value of the business.

16.     Further, A&M-S believed that, while Silver Point was conducting a robust marketing process to sell its debt position at a discount to par, such actions essentially eliminated the ability of A&M-S to simultaneously solicit the interest of unrelated third parties in a sale or complete secured debt refinancing of the Debtors. Silver Point was essentially actively soliciting such interest on its own, potentially at a discount to the value of its debt and therefore at a discount to A&M-S' preliminary view of the valuation of the Debtors. This undermined the potential value that A&M-S could hope to obtain from the market.

17.     As such, A&M-S determined that the Debtors would be better served to focus efforts to raise new capital from existing equity and/or the Senior Noteholders which had an extensive knowledge of the business and its prospects, which are important considerations in properly valuing the business. A&M-S believed that such parties were more likely to enter into a transaction that included a new money investment at a valuation higher than that implied by a discounted purchase of Silver Point's Existing Credit Documents Claim and that such a deal could potentially provide full recovery to secured creditors and partial recovery to unsecured creditors. Further, A&M-S believed that if the Debtors were to reach such an agreement, that such a transaction, coupled with a deleveraging of the unsecured bond debt, would create a plan

with no break-fees that protected secured and unsecured debt recoveries and that created a transaction benchmark that other interested parties would have to match or top..

18.     On March 9, 2009 I also recommended to the BOD that the Debtors pursue a two tiered negotiation process whereby they would attempt to reach a consensual agreement with the Senior Noteholders, followed by negotiations with the Existing Secured Lenders.  I indicated that the potential "ask" of the Existing Secured Lenders during consensual negotiations could be prohibitively expensive.  A&M-S believed that absent the negotiating leverage of a consensual deal with the Senior Noteholders and the potential of a cash paydown, the potential existed that the Existing Secured Lenders would ask for rates and terms on their debt that could create tight liquidity even in case where the unsecured bonds were to be completely extinguished or equitized as part of a restructuring plan.  My recommendation as to the two-tiered negotiating strategy was directly influenced by Silver Point's representations to me that it desired to be completely taken out of the Debtors' capital structure and that it was not at all interested in providing any additional capital to the Company.  As a result, I believed that Silver Point was unlikely to support a capital structure restructuring that contemplated their continued investment in the Debtors unless the Debtors had the negotiating leverage of having reached a restructuring deal with another impaired class.  My belief was further influenced by the terms and conditions of DIP Financing proposed by WFF (in consultation with Silver Point) and Silver Point's efforts to sell its debt position at a discount.

19.     Finally, I commented that such a restructuring may have to be implemented via a bankruptcy filling in order to cancel all preferred and common equity, bind holdouts among the Discount Notes and Senior Noteholders and for tax and legal considerations.

**C.    The Initial Term Sheet From the New Investors**

20.     Following the initial presentation to the BOD, A&M-S had a series of conversations with a variety of members of the Debtors' capital structure including, the Existing Lenders, Apollo, Barclays, Johan van den Berg and Bank of America Capital Investment ("**BACI**").    The goal of these conversations was to arrive at a pre-negotiated, consensual restructuring that included the extinguishment or equitization of the unsecured bonds and the injection of new money to provide a pay down to the Existing Secured Lenders and to infuse working capital into the business.

21.     Ultimately, on April 16, 2009, the Debtors received a non-binding term sheet for a proposed Chapter 11 Plan of Reorganization contemplating a New Money Investment from Mr. Van den Berg and certain Senior Noteholders (together the "**New Investors**") in the amount of $10 million (the "**Initial Term Sheet**").    At this same time, the New Investors provided a supplemental term sheet providing for a New Money Investment of $20 million ("**Supplemental Term Sheet**").

22.     On April 18, 2009, the BOD convened a meeting at which I made a presentation regarding <u>both</u> the <u>Initial Term Sheet and the Supplemental Term Sheet</u>.    A copy of the April 2009 Presentation to the BOD is located at Exhibit 3 in the Exhibit Binder.

23.     In this presentation, I explained the key aspects of the term sheet to the BOD, the impact of the term sheet on the Debtors' pro forma capitalization and projected financial performance, as well as the lack of break-up fees in the Initial Term Sheets and Supplemental Term Sheet.    I recommended to the BOD that the Debtors move forward in exploring the New Investors Initial Term Sheets and the proposed investment by the New Investors.

24.     On April 14, 2009, I attended a BOD meeting in which the Directors determined that, in the event an extension to the SP Forbearance Agreement (defined below) was not secured, it was in the best interests of the Debtors and their creditors, stockholders and other interested parties, to file a petition seeking relief under the provisions of Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

25.     The next day, the forbearance agreement between Debtors and the Existing Lenders ("**SP Forbearance Agreement**"), resulting from the Debtors' failure to make a January 15, 2009 scheduled interest payment on the Senior Notes, expired as efforts to secure an extension were unsuccessful.

26.     As a result of the expiration of the SP Forbearance Agreement and the inability of the Debtors' to secure an extended forbearance agreement from the Existing Lenders, the Debtors filed petitions seeking relief under the provisions of Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*  Concurrent with the Debtors bankruptcy filing, the Initial Term Sheet was filed with the Court.  Ultimately, the Debtors were significantly advantaged by going into the bankruptcy proceeding with the stability of a potential new investment that would allow the Debtors to exit bankruptcy as a reorganized entity with the support of a major creditor constituency.

**D.      Formation of the Special Committee and Consideration of the New Money Investment**

27.     On May 5, 2009, I attended a BOD meeting during which the Directors voted to form a Restructuring Committee (the "**Special Committee**") comprised of Independent Directors Travis Hain, Scott Komar and John Shimp.  Each member of the Special Committee was considered to be "independent" as none of them has a material interest in the Company.  Mr.

Komar is Vice President of Operations at Organicgirl, LLC and NewStar Fresh Food, LLC and Messrs. Hain and Shimp are each Partners at BACI.

28.     The Special Committee was tasked with formulating, developing, reviewing and analyzing all reasonably available alternatives for restructuring and reorganizing the Debtors' debts, assets.  The decision to convene the Special Committee was based on the BOD's desire to insulate the consideration of alternate proposals from Mr. van den Berg as he had become an interested party due to his participation in the new investment proposal as well as from Dwight Ferguson who was the Chief Executive Officer of the Company.

29.     The Special Committee was authorized to engage, on the Debtors' behalf, in discussions and negotiations with (a) holders of the Debtors' outstanding debt and equity interests; (b) potential lenders and other sources of capital; and (c) any other parties that may have be necessary and appropriate in formulating, developing, reviewing and analyzing potential alternatives for restructuring and reorganizing the Debtors' debts, assets, and capital structure.

30.     As such, it became the sole province of the Special Committee to consider various strategic alternatives and then, when appropriate, report to the BOD regarding the status of those proposals and any recommendations to move forward with those proposals.

31.     From that point on, my primary contact regarding strategic restructuring alternatives was the Special Committee.  My conversations with company management regarding proposals or strategic alternatives remained general in nature.

32.     My first presentation to the Special Committee took place on May 11, 2009 at its inaugural meeting.  In that presentation, I provided general background information regarding the recent bankruptcy filing, including a discussion of key dates and an update on recent developments and discussions with certain key constituents involved in the bankruptcy

proceedings. A copy of the May 11, 2009 Presentation is located at Exhibit 4 in the Exhibit Binder. I also addressed the key terms of the recommended initial plan of reorganization and the pro forma capitalization, free cash flow, liquidity, and leverage statistics under that plan.

33. I recommended to the Special Committee that we reserve $5 million of the $20 million New Money Investment set forth in the Supplemental Term Sheet. The reserve capital gave the Company the latitude to modify the plan during the bankruptcy process. The purpose of holding this amount in reserve was to provide incremental capital that could be offered in an effort to reach a consensual deal with the Existing Lenders. Further, I informed the Special Committee that, in the event Silver Point did not support the plan, then Debtors could consider pursuing a "cram down" plan over the objection of Silver Point. While I explained the option of the "cram down" to the Special Committee, our primary objective throughout the entire bankruptcy process was to develop a consensual plan. I suggested this "cram down" as a last resort in the event that the Debtors could not engender the support of the Existing Lenders for the Debtors' plan or reorganization.

34. On or about June 12, 2009, the Debtors filed their Disclosure Statement, initial Plan of Reorganization (the "**Initial Plan**"), and Investment and Plan Support Agreement (the "**IPSA**") which described the proposed New Money Investment, which at the time provided for a $7.5 million pay down of the Existing Credit Documents Claims and $7.5 million working capital infusion ("**Initial POR New Money Investment**"). The IPSA included language expressly reserving the right of the Debtors to pursue a higher and better offer than the Initial POR New Money Investment without incurring financial penalty to the extent A&M-S or the Debtors were approached by a third party. It was this language that allowed A&M-S to continue

to entertain alternative restructuring proposals on an on-going basis following the bankruptcy filing.

**E.      Solicitation of Exit Financing**

35.      During May and June of 2009, A&M-S engaged in an active solicitation effort to secure first lien exit financing for the company.  To that end, A&M-S created a marketing "teaser" and a confidential information memorandum ("**CIM**") which was distributed to various prospective investors.  A copy of the marketing teaser is located at Exhibit 5 in the Exhibit Binder and the CIM is located at Exhibit 6 in the Exhibit Binder.

36.      Notably, A&M-S' efforts in soliciting proposals for exit financing were largely guided by representations made to us by Broadpoint, the Financial Advisor retained by Silver Point, that Silver Point had changed its original position of wanting completely taken out of the capital structure and was now highly interested in receiving a very significant cash pay-down and exchanging any residual claim following such cash pay-down into a second lien security.  It was with this knowledge that A&M-S pursued the exit financing process.

37.      A&M-S also sought and received the input and feedback of Silver Point, through Broadpoint in the compilation of the list of prospective investors contacted during the exit financing process and in drafting of the key documents surrounding the marketing of the potential exit financing.

38.      While the focus of A&M-S' efforts was to solicit proposals for first lien exit financing, A&M-S explicitly noted in its marketing teaser and CIM that the Debtors were "open to alternative financing structures."   A&M-S believed that this expression of openness to alternative financing structures was an invitation to prospective investors to provide multiple and different forms of financing outside of the potential debt structure proposed in the exit financing

document, including providing subordinated debt and/or equity financing as a sponsor of an alternative restructuring plan.

39.     During the exit financing process, A&M-S contacted approximately 35 prospective investors. Of that group, we believe that at least 20 such investors generally make equity investments, including control equity investments, in addition to debt financing investments. Given the stated investment objectives (equity and debt investments) and typical practices of these investors, it is likely they would have evaluated this investment among multiple structural lines (e.g., equity and/or debt), particularly given the stated openness to alternative financing structures articulated by the Debtors in these documents.

40.     In fact, HIG Capital, whom A&M-S approached during the exit financing process, ultimately did submit an alternative restructuring proposal through its joint proposal with Village Farms Income Fund ("**Village Farms**").

41.     Ultimately, the exit financing process did not elicit an indication of interest in providing first lien exit financing in connection with the Initial Plan from any third party investors; however the openness expressed by Silver Point to exchange any residual claim into a second lien security was taken as informative as to Silver Point's objectives and used during subsequent negotiations with (a) the New Money Investors in the formulation of Option A of the Plan of Reorganization; and (b) other potential third parties interested in submitting alternative restructuring proposals.

**F.     Efforts with Respect to Restructuring Alternatives (the Window Shop Process)**

42.     Due, in part, to Silver Point's highly active solicitation efforts to sell its debt at a discount, which benefited from its use of an investment bank as an intermediary, A&M-S determined that a "window shop" process (the "**Window Shop Process**") rather than an active

solicitation, would best serve the needs of Debtors and efficiently utilize A&M-S resources. A&M-S believed that parties that were interested in submitting alternative proposals would pursue the Debtors through the Window Shop Process. A&M-S believed that such parties would be aware of the situation either as a result of their evaluating the purchase of the Silverpoint debt, given the profile of the Debtor in the markets generally, given the public nature of the bankruptcy process, or the filing of the Initial Term Sheet that permitted the Debtors to review and analyze competing offers.

43.     Within days of the Bankruptcy filing, A&M-S was also working diligently to address the interests of third parties regarding alternative restructuring proposals. With respect to this process, I ultimately had communications by telephone, by electronic mail and in-person with approximately 14 different prospective investors ("**Prospective Investors**") regarding potential restructuring alternatives to the New Money Investment. A copy of the matrix setting forth those communications is located at Exhibit 7 in the Exhibit Binder.

44.     In communicating with these Prospective Investors, A&M-S expressly informed them that while the Debtors had indeed signed the IPSA, it was entirely open to superior proposals and the existing agreement allowed for the Debtors to pursue those proposals without financial penalty. In so stating, A&M-S encouraged Prospective Investors to submit their proposals and assured them they would be given due consideration by the Special Committee.

45.     The Prospective Investors were comprised of exclusively financial investors with one exception being a strategic investor, Village Farms, which is a direct competitor of the Debtors in the agricultural industry.

46.     Prospective Investors that expressed interest in receiving additional information were asked to sign a confidentiality agreement. In total three Potential Investors executed and returned the confidentiality agreement.

47.     Upon receiving an executed copy of the confidentiality agreement from a Prospective Investor, A&M-S provided that investor with an information packet containing proprietary, non-public information regarding the Company ("**Information Package**"). The Information Package contained a Confidential Information Memorandum prepared by A&M-S as well as various other documents including a Form 10-Q for the period ending September 30, 2008, the Proposed Plan, financial projections, the Second Interim Cash Collateral Order and a presentation addressing the tomato viroid experienced by certain tomato crops at Eurofresh. A copy of the Information Package is located at Exhibit 8 in the Exhibit Binder.

**G.     The Window Shop Process Resulted in Two Alternative Proposals**

48.     Ultimately, two entities, in addition to Silver Point, submitted proposals as a result of A&M-S' marketing process: Wellspring Capital Management, LLC ("**Wellspring**") and Village Farms.

49.     On June 16, 2009, Wellspring submitted its first official proposal (the "**First Wellspring Proposal**") to A&M-S. On June 17, 2009, a meeting of the Special Committee was convened to discuss the terms of Wellspring's proposal. In this meeting I made a presentation setting forth a side-by-side comparison of the proposed New Money Investment, the Supplemental Term Sheet and the First Wellspring Proposal. A copy of the June 16, 2009 Presentation to the Restructuring Committee is located at Exhibit 9 in the Exhibit Binder.

50.     The First Wellspring Proposal borrowed many of the same structural elements of the New Money Investment with several notable differences, primarily the amount of new

money to be invested in the Company. As set forth in my presentation to the Special Committee, the Initial POR New Money Investment provided for $12.5 million of new money, the Supplemental Term Sheet to the New Money Investment provided for $20 million of new money, and the First Wellspring Proposal provided for $22.5 million of new money capital. Thus, the First Wellspring Proposal provided for a $17.5 million paydown to the Existing Lenders as compared to the contemplated $15 million paydown in the Supplemental Term Sheet.

51.     The First Wellspring Proposal, however, presented several areas of concern for the Debtors. First, it was a non-binding agreement that included a list conditions precedent. Second, there were mandatory expense reimbursements that the Debtors would be required to provide to Wellspring while it conducted its due diligence. Third, because it was non-binding, there was no assurance that Wellspring would be willing to move forward with the proposal following its due diligence investigation. Fourth, and perhaps most importantly, the First Wellspring Proposal did not have a clear path to getting the support of a consenting impaired class to a plan of reorganization. Finally, there were break up fees if the transaction was not consummated for certain reasons. Each of these issues was concerning given the Debtors liquidity situation.

52.     The Special Committee discussed these issues at length and ultimately directed me to go back to Wellspring to seek an enhanced proposal. I provided Wellspring with verbal guidance as to how to improve their proposal which included an increase in the amount of new capital being in the Debtors to (a) increase the pay down to Silver Point and (b) for working capital and to enhance distributions of new securities to the Senior Noteholders. In response to my efforts to solicit an improved offer, Wellspring submitted a second proposal on June 23, 2009 (the "**Second Wellspring Proposal**") providing an enhanced new money infusion to $32.5

million, with $10.0 million of the new capital being invested by Wellspring only in the event the Debtors were unable to secure exit financing from a third party. Thereafter, I made another presentation to the Special Committee addressing the Second Wellspring Proposal. A copy of the June 23, 2009 Presentation is located at Exhibit 10 in the Exhibit Binder. This presentation included a side-by-side comparison of the Supplemental Term Sheet to the New Money Investment, the First Wellspring Proposal, and the Second Wellspring Proposal. Notably, the Second Wellspring Proposal increased the amount of new capital invested in the Company from a working capital perspective. However, many of the same concerns and uncertainties presented by the First Wellspring Proposal remained. As important, there remained significant concerns as to who would be the consenting impaired class in the Second Wellspring Proposal, as Wellspring had not increased the amount of their pay down to Silver Point as compared to the First Wellspring Proposal and Silver Point had not given me an indication that a $17.5 million paydown was sufficient to receive their support for a restructuring plan. A&M-S did not believe that the Senior Noteholders would support either of the Wellspring proposals and, therefore, viewed Silver Point as the most likely consenting impaired class to support their proposal.

53. The Special Committee engaged in detailed, exhaustive discussions on these issues and determined to continue to negotiate with Wellspring in order to attempt to improve their proposal.

54. Following the Special Committee meeting, in order to gain information with which to address the lack of a consenting impaired class in the Wellspring proposal, I reached out to Broadpoint to obtain guidance on what paydown and other terms would deliver the support of Silver Point to a Wellspring sponsored plan of reorganization. The goal was to share that information with Wellspring so I could assist them in the development of a term sheet that

would garner the support of Silver Point as a consenting impaired class. Despite this request, I did not receive any feedback from either Silver Point or Broadpoint on this issue.

55.     On June 25, 2009, in order to address the concerns of the Special Committee outlined above, I developed a counter proposal to Wellspring. This counter proposal included $5 million of additional capital above that of the Second Wellspring Proposal which was used to enhance the paydown to Silver Point and the issuance of $5M of additional PIK Preferred Stock to the Senior Noteholders. In addition, the counter proposal reduced the reimbursable fees and expenses and sought to limit Wellspring's diligence outs. On June 26, 2009, Wellspring withdrew the Second Wellspring Proposal, citing a lack of desire to meet any of the enhancements I had articulated in the Debtors' June 25, 2009 counter-proposal. Ultimately, I was able to convince Wellspring to proceed with its pursuit of an alternative restructuring plan under the terms of the Second Wellspring Proposal. On June 30, 2009, A&M-S facilitated a discussion between Wellspring and members of the management team in order to assist Wellspring in its diligence efforts and in an effort to attempt to tighten certain of the diligence outs and conditions precedent in the Second Wellspring Proposal.

56.     On June 30th, Village Farms, with its financial partner H.I.G. Capital, submitted a restructuring proposal through its investment bank Genuity Capital Markets ("**Genuity**") (this proposal was also sent directly by Genuity to Silver Point). On that same day, the Senior Noteholders and Mr. van den Berg submitted a preliminary update to the New Money Investment that contemplated $47.0 million of new money being invested as part of a plan of reorganization ("**Updated New Money Investment**"). The Updated New Money Investment was secured, in part, due to the competitive pressure of the Wellspring proposals. In other words, A&M-S was able to use the Wellspring proposals to garner additional new money from the

Senior Noteholders and Mr. van den Berg. Further, the Updated New Money Investment was structured to elicit the support of Silver Point to the Debtor's plan of reorganization by addressing Silver Point's indication that it would be willing to roll over into a second lien security after having received a substantial cash paydown.

57.    On July 2, 2009, I made a presentation to the Special Committee setting forth a side-by-side comparison of the Updated New Money Investment, the Second Wellspring Proposal and the June 30, 2009 Village Farms proposal. A copy of the July 2, 2009 Presentation is located at Exhibit 11 in the Exhibit Binder. In counseling the Special Committee in its evaluation of the three alternative restructuring proposals, I instructed them to consider the following:

- The feasibility and viability of the capital structure post-restructuring;

- The degree of value and recovery to creditor constituents;

- The amount of risk involved in reaching closing; and

- The cash flow situation facing the Debtors.

58.    As with the earlier proposals, the Special Committee gave serious and informed consideration to the three scenarios presented in the July 2, 2009 A&M-S Presentation. Further, while the Senior Noteholders and Mr. van den Berg were made aware of the alternative proposals, as required by the IPSA, neither the Senior Noteholders nor Mr. van den Berg in any way influenced the deliberations of the Special Committee in considering the various proposals.

59.    The Special Committee observed, with my counsel, that the Second Wellspring Proposal called for similar all-in levels of recovery for the Existing Lenders and the Senior Noteholders as compared to the Updated New Money Investment, albeit the amount of cash paydown to the Existing Lenders in the Updated New Money Investment was significantly

higher, which was judged to be an important factor in reaching a consensual resolution with the Existing Lenders given Silver Point's indications to us during the exit financing process discussed above. Further, the Special Committee observed, with my counsel, that the Village Farms proposal called for similar levels of recovery to the Existing Lenders as compared to the Updated New Money Investment, albeit the amount of cash offered to the Existing Lenders in the Updated New Money Investment was significantly higher. With regard to the Village Farms proposal, however, there was doubt as to the implied recovery to the Existing Lenders in light of the offering of $3.0 million of Village Farms common stock, which is traded publicly. Further, while A&M-S noted a potentially superior treatment of the Senior Noteholders under the Village Farms proposal, the same doubt with regard to the value of the $10.0 million of Village Farms common stock was present. The key Village Farms common stock valuation issue was that the value of such stock could change, potentially negatively, depending on Village Farms' financial performance (this indeed has occurred as Village Farms' stock is down ~20% since the time of their proposal) and the Senior Noteholders may prefer common equity ownership in the Debtors versus Village Farms given, among other things, their increased familiarity with the Debtors versus Village Farms.

60. Each alternative proposal bore significant additional risk in two meaningful ways: (1) Neither Wellspring nor Village Farms had conducted due diligence. As such, there was no assurance whatsoever that either entity would want to move forward with their proposals following that investigation. In the meantime, the Debtors were facing an increasingly worrisome financial situation and could not afford a protracted due diligence period that could ultimately end in the possible abandonment of the agreement by either Wellspring or Village Farms; and (2) Neither proposal benefitted from the support of a consenting impaired class,

without which confirmation of the plan of reorganization was not likely. On the other hand, the New Money Investment unequivocally had the support of an impaired class and there was low risk that the proposal would fall through as a result of a due diligence process, nor would there be an increased cost with a due diligence process as it was already complete.

61.     In an effort to address and diminish the foregoing risks and concerns, A&M-S worked with both Wellspring and Village Farms to modify their proposals in such a way as to maximize the potential acceptance of such a proposal by an impaired class.

62.     A&M-S had direct conversations with Broadpoint in an effort to better understand Silver Point's objectives in order to assist in the development by Wellspring and Village Farms of better proposals. A&M-S shared the Wellspring proposal with Broadpoint and in doing so facilitated direct conversations between Wellspring with Broadpoint which A&M-S hoped would further Wellspring's efforts at achieving the support of a consenting impaired class. A&M-S also facilitated direct conversations between Village Farms and select Senior Noteholders to further their efforts at achieving the support of a consenting impaired class. Following these direct conversations, A&M-S was informed by Wellspring and Village Farms that they had, respectively, determined to suspend their pursuit of sponsoring an alternative restructuring, primarily due to a lack of support of any creditor constituents.

**H.     Silver Point's Proposal**

63.     On July 31, 2009, Silver Point unexpectedly submitted an alternative restructuring proposal for the Debtors' consideration.

64.     As with the prior proposals received by Debtors, A&M-S immediately prepared a presentation to the Special Committee and convened a meeting to discuss Silver Point's proposal. A copy of the August 4, 2009 Presentation is located at Exhibit 12 in the Exhibit Binder. This

initial proposal had the benefit of the support of Silver Point; however it contained significant issues that essentially rendered it structurally flawed and therefore non-competitive with the New Money Investment, including the recovery by Silver Point of make-whole claims which A&M-S believed would allow Silver Point to recover more than the allowed amount of its claim and the treatment of WFF's debt under the proposal.

65.     Following discussions with the Special Committee on these issues, I contacted Broadpoint and communicated a list of very specific modifications that the Special Committee required in order to support Silver Point's proposal. I was open and transparent in my communications with Broadpoint, and shared with them the A&M-S analysis of the Silver Point proposal.

66.     A&M-S received a second proposal from Silver Point on August 6, 2009. I prepared another presentation for the Special Committee's consideration which set forth a side-by-side comparison of Silver Point's August 6th Proposal and the New Money Investment (Options A and B). A copy of the August 7, 2009 Presentation is located at Exhibit 13 in the Exhibit Binder. While Silver Point's second proposal reflected certain enhancements to the original proposal, it still failed to adequately resolve other key issues.

67.     Specifically, significant execution risk existed with respect to the Silver Point proposal due to potential contingencies and the lack of binding agreement, the impact of the delay on junior creditor recoveries and the liquidity situation facing the Debtors. While Silver Point offered to provide the Debtors with DIP Financing in the event cash needs warranted, the terms of such financing were onerous and included a covenant requiring a 363 sale if certain milestones were not met. To the extent Debtors were to undergo a 363 sale, we believed that a

very real risk existed that the unsecured creditors would experience a gravely diminished recovery or perhaps no recovery at all.

68.     Another area of concern existed with respect to the Senior Noteholder recovery. The value of the common equity distributions to the Senior Noteholders was diminished given Silver Point's requirement that it be permitted to appoint four out of five members of the Board of Directors and other limited shareholder and governance rights for the Senior Noteholders.

69.     Compared to the New Money Investment, Silver Point's enhanced proposal was not judged to be a higher and better offer.  On the contrary, the New Money Investment was considered superior to Silver Point's proposal for the following reasons:

- The Initial Plan was expected to be confirmed by August 31, 2009 and prior to that time Debtors were not expected to experience liquidity issues.  In other words, implementation of the New Money Investment was not expected to create the risk of the Debtors running out of money, drawing on DIP financing and potentially being forced, as a result of covenants in the DIP financing, into a 363 sale that could potentially severely reduce recoveries to junior creditors.

- Under the New Money Investment—both Options A and B—the Debtors benefited from $15 million of cash/revolver availability to fund restructuring costs and provide post-emergence liquidity.  The Silver Point proposal did not improve upon this figure but instead matched it.

- The New Money Investment—Option A provided for first lien term debt of $23.0 million, from the New Investors, priced at LIBOR + 600 (200 bps LIBOR Floor), all of which would have been cash pay.  In addition, Option A

provided new second lien term debt for the Existing Lenders of $36.1 million, priced at Silver Point's interest rate of LIBOR + 725 (350 bps LIBOR Floor). Under the New Money Investment – Option B, the Debtors would have the lowest cost of secured financing with $61.1 million of first lien term debt in favor of the Existing Lenders, priced at the five year constant maturity treasury rate + 500 basis points (~7.38%) all of which would be cash pay. Conversely, Silver Point's alternative proposal included $50.0 million of expensive first lien term debt with pricing of LIBOR + 1150 bps (350 bps LIBOR Floor), 500 bps of which would be PIK. This represents a minimum cash component to the financing of 10.0%.

- The Silver Point alternative proposal included common equity distributions to Senior Noteholders that were diminished in value given their lack of governance rights, etc. Therefore, A&M-S judged recovery to the Senior Noteholders under the Silver Point proposal to be equal to or less than that offered under the New Money Investment.

- The New Money Investment contemplated no due diligence costs or requirements. On the other hand, the Silver Point alternative proposal included customary due diligence, completion of Definitive Documentation and other standard terms and conditions.

- Given the uncertainties and risks associated with pursuing an alternative proposal so late in the process and given the Debtors' liquidity concerns, A&M-S believed that the capital investment and terms of the Silver Point alternative proposal would have to be meaningfully better than the "bird in the

hand" New Money Investment in order to be considered the highest and best offer. Ultimately A&M-S determined and advised the Special Committee that this was not the case with Silver Point's alternative proposal.

70. Once again, following discussions with the Special Committee on these issues, I contacted Broadpoint and communicated a list of very specific modifications that the Special Committee required in order to support the Silver Point's proposal. I was open and transparent in my communications with Broadpoint and shared with them the A&M-S' analysis of the Silver Point proposal. Ultimately Silver Point did not submit a revised proposal incorporating any of the suggested modifications and negotiations between that parties effectively ceased.

## Part III
## Determination of the Interest Rate Under the New Credit Facility

71. Part of my responsibilities as an investment banker is to know the condition of the financing markets. This is important in order for me to provide advice to my clients regarding the financing of transactions and what are appropriate expectations regarding such financing.

**A.** **Lack of an Efficient Market for Determining Interest Rate**

72. I believe the financing markets are currently in disarray and thus provide little guidance as to the interest rate an efficient market would produce under the New Credit Facility. There is no uniformity or predictability in the markets currently that can be applied to determine a market rate of interest under the New Credit Facility.

73. There are a number of widely reported events within the financial markets (e.g., Lehman, AIG, Fannie Mae, Freddie Mac, Washington Mutual, etc.) that have caused disarray in the capital markets and that support my opinion that there is no efficient market at this time by which to analyze Debtors' requested financing.

a. In addition, recent events surrounding CIT Group underscored the lack of capital available for middle market companies. CIT Group warned in October of 2009 that it may need to file bankruptcy due to its financial difficulties. CIT Group is the largest bank specializing in the financing of US businesses and focuses on providing loans to small and medium sized businesses. While struggling with its financial problems, CIT Group's participation in the financing of small and medium sized businesses has suffered significantly. Furthermore, over 98 banks have failed to date in 2009 as noted by the FDIC, many of which are regional institutions that have been an important source of loans to small and medium sized businesses.

b. The fallout of the financial market turmoil has been a freezing of the capital available for many companies, particularly for mid-sized, single B rated companies such as Eurofresh. For example, for the 5 year period from 2003 to 2007, S&P tracked issuance of single-B leveraged loans at 286 new loans issued on average per year, reaching a high of 428 in 2007. During 2008 only 73 such loans (or 26% of average) were issued and for the first half of 2009 only 12 such loans were issued (or 8% of average on an annualized basis).

c. At the same time the new issuance market has been on life support, secondary trading levels for many mid-sized single-B rated loans have been depressed as a result of many factors, including the reduction in the supply of capital available to lend to such companies. These issues have manifested themselves in the form of highly volatile secondary market trading levels and the resulting implied interest rates on such loans.

**B.      Comparison of Risk at March of 2008 and Post-Emergence**

74.    Because there is no efficient market from which to determine the interest rate under the New Credit Facility, I considered the interest rate that would adequately compensate Silver Point for the time value of its money along with the risk it will take on as Reorganized Eurofresh's first lien secured lender under the New Credit Facility.

75.    A comparison of the financial condition of the Company at the time the Existing Credit Documents were executed in March of 2008 and at emergence under the Plan (assumed to be October 30, 2009) illustrates that Silver Point's risk at emergence is lower than at the time the Existing Credit Agreement Documents were entered into.

a. <u>March of 2008</u>:

1. In March of 2008, immediately prior to entering into the Credit Agreement with Silver Point, the Company carried a high amount of debt. Including the anticipated loans from Silver Point, the

Company had approximately $299.5 million of interest bearing debt, including the aggregate commitments under the anticipated revolving credit facility to be provided by Silver Point under the Existing Credit Agreement and the face amount of the Discount Notes.

2. The Company's total projected secured debt,[2] including anticipated availability under the revolving credit facility at March 2008, was $84.9 million. *Id.*

3. Also at that time, Silver Point forecasted that annual cash interest debt service for FY2008 would be $27.2 million. *Id*. at p. 47 (under "Cash Interest").

4. Silver Point forecasted the Company's adjusted EBITDA [3] for FY2008 to be $24.5 million ("**Silver Point's Projected FY2008 Adjusted EBITDA**"). *Id*. (under "Adjusted EBITDA").

5. Applying a 6.0x [4] multiple to Silver Point's Projected FY2008 Adjusted EBITDA resulted in a fair market valuation of the Company in March of 2008 was $147 million.

6. In March 2008, the Company's total debt (including the aggregate commitments under the anticipated revolving credit facility to be provided by Silver Point) to fair market valuation [5] was approximately 204%. The Company's interest coverage ratio[6] was approximately 0.9x, meaning that the Company paid more in annual debt service than Silver Point projected the Company's adjusted EBITDA to be. The Company's total interest bearing debt leverage[7] was approximately 12.2x Silver Point's Projected FY2008 Adjusted EBITDA. The Company's total secured debt leverage [8] was approximately 3.5x Silver Point's Projected FY2008 Adjusted

---

[2] For the purposes of this declaration, secured debt is defined to be that debt owed by the Company to Silver Point, or other lenders, under the Existing Credit Agreement Documents.

[3] Earnings before interest, taxes, depreciation and amortization adjusted to add back certain non-cash and non-recurring items.

[4] 6.0x multiple as noted as the low point used in Silver Point's Investment Committee Presentation March 2008 for loan to value analysis.

[5] Arrived at by dividing total debt (including the unused revolving credit facility under the Existing Credit Agreement and Discount Notes) by total fair market valuation using 6.0x EBITDA valuation multiple.

[6] Silver Point's Projected FY2008 Adjusted EBITDA divided by annual debt service. Numbers below 1.0x have higher annual debt service than adjusted EBITDA.

[7] Total interest bearing debt divided by Silver Point's Projected FY2008 adjusted EBITDA. Total interest bearing debt includes the Discount Notes, which would go cash pay in July 2010

[8] The amount of Silver Point's loans to the Company, inclusive of available but undrawn amounts under the revolving credit facility, divided by adjusted EBITDA.

EBITDA. The Company's secured debt loan-to-value [9] was approximately 58%. *See* Comparison Chart Regarding Silver Point Risk included as Exhibit 84 in the Exhibit Binder.

b. Projections at emergence:

1. Under the Plan, Reorganized Eurofresh will emerge with $61.1 million [10] of amended loans under the New Credit Facility. Reorganized Eurofresh's total capitalization at emergence will be $108.2 million.

2. Annual cash interest debt service for 2010 is projected to be $4.9 million under the Plan, compared with expected cash interest of $26.8 million in 2010 as projected in the Silver Presentation. Silver Point Presentation at p. 47 (under "Cash Interest").

3. The Debtors project adjusted EBITDA [11] to be $18.9 million for the full year ending December 31, 2009 ("**Eurofresh Projected 2009 Adjusted EBITDA**").

4. Applying a 6.0x [12] multiple to Eurofresh Projected 2009 Adjusted EBITDA, at emergence the fair market value of Reorganized Eurofresh would be $113.4 million. This is different than Edward McDonough's valuation analysis due to the fact that a 6.0x multiple is consistent with the methodology used by Silver Points loan to value analysis as prepared in Silverpoint's Investment Committee Presentation

5. At emergence, Reorganized Eurofresh's cash interest bearing debt [13] to fair market value ratio will be 57%—significantly lower than at March 2008 which was 204%. The interest coverage ratio at emergence will be a much improved 3.8x, meaning that for the first time since Silver Point issued loans to the Debtors, Reorganized Eurofresh will have an adjusted EBITDA that is higher than its annual debt service. Reorganized Eurofresh's total interest bearing debt leverage at emergence will be approximately 3.4x Eurofresh using Projected FY 2009 Adjusted EBITDA, again, much improved over the prior comparison period. Reorganized Eurofresh's secured

---

[9] The amount of Silver Point's loans to the Company, inclusive of available but undrawn amount under the revolving credit facility, divided by fair market value of the Company using 6.0x EBITDA valuation multiple.

[10] Does not include Class 1B Capital Lease Claims.

[11] Earnings before interest, taxes, depreciation and amortization adjusted to add back certain non-cash and non-recurring items such as restructuring expenses.

[12] 6.0x multiple as noted as the low point used in Silver Point's Investment Committee Presentation March 2008 for loan to value analysis.

[13] Reorganized Eurofresh's cash interest bearing debt includes all obligations under the Existing Credit Agreement Documents.

> debt leverage at emergence will also be 3.2x Eurofresh Projected FY 2009 Adjusted EBITDA (as compared to 3.5x in March-2008). Finally, Reorganized Eurofresh's secured debt loan-to-value will be approximately 54% at emergence as compared to 58% in March-2008. *See* Comparison Chart Regarding Silver Point Risk

76.     In addition, Reorganized Eurofresh will emerge with over $210 million[14] less in cash interest bearing unsecured bond debt than it had when Silver Point first made loans to the Debtors under the Existing Credit Agreement Documents. Reducing debt by over $210 million will reduce annual interest payments by over $26 million and result in Reorganized Eurofresh being better able to pay its annual debt service and to repay Silver Point.

77.     Also, Silver Point's position will be protected by covenants under the New Credit Facility that are similar to covenants Silver Point has under the Existing Credit Agreement. In particular:

    a. Total Net Leverage under the New Credit Facility may not exceed 5.0x, while under the Existing Credit Agreement, total leverage could be as high 14.76x.

    b. Maximum Capital Expenditures under the New Credit Facility is $7.0 million. Though that is higher than the maximum capital expenditures allowance under the Existing Credit Agreement, Silver Point is adequately protected by the maximum allowance of $7.0 million as such amount, if invested in the business, will be spent to enhance the value of the collateral to which Silver Point has a lien.

    c. Under the New Credit Facility, Reorganized Eurofresh remains obligated to provide an excess cash flow sweep. Under the New Credit Facility, the mandatory excess cash flow sweep is 50%.

    d. The Minimum Adjusted EBITDA covenant in the Existing Credit Agreement has been removed in the Amended Credit Agreement; however, EBITDA is the denominator in the Total Net Leverage Covenant and therefore is implicitly monitored through this covenant contained in the New Credit Facility. In addition, the New Credit Facility contains negative covenants that restrict the Company's ability to incur additional cash interest bearing indebtedness beyond that outstanding at Emergence thus providing protection to the Lenders.

---

[14] Figure includes Discount Notes which go cash pay in July of 2010 at face value.

78.     I believe that, while the modifications to the select financial covenants in the New Credit Facility will provide increased flexibility to Reorganized Eurofresh, they are appropriate given the significant de-leveraging, secured debt pay-down and removal of lender exposure to the unfunded revolving credit facility provided under the Existing Credit Agreement, all as contemplated under the Plan, as such elements significantly enhance the protection of Silver Point under the New Credit Facility.

79.     I understand that Silver Point has complained that the debt to capitalization ratio of 83% under the Plan is "too high for a business with such volatile earnings as evidenced by historical performance and management's own admission of the volatility of said earnings, and is beyond the level of debt to capitalization accepted by the market today for going concern leveraged companies." *Objection of Silver Point to Confirmation of First Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the Bankruptcy Code* at p. 39). The debt to capitalization ratio of 82% in March of 2008 lacks any substantive difference from the projected 83% debt to capitalization ratio at emergence under the Plan. Importantly, included in this 83% ratio under the Plan are the Subordinated PIK Notes and Subordinated PIK A Notes, which do not bear any cash interest and, but for the Subordinated PIK A Notes, mature later than the New Credit Facility. Therefore no cash flow outside of the approximately $5 million upon maturity of Subordinated PIK A Notes is required to service this debt. As such a more appropriate figure to evaluate and compare on a relative basis is the Reorganized Debtors' cash interest bearing debt + Subordinated PIK A Notes to capitalization ratio at emergence, which is 64% as compared to the 82% figure of March 2008 and the skewed 83% number of which Silver Point complains. This represents a significant improvement. As a result, I do not view the debt to capitalization ratio of Reorganized Eurofresh as indicating any degree of increased risk to Silver Point.

C.      **Interest Rate and Risk Premium Range**

80.      I have considered the same factors that Silver Point considered in its March 2008 Investment Committee Memorandum and March 2009 Business Overview and conclude that those factors show a decreased risk to Silver Point at emergence as compared to when Silver Point first made the loans.

81.      For purposes of this Declaration, I have assumed that Silver Point had valid reasons upon which to charge the Debtors a 10.75% interest rate at the time it agreed to make loans under the Existing Credit Documents in March of 2008.  In fact, however, I believe it is likely the 10.75% interest rate Silver Point charged the Debtors under the Existing Credit Documents was opportunistic.  My basis for this is that I understand that, at the time Silver Point offered to provide financing to the Debtors, the Debtors were in need of refinancing and were facing a mandatory $10 million pay down to its existing lenders if they failed to find refinancing, which funds the Debtors did not have.  In addition, Silver Point had a $1 million break up fee if the Debtors rejected its proposed loans and refinanced with another entity.  Because of the break up fee, the mandatory payment required by the Debtors' prior lenders, and the Debtors' financial condition in March of 2008, it is likely Silver Point was able to charge a higher than market rate for the March 2008 refinancing.

82.      Based on my analysis, consideration of the Silver Point financing in March of 2008 and the projections at emergence, I conclude that an interest rate of the 5 year U.S. Treasury Note rate plus a range (the "**Risk Premium Range**") of 400 to 600 basis points ("**bps**") is a reasonable and appropriate interest rate that adequately represents the risk Silver Point will bear under the New Credit Facility.

## D. Limited Market Data Regarding Comparable Companies Supports the Risk Premium Range

83.     Although I do not believe there is an efficient market from which I can discern what a free market loan, such as the one anticipated in the Plan, would be, I believe that recent secured financing activities by entities within the Debtors' industry (agriculture) provide support for the Risk Premium Range.

      a.   <u>Village Farms</u> - In June of 2009, Village Farms—the Debtors' closest competitor—reset the interest rate on its U.S. secured loan due to its failure to meet its minimum debt service coverage ratio. This transaction would be the most similar transaction from which I could discern what the market rate of interest would likely be under the Amended and Restated Credit Agreement. Village Farms' amendment raised the rate of its U.S. Capital Loan to LIBOR + 325 bps (approximately 3.5%), representing a 115 bps spread to the 5 year U.S. Treasury Note. Currently, Village Farms has a secured debt to LTM EBITDA leverage ratio of approximately 6.1x and a secured debt loan to value ratio of 75%.

      b.   <u>Dole Foods Company</u> - Dole Food Company recently closed a $315.0 million junior secured bond offering priced at 8.0%. Dole Food Company's junior secured offering represents a 562 bps spread to the 5 year U.S. Treasury Note. The Notes have the benefit of a lien on certain U.S. assets of Dole and its U.S. subsidiaries that is junior to the liens of Dole's senior secured credit facilities. In addition the Notes do not carry any financial covenants. Dole Food Company's Total Debt to LTM EBITDA leverage ratio is approximately 3.5x and its Secured Debt to LTM EBITDA leverage ratio is approximately 4.6x.

      c.   <u>Comparison to Reorganized Eurofresh</u> - At emergence, Reorganized Eurofresh's secured debt to Eurofresh Projected FY2009 Adjusted EBITDA will be leveraged 3.2x (compared to 6.1x for Village Farms and 3.5x for Dole Food Company) and, based on a 6x multiplier, Reorganized Eurofresh will have a 54% secured debt loan-to-value ratio (compared to 75% for Village Farms). At emergence, Reorganized Eurofresh's Total Debt to Eurofresh Projected FY 2009 Adjusted EBITDA leverage ratio will be 4.7x which includes non-cash interest bearing debt (versus 6.1x for Village Farms and 4.6x for Dole Food).

84.     I note that the low end of the Risk Premium Range is approximately 285 basis points ("**bps**") higher than the interest rate paid by Village Farms on the recently re-priced U.S. Secured Loan, the Debtors most comparable competitor. Village Farms suffers from meaningfully worse credit statistics as compared to the Reorganized Debtors and was recently

forced to reset the interest rates on this debt security as a result of a covenant failure in June of 2009.  Further, I note that the high end of the Risk Premium Range is 38 bps higher than the interest rate of the recent secured financing closed by Dole Foods, which issued an 8% secured bond in September of 2009.   In other words, if the interest rate proposed under the New Credit Facility (T + 500) is approved, Reorganized Eurofresh will be paying a substantially higher interest rate than Village Farms on its U.S. Loan and only slightly less than Dole Food Company junior secured offering, while having substantially lower leverage ratios than Village Farms and comparable leverage ratios to Dole Food Company.

Dated this 7th day of October, 2009.

_____/s/ Marc Liebman_____
Name:   Marc Liebman
Title:    Managing Director
