Craig D. Hansen (AZ Bar No. 007405) chansen@ssd.com
Bradley A. Cosman (AZ Bar No. 026223) bcosman@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
Two Renaissance Square, Suite 2700
40 North Central Avenue
Phoenix, Arizona 85004-4498
(602) 528-4000

and

Kristin E. Richner (OH Bar No. 0078582) krichner@ssd.com
Nicholas J. Brannick (OH Bar No. 0079642) nbrannick@ssd.com
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-2700

Counsel to Debtors and Debtors-In-Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Case No. 2:09-bk-07970-CGC |
| | (Jointly Administered) |
| EUROFRESH, INC. *et al* | |
| | Chapter 11 |
| Debtors. | |
| | **NOTICE OF FILING OF THIRD PLAN SUPPLEMENT** |

    **PLEASE TAKE NOTICE THAT** EUROFRESH, INC. and EUROFRESH PRODUCE, LTD., (the "**Debtors**"), debtors and debtors-in-possession in the above-captioned Chapter 11 cases, hereby file their Third Supplement (the "**Third Plan Supplement**") in conjunction with the "Debtors' First Amended Joint Plan Of Reorganization under Chapter 11 of the United States Bankruptcy Code" [Docket No. 379] (the "**Plan**") and the "First Amended Disclosure Statement in Support of Debtors' First Amended Joint Plan Of Reorganization" [Docket No. 380] (the "**Disclosure Statement**").

    The Third Plan Supplement includes the following documents (as these terms are defined in the Plan):

| Exh. 1 | Certificate of Incorporation – Eurofresh Holding Company, Inc. |
| Exh. 2 | Bylaws – Eurofresh Holding Company, Inc. |
| Exh. 3 | Third Amended and Restated Certificate of Incorporation - Reorganized Eurofresh (redline version) |
| Exh. 4 | Amended and Restated Bylaws - Reorganized Eurofresh (redline version) |
| Exh. 5 | Amended and Restated Bylaws – Eurofresh Produce, Ltd. (redline version) |
| Exh. 6 | Eurofresh Management Incentive Plan (redline version) |
| Exh. 7 | Certificate of Designation - Eurofresh Holding Company, Inc. Preferred Stock (redline version) |
| Exh. 8 | Reserved Shares Trust Agreement (redline version) |
| Exh. 9 | Stockholders Agreement (redline version) |
| Exh. 10 | Eurofresh Subordinated PIK Note Purchase Agreement (clean version) |
| Exh. 11 | Eurofresh Subordinated PIK Note Purchase Agreement (redline version) |
| Exh. 12 | Credit and Guaranty Agreement (clean version) |
| Exh. 13 | Credit and Guaranty Agreement (redline version) |

Parties wishing to view the Third Plan Supplement may access the Debtors' web-site at http://www.kccllc.net/EuroFresh.  If you are a registered PACER user, the Third Plan Supplement may be obtained electronically at www.azb.uscourts.gov.  Should you have any additional questions or concerns, please contact Kurtzman Carson Consultants LLC ("**KCC**"), the Debtors' proposed claims, noticing and solicitation agent, toll-free at 866-381-9100.

Dated this 27th day of October, 2009.

**SQUIRE, SANDERS & DEMPSEY L.L.P.**

By: ___*/s/ Craig D. Hansen*_____

     Craig D. Hansen
     Bradley A. Cosman

Two Renaissance Square
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004-4498
(602) 528-4000

- and -

Kristin E. Richner (OH Bar No. 0078582)
Nicholas J. Brannick (OH Bar No. 0079642)
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215

*Counsel to Debtors and Debtors-in-Possession*

<u>EXHIBIT 1</u>

Certificate of Incorporation – Eurofresh Holding Company, Inc.

# CERTIFICATE OF INCORPORATION

# OF EUROFRESH HOLDING COMPANY, INC.

## ARTICLE ONE

The name of the corporation is Eurofresh Holding Company, Inc. (hereinafter called the "Corporation").

## ARTICLE TWO

The address of the Corporation's registered office in the state of Delaware is 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is Corporation Service Company.

## ARTICLE THREE

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

## ARTICLE FOUR

A.      AUTHORIZED SHARES.

The total number of shares of capital stock which the Corporation has authority to issue is 25,000,000, consisting of:

1.      20,000,000 shares of common stock, par value $0.001 per share (the "Common Stock"); and

2.      5,000,000 shares of preferred stock, par value $0.001 per share (the "Preferred Stock").

The shares of the preferred stock of the Corporation authorized in this Section A(2) may be issued from time to time in one or more series, each of which series shall have such distinctive designations and number of shares as shall be fixed by the board of directors of the Corporation prior to the issuance of any shares thereof. Each such series of preferred stock shall have such voting powers, full or limited, and such preferences and relative, participating, optional or other special rights, and such qualifications, limitations or restrictions, as shall be stated in such resolution or resolutions providing for the issue of such series of preferred stock as may be adopted from time to time by the board of directors of the Corporation prior to the issuance of any shares thereof pursuant to the authority hereby expressly vested in it, all in accordance with the laws of the State of Delaware.

3.     In addition to any other consent or approval which may be required pursuant to this Certificate of Incorporation or by law, no amendment or waiver of any provision of this Article Four shall be effective without the prior approval of the holders of a majority of the then outstanding Common Stock, voting as a single class.  For purposes of votes on amendments and waivers to this Section A(3), each share of capital stock shall be entitled to one vote.

## ARTICLE FIVE

The name and mailing address of the Corporation is as follows:

Eurofresh Holding Company, Inc.
26050 South Eurofresh Avenue
Willcox, Arizona 85643

## ARTICLE SIX

The name and mailing address of the sole incorporator are as follows:

Jan Pouncey                          40 N. Central Avenue, Suite 2700
                                     Phoenix, AZ 85004

All powers, duties and responsibilities of the sole incorporator shall terminate upon filing this Certificate of Incorporation with the Secretary of State of the State of Delaware.

## ARTICLE SEVEN

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors of the Corporation is expressly authorized to adopt, make, repeal, alter, amend and rescind the by-laws of the Corporation, except as may otherwise be provided in such by-laws.

## ARTICLE EIGHT

The Corporation expressly elects not to be governed by Section 203 of the General Corporation Law of the State of Delaware.

## ARTICLE NINE

The Corporation shall indemnify each person identified in Section 145(a) and (b) of the Delaware General Corporation Law, as the same exists or may hereafter be amended, to the fullest extent permissible under those subsections or the indemnification provisions of any successor or amended statute or to such greater extent as provided in the Bylaws of the Corporation or by agreement.

## ARTICLE TEN

To the fullest extent permitted by the Delaware General Corporation Law, as the same exists or may hereafter be amended, a director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for a breach of fiduciary duty as a director. This Article Ten shall not eliminate or limit the liability of a director for any conduct described in Section 102(b)(7)(i) through (iv) of the Delaware General Corporation Law. Any repeal or modification of this Article Ten shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification and shall not increase the liability of a director of the Corporation arising out of acts or omissions occurring before the repeal or modification becomes effective.

## ARTICLE ELEVEN

The Board of Directors of the Corporation initially shall be comprised of five (5) members, which number may be amended and altered from time to time as provided in the Bylaws of the Corporation. The names and mailing addresses of the initial Board of Directors of the Corporation, who shall serve as directors until the first annual meeting of the stockholders or until their successors are elected and qualify, are:

| | |
|---|---|
| Johan van den Berg | c/o Eurofresh Holding Company, Inc. 26050 South Eurofresh Avenue Willcox, Arizona 85643 |
| Scott E. Komar | c/o Eurofresh Holding Company, Inc. 26050 South Eurofresh Avenue Willcox, Arizona 85643 |
| Charles T. Lanktree | c/o Eurofresh Holding Company, Inc 26050 South Eurofresh Avenue Willcox, Arizona 85643 |
| David R. Jessick | c/o Eurofresh Holding Company, Inc. 26050 South Eurofresh Avenue Willcox, Arizona 85643 |
| Scott W. Meader | c/o Eurofresh Holding Company, Inc. 26050 South Eurofresh Avenue Willcox, Arizona 85643 |

## <u>ARTICLE TWELVE</u>

The Corporation reserves the right to amend or repeal any provisions contained in this Certificate of Incorporation from time to time and at any time in the manner now or hereafter prescribed by the laws of the State of Delaware, and all rights conferred upon stockholders and directors are granted subject to such reservation.

THE UNDERSIGNED, being the sole incorporator hereinbefore named, for the purpose of forming a corporation pursuant to the General Corporation Law of the State of Delaware, does make this Certificate, hereby declaring and certifying that this is my act and deed and the facts herein stated are true, and accordingly have hereunto set my hand this __ day of _____, 2009.

**SOLE INCORPORATOR:**

_____

Jan Pouncey

<u>EXHIBIT 2</u>

Bylaws – Eurofresh Holding Company, Inc.

EUROFRESH HOLDING COMPANY, INC.

* * * * * *

BYLAWS

# Eurofresh Holding Company, Inc.

\* \* \* \* \*

## BYLAWS

\* \* \* \* \*

## ARTICLE I

Offices

SECTION 1.  Registered Office.  The registered office shall be in the City of Wilmington, County of New Castle, State of Delaware.

SECTION 2.  Other Offices.  Eurofresh Holding Company, Inc. (the "*Corporation*") may also have offices at such other places both within and without the State of Delaware as the Board of Directors of the Corporation (the "*Board of Directors*") may from time to time determine or the business of the Corporation may require.

## ARTICLE II

Stockholders

SECTION 1.  Annual Meetings.  If required by applicable law, the annual meeting of Stockholders, as defined below, of the Corporation for the election of directors and for the transaction of such other business as may properly come before the meeting shall be held each year at such date and time, within or without the State of Delaware, as the Board of Directors of the Corporation shall determine.

SECTION 2.  Special Meetings.  Special meetings of stockholders of the Corporation (the "*Stockholders*") for the transaction of such business as may properly come before the meeting may be called by order of the Chairman of the Board of Directors, the Chief Executive Officer, the President, a majority of the directors then in office or at the request, in writing, of stockholders owning a majority in amount of the entire capital stock of the Corporation issued and outstanding and entitled to vote.  Such request shall state the purpose or purposes of the proposed meeting and business transacted at any special meeting shall be limited to the purposes stated in the notice thereof.  The special meeting shall be held at such date and time, within or without the State of Delaware, as may be specified by such order.

SECTION 3.  Notice of Meetings.  Whenever Stockholders are required or permitted to take any action at a meeting, a notice of the meeting shall be given that shall state the place, if any, date and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called.  Unless otherwise provided by law, the Certificate of Incorporation of the Corporation (as amended from time to time, including the terms of any certificate of designation of any series of preferred stock of the Corporation, the "*Certificate*") or these Bylaws (as amended from time to time, these "*Bylaws*"), the notice of any meeting shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each

1

Stockholder entitled to vote at such meeting. If mailed, such notice shall be deemed to be given when deposited in the United States mail, postage prepaid, directed to the Stockholder at such Stockholder's address as it appears on the records of the Corporation.

Notice may also be given to stockholders by a form of electronic transmission in accordance with and subject to the provisions of Section 232 of the General Corporation Law of Delaware.

SECTION 4.    Stockholder Lists.  The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least 10 days before every meeting of Stockholders, a complete list of the Stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each Stockholder and the number of shares registered in the name of each Stockholder.  Such list shall be open to the examination of any Stockholder, for any purpose germane to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held.  The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any Stockholder who is present.

The stock ledger shall be the only evidence as to who are the Stockholders entitled to examine the stock ledger, the list required by this section or the books of the Corporation, or to vote in person or by proxy at any meeting of Stockholders.

SECTION 5.    Quorum.  Except as otherwise provided by law, the Certificate or these Bylaws, a quorum for the transaction of business at any meeting of Stockholders shall consist of the holders of record of a majority of the issued and outstanding shares of the capital stock of the Corporation entitled to vote at the meeting, present in person or by proxy.  If there be no such quorum, the holders of a majority of such shares so present or represented may adjourn the meeting from time to time, without further notice, until a quorum shall have been obtained.  When a quorum is once present it is not broken by the subsequent withdrawal of any Stockholder.

SECTION 6.    Organization.  Meetings of Stockholders shall be presided over by the Chairman, if any, or if none or in the Chairman's absence the Chief Executive Officer, if any, or if none or in the Chief Executive Officer's absence the President, if any, or if none or in the President's absence a Vice-President, or, if none of the foregoing is present, by a chairman to be chosen by the Stockholders entitled to vote who are present in person or by proxy at the meeting. The Secretary of the Corporation, or in the Secretary's absence an Assistant Secretary, shall act as secretary of every meeting, but if neither the Secretary nor an Assistant Secretary is present, the presiding officer of the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 7.    Voting; Proxies; Required Vote.

(a)    At each meeting of Stockholders, every Stockholder shall be entitled to vote in person or by proxy appointed by instrument in writing, subscribed by such Stockholder or by such Stockholder's duly authorized attorney-in-fact (but no such proxy shall be voted or acted

2

upon after three years from its date, unless the proxy provides for a longer period), and, unless the Certificate provides otherwise, shall have one vote for each share of stock entitled to vote registered in the name of such Stockholder on the books of the Corporation on the applicable record date fixed pursuant to these Bylaws. A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A Stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary of the Corporation a revocation of the proxy or a new proxy bearing a later date. At all elections of directors the voting may but need not be by ballot and a plurality of the votes cast there shall elect. Except as otherwise required by law, the Certificate or these Bylaws, any other action shall be authorized by a majority of the votes cast.

(b) Unless otherwise provided in the certificate of incorporation, any action required to be taken at any annual or special meeting of stockholders of the corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing. Stockholders may, unless the certificate of incorporation otherwise provides, act by written consent to elect directors; provided, however, that if such consent is less than unanimous, such action by written consent may be in lieu of holding an annual-meeting only if all of the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action.

SECTION 8. <u>Adjournments</u>. Any meeting of Stockholders, annual or special, may adjourn from time to time to reconvene at the same or some other place, and, subject to the second succeeding sentence, notice need not be given of any such adjourned meeting if the time, date and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, notice of the adjourned meeting shall be given to each Stockholder of record entitled to vote at the meeting.

**ARTICLE III**

<u>Board of Directors</u>

SECTION 1. <u>General Powers</u>. The business, property and affairs of the Corporation shall be managed by, or under the direction of, the Board of Directors, who may exercise all the powers of the Corporation except as otherwise provided by law, the Certificate or these Bylaws.

(a) <u>Qualification; Number; Term; Remuneration</u>. Each director shall be at least 18 years of age. A director need not be a Stockholder, a citizen of the United States, or a

resident of the State of Delaware. The number of directors, which shall be not less than three (3) nor more than seven (7), shall be determined, from time to time, by resolution of the Board of Directors or by the vote of the Stockholders of the Corporation. The directors shall be elected at the annual meeting of Stockholders by such Stockholders as have the right to vote on such election as set forth in the Certificate. Each director shall hold office until his successor is elected and qualified. The use of the phrase "entire Board" herein refers to the total number of directors which the Corporation would have if there were no vacancies.

Immediately following the adoption of these Bylaws, the Board of Directors shall consist of five (5) members. The initial members of the Board of Directors following the adoption of these Bylaws shall be:

> Johan van den Berg;
> Scott E. Komar;
> Charles T. Lanktree;
> David R. Jessick; and
> Scott W. Meader, Chairman.

(b)     Unless otherwise restricted by the Certificate or these Bylaws, the Board of Directors shall have the authority to fix the compensation of directors. Directors may be paid reimbursement of their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated compensation as director. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

SECTION 2.    Quorum and Manner of Voting. Except as otherwise provided by law, the Certificate or these Bylaws, a majority of the directors then in office shall constitute a quorum. A majority of the directors present, whether or not a quorum is present, may adjourn a meeting from time to time to another time and place without notice. Except as otherwise provided by law, the Certificate or these Bylaws, the vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

SECTION 3.    Places of Meetings. Meetings of the Board of Directors may be held at any place within or without the State of Delaware, as may from time to time be fixed by resolution of the Board of Directors, or as may be specified in the notice of meeting.

SECTION 4.    Regular Meetings. Regular meetings of the Board of Directors shall be held at such times and places as the Board of Directors shall from time to time by resolution determine.

SECTION 5.    Special Meetings. Special meetings of the Board of Directors shall be held whenever called by the Chairman of the Board, Chief Executive Officer, President or by a majority of the directors then in office.

SECTION 6.    Notice of Meetings. A notice of the place, date and time and the purpose or purposes of each meeting of the Board of Directors shall be given to each director by

mailing the same at least five (5) days before the meeting, or by telephoning the same or by delivering the same personally or by electronic or facsimile transmission not later than two (2) days before the meeting.

SECTION 7. Organization. At all meetings of the Board of Directors, the Chairman, if any, or if none or in the Chairman's absence or inability to act, a chairman chosen by the directors, shall preside. The Secretary of the Corporation shall act as secretary at all meetings of the Board of Directors when present, and, in the Secretary's absence, the presiding officer may appoint any person to act as secretary.

SECTION 8. Resignation. Any director may resign at any time upon written notice to the Corporation and such resignation shall take effect upon receipt thereof by the Chief Executive Officer, President or Secretary, unless otherwise specified in the resignation.

SECTION 9. Vacancies. Unless otherwise provided in these Bylaws, vacancies on the Board of Directors, whether caused by resignation, death, disqualification, removal, an increase in the authorized number of directors or otherwise, may be filled by the affirmative vote of a majority of the remaining directors, although less than a quorum, or by a sole remaining director, or at a special meeting of the Stockholders, by the holders of shares entitled to vote for the election of directors. A director elected to fill a vacancy shall be elected for the unexpired term of his or her predecessor in office, and a director chosen to fill a position resulting from an increase in the number of directors shall hold office until the next election of the class for which such director shall have been chosen, subject to the election and qualification of his or her successor and to his or her earlier death, resignation or removal.

SECTION 10. Action by Written Consent. Unless otherwise provided by law, the Certificate or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors may be taken without a meeting if all the directors consent thereto in writing or electronic transmission, and the writing or writings or electronic transmission or electronic transmissions are filed with the minutes of proceedings of the Board of Directors.

SECTION 11. Meetings by Telephone Conference Calls. The Board of Directors or any members of any committee of the Board of Directors designated by the directors may participate in a meeting of the Board of Directors or such committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other. Participation by such means shall constitute presence in person at such meeting.

SECTION 12. Removal. Unless otherwise restricted by the Certificate or by law, any director or the entire board of directors may be removed, with or without cause, by the holders of a majority of shares entitled to vote at an election of directors.

**ARTICLE IV**

Committees

SECTION 1. Appointment. Unless otherwise provided by law, the Certificate or these Bylaws, from time to time the Board of Directors may appoint by resolution any

committee or committees comprised of one or more directors for any purpose or purposes, to the extent lawful, which shall have powers as shall be determined and specified by the Board of Directors in the resolution of appointment.

SECTION 2.　__Procedures, Quorum and Manner of Acting__.　Each committee shall fix its own rules of procedure, and shall meet where and as provided by such rules or by resolution of the Board of Directors.　Except as otherwise provided by law, the presence of a majority of the then-appointed members of a committee shall constitute a quorum for the transaction of business by that committee, and in every case where a quorum is present the affirmative vote of a majority of the members of the committee present shall be the act of the committee.　Each committee shall keep minutes of its proceedings, and actions taken by a committee shall be reported to the Board of Directors.

SECTION 3.　__Action by Written Consent__.　Any action required or permitted to be taken at any meeting of any committee of the Board of Directors may be taken without a meeting if all the members of the committee consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the committee.

SECTION 4.　__Term; Termination__.　In the event any person shall cease to be a director of the Corporation, such person shall simultaneously therewith cease to be a member of any committee appointed by the Board of Directors.

**ARTICLE V**

Officers

SECTION 1.　__Election and Qualifications__.　The Board of Directors shall elect the officers of the Corporation, which shall include a President and a Secretary, and may include, by election or appointment, a Chief Executive Officer, one or more Vice-Presidents (any one or more of whom may be given an additional designation of rank or function), a Treasurer and such Assistant Secretaries, such Assistant Treasurers and such other officers as the Board of Directors may from time to time deem proper.　Each officer shall have such powers and duties as may be prescribed by these Bylaws and as may be assigned by the Board of Directors, the Chief Executive Officer, or the President.

SECTION 2.　__Term of Office and Remuneration__.　The term of office of all officers shall be as determined from time to time by the Board of Directors and until their respective successors have been elected and qualified, but any officer may be removed from office, either with or without cause, at any time by the Board of Directors.　Any vacancy in any office arising from any cause may be filled for the unexpired portion of the term by the Board of Directors.　The remuneration of all officers of the Corporation may be fixed by the Board of Directors or in such manner as the Board of Directors shall provide.

SECTION 3.　__Resignation; Removal__.　Any officer may resign at any time upon written notice to the Corporation and such resignation shall take effect upon receipt thereof by the Chief Executive Officer, President or Secretary, unless otherwise specified in the resignation.

6

Any officer shall be subject to removal, with or without cause, at any time by vote of a majority of the entire Board.

Except as the Board of Directors may otherwise determine, no officer who resigns or is removed shall have any right to any compensation as an officer for any period following his or her resignation or removal, or any right to damages on account of such removal, whether his of her compensation be by the month or by the year or otherwise, unless such compensation is expressly provided in a duly authorized written agreement with the Corporation.

SECTION 4.    Chairman of the Board.    The Chairman of the Board of Directors, if there be one, shall preside at all meetings of the Board of Directors and shall have such other powers and duties as may from time to time be assigned by the Board of Directors.

SECTION 5.    Chief Executive Officer.    The chief executive officer shall have such duties as customarily pertain to that office, including the implementation of the policies of the Corporation as determined by the Board of Directors, and shall have such other authority as from time to time may be assigned by the Board of Directors.

SECTION 6.    President.    The President shall have such duties as customarily pertain to that office, including the general management and supervision of the property, business and affairs of the Corporation and shall have such other authority as from time to time may be assigned by the Board of Directors.

SECTION 7.    Vice-President.    A Vice-President, if there shall be one, may execute and deliver in the name of the Corporation contracts and other obligations and instruments pertaining to the regular course of the duties of said office, and shall have such other authority as from time to time may be assigned by the Board of Directors, the President or the Chief Executive Officer.

SECTION 8.    Treasurer.    The Treasurer, if there shall be one, shall in general have all duties incident to the position of Treasurer and such other duties as may be assigned by the Board of Directors, the President or the Chief Executive Officer.

SECTION 9.    Secretary.    The Secretary shall in general have all the duties incident to the office of Secretary and such other duties as may be assigned by the Board of Directors, the President or the Chief Executive Officer.

SECTION 10.    Assistant Officers.    Any assistant officer shall have such powers and duties of the officer such assistant officer assists as such officer or the Board of Directors shall from time to time prescribe.

**ARTICLE VI**

Books and Records

SECTION 1.    Location.    The books and records of the Corporation may be kept at such place or places within or outside the State of Delaware as the Board of Directors or the respective officers in charge thereof may from time to time determine.    The record books

containing the names and addresses of all Stockholders, the number and class of shares of stock held by each and the dates when they respectively became the owners of record thereof shall be kept by the Secretary as prescribed in the Bylaws and by such officer or agent as shall be designated by the Board of Directors.

SECTION 2.   Addresses of Stockholders.   Notices of meetings and all other corporate notices may be delivered personally or mailed to each Stockholder at the Stockholder's address as it appears on the records of the Corporation.

SECTION 3.   Fixing Date for Determination of Stockholders of Record.

(a)   In order that the Corporation may determine the Stockholders entitled to notice of or to vote at any meeting of Stockholders or any adjournment thereof, the Board of Directors may fix a record date which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting.  If no record date is fixed by the Board of Directors, the record date for determining Stockholders entitled to notice of or to vote at a meeting of Stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

(b)   In order that the Corporation may determine the Stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the Stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date which record date shall be not more than sixty (60) days prior to such action.  If no record date is fixed, the record date for determining Stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

## ARTICLE VII

### Certificates Representing Stock

SECTION 1.   Certificates; Signatures.   The shares of the Corporation shall be represented by certificates or shall be uncertificated, as determined from time to time by the Board of Directors.  Any resolution that some or all of any or all classes or series of stock shall be uncertificated shall not apply to previously issued shares represented by a certificate until such certificate is surrendered to the Corporation.  Notwithstanding the adoption of such a resolution by the Board of Directors, every holder of stock represented by certificates and upon request every holder of uncertificated shares shall be entitled to have a certificate, signed by or in the name of the Corporation by the Chairman of the Board of Directors, or the President or Vice-President, and by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary of the Corporation, representing the number of shares registered in certificate form.  Any and all signatures on any such certificate may be facsimiles.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he were such officer, transfer agent or registrar at the date of issue.  The name of the holder of record of the shares represented

thereby, with the number of such shares and the date of issue, shall be entered on the books of the Corporation.

SECTION 2.    <u>Transfers of Stock</u>.  Upon compliance with provisions restricting the transfer or registration of transfer of shares of stock, if any, shares of capital stock shall be transferable on the books of the Corporation only by the holder of record thereof in person, or by duly authorized attorney, upon surrender and cancellation of certificates for a like number of shares, properly endorsed, and the payment of all taxes due thereon.

SECTION 3.    <u>Fractional Shares</u>.  The Corporation may, but shall not be required to, issue certificates for fractions of a share where necessary to effect authorized transactions, or the Corporation may pay in cash the fair value of fractions of a share as of the time when those entitled to receive such fractions are determined, or it may issue scrip in registered or bearer form over the manual or facsimile signature of an officer of the Corporation or of its agent, exchangeable as therein provided for full shares, but such scrip shall not entitle the holder to any rights of a Stockholder except as therein provided.

The Board of Directors shall have power and authority to make all such rules and regulations as it may deem expedient concerning the issue, transfer and registration of certificates representing shares of the Corporation.

SECTION 4.    <u>Lost, Stolen or Destroyed Certificates</u>.  The Corporation may issue a new certificate of stock in place of any certificate, theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Board of Directors may require the owner of any lost, stolen or destroyed certificate, or his legal representative, to give the Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of any such new certificate.

SECTION 5.    <u>Registered Shares</u>.  The Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, if any, and to vote as such owner, and to hold liable for calls and assessments a person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

**ARTICLE VIII**

<u>Dividends</u>

Subject to the provisions of law and the Certificate, the Board of Directors shall have full power to determine whether any, and, if any, what part of any, funds legally available for the payment of dividends shall be declared as dividends and paid to Stockholders; the division of the whole or any part of such funds of the Corporation shall rest wholly within the lawful discretion of the Board of Directors, and it shall not be required at any time, against such discretion, to divide or pay any part of such funds among or to the Stockholders as dividends or

9

otherwise; and before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the Board of Directors from time to time, in its absolute discretion, thinks proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for such other purpose as the Board of Directors shall think conducive to the interest of the Corporation, and the Board of Directors may modify or abolish any such reserve in the manner in which it was created. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the certificate of incorporation.

## ARTICLE IX

### Ratification

Any transaction, questioned in any law suit on the ground of lack of authority, defective or irregular execution, adverse interest of director, officer or Stockholder, non-disclosure, miscomputation, or the application of improper principles or practices of accounting, may be ratified before or after judgment, by the Board of Directors or by the Stockholders, and if so ratified shall have the same force and effect as if the questioned transaction had been originally duly authorized. Such ratification shall be binding upon the Corporation and its Stockholders and shall constitute a bar to any claim or execution of any judgment in respect of such questioned transaction.

## ARTICLE X

### Fiscal Year

The fiscal year of the Corporation shall be fixed, and shall be subject to change, by the Board of Directors.

## ARTICLE XI

### Waiver of Notice

Whenever any notice is required to be given by law, by the Certificate or by these Bylaws, a waiver thereof in writing, signed by the person or persons entitled to notice or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent thereto. Any member of the Board of Directors or any committee thereof who is present at a meeting shall be conclusively presumed to have waived notice of such meeting except when such member attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. Such member shall be conclusively presumed to have assented to any action taken unless his or her dissent shall be entered in the minutes of the meeting or unless his or her written dissent to such action shall be filed with the person acting as the secretary of the meeting before the adjournment thereof or shall be forwarded by registered mail to the Secretary of the Corporation immediately after the adjournment of the meeting. Such right to dissent shall not apply to any member who voted in favor of such action.

PHOENIX/505835.1

# ARTICLE XII

## Bank Accounts, Drafts, Contracts, Etc.

SECTION 1.   Bank Accounts and Drafts.  In addition to such bank accounts as may be authorized by the Board of Directors, the primary financial officer or any person designated by said primary financial officer, whether or not an employee of the Corporation, may authorize such bank accounts to be opened or maintained in the name and on behalf of the Corporation as he may deem necessary or appropriate, payments from such bank accounts to be made upon and according to the check of the Corporation in accordance with the written instructions of said primary financial officer, or other person so designated by the Treasurer.

SECTION 2.   Contracts.  The Board of Directors may authorize any person or persons, in the name and on behalf of the Corporation, to enter into or execute and deliver any and all deeds, bonds, mortgages, contracts and other obligations or instruments, and such authority may be general or confined to specific instances.

SECTION 3.   Proxies; Powers of Attorney; Other Instruments.  The Chairman, the Chief Executive Officer, the President or any other person designated by any of them shall have the power and authority to execute and deliver proxies, powers of attorney and other instruments on behalf of the Corporation in connection with the rights and powers incident to the ownership of stock by the Corporation.   The Chairman, the Chief Executive Officer, the President or any other person authorized by proxy or power of attorney executed and delivered by either of them on behalf of the Corporation may attend and vote at any meeting of Stockholders of any company in which the Corporation may hold stock, and may exercise on behalf of the Corporation any and all of the rights and powers incident to the ownership of such stock at any such meeting, or otherwise as specified in the proxy or power of attorney so authorizing any such person.  The Board of Directors, from time to time, may confer like powers upon any other person.

SECTION 4.   Financial Reports.   The Board of Directors may appoint the primary financial officer or other fiscal officer and/or the Secretary or any other officer to cause to be prepared and furnished to Stockholders entitled thereto any special financial notice and/or financial statement, as the case may be, which may be required by any provision of law.

# ARTICLE XIII

## Amendments

The Bylaws may be altered, amended or repealed or new Bylaws may be adopted by the affirmative vote of a majority of the directors present at any regular or special meeting of the Board of Directors at which a quorum is present or at any regular or special meeting of the Stockholders by the affirmative vote of a majority of the holders of the Shares outstanding.

PHOENIX/505835.1

## ARTICLE XIV

### Indemnification

The Corporation shall indemnify its officers, directors, employees and agents to the extent permitted by the General Corporation Law of Delaware.

PHOENIX/505835.1

<u>EXHIBIT 3</u>

Third Amended and Restated Certificate of Incorporation - Reorganized Eurofresh
(redline version)

# CERTIFICATE OF

## AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

## OF

## EUROFRESH, INC.

Brian McLaughlin, being the duly elected Secretary of Eurofresh, Inc., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (the "Corporation"), does hereby certify as follows:

1.     That the Corporation filed its original Certificate of Incorporation with the Delaware Secretary of State on January 24, 1992 (the "Original Certificate").

2.     That the original name of the Corporation was Bonita Nurseries, Inc.

3.     That the Corporation amended, restated or otherwise modified the Original Certificate and filed such amended, restated and modified certificates with the Delaware Secretary of State on each of December 27, 2001, May 14, 2004, December 1, 2005, and December 21, 2005 (collectively, the "Amended Certificate").

4.     That the Board of Directors of the Corporation, pursuant to Sections 141, 242 and 245 of the General Corporation Law of the State of Delaware, adopted resolutions authorizing the Corporation to amend, integrate and restate the Corporation's Amended Certificate in its entirety to read as set forth in Exhibit A attached hereto and made a part hereof (the "Third Amended and Restated Certificate").

IN WITNESS WHEREOF, the undersigned, being the Secretary hereinabove named, for the purpose of amending and restating the Certificate of Incorporation of the Corporation pursuant to the General Corporation Law of the State of Delaware, under penalties of perjury does hereby declare and certify that this is the act and deed of the Corporation and the facts stated herein are true, and accordingly has hereunto signed this Certificate of Amended and Restated Certificate of Incorporation this [_____] day of [_____], 2009.

By: _____
        Brian McLaughlin
        Secretary

# THIRD AMENDED AND RESTATED

# CERTIFICATE OF INCORPORATION

# OF EUROFRESH, INC.

## ARTICLE ONE

The name of the corporation is Eurofresh, Inc. (hereinafter called the "Corporation").

## ARTICLE TWO

The address of the Corporation's registered office in the state of Delaware is 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is Corporation Service Company.

## ARTICLE THREE

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

## ARTICLE FOUR

~~A.     AUTHORIZED SHARES.~~

The total number of shares of capital stock which the Corporation has authority to issue is ~~25,000,000, consisting of:~~

~~1.      20,000,000~~100 shares of common stock, no par value ~~$0.001 per share~~ (the "Common Stock")~~; and~~

~~2.      5,000,000 shares of preferred stock, par value $0.001 per share (the "Preferred Stock").The shares of the preferred stock of the Corporation authorized in this Section A(2) may be issued from time to time in one or more series, each of which series shall have such distinctive designations and number of shares as shall be fixed by the board of directors of the Corporation prior to the issuance of any shares thereof. Each such series of preferred stock shall have such voting powers, full or limited, and such preferences and relative, participating, optional or other special rights, and such qualifications, limitations or restrictions, as shall be stated in such resolution or resolutions providing for the issue of such series of preferred stock as may be adopted from time to time by the board of directors of the Corporation prior to the issuance of any shares thereof pursuant to the authority hereby expressly vested in it, all in accordance with the laws of the State of Delaware.~~  In no event shall the Corporation issue any series of non-voting capital stock.

3.     In addition to any other consent or approval which may be required pursuant to this Certificate of Incorporation or by law, no amendment or waiver of any provision of this Article Four shall be effective without the prior approval of the holders of a majority of the then outstanding Common Stock, voting as a single class.   For purposes of votes on amendments and waivers to this Section A(3), each share of capital stock shall be entitled to one vote.

## ARTICLE FIVE

The name and mailing address of the Corporation is as follows:

Eurofresh, Inc.
26050 South Eurofresh Avenue
Willcox, Arizona 85643

## ARTICLE SIX

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors of the Corporation is expressly authorized to adopt, make, repeal, alter, amend and rescind the by-laws of the Corporation, except as may otherwise be provided in such by-laws.

## ARTICLE SEVEN

The Corporation expressly elects not to be governed by Section 203 of the General Corporation Law of the State of Delaware.

## ARTICLE EIGHT

The Corporation shall indemnify each person identified in Section 145(a) and (b) of the Delaware General Corporation Law, as the same exists or may hereafter be amended, to the fullest extent permissible under those subsections or the indemnification provisions of any successor or amended statute or to such greater extent as provided in the Bylaws of the Corporation or by agreement.

## ARTICLE NINE

To the fullest extent permitted by the Delaware General Corporation Law, as the same exists or may hereafter be amended, a director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for a breach of fiduciary duty as a director. This Article Nine shall not eliminate or limit the liability of a director for any conduct described in Section 102(b)(7)(i) through (iv) of the Delaware General Corporation Law.   Any repeal or modification of this Article Nine shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification and shall not increase the liability of a director of the Corporation arising out of acts or omissions occurring before the repeal or modification becomes effective.

## ARTICLE TEN
## ARTICLE TEN

The Board of Directors of the Corporation initially shall be comprised of five (5) members, which number may be amended and altered from time to time as provided in the Bylaws of the Corporation.

## ARTICLE ELEVEN
## ARTICLE ELEVEN

The Corporation reserves the right to amend or repeal any provisions contained in this Certificate of Incorporation from time to time and at any time in the manner now or hereafter prescribed by the laws of the State of Delaware, and all rights conferred upon stockholders and directors are granted subject to such reservation; provided that the Corporation will not amend this Certificate of Incorporation to authorize additional shares of capital stock without the consent of Eurofresh Holding Company, Inc., so long as (i) Eurofresh Holding Company, Inc. holds all of the issued and outstanding capital stock of the Corporation and (ii) any shares of 10.0% Series A Preferred Stock of Eurofresh Holding Company, Inc. remain issued and outstanding.

<u>EXHIBIT 4</u>

Amended and Restated Bylaws - Reorganized Eurofresh
(redline version)

EUROFRESH, INC.

\* \* \* \* \* \*

AMENDED AND RESTATED BY-LAWS

# Eurofresh, Inc.

\* \* \* \* \*

# AMENDED AND RESTATED BY - LAWS

\* \* \* \* \*

## ARTICLE I

### Offices

SECTION 1. <u>Registered Office.</u> The registered office shall be in the City of Wilmington, County of New Castle, State of Delaware.

SECTION 2. <u>Other Offices.</u> Eurofresh, Inc. (the "*Corporation*") may also have offices at such other places both within and without the State of Delaware as the Board of Directors of the Corporation (the "*Board of Directors*") may from time to time determine or the business of the Corporation may require.

## ARTICLE II

### Stockholders

SECTION 1. <u>Annual Meetings.</u> If required by applicable law, the annual meeting of Stockholders, as defined below, of the Corporation for the election of directors and for the transaction of such other business as may properly come before the meeting shall be held each year at such date and time, within or without the State of Delaware, as the Board of Directors of the Corporation shall determine.

SECTION 2. <u>Special Meetings.</u> Special meetings of stockholders of the Corporation (the "*Stockholders*") for the transaction of such business as may properly come before the meeting may be called by order of the Chairman of the Board of Directors, the Chief Executive Officer, the President, a majority of the directors then in office or at the request, in writing, of stockholders owning a majority in amount of the entire capital stock of the Corporation issued and outstanding and entitled to vote. Such request shall state the purpose or purposes of the proposed meeting and business transacted at any special meeting shall be limited to the purposes stated in the notice thereof. The special meeting shall be held at such date and time, within or without the State of Delaware, as may be specified by such order.

SECTION 3. <u>Notice of Meetings.</u> Whenever Stockholders are required or permitted to take any action at a meeting, a notice of the meeting shall be given that shall state the place, if any, date and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Unless otherwise provided by law, the Third Amended and Restated Certificate of Incorporation of the Corporation (as amended from time to time, including the terms of any certificate of designation of any series of preferred stock of the Corporation, the "*Certificate*") or these

1

Amended and Restated By-laws (as amended from time to time, these "*By-laws*"), the notice of any meeting shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each Stockholder entitled to vote at such meeting. If mailed, such notice shall be deemed to be given when deposited in the United States mail, postage prepaid, directed to the Stockholder at such Stockholder's address as it appears on the records of the Corporation.

Notice may also be given to stockholders by a form of electronic transmission in accordance with and subject to the provisions of Section 232 of the General Corporation Law of Delaware.

SECTION 4.   Stockholder Lists.  The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least 10 days before every meeting of Stockholders, a complete list of the Stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each Stockholder and the number of shares registered in the name of each Stockholder.  Such list shall be open to the examination of any Stockholder, for any purpose germane to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held.  The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any Stockholder who is present.

The stock ledger shall be the only evidence as to who are the Stockholders entitled to examine the stock ledger, the list required by this section or the books of the Corporation, or to vote in person or by proxy at any meeting of Stockholders.

SECTION 5.  Quorum.   Except as otherwise provided by law, the Certificate or these By-laws, a quorum for the transaction of business at any meeting of Stockholders shall consist of the holders of record of a majority of the issued and outstanding shares of the capital stock of the Corporation entitled to vote at the meeting, present in person or by proxy.  If there be no such quorum, the holders of a majority of such shares so present or represented may adjourn the meeting from time to time, without further notice, until a quorum shall have been obtained.  When a quorum is once present it is not broken by the subsequent withdrawal of any Stockholder.

SECTION 6.  Organization.  Meetings of Stockholders shall be presided over by the Chairman, if any, or if none or in the Chairman's absence the Chief Executive Officer, if any, or if none or in the Chief Executive Officer's absence the President, if any, or if none or in the President's absence a Vice-President, or, if none of the foregoing is present, by a chairman to be chosen by the Stockholders entitled to vote who are present in person or by proxy at the meeting.  The Secretary of the Corporation, or in the Secretary's absence an Assistant Secretary, shall act as secretary of every meeting, but if neither the Secretary nor an Assistant Secretary is present, the presiding officer of the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 7.   Voting; Proxies; Required Vote.

(a)          At each meeting of Stockholders, every Stockholder shall be entitled to vote in person or by proxy appointed by instrument in writing, subscribed by such Stockholder or by such Stockholder's duly authorized attorney-in-fact (but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period), and, unless the Certificate provides otherwise, shall have one vote for each share of stock entitled to vote registered in the name of such Stockholder on the books of the Corporation on the applicable record date fixed pursuant to these By-laws. A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A Stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary of the Corporation a revocation of the proxy or a new proxy bearing a later date. At all elections of directors the voting may but need not be by ballot and a plurality of the votes cast there shall elect. Except as otherwise required by law, the Certificate or these By-laws, any other action shall be authorized by a majority of the votes cast.

(b)          Unless otherwise provided in the certificate of incorporation, any action required to be taken at any annual or special meeting of stockholders of the corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing. Stockholders may, unless the certificate of incorporation otherwise provides, act by written consent to elect directors; provided, however, that if such consent is less than unanimous, such action by written consent may be in lieu of holding an annual-meeting only if all of the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action.

SECTION 8.   Adjournments.  Any meeting of Stockholders, annual or special, may adjourn from time to time to reconvene at the same or some other place, and, subject to the second succeeding sentence, notice need not be given of any such adjourned meeting if the time, date and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, notice of the adjourned meeting shall be given to each Stockholder of record entitled to vote at the meeting.

3

**ARTICLE III**

Board of Directors

SECTION 1.   General Powers.  The business, property and affairs of the Corporation shall be managed by, or under the direction of, the Board of Directors, who may exercise all the powers of the Corporation except as otherwise provided by law, the Certificate or these By-laws.

(a)            Qualification; Number; Term; Remuneration.    Each director shall be at least 18 years of age.  A director need not be a Stockholder, a citizen of the United States, or a resident of the State of Delaware.  The number of directors, which shall be not less than three (3) nor more than seven (7), shall be determined, from time to time, by resolution of the Board of Directors or by the vote of the Stockholders of the Corporation**.**  The directors shall be elected at the annual meeting of Stockholders by such Stockholders as have the right to vote on such election as set forth in the Certificate.  Each director shall hold office until his successor is elected and qualified.  The use of the phrase "entire Board" herein refers to the total number of directors which the Corporation would have if there were no vacancies.

Immediately following the adoption of these By-laws, the Board of Directors shall consist of five (5) members.  The initial members of the Board of Directors following the adoption of these By-laws shall be:



[                    ];
[                    ];
[                    ];
[                    ];
Johan van den Berg;
Scott E. Komar;
Charles T. Lanktree;
[                    ]David R. Jessick; and
[                    ];
Scott W. Meader, Chairman.

(b)            Unless otherwise restricted by the Certificate  or these By-laws, the Board of Directors shall have the authority to fix the compensation of directors.  Directors may be paid reimbursement of their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated compensation as director.  No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.  Members of special or standing committees may be allowed like compensation for attending committee meetings.

SECTION 2.   Quorum and Manner of Voting.   Except as otherwise provided by law, the Certificate or these By-laws, a majority of the directors then in office shall constitute a quorum.  A majority of the directors present, whether or not a quorum is present, may adjourn a meeting from time to time to another time and place without notice.

4

Except as otherwise provided by law, the Certificate or these By-laws, the vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

SECTION 3.  Places of Meetings.  Meetings of the Board of Directors may be held at any place within or without the State of Delaware, as may from time to time be fixed by resolution of the Board of Directors, or as may be specified in the notice of meeting.

SECTION 4.  Regular Meetings.  Regular meetings of the Board of Directors shall be held at such times and places as the Board of Directors shall from time to time by resolution determine.

SECTION 5.  Special Meetings.  Special meetings of the Board of Directors shall be held whenever called by the Chairman of the Board, Chief Executive Officer, President or by a majority of the directors then in office.

SECTION 6.  Notice of Meetings.  A notice of the place, date and time and the purpose or purposes of each meeting of the Board of Directors shall be given to each director by mailing the same at least five (5) days before the meeting, or by telephoning the same or by delivering the same personally or by electronic or facsimile transmission not later than two (2) days before the meeting.

SECTION 7.  Organization.  At all meetings of the Board of Directors, the Chairman, if any, or if none or in the Chairman's absence or inability to act, a chairman chosen by the directors, shall preside.  The Secretary of the Corporation shall act as secretary at all meetings of the Board of Directors when present, and, in the Secretary's absence, the presiding officer may appoint any person to act as secretary.

SECTION 8.  Resignation.  Any director may resign at any time upon written notice to the Corporation and such resignation shall take effect upon receipt thereof by the Chief Executive Officer, President or Secretary, unless otherwise specified in the resignation.

SECTION 9.  Vacancies.  Unless otherwise provided in these By-laws, vacancies on the Board of Directors, whether caused by resignation, death, disqualification, removal, an increase in the authorized number of directors or otherwise, may be filled by the affirmative vote of a majority of the remaining directors, although less than a quorum, or by a sole remaining director, or at a special meeting of the Stockholders, by the holders of shares entitled to vote for the election of directors.  A director elected to fill a vacancy shall be elected for the unexpired term of his or her predecessor in office, and a director chosen to fill a position resulting from an increase in the number of directors shall hold office until the next election of the class for which such director shall have been chosen, subject to the election and qualification of his or her successor and to his or her earlier death, resignation or removal.

SECTION 10. Action by Written Consent.  Unless otherwise provided by law, the Certificate or these By-laws, any action required or permitted to be taken at any

5

meeting of the Board of Directors may be taken without a meeting if all the directors consent thereto in writing or electronic transmission, and the writing or writings or electronic transmission or electronic transmissions are filed with the minutes of proceedings of the Board of Directors.

SECTION 11. Meetings by Telephone Conference Calls. The Board of Directors or any members of any committee of the Board of Directors designated by the directors may participate in a meeting of the Board of Directors or such committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other. Participation by such means shall constitute presence in person at such meeting.

SECTION 12. Removal. Unless otherwise restricted by the Certificate or by law, any director or the entire board of directors may be removed, with or without cause, by the holders of a majority of shares entitled to vote at an election of directors.

## ARTICLE IV

### Committees

SECTION 1. Appointment. Unless otherwise provided by law, the Certificate or these By-laws, from time to time the Board of Directors may appoint by resolution any committee or committees comprised of one or more directors for any purpose or purposes, to the extent lawful, which shall have powers as shall be determined and specified by the Board of Directors in the resolution of appointment.

SECTION 2. Procedures, Quorum and Manner of Acting. Each committee shall fix its own rules of procedure, and shall meet where and as provided by such rules or by resolution of the Board of Directors. Except as otherwise provided by law, the presence of a majority of the then-appointed members of a committee shall constitute a quorum for the transaction of business by that committee, and in every case where a quorum is present the affirmative vote of a majority of the members of the committee present shall be the act of the committee. Each committee shall keep minutes of its proceedings, and actions taken by a committee shall be reported to the Board of Directors.

SECTION 3. Action by Written Consent. Any action required or permitted to be taken at any meeting of any committee of the Board of Directors may be taken without a meeting if all the members of the committee consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the committee.

SECTION 4. Term; Termination. In the event any person shall cease to be a director of the Corporation, such person shall simultaneously therewith cease to be a member of any committee appointed by the Board of Directors.

6

## ARTICLE V

### Officers

SECTION 1.  <u>Election and Qualifications</u>.  The Board of Directors shall elect the officers of the Corporation, which shall include a President and a Secretary, and may include, by election or appointment, a Chief Executive Officer, one or more Vice-Presidents (any one or more of whom may be given an additional designation of rank or function), a Treasurer and such Assistant Secretaries, such Assistant Treasurers and such other officers as the Board of Directors may from time to time deem proper. Each officer shall have such powers and duties as may be prescribed by these By-laws and as may be assigned by the Board of Directors, the Chief Executive Officer, or the President.

SECTION 2.  Term of Office and Remuneration.  The term of office of all officers shall be as determined from time to time by the Board of Directors and until their respective successors have been elected and qualified, but any officer may be removed from office, either with or without cause, at any time by the Board of Directors. Any vacancy in any office arising from any cause may be filled for the unexpired portion of the term by the Board of Directors.  The remuneration of all officers of the Corporation may be fixed by the Board of Directors or in such manner as the Board of Directors shall provide.

SECTION 3.  Resignation; Removal.  Any officer may resign at any time upon written notice to the Corporation and such resignation shall take effect upon receipt thereof by the Chief Executive Officer, President or Secretary, unless otherwise specified in the resignation.  Any officer shall be subject to removal, with or without cause, at any time by vote of a majority of the entire Board.

Except as the Board of Directors may otherwise determine, no officer who resigns or is removed shall have any right to any compensation as an officer for any period following his or her resignation or removal, or any right to damages on account of such removal, whether his of her compensation be by the month or by the year or otherwise, unless such compensation is expressly provided in a duly authorized written agreement with the Corporation.

SECTION 4.  Chairman of the Board.  The Chairman of the Board of Directors, if there be one, shall preside at all meetings of the Board of Directors and shall have such other powers and duties as may from time to time be assigned by the Board of Directors.

SECTION 5.  Chief Executive Officer.  The chief executive officer shall have such duties as customarily pertain to that office, including the implementation of the policies of the Corporation as determined by the Board of Directors, and shall have such other authority as from time to time may be assigned by the Board of Directors.

SECTION 6.  President.  The President shall have such duties as customarily pertain to that office, including the general management and supervision of

the property, business and affairs of the Corporation and shall have such other authority as from time to time may be assigned by the Board of Directors.

SECTION 7.  Vice-President.  A Vice-President, if there shall be one, may execute and deliver in the name of the Corporation contracts and other obligations and instruments pertaining to the regular course of the duties of said office, and shall have such other authority as from time to time may be assigned by the Board of Directors, the President or the Chief Executive Officer.

SECTION 8.  Treasurer.  The Treasurer, if there shall be one, shall in general have all duties incident to the position of Treasurer and such other duties as may be assigned by the Board of Directors, the President or the Chief Executive Officer.

SECTION 9.  Secretary.  The Secretary shall in general have all the duties incident to the office of Secretary and such other duties as may be assigned by the Board of Directors, the President or the Chief Executive Officer.

SECTION 10. Assistant Officers.  Any assistant officer shall have such powers and duties of the officer such assistant officer assists as such officer or the Board of Directors shall from time to time prescribe.

**ARTICLE VI**

Books and Records

SECTION 1.  Location.  The books and records of the Corporation may be kept at such place or places within or outside the State of Delaware as the Board of Directors or the respective officers in charge thereof may from time to time determine. The record books containing the names and addresses of all Stockholders, the number and class of shares of stock held by each and the dates when they respectively became the owners of record thereof shall be kept by the Secretary as prescribed in the By-laws and by such officer or agent as shall be designated by the Board of Directors.

SECTION 2.  Addresses of Stockholders.  Notices of meetings and all other corporate notices may be delivered personally or mailed to each Stockholder at the Stockholder's address as it appears on the records of the Corporation.

SECTION 3.  Fixing Date for Determination of Stockholders of Record.

(a)          In order that the Corporation may determine the Stockholders entitled to notice of or to vote at any meeting of Stockholders or any adjournment thereof, the Board of Directors may fix a record date which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting.  If no record date is fixed by the Board of Directors, the record date for determining Stockholders entitled to notice of or to vote at a meeting of Stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

8

(b)　　　　　　In order that the Corporation may determine the Stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the Stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date which record date shall be not more than sixty (60) days prior to such action.  If no record date is fixed, the record date for determining Stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

## ARTICLE VII

### Certificates Representing Stock

SECTION 1.  <u>Certificates; Signatures</u>.  The shares of the Corporation shall be represented by certificates or shall be uncertificated, as determined from time to time by the Board of Directors.  Any resolution that some or all of any or all classes or series of stock shall be uncertificated shall not apply to previously issued shares represented by a certificate until such certificate is surrendered to the Corporation.  Notwithstanding the adoption of such a resolution by the Board of Directors, every holder of stock represented by certificates and upon request every holder of uncertificated shares shall be entitled to have a certificate, signed by or in the name of the Corporation by the Chairman of the Board of Directors, or the President or Vice-President, and by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary of the Corporation, representing the number of shares registered in certificate form.  Any and all signatures on any such certificate may be facsimiles.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he were such officer, transfer agent or registrar at the date of issue.  The name of the holder of record of the shares represented thereby, with the number of such shares and the date of issue, shall be entered on the books of the Corporation.

SECTION 2.  <u>Transfers of Stock</u>.  Upon compliance with provisions restricting the transfer or registration of transfer of shares of stock, if any, shares of capital stock shall be transferable on the books of the Corporation only by the holder of record thereof in person, or by duly authorized attorney, upon surrender and cancellation of certificates for a like number of shares, properly endorsed, and the payment of all taxes due thereon.

SECTION 3.  <u>Fractional Shares</u>.  The Corporation may, but shall not be required to, issue certificates for fractions of a share where necessary to effect authorized transactions, or the Corporation may pay in cash the fair value of fractions of a share as of the time when those entitled to receive such fractions are determined, or it may issue scrip in registered or bearer form over the manual or facsimile signature of an officer of the Corporation or of its agent, exchangeable as therein provided for full shares, but such scrip shall not entitle the holder to any rights of a Stockholder except as therein provided.

9

The Board of Directors shall have power and authority to make all such rules and regulations as it may deem expedient concerning the issue, transfer and registration of certificates representing shares of the Corporation.

SECTION 4.   Lost, Stolen or Destroyed Certificates.   The Corporation may issue a new certificate of stock in place of any certificate, theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Board of Directors may require the owner of any lost, stolen or destroyed certificate, or his legal representative, to give the Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of any such new certificate.

SECTION 5.   Registered Shares.   The Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, if any, and to vote as such owner, and to hold liable for calls and assessments a person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

**ARTICLE VIII**

Dividends

Subject to the provisions of law and the Certificate, the Board of Directors shall have full power to determine whether any, and, if any, what part of any, funds legally available for the payment of dividends shall be declared as dividends and paid to Stockholders; the division of the whole or any part of such funds of the Corporation shall rest wholly within the lawful discretion of the Board of Directors, and it shall not be required at any time, against such discretion, to divide or pay any part of such funds among or to the Stockholders as dividends or otherwise; and before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the Board of Directors from time to time, in its absolute discretion, thinks proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for such other purpose as the Board of Directors shall think conducive to the interest of the Corporation, and the Board of Directors may modify or abolish any such reserve in the manner in which it was created. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the certificate of incorporation.

**ARTICLE IX**

Ratification

Any transaction, questioned in any law suit on the ground of lack of authority, defective or irregular execution, adverse interest of director, officer or Stockholder, non-disclosure, miscomputation, or the application of improper principles or practices of accounting, may be ratified before or after judgment, by the Board of Directors or by the Stockholders, and if so

ratified shall have the same force and effect as if the questioned transaction had been originally duly authorized. Such ratification shall be binding upon the Corporation and its Stockholders and shall constitute a bar to any claim or execution of any judgment in respect of such questioned transaction.

## ARTICLE X

### Fiscal Year

The fiscal year of the Corporation shall be fixed, and shall be subject to change, by the Board of Directors.

## ARTICLE XI

### Waiver of Notice

Whenever any notice is required to be given by law, by the Certificate or by these By-laws, a waiver thereof in writing, signed by the person or persons entitled to notice or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent thereto. Any member of the Board of Directors or any committee thereof who is present at a meeting shall be conclusively presumed to have waived notice of such meeting except when such member attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. Such member shall be conclusively presumed to have assented to any action taken unless his or her dissent shall be entered in the minutes of the meeting or unless his or her written dissent to such action shall be filed with the person acting as the secretary of the meeting before the adjournment thereof or shall be forwarded by registered mail to the Secretary of the Corporation immediately after the adjournment of the meeting. Such right to dissent shall not apply to any member who voted in favor of such action.

## ARTICLE XII

### Bank Accounts, Drafts, Contracts, Etc.

SECTION 1. <u>Bank Accounts and Drafts</u>. In addition to such bank accounts as may be authorized by the Board of Directors, the primary financial officer or any person designated by said primary financial officer, whether or not an employee of the Corporation, may authorize such bank accounts to be opened or maintained in the name and on behalf of the Corporation as he may deem necessary or appropriate, payments from such bank accounts to be made upon and according to the check of the Corporation in accordance with the written instructions of said primary financial officer, or other person so designated by the Treasurer.

SECTION 2. <u>Contracts</u>. The Board of Directors may authorize any person or persons, in the name and on behalf of the Corporation, to enter into or execute and deliver any and all deeds, bonds, mortgages, contracts and other obligations or instruments, and such authority may be general or confined to specific instances.

SECTION 3.   Proxies; Powers of Attorney; Other Instruments.   The Chairman, the Chief Executive Officer, the President or any other person designated by any of them shall have the power and authority to execute and deliver proxies, powers of attorney and other instruments on behalf of the Corporation in connection with the rights and powers incident to the ownership of stock by the Corporation.   The Chairman, the Chief Executive Officer, the President or any other person authorized by proxy or power of attorney executed and delivered by either of them on behalf of the Corporation may attend and vote at any meeting of Stockholders of any company in which the Corporation may hold stock, and may exercise on behalf of the Corporation any and all of the rights and powers incident to the ownership of such stock at any such meeting, or otherwise as specified in the proxy or power of attorney so authorizing any such person.   The Board of Directors, from time to time, may confer like powers upon any other person.

SECTION 4.   Financial Reports.   The Board of Directors may appoint the primary financial officer or other fiscal officer and/or the Secretary or any other officer to cause to be prepared and furnished to Stockholders entitled thereto any special financial notice and/or financial statement, as the case may be, which may be required by any provision of law.

## ARTICLE XIII

### Amendments

The By-laws may be altered, amended or repealed or new By-laws may be adopted by the affirmative vote of a majority of the directors present at any regular or special meeting of the Board of Directors at which a quorum is present or at any regular or special meeting of the Stockholders by the affirmative vote of a majority of the holders of the Shares outstanding.

## ARTICLE XIV

### Indemnification

The Corporation shall indemnify its officers, directors, employees and agents to the extent permitted by the General Corporation Law of Delaware.

# EXHIBIT 5

Amended and Restated Bylaws – Eurofresh Produce, Ltd.
(redline version)

AMENDED AND RESTATED BY-LAWS

of

EUROFRESH PRODUCE, LTD.

\* \* \* \* \* \*

# ARTICLE I

Offices

SECTION 1.     Registered Office.  The registered office shall be in the City of Wilmington, County of New Castle, State of Delaware.

SECTION 2.     Other Offices.  Eurofresh ~~Produce~~ Produce, ~~Inc~~Ltd. (the "*Corporation*") may also have offices at such other places both within and without the State of Delaware as the Board of Directors of the Corporation (the "*Board of Directors*") may from time to time determine or the business of the Corporation may require.

# ARTICLE II

Stockholders

SECTION 1.     Annual Meetings.  If required by applicable law, the annual meeting of Stockholders, as defined below, of the Corporation for the election of directors and for the transaction of such other business as may properly come before the meeting shall be held each year at such date and time, within or without the State of Delaware, as the Board of Directors of the Corporation shall determine.

SECTION 2.     Special Meetings.  Special meetings of stockholders of the Corporation (the "*Stockholders*") for the transaction of such business as may properly come before the meeting may be called by order of the Chairman of the Board of Directors, the Chief Executive Officer, the President, a majority of the directors then in office or at the request, in writing, of stockholders owning a majority in amount of the entire capital stock of the Corporation issued and outstanding and entitled to vote.  Such request shall state the purpose or purposes of the proposed meeting and business transacted at any special meeting shall be limited to the purposes stated in the notice thereof.  The special meeting shall be held at such date and time, within or without the State of Delaware, as may be specified by such order.

SECTION 3.     Notice of Meetings.  Whenever Stockholders are required or permitted to take any action at a meeting, a notice of the meeting shall be given that shall state the place, if any, date and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called.  Unless otherwise provided by law, the Amended and Restated Certificate of Incorporation of the Corporation (as amended from time to time, including the terms of any certificate of designation of any series of preferred stock of the Corporation, the

1

"*Certificate*") or these Amended and Restated By-laws (as amended from time to time, these "*By-laws*"), the notice of any meeting shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each Stockholder entitled to vote at such meeting. If mailed, such notice shall be deemed to be given when deposited in the United States mail, postage prepaid, directed to the Stockholder at such Stockholder's address as it appears on the records of the Corporation.

Notice may also be given to stockholders by a form of electronic transmission in accordance with and subject to the provisions of Section 232 of the General Corporation Law of Delaware.

SECTION 4. Stockholder Lists. The officer who has charge of the stock ledger of the Corporation shall prepare and make, at least 10 days before every meeting of Stockholders, a complete list of the Stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each Stockholder and the number of shares registered in the name of each Stockholder. Such list shall be open to the examination of any Stockholder, for any purpose germane to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any Stockholder who is present.

The stock ledger shall be the only evidence as to who are the Stockholders entitled to examine the stock ledger, the list required by this section or the books of the Corporation, or to vote in person or by proxy at any meeting of Stockholders.

SECTION 5. Quorum. Except as otherwise provided by law, the Certificate or these By-laws, a quorum for the transaction of business at any meeting of Stockholders shall consist of the holders of record of a majority of the issued and outstanding shares of the capital stock of the Corporation entitled to vote at the meeting, present in person or by proxy. If there be no such quorum, the holders of a majority of such shares so present or represented may adjourn the meeting from time to time, without further notice, until a quorum shall have been obtained. When a quorum is once present it is not broken by the subsequent withdrawal of any Stockholder.

SECTION 6. Organization. Meetings of Stockholders shall be presided over by the Chairman, if any, or if none or in the Chairman's absence the Chief Executive Officer, if any, or if none or in the Chief Executive Officer's absence the President, if any, or if none or in the President's absence a Vice-President, or, if none of the foregoing is present, by a chairman to be chosen by the Stockholders entitled to vote who are present in person or by proxy at the meeting. The Secretary of the Corporation, or in the Secretary's absence an Assistant Secretary, shall act as secretary of every meeting, but if neither the Secretary nor an Assistant Secretary is present, the presiding officer of the meeting shall appoint any person present to act as secretary of the meeting.

SECTION 7. Voting; Proxies; Required Vote. (a) At each meeting of Stockholders, every Stockholder shall be entitled to vote in person or by proxy appointed by instrument in writing, subscribed by such Stockholder or by such Stockholder's duly authorized

2

attorney-in-fact (but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period), and, unless the Certificate provides otherwise, shall have one vote for each share of stock entitled to vote registered in the name of such Stockholder on the books of the Corporation on the applicable record date fixed pursuant to these By-laws. A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A Stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary of the Corporation a revocation of the proxy or a new proxy bearing a later date. At all elections of directors the voting may but need not be by ballot and a plurality of the votes cast there shall elect. Except as otherwise required by law, the Certificate or these By-laws, any other action shall be authorized by a majority of the votes cast.

(b)     Unless otherwise provided in the Certificate, any action required to be taken at any annual or special meeting of stockholders of the corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing. Stockholders may, unless the Certificate otherwise provides, act by written consent to elect directors; provided, however, that if such consent is less than unanimous, such action by written consent may be in lieu of holding an annual-meeting only if all of the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action.

SECTION 8.     Adjournments.  Any meeting of Stockholders, annual or special, may adjourn from time to time to reconvene at the same or some other place, and, subject to the second succeeding sentence, notice need not be given of any such adjourned meeting if the time, date and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, notice of the adjourned meeting shall be given to each Stockholder of record entitled to vote at the meeting.

**ARTICLE III**

Board of Directors

SECTION 1.     General Powers.  The business, property and affairs of the Corporation shall be managed by, or under the direction of, the Board of Directors, who may exercise all the powers of the Corporation except as otherwise provided by law, the Certificate or these By-laws.

(a)     Qualification; Number; Term; Remuneration.  Each director shall be at least 18 years of age. A director need not be a Stockholder, a citizen of the United States, or a resident of the State of Delaware. The number of directors, which shall be not less than three (3),

3

which may be increased or decreased nor more than seven (7), shall be determined, from time to time, by resolution of the Board of Directors or by the vote of the stockholders of the Corporation; provided, however, that the number of directors may not be less than three (3) except that where all the shares of the corporation are owned beneficially and of record by either one or two stockholders, the number of directors may be less than three but not less than the number of stockholders Stockholders of the Corporation. The directors shall be elected at the annual meeting of the stockholders and each director shall be elected to serve Stockholders by such Stockholders as have the right to vote on such election as set forth in the Certificate. Each director shall hold office until his successor shall be elected and shall qualify. is elected and qualified. The use of the phrase "entire Board" herein refers to the total number of directors which the Corporation would have if there were no vacancies.

Immediately following the adoption of these By-laws, the Board of Directors shall consist of three five (3 5) members. The initial members of the Board of Directors following the adoption of these By-laws shall be:



[_____];
Johan van den Berg;
Scott E. Komar;
Charles T. Lanktree;
[_____]David R. Jessick; and
[_____];
Scott W. Meader, Chairman.

(b)    Unless otherwise restricted by the Certificate or these By-laws, the Board of Directors shall have the authority to fix the compensation of directors. Directors may be paid reimbursement of their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated compensation as director. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

SECTION 2.    Quorum and Manner of Voting. Except as otherwise provided by law, the Certificate or these By-laws, a majority of the directors then in office shall constitute a quorum. A majority of the directors present, whether or not a quorum is present, may adjourn a meeting from time to time to another time and place without notice. Except as otherwise provided by law, the Certificate or these By-laws, the vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

SECTION 3.    Places of Meetings. Meetings of the Board of Directors may be held at any place within or without the State of Delaware, as may from time to time be fixed by resolution of the Board of Directors, or as may be specified in the notice of meeting.

SECTION 4.    Regular Meetings. Regular meetings of the Board of Directors shall be held at such times and places as the Board of Directors shall from time to time by resolution determine.

4

SECTION 5. <u>Special Meetings</u>. Special meetings of the Board of Directors shall be held whenever called by the Chairman of the Board, Chief Executive Officer, President or by a majority of the directors then in office.

SECTION 6. <u>Notice of Meetings</u>. A notice of the place, date and time and the purpose or purposes of each meeting of the Board of Directors shall be given to each director by mailing the same at least five (5) days before the meeting, or by telephoning the same or by delivering the same personally or by electronic or facsimile transmission not later than two (2) days before the meeting.

SECTION 7. <u>Organization</u>. At all meetings of the Board of Directors, the Chairman, if any, or if none or in the Chairman's absence or inability to act, a chairman chosen by the directors, shall preside. The Secretary of the Corporation shall act as secretary at all meetings of the Board of Directors when present, and, in the Secretary's absence, the presiding officer may appoint any person to act as secretary.

SECTION 8. <u>Resignation</u>. Any director may resign at any time upon written notice to the Corporation and such resignation shall take effect upon receipt thereof by the Chief Executive Officer, President or Secretary, unless otherwise specified in the resignation.

SECTION 9. <u>Vacancies</u>. Unless otherwise provided in these By-laws, vacancies on the Board of Directors, whether caused by resignation, death, disqualification, removal, an increase in the authorized number of directors or otherwise, may be filled by the affirmative vote of a majority of the remaining directors, although less than a quorum, or by a sole remaining director, or at a special meeting of the Stockholders, by the holders of shares entitled to vote for the election of directors. A director elected to fill a vacancy shall be elected for the unexpired term of his or her predecessor in office, and a director chosen to fill a position resulting from an increase in the number of directors shall hold office until the next election of the class for which such director shall have been chosen, subject to the election and qualification of his or her successor and to his or her earlier death, resignation or removal.

SECTION 10. <u>Action by Written Consent</u>. Unless otherwise provided by law, the Certificate or these By-laws, any action required or permitted to be taken at any meeting of the Board of Directors may be taken without a meeting if all the directors consent thereto in writing or electronic transmission, and the writing or writings or electronic transmission or electronic transmissions are filed with the minutes of proceedings of the Board of Directors.

SECTION 11. <u>Meetings by Telephone Conference Calls</u>. The Board of Directors or any members of any committee of the Board of Directors designated by the directors may participate in a meeting of the Board of Directors or such committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other. Participation by such means shall constitute presence in person at such meeting.

SECTION 12. <u>Removal</u>. Unless otherwise restricted by the Certificate or by law, any director or the entire board of directors may be removed, with or without cause, by the holders of a majority of shares entitled to vote at an election of directors.

## ARTICLE IV

### Officers

SECTION 1.    Election and Qualifications.  The Board of Directors shall elect the officers of the Corporation, which shall include a President and a Secretary, and may include, by election or appointment, a Chief Executive Officer, one or more Vice-Presidents (any one or more of whom may be given an additional designation of rank or function), a Treasurer and such Assistant Secretaries, such Assistant Treasurers and such other officers as the Board of Directors may from time to time deem proper.  Each officer shall have such powers and duties as may be prescribed by these By-laws and as may be assigned by the Board of Directors, the Chief Executive Officer, or the President.

SECTION 2.    Term of Office and Remuneration.  The term of office of all officers shall be as determined from time to time by the Board of Directors and until their respective successors have been elected and qualified, but any officer may be removed from office, either with or without cause, at any time by the Board of Directors.  Any vacancy in any office arising from any cause may be filled for the unexpired portion of the term by the Board of Directors.  The remuneration of all officers of the Corporation may be fixed by the Board of Directors or in such manner as the Board of Directors shall provide.

SECTION 3.    Resignation; Removal.  Any officer may resign at any time upon written notice to the Corporation and such resignation shall take effect upon receipt thereof by the Chief Executive Officer, President or Secretary, unless otherwise specified in the resignation.  Any officer shall be subject to removal, with or without cause, at any time by vote of a majority of the entire Board.

Except as the Board of Directors may otherwise determine, no officer who resigns or is removed shall have any right to any compensation as an officer for any period following his or her resignation or removal, or any right to damages on account of such removal, whether his of her compensation be by the month or by the year or otherwise, unless such compensation is expressly provided in a duly authorized written agreement with the Corporation.

SECTION 4.    Chairman of the Board.  The Chairman of the Board of Directors, if there be one, shall preside at all meetings of the Board of Directors and shall have such other powers and duties as may from time to time be assigned by the Board of Directors.

SECTION 5.    Chief Executive Officer.  The chief executive officer shall have such duties as customarily pertain to that office, including the implementation of the policies of the Corporation as determined by the Board of Directors, and shall have such other authority as from time to time may be assigned by the Board of Directors.

SECTION 6.    President.  The President shall have such duties as customarily pertain to that office, including the general management and supervision of the property, business and affairs of the Corporation and shall have such other authority as from time to time may be assigned by the Board of Directors.

PHOENIX/494943.3 494943.4

SECTION 7.     Vice-President.  A Vice-President, if there shall be one, may execute and deliver in the name of the Corporation contracts and other obligations and instruments pertaining to the regular course of the duties of said office, and shall have such other authority as from time to time may be assigned by the Board of Directors, the President or the Chief Executive Officer.

SECTION 8.     Treasurer.  The Treasurer, if there shall be one, shall in general have all duties incident to the position of Treasurer and such other duties as may be assigned by the Board of Directors, the President or the Chief Executive Officer.

SECTION 9.     Secretary.  The Secretary shall in general have all the duties incident to the office of Secretary and such other duties as may be assigned by the Board of Directors, the President or the Chief Executive Officer.

SECTION 10.    Assistant Officers.  Any assistant officer shall have such powers and duties of the officer such assistant officer assists as such officer or the Board of Directors shall from time to time prescribe.

**ARTICLE V**

Books and Records

SECTION 1.     Location.  The books and records of the Corporation may be kept at such place or places within or outside the State of Delaware as the Board of Directors or the respective officers in charge thereof may from time to time determine.  The record books containing the names and addresses of all Stockholders, the number and class of shares of stock held by each and the dates when they respectively became the owners of record thereof shall be kept by the Secretary as prescribed in the By-laws and by such officer or agent as shall be designated by the Board of Directors.

SECTION 2.     Addresses of Stockholders.  Notices of meetings and all other corporate notices may be delivered personally or mailed to each Stockholder at the Stockholder's address as it appears on the records of the Corporation.

SECTION 3.     Fixing Date for Determination of Stockholders of Record.

(a)     In order that the Corporation may determine the Stockholders entitled to notice of or to vote at any meeting of Stockholders or any adjournment thereof, the Board of Directors may fix a record date which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting.  If no record date is fixed by the Board of Directors, the record date for determining Stockholders entitled to notice of or to vote at a meeting of Stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

(b)     In order that the Corporation may determine the Stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the Stockholders entitled to exercise any rights in respect of any change, conversion or exchange of

7

stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date which record date shall be not more than sixty (60) days prior to such action.  If no record date is fixed, the record date for determining Stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

## ARTICLE VI

### Certificates Representing Stock

SECTION 1.        Certificates; Signatures.  The shares of the Corporation shall be represented by certificates or shall be uncertificated, as determined from time to time by the Board of Directors.  Any resolution that some or all of any or all classes or series of stock shall be uncertificated shall not apply to previously issued shares represented by a certificate until such certificate is surrendered to the Corporation.  Notwithstanding the adoption of such a resolution by the Board of Directors, every holder of stock represented by certificates and upon request every holder of uncertificated shares shall be entitled to have a certificate, signed by or in the name of the Corporation by the Chairman of the Board of Directors, or the President or Vice-President, and by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary of the Corporation, representing the number of shares registered in certificate form.  Any and all signatures on any such certificate may be facsimiles.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he were such officer, transfer agent or registrar at the date of issue.  The name of the holder of record of the shares represented thereby, with the number of such shares and the date of issue, shall be entered on the books of the Corporation.

SECTION 2.        Transfers of Stock.  Upon compliance with provisions restricting the transfer or registration of transfer of shares of stock, if any, shares of capital stock shall be transferable on the books of the Corporation only by the holder of record thereof in person, or by duly authorized attorney, upon surrender and cancellation of certificates for a like number of shares, properly endorsed, and the payment of all taxes due thereon.

SECTION 3.        Fractional Shares.  The Corporation may, but shall not be required to, issue certificates for fractions of a share where necessary to effect authorized transactions, or the Corporation may pay in cash the fair value of fractions of a share as of the time when those entitled to receive such fractions are determined, or it may issue scrip in registered or bearer form over the manual or facsimile signature of an officer of the Corporation or of its agent, exchangeable as therein provided for full shares, but such scrip shall not entitle the holder to any rights of a Stockholder except as therein provided.

The Board of Directors shall have power and authority to make all such rules and regulations as it may deem expedient concerning the issue, transfer and registration of certificates representing shares of the Corporation.

SECTION 4.        Lost, Stolen or Destroyed Certificates.  The Corporation may issue a new certificate of stock in place of any certificate, theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Board of Directors may require the owner of any lost,

8

stolen or destroyed certificate, or his legal representative, to give the Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of any such new certificate.

SECTION 5.    Registered Shares.    The Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, if any, and to vote as such owner, and to hold liable for calls and assessments a person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

## ARTICLE VII

### Dividends

Subject to the provisions of law and the Certificate, the Board of Directors shall have full power to determine whether any, and, if any, what part of any, funds legally available for the payment of dividends shall be declared as dividends and paid to Stockholders; the division of the whole or any part of such funds of the Corporation shall rest wholly within the lawful discretion of the Board of Directors, and it shall not be required at any time, against such discretion, to divide or pay any part of such funds among or to the Stockholders as dividends or otherwise; and before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the Board of Directors from time to time, in its absolute discretion, thinks proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for such other purpose as the Board of Directors shall think conducive to the interest of the Corporation, and the Board of Directors may modify or abolish any such reserve in the manner in which it was created. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the certificate of incorporation.

## ARTICLE VIII

### Ratification

Any transaction, questioned in any law suit on the ground of lack of authority, defective or irregular execution, adverse interest of director, officer or Stockholder, non-disclosure, miscomputation, or the application of improper principles or practices of accounting, may be ratified before or after judgment, by the Board of Directors or by the Stockholders, and if so ratified shall have the same force and effect as if the questioned transaction had been originally duly authorized. Such ratification shall be binding upon the Corporation and its Stockholders and shall constitute a bar to any claim or execution of any judgment in respect of such questioned transaction.

9

## ARTICLE IX

### Fiscal Year

The fiscal year of the Corporation shall be fixed, and shall be subject to change, by the Board of Directors.

## ARTICLE X

### Waiver of Notice

Whenever any notice is required to be given by law, by the Certificate or by these By-laws, a waiver thereof in writing, signed by the person or persons entitled to notice or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent thereto. Any member of the Board of Directors or any committee thereof who is present at a meeting shall be conclusively presumed to have waived notice of such meeting except when such member attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. Such member shall be conclusively presumed to have assented to any action taken unless his or her dissent shall be entered in the minutes of the meeting or unless his or her written dissent to such action shall be filed with the person acting as the secretary of the meeting before the adjournment thereof or shall be forwarded by registered mail to the Secretary of the Corporation immediately after the adjournment of the meeting. Such right to dissent shall not apply to any member who voted in favor of such action.

## ARTICLE XI

### Bank Accounts, Drafts, Contracts, Etc.

SECTION 1. **Bank Accounts and Drafts**. In addition to such bank accounts as may be authorized by the Board of Directors, the primary financial officer or any person designated by said primary financial officer, whether or not an employee of the Corporation, may authorize such bank accounts to be opened or maintained in the name and on behalf of the Corporation as he may deem necessary or appropriate, payments from such bank accounts to be made upon and according to the check of the Corporation in accordance with the written instructions of said primary financial officer, or other person so designated by the Treasurer.

SECTION 2. **Contracts**. The Board of Directors may authorize any person or persons, in the name and on behalf of the Corporation, to enter into or execute and deliver any and all deeds, bonds, mortgages, contracts and other obligations or instruments, and such authority may be general or confined to specific instances.

SECTION 3. **Proxies; Powers of Attorney; Other Instruments**. The Chairman, the Chief Executive Officer, the President or any other person designated by any of them shall have the power and authority to execute and deliver proxies, powers of attorney and other instruments on behalf of the Corporation in connection with the rights and powers incident to the ownership of stock by the Corporation. The Chairman, the Chief Executive Officer, the

10

President or any other person authorized by proxy or power of attorney executed and delivered by either of them on behalf of the Corporation may attend and vote at any meeting of Stockholders of any company in which the Corporation may hold stock, and may exercise on behalf of the Corporation any and all of the rights and powers incident to the ownership of such stock at any such meeting, or otherwise as specified in the proxy or power of attorney so authorizing any such person. The Board of Directors, from time to time, may confer like powers upon any other person.

SECTION 4.     <u>Financial Reports</u>.  The Board of Directors may appoint the primary financial officer or other fiscal officer and/or the Secretary or any other officer to cause to be prepared and furnished to Stockholders entitled thereto any special financial notice and/or financial statement, as the case may be, which may be required by any provision of law.

## ARTICLE XII

<u>Close Corporations; Management by Stockholders</u>

If the Certificate states that the business and affairs of the Corporation shall be managed by the stockholders of the Corporation rather than by a board of directors, then, whenever the context so requires the stockholders of the Corporation shall be deemed the directors of the Corporation for purposes of applying any provision of these By-laws.

## ARTICLE XIII

<u>Amendments</u>

The By-laws may be altered, amended or repealed or new By-laws may be adopted by the affirmative vote of a majority of the directors present at any regular or special meeting of the Board of Directors at which a quorum is present or at any regular or special meeting of the Stockholders by the affirmative vote of a majority of the holders of the Shares outstanding.

## ARTICLE XIV

<u>Indemnification</u>

The Corporation shall indemnify its officers, directors, employees and agents to the extent permitted by the General Corporation Law of Delaware.

11

<u>EXHIBIT 6</u>

Eurofresh Management Incentive Plan
(redline version)

**EUROFRESH HOLDING COMPANY, INC.**
**2009 MANAGEMENT INCENTIVE PLAN**

**ARTICLE 1**
**PURPOSE**

The purpose of the Eurofresh Holding Company, Inc. 2009 Management Incentive Plan (the "**Plan**") is to promote the success and enhance the value of Eurofresh Holding Company, Inc. (the "**Company**") by linking the personal interests of its Board members, officers and executives to the interests of the Company and its shareholders by providing such individuals with incentives for outstanding performance and for generating superior returns to Company shareholders. The Plan is also intended to provide flexibility to the Company in motivating, attracting, and retaining the services of Board members, officers and executives whose judgment, interest, and special efforts are responsible for the successful conduct of the Company's operations.

**ARTICLE 2**
**DEFINITIONS**

2.1 **Definitions.** When a word or phrase appears in the Plan with the initial letter capitalized, and the word or phrase does not begin a sentence, the word or phrase will be given the meaning in this Section 2.1 or in Article 1 unless otherwise indicated by the context.

(a) "**Affiliate**" shall mean an employer with which the Company would be considered a single employer under Sections 414(b) and 414(c) of the Code, using 50% as the percentage of ownership required under such Code sections.

(b) "**Award**" means any Option granted to a Participant under the terms of the Plan.

(c) "**Award Agreement**" means any written agreement, contract, or other instrument or document evidencing an Award.

(d) "**Board**" means the Board of Directors of the Company.

(e) "**Cause**" means any of the following: (i) Participant's conviction of, or plea of guilty or *nolo contendere* to, a felony or a crime involving embezzlement, conversion of property, or moral turpitude; (ii) a finding by a majority of the Board of Participant's fraud, embezzlement, or conversion of the Company's property; (iii) Participant's conviction of, or plea of guilty or *nolo contendere* to, a crime involving the acquisition, use, or expenditure of federal, state, or local government funds or the unlawful use, possession, or sale of illegal substances; (iv) an administrative or judicial determination that Participant committed fraud or any other violation of law involving federal, state, or local government funds; (v) a finding by a majority of the Board of Participant's knowing breach of any of Participant's fiduciary duties to the Company or the Company's shareholders or making of a misrepresentation or omission, which breach, misrepresentation, or omission would reasonably be expected to materially adversely affect the business, properties, assets, condition (financial or other), or prospects of the Company; (vi) Participant's alcohol or substance abuse, which materially interferes with Participant's ability to discharge the

duties, responsibilities, and obligations to or for the Company; provided that Participant has been given notice and fails to cure such abuse within 30 days after delivery of such notice by the Company; (vii) Participant's personal (as opposed to the Company's) material and knowing failure to observe or comply with applicable laws whether as an officer, shareholder, or otherwise in any material respect or in any manner which would reasonably be expected to have a material adverse effect in respect of the Company's ongoing business, operations, conditions, other business relationships, or properties; or (viii) Participant's breach of her/his employment or service agreement with the Company, if any, or Participant's termination for "cause" as such term is defined in any such employment or service agreement, as applicable.

Any rights the Company or any of its Affiliates have to determine the existence of events giving rise to Cause are in addition to the rights the Company or any of its Affiliates may have under any other agreement with the Participant or at law or in equity. If, after a Participant's termination of employment or services, the Company discovers that such Participant's employment or services could have been terminated for Cause, such Participant's employment or services will, in the Board's sole discretion, be deemed to have been terminated for Cause retroactively to the date the events giving rise to Cause occurred.

(f)     "**Change of Control**" means the earliest of the following dates:  (i) the date of any sale (in one transaction or series of related transactions) of all or substantially all the Company's assets to any person or more than one person acting as a group within the meaning of Treasury Regulation Section 1.409A-3(i)(5)(v)(B) ("**Group**");  (ii) the date any person or Group becomes the beneficial owner, directly or indirectly, of shares representing more than 50% of the total fair market value or total voting power of the issued and outstanding stock entitled to vote in the election of directors of the Company; (iii)  the date a majority of members of the Company's Board is replaced during a 12-month period by directors whose appointment or election is not endorsed by a majority of the members of the Board before the date of the appointment or election; or  (iv) the date of the completion of a merger or consolidation of the Company with another entity in which holders of the Stock immediately before the completion of the transaction hold, directly or indirectly, immediately after the transaction, less than 50% of the common equity interest in the surviving corporation in the transaction.   Notwithstanding the foregoing, in no event will a Change of Control be deemed to have occurred as a result of an initial public offering of the Stock.

(g)     "**Code**" means the Internal Revenue Code of 1986, as amended.

(h)     "**Committee**" means the committee of the Board described in Article 3.

(i)     "**Disability**" or "**Disabled**" means:

(1)     For purposes of Incentive Stock Options, a permanent and total disability within the meaning of Section 22(e)(3) of the Code.

(2)     For purposes of any Award the payment of which constitutes "nonqualified deferred compensation" within the meaning of Section 409A paid upon a disability, Disability means:

(A)     If the Participant is not covered under a disability insurance program of the Company or an Affiliate, that the Participant is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months; or

(B)     If the Participant is covered by a disability insurance program of the Company or an Affiliate, that the Participant is, by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months, receiving income replacement benefits for a period of not less than 3 months under an accident and health plan covering employees of the Company or an Affiliate; provided that the definition of "disability" under such disability insurance program complies with the immediately foregoing definitional requirements of Disability.

For purposes of this Section 2.1(i)(2), a Participant shall be deemed to be Disabled if such Participant is determined to be totally disabled by the United States Social Security Administration.

(3)     For all other purposes, (unless otherwise defined in an employment agreement between the Company or any of its Affiliates and the Participant or in the Participant's Award Agreement) any illness or other physical or mental condition of a Participant that renders the Participant incapable of performing her/his customary and usual duties for the Company or Affiliate, or any medically determinable illness or other physical or mental condition resulting from a bodily injury, disease, or mental disorder, which in the Committee's sole judgment is permanent and continuous in nature.

In all cases, the Committee may require such medical or other evidence as it deems necessary to judge the nature and permanency of the Participant's condition.

**(j)**     "**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

**(k)**     "**Fair Market Value**" means, as of any given date, the fair market value of Stock on a particular date determined by such methods or procedures established by the Committee in accordance with Section 409A, and, with respect to an Incentive Stock Option, Code Section 422.

**(l)**     "**Good Reason**" means, when used with reference to a voluntary termination by Participant of Participant's employment or service with the Company and its Affiliates that constitutes a Separation from Service, (i) a material reduction in Participant's authority, duties, or responsibilities or base compensation (other than such a reduction which affects all of the Company's senior executives on a substantially equal or

proportionate basis), or (ii) a material change in the geographic location of Participant's primary work location; provided that Participant shall be required to give notice to the Company or the applicable Affiliate of the existence of the condition in (i) or (ii) within a period not to exceed 90 days of the initial existence of the condition, and the Company or Affiliate must be provided a period of at least 30 days during which it can remedy the condition.

**(m)** "**Incentive Stock Option**" means an Option that is intended to meet the requirements of Section 422 of the Code or any successor provision.

**(n)** "**Non-Employee Director**" means a member of the Board who qualifies as a "Non-Employee Director" as defined in Rule 16b-3(b)(3) of the Exchange Act, or any successor provision.

**(o)** "**Non-Qualified Stock Option**" means an Option that is not intended to be an Incentive Stock Option.

**(p)** "**Option**" means a right granted to a Participant under Article 6 of the Plan to purchase Stock at a specified price during specified time periods. An Option may be either an Incentive Stock Option or a Non-Qualified Stock Option.

**(q)** "**Participant**" means a person who, as a Board member, officer or executive of the Company or any Affiliate, has been granted an Award under the Plan.

**(r)** "**Plan**" means the Eurofresh Holding Company, Inc. 2009 Management Incentive Plan, as the same may be amended from time to time.

**(s)** "**Section 409A**" means Section 409A of the Code and the guidance issued thereunder by the United States Department of the Treasury and/or Internal Revenue Service.

**(t)** "**Separation from Service**" means a termination of employment with the Company and all Affiliates that is a "separation from service" within the meaning of Section 409A.

**(u)** "**Stock**" means the common stock of the Company and such other securities of the Company that may be substituted for Stock pursuant to Article 8.

**2.2    Construction.** Wherever appropriate, words used in the Plan in the singular may include the plural, or the plural may be read as the singular. References to one gender shall include the other.

**ARTICLE 3**
**ADMINISTRATION**

**3.1    Committee.** The Plan will be administered by the Board or a Committee appointed by, and which serves at the discretion of, the Board. If the Board appoints a Committee, the Committee will consist of at least two individuals, each of whom qualifies as (i) a Non-Employee Director, and (ii) an "outside director" under Code Section 162(m) and the regulations issued thereunder. Reference to the Committee in the Plan will refer to the Board if the Board does not appoint a Committee.

**3.2** **Action by the Committee**. A majority of the Committee will constitute a quorum. The acts of a majority of the members present at any meeting at which a quorum is present, and acts approved in writing by a majority of the Committee in lieu of a meeting, will be deemed the acts of the Committee. Each member of the Committee is entitled to, in good faith, rely or act upon any report or other information furnished to that member by any officer or other employee of the Company or any Affiliate, the Company's independent certified public accountants, any executive compensation consultant, or other professional retained by the Company to assist in the Plan's administration.

**3.3** **Authority of Committee.** Subject to any specific designation in the Plan, the Committee has the exclusive power, authority, and discretion to:

(a) Designate Participants to receive Awards;

(b) Determine the number of Awards granted and the number of shares of Stock to be covered by each Award;

(c) Except as otherwise provided in the Plan, determine the terms and conditions of any Award granted under the Plan including but not limited to, any restrictions or limitations on the Award, any schedule for lapse of forfeiture restrictions or restrictions on the exercisability of an Award, and accelerations or waivers thereof, based in each case on such considerations, including Section 409A, as the Committee in its sole discretion determines;

(d) Amend, modify, or terminate any outstanding Award, with the Participant's consent unless the Committee has the authority to amend, modify, or terminate an Award without the Participant's consent under any other provision of the Plan;

(e) Determine whether, to what extent, and under what circumstances an Award may be settled in, or the exercise price of an Award may be paid in, cash, Stock, or other property, or an Award may be canceled, forfeited, or surrendered (after giving consideration to Section 409A);

(f) Prescribe the form of each Award Agreement, which need not be identical for each Participant;

(g) Decide all other matters that must be determined in connection with an Award;

(h) Establish, adopt, or revise any rules and regulations as it may deem necessary or advisable to administer the Plan;

(i) Interpret the terms of, and any matter arising under, the Plan or any Award Agreement; and

(j) Make all other decisions and determinations that may be required under the Plan or as the Committee deems necessary or advisable to administer the Plan.

**3.4** **Decisions Binding.** The Committee's interpretation of the Plan, any Awards granted under the Plan, any Award Agreement, and all decisions and determinations by the Committee with respect to the Plan are final, binding, and conclusive on all parties.

## ARTICLE 4
## SHARES SUBJECT TO THE PLAN

**4.1** **Number of Shares.** Subject to adjustment provided in Section 8.1, the aggregate number of shares of Stock reserved and available for grant under the Plan will be 750,000. For purposes of clarification, the maximum number of shares of Stock that may be issued under the Plan pursuant to the grant of Incentive Stock Options shall not exceed 750,000.

**4.2** **Lapsed Awards.** To the extent that an Award terminates, expires, or lapses for any reason, any shares of Stock subject to the Award will again be available to the Committee to grant Awards under the Plan.

**4.3** **Stock Distributed.** Any Stock distributed pursuant to an Award may consist, in whole or in part, of authorized and unissued Stock, treasury Stock or Stock purchased on the open market.

## ARTICLE 5
## ELIGIBILITY AND PARTICIPATION

**5.1** **Eligibility**.

    **(a)** **General.** Persons eligible to participate in the Plan include all Board members, officers and executives of the Company or an Affiliate, as determined by the Committee.

    **(b)** **Foreign Participants.** To assure the viability of Awards granted to Participants employed in foreign countries, the Committee is authorized to provide for any special terms it considers necessary or appropriate to accommodate differences in local law, tax policy, or custom. Moreover, the Committee may approve any supplements to, or amendments, restatements, or alternative versions of the Plan as it considers necessary or appropriate for such purposes without affecting the terms of the Plan as in effect for any other purpose; provided, however, that no such supplements, amendments, restatements, or alternative versions may increase the share limitations contained in Section 4.1 of the Plan.

**5.2** **Actual Participation.** Subject to the provisions of the Plan, the Committee may, from time to time, select from among all eligible individuals, those to whom Awards will be granted and will determine the nature and amount of each Award. No individual will have any right to be granted an Award under the Plan.

## ARTICLE 6
## STOCK OPTIONS

**6.1** **In General.** For purposes of the Plan, a grant shall be considered to have been made when the Committee has fixed, for each Option, the identity of the Participant and the maximum number of Shares; provided that there is no unreasonable delay in giving notice of the grant to the Participant.

Any Option granted under the Plan shall be evidenced by a written Award Agreement in such form as the Committee may from time to time approve. The Committee is authorized to grant Options to Participants subject to the following terms and conditions and to such additional terms and conditions, not inconsistent with the Plan, as the Committee deems appropriate:

(a) **Exercise Price.** The exercise price per share of Stock under an Option ("**Exercise Price**") shall be determined by the Committee; provided that the Exercise Price shall be no less than the Fair Market Value per share of Stock on the date of grant of the Option (or 110% of the Fair Market Value with respect to an Incentive Stock Option granted to an employee who owns stock possessing more than 10% of the total combined voting power of all classes of stock of the Company or of any parent or subsidiary corporation of the Company, as provided in Section 6.2(d) hereof).

(b) **Number of Shares.** The number of shares of Stock subject to an Option shall be fixed on the date of grant of the Option.

(c) **Time of Exercise.** Options shall be exercisable at such time or times in whole or in part as determined by the Committee at or subsequent to grant; provided that any extension of an Option shall result in exercise no later than the earlier of the latest date upon which the Option would have expired by its original terms or the 10-year anniversary of the date of grant of the Option. Unless otherwise provided in the Award Agreement, an Option will lapse immediately if a Participant's employment or services are terminated by the Company for Cause or by the Participant without Good Reason. Any Option not exercised before the expiration of the exercise period shall terminate.

(d) **Conditions of Exercise.** The performance or other conditions, if any, that must be satisfied before all or part of an Option may be exercised will be fixed by the Committee at the time the Option is granted.

(e) **Payment.** The Committee will determine the methods by which the Exercise Price of an Option may be paid, the form of payment, including, without limitation, cash, recourse promissory note, shares of Stock (through actual tender or by attestation or, if permitted by applicable law, broker-assisted "cashless exercise" arrangements), and the methods by which shares of Stock will be delivered to Participants.

(f) **No Deferral Feature**. No Option shall have any feature that would allow for the deferral of compensation (within the meaning of Section 409A) other than the deferral of recognition of income until the later of the exercise or disposition of the Option or the time the shares acquired subject to the exercise of the Option first become substantially vested (as defined in Treasury Regulation Section 1.83-3(b)).

6.2 **Incentive Stock Options.** Incentive Stock Options will be granted only to employees, and the terms of any Incentive Stock Options granted under the Plan must comply with the requirements of Section 6.1 and the following additional rules:

(a) **Exercise.** No Incentive Stock Option shall be exercisable for more than 10 years after the date of its grant.

**(b)     Lapse of Option.**   An Incentive Stock Option will lapse under the following circumstances:

**(1)**     The Incentive Stock Option will lapse 10 years from the date it is granted, unless it lapses earlier under the Award Agreement.

**(2)**     Unless otherwise provided in the Award Agreement, an Incentive Stock Option will lapse upon a Participant's termination of employment for Cause or for any other reason (other than the death or Disability).

**(3)**     If the Participant terminates employment because of Disability or death before the Option lapses pursuant to paragraph (1) or (2) above, the Incentive Stock Option will lapse, unless it is sooner exercised, on the earlier of:

(i)     the date on which the Option would have lapsed had the Participant not become Disabled or lived and had remain employed; or

(ii)     12 months after the date of the Participant's termination of employment because of Disability or death.

Upon the Participant's Disability or death, any Incentive Stock Option exercisable at the Participant's Disability or death may be exercised by the Participant's legal representative, by the person or persons entitled to do so under the Participant's last will and testament, or, if the Participant fails to make testamentary disposition of such Incentive Stock Option or dies intestate, by the person or persons entitled to receive the Incentive Stock Option under the applicable laws of descent and distribution.

**(c)     Individual Dollar Limitation.**   The aggregate Fair Market Value (determined as of the date of grant) of all shares of Stock with respect to which Incentive Stock Options are first exercisable by a Participant in any calendar year may not exceed $100,000.00 or such other limitation as imposed by Section 422(d) of the Code, or any successor provision.  To the extent that Incentive Stock Options are first exercisable by a Participant in excess of such limitation, the excess will be considered Non-Qualified Stock Options.

**(d)     Ten Percent Owners.**  An Incentive Stock Option will be granted to any individual who, at the date of grant, owns stock possessing more than 10% of the total combined voting power of all classes of stock of the Company or of any parent or subsidiary corporation of the Company, only if such Option is granted at an Exercise Price that is not less than 110% of Fair Market Value per share of Stock on the date of grant and the Option is exercisable for no more than 5 years from the date of grant.

**(e)     Expiration of Incentive Stock Options.**  No Award of an Incentive Stock Option may be made pursuant to the Plan after the tenth year anniversary of the effective date of the Plan.

**(f)     Right To Exercise.**  An Incentive Stock Option may be exercised only by the Participant during her/his lifetime.

**(g)     Disqualifying Dispositions.**  If shares of Stock acquired upon exercise of an Incentive Stock Option are disposed of within 2 years following the date of grant or 1 year following the transfer of such shares to a Participant upon exercise, the Participant

shall, promptly following such disposition, notify the Company in writing of the date and terms of such disposition and provide such other information regarding the disposition as the Committee may reasonably require.

## ARTICLE 7
## PROVISIONS APPLICABLE TO AWARDS

**7.1**    **Term of Award.**  The term of each Award will be for the period as determined by the Committee; provided that in no event will the term of any Incentive Stock Option exceed a period of 10 years from the date of its grant.

**7.2**    **Limits on Transfer**.  No right or interest of a Participant in any Award may be pledged, encumbered, or hypothecated to or in favor of any party other than the Company or an Affiliate, or will be subject to any lien, obligation, or liability of such Participant to any other party other than the Company or an Affiliate.  Except as otherwise provided by the Committee, no Award will be assignable or transferable by a Participant other than by will or the laws of descent and distribution.

**7.3**    **Beneficiaries.**  A Participant may, in the manner determined by the Committee, designate a beneficiary to exercise the rights of the Participant and to receive any distribution with respect to any Award upon the Participant's death.

A beneficiary, legal guardian, legal representative, or other person claiming any rights under the Plan is subject to all terms and conditions of the Plan and any Award Agreement applicable to the Participant, except to the extent the Plan and Award Agreement otherwise provide, and to any additional restrictions deemed necessary or appropriate by the Committee.  If the Participant is married, a designation of a person other than the Participant's spouse as her/his beneficiary with respect to more than 50% of the Participant's interest in the Award will not be effective without the written consent of the Participant's spouse.  If no beneficiary has been designated or survives the Participant, payment will be made to the person entitled thereto under the Participant's will or the laws of descent and distribution.  Subject to the foregoing, a beneficiary designation may be changed or revoked by a Participant at any time; provided that the change or revocation is filed with the Committee before the Participant's death.

**7.4**    **Stock Certificates.**  Notwithstanding anything herein to the contrary, the Company will not be required to issue or deliver any certificates evidencing shares of Stock pursuant to the exercise of any Awards, unless and until the Board has determined, with advice of counsel, that the issuance and delivery of such certificates is in compliance with all applicable laws, regulations of governmental authorities, and, if applicable, the requirements of any exchange on which the shares of Stock are listed or traded.  All Stock certificates delivered under the Plan are subject to any stop-transfer orders and other restrictions as the Committee deems necessary or advisable to comply with Federal, state, or foreign jurisdiction, securities or other laws, rules, and regulations, and the rules of any national securities exchange or automated quotation system on which the Stock is listed, quoted, or traded.  The Committee may place legends on any Stock certificate to reference restrictions applicable to the Stock.  In addition to the terms and conditions provided herein, the Board may require that a Participant make such reasonable covenants, agreements, and representations as the Board, in its discretion, deems advisable in order to comply with any such laws, regulations, or requirements.

**7.5**     <u>Acceleration upon a Change of Control.</u>  If (a) a Change of Control occurs and if (b) within one year after the Change of Control either (i) the Participant's employment or service with the Company and its Affiliates is terminated by the Company (or an Affiliate) without Cause, such that s/he incurs a Separation from Service, or (ii) the Participant incurs a Separation from Service for Good Reason, then all outstanding Options will become fully exercisable and all restrictions on outstanding Awards will lapse.  To the extent that this provision causes Incentive Stock Options to exceed the dollar limitation set forth in <u>Section 6.2(d)</u>, the excess Options will be deemed to be Non-Qualified Stock Options.  Upon or in anticipation of a Change of Control, the Committee may cause every Option outstanding hereunder to terminate at a specific time in the future and will give each Participant the right to exercise Options during a period of time as the Committee, in its sole and absolute discretion, will determine.

## ARTICLE 8
## CHANGES IN CAPITAL STRUCTURE

**8.1**     <u>General.</u>

**(a)**     <u>Shares Available for Grant and Limits.</u>  If there is any change in the number of shares of Stock outstanding by reason of any stock dividend or split, recapitalization, merger, consolidation, combination, or exchange of shares, or similar corporate change, the maximum aggregate number of shares of Stock with respect to which the Committee may grant Awards pursuant to <u>Section 4.1</u> and the maximum number of shares of Stock which may be granted to any one person in a single calendar year pursuant to <u>Section 4.4</u> will be appropriately adjusted by the Committee.  Except as required by Sections 162(m) and 422 of the Code and Section 409A, if there is any change in the number of shares of Stock outstanding by reason of any other event or transaction, the Committee may, but need not, make such adjustments in the number and class of shares of Stock with respect to which Awards may be granted pursuant to <u>Section 4.1</u> and the maximum number of shares of Stock which may be granted to any one person in a single calendar year pursuant to <u>Section 4.4</u>, as the Committee may deem appropriate.

**(b)**     <u>Outstanding Awards – Increase or Decrease in Issued Shares Without Consideration.</u>  Subject to any required action by the shareholders of the Company, if there is any increase or decrease in the number of issued shares of Stock resulting from a subdivision or consolidation of shares of Stock or the payment of a stock dividend (but only on the shares of Stock), or any other increase or decrease in the number of such shares effected without receipt or payment of consideration by the Company, the Committee will proportionally adjust the number of shares of Stock subject to each outstanding Award and the exercise price (or grant price) per share of Stock of each such Award.

**(c)**     <u>Outstanding Awards – Certain Mergers.</u>  Subject to any required action by the shareholders of the Company, if the Company is the surviving corporation in any merger or consolidation (except a merger or consolidation as a result of which the holders of shares of Stock receive securities of another corporation), each Award outstanding on the date of such merger or consolidation will pertain to and apply to the securities which a holder of the number of shares of Stock subject to such Award would have received in such merger or consolidation.

(d)     **Outstanding Awards – Other Changes.**   If any other change in the capitalization of the Company or corporate change other than those specifically referred to in this Article 8 occurs, the Committee may, in its absolute discretion, make such adjustments in the number and class of shares subject to Awards outstanding on the date on which such change occurs and in the per share exercise price of each Award as the Committee may consider appropriate to prevent dilution or enlargement of rights, consistent with Section 422 of the Code and Section 409A.

(e)     **No Other Rights.**   Except as expressly provided in the Plan, no Participant will have any rights by reason of any subdivision or consolidation of shares of stock of any class, the payment of any dividend, any increase or decrease in the number of shares of stock of any class or any dissolution, liquidation, merger, or consolidation of the Company or any other corporation.   Except as expressly provided in the Plan, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, will affect, and no adjustment by reason thereof will be made with respect to, the number of shares of Stock subject to an Award or the exercise price (and any grant price) of any Award.

# ARTICLE 9
# AMENDMENT, MODIFICATION, AND TERMINATION

**9.1     Amendment, Modification, And Termination.**   With the approval of the Board, subject to Section 409A, at any time and from time to time, the Committee may terminate, amend or modify the Plan; provided, however, that to the extent necessary and desirable to comply with any applicable law, regulation, or stock exchange rule, the Company will obtain shareholder approval of any Plan amendment in such a manner and to such a degree as required.

**9.2     Awards Previously Granted.**   Except as otherwise provided in the Plan, including without limitation, the provisions of Article 8, no termination, amendment, or modification of the Plan will adversely affect in any material way any Award previously granted under the Plan, without the written consent of the Participant.

# ARTICLE 10
# GENERAL PROVISIONS

**10.1     No Rights to Awards.**   No Participant, employee, or other person will have any claim to be granted any Award under the Plan, and neither the Company nor the Committee is obligated to treat Participants, employees, and other persons uniformly.

**10.2     No Shareholders Rights.**   No Award gives the Participant any of the rights of a shareholder of the Company unless and until shares of Stock are in fact issued to such person in connection with such Award.

**10.3     Tax Reporting and Withholding.**   The Company or any Affiliate has the authority and the right to report income with respect to an Award and to deduct or withhold, or require a Participant to remit to the Company, an amount sufficient to satisfy federal, state, local, and foreign taxes (including the Participant's FICA and Medicare obligations) required by law to be

withheld with respect to any taxable event arising as a result of the Plan. With the Committee's consent, a Participant may elect to have the Company withhold from those shares of Stock that would otherwise be received upon the exercise of any Option, a number of shares having a Fair Market Value equal to the minimum statutory amount necessary to satisfy the Participant's applicable federal, state, local, and foreign income and employment tax withholding obligations.

**10.4** **No Right to Employment or Services.** Nothing in the Plan or any Award Agreement will interfere with or limit in any way the right of the Company or any Affiliate to terminate any Participant's employment or services at any time, nor confer upon any Participant any right to continue in the employ or service of the Company or any Affiliate.

**10.5** **Unfunded Status of Awards.** The Plan is intended to be an "unfunded" plan for incentive compensation. With respect to any payments not yet made to a Participant pursuant to an Award, nothing contained in the Plan or any Award Agreement will give the Participant any rights that are greater than those of a general unsecured creditor of the Company or any Affiliate.

**10.6** **Indemnification.** To the extent allowable under applicable law, each member of the Committee or the Board will be indemnified and held harmless by the Company from any loss, cost, liability, or expense that may be imposed upon or reasonably incurred by such member in connection with or resulting from any claim, action, suit, or proceeding to which s/he may be a party or in which s/he may be involved by reason of any action or failure to act under the Plan and against and from any and all amounts paid by her/him in satisfaction of judgment in such action, suit, or proceeding against her/him; provided s/he gives the Company an opportunity, at its own expense, to handle and defend the same before s/he undertakes to handle and defend it on her/his own behalf. The foregoing right of indemnification is in addition to any other rights of indemnification to which such persons may be entitled under the Company's Certificate of Incorporation or Bylaws, as a matter of law, or otherwise, or any power that the Company may have to indemnify them or hold them harmless.

**10.7** **Relationship to Other Benefits**. No payment under the Plan will be taken into account in determining any benefits under any pension, retirement, savings, profit sharing, group insurance, welfare, or other benefit plan of the Company or any Affiliate.

**10.8** **Expenses.** The Company and its Affiliates will pay the expenses of administering the Plan.

**10.9** **Titles and Headings.** The titles and headings of the Sections in the Plan are for convenience of reference only, and if there is any conflict, the text of the Plan, rather than such titles or headings, will control.

**10.10** **Fractional Shares.** No fractional shares of Stock will be issued, and the Committee will determine, in its discretion, whether cash will be given in lieu of fractional shares or whether such fractional shares will be eliminated by rounding up or down as appropriate.

**10.11** **Securities Law Compliance.** Transactions under the Plan are intended to comply with all applicable conditions of Rule 16b-3 or its successors under the Exchange Act, including those with respect to any person who is, on the relevant date, obligated to file reports under Section 16 of the Exchange Act. To the extent any provision of the Plan or action by the Committee fails to so comply, it will be void to the extent permitted by law and voidable as deemed advisable by the Committee.

**10.12    Government and Other Regulations.**  The obligation of the Company to make payment of Awards in Stock or otherwise will be subject to all applicable laws, rules, and regulations, and to such approvals by government agencies as may be required.  The Company will be under no obligation to register under the Securities Act of 1933, as amended, any of the shares of Stock paid under the Plan. If the shares paid under the Plan may in certain circumstances be exempt from registration under the Securities Act of 1933, as amended, the Company may restrict the transfer of such shares in such manner as it deems advisable to ensure the availability of any such exemption.

**10.13    Governing Law.**  The Plan and all Award Agreements will be construed in accordance with and governed by the laws of the State of Delaware.

**10.14    No Authority to Reprice.**  Other than in connection with a change in the Company's capital structure (as described in Article 8 of the Plan), neither the Committee nor the Board shall have the authority to reprice any outstanding Option without the prior approval of the Company's shareholders. "Repricing" means any of the following or any other action that has the same effect: (i) lowering the Exercise Price of an Option after it is granted; (ii) any other action that is treated as a repricing under generally accepted accounting principles; or (iii) canceling an Option at a time when its Exercise Price exceeds the fair market value of the underlying stock, in exchange for another Option or other equity, unless the cancellation and exchange occurs in connection with a change in the Company's capital structure (as described in Article 8 of the Plan). In permitting any repricing, the Company will consider the tax effects, if any, of Section 409A.

**10.15    No Guarantee of Tax Treatment.**  Notwithstanding any other provision of the Plan, although the Committee shall use its best efforts to avoid the imposition of taxation, penalties, and interest under Section 409A, the tax treatment of Awards under the Plan shall not be, and is not, warranted or guaranteed.  Neither the Company, any Affiliate, the Board, the Committee, nor any of their designees shall be held liable for any taxes, penalties, or other monetary amounts owed by a Participant, former Participant, beneficiary, or other person as a result of any deferral or payment under the Plan.

*[The balance of this page was intentionally left blank.]*

IN WITNESS WHEREOF, this Eurofresh Holding Company, Inc. 2009 Management

Incentive Plan is executed on behalf of the Company on this _____ day of _____, 2009.

**EUROFRESH HOLDING COMPANY, INC.**


By: _____

Name:_____

Title: _____

<u>EXHIBIT 7</u>

Certificate of Designation – Eurofresh Holding Company, Inc.
Preferred Stock (redline version)

CERTIFICATE OF DESIGNATIONS, PREFERENCES
AND RELATIVE, PARTICIPATING, OPTIONAL AND
OTHER SPECIAL RIGHTS

OF

10.0% SERIES A PREFERRED STOCK

OF

EUROFRESH HOLDING COMPANY, INC.

PURSUANT TO SECTION 151 OF THE
GENERAL CORPORATION LAW OF THE STATE OF DELAWARE

Eurofresh Holding Company, Inc. (the "Company"), a corporation organized and existing under the General Corporation Law of the State of Delaware, certifies that pursuant to the authority contained in Article 9Four of its Third Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation") and in accordance with the provisions of Section 151 of the General Corporation Law of the State of Delaware, the Board of Directors of the Company, by unanimous consent dated [          ], 2009 duly approved and adopted the following resolutions (this "Certificate of Designation") which resolutions remain in full force and effect on the date hereof:

RESOLVED, that on [          ], 2009 the Board of Directors of the Company designated, created, authorized and provided for the issue of 10.0% Series A Preferred Stock, par value $0.001 per share ("Series A Preferred Stock"), with an initial issue price of $1,000.00 per share (the "Issue Price"), consisting of 32,000 shares on the terms and with the voting powers, preferences and relative, participating, optional and other special rights, and qualifications, limitations and restrictions set forth herein (in addition to those set forth in the Company's Certificate of Incorporation).

1.    **Certain Definitions.**

Unless the context otherwise requires, the terms defined in this Section 1 shall have, for all purposes of this resolution, the meanings herein specified (with terms defined in the singular having comparable meanings when used in the plural).

"Board of Directors" means the Board of Directors of the Company or any committee thereof duly authorized to act on behalf of such Board.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banking institutions are authorized or required by law to close in New York City.

"Capital Stock" of any Person means any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in, however designated, the equity of such Person, including any Preferred Stock.

"Change of Control" means:

(1) any event occurs the result of which is that any Person becomes the beneficial owner, as defined in Rules 13d-3 and 13d-5 under the Exchange Act (except that a Person shall be deemed to have "beneficial ownership" of all shares that any such Person has the right to acquire within one year) directly or indirectly, of more than [50]% of the voting Capital Stock of the Company or a Successor Company, including, without limitation, through a merger or consolidation or purchase of voting Capital Stock of the Company; provided that the transfer of 100% of the voting Capital Stock of the Company to a Person that has an ownership structure and beneficial owners identical to that of the Company prior to such transfer, such that the Company becomes a Wholly Owned Subsidiary of such Person, shall not be treated as a Change of Control for purposes of this Certificate of Designation;

(2) during any period of two consecutive years occurring after the Issue Date, individuals who at the beginning of such period constituted the Board of Directors, together with any new directors whose election by such Board of Directors or whose nomination for election by the stockholders of the Company was approved by a vote of a majority of the directors of the Company then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved, cease for any reason to constitute a majority of the Board of Directors then in office;

(3) the sale, lease, transfer, exchange, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries taken as a whole to any Person or group of related Persons; provided that the sale, lease, transfer, exchange, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company to a Person that has an ownership structure and beneficial owners identical to that of the Company prior to such sale, lease, transfer, exchange, conveyance or other disposition shall not be treated as a Change of Control for purposes of this Certificate of Designation; or

(4) the approval, adoption or initiation of a plan or proposal relating to the liquidation or dissolution of the Company.

"Change of Control Date" has the meaning set forth in Section 5(b).

"Change of Control Notice" has the meaning set forth in Section 5(b).

"Credit Agreement" means that certain [First Lien Loans and Term B Loan] / [the New]the Credit Facility]and Guaranty Agreement, dated on or about the Issue Date, by and among the Company, its Subsidiaries, the various lenders party thereto, and the Senior Lender, and each other document entered into as part of the transactions contemplated by the Credit

Agreement, as such agreement and documents may be amended, supplemented, restated, amended and restated or otherwise modified, or refinanced, replaced, renewed or otherwise restructured, in whole or in part from time to time (including increasing the amount of available borrowings thereunder or adding Subsidiaries of the Company as additional borrowers or guarantors thereunder) with respect to all or any portion of the indebtedness under such agreement or agreements or any successor or replacement agreement or agreements and whether by the same or any other agent, lender or group of lenders.

"Credit Agreement Obligations" means (i) all obligations for principal, premium, interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), penalties, fees, indemnifications, reimbursements and damages payable under the Credit Agreement and (ii) any commitment or obligation of the lenders or issuing bank under the Credit Agreement to extend any credit or issue or honor any letter of credit.

"Debt Documents" means the Credit Agreement [and the Subordinated PIK Purchase Agreement], together with the other agreements, documents and instruments referred to therein.

"Debt Payoff Date" means the date on which (i) all Credit Agreement Obligations and (ii) all Subordinated Note Obligations have been fully and completely satisfied by the Company such that no further obligations remain under any of the Debt Documents.

"DGCL" means the Delaware General Corporation Law, as in effect from time to time.

"Dividend Conversion Date" means the date that the Board of Directors adopts a resolution authorizing the payment of dividends on the Series A Preferred Stock in cash, rather than in additional shares of Series A Preferred Stock, which resolution shall not be adopted prior to the Debt Payoff Date.

"Dividend Payment Date" means June 30 of each year.

"Dividend Rate" has the meaning set forth in Section 3(a) hereof.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Holder" means a Person in whose name a share of Series A Preferred Stock is registered.

"Initial Holders" means, collectively, the Persons to whom shares of Series A Preferred Stock are first issued.

"Issue Date" means the date that shares of Series A Preferred Stock are first issued to the Initial Holders, regardless of the number of times a transfer of any share of Series A Preferred Stock is made on the stock records maintained by or for the Company and regardless of the number of certificates that may be issued to evidence any share of Series A Preferred Stock.

"Issue Price" has the meaning set forth in the recitals.

"Junior Securities" has the meaning set forth in Section 2 hereof.

"Liquidation Event" means any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Company, in any single transaction or series of transactions.

"Liquidation Preference" means for each share of Series A Preferred Stock, the Issue Price plus all accrued and unpaid dividends thereon.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Preferred Stock" as applied to the Capital Stock of any corporation means Capital Stock of any class or classes, however designated, that is preferred as to the payment of dividends, or as to the distribution of assets upon any Liquidation Event, over shares of Capital Stock of any other class of such corporation.

"Record Date" has the meaning set forth in Section 3 hereof.

"Securities Act" means the Securities Act of 1933, as amended.

"Senior Lender" means [[——————]Silver Point Finance, LLC., as administrative agent for the banks party to the Credit Agreement].

"Series A Majority Vote" means the affirmative vote of a majority of the outstanding shares of Series A Preferred Stock.

"Series A Preferred Stock" has the meaning set forth in the recitals hereto.

"Subordinated Notes" means the [$12,000,000] / [$20,000,000]$30,000,000 aggregate principal amount of 15% notes due 2016 issued by the Company on the Issue Date.

"Subordinated Note Obligations" means (i) all obligations for principal, premium, interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), penalties, fees, indemnifications, reimbursements and damages payable under the [Subordinated PIK A Notes and] Subordinated Notes and the Subordinated PIK Purchase Agreement and (ii) any commitment or obligation of the Company to issue any additional [Subordinated PIK A Notes and] Subordinated Notes under the terms of the Subordinated PIK Purchase Agreement.

"Subordinated Noteholder" means a Person who, as of the date hereof, is a holder of any [Subordinated PIK A Notes and/or] Subordinated Notes.

["Subordinated PIK A Notes" means the $5,000,000 aggregate principal amount of 1520% class A notes due March 31, 2010, subordinated to claims under the New Credit Facility but senior to the Subordinated Notes, issued by the Company on the Issue Date.]

"Subordinated PIK Purchase Agreement" means the 15% Subordinated PIK Purchase Agreement governing the [Subordinated PIK A Notes and] Subordinated Notes, dated on or about the Issue Date by and among the Company and the other parties listed thereto, as amended,

restated, supplemented, or modified from time to time and each other document entered into as part of the transactions contemplated by such agreements.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a partnership, limited liability company, association or other business entity, a majority of the partnership, membership interests or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, limited liability company, association or other business entity if such Person or Persons shall be allocated a majority of partnership, limited liability company, association or other business entity gains or losses or shall be or control the managing director, managing member or a general partner of such partnership, limited liability company, association or other business entity.

"Successor Company" means the Company's successor in the event of a merger, recapitalization or consolidation.

"Transfer Agent" means the Company or any third party appointed by the Company, in each case, including any successor or replacement transfer agent appointed by the Company (including the Company itself), provided the Company has given notice to Holders of such appointment.

"Triggering Event" means the Company's failure to make an offer to purchase all of the outstanding shares of Series A Preferred Stock following a Change of Control (whether or not the Company is permitted to do so by any other obligation of the Company) or its failure to purchase shares of Series A Preferred Stock from Holders who elect to have such shares repurchased pursuant to the Change of Control offer (whether or not the Company is permitted to do so by any other obligation of the Company).

"Wholly Owned Subsidiary" means a Subsidiary of the Company all the Capital Stock of which, other than directors' qualifying shares, is owned by the Company or another Wholly Owned Subsidiary.

## 2. **Ranking.**

The Series A Preferred Stock will rank, with respect to dividend distributions and distributions upon a Liquidation Event, senior to the common stock of the Company and to each other class of Capital Stock or series of Preferred Stock created before or after the date of this Certificate of Designation (collectively referred to with the common stock of the Company as "Junior Securities").  The Company shall not issue any series of Capital Stock or Preferred Stock that ranks *pari passu* or senior to the Series A Preferred Stock with respect to dividend distributions or distributions upon a Liquidation Event, except as provided in Section 6(c) below.

3. **Dividends.**

   (a)    Each share of Series A Preferred Stock will accrue dividends on a daily basis from the date of issuance of such shares on the Issue Price plus all accumulated but unpaid dividends (solely for such period as any unpaid dividends remain outstanding) at 10.0% per annum (the "Dividend Rate").  Dividends on the Series A Preferred Stock will be computed on the basis of a 360-day year comprised of twelve 30-day months.  Dividends, whether or not declared or paid (and regardless of whether or not there are profits, surplus or other funds legally available therefor), will be payable [annually in arrears on June 30 of each year] (each, a "Dividend Payment Date"), commencing on [June 30, 2010]; provided, however that if any Dividend Payment Date occurs on a date that is not a Business Day, any accrued dividends otherwise payable on such Dividend Payment Date shall be paid on the next succeeding Business Day.  Dividends shall be paid to the Holders on each Dividend Payment Date as their names shall appear on the share register of the Company as of the close of business on the date immediately preceding such Dividend Payment Date (the "Record Date").

   (b)    Until the Dividend Conversion Date, all dividends on the Series A Preferred Stock shall be paid by the issuance of additional fully paid and nonassessable shares of Series A Preferred Stock, including fractional shares, legally available for such purpose and having an aggregate Issue Price equal to the amount of such dividends.  The issuance of such additional shares of Series A Preferred Stock shall constitute a "payment" of the related dividend for all purposes of this Certificate of Designation.  Any additional shares of Series A Preferred Stock issued pursuant to this Section 3(b) shall be governed by this Certificate of Designation and shall be subject in all respects, except as to the date of issuance and the date from which dividends accrue and cumulate as set forth above, to the same terms as the shares of Series A Preferred Stock originally issued hereunder.  From and after the Dividend Conversion Date, all dividends shall be paid in cash.

   (c)    To the extent that accrued but unaccumulated dividends are not paid either by the issuance of additional shares of Series A Preferred Stock or in cash, as applicable, on any Dividend Payment Date, all dividends that have accrued (but are unpaid) on each share of Series A Preferred Stock outstanding during the annual period ending upon each such Dividend Payment Date will be accumulated and added to the Liquidation Preference of such share of Series A Preferred Stock and shall remain part of the Liquidation Preference thereof until paid to the holder thereof. Nothing contained herein shall in any way or under any circumstances be construed or deemed to require the Board of Directors to declare, or the Company to pay or set apart for payment, any dividends on shares of Series A Preferred Stock if such payment would be a breach of the Company's obligations under the Debt Documents and unless the Company has legally available funds for such payment.

   (d)    Other than any dividends or distributions declared, made or paid, or set apart for payment as required with respect to the Series A Preferred Stock pursuant to its terms, no dividends or other distributions may be declared, made or paid, or set apart for payment upon, any Junior Securities (other than dividends payable solely in shares of, or rights to acquire shares of, the class or series of Junior Securities upon which such dividends are declared or paid), nor may any Junior Securities be redeemed, purchased or otherwise acquired for any consideration (other than a purchase, redemption or acquisition of shares of Junior Securities made for purposes of an employee incentive or benefit plan of the Company, including, without limitation,

the acquisition upon exercise of stock options, warrants or rights to acquire Capital Stock if the security acquired represents a portion of the exercise price thereof and acquisitions from employees under any such employee incentive or benefit plan and the acquisition of securities repurchased from any employee, director or consultant (or his, her or its permitted transferees) upon the termination of their employment with or service to the Company and its Subsidiaries), nor shall any money be paid to or made available for a sinking fund for the redemption of any Junior Securities by or on behalf of the Company while any Series A Preferred Stock remains outstanding.

(e)     Except as otherwise provided herein, if at any time the Company elects or is required to pay dividends in cash and pays less than the total amount of dividends then accrued and unpaid with respect to the Series A Preferred Stock, such payment will be distributed ratably among the Holders of Series A Preferred Stock in proportion to the full amount to which they would otherwise be respectively entitled, and any amounts of such total amount of dividends remaining thereafter shall, until paid to the Holder thereof, remain accrued and unpaid dividends with respect to such Series A Preferred Stock accumulating pursuant to Section 3(c).

4.     **Distributions Upon a Liquidation Event.**

(a)     Upon a Liquidation Event (the date of such occurrence, the "Liquidation Date"), the Company shall, out of the assets of the Company available for distribution, make the following payments:

(i)     first a payment on each share of the Series A Preferred Stock in an amount equal to the Liquidation Preference (including an amount in cash equal to a prorated dividend for the period from the Dividend Payment Date immediately prior to the redemption date to the redemption date); provided, that if upon any Liquidation Event, the funds available to pay the Series A Preferred Stock are not sufficient to pay such securities in full, the Holders will share equally and ratably in any distribution of assets of the Company in proportion to the full Liquidation Preference on each share of the Series A Preferred Stock to which each such Holder is entitled: and

(ii)     second, payments on any Junior Securities, including, without limitation, the common stock of the Company.

(b)     The Company will send a written notice of liquidation to each Holder of record of shares of Series A Preferred Stock not less than ten (10) days prior to the Liquidation Date. Such notice shall specify (i) the Liquidation Date, (ii) the nature of the Liquidation Event, (iii) the amount of the liquidation payment to be made to such Holder, and (iv) that, unless the Company defaults in making such liquidation payment, dividends on the Series A Preferred Stock shall cease to accumulate as of the Liquidation Date.

(c)     After payment in full in cash of the Liquidation Preference, Holders shall not be entitled to any further participation in any distribution of assets of the Company with respect to the shares of Series A Preferred Stock on which they have received the Liquidation Preference.

**(d)**    Subject to Section 5(b), neither the sale, conveyance, exchange or transfer (for cash, shares of stock, securities or other consideration) of all or substantially all the property or assets of the Company, nor the consolidation or merger of the Company into or with any other entity or entities (whether or not the Company is the surviving entity), nor the reduction of the capital stock of the Company, nor any other form of recapitalization or reorganization affecting the Company, shall be deemed to be a Liquidation Event (unless such sale, conveyance, exchange or transfer is in connection with a dissolution or winding-up of the business of the Company).

**5.    Redemption.**

   **(a)**    Optional Redemption.

      **(i)**    At any time after the Dividend Conversion Date, the Company may, at its option, at any time and from time to time, redeem for cash all or any portion of the outstanding shares of Series A Preferred Stock upon not less than thirty (30) nor more than ninety (90) days' notice (subject to contractual and other restrictions with respect thereto and to the legal availability of funds therefor), for an amount equal to the Liquidation Preference (including an amount in cash equal to a prorated dividend for the period from the Dividend Payment Date immediately prior to the redemption date to the redemption date).

      **(ii)**    The Company will send a written notice of redemption to each Holder of record of shares of Series A Preferred Stock not less than thirty (30) days or more than ninety (90) days prior to the date fixed for such redemption. Such notice shall specify (i) the date fixed for such redemption, (ii) the redemption price, (iii) if less than all of the Series A Preferred Stock is being redeemed, the number of Series A Preferred Stock being redeemed, (iv) the name and address of the Transfer Agent, (v) that shares called for redemption must be surrendered to the Transfer Agent to receive payment, and (vi) that, unless the Company defaults in making such redemption payment, dividends on the Series A Preferred Stock called for redemption shall cease to accrue as of the date fixed for such redemption. Shares of Series A Preferred Stock issued and reacquired will be automatically cancelled and retired and shall cease to exist.

      **(iii)**    Prior to a date of redemption, the Company shall deposit the funds for redemption (including an amount in cash equal to a prorated dividend for the period from the Dividend Payment Date immediately prior to the redemption date to the redemption date) with the Transfer Agent, who shall hold such amount in trust for the benefit of the Holders of the shares called for redemption.

      **(iv)**    On and after a redemption date, unless the Company defaults in the payment of the applicable redemption price, dividends will cease to accrue on shares of Series A Preferred Stock called for redemption and all rights of Holders of such shares will terminate (with respect to such

shares), except for the right to receive the redemption price (such price including an amount in cash equal to a prorated dividend for the period from the Dividend Payment Date immediately prior to the redemption date to the redemption date).

(v) All partial optional redemptions of Series A Preferred Stock pursuant to this <u>Section 5(a)</u> shall be made pro rata among the Holders on the basis of the number of shares of Series A Preferred Stock held by each such Holder.

(vi) Notwithstanding anything to the contrary herein, redemption of the Series A Preferred Stock is subject to contractual and other restrictions with respect thereto and to the legal availability of funds therefore and the Series A Preferred Stock shall not be redeemed pursuant to this <u>Section 5</u> at any time that such redemption is expressly prohibited by the Debt Documents.

(b) <u>Redemption Upon Change of Control</u>.

(i) In the event of any Change of Control, each Holder shall have the right, at such Holder's election as set forth below, to cause the Company to redeem for cash on the date such Change of Control occurs (the "<u>Change of Control Date</u>") all or any of such Holder's shares of Series A Preferred Stock for a redemption price equal to the then applicable Liquidation Preference (including an amount in cash equal to a prorated dividend for the period from the Dividend Payment Date immediately prior to the redemption date to the redemption date).

(ii) The Company shall send to each Holder a written notice at least fifteen (15) Business Days prior to any Change of Control, to the extent the circumstances of the Change of Control permit the Company to give advance notice, and if advance notice is not possible under the circumstances, as promptly as possible following such Change of Control (the "<u>Change of Control Notice</u>").  The Change of Control Notice shall set forth (a) a description of the nature of the Change of Control, (b) the circumstances and relevant facts and financial information regarding such Change of Control, (c) the date at which such Change of Control is anticipated to take place or did take place, as applicable, (d) a statement that each Holder may elect to have any or all of its shares of Series A Preferred Stock redeemed as set forth below, (e) the Liquidation Preference (including an amount in cash equal to a prorated dividend for the period from the Dividend Payment Date immediately prior to the redemption date to the redemption date) applicable to each share of Series A Preferred Stock, (f) the place or places where such shares are to be surrendered in the event redemption is elected; and (g) any other instructions consistent with this Section, that a Holder must follow in order to have its shares of Series A Preferred Stock redeemed.

(iii) In the event that the Change of Control Notice is delivered prior to a Change of Control, the Company will, on or before the Change of Control Date, to the extent lawful:

    A. accept for payment all shares properly tendered and not withdrawn pursuant to the Change of Control Notice; and

    B. deposit with the Transfer Agent an amount equal to the Liquidation Preference (including an amount in cash equal to a prorated dividend for the period from the Dividend Payment Date immediately prior to the redemption date to the redemption date) in respect of all shares properly tendered and not withdrawn.

(iv) Within fifteen (15) Business Days following the Change of Control Date, or on the Change of Control Date if the Company has delivered the Change of Control Notice prior to such Change of Control, the Company shall cause the Transfer Agent to pay to each Holder of shares of Series A Preferred Stock properly tendered and not withdrawn the Liquidation Preference (including an amount in cash equal to a prorated dividend for the period from the Dividend Payment Date immediately prior to the redemption date to the redemption date) for such shares, and, if necessary, the Transfer Agent will send to each Holder a new certificate equal to the unpurchased portion of the shares surrendered, if any. On the Change of Control Date, if the Company is in compliance with its obligations under this Section 5(b), dividends will cease to accrue on shares of Series A Preferred Stock tendered for redemption and all rights of Holders of such shares will terminate (with respect to such shares), except for the right to receive the redemption price set forth in Section 5(b)(i).

(v) The Company shall neither consummate a Change of Control nor permit the consummation of a Change of Control until all of the requirements of this Section 5(b), including, without limitation, the requirements of Section 5(b)(vi), have been satisfied.

(vi) If the terms of any Debt Document would prohibit the Company from honoring its obligations under this Certificate of Designation upon a Change of Control, then, prior to the performance of such obligations, the Company shall use its reasonable best efforts to obtain the necessary consents or waivers under the Debt Documents to permit the Company to perform such obligations without breaching the terms of the applicable Debt Documents; provided, however, that if the Company is unable to obtain all necessary consents the Company shall have no obligation to redeem the Series A Preferred Stock pursuant to this Section 5(b).

(vii) Upon the occurrence and during the continuation of a Triggering Event, the right of each Holder of Series A Preferred Stock to bring a claim for damages against the Company based on such Triggering Event shall be suspended until the Company has complied with its obligations under Section 5(b)(vi); provided, however that this Section 5(b)(vii) shall in no

way affect the Holders' rights to seek remedies for the failure of the Company to comply with its obligations under this Certificate of Designation, including, without limitation, the Holders' rights to specific performance and injunctive relief.

**(c)** <u>Deposit with Transfer Agent.</u>

Any deposit of funds with the Transfer Agent for the purpose of redeeming Series A Preferred Stock pursuant to this <u>Section 5</u> shall be irrevocable except that:

**(i)** the Company shall be entitled to receive from the Transfer Agent (if the Transfer Agent is a third party) the interest or other earnings, if any, earned on any money so deposited in trust; and

**(ii)** any balance of monies so deposited by the Company and unclaimed by the Holders of the Series A Preferred Stock entitled thereto at the expiration of two years from the date notice of redemption is first sent by the Company shall be repaid, together with any interest or other earnings earned thereon, to the Company, and after any such repayment, the Holders of the shares entitled to the funds so repaid to the Company shall look only to the Company for payment without interest or other earnings.

## 6. **Voting Rights.**

**(a)** Holders of the Series A Preferred Stock will have no voting rights with respect to general corporate matters of the Company, except as required by Delaware law or as set forth in this <u>Section 6</u> ~~and~~<u>or</u> <u>Section 14</u>.

**(b)** With respect to any issue required to be voted on and approved by Holders of Series A Preferred Stock pursuant to this <u>Section 6</u> or <u>Section 14</u>, the Holders of Series A Preferred Stock shall be entitled to one vote per share of Series A Preferred Stock.

**(c)** The issuance by the Company of any series of Capital Stock or Preferred Stock that would rank senior to or *pari passu* with the Series A Preferred Stock with respect to payment of dividends or distributions in the event of a Liquidation Event may occur only upon the approval of the Holders by a Series A Majority Vote. Notwithstanding anything to the contrary contained herein, the Board may issue additional shares of Series A Preferred Stock from time to time, whether as dividends pursuant to the terms of this Certificate of Designation, or otherwise, and no vote of the Holders of Series A Preferred Stock shall be required in connection therewith.

**(i)** In the event that the Company proposes to issue additional shares of Series A Preferred Stock in order to cure a financial covenant default under the Credit Agreement ("<u>Additional Shares</u>"), the Company shall deliver written notice to each Holder (the "<u>Preemptive Right Notice</u>"), which notice shall specify the number of Additional Shares to be issued.

**(ii)** Each Holder shall have a preemptive right to purchase its pro rata share of such Additional Shares, determined by multiplying (i) the total number of

Additional Shares to be issued by (ii) a fraction, the numerator of which is the number of shares of Series A Preferred Stock then owned by such Holder and the denominator of which is the number of shares of Series A Preferred Stock then owned by all of the Holders, by delivering written notice to the Company of its exercise of its preemptive right hereunder within twenty (20) days of the Preemptive Right Notice (the "Exercise Notice").

(iii)     The closing for any purchase of Additional Shares hereunder shall take place no later than twenty (20) days after delivery of the Exercise Notice.

## 7.    Certain Covenants.

(a)    The Company shall not, and shall not permit any Subsidiary to, permit any amendment, supplement, restatement or other modification to any of the Debt Documents that would impair the ability of the Company or any Subsidiary to comply with and perform its obligations under this Certificate of Designation.

(b)    The Company shall not amend or otherwise change the terms of Series A Preferred Stock if the effect of such amendment or change is to confer any additional rights on the holders of such Series A Preferred Stock that would be adverse to any party to any of the Debt Documents.

(c)    So long as any Series A Preferred Stock remains issued and outstanding, the Company shall not consent to any amendment to the Certificate of Incorporation of Eurofresh, Inc., its Wholly Owned Subsidiary, to authorize additional shares of capital stock of Eurofresh, Inc.

## 8.    Payment.

(a)    All amounts payable in cash with respect to the Series A Preferred Stock shall be payable in United States dollars. If a Holder has given wire instructions to the Company at least three (3) business days prior to any payment to be made by the Company, the Company will make all payments on that Holder's shares in accordance with such instructions. If a Holder has not given wire instructions to the Company in accordance with the previous sentence, the Company will make all payments on that Holder's shares by check and send all payment checks to that Holder in accordance with Section 10.

(b)    Any payment on the Series A Preferred Stock due on any day that is not a Business Day need not be made on such day, but shall be made on the next succeeding Business Day with the same force and effect as if made on such due date.

(c)    Dividends payable on the Series A Preferred Stock on any redemption date that is a Dividend Payment Date shall be paid to the Holders of record as of the immediately preceding Record Date.

## 9.      Transfers.

(a)      All shares of Series A Preferred Stock are freely transferable, subject to any restrictions imposed by applicable laws and regulations.

(b)      In the event of a share transfer, the Company shall cause the Transfer Agent to register such transfer and issue one or more share certificates to the transferee and, if shares of Series A Preferred Stock are still held by the transferor following the transfer, the transferor promptly on receipt of share certificates for the transferred shares accompanied by a duly executed stock power(s) and written notice containing the details of the transfer, including the name and address of the transferee and the number of share certificates required by the transferor and transferee.

## 10.     Notices.

All notices, requests, consents and other communications hereunder to any Holder shall be sent by nationally-recognized overnight courier, or by first class registered or certified mail, postage prepaid, addressed to the Holder at the address set forth in the register of Holders of Series A Preferred Stock maintained by the Transfer Agent or such other address as a Holder has set forth in a written notice delivered to the Transfer Agent.

## 11.     Inconsistent Provisions.

In the event of any inconsistency between any provision contained herein and any provision contained in the Certificate of Incorporation (as in effect now or as amended after the date hereof), the provisions contained herein shall control.

## 12.     Headings of Subdivisions.

The headings of the various subdivisions hereof are for convenience of reference only and shall not affect the interpretation of any of the provisions hereof.

## 13.     Severability of Provisions.

If any of the voting powers, preferences and relative, participating, optional and other special rights of the Series A Preferred Stock and qualifications, limitations and restrictions thereof set forth in this Certificate of Designation (as it may be amended from time to time) are invalid, unlawful or incapable of being enforced by reason of any rule of law or public policy, all other voting powers, preferences and relative, participating, optional and other special rights of Series A Preferred Stock and qualifications, limitations and restrictions thereof set forth in this Certificate of Designation (as so amended) that may be given effect without the invalid, unlawful or unenforceable voting powers, preferences and relative, participating, optional and other special rights of Series A Preferred Stock and qualifications, limitations and restrictions thereof shall, nevertheless, remain in full force and effect, and no voting powers, preferences and relative, participating, optional or other special rights of Series A Preferred Stock and qualifications, limitations and restrictions thereof herein set forth shall be deemed dependent upon any other such voting powers, preferences and relative, participating, optional or other special rights of Series A Preferred Stock and qualifications, limitations and restrictions thereof unless so expressed herein.

14.    **Amendment.**

The Company and the Holders of the Series A Preferred Stock by Series A Majority Vote may (i) amend, supplement, restate, repeal, nullify or otherwise modify (whether by merger, consolidation or otherwise) this Certificate of Designation or (ii) waive any non-compliance with any provision of this Certificate of Designation, <u>provided</u>, <u>however</u>, that any such modification to <u>Section 3</u> shall require the consent of all Holders of the Series A Preferred Stock.

RESOLVED, FURTHER, that any duly authorized officer of the Company be, and each duly authorized officer hereby is, authorized, empowered and directed to execute this Certificate of Designation, and that such Certificate be delivered to and filed with the Secretary of State of the State of Delaware pursuant to the provisions of Section 103 and Section 151(8) of the DGCL, both as amended.

* * * * *

IN WITNESS WHEREOF, Eurofresh Holding Company, Inc. has caused this Certificate of Designation to be executed by its duly authorized officer as of [                    ], 2009.

**EUROFRESH HOLDING COMPANY, INC.**


By: _____
      Name: Brian McLaughlin
      Title: Secretary

<u>EXHIBIT 8</u>

Reserved Shares Trust Agreement
(redline version)

# RESERVED SHARES TRUST AGREEMENT

_____ _____, 2009

This RESERVED SHARES TRUST AGREEMENT (this "**Trust Agreement**") is made and entered into as of the date set forth above by and among EUROFRESH HOLDING COMPANY, INC., a Delaware corporation (the "**Company**"), and ~~_____~~as settlor of the trust created herein and as trustee (together with ~~her/his~~its successors, the "**Trustee**"), for the benefit of the Certificate Holders (as defined herein).

## Background

A. On April 21, 2009, Eurofresh, Inc., a Delaware corporation and the wholly-owned subsidiary of the Company ("**EFI**") and Eurofresh Produce, Ltd., a Delaware corporation and the wholly-owned subsidiary of ~~Eurofresh~~EFI ("**EPL**", and together with ~~the Company~~EFI, the "**Debtors**") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code.

B. ~~Debtors~~EFI had issued and outstanding $170,000,000 in aggregate principal amount of 11½ % Senior Notes Due in 2013 (the "**Senior Notes**") payable to the holders of the Senior Notes (the "**Senior Noteholders**") pursuant to an Indenture dated December 21, 2005 (the "**Senior Indenture**") among the Debtors and U.S. Bank National Association, as successor trustee to Wells Fargo Bank, N.A. The name and address of each Senior Noteholder and the denominations of the Senior Notes held by each are listed on Exhibit A hereto.

C. Pursuant to a joint plan of reorganization (the "**Plan**") confirmed by the Confirmation Order by the United States Bankruptcy Court for the District of Arizona entered on _____, 2009 (Doc. No. _____), the Debtors have undertaken a comprehensive financial restructuring and recapitalization of the Debtors (the "**Reorganization**").

D. Certain of the Senior Noteholders (the "**Investing Noteholders**") have agreed, as part of the Reorganization, to invest an aggregate of $~~12,500,000~~20,000,000 (the "**Investing Noteholder Investment**") in the Company, after it has been reorganized and reconstituted pursuant to the Plan. The name and address of each Investing Noteholder and the amount of the Investing Noteholder Investment by each are listed on Exhibit B hereto.

E. In accordance with the Plan, the Company has authorized 20,000,000 shares of common stock ("**Common Stock**"), of a single class, pursuant to the Company's ~~Third Amended and Restated~~ Certificate of Incorporation, which was filed with the Secretary of State of the State of Delaware on [_____ __, 2009].

F. Pursuant to the Plan, the Company has agreed, as part of the Reorganization, to authorize and place 1,000,000 shares of Common Stock (the "**Reserved Shares**") in trust to be held, allocated and distributed to the Investing Noteholders and the Senior Noteholders in accordance with this Trust Agreement.

-1-

**Agreement**

NOW, THEREFORE, in consideration of the mutual covenants and the agreements of the parties contained herein, and subject to the conditions specified herein, the parties hereto agree as follows:

**1.     Establishment of Trust.**

(a)     The Company hereby establishes a trust under the laws of the State of Arizona and irrevocably transfers legal title and record ownership of the Reserved Shares to the Trustee to hold in trust for the benefit of the Investing Noteholders and the Senior Noteholders in accordance with the terms of this Trust Agreement.

(b)     The Company shall, upon reasonable request of the Trustee, execute, acknowledge and deliver such further instruments and do such further acts as may be necessary or proper to more effectively carry out the purposes of this Trust Agreement and to vest in the Trustee, its successors and assigns, the Reserved Shares in trust hereunder.

**2.     Trust Certificates.**

(a)     The Trustee is authorized and directed to authenticate by execution and delivery to the Investing Noteholders certificates (the "**Investing Noteholder Certificates**") in the form attached hereto as Exhibit C and to the Senior Noteholders certificates (the "**Senior Noteholder Certificates**") in the form attached hereto as Exhibit D.  The Investing Noteholder Certificates and the Senior Noteholder Certificates are collectively referred to as the "**Certificates**."

(b)     Each Investing Noteholder shall receive an Investing Noteholder Certificate representing the Investing Noteholder's percentage ownership of Share Proceeds (as defined below) payable to the Investing Noteholders ("**Investing Noteholders' Share Proceeds**") and each Senior Noteholder shall receive a Senior Noteholder Certificate representing the Senior Noteholder's percentage ownership of Share Proceeds payable to the Senior Noteholders ("**Senior Noteholders' Share Proceeds**").  The percentage of the Investing Noteholders' Share Proceeds assigned to an Investing Noteholder and represented by the Investing Noteholder Certificate shall be the amount of such Investing Noteholder's portion of the Investing Noteholder Investment divided by the total Investing Noteholder Investment.  The percentage of the Senior Noteholders' Share Proceeds assigned to a Senior Noteholder and represented by the Senior Noteholder Certificate shall be the amount of such Senior Noteholder's portion of the outstanding Senior Notes divided by the total amount of the outstanding Senior Notes.

(c)     An executive officer of the Trustee shall sign the Certificates on behalf of the Trustee by manual or facsimile signature.  If such executive officer no longer holds a position as an executive officer at the time a Certificate is authenticated, the Certificate shall nevertheless be valid.  A Certificate shall not be valid until authenticated by the manual signature of the Trustee.  The Trustee's signature shall be conclusive evidence that the Certificate has been authenticated under this Trust Agreement.  The Trustee may appoint an authenticating agent acceptable to the Company to authenticate Certificates.  An authenticating agent may authenticate Certificates whenever the Trustee may do so.  Each reference in this Trust Agreement to authentication by the

COLUMBUS/692457.4
PHOENIX/505829.2

Trustee includes authentication by such agent. The Certificates shall be distributed to the appropriate holder upon authentication by the Trustee.

(d)     The Company shall maintain an office or agency where Certificates may be presented for registration of transfer or for exchange ("**Registrar**"). The Registrar shall keep a register of the Certificates and of their transfer and exchange. The Company may appoint one or more co-registrars and the term "Registrar" includes any co-registrar. The Trustee shall initially serve as the Registrar. The holders of the Certificates, as determined from time to time by the Registrar as a result of any transfer of a Certificate in accordance with the terms of this Trust Agreement, shall for all purposes of this Trust Agreement, be referred to collectively as the "**Certificate Holders**" and singularly as a "**Certificate Holder**."

(e)     If the Company receives a sworn affidavit from a holder or other satisfactory evidence of the destruction, loss or theft of any Certificate, the Company shall issue and the Trustee shall authenticate a replacement Certificate. If required by the Company, an indemnity bond shall be supplied by the holder that is sufficient in the judgment of the Company to protect the Company, the Trustee and any authenticating agent from any loss that any of them may suffer as a result of authenticating or issuing a replacement Certificate. The Company may charge a holder who is issued a replacement Certificate for the Company's expenses (including reasonable attorneys' fees and expenses) in replacing a Certificate. Every replacement Certificate shall be entitled to all of the benefits of this Trust Agreement equally and proportionately with all other Certificates duly issued hereunder.

(f)     The Certificates are transferable upon the conditions hereinafter specified. To ensure compliance with the provisions of the Securities Act of 1933, as amended ("**Securities Act**"), and any applicable state securities laws, in respect of the transfer of any Certificate, in the event that a holder proposes to transfer a Certificate issued under this Trust Agreement, such holder will give prior written notice to the Company of such holder's intention to transfer such Certificate (or any portion thereof), describing briefly the manner and circumstances of the proposed transfer, together with an opinion of counsel to the effect that the proposed transfer may be effected without registration or qualification under any federal or state law. Unless the Company shall have received an opinion from counsel to the Company (which opinion shall be obtained by the Company not more than 10 days after notice of a proposed transfer) that the proposed transfer may not be effected without registration or qualification under federal or state law, such holder shall be entitled to transfer such Certificate, all in accordance with the terms of the notice delivered by such holder to the Company. All fees and expenses of counsel for the Company in connection with the rendition of the opinion provided for in this Section 2(f) shall be paid by the Company. If in the opinion of either counsel a proposed transfer of a Certificate requested by the holder thereof may not be effected without registration or qualification under applicable federal or state law, the Company shall promptly give written notice to the holder who proposes to transfer the Certificate (or any portion thereof) that the holder shall not consummate the proposed transfer and the reasons therefor. No Certificate (or any portion thereof) for which a transfer has been proposed pursuant to this Section 2(f) may be transferred in the manner proposed if registration thereof under the Securities Act would be required in the opinion of either counsel mentioned above. In addition to the foregoing, no holder shall be permitted to transfer any Certificate issued under this Trust Agreement (or any portion thereof) if the Company determines that the effect of such transfer would be to cause the Company to become a reporting company

-3-

under the Securities Exchange Act of 1934.  Any transferee to whom any Certificate is transferred pursuant to this <u>Section 2(f)</u> must acknowledge and agree that such Certificate shall remain subject to this Agreement.

(g)     Each Certificate initially issued under this Trust Agreement and each Certificate issued in exchange therefor shall bear on the face thereof a legend substantially as follows:

THIS CERTIFICATE HAS NOT BEEN REGISTERED PURSUANT TO THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY BE OFFERED OR SOLD ONLY IF REGISTERED UNDER APPLICABLE SECURITIES LAWS OR IF AN EXEMPTION THEREFROM IS AVAILABLE.  THIS CERTIFICATE IS TRANSFERABLE ONLY UPON THE CONDITIONS SPECIFIED IN THE RESERVED SHARES TRUST AGREEMENT PURSUANT TO WHICH THIS CERTIFICATE HAS BEEN ISSUED.  A COPY OF THE RESERVED SHARES TRUST AGREEMENT WILL BE PROVIDED TO THE REGISTERED HOLDER THEREOF UPON REQUEST TO THE COMPANY.

(h)     Certificates shall be canceled by the Trustee upon replacement, transfer, payment or exchange in accordance with the provisions of this Trust Agreement.  The Trustee and no one else shall cancel all Certificates that are subject to registration of transfer, exchange, payment, replacement or cancellation and shall destroy canceled Certificates (subject to the record retention requirements of applicable law), or otherwise indicate on their face that such Certificates have been canceled.  Certification of the destruction of all canceled Certificates shall be delivered to the Company.

3.     <u>Administration</u>.

(a)     During the term of this Trust Agreement, any cash dividends collected by, or for, the account of the Trustee from the Reserved Shares shall be maintained by the Trustee and placed in a separate account (the "<u>Account</u>") for the benefit of the Certificate Holders.  In the event the Trustee receives any shares of capital stock of the Company as a dividend on the Reserved Shares <u>or any shares of Common Stock pursuant to Section 2.4 of the Subordinated PIK Note Purchase Agreement dated as of                    , 2009 among the Company, EFI, EPL and the New Investors (as defined therein)</u>, the Trustee shall accept such additional shares and such additional shares shall become Reserved Shares hereunder.

(b)     This Trust Agreement shall continue in effect until and shall terminate after the distribution of proceeds received on or on account of the Reserved Shares (the "<u>Share Proceeds</u>") upon the consummation of a disposition, by sale or merger, of all or substantially all of the Common Stock, including the Reserved Shares, or a disposition of all or substantially all of the assets of the Company that is to be followed by a distribution to the shareholders of the Company (a "<u>Disposition</u>").  Upon a Disposition, the Share Proceeds and any amount held in the Account shall be divided into two shares, the Investing Noteholders' Share Proceeds and the Senior Noteholders' Share Proceeds as follows:

(i)     The Investing Noteholders' Share Proceeds shall equal such amount, if any, as is necessary so that, when added to the distributions and proceeds received by the Investing Noteholders on account of (a) the Subordinated PIK A Notes and the Subordinated PIK Notes

-4-

(each as defined in the Plan), and (b) Common Stock issued to the Investing Noteholders as a result of their Investing Noteholder Investment (the "**Investment Return**"), will equal an aggregate amount of the product of multiplying 2.5 by the amount of the Investing Noteholder Investment; and

(ii)     The Senior Noteholders' Share Proceeds shall equal any residual Share Proceeds after the amount of the Investing Noteholders' Share Proceeds have been calculated and deducted from the total Share Proceeds.

(c)     The Company shall calculate and certify to the Trustee the total amount of the Investment Return and the aggregate amount of the Investing Noteholder Investment and the Trustee may rely solely on such calculation for purposes of calculating the Investing Noteholders' Share Proceeds and the Senior Noteholders' Share Proceeds as required in Section 3(b) above.  Upon determination of the Investing Noteholders' Share Proceeds, if any, and the Senior Noteholders' Share Proceeds, if any, and upon surrender to the Trustee by each Investing Noteholder of its Investing Noteholder Certificate and each Senior Noteholder of its Senior Noteholder Certificate, as applicable, the Trustee shall distribute the Investing Noteholders' Share Proceeds, if any, to the record holders of the Investing Noteholder Certificates and the Senior Noteholders' Share Proceeds, if any, to the record holders of the Senior Noteholder Certificates, in proportion to the percentages set forth on such Certificates as reflected on the registration records of the holders of such Certificates maintained by the Registrar.

(d)     The Trustee shall not at any time, on behalf of this Trust, enter into or engage in any business.  The Trustee shall be restricted to the holding of the Reserved Shares and distributions of the Reserved Shares in accordance with this Trust Agreement and to the conservation and protection of the Reserved Shares and the administration thereof in accordance with the provisions of this Trust Agreement.

4.     **Powers of Trustee**

(a)     The Trustee shall hold the legal and equitable title to the Reserved Shares and shall hold the Reserved Shares in trust for the benefit of the Certificate Holders to be administered and disposed of by the Trustee pursuant to the terms of this Trust Agreement.

(b)     The Trustee shall be required to vote the Reserved Shares for and against any matters submitted to the holders of Common Stock in the same proportion as the vote of the  Common Stock issued pursuant to the Plan, but not any shares issued pursuant to the Company's 2009 Management Incentive Plan or otherwise issued after the confirmation of the Plan.

(c)     Subject to the provisions of this Trust Agreement, the Trustee shall have the power to do and perform any acts or things and only those acts or things necessary or appropriate for the conservation and protection of the Reserved Shares and any other assets held by the Trustee pursuant to this Trust Agreement.

COLUMBUS/692457.4
PHOENIX/505829.2

(d)     Anything in this Trust Agreement to the contrary notwithstanding, the Trustee may not sell or otherwise dispose of the Reserve Shares without the unanimous written consent of the Certificate Holders.

(e)     Except as set forth in Section 4(d) above, no actions taken by the Trustee shall require approval of the Certificate Holders.

5.     **Trustee.**

(a)     The Trustee accepts and undertakes to discharge this Trust created by this Trust Agreement upon the terms and conditions hereof.  Without in any respect relieving the Trustee from liability for bad faith, willful misfeasance or willful disregard of its duties, it is expressly agreed that:

(i)     No successor Trustee shall be in any way responsible for the acts or omissions of any Trustee in office prior to the date on which the successor becomes a Trustee.

(ii)     The Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Trust Agreement, and no implied covenants or obligations shall be read into this Trust Agreement against the Trustee.

(iii)     The Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Trust Agreement; but in the case of any certificates or opinions that are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine them to determine whether such certificates or opinions conform to the requirements of this Trust Agreement.

(iv)     No Trustee shall be liable for any error of judgment made in good faith.

(b)     Except as otherwise provided in paragraph (a) above:

(i)     The Trustee may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order or other paper or document believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties.

(ii)     The Trustee may consult with legal counsel to be selected by the Trustee, and the Trustee shall not be liable for any action taken or suffered by the Trustee in accordance with the advice of counsel.

(iii)     Persons dealing with the Trustee shall look only to the Reserved Shares and any other assets held by the Trustee pursuant to this Trust Agreement to satisfy any liability incurred by the Trustee to such person in carrying out the terms of this Trust, and the Trustee shall have no personal individual obligation to satisfy any such liability.

(c)     The Trustee shall be indemnified by and receive reimbursement from the Company against and from any and all loss, liability, expense or damage that the Trustee may incur or sustain,

-6-

in good faith, in the exercise and performance of any of the powers and duties of the Trustee under this Trust Agreement.

(d)     Any person dealing with the Trustee shall be fully protected in relying upon the Trustee's certificate that the Trustee has authority to take any action under this Trust.

(e)     The Company shall pay reasonable compensation to the Trustee and shall reimburse all expenses reasonably incurred by the Trustee in the performance of its duties in accordance with this Trust Agreement.

## 6.     Successor Trustees.

(a)     The Trustee may resign and be discharged by mailing notice to the Company and the Certificate Holders at their respective addresses as maintained by the Registrar or to such other place as the Company or any Certificate Holder may designate by written notice to the Trustee. Such resignation shall become effective on the day specified in the notice or upon the appointment of the Trustee's successor and the successor's acceptance of the appointment, whichever is earlier.

(b)     Should at any time the Trustee resign or be removed, or die or become incapable of acting, or be adjudged a bankrupt or insolvent, a vacancy shall be deemed to exist in the office of such Trustee and a successor shall be appointed by a vote of the holders of a majority of the percentages of the outstanding Investing Noteholder Certificates.

(c)     Any successor Trustee shall execute an instrument accepting the appointment and shall deliver one counterpart to the Company and each of the Certificate Holders and, in case of a resignation, to the retiring Trustee. Thereupon, the successor Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of its predecessor hereunder with like effect as if originally named; but the retiring Trustee shall nevertheless, when requested in writing by the successor Trustee and upon payment of lawful charges and disbursements then unpaid, if any, execute and deliver an instrument or instruments conveying and transferring to the successor Trustee all the estates, properties, rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to the successor Trustee all property and money held by the retiring Trustee hereunder.

(d)     In the event a vacancy in the office of Trustee shall continue for a period of at least 90 days, a temporary Trustee may be appointed by any court of competent jurisdiction on the application of any of the Company or any Certificate Holder upon such notice, if any, as the court may deem proper and prescribe. The temporary Trustee shall act only until a successor Trustee is appointed in the manner prescribed in Section 6(b) above.

(e)     No bond shall be required of the original Trustee, or, if a bond is required by law, no surety or security with respect to such bond shall be required unless required by law. No bond shall be required of any successor Trustee, or, if a bond is required by law, no surety or security with respect to such bond shall be required unless required by law.

## 7.     Entire Agreement; Amendments.

COLUMBUS/692457.4
PHOENIX/505829.2

This Trust Agreement, together with all exhibits and schedules hereto, constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties. By unanimous written consent of the Company and the Certificate Holders, but without consent of the Trustee, this Trust Agreement may be amended or revoked by written instrument delivered to the Trustee; *provided, however*, that in no event shall this Trust Agreement be amended so as to grant the Certificate Holders the right to vote the Reserved Shares in any way other than as set forth in this Agreement. Notwithstanding the foregoing, the Company shall revise Exhibit A hereto to reflect any additional Senior Noteholders as of the date of this Agreement. The Trustee will execute any instrument and take any other reasonable actions to enable the exercise or facilitate the exercise of any rights reserved hereunder. In particular, without limitation of the foregoing, the Trustee, after receiving an instrument in writing revoking this Trust Agreement, shall dispose of the Reserved Shares then held by the Trustee or thereafter received by the Trustee, as directed in said instrument of revocation.

8.      **Miscellaneous Provisions.**

(a)      This Trust Agreement may be filed or recorded in such governmental office or offices as the Trustee may determine to be necessary. A copy of this Trust Agreement and all amendments shall be filed in the office of the Trustee and shall be available at all times for inspection by the Company, any Certificate Holder or their duly authorized representatives. The Trustee shall file or record any amendment of this Trust Agreement in the same places where the original Trust Agreement is filed or recorded, if any. The Trustee shall file or record any instrument that relates to any change in the office of Trustee in the same places where the original of this Trust Agreement is filed or recorded, if any.

(b)      This Trust Agreement is not intended to create and shall not be interpreted as creating an association, partnership or joint venture of any kind. It is intended as a trust to be governed and construed in all respects as a trust.

(c)      This Trust Agreement shall be governed by and construed in accordance with the laws of the State of Arizona, without reference to the choice of law provisions thereof.

(d)      In the event any provision of this Trust Agreement or its application to any person or circumstance shall be finally determined by a court of proper jurisdiction to be invalid or unenforceable to any extent, the remainder of this Trust Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

(e)      Any notice or other communication by one party to another party hereunder shall deemed sufficiently given if in writing either served by personal delivery or sent by overnight courier guaranteeing next-day delivery or by facsimile, to the recipient's address as maintained by the Registrar or to such other place as the recipient may designate as to itself by written notice to the other parties hereto. Notice given by personal delivery shall be effective upon delivery. Notice transmitted

COLUMBUS/692457.4
PHOENIX/505829.2

by overnight courier guaranteeing next-day delivery shall be effective on the business day following timely delivery to such courier.  Notice transmitted by facsimile shall be effective when receipt is acknowledged.

(f)     This Trust Agreement may be executed in any number of counterparts, each of which shall be an original, but the counterparts shall together constitute but one and the same instrument.

[Remainder of page intentionally left blank.]

COLUMBUS/692457.4
PHOENIX/505829.2

IN WITNESS WHEREOF, each of the Company and the Trustee have executed this Trust Agreement as of the date first written above.

**TRUSTEE:**

**COMPANY:**

**EUROFRESH** **HOLDING COMPANY**, **INC.**

**EUROFRESH HOLDING COMPANY, INC.**
_____

By:_____

By:_____ Name:_____

Name:_____ Title:_____

Title:_____

Address:_____

Address:_____ _____

_____

**<u>EXHIBIT A</u>**

**SENIOR NOTEHOLDERS**

# EXHIBIT B

## INVESTING NOTEHOLDERS

**EXHIBIT C**

**FORM OF INVESTING NOTEHOLER CERTIFICATE**

# EXHIBIT D

## FORM OF SENIOR NOTEHOLDER CERTIFICATE

<u>EXHIBIT 9</u>

Stockholders Agreement
(redline version)

# STOCKHOLDERS AGREEMENT

**THIS STOCKHOLDERS AGREEMENT** (the "*Agreement*") is made as of this ___ day of _____, 2009, by and among Eurofresh Holding Company, Inc., a Delaware corporation (together with any successor thereto, the "*Company*"), JB (as defined below), the Investing Noteholders (as defined below), and any other Person, including any holder of New Common Stock upon confirmation of the Plan, who from time to time becomes a party to this Agreement by execution of a Joinder Agreement in substantially the form attached hereto as <u>Exhibit A</u> (each, an "*Investor*" and collectively, the "*Investors*").

**WHEREAS**, the Company and the New Investors have entered into an Amended and Restated Investment Plan and Support Agreement, dated as of _____, 2009 (August ___, 2009 and amended by that certain Amendment dated October ___, 2009 (as amended or restated from time to time, the "*Support Agreement*"), pursuant to which the New Investors have agreed to contribute certain funds (the "*New Money Investment*") to the Company in exchange for, among other things, shares of the Company's New Common Stock (as defined below), in accordance with the terms and conditions contained therein;

**WHEREAS**, the execution and delivery of this Agreement is a condition precedent to the acquisition by the New Investors of the New Common Stock and other securities under the Support Agreement; and

**WHEREAS**, after the delivery of the shares of New Common Stock in respect of the New Money Investment and the settlement of claims pursuant to the Company's Plan of Reorganization (the "*Plan*"(as defined below), the New Investors will hold the number of shares of New Common Stock set forth opposite their names on <u>Exhibit B</u>.

**NOW THEREFORE**, in consideration of the foregoing and the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.1** **Certain Definitions**. The following capitalized terms, as used in this Agreement, shall have the meanings set forth below.

["*7.5% Holder*" shall mean an Investor that holds more than 7.5% of the outstanding New Common Stock.]

"*Affiliate*," with respect to any Person, shall mean a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with the first mentioned Person. A Person shall be deemed to control another Person if such first Person possesses directly or indirectly the power to direct, or cause the direction of, the management and policies of the second Person, whether through the ownership of voting securities, by contract or otherwise.

"*__Anti-Dilution Shares__*" shall mean, collectively, shares of New Common Stock issued to Senior Noteholders or placed in the Reserved Shares Trust for the benefit of Senior Noteholders upon the issuance of Conversion Shares, pursuant to Section 2.4 of the PIK Note Purchase Agreement.

"*__Bankruptcy Code__*" means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases.

"*__Board of Directors__*" shall mean the Board of Directors of the Company.

"*__Conversion Notes__*" shall mean PIK Notes issued to the holders of PIK A Notes upon conversion of the unpaid portion of such PIK A Notes pursuant to Section 2.4 of the PIK Note Purchase Agreement.

"*__Conversion Shares__*" shall mean shares of New Common Stock issued to the holders of PIK A Notes upon conversion of the unpaid portion of such PIK A Notes pursuant to Section 2.4 of the PIK Note Purchase Agreement.

"*__EFI__*" means Eurofresh, Inc., a Delaware corporation and wholly-owned subsidiary of the Company.

"*__EPL__*" means Eurofresh Produce, Ltd., a Delaware corporation and wholly-owned subsidiary of EFI.

"*__Initial Public Offering__*" shall mean the Company's first underwritten public offering on a firm commitment basis by a nationally recognized investment banking organization or organizations, pursuant to an effective registration statement under the Securities Act covering the offer and sale of shares of the Company's New Common Stock and with respect to which such New Common Stock is listed for trading on either the New York Stock Exchange or the Nasdaq National Market (or any successor thereto).

"*__Investing Noteholders__*" means those investors set forth on Exhibit C hereto.

"*__JB__*" means Johan van den Berg or his Affiliate, as applicable.

"*__Majority Interest__*" means the holders of (i) at least 66-2/3% of the outstanding New Common Stock during the period from the date hereof until the third anniversary of the date hereof, and (ii) more than 50% of the outstanding New Common Stock thereafter.

"*__New Common Stock__*" means 20,000,000 shares, or such other number of shares that may be authorized from time to time, of common stock of the Company as reorganized and reconstituted pursuant to the Plan and the Support Agreement, and any common stock obtained in any stock split, combination, reorganization, recapitalization, reclassification, stock distribution, stock dividend or similar event affecting the common stock of the Company.

"*__New Investors__*" shall mean JB and the Investing Noteholders.

"**Person**" shall mean an individual, a corporation, a partnership, a joint venture, a limited liability company, an estate, a trust, an unincorporated organization, and any other entity or organization, governmental or otherwise.

"**Plan**" shall mean the Joint Plan of Reorganization of ~~the Company and Eurofresh Produce, Ltd., a Delaware corporation and wholly-owned subsidiary of the Company~~EFI and EPL, under section 1121(a) of the Bankruptcy Code, as may be amended, modified, or restated.

"***PIK A Notes***" shall mean the subordinated unsecured class A promissory notes issued pursuant to the PIK Note Purchase Agreement.

"***PIK Notes***" shall mean the subordinated unsecured promissory notes issued pursuant to the PIK Note Purchase Agreement.

"***PIK Note Purchase Agreement***" shall mean the Subordinated PIK Purchase Agreement dated as of _____, 2009 among the Company, EFI, EPL and the New Investors, pursuant to which the Company's Subordinated PIK A Notes and the Subordinated PIK Notes are issued.

"**PIK Preferred**" shall mean the Company's 10.0% Series A Preferred Stock, par value $0.001 per share.

"**Registration Expenses**" shall mean all expenses incurred by the Company in complying with Sections 2.1 or 2.2 hereof, including, without limitation, all registration and filing fees (exclusive of underwriting discounts and commissions), printing expenses, fees and disbursements of counsel for the Company, reasonable fees and disbursements of a single special counsel for the Investors, blue sky fees and expenses and the expense of any special audits incident to or required by any such registration.

"***Reserved Shares***" means the shares of New Common Stock placed in the Reserved Shares Trust on the Effective Date (as defined in the Plan), together with any additional shares of New Common Stock placed in the Reserved Shares Trust thereafter.

"***Reserved Shares Trust***" means the trust into which the Company will place shares of New Common Stock for the benefit of the Senior Noteholders, as set forth in the Plan.

"**Sale Event**" shall mean a bona fide negotiated transaction with a non-Affiliate in which (i) the Company merges or consolidates with or into another corporation or entity (except a merger or consolidation in which the holders of capital stock of the Company immediately prior to such merger or consolidation continue to hold at least a majority of the voting power of the surviving or resulting corporation or entity following such merger or consolidation), (ii) the Company sells, leases, licenses or transfers all or substantially all of its assets, or (iii) the Company engages in any other transaction in which the holders of capital stock of the Company immediately prior to such transaction hold less than a majority of the voting power of the surviving or resulting corporation or entity following such transaction.

"**Securities Act**" shall mean the Securities Act of 1933, as amended, or any similar successor federal statute, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder, all as the same shall be in effect at the time.

"**Selling Expenses**" shall mean all underwriting discounts, selling commissions and stock transfer taxes applicable to the sale of New Common Stock and fees and disbursements of counsel for any Investor (other than the fees and disbursements of counsel included in the Registration Expenses).

"**Senior Noteholders**" shall mean holders of $170,000,000 in aggregate principal amount of 11½ % Senior Notes Due in 2013 issued by EFI pursuant to an Indenture dated December 21, 2005 among EFI, EPL and U.S. Bank National Association, as successor trustee to Wells Fargo Bank, N.A, which holders are entitled to receive New Common Stock and Reserved Shares as settlement of their claims pursuant to the Plan.

"**Subsidiary**" means any corporation more than 50% of the outstanding voting securities of which, or any partnership, joint venture or other entity more than 50% of the voting equity interests of which are, directly or indirectly owned by the Company or any other entity otherwise controlled by or under common control with the Company.

"**Third-Party Buyer**" shall mean the surviving or resulting corporation or entity in clause (i) of the definition of "Sale Event" and the buyer or buyers in clauses (ii) or (iii) of the definition of "Sale Event."

"**Transfer**" means any direct or indirect transfer, donation, sale, assignment, pledge, hypothecation, grant of a security interest in or other disposal or attempted disposal of all or any portion of a security or of any rights. "Transferred" means the accomplishment of a Transfer, and "Transferee" means the recipient of a Transfer.

## ARTICLE II
## REGISTRATION RIGHTS

**Section 2.1     Demand Registration**.

(a)     Subject to the conditions of this Section 2.1, if the Company shall receive a written request from a Majority Interest (the "**Initiating Investors**") that the Company file a registration statement under the Securities Act covering the registration of New Common Stock, then the Company shall, within thirty (30) days of the receipt thereof, give written notice of such request to all Investors and, subject to the limitations of this Section 2.1, use its reasonable commercial efforts to effect, as soon as practicable, the registration under the Securities Act of all New Common Stock that the Investors request to be registered.

(b)     If the Initiating Investors intend to distribute the New Common Stock covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to this Section 2.1 and the Company shall include such information in the written notice referred to in Section 2.1(a). In such event, the right of any Investor to include its New Common Stock in such registration shall be conditioned upon such Investor's participation in such underwriting and the inclusion of such Investor's New Common Stock in the

underwriting to the extent provided herein (unless otherwise mutually agreed by a Majority Interest and such Investor). All Investors proposing to distribute their securities through such underwriting shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by a Majority Interest (which underwriter or underwriters shall be reasonably acceptable to the Company). Notwithstanding any other provision of this Section 2.1, if the underwriter advises the Company that marketing factors require a limitation of the number of shares of new Common Stock to be underwritten, then the Company shall so advise all Investors whose New Common Stock would otherwise be underwritten pursuant hereto, and the number of shares that may be included in the underwriting shall be allocated to such Investors on a *pro rata* basis based on the number of shares of New Common Stock held by all such Investors (including the Initiating Investors). Any New Common Stock excluded or withdrawn from such underwriting shall be withdrawn from the registration.

**(c)** The Company shall not be required to effect a registration pursuant to this Section 2.1:

(i) until the Company has completed its Initial Public Offering;

(ii) during the period starting with the date of filing of, and ending on the date 180 days following the effective date of the registration statement pertaining to the Company's Initial Public Offering;

(iii) if the Company shall furnish to the Initiating Investors a certificate signed by the Chairman of the Board stating that, in the good faith judgment of a majority of the Directors of the Company, it would be seriously detrimental to the Company and its stockholders for such registration statement to be effected at such time, in which event the Company shall have the right to defer such filing for a period of not more than sixty (60) days after receipt of the request of the Initiating Investors; provided that such right to delay a request shall be exercised by the Company not more than once in any twelve (12) month period; or

(iv) after the Company has effected two (2) such registrations, and such registrations have been declared or ordered effective.

**Section 2.2  Piggyback Registrations**.

**(a)** The Company shall notify all Investors in writing at least thirty (30) days prior to the filing of any registration statement under the Securities Act for purposes of a public offering of securities of the Company (including, but not limited to, registration statements relating to secondary offerings of securities of the Company, but excluding registration statements relating to the Company's Initial Public Offering, employee benefit plans or with respect to corporate reorganizations or other transactions under Rule 145 of the Securities Act) and will afford each such Investor an opportunity to include in such registration statement all or part of the New Common Stock held by such Investor. Each Investor desiring to include in any such registration statement all or any part of the New Common Stock held by it shall, within ten (10) days after the receipt of the above-described notice from the Company, so notify the Company in writing. Such notice shall state the intended method of disposition of the New Common Stock held by such Investor. If an Investor decides not to include all of its New Common Stock in any registration

statement thereafter filed by the Company, such Holder shall nevertheless continue to have the right to include any New Common Stock in any subsequent registration statement or registration statements as may be filed by the Company with respect to offering of its securities, all upon the terms and conditions set forth herein.

(b)     If the registration statement under which the Company gives notice under this Section 2.2 is for an underwritten offering, the Company shall so advise the Investors.  In such event, the right of any such Investor to be included in a registration pursuant to this Section 2.2 shall be conditioned upon such Investor's participation in such underwriting and the inclusion of such Investor's New Common Stock in the underwriting to the extent provided herein.   All Investors proposing to distribute their New Common Stock through such underwriting shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Company.  Notwithstanding any other provision of the Agreement, if the underwriter and/or the Company determine in good faith that marketing factors require a limitation of the number of shares to be underwritten, the number of shares that may be included in the underwriting shall be allocated first to the Company, and then to Investors, on a *pro rata* basis based on the total number of New Common Stock held by the Investors.  In no event will shares of any other stockholder be included in such registration that would reduce the number of shares that may be included by the Investors without the prior written consent of a Majority Interest.  In no event will the Company be required to reduce the number of shares it desires to sell to accommodate Investors.

(c)     Upon an affirmative vote of a majority of the directors of the Company, the Company shall have the right to terminate or withdraw any registration initiated by it under this Section 2.2 prior to the effectiveness of such registration whether or not any Investor has elected to include securities in such registration.  The Registration Expenses of such withdrawn registration shall be borne by the Company in accordance with Section 2.3 hereof.

Section 2.3     **Expenses of Registration**.   All Registration Expenses incurred in connection with any registration, qualification or compliance pursuant to Section 2.1 or 2.2 shall be borne by the Company.  All Selling Expenses incurred in connection with any registrations hereunder, shall be borne by the Investors of the securities so registered *pro rata* on the basis of the number of shares so registered.

Section 2.4     **Obligations of the Company**.  Whenever required by the provisions of this Agreement to effect the registration of any New Common Stock, the Company shall, as expeditiously as reasonably possible:

(a)     Prepare and file with the SEC a registration statement with respect to such New Common Stock and use all reasonable efforts to cause such registration statement to become effective, and, upon the request of the holders of a majority up the New Common Stock registered thereunder, keep such registration statement effective for up to ninety (90) days or, if earlier, until the they have completed the distribution related thereto; provided, however, that if the registration is on Form S-3, the Company shall use reasonable efforts to cause it to remain effective for so long as (i) shares of New Common Stock remain unsold under the registration statement and (ii) the Company is eligible to use Form S-3 and the time period for the registration has not expired.

(b)     Subject to Section 2.6 hereof, prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement.

(c)     Furnish to the Investors such number of copies of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of the New Common Stock owned by them.

(d)     Use all reasonable efforts to register and qualify the New Common Stock under such other securities or Blue Sky laws of such jurisdictions as shall be reasonably requested by the Investors, provided that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

(e)     In the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing underwriter(s) of such offering.  Each Investor participating in such underwriting shall also enter into and perform its obligations under such an agreement.

(f)     Notify each Investor covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing.

(g)     Cause all such New Common Stock to be listed on each securities exchange or automated quotation system on which similar securities issued by the Company are then listed.

(h)     Promptly provide a transfer agent and registrar for all such New Common Stock not later than the effective date of the registration statement.

(i)     Furnish, at the request of holders of a majority of the New Common Stock being registered, on the date that such shares of New Common Stock are delivered to the underwriters for sale, if such securities are being sold through underwriters, or, if such securities are not being sold through underwriters, on the date that the registration statement with respect to such securities becomes effective, (i) an opinion, dated as of such date, of the counsel representing the Company for the purposes of such registration, in form and substance as is customarily given to underwriters in an underwritten public offering and reasonably satisfactory to the holders of a majority of the New Common Stock being registered, addressed to the underwriters, if any, and to the holders of New Common Stock requesting registration and (ii) a letter dated as of such date, from the independent certified public accountants of the Company, in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering and reasonably satisfactory to the holders of a majority of the New Common Stock

being registered, addressed to the underwriters, if any, and if permitted by applicable accounting standards, to the holders of New Common Stock requesting registration of New Common Stock.

(j)     Promptly following the effectiveness of such registration statement, notify each Investor of the effectiveness of such registration statement and thereafter, notify each Investor of any request by the SEC for the amending or supplementing of such registration statement or prospectus.

**Section 2.5     Termination of Registration Rights**.  All registration rights granted under this Article II shall terminate, and be of no further force and effect, upon the earliest to occur of (i) the five year anniversary date of the closing of the Company's Initial Public Offering, (ii) a Sale Event, (iii) the date on which all New Common Stock held by the Investors may immediately be sold in any three-month period without registration pursuant to Rule 144 under the Securities Act, or (iv) a dissolution or liquidation of the Company.

**Section 2.6     Delay of Registration; Furnishing Information**.

(a)     No Investor shall have any right to obtain or seek an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Article II.

(b)     It shall be a condition precedent to the obligations of the Company to take any action pursuant to Section 2.1 or 2.2 that the selling Investors shall furnish to the Company such information regarding themselves, the New Common Stock held by them and the intended method of disposition of such securities as shall be required to effect the registration of their New Common Stock.

(c)     If the Company shall notify Investors pursuant to Section 2.4(f) of this Agreement that a prospectus required to be delivered includes an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing, the Investors shall not make any sales of New Common Stock using such prospectus; *provided, however*, that the Company must furnish the Investors with a prospectus that may be used to sell New Common Stock within thirty (30) days after notifying the Investors pursuant to Section 2.4(f) hereof, and *provided further*, that the Company may not delay the Investors' ability to sell New Common Stock pursuant to this Section 2.6(c) for more than sixty (60) days in any twelve month period.

**Section 2.7     Indemnification**.  In the event any New Common Stock are included in a registration statement under Sections 2.1 or 2.2:

(a)     To the extent permitted by law, the Company will indemnify and hold harmless each Investor, the partners, managers, officers, directors and legal counsel of each Investor, any underwriter (as defined in the Securities Act) for such Investor and each person, if any, who controls such Investor or underwriter within the meaning of the Securities Act or the Exchange Act, against any losses, claims, damages, or liabilities (joint or several) to which they may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any of the following statements' omissions or violations (each a "Violation") by

the Company: (i) any untrue statement or alleged untrue statement of a material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, (ii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading, (iii) any violation or alleged violation by the Company of the Securities Act, the Exchange Act, any state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any state securities law in connection with the offering covered by such registration statement, or (iv) any breach of the terms of any underwriting agreement, placement agency agreement or other similar contract or arrangement; and the Company will reimburse each such Investor, partner, officer or director, underwriter or controlling person for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action; *provided, however*, that the Company shall not be liable in any such case for any such loss, claim, damage, liability or action to the extent that it arises solely out of or is based solely upon a Violation which occurs in reliance upon and in conformity with written information furnished expressly for use in connection with such registration by such Investor, partner, officer, director, underwriter or controlling person of such Investor.

(b)     To the extent permitted by law, each Investor will, if New Common Stock held by such Investor is included in the securities as to which such registration qualifications or compliance is being effected, severally and not jointly, indemnify and hold harmless the Company, each of its directors, its officers, and legal counsel and each person, if any, who controls the Company within the meaning of the Securities Act, any underwriter and any other Investor selling securities under such registration statement or any of such other Investor's partners, directors or officers or any person who controls such Investor, against any losses, claims, damages or liabilities (joint or several) to which the Company or any such director, officer, controlling person, underwriter or other such Investor, or partner, director, officer or controlling person of such other Investor may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages or liabilities (or actions in respect thereto) arise out of or are based upon any Violation, in each case to the extent (and only to the extent) that such Violation occurs in reliance upon and in conformity with written information furnished by such Investor under an instrument duly executed by such Investor (or its authorized agent) and stated to be specifically for use in connection with such registration; and each such Investor will reimburse any legal or other expenses reasonably incurred by the Company or any such director, officer, controlling person, underwriter or other Investor, or partner, officer, director or controlling person of such other Investor in connection with investigating or defending any such loss, claim, damage, liability or action if it is finally judicially determined that there was such a Violation; *provided, however*, in no event shall any indemnity under this Section 2.7 exceed the net proceeds from the offering received by such Investor.

(c)     Promptly after receipt by an indemnified party under this Section 2.7 of notice of the commencement of any action (including any governmental action), such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this Section 2.7, deliver to the indemnifying party a written notice of the commencement thereof and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume the defense thereof with counsel mutually satisfactory to the parties; *provided, however*, that an indemnified party shall have the right to retain its own counsel, with the fees and expenses to be paid by the

indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such proceeding. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action, if materially prejudicial to its ability to defend such action, shall relieve such indemnifying party of any liability to the indemnified party under this Section 2.7, but the omission so to deliver written notice to the indemnifying party will not relieve it of any liability that it may have to any indemnified party otherwise than under this Section 2.7.

(d)     If the indemnification provided for in this Section 2.7 is held by a court of competent jurisdiction to be unavailable to an indemnified party with respect to any losses, claims, damages or liabilities referred to herein, the indemnifying party, in lieu of indemnifying such indemnified party thereunder, shall to the extent permitted by applicable law contribute to the amount paid or payable by such indemnified party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and of the indemnified party on the other in connection with the Violation(s) that resulted in such loss claim, damage or liability, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and of the indemnified party shall be determined by a court of law by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission; provided, that in no event shall any contribution by an Investor hereunder exceed the proceeds from the offering received by such Investor.

(e)     The obligations of the Company and Investor under this Section 2.7 shall survive completion of any offering of New Common Stock in a registration statement. No indemnifying party, in the defense of any such claim or litigation, shall, except with the consent of each indemnified party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation. No indemnifying party shall be liable to any indemnified party in respect of any amounts due in settlement of any claim or litigation without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld.

Section 2.8     **Limitation on Subsequent Registration Rights**. After the date of this Agreement, the Company shall not, without the prior written consent of a Majority Interest, enter into any agreement with any Person that would grant such Person registration rights senior to those granted to the Investors hereunder.

Section 2.9     **"Market Stand-Off" Agreement**. Each Investor that is an officer or director of the Company or that owns greater than ten percent (10%) of the Company's outstanding New Common Stock, hereby agrees that it will not, without the prior written consent of the underwriters, during the period commencing on the effective date of a registration statement relating to any registered public offering of the Company's New Common Stock and ending on the date specified by the Company and the underwriters (such period not to exceed 180 days in the case of the Company's Initial Public Offering and 90 days in the case of all other offerings) (i) lend,

offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right, or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of New Common Stock or any securities convertible into or exercisable or exchangeable for New Common Stock or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the New Common Stock, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of New Common Stock or other securities, in cash, or otherwise. The foregoing provisions of this Section 2.9 shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, and shall be applicable only if all officers, directors and stockholders individually owning more than one percent (10%) of the Company's outstanding New Common Stock are subject to the same restrictions. The underwriters in connection with the offering are intended third-party beneficiaries of this Section 2.9 and shall have the right, power, and authority to enforce the provisions hereof as though they were a party hereto. Each Investor further agrees to execute such agreements as may be reasonably requested by the underwriters in the offering that are consistent with this Section 2.9 or that are necessary to give further effect thereto.

## ARTICLE III
## OWNERSHIP AND TRANSFER RESTRICTIONS

**Section 3.1      Limitation on Ownership**.  No Investor shall be permitted to own more than 44.9% of the Company's outstanding New Common Stock, without the prior written consent of a Majority Interest.

**Section 3.2      Prohibited Transfers**.  If any Transfer is made or attempted contrary to the provisions of this Agreement, such purported Transfer shall be void *ab initio*; the Investors shall have, in addition to any other legal or equitable remedies that they may have, the right to enforce the provisions of this Agreement by actions for specific performance (to the extent permitted by law); and the Company shall have the right to refuse to recognize any Transferee as one of its stockholders for any purpose.  Without limitation of the foregoing, each of the Investors further agrees that the provisions of Section 8.7 shall apply in the event of any violation or threatened violation of this Agreement.

**Section 3.3      Restrictions on Transfer**.  Each Investor agrees that he, she or it will not Transfer all or any portion of the shares of New Common Stock now owned or hereafter acquired by it, him or her, except in connection with, and strictly in compliance with the conditions of, any of the following:

(a)      Transfers by an Investor effected pursuant to Section 3.4 or Section 3.5 hereof, as applicable, in each case made strictly in accordance with the procedures set forth therein;

(b)      Transfers by an Investor to an Affiliate;

(c)      Transfers in which Investors are selling their New Common Stock on a pro rata basis; or

(d)      [Transfers by Investors that are not 7.5% Holders.]

Any permitted transferee described in the preceding clauses shall be referred to herein as a "**Permitted Transferee**."  Notwithstanding anything to the contrary in this Agreement or any failure to execute a Joinder Agreement as contemplated hereby, Permitted Transferees shall take any shares of New Common Stock so Transferred subject to all provisions of this Agreement as if such shares were still held by the transferor, whether or not they so agree with the transferor and/or the Company.

**Section 3.4    Right of First Refusal**.    In the event that any [7.5% Holder] (a "**Transferring Stockholder**"), receives a bona fide offer to purchase all or any portion of the shares of New Common Stock held by such Transferring Stockholder (a "**ROFR Proposed Transaction**") from a Person other than a Permitted Transferee (a "**Proposed Transferee**"), such Transferring Stockholder may, subject to the provisions of Section 3.5 hereof, Transfer such shares pursuant to and in accordance with the following provisions of this Section 3.4:

(a)    Such Transferring Stockholder shall deliver written notice (the "**ROFR Offer Notice**") of its desire to consummate the ROFR Proposed Transaction to the other [7.5% Holders] (with a copy to the Company), and shall otherwise comply with the provisions of this Section 3.4 and, if applicable, Section 3.5.  The ROFR Offer Notice shall specify (i) the number of share of New Common Stock held by the Transferring Stockholder that are subject to the ROFR Proposed Transaction (the "**ROFR Offered Shares**"), (ii) the consideration per share that the Proposed Transferee has firmly committed to pay for the ROFR Offered Shares (which shall be stated in cash), and (iii) all other material terms and conditions of the ROFR Proposed Transaction. The Transferring Stockholder's ROFR Offer Notice shall constitute an irrevocable offer to sell all such ROFR Offered Shares to the other [7.5% Holders] on the terms set forth below.

(b)    The other [7.5% Holders] shall have the right (the "**Right of First Refusal**") to accept the offer to purchase the number of ROFR Offered Shares which is equal to the product obtained by multiplying (i) the total number of shares subject to the ROFR Transaction by (ii) a fraction, the <u>numerator</u> of which is the total number of shares of New Common Stock held by such [7.5% Holder] on the date of the ROFR Offer Notice and the <u>denominator</u> of which is the total number of shares of New Common Stock then held by all [7.5% Holders], excluding the Transferring Stockholder, on such date.  To the extent one or more [7.5 Holders] do not exercise their Right of First Refusal, then the rights of the other [7.5% Holders] (who exercise their Right of First Refusal) to purchase shares shall be increased proportionately based on their relative holdings by the full amount of shares which the non-electing [7.5% Holders] were entitled to purchase pursuant to this Section 3.4.

(c)    Each [7.5% Holder] shall have the right to exercise its Right of First Refusal by giving notice of such exercise to the Transferring Stockholder within twenty (20) days after its receipt of the ROFR Offer Notice (the "**Right of First Refusal Period**").  Such written election to purchase shall constitute a valid, legally binding and enforceable agreement for the purchase by the [7.5% Holder] of the ROFR Offered Shares.

(d)    The closing for any purchase of ROFR Offered Shares hereunder shall take place no later than twenty (20) days after the expiration of the Right of First Refusal Period.

(e)  In the event that the other [7.5% Holders] do not elect to exercise their Right of First Refusal with respect to all of the ROFR Offered Shares, the Transferring Stockholder may sell the ROFR Offered Shares on the terms and conditions set forth in the ROFR Offer Notice, subject to compliance with the provisions of Section 3.5.  If the Transferring Stockholder's Transfer to the Proposed Transferee is not consummated in accordance with the terms of the ROFR Proposed Transaction within sixty (60) days after the later of the expiration of the Right of First Refusal Period and the Co-Sale Option Period set forth in Section 3.5, the ROFR Proposed Transaction shall be deemed to lapse, and any Transfers of shares pursuant to this Section 3.4 shall be deemed to be in violation of the provisions of this Agreement unless the other [7.5% Holders] are once again afforded a Right of First Refusal provided for herein with respect to any ROFR Proposed Transaction.

**Section 3.5** <u>**Co-Sale Option**</u>.  In the event that the Transferring Stockholder proposes to Transfer shares of New Common Stock where the Right of First Refusal under Section 3.4 above is not exercised with respect to all of the shares proposed to be Transferred [and such Transfer would cause the Proposed Transferee to hold 40% or more of the outstanding New Common Stock], such Transferring Stockholder may Transfer such shares only pursuant to and in accordance with the following provisions of this Section 3.5:

(a)  The Transferring Stockholder shall notify the other [Investors][7.5% Holders] in writing (with a copy to the Company) (the "***Co-Sale Notice***") that such [Investors][7.5% Holders] have the opportunity to participate in the proposed transaction (the "***Co-Sale Transaction***").  Each [Investor][7.5% Holder] shall have the right to participate in such Co-Sale Transaction on the terms and conditions herein stated (the "***Co-Sale Option***") by delivering written notice (the "***Acceptance Notice***") to the Transferring Stockholder within ten (10) days after his, her or its receipt of the Co-Sale Notice ("***Co-Sale Option Period***").  The Acceptance Notice shall indicate the maximum number of shares such [Investor][7.5% Holder] wishes to sell (including the number of shares it would sell if one or more Investors do not elect to participate in the sale) on the terms and conditions stated in the Co-Sale Notice.

(b)  Each such [Investor][7.5% Holder] shall have the right to sell a portion of his, her or its shares pursuant to the Co-Sale Transaction which is equal to or less than the product obtained by multiplying (i) the total number of shares subject to the Co-Sale Transaction by (ii) a fraction, the <u>numerator</u> of which is the total number of shares of New Common Stock held by such [Investor][7.5% Holder] on the date of the Acceptance Notice and the <u>denominator</u> of which is the total number of shares of New Common Stock then held by all [Investors][7.5% Holders] on the date of the Acceptance Notice.  To the extent one or more [Investors][7.5% Holders] do not exercise their Co-Sale Option, then the rights of the other [Investors][7.5% Holders] (who exercise their Co-Sale Option) to sell shares shall be increased proportionately based on their relative holdings by the full amount of shares which the non-electing [Investors][7.5% Holders] were entitled to sell pursuant to this Section 3.5.

(c)  Within ten (10) days after the expiration of the Co-Sale Option Period, the Transferring Stockholder shall notify each participating [Investor][7.5% Holder] of the number of shares of New Common Stock held by such [Investor][7.5% Holder] that will be included in the sale and the date on which the Co-Sale Transaction will be consummated, which shall be no later than twenty (20) days after the expiration of the Co-Sale Option Period.

**(d)** Any [Investor][7.5% Holder] may effect its participation in any Co-Sale Transaction hereunder by delivery to the Proposed Transferee, or to the Transferring Stockholder for delivery to the Proposed Transferee, of one or more instruments or certificates, properly endorsed for Transfer, representing the shares it elects to sell therein, <u>provided</u>, that each of the [Investors][7.5% Holders] exercising such Co-Sale Option undertakes all obligations undertaken by the Transferring Stockholder in connection with the Co-Sale Transaction, including, without limitation, all indemnification and escrow obligations, on a pro rata basis based upon the distribution of proceeds in the Co-Sale Transaction. At the time of consummation of the Co-Sale Transaction, the Proposed Transferee shall remit directly to each such participating [Investor][7.5% Holder] that portion of the sale proceeds to which such [Investor][7.5% Holder] is entitled by reason of his, her or its participation therein.

**(e)** Promptly after such sale, the Transferring Stockholder shall notify each participating [Investor][7.5% Holder] of the consummation thereof and shall furnish such evidence of the completion and time of completion of such sale and of the terms thereof as may reasonably be requested by any such [Investor][7.5% Holder]. In the event that the Co-Sale Transaction is not consummated within the period required by Section 3.5(c) above or the Proposed Transferee fails timely to remit to each such [Investor][7.5% Holder] its portion of the sale proceeds, the Co-Sale Transaction shall be deemed to lapse, and any Transfers of shares pursuant to such Co-Sale Transaction shall be deemed to be in violation of the provisions of this Agreement unless the Transferring Stockholder once again complies with the provisions of Section 3.4 and this Section 3.5 with respect to any such Transfers of shares.

**(f)** [In the event that the Transferring Stockholder proposes to Transfer shares of New Common Stock where the Right of First Refusal under Section 3.4 above is not exercised with respect to all of the shares proposed to be Transferred and such Transfer would cause the Proposed Transferee to hold 40% or more of the outstanding New Common Stock, the Co-Sale Option provided by this Section 3.5 shall be available to all Investors on a pro rata basis.]

**Section 3.6    Drag-along Right**.

**(a)** In the event of a Sale Event, the Investors (other than the Investors who constitute the Majority Interest exercising the Drag Along Right (as defined below)) (collectively, the "***Dragged Stockholders***") shall upon the written request of a Majority Interest be obligated to: (i) sell, transfer and deliver, or cause to be sold, transferred and delivered, to the Third-Party Buyer a pro rata portion of his, her or its shares of New Common Stock on substantially the same terms as are applicable to the Majority Interest; and (ii) execute and deliver such instruments of conveyance and transfer and take such other action, including voting such shares of capital stock in favor of any Sale Event proposed by a Majority Interest and executing (on similar terms as the Majority Interest) any purchase agreements, merger agreements, indemnity agreements, escrow agreements or related documents, as such Majority Interest or the Third-Party Buyer may reasonably require in order to carry out the terms and provisions of this Section 3.6 (the right of the Majority Interest to effect such transaction, the "***Drag-Along Right***").

**(b)** Not less than twenty (20) days prior to the date proposed for the closing of any Sale Event, the Majority Interest shall give notice to each of the Dragged Stockholders setting forth in reasonable detail the name or names of the Third-Party Buyer, the terms and conditions of

the Sale Event, including the purchase price or other consideration for the shares of New Common Stock (which terms and conditions, including price, shall be the same in all material respects for the Dragged Stockholders and the Majority Interest) and the proposed closing date. In furtherance of the provisions of this Section 3.6, each of the Dragged Stockholders hereby (i) irrevocably appoints the designee of the Majority Interest, as its agent and attorney-in-fact (the "***Agent***") (with full power of substitution) to execute all agreements, instruments and certificates and take all actions necessary or desirable to effect any transaction hereunder; and (ii) grants to the Agent a proxy to vote the shares of New Common Stock held by the Dragged Stockholders in favor of any Sale Event hereunder.

(c)     [In the event of a Sale Event in which the Majority Interest does not exercise its Drag-Along Right set forth in Section 3.6(a) above, each of the other Investors shall have the right to require the Majority Interest to include such Investors' shares of New Common Stock in the Sale Event on the same economic terms and conditions as the shares of New Common Stock held by the Majority Interest (the "***Tag-Along Right***"); provided, that each of the Investors exercising such Tag-Along Right undertakes all obligations undertaken by the Majority Interest in connection with the Sale Event, including, without limitation, all indemnification and escrow obligations on a pro rata basis based upon the distribution of proceeds in the Sale Event.]

## ARTICLE IV
## RIGHTS TO PURCHASE

**Section 4.1     Right to Participate in Certain Sales of Additional Securities**.  The Company agrees that it will not sell or issue, or agree to sell or issue: (a) any shares of capital stock of the Company, or (b) any securities (including any options, warrants or other rights) convertible into or exercisable or exchangeable for capital stock of the Company, unless the Company first submits a written notice (the "***Pre-Emptive Rights Notice***") to each Investor, identifying the terms of the proposed sale (including proposed purchasers, price, number of securities to be sold, and all other material terms), and offers to each Investor who is an "accredited investor," as such term is defined in Rule 501 under the Securities Act (each, an "***Eligible Person***"), the opportunity to purchase his, her or its Pro Rata Allotment (as defined below) of the offered securities (subject to increase if one or more Eligible Persons do not fully exercise their rights hereunder) on terms and conditions, including price, not less favorable than those on which the Company proposes to sell such securities to proposed purchasers thereof.  The Company's offer pursuant to this Section 4.1 to sell such securities to the Eligible Persons shall remain open and irrevocable for a period of twenty (20) days following receipt by the Eligible Persons of such Pre-Emptive Rights Notice.

**Section 4.2     Eligible Person Acceptance**.  Each Eligible Person shall have the right to purchase its Pro Rata Allotment by giving written notice of his, her or its intent to do so (the "***Pre-Emptive Rights Acceptance Notice***") to the Company within twenty (20) days after such Eligible Person's receipt of the Pre-Emptive Rights Notice (the "***Pre-Emptive Rights Acceptance Period***").  Each Pre-Emptive Rights Acceptance Notice shall indicate the maximum number of securities subject thereto that such Eligible Person wishes to purchase, including the number of securities it would purchase if one or more other Eligible Persons do not elect to participate in the sale on the terms and conditions stated in the Pre-Emptive Rights Notice.

**Section 4.3    Calculation of Pro Rata Allotment**.  Each Eligible Person's "*Pro Rata Allotment*" of the securities to be sold by the Company shall be equal to the ratio that the number of shares of New Common Stock owned by such Eligible Person bears to all of the issued and outstanding shares of New Common Stock as of the date of the applicable Pre-Emptive Rights Notice.  If one or more Eligible Persons do not elect to purchase their respective Pro Rata Allotments, each of the participating Eligible Persons may purchase a portion of each such non-participating Eligible Person's allotment (taking into account the maximum number of securities each desires to purchase) on a pro rata basis, based on the relative holdings of shares of New Common Stock of each of the participating Eligible Persons.

**Section 4.4    Sale to Third Party**.  Any securities that the Company offers for sale that Eligible Persons do not elect to purchase pursuant to the offer delivered by the Company pursuant to Section 4.1 above may be sold by the Company, but only on terms and conditions not more favorable to the purchasers than those set forth in the Pre-Emptive Rights Notice, at any time after five (5) days but within sixty (60) days following the termination of the above-referenced 20-day period, but may not be sold to any other Person or on terms and conditions, including price, that are more favorable to the purchasers than those set forth in such Pre-Emptive Rights Notice or after such 60-day period without renewed compliance with this Article IV.

**Section 4.5    Exceptions to Pre-Emptive Rights**.  Notwithstanding the foregoing, the right to purchase granted under this Article IV shall not apply to: (a) the issuance of shares of New Common Stock in connection with, or upon the exercise of, options or other awards granted or to be granted to Persons under any stock option or other equity incentive plan of the Company that has been approved by the Board of Directors of the Company or any compensation committee thereof, (b) securities issued as a result of or in connection with any stock split, stock dividend, combination, reclassification, reorganization or similar event with respect to the Company's capital stock, (c) securities issued upon the conversion, exercise or exchange of securities issued in a transaction effected in compliance with this Article IV, (d) securities issued as consideration for the purchase of stock or assets in any acquisition or merger that is approved by the Board of Directors, (e) the issuance of shares of PIK Preferred (f, (f) the issuance of Conversion Shares and Anti-Dilution Shares, or (g) the issuance of other securities not included in (a) through (f) issued with the approval of a Majority Interest; provided, that such other securities identified in clause (g) are issued to Persons who are not Investors or Affiliates of any Investor.

## ARTICLE V
## BOARD OF DIRECTORS AND RELATED MATTERS

**Section 5.1    Board Composition**.

**(a)**    Each Investor agrees to vote all of his, her or its shares of New Common Stock in connection with the election of directors of the Company and to take such other actions as are necessary so as to fix the number of members of the Board of Directors at not more than five (5) and to elect and continue in office as directors the following:

(i)    Two individuals nominated by the Investing Noteholders, who shall initially be _____ (the "*Noteholder Directors*");

(ii)    Two individuals nominated by JB, who shall initially be JB and _____ (the "***JB Directors***");

(iii)    One individual nominated by the Investing Noteholders and JB or, if they cannot agree on a nominee, by the other four directors.

In the event JB's or the Investing Noteholders' ownership of the outstanding New Common Stock drops below 20% of such outstanding stock, JB or the Investing Noteholders, as applicable, shall be entitled to select one director, the other selected director shall resign and the vacancy shall be filled by the remaining directors. In the event JB's or the Investing Noteholders' ownership of the outstanding New Common Stock drops below 10% of such outstanding stock, JB or the Investing Noteholders, as applicable, shall not be entitled to select a director, the director(s) selected shall resign and the vacancy shall be filled by the then sitting board. Any director selected to fill any vacancy as a result of JB' or the Investing Noteholders' ownership of the outstanding New Common Stock decreasing as per above shall serve the unexpired term of the director such new director replaces, and may be nominated for an additional term. JB and the Investing Noteholders shall only be required to vote for the election (A) of persons selected by the other as provided above and (B) only for the fifth director for so long as each party has a right to select two directors.

**(b)**    Each Investor agrees to vote all of his, her or its shares of New Common Stock for the removal of any director upon the request of the party nominating such director under Section 5.1(a)(i) above or Section 5.1(a)(ii) above and for the election to the Board of Directors of a substitute nominated by such party in accordance with the provisions of Section 5.1(a) hereof. Each Investor further agrees to vote all of his, her or its shares of New Common Stock in such manner as shall be necessary or appropriate to ensure that any vacancy on the Board of Directors occurring for any reason shall be filled only in accordance with the provisions of this Article V.

**Section 5.2    Committees of the Board**.  The composition of any committee to the Board of Directors shall be apportioned in a similar fashion as set forth in Section 5.1. JB shall serve on any executive committee or similar committee of the Company.

**Section 5.3    Officers**.  The Board of Directors may delegate to the Company's officers the authority to carry out the Company's day-to-day functions, pursuant to the direction and policies established by the Board of Directors.

**Section 5.4    Actions Requiring Prior Approval from the Board of Directors**. Notwithstanding any other provisions of this Agreement, the Company shall not take any action on any of the following matters without the prior written consent of a majority of the members of the Board of Directors:

**(a)**    approval of the appointment of the members of any committee established by the Board of Directors;

**(b)**    approval of, and material change to, annual operating and capital expenditure budgets, provided that management may operate under any proposed budget pending Board approval, which approval may not be unreasonably or untimely withheld;

(c)     adoption of any pension plan, employee welfare plan or policy that will impose material costs, and granting of any options, restricted stock or similar rights;

(d)     any transaction between the Company and any stockholder, officer, director or Affiliate of the Company, or any representative or relative thereof, other than normal compensation agreements, customary intercompany arrangements, and agreements involving less than $100,000 annually;

(e)     amendment of the Company's ~~charter~~<u>Certificate of Incorporation</u> or the Company's bylaws; provided that no such amendment may materially disproportionately affect any holder of New Common Stock;

(f)     merger into or with or acquisition of all or part of the business of another Person involving a purchase price over $5,000,000;

(g)     sale, lease, transfer, or other disposition of all or substantially all of the assets of the Company or a Subsidiary;

(h)     liquidation, dissolution, winding up or voluntary bankruptcy of the Company or a Subsidiary;

(i)     declaration of dividends or other distributions;

(j)     issuance, purchase or redemption by the Company of any of its securities ~~and~~<u>or</u> any change, increase or reduction in its capitalization<u>; provided, however, that the issuance of Conversion Notes, Conversion Shares and Anti-Dilution Shares will not require the prior written consent of a majority of the members of the Board of Directors</u>; or

(k)     entering into any material debt financings, except working capital financings, financings associated with permitted capital expenditures, and refinancings.

**Section 5.5     Board Observer**.  Any Investing Noteholder holding 10% or more of the New Common Stock may elect to send a non-director representative to attend meetings of the Board or any committee thereof (the "***Observer***").  No Observer will be compensated for any services provided by such Observer to the Company.  The Observer will receive all notices and other information regarding and will be permitted to attend, all meetings he or she would be permitted to attend as a member of the Board, but will not have any of the duties or liabilities of a member of the Board.  The Observer may be excluded from meetings, or portions of meetings, of the Board or any committee thereof as necessary to protect the attorney-client privilege.

**Section 5.6     Charter and Bylaws; Insurance**.  The Certificate of Incorporation and ~~By-laws~~<u>bylaws</u> of the Company will provide for exculpation and indemnification of the Directors and limitations on the liability of the Directors to the fullest extent permitted under applicable state law.  The Company shall obtain and maintain insurance coverage under an errors and omissions insurance policy, a director and officer liability insurance policy, and an employment practices liability insurance policy, each effective as of the date hereof and each covering occurrences during the period beginning on the date hereof and ending at least one year after the date on which no nominee of an Investor serves on the Board of Directors, for the benefit of directors, managers

and employees of the Company, in an amount of not less than $5 million per occurrence and otherwise containing limits, deductibles, coverages and other features reasonably satisfactory to the Investors.

## ARTICLE VI
## STOCKHOLDER APPROVALS

**Section 6.1** **Actions Requiring Prior Approval from the Stockholders**. Notwithstanding any other provisions of this Agreement, the Company shall not take any action on any of the following matters without the prior written consent of a Majority Interest:

**(a)** amendment of the Company's ~~charter~~Certificate of Incorporation or the Company's bylaws; provided that no such amendment may materially disproportionately affect any holder of New Common Stock;

**(b)** merger into or with or acquisition of all or part of the business of another Person involving a purchase price over $5,000,000;

**(c)** sale, lease, transfer, or other disposition of all or substantially all of the assets of the Company or a Subsidiary;

**(d)** liquidation, dissolution, winding up or voluntary bankruptcy of the Company or a Subsidiary;

**(e)** declaring of dividends or other distributions;

**(f)** issuance, purchase or redemption by the Company of any of its securities ~~and~~or any change, increase or reduction in its capitalization; provided, however, that the issuance of Conversion Notes, Conversion Shares and Anti-Dilution Shares will not require the prior written consent of a Majority Interest; and

**(g)** entering into any material debt financings, except working capital financings, financings associated with permitted capital expenditures, and refinancings.

## ARTICLE VII
## OTHER AGREEMENTS

**Section 7.1** **Information Rights**. The Company shall deliver to each of the Investors the following:

**(a)** Within 120 days after the end of each fiscal year of the Company or within five days after the approval of such audited financial statements by the Board of Directors, if earlier, a consolidated balance sheet of the Company and any Subsidiary as of the end of such fiscal year and the related consolidated statements of income, stockholders' equity and cash flows for such fiscal year, prepared in accordance with U.S. generally accepted accounting principles and audited by a firm of independent certified public accountants selected by the Board of Directors; and

**(b)**     Within 60 days after the end of each fiscal quarter of the Company or within five days after the approval of such interim financial statements by the Board of Directors, if earlier, a consolidated balance sheet of the Company and any Subsidiary as of the end of such fiscal quarter and the related consolidated statements of income and cash flows for such fiscal quarter, unaudited but prepared in accordance with U.S. generally accepted accounting principles.

## ARTICLE VIII
## GENERAL

**Section 8.1     Amendments, Waivers and Consents**.     For the purposes of this Agreement, no course of dealing between or among any of the parties hereto and no delay on the part of any party hereto in exercising any rights hereunder or thereunder shall operate as a waiver of the rights hereof and thereof.     This Agreement may not be amended or modified or any provision hereof waived without the joint written consent of the Company and a Majority Interest; provided, that any party may waive any provision hereof intended for its benefit by written consent; and, provided, further, that any amendment or modification that would adversely affect a party hereto in a manner different than the parties hereto seeking to approve such amendment or modification shall require the prior written consent of each adversely affected party.

**Section 8.2     Legend on Securities**.     The Company, each of the Investors and each of the Stockholders acknowledge and agree that substantially the following legend shall be typed on each certificate evidencing any of the securities issued hereunder held at any time by an Investor or a Stockholder:

> THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO THE PROVISIONS OF A STOCKHOLDERS AGREEMENT BETWEEN THE COMPANY AND CERTAIN STOCKHOLDERS OF THE COMPANY, INCLUDING THEREIN CERTAIN RESTRICTIONS ON TRANSFER.     A COMPLETE AND CORRECT COPY OF THIS AGREEMENT IS AVAILABLE FOR INSPECTION AT THE PRINCIPAL OFFICE OF THE COMPANY AND WILL BE FURNISHED UPON WRITTEN REQUEST AND WITHOUT CHARGE.

**Section 8.3     Governing Law**.     This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without regard to the principles thereof relating to conflict of laws.

**Section 8.4     Section Headings and Gender**.     The descriptive headings in this Agreement have been inserted for convenience only and shall not be deemed to limit or otherwise affect the construction of any provision hereof.     The use in this Agreement of the masculine pronoun in reference to a party hereto shall be deemed to include the feminine or neuter, and vice versa, as the context may require.

**Section 8.5     Counterparts**.     This Agreement may be executed simultaneously in any number of counterparts, each of which when so executed and delivered shall be taken to be an original; but such counterparts shall together constitute but one and the same document.     This Agreement may be executed by facsimile.

**Section 8.6    Notices and Demands**.   Any notice or demand which is required or provided to be given under this Agreement shall be deemed to have been sufficiently given and received for all purposes when delivered by hand, telecopy, telex or other method of facsimile, or five (5) days after being sent by certified or registered mail, postage and charges prepaid, return receipt requested, or two (2) days after being sent by overnight delivery providing receipt of delivery, to the addresses provided by the parties in the Support Agreement.

**Section 8.7    Remedies; Severability**.  It is specifically understood and agreed that any breach of the provisions of this Agreement by any Person subject hereto will result in irreparable injury to the other parties hereto, that the remedy at law alone will be an inadequate remedy for such breach, and that, in addition to any other remedies which they may have, such other parties may enforce their respective rights by actions for specific performance (to the extent permitted by applicable law).  The Company may refuse to recognize any unauthorized Transferee as one of its stockholders for any purpose, including, without limitation, for purposes of dividend and voting rights, until the relevant party or parties have complied with all applicable provisions of this Agreement.  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be deemed prohibited or invalid under such applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, and such prohibition or invalidity shall not invalidate the remainder of such provision or the other provisions of this Agreement.

**Section 8.8    Integration**.    This Agreement constitutes the entire agreement, and supersedes all other prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof.

**Section 8.9    Adjustment**.  All references to share amounts and prices herein shall be equitably adjusted to reflect any stock split, combination, reorganization, recapitalization, reclassification, stock distribution, stock dividend or similar event affecting the capital stock of the Company.

**Section 8.10   Term**.   Unless otherwise set forth herein, the provisions contained in Articles III, IV, V, VI and VII hereof shall terminate upon the earliest to occur of (i) an Initial Public Offering, (ii) a Sale Event or (iii) a dissolution or liquidation of the Company.

**Section 8.11   Joinder**.   Upon confirmation of the Plan, any holder of New Common Stock that is not a New Investor shall have the right to become a party to this Agreement by executing a Joinder Agreement in substantially the form attached hereto as Exhibit A and returning the certificate representing such holder's New Common Stock for the affixation of the legend described in Section 8.2 above to such certificate.  Notice of this right shall be distributed by the Company to such holders with the notice of issuance of the New Common Stock.

**Section 8.12   Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the parties hereto as contemplated herein, and any successor to the Company by way of merger or otherwise shall specifically agree to be bound by the terms hereof as a condition of such succession.  The rights of the Investors hereunder shall be binding upon and inure to the benefit of Permitted Transferees.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, the parties have executed this Stockholders Agreement as of the date first above written.

<u>**COMPANY**</u>:

Eurofresh Holding Company, Inc.

By: _____
Name:
Title:

<u>**INVESTING NOTEHOLDERS**</u>:

J.P. Morgan Investment Management Inc., as discretionary investment manager for Noteholders who are clients of its Cincinnati High Yield Group

By: _____
    Name:
    Title:

Scoggin Capital Management, LP II
By: S&E Partners LP Its: General Partner
By: Scoggin Inc. Its: General Partner

By: _____
    Name:
    Title:

Scoggin International Fund Ltd.
By: Scoggin LLC Its: Investment Manager

By: _____
    Name:
    Title:

Scoggin Worldwide Fund Ltd.
By: Old Bellows Partners LP Its: Investment Manager
By:  Old Bell Associates Its: General Partner


By: _____
      Name:
      Title:


Barclays Bank PLC


By: _____
      Name:
      Title:


Credit Suisse Syndicated Loan Fund
  By: Credit Suisse Alternative Capital, Inc. as Agent
(Subadvisor) for Credit Suisse Asset Management
(Australia) Limited, the Responsible Entity for Credit Suisse
Syndicated Loan Fund


By: _____
      Name:
      Title:


Credit Suisse High Yield Fund
  By: Credit Suisse Alternative Capital, Inc. as Agent
(Subadvisor) for Credit Suisse Asset Management
(Australia) Limited, the Responsible Entity for Credit Suisse
High Yield Fund


By: _____
      Name:
      Title:

**<u>JB</u>:**

Bio Dynamics B.V./S.a.r.L.

By:_____
Name:
Title:

## EXHIBIT A

### Form of Joinder Agreement

The undersigned hereby agrees, effective as of the date hereof, to become a party to that certain Stockholders Agreement (the "***Agreement***") dated as of _____ \_\_, 2009 by and between among Eurofresh Holding Company, Inc. (the "***Company***") and the other parties named therein, and for all purposes of the Agreement, the undersigned shall be included within the term "Investor" (as defined in the Agreement). The address and facsimile number to which notices may be sent to the undersigned is as follows:

_____

Facsimile No. _____.


_____

**[NAME OF UNDERSIGNED]**

## EXHIBIT B

**New Investor Ownership Table**

## EXHIBIT C

### Investing Noteholders

Barclays Bank PLC
Scoggin Capital Management
JP Morgan Investment Management
Credit Suisse Alternative Capital, Inc.

## <u>EXHIBIT 10</u>

Eurofresh Subordinated PIK Note Purchase Agreement
(clean version)

**EUROFRESH, INC.**


**$5,000,000 20.00% SUBORDINATED PIK A NOTES**
**DUE MARCH 31, 2010**
**$30,000,000 15.00% SUBORDINATED PIK NOTES**
**DUE [_____ ___,] 2016**


_____


**SUBORDINATED PIK NOTE PURCHASE AGREEMENT**


_____


**Dated as of [_____ ___,] 2009**

# TABLE OF CONTENTS

EXHIBIT A          --          FORM OF SUBORDINATED NOTE

EXHIBIT B          --          FORM OF SUBORDINATED PIK A NOTE

EXHIBIT C          --          FORM OF AFFILIATE GUARANTY

EXHIBIT D          --          FORM OF SUBORDINATION AGREEMENT

PHOENIX/505708.4

**EUROFRESH, INC.**

**SUBORDINATED PIK NOTE PURCHASE AGREEMENT**

THIS SUBORDINATED PIK NOTE PURCHASE AGREEMENT (this "**Agreement**") is made as of the __ day of _____, 2009 by and among Eurofresh, Inc., a Delaware corporation (the "**Company**"), Eurofresh Holding Company, Inc., a Delaware corporation and the parent of the Company, as guarantor ("**Holdco**"), Eurofresh Produce, Ltd., a Delaware corporation and the wholly-owned subsidiary of Eurofresh, as guarantor ("**EPL**", and together with the Company, the "**Debtors**"), the Investing Noteholders identified on Exhibit A hereto (the "**Investing Noteholders**"), and Bio Dynamics B.V./S.a.r.L., a Luxembourg company ("**Bio Dynamics**" and together with its successors and permitted assigns, and together with the Investing Noteholders, the "**New Investors**").

**RECITALS**

A.       On April 21, 2009, the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, which are pending before the United States Bankruptcy Court for the District of Arizona (the "**Bankruptcy Court**").

B.       The Company had issued and outstanding $170,000,000 in aggregate principal amount of 11½ % Senior Notes Due in 2013 (the "**Senior Notes**") payable to the holders of the Senior Notes (the "**Senior Noteholders**") pursuant to an Indenture dated December 21, 2005 (the "**Senior Indenture**") among the Company, EPL and U.S. Bank National Association, as successor trustee to Wells Fargo Bank, N.A.

C.       Pursuant to a joint plan of reorganization (the "**Plan**") confirmed by the Confirmation Order by the Bankruptcy Court entered on _____, 2009 (Doc. No. _____), the Debtors have undertaken a comprehensive financial restructuring and recapitalization of the Debtors (the "**Reorganization**").

D.       Following the effective date of the Plan, Holdco will own 100% of the capital stock of the Company.

E.       Pursuant to the Plan, the New Investors have agreed, as part of the Reorganization, to invest an aggregate of $35,000,000 in the Company (the "**New Money Investment**"), of which (i) $20,000,000 will be invested by the Investing Noteholders (the "**Investing Noteholders Investment**") and (ii) $15,000,000 of which will be invested by Bio Dynamics, as consideration for $30,000,000 in subordinated unsecured promissory notes in substantially the form attached to this Agreement as Exhibit A (each, a "**Subordinated Note**" and together, the "**Subordinated Notes**"), and $5,000,000 senior subordinated unsecured promissory class A notes in substantially the form attached to this Agreement as Exhibit B (each, a "**Subordinated PIK A Note**" and together, the "**Subordinated PIK A Notes**," and together with the Subordinated Notes, the "**Notes**"), among other securities of the Company and Holdco.

F.       Pursuant to the Plan, in exchange for the New Money Investment, (i) each Investing Noteholder shall receive its pro rata share of the Subordinated Notes in the principal

amount of $15,000,000, in each case determined based on its proportionate share of the Investing Noteholders Investment, and its pro rata share of the Subordinated PIK A Notes in the principal amount of $5,000,000 and (ii) Bio Dynamics shall receive a Subordinated Note in the principal amount of $15,000,000.

NOW, THEREFORE, in consideration of the mutual covenants and the agreements of the parties contained herein, and subject to the conditions specified herein, the parties hereto agree as follows:

# ARTICLE I

## DEFINITIONS

For the purpose of this Agreement, capitalized terms not otherwise defined herein shall have the respective meanings

"**Affiliate**" shall mean, with respect to any Person, (a) any other Person who is a partner, director, officer or stockholder of such Person; and (b) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such Person, and any partner, director, officer or stockholder of such other Person described.  For purposes of this Agreement, control of a Person by another Person shall be deemed to exist if such other Person has the power, directly or indirectly, either to (i) vote twenty percent (20%) or more of the securities having the power to vote in an election of directors of such Person, or (ii) direct the management of such Person, whether by contract or otherwise and whether alone or in combination with others.

"**Affiliate Guarantor**" means each Affiliate that is party to the Affiliate Guaranty.

"**Anti-Dilution Shares**" shall mean, collectively, shares of New Common Stock issued to Senior Noteholders or added to the Reserved Shares Trust for the benefit of Senior Noteholders upon the issuance of Conversion Shares pursuant to Section 2.4.

"**Bankruptcy Code**" shall mean the Bankruptcy Reform Act of 1978, as codified under Title 11 of the United States Code, and the Bankruptcy Rules promulgated thereunder, as the same may be in effect from time to time.

"**Business Day**" shall mean any day other than a Saturday, a Sunday or a day on which commercial banks in New York City are required or authorized to be closed.

"**Change of Control**" shall mean:

(1)     any event occurs the result of which is that any Person becomes the beneficial owner, as defined in Rules 13d-3 and 13d-5 under the Exchange Act (except that a Person shall be deemed to have "beneficial ownership" of all shares that any such Person has the right to acquire within one year) directly or indirectly, of more than 50% of the Voting Stock of Holdco or a Successor Company, including, without limitation, through a merger or consolidation or purchase of voting Capital Stock of Holdco; provided that the transfer of 100% of the Voting Stock of Holdco to a Person that has an ownership structure and beneficial owners

2

identical to that of Holdco prior to such transfer, such that Holdco becomes a Wholly Owned Subsidiary of such Person, shall not be treated as a Change of Control for purposes of this Agreement;

(2)     during any period of two consecutive years occurring after the date of this Agreement, individuals who at the beginning of such period constituted the Board of Directors, together with any new directors whose election by such Board of Directors or whose nomination for election by the stockholders of Holdco was approved by a vote of a majority of the directors of Holdco then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved, cease for any reason to constitute a majority of the Board of Directors then in office;

(3)     the sale, lease, transfer, exchange, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries taken as a whole to any Person or group of related Persons; provided that the sale, lease, transfer, exchange, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company to a Person that has an ownership structure and beneficial owners identical to that of the Company prior to such sale, lease, transfer, exchange, conveyance or other disposition shall not be treated as a Change of Control for purposes of this Agreement; or

(4)     the approval, adoption or initiation of a plan or proposal relating to the liquidation or dissolution of the Company.

"**Closing**" or "**Closing Date**" shall have the meaning given in Section 2.9 hereof.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Effective Date**" shall have the meaning set forth in the Plan.

"**Event of Default**" shall mean any of the events specified in Section 7.1, provided that there has been satisfied any requirement in connection with such event for the giving of notice, or the lapse of time, or the happening of any further condition, event or act.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Existing Credit Facility**" shall mean that certain Credit and Guaranty Agreement dated as of March 25, 2008, as amended or otherwise modified to date, among the Company, EPL and the financial institutions party thereto as lenders, including SP, as administrative agent, collateral agent, syndication agent, documentation agent and lead arranger.

"**Governmental Authority**" shall mean any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government or any political subdivision thereof.

3

"**Individual Conversion Amount**" shall mean, for each holder of a Subordinated PIK A Note, the unpaid portion of such holder's Subordinated PIK A Note converted pursuant to Section 2.4.

"**Individual Initial Investment**" shall mean, for each holder of a Subordinated PIK A Note, the portion of the Investing Noteholders Investment invested by such Holder.

"**Individual Initial Shares**" shall mean, for each holder of a Subordinated PIK A Note, the shares of New Common Stock issued to such holder on the Effective Date in exchange for its portion of the Investing Noteholders Investment.

"**Individual Total Investment**" shall mean, for each holder of a Subordinated PIK A Note, the sum of such holder's Individual Initial Investment plus its Individual Conversion Amount.

"**Law**" shall mean any statute, rule, regulation, order, judgment, award or decree of any Governmental Authority.

"**Material Adverse Effect**" shall mean (i) a material adverse effect on the business, assets, liabilities, operations or condition, financial or otherwise, of the Company and its Subsidiaries, taken as a whole, (ii) material impairment of the Company's ability to perform any of its respective obligations under this Agreement, the Subordinated Notes or any other Transaction Document or (iii) material impairment of the validity or enforceability of the rights of, or the benefits available to, the holders of any of the Subordinated Notes under this Agreement, the Subordinated Notes or any other Transaction Document.

"**New Common Stock**" means the 20,000,000 shares of common stock of Holdco, of a single class, 4,000,000 shares of which will be issued to the Investing Noteholders on the Effective Date, 4,000,000 shares of which will be issued to Bio Dynamics on the Effective Date, 1,000,000 shares of which will be issued to the Senior Noteholders on the Effective Date, and 1,000,000 shares of which will be Reserved Shares, in each case pursuant to the Plan.

"**New Credit Facility**" shall mean the Credit and Guaranty Agreement, dated as of [_____ __, 2009], among the Debtors, the various lenders party thereto and SP as Administrative Agent, Collateral Agent, Syndication Agent, Documentation Agent and Lead Arranger, and any related documents or agreements in connection therewith.

"**Percentage Investment at Conversion**" shall mean, for each holder of a Subordinated PIK A Note, the quotient obtained by dividing such holder's Individual Total Investment by the Total Investment at Conversion.

"**Person**" shall mean and include an individual, a partnership, a joint venture, a corporation, a trust, a limited liability company, an unincorporated organization and a government or any department or agency thereof.

"**Reserved Shares**" means the shares of New Common Stock placed in the Reserved Shares Trust on the Effective Date, together with any additional shares of New Common Stock placed in the Reserved Shares Trust thereafter.

4

"**Reserved Shares Trust**" means the trust into which Holdco will place shares of New Common Stock for the benefit of the Senior Noteholders, as set forth in the Plan.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**SP**" shall mean Silver Point Finance, LLC.

"**Stockholders Agreement**" means that certain Stockholders Agreement, dated on or about the Closing Date, by and among Holdco, the Persons to whom shares of New Common Stock of Holdco are first issued and the other parties listed thereto, as such agreement may be amended, supplemented, restated or otherwise modified from time to time.

"**Subordination Agreement**" shall mean the Subordination Agreement, dated as of the date of this Agreement, in substantially the form attached as <u>Exhibit D</u> hereto, by and among the Debtors, the New Investors, and SP, as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms thereof.

"**Subsidiary**" of any Person shall mean any corporation or other entity all of the stock or other ownership interests of every class of which, except directors' qualifying shares, greater than fifty percent (50%) of the total combined voting power of all classes of Voting Stock or greater than fifty percent (50%) of the total outstanding ownership interests of all classes of which shall, at the time as of which any determination is being made, be owned by such Person either directly or through Subsidiaries of such Person. Unless the context otherwise clearly requires, any reference to a "Subsidiary" is a reference to a Subsidiary of the Company.

"**Successor Company**" means Holdco's successor in the event of a merger, recapitalization or consolidation.

"**Total Conversion Amount**" shall mean the total unpaid portion of Subordinated PIK A Notes converted by holders of Subordinated PIK A Notes pursuant to <u>Section 2.4</u>.

"**Total Initial Investment**" shall mean $30,000,000.

"**Total Initial Shares**" shall mean the 8,000,000 shares of New Common Stock issued to such the Investing Noteholders on the Effective Date in exchange for the Investing Noteholders Investment.

"**Total Investment at Conversion**" shall mean the sum of the Total Initial Investment plus the Total Conversion Amount.

"**Transaction Documents**" shall mean this Agreement, the Notes, and any other agreements, documents, certificates and instruments now or hereafter executed or delivered by the Company or any Subsidiary or Affiliate in connection with this Agreement.

"**Voting Stock**" shall mean, with respect to any corporation, any shares of stock of such corporation whose holders are entitled under ordinary circumstances to vote for the election of directors of such corporation (irrespective of whether at the time stock of any other class or classes shall have or might have voting power by reason of the happening of any contingency).

5

"**Wholly-Owned Subsidiary**" shall mean any Subsidiary of which all of the outstanding capital stock of every class or outstanding ownership interests of every class is owned by the Company or another Wholly-Owned Subsidiary of the Company.

**ARTICLE II**

**THE NOTES**

2.1     Authorization of the Notes.  The Company has authorized the issuance of the Subordinated Notes in the original aggregate principal amount of $30,000,000.  The Subordinated Notes will be dated as of the Closing Date (as defined herein) and will mature on the date which is seven (7) years from the Closing Date.  The Company has authorized the issuance of the Subordinated PIK A Notes in the original aggregate principal amount of $5,000,000.  The Subordinated PIK A Notes will be dated as of the Closing Date and will mature on March 31, 2010, or such later date as provided herein.  The Subordinated PIK A Notes will rank senior in right of payment to the Subordinated Notes.  The Subordinated Notes shall bear interest on the unpaid balance thereof from the date thereof until the Interest Conversion Date at the rate of fifteen percent (15%) per annum and the Subordinated PIK A Notes shall bear interest on the unpaid balance thereof from the date thereof until the Interest Conversion Date at the rate of twenty percent (20%) per annum, plus two (2) additional basis points paid in cash on the Closing Date.  The Company shall also pay to the holders of Subordinated PIK A Notes an expense reimbursement fee not to exceed $50,000 for reasonable and actual expenses incurred in connection with this Agreement on the Closing Date.  Interest on the Notes shall be payable only in kind until the Discharge of Senior Obligations (as defined in the Subordination Agreement), and thereafter, interest on the Notes shall continue to be payable in kind until the first interest payment date following the adoption by the Board of Directors of the Company (the "**Board**") of a resolution authorizing the payment of cash interest on the Notes (the date of such resolution, the "**Interest Conversion Date**").  Notwithstanding the foregoing, however, all unpaid principal and interest due on any Note will be paid in cash upon the maturity of such Note.  From and after the Interest Conversion Date, the Notes will bear interest on the unpaid balance at the rate of twelve and one-half percent (12.5%) per annum.  Interest on the Notes shall be computed on the basis of a three hundred sixty (360)-day year comprised of twelve (12) thirty (30)-day months.

2.2     Maturity of the Subordinated PIK A Notes.  The Subordinated PIK A Notes will mature on March 31, 2010 (the "**Initial Maturity Date**"), subject to the conditions set forth herein.  On the Initial Maturity Date, the Company will determine its available cash as of such date.  If the Company's available cash on the Initial Maturity Date equals or exceeds a sum equal to (i) the aggregate principal amount and unpaid interest due on Subordinated PIK A Notes on such date plus (ii) $7,500,000 (such sum, the "**Minimum Cash Threshold**"), the Company will pay in full the aggregate principal amount and unpaid interest due on the Subordinated PIK A Notes within five (5) days of the Initial Maturity Date.  If the Company's available cash on the Initial Maturity Date is less than the Minimum Cash Threshold, the Company will pay a portion of the principal amount of all Subordinated PIK A Notes in amount equal to its available cash less $7,500,000, with such payment made pro rata among the holders on the basis of the principal amount of Subordinated PIK A Notes held by each such holder, within five (5) days of the Initial Maturity Date.  The principal amount due on any Subordinated PIK A Note following

6

any payment in part as provided herein shall be the amount recorded in the books and records of the Company, absent manifest error.

2.3     Extension of the Subordinated PIK A Note Maturity Date.  In the event that on the Initial Maturity Date the Minimum Cash Threshold is not satisfied, the maturity of the unpaid portion of the principal amount of the Subordinated PIK A Notes will be extended to March 31, 2011 and annually thereafter (each, a "**Subsequent Maturity Date**") until the Minimum Cash Threshold is satisfied on any Subsequent Maturity Date, unless, pursuant to Section 2.4, the Company shall have received a Conversion Notice as described in Section 2.4.1.

2.4     Optional Conversion of Subordinated PIK A Notes.  In the event that the Subordinated PIK A Notes are not paid in full on the Initial Maturity Date or any Subsequent Maturity Date, each holder of a Subordinated PIK A Note shall have the option to cause the Company to convert all, but not less than all, of the unpaid portion of the Subordinated PIK A Note held by it (the "**Converted Amount**") into (i) a Subordinated Note in the principal amount of such holder's Converted Amount and (ii) a number of shares of New Common Stock ("**Conversion Shares**") equal to (A) such holder's Percentage Investment at Conversion multiplied by the product of (x) a fraction, the numerator of which is the Total Initial Shares and the denominator of which is the Total Initial Investment and (y) the Total Investment at Conversion, (B) less the Individual Initial Shares.

2.4.1   Any holder of a Subordinated PIK A Note who wishes to convert the unpaid principal amount of such Note as permitted in Section 2.4 above must deliver written notice (a "**Conversion Notice**") to the Company of its election within twenty (20) days of nonpayment in full of such Note on the Initial Maturity Date or any Subsequent Maturity Date, as applicable.  Pursuant to Section 2.4 above, the Company will issue a Subordinated Note and Conversion Shares to each Converting Holder within thirty (30) days of the Company's receipt of all Converting Holders' Conversion Notices timely received by the Company with respect to such maturity date.

2.4.2   To prevent dilution to the Senior Noteholders, in the event that any Conversion Shares are issued by the Company pursuant to Section 2.4 above, (i) additional shares of New Common Stock will be issued pro rata to the Senior Noteholders in an amount sufficient to give such Senior Noteholders aggregate shares of New Common Stock representing ten percent (10%) of the sum of (a) the total New Common Stock issued on the Effective Date, (b) the Conversion Shares, (c) the portion of the Anti-Dilution Shares issued to Senior Noteholders and (d) the portion of the Anti-Dilution Shares added to the Reserved Shares Trust, and (ii) additional shares of New Common Stock will be placed in the Reserved Shares Trust in an amount sufficient such that the aggregate Reserved Shares will represent ten percent (10%) of the sum of (a) the total New Common Stock issued on the Effective Date, (b) the Conversion Shares, (c) the portion of the Anti-Dilution Shares issued to Senior Noteholders and (d) the portion of the Anti-Dilution Shares added to the Reserved Shares Trust.

2.5     Issuance of the Notes.  Subject to the terms and conditions set forth herein and in the Plan, the Company hereby agrees to issue Notes to each Investing Noteholder in the original principal amounts set forth opposite each Investing Noteholder's name on Schedule A attached hereto.  Subject to the terms and conditions set forth herein and in the Plan, the Company hereby

7

agrees to issue to Bio Dynamics a Subordinated Note in the original principal amount of $15,000,000.

2.6     Security Interest; Subordination.  The indebtedness represented by the Notes shall be unsecured and shall be subordinated to claims under the New Credit Facility pursuant to the terms of the Subordination Agreement and to all indebtedness of the Company which, by its terms, is designated as senior in right of payment to the indebtedness evidenced by the Notes, whether existing as of the date hereof or incurred subsequent to the date hereof.   The Subordinated Notes will be subordinated in order of payment to claims under the Subordinated PIK A Notes.

2.7     Exemption from Securities Act Registration.  The Notes will not be registered or qualified under the Securities Act, or under any state securities laws.  As set forth in the Plan, although Section 1145 of the Bankruptcy Code may exempt the offer and sale by the Company of the Notes from the registration requirements of the Securities Act, the Company intends to rely on the exemption from registration provided by Section 4(2) and/or Regulation D promulgated thereunder.  The Notes will only be issued to "accredited investors," as defined in Rule 501(a) of Regulation D.

2.8     Replacement Notes.  If any mutilated Note is surrendered to the Company, or the Company receives evidence to its satisfaction of the destruction, loss or theft of any Note, the Company shall issue a replacement Note.  If required by the Company, an indemnity bond must be supplied by the holder of the applicable Note that is sufficient in the judgment of the Company to protect the Company and any authenticating agent from any loss that any of them may suffer if a Note is replaced.  The Company may charge for its expenses in replacing a Note.  Every replacement Note is an additional obligation of the Company and shall be entitled to all of the benefits set forth herein equally and proportionately with all other Notes duly issued hereunder.

2.9     Closings; Delivery.  The issuance of the Notes will take place at the offices of Squire, Sanders & Dempsey L.L.P. in Phoenix, Arizona, on _____ ____, 2009 (herein called the "**Closing**" or the "**Closing Date**").  The Company shall deliver to each Investing Noteholder such New Investor's Notes against payment of such Investing Noteholder's portion of the Investing Noteholders Investment and to Bio Dynamics its Subordinated Note against payment of its portion of the New Money Investment by certified or cashiers check or by wire transfer of immediately available funds to a bank account of the Company specified in writing by the Company.

2.10     Affiliate Guaranty.  The payment by the Company of all amounts due with respect to the Notes and the performance by the Company of its obligations under this Agreement will be absolutely and unconditionally guaranteed by the Affiliate Guarantors pursuant to a Affiliate Guaranty Agreement dated as of even date herewith, which shall be substantially in the form of Exhibit C attached hereto (the "**Affiliate Guaranty**") and which shall be subject to the terms of the Subordination Agreement.

# ARTICLE III

## REDEMPTION

3.1 <u>Optional Redemption</u>.

3.1.1 At any time after the Interest Conversion Date, the Company may, at its option, at any time and from time to time, redeem for cash all or any portion of the outstanding Notes upon not less than thirty (30) nor more than ninety (90) days' notice, for an amount equal to the principal amount of such Notes plus accrued and unpaid interest, if any, to, but not including, the redemption date.

3.1.2 The Company will send a written notice of redemption to each holder of Notes not less than thirty (30) days or more than ninety (90) days prior to the date fixed for such redemption. Such notice shall specify (i) the date fixed for such redemption, (ii) the redemption price, (iii) if less than all of the Notes are being redeemed, the principal amount of Notes being redeemed, and (iv) that, unless the Company defaults in making such redemption payment, interest on the Notes called for redemption shall cease to accrue as of the date fixed for such redemption.

3.1.3 On and after a redemption date, unless the Company defaults in the payment of the applicable redemption price, interest will cease to accrue on Notes called for redemption and all rights of holders of such Notes will terminate (with respect to such Notes), except for the right to receive the redemption price.

3.1.4 All partial optional redemptions of Notes pursuant to this <u>Section 3.1</u> shall be made pro rata among the holders on the basis of the principal amount of Notes held by each such holder.

3.1.5 Notwithstanding anything to the contrary herein, redemption of the Notes is subject to contractual and other restrictions with respect thereto and to the legal availability of funds therefore and the Notes shall not be redeemed pursuant to this <u>Section 3.1</u> at any time that such redemption is expressly prohibited by the New Credit Facility or the Subordination Agreement.

3.2 <u>Redemption Upon Change of Control</u>.

3.2.1 In the event of any Change of Control, subject to Section 3.2.6 below, each holder of a Note or Notes shall have the right, at such holder's election as set forth below, to cause the Company to redeem for cash on the date such Change of Control occurs (the "**Change of Control Date**") all or any portion of such holder's Notes for a redemption price equal to the then outstanding principal amount of such Notes plus accrued and unpaid interest, if any, to, but not including, the redemption date.

3.2.2 The Company shall send to each holder a written notice at least fifteen (15) Business Days prior to any Change of Control, to the extent the circumstances of the Change of Control permit the Company to give advance notice, and if advance notice is not possible under the circumstances, as promptly as possible following such Change of Control (the

9

"**Change of Control Notice**").  The Change of Control Notice shall set forth (a) a description of the nature of the Change of Control, (b) the circumstances and relevant facts and financial information regarding such Change of Control, (c) the date at which such Change of Control is anticipated to take place or did take place, as applicable, (d) a statement that each holder may elect to have any or all of its Notes redeemed as set forth below and subject to Section 3.2.6 below, (e) the place or places where such Notes are to be surrendered in the event redemption is elected; and (f) any other instructions consistent with this Section, that a holder must follow in order to have its Notes redeemed.

3.2.3   In the event that the Change of Control Notice is delivered prior to a Change of Control, the Company will, on or before the Change of Control Date, to the extent lawful, accept for payment all Notes properly tendered and not withdrawn pursuant to the Change of Control Notice.

3.2.4   Within fifteen (15) Business Days following the Change of Control Date, or on the Change of Control Date if the Company has delivered the Change of Control Notice prior to such Change of Control, the Company shall pay to each holder of Notes properly tendered and not withdrawn the principal amount of such Notes plus accrued and unpaid interest, if any, to, but not including, the redemption date, and, if necessary, the Company will send to each holder a new Note equal to the unpurchased principal portion of the Notes surrendered, if any.  If the Company is in compliance with its obligations under this Section 3.2, interest will cease to accrue on Notes tendered for redemption and all rights of the holder of such Notes will terminate (with respect to such Notes), except for the right to receive the redemption price set forth in Section 3.2.1.

3.2.5   The Company shall neither consummate a Change of Control nor permit the consummation of a Change of Control until all of the requirements of this Section 3.2 have been satisfied.

3.2.6   If the terms of the New Credit Facility or the Subordination Agreement would prohibit the Company from honoring its obligations under this Agreement upon a Change of Control, then, prior to the performance of such obligations, the Company shall use its reasonable best efforts to obtain the necessary consents or waivers under the New Credit Facility to permit the Company to perform such obligations without breaching the terms of the New Credit Facility; provided, however, that if the Company is unable to obtain all necessary consents the Company shall have no obligation to redeem the Notes pursuant to this Section 3.2.

3.2.7   To the extent that the Company does not have sufficient funds to pay each holder of Notes the principal amount of its properly tendered Notes, plus accrued and unpaid interest, if any, the payment by the Company shall be made pro rata among the holders that properly tendered their Notes on the basis of the principal amount of Notes held by such holders. Thereafter, the Company will send to each such holder a new Note equal to the unpurchased principal portion of the Notes surrendered.

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to the New Investors that:

4.1    Organization and Validity.

4.1.1    The Company is duly formed as a corporation and validly existing under the laws of its state of incorporation, is duly qualified, is validly existing and in good standing and, subject to the Bankruptcy Court's approval of the Plan, has lawful power and authority to engage in the business it conducts in each state and other jurisdiction where the nature and extent of its business requires qualification, except where the failure to so qualify would not reasonably be expected to have a Material Adverse Effect.

4.1.2    The making and performance of this Agreement and related agreements, and each document required by any Section hereof, will not violate or result in the default of (a) any law, government rule or regulation, (b) the charter, minutes, partnership agreement, operating agreement or bylaw provisions of the Company, or (c) (immediately or with the passage of time) under any contract, agreement or instrument to which the Company is a party, or by which the Company is bound, except, in the case of (a) and (c) above, for any such violations which would not reasonably be expected to have a Material Adverse Effect.  The Company is not in violation of nor has knowingly caused any Person to violate any term of any agreement or instrument to which it or such Person is a party or by which it may be bound which violation could reasonably be expected to have a Material Adverse Effect, or of its or such Person's charter, articles of incorporation, minutes or bylaws.

4.1.3    Subject to the Bankruptcy Court's approval of the Plan, the Company has all requisite power and authority to enter into and perform this Agreement and to incur the obligations herein provided for, and has taken all proper and necessary corporate action to authorize the execution, delivery and performance of this Agreement.

4.1.4    This Agreement, the Notes and the Subordination Agreement, when delivered, will be valid and binding upon the Company as a party thereto and enforceable in accordance with their respective terms.

4.2    Places of Business.  The Company's chief executive office and the only other places of business of the Company are located at the corresponding addresses set forth on Schedule 1.  Except as disclosed on Schedule 1:  (a) the Company has not changed any such location in the last five (5) years, (b) the Company has not changed its name in the last five years, and (c) during such period the Company has not used, nor does the Company now use, any fictitious or trade name.

4.3    Operation of Facilities.    The Company has obtained all material licenses, accreditations and approvals of Governmental Authorities and all other Persons and certificates of need necessary for the Company to own its assets, to carry on its business and to execute, deliver and perform this Agreement, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.  The Company has not been notified by such

11

Governmental Authority or other person during the twenty-four (24)-month period immediately preceding the date of this Agreement that such party has rescinded or not renewed, or intends to rescind or not renew, any such license or approval, except for any rescission or non-renewal that would not be likely to have a Material Adverse Effect.

4.4    Pending Litigation.  As of the date of this Agreement, there are no judgments or judicial or administrative orders, proceedings or investigations (civil or criminal) (collectively, "**Pending Claims**") pending, or to the knowledge of the Company, threatened, against the Company in any court or before any Governmental Authority or arbitration board or tribunal which, if adversely determined, would have a Material Adverse Effect, other than as set forth on Schedule 1 hereto.  To the Company's knowledge, the Company is not in default with respect to any order of any court, Governmental Authority, regulatory agency or arbitration board or tribunal, except where any such default would not be likely to have a Material Adverse Effect. To the Company's knowledge, no stockholder or executive officer of the Company has been indicted or convicted in connection with, or is currently subject to any lawsuit or proceeding in connection with, any anti-racketeering or other criminal conduct or activity.

4.5    Governmental Consent.  Neither the nature of the Company nor of the Company's business, nor any relationship between the Company and any other Person, nor any circumstance affecting the Company in connection with the issuance or delivery of the Notes, is such as to require a consent, approval or authorization of, or filing, registration or qualification with, any Governmental Authority on the part of the Company in connection with the execution and delivery of this Agreement or the issuance or delivery of the Notes.

4.6    Taxes.  All tax returns required to be filed by the Company in any jurisdiction have in fact been filed, and all taxes, assessments, fees and other governmental charges upon the Company or upon any of its Property, income or franchises, which are shown to be due and payable on such returns have been paid, except for those taxes being contested in good faith with due diligence by appropriate proceedings.  The Company is not aware of any proposed additional tax assessment or tax to be assessed against or applicable to the Company that might have a Material Adverse Effect.

4.7    Financial Statements.  The financial statements of the Company as of and for the fiscal year of the Company ending December 31, 2007 have been prepared by the Company.  To the Company's knowledge, such financial statements have been prepared in accordance with GAAP and fairly present in all material respects the financial condition of the Company and the results of operations and changes in financial condition of the business, as of the dates and for the periods referred to, and there are no material unrealized or anticipated liabilities, direct or indirect, fixed or contingent, of the Company as of the dates of such financial statements which are not reflected in such financial statements or in the notes to such financial statements.

4.8    Compliance with Laws.  The Company is not in violation of, has not received written notice that it is in violation of, and has not knowingly caused any Person to violate, any applicable statute, regulation or ordinance of the United States of America, or of any state, city, town, municipality, county or of any other jurisdiction, or of any agency, or department thereof (including environmental laws and regulations), except where any such violation would not

PHOENIX/505708.4

reasonably be expected to result in a Material Adverse Effect, other than as set forth on Schedule 1 hereto.

## ARTICLE V

## COVENANTS

The Company covenants and agrees that so long as any of the Notes are outstanding:

5.1     Payment of Notes.  Subject to the terms of the Subordination Agreement, the Company shall pay or cause to be paid the principal of, premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes.  The Company shall pay interest (including post-petition interest in any proceeding under the Bankruptcy Code) on overdue principal at the rate equal to one percent (1%) per annum in excess of the then applicable interest rate on the Notes to the extent lawful; it shall pay interest (including post-petition interest in any proceeding under the Bankruptcy Code on overdue installments of interest (without regard to any applicable grace period) at the same rate to the extent lawful.

5.2     Tax, Insurance.

5.2.1   The Company shall pay, and shall cause each of its Subsidiaries to pay, prior to delinquency all material taxes, assessments and governmental levies, except such as are contested in good faith and by appropriate proceedings and with respect to which appropriate reserves have been taken in accordance with GAAP or where the failure to effect such payment would not reasonably be expected to have a Material Adverse Effect.

5.2.2   The Company will maintain, and will cause each of its Subsidiaries to maintain, with financially sound and reputable insurance companies, or, in the case of flood insurance, the Federal Emergency Management Agency, insurance in such amounts and against such risks (including fire, business interruption, flood and other risks insured by extended coverage) as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations (as determined by the Board of Directors), including public liability insurance against claims for personal injury, death or property damage occurring upon, about or in connection with the use of any properties owned, occupied or controlled by it as well as such other insurance as may be required by law; provided that the Company may self-insure any risk for which insurance is required hereunder in an amount not to exceed $1,000,000 per occurrence and not more than $2,000,000 in the aggregate during any policy year.

5.3     Stay, Extension and Usury Laws.  The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Agreement or the Notes; and the Company and each of the Affiliate Guarantors (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to holders of the Notes.

PHOENIX/505708.4

5.4    Limitation on Dividends and Distributions.  Until the Interest Conversion Date, the Company will not, and will not permit any of its Subsidiaries to, directly or indirectly declare, make or set apart, any sum for any Restricted Junior Payment (as defined in the New Credit Facility), except (a) dividends and distributions by Subsidiaries of Company to Company or a Subsidiary of Company, (b) grants of options to purchase common stock of the Company, and the exercise of such options, pursuant to the Company's management incentive plan, to and by directors, officers and executives of the Company or an employer with which the Company would be considered a single employer under Sections 414(b) and (c) of the Code, (c) scheduled interest payments payable in kind with respect to other Subordinated Indebtedness (as defined in the New Credit Facility) and (d) payments of dividends payable in kind with respect to the PIK Preferred Stock (as defined in the New Credit Facility).  Notwithstanding anything to the contrary contained herein, the Board may issue additional Notes from time to time, whether as interest pursuant to the terms of this Agreement, or otherwise, and no vote of the holders of the Notes shall be required in connection therewith.

5.5    Corporate Existence.  The Company shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and the corporate, partnership, limited liability company or other existence of each of its Subsidiaries in accordance with the respective organizational documents (as the same may be amended from time to time) of the Company or any such Subsidiary and the rights (charter and statutory), licenses and franchises of the Company and its Subsidiaries; provided that the Company shall not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Subsidiaries, if the Board of Directors of the Company shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Subsidiaries, taken as a whole.

5.6    Additional Affiliate Guarantors.  The Company will cause any Subsidiary which is required by the terms of the New Credit Facility to become a party to, or otherwise guarantee, indebtedness in respect of the New Credit Facility to enter into the Affiliate Guaranty and the Subordination Agreement and to deliver to each of the holders of the Notes (concurrently with the incurrence of any such obligation pursuant to the New Credit Facility) a joinder or supplemental agreement in respect of the Affiliate Guaranty and the Subordination Agreement.

5.7    Compliance with Laws and Regulations.  Without limiting Article IV, the Company will, and will cause each of its Subsidiaries to, comply with all laws, ordinances or governmental rules or regulations to which each of them is subject, and will obtain and maintain in effect all licenses, certificates, permits, franchises and other governmental authorizations necessary to the ownership of their respective properties or to the conduct of their respective businesses, in each case to the extent necessary to ensure that non-compliance with such laws, ordinances or governmental rules or regulations or failures to obtain or maintain in effect such licenses, certificates, permits, franchises and other governmental authorizations would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.8    Books and Records.  The Company will, and will cause each of its Subsidiaries to, maintain proper books of record and account in conformity with GAAP and all applicable requirements of any governmental authority having legal or regulatory jurisdiction over the Company or such Subsidiary, as the case may be.

14

5.9     Terrorism Sanction Regulations.  The Company will not and will not permit any Subsidiary to (a) become a Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of Executive Order No. 13,224 of October 24, 2001, Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism, 66 U.S. Fed. Reg. 49, 079 (2001), as amended, or (b) to the knowledge of the Company, engage in any dealings or transactions with any such Person.  The Company will, and will cause each Subsidiary to, comply with all respects with United States Public Law 107-56, Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF THE NEW INVESTORS

Each New Investor, severally and not jointly, hereby represents and warrants to the Company that:

6.1     Purchase Entirely for Own Account.  The Notes to be acquired by such New Investor will be acquired for investment for such New Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and New Investor has no present intention of selling, granting any participation in, or otherwise distributing the same.  Such New Investor has not been formed for the specific purpose of acquiring any of the Subordinated Notes.

6.2     Knowledge.  Such New Investor is aware of the Debtors' business affairs and financial condition, has reviewed the First Amended Disclosure Statement in Support of Debtors' First Amended Joint Plan of Reorganization (the "**Disclosure Statement**"), and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Notes.

6.3     Restricted Securities.  Such New Investor understands that the Notes have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of such New Investor's representations as expressed herein.  Such New Investor understands that the Notes are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, such New Investor must hold the Notes indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available.  Such New Investor acknowledges that the Company has no obligation, and does not intend, to register or qualify the Notes for resale.  Such New Investor further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Notes, and on requirements relating to the Company which are outside of such New Investor control, and which the Company is under no obligation and may not be able to satisfy.

15

6.4     No Public Market.  The Notes will not be listed on a national exchange and will not be registered under the Securities Act, by reason of certain exemptions from the registration provisions of the Securities Act.

6.5     Legends.  Such New Investor understands that the Notes may bear one or all of the following legends:

6.5.1   "THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD OR TRANSFERRED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES OR THE SECURITIES ARE SOLD AND TRANSFERRED IN A TRANSACTION THAT IS EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT."

6.5.2   Any legend required by the Blue Sky laws of any state to the extent such laws are applicable to the Notes.

6.6     Accredited Investor.  Such New Investor is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act acting for its own account (and not for the account of others) or as a fiduciary or agent for others (which others also are "accredited investors").

**ARTICLE VII**

**DEFAULTS AND REMEDIES**

7.1     Events of Default.  Each of the following constitutes an "**Event of Default**":

7.1.1   default in the payment in respect of the principal of (or premium, if any, on) any Note at its maturity (whether at its stated maturity or upon acceleration, optional redemption or otherwise); provided that in no event shall the nonpayment in full of any Subordinated PIK A Note on its maturity and the subsequent extension of such maturity or conversion of the unpaid amount of such Subordinated PIK A Note constitute an Event of Default hereunder;

7.1.2   default in the payment of any interest upon any Note when it becomes due and payable, and continuance of such default for a period of thirty (30) days;

7.1.3   default in the performance, or breach, of any covenant or agreement of the Company in this Agreement (other than a covenant or agreement a default in whose performance or whose breach is specifically dealt with in Section 7.1.1 or 7.1.2 above), and continuance of such default or breach for a period of sixty (60) days after written notice thereof has been given to the Company by the holders of at least twenty-five percent (25%) in aggregate principal amount of the outstanding Notes;

7.1.4   [Intentionally omitted];

7.1.5    the entry against the Company of a final judgment or final judgments for the payment of money (except to the extent such judgment is covered by insurance and the Company's insurer has not denied coverage) in an aggregate amount in excess of $10.0 million, by a court or courts of competent jurisdiction, which judgments remain undischarged, unwaived, unstayed, unbonded or unsatisfied for a period of sixty (60) consecutive days;

7.1.6    the Company, pursuant to or within the meaning of the Bankruptcy Code:

(a)    commences a voluntary case;

(b)    consents to the entry of an order for relief against it in an involuntary case;

(c)    consents to the appointment of a custodian of it or for all or substantially all of its property;

(d)    makes a general assignment for the benefit of its creditors, or

(e)    generally is not paying its debts as they become due; or

7.1.7    a court of competent jurisdiction enters an order or decree under the Bankruptcy Code that:

(a)    is for relief against the Company in an involuntary case;

(b)    appoints a custodian of the Company or for all or substantially all of the property of the Company; or

(c)    orders the liquidation of the Company and the order or decree remains unstayed and in effect for sixty (60) consecutive days.

7.2    Acceleration.  Subject to the terms of the Subordination Agreement:

7.2.1    If an Event of Default specified in Section 7.1.6 or 7.1.7 above occurs with respect to the Company, the principal of and any accrued interest on the Notes then outstanding shall automatically become immediately due and payable without any declaration or other act on the part of any holder.

7.2.2    If any other Event of Default has occurred and is continuing, any holder or holders of more than fifty percent (50%) in aggregate principal amount of the Notes at the time outstanding may at any time at its or their option, by notice or notices to the Company, declare all the Notes then outstanding to be immediately due and payable.

7.2.3    If an Event of Default specified in Section 7.1.1 or 7.1.2 above has occurred and is continuing with respect to any Notes, any holder or holders of Notes at the time outstanding affected by such Event of Default may at any time, at its or their option, by notice or notices to the Company, declare all the Notes held by such holder or holders to be immediately due and payable.

17

7.2.4   Upon any Note's becoming due and payable under this <u>Section 7.2</u>, whether automatically or by declaration, such Note will forthwith mature and the entire unpaid principal amount of such Note, plus all accrued and unpaid interest thereon, shall be immediately due and payable, in each and every case without presentment, demand, protest or further notice, all of which are hereby waived.  To the extent that the Company does not have sufficient funds to pay the unpaid principal amount of the Notes, plus all accrued and unpaid interest thereon, in full, any payment by the Company shall be made pro rata among the holders on the basis of the principal amount of Notes held by each holder (with the outstanding balance remaining due and payable).

7.3   <u>Other Remedies</u>.  If any Event of Default has occurred and is continuing, and irrespective of whether any Notes have become or have been declared immediately due and payable under <u>Section 7.2.1</u>, subject to the terms of the Subordination Agreement, the holder of any Note at the time outstanding may proceed to protect and enforce the rights of such holder by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement contained herein or in any Note, or for an injunction against a violation of any of the terms hereof or thereof, or in aid of the exercise of any power granted hereby or thereby or by law or otherwise.

7.4   <u>Rescission</u>.  At any time after any Notes have been declared due and payable pursuant to <u>Section 7.2.2</u> or <u>7.2.3</u>, the holders of more than fifty percent (50%) in aggregate principal amount of the Notes then outstanding, by written notice to the Company, may rescind and annul any such declaration and its consequences with respect to the Notes if (a) the Company has paid all overdue interest on the Notes, all principal, if any, on any Notes that are due and payable and are unpaid other than by reason of such declaration, and all interest on such overdue principal, if any, and (to the extent permitted by applicable law) any overdue interest in respect of the Notes, (b) neither the Company nor any other Person shall have paid any amounts which have become due solely by reason of such declaration, (c) all Events of Default, other than non-payment of amounts that have become due solely by reason of such declaration, have been cured or have been waived pursuant to this Agreement, and (d) no judgment or decree has been entered for the payment of any monies due pursuant hereto or to any Notes.  No rescission and annulment under this <u>Section 7.4</u> will extend to or affect any subsequent Event of Default or impair any right consequent thereon.

7.5   <u>No Waivers or Election of Remedies, Expenses, Etc.</u>  No course of dealing and no delay on the part of any holder of any Note in exercising any right, power or remedy shall operate as a waiver thereof or otherwise prejudice such holder's rights, powers or remedies.  No right, power or remedy conferred by this Agreement or by any Note upon any holder thereof shall be exclusive of any other right, power or remedy referred to herein or therein or now or hereafter available at law, in equity, by statute or otherwise.  Without limiting the obligations of the Company under this Agreement, the Company will pay to the holder of each Note on demand such further amount as shall be sufficient to cover all costs and expenses of such holder incurred in any enforcement or collection under this <u>Article VII</u>, including, without limitation, reasonable attorneys' fees, expenses and disbursements.

PHOENIX/505708.4

# ARTICLE VIII

## MISCELLANEOUS.

8.1   <u>Notices</u>.  All written communications provided for hereunder shall be sent by first class mail or nationwide overnight delivery service (with charges prepaid) (i) if to any New Investor, addressed to such New Investor at the address specified for such communications in the <u>Schedule A</u> attached hereto, or at such other address as such New Investor shall have specified to the Company in writing, and (ii) if to the Company, addressed to it at:

> If to the Company:
>
> > Eurofresh, Inc.
> > 26050 South Eurofresh Avenue
> > Willcox, Arizona  85643
> > Facsimile:  520-384-1771
> > Attention:  Chief Executive Officer
>
> With a copy to:
>
> > Squire, Sanders & Dempsey L.L.P.
> > 40 North Central Avenue
> > Suite 2700
> > Phoenix, Arizona 85004
> > Facsimile:  602-253-8129
> > Attention:  Christopher D. Johnson, Esq.

The Company, by notice to the other, may designate additional or different addresses for subsequent notices or communications.

All notices and communications delivered hereunder shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; five (5) Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if telecopied; and the next Business Day after timely delivery to the courier, if sent by overnight air courier promising next Business Day delivery.

8.2   <u>Amendment, Supplement and Waiver</u>.  Subject to the following paragraphs and subject to the Subordination Agreement, the Agreement and the Notes may be amended or supplemented only with the consent of the holders of at least a majority in aggregate principal amount of the then outstanding Notes.

8.2.1   Notwithstanding <u>Section 8.2</u> above, and subject to the Subordination Agreement, without the consent of any holders of Notes, the Company, at any time and from time to time, may enter into one or more amendments supplemental to this Agreement or the Notes for any of the following purposes:

(a)   to evidence the succession of another Person to the Company and the assumption by any such successor of the covenants of the Company in the Agreement and in the Notes;

(b)	to add to the covenants of the Company for the benefit of the holders, or to surrender any right or power herein conferred upon the Company;

(c)	to add additional Events of Default;

(d)	to provide for uncertificated Notes in addition to or in place of the certificated Notes; or

(e)	to cure any ambiguity, to correct or supplement any provision in this Agreement which may be defective or inconsistent with any other provision in the Agreement, or to make any other provisions with respect to matters or questions arising under this Agreement, *provided* that such actions pursuant to this clause shall not adversely affect the interests of the holders in any material respect, as determined in good faith by the Board.

8.2.2	With the consent of the holders of not less than a majority in aggregate principal amount of the outstanding Notes, and subject to the Subordination Agreement, the Company may enter into an amendment or amendments supplemental to this Agreement for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or of modifying in any manner the rights of the holders under the Agreement, including the definitions therein; *provided, however,* that no such supplemental amendments shall, without the consent of the holder of each outstanding Note affected thereby:

(a)	change the stated maturity of any Note or of any installment of interest on any Note, or reduce the amount payable in respect of the principal thereof or the rate of interest thereon or any premium payable thereon, or reduce the amount that would be due and payable on acceleration of the maturity thereof, or change the place of payment where, or the coin or currency in which, any Note or any premium or interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the stated maturity thereof, or change the date on which any Notes may be subject to redemption or reduce the redemption price therefore,

(b)	reduce the percentage in aggregate principal amount of the outstanding Notes, the consent of whose holders is required for any such supplemental amendment, or the consent of whose holders is required for any waiver (of compliance with certain provisions of this Agreement or certain defaults thereunder and their consequences) provided for in this Agreement,

(c)	modify the obligations of the Company to redeem Notes upon a Change of Control, or

(d)	modify any of the provisions of this Section or provisions relating to waiver of defaults or certain covenants, except to increase any such percentage required for such actions or to provide that certain other provisions of this Agreement cannot be modified or waived without the consent of the holder of each outstanding Note affected thereby.

8.3    Registration and Transfer of Notes.

8.3.1    The Company shall keep at its principal executive office a register for the registration and registration of transfers of Notes.  The name and address of each holder of one or more Notes, each transfer thereof and the name and address of each transferee of one or more Notes shall be registered in such register.  Prior to due presentment for registration of transfer, the Person in whose name any Note shall be registered shall be deemed and treated as the owner and holder thereof for all purposes hereof, and the Company shall not be affected by any notice or knowledge to the contrary.

8.3.2    Upon surrender of any Note to the Company at its principal executive office for registration of transfer or exchange (and in the case of a surrender for registration of transfer accompanied by a written instrument of transfer duly executed by the registered holder of such Note or such holder's attorney duly authorized in writing and accompanied by the relevant name, address and other information for notices of each transferee of such Note or part thereof), within fifteen (15) Business Days thereafter, the Company shall execute and deliver, at the Company's expense (except as provided below), one or more new Notes (as requested by the holder thereof) in exchange therefor, in an aggregate principal amount equal to the unpaid principal amount of the surrendered Note.  Each such new Note shall be payable to such Person as such holder may request and shall be substantially in the form of the Note originally issued hereunder or pursuant to any amendment or supplement hereto.  Each such new Note shall be dated and bear interest from the date to which interest shall have been paid on the surrendered Note or dated the date of the surrendered Note if no interest shall have been paid thereon.  The Company may require payment of a sum sufficient to cover any stamp tax or governmental charge imposed in respect of any such transfer of Notes.  Notes shall not be transferred in denominations of less than $100,000, *provided* that if necessary to enable the registration of transfer by a holder of its entire holding of Notes, one Note of such Series and tranche, if applicable, may be in a denomination of less than $100,000.  Notwithstanding the foregoing, the Notes have not been registered under the Securities Act or under the securities laws of any state and may not be transferred or resold unless registered under the Securities Act and all applicable state securities laws or unless an exemption from the requirement for such registration is available.

8.3.3    Upon receipt by the Company at its principal executive office of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note, and

(a)    in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it, or

(b)    in the case of mutilation, upon surrender and cancellation thereof,

the Company shall execute and deliver not more than fifteen (15) Business Days following satisfaction of such conditions, in lieu thereof, a new Note, dated and bearing interest from the date to which interest shall have been paid on such lost, stolen, destroyed or mutilated Note or dated the date of such lost, stolen, destroyed or mutilated Note if no interest shall have been paid thereon.

21

8.4    No Personal Liability of Directors, Officers, Employees and Stockholders.  No director, officer, employee, stockholder, general or limited partner or incorporator, past, present or future, of the Company or any of its Subsidiaries, as such or in such capacity, shall have any personal liability for any obligations of the Company under the Notes by reason of his, her or its status as such director, officer, employee, stockholder, general or limited partner or incorporator.

8.5    Governing Law.  **THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

8.6    Forum Selection and Consent to Jurisdiction.

8.6.1    The Company hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, the Notes, the Affiliate Guaranty or the Subordination Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any New Investor may otherwise have to bring any action or proceeding relating to this Agreement, the Notes, the Affiliate Guaranty or the Subordination Agreement against the Company or their properties in the courts of any jurisdiction.

8.6.2    The Company hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement, the Notes, the Affiliate Guaranty or the Subordination Agreement in any court referred to in Section 8.6.2 above.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

8.6.3    The Company irrevocably consents to service of process in any action or proceeding arising out of or relating to this Agreement, the Notes, the Affiliate Guaranty or the Subordination Agreement in the manner provided for notices in Section 8.1 hereof.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

8.7    Waiver of Jury Trial.  TO THE FULLEST EXTENT PERMITTED BY LAW THE PARTIES HERETO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION BROUGHT

PHOENIX/505708.4

ON OR WITH RESPECT TO THIS AGREEMENT, THE NOTES OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THEREWITH.

8.8    Successors.  All agreements of the Company in this Agreement and the Notes shall bind their respective successors and assigns.

8.9    Severability.  In case any provision in this Agreement or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

8.10    Counterpart Originals.  The parties may sign any number of copies of this Agreement.  Each signed copy shall be an original, but all of them together represent the same agreement.

8.11    Headings.  The headings of the Articles and Sections of this Agreement have been inserted for convenience of reference only, are not to be considered a part of this Agreement and shall in no way modify or restrict any of the terms or provisions hereof.

8.12    Subordination Agreement.  The obligations in respect of the Notes shall be subordinate and junior in right of payment to the prior payment in full of all Senior Obligations (as defined in the Subordination Agreement) and the rights and remedies available to the holders of the Notes are subject to the terms of the Subordination Agreement.  The provisions of this Agreement, the Notes and the Affiliate Guaranty and the rights of the holders of the Notes hereunder and thereunder shall be subject to the provisions of the Subordination Agreement.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.
SIGNATURES ON THE FOLLOWING PAGE.]

PHOENIX/505708.4

IN WITNESS WHEREOF, this Agreement is executed as of the date first written above.

EUROFRESH, INC.


By:_____
Title:

[New investors' signatures]

SCHEDULE A

| Investor name and address | Subordinated Note Principal Amount | Subordinated PIK A Note Principal Amount | Proportion of New Money Investment Invested |
| --- | --- | --- | --- |

## [FORM OF SUBORDINATED NOTE]

THE INDEBTEDNESS EVIDENCED BY THIS INSTRUMENT IS SUBORDINATED TO THE PRIOR PAYMENT IN FULL OF THE SENIOR OBLIGATIONS (AS DEFINED IN THE SUBORDINATION AGREEMENT, DATED AS OF [_____], 2009) PURSUANT TO, AND TO THE EXTENT PROVIDED IN, SUCH SUBORDINATION AGREEMENT BY THE MAKER HEREOF AND PAYEE NAMED HEREIN IN FAVOR OF THE SENIOR CREDITORS AND ANY PERSON NOW OR HEREAFTER DESIGNATED AS THEIR REPRESENTATIVE.

EUROFRESH, INC.

15.00% SUBORDINATED UNSECURED NOTE DUE _____ ___, 2016

No. _____                                                                              [DATE]

$_____

FOR VALUE RECEIVED, the undersigned, EUROFRESH, INC., a corporation organized and existing under the laws of the State of Delaware (herein called the "Company"), hereby promises to pay to _____ _____, or registered assigns, on _____ __, 2016, the principal sum of _____ DOLLARS, with interest (computed on the basis of a 360-day year--30-day month) on the unpaid balance thereof at the rate of 15.00% per annum from the date hereof, payable quarterly on the ____ day of _____, _____, _____, and _____ in each year, commencing with the _____, _____, _____, or _____ next succeeding the date hereof, until the principal hereof shall have become due and payable.  Interest on this Subordinated Note shall be payable only in kind until the Discharge of Senior Obligations (as defined in the Subordination Agreement), and thereafter, interest on the Subordinated Notes shall continue to be payable in kind until the first interest payment date following the adoption by the Board of Directors of the Company of a resolution authorizing the payment of cash interest on the Notes, at which point the annual rate of interest going forward shall be reduced to 12.5%.

This Subordinated Note is one of a series of subordinated unsecured promissory notes (herein called the "Subordinated Notes") issued pursuant to a Note Purchase Agreement, dated as of _____ __, 2009 (herein called the "Agreement"), among the Company and the original purchasers of the Subordinated Notes named in Schedule A attached thereto and is entitled to the benefits thereof.  This Subordinated Note is subject to all terms set forth in the Agreement and the Subordination Agreement.

A-1

The Company agrees to make required prepayments of principal on the dates and in the amounts specified in the Agreement. This Subordinated Note is also subject to optional redemption, in whole or from time to time in part, on the terms specified in the Agreement.

In case an Event of Default, as defined in the Agreement, shall occur and be continuing, the principal of this Subordinated Note may be declared or otherwise become due and payable in the manner and with the effect provided in the Agreement.

**THIS SUBORDINATED NOTE IS INTENDED TO BE PERFORMED IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAW OF SUCH STATE (EXCLUDING ANY CONFLICTS OF LAW RULES WHICH WOULD OTHERWISE CAUSE THIS SUBORDINATED NOTE TO BE CONSTRUED OR ENFORCED IN ACCORDANCE WITH THE LAWS OF ANY OTHER JURISDICTION)**.

EUROFRESH, INC.


By:_____
Title:

A-2

**[FORM OF SUBORDINATED PIK A NOTE]**

THE INDEBTEDNESS EVIDENCED BY THIS INSTRUMENT IS SUBORDINATED TO THE PRIOR PAYMENT IN FULL OF THE SENIOR OBLIGATIONS (AS DEFINED IN THE SUBORDINATION AGREEMENT, DATED AS OF [_____], 2009) PURSUANT TO, AND TO THE EXTENT PROVIDED IN, SUCH SUBORDINATION AGREEMENT BY THE MAKER HEREOF AND PAYEE NAMED HEREIN IN FAVOR OF THE SENIOR CREDITORS AND ANY PERSON NOW OR HEREAFTER DESIGNATED AS THEIR REPRESENTATIVE.

EUROFRESH, INC.

20.00% SUBORDINATED UNSECURED CLASS A NOTE DUE MARCH 31, 2010

No. _____ [DATE]

$_____

FOR VALUE RECEIVED, the undersigned, EUROFRESH, INC., a corporation organized and existing under the laws of the State of Delaware (herein called the "Company"), hereby promises to pay to _____ _____, or registered assigns, on March 31, 2010 the principal sum of _____ DOLLARS, or such lesser amount as may be recorded on the books and records of the Company, with interest (computed on the basis of a 360-day year--30-day month) on the unpaid balance thereof at the rate of 20.00% per annum from the date hereof, payable quarterly on the ____ day of _____, _____, _____, and _____, until the principal hereof shall have become due and payable. Interest on this Subordinated PIK A Note shall be payable only in kind until the Discharge of the Senior Obligations (as defined in the Subordination Agreement), and thereafter, interest on the Subordinated PIK A Notes shall continue to be payable in kind until the first interest payment date following the adoption by the Board of Directors of the Company of a resolution authorizing the payment of cash interest on the Notes, at which point the annual rate of interest going forward shall be reduced to 12.5%.

This Subordinated PIK A Note is one of a series of senior subordinated unsecured promissory class A notes (herein called the "Subordinated PIK A Notes") issued pursuant to a Note Purchase Agreement, dated as of _____ __, 2009 (herein called the "Agreement"), among the Company and the original purchasers of the Subordinated PIK A Notes named in Schedule A attached thereto and is entitled to the benefits thereof. This Subordinated PIK A Note is subject to all terms set forth in the Agreement and the Subordination Agreement.

The Company agrees to make required prepayments of principal on the dates and in the amounts specified in the Agreement. This Subordinated PIK A Note is also subject to optional redemption, in whole or from time to time in part, on the terms specified in the Agreement.

In case an Event of Default, as defined in the Agreement, shall occur and be continuing, the principal of this Subordinated PIK A Note may be declared or otherwise become due and payable in the manner and with the effect provided in the Agreement.

**THIS SUBORDINATED PIK A NOTE IS INTENDED TO BE PERFORMED IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAW OF SUCH STATE (EXCLUDING ANY CONFLICTS OF LAW RULES WHICH WOULD OTHERWISE CAUSE THIS SUBORDINATED NOTE TO BE CONSTRUED OR ENFORCED IN ACCORDANCE WITH THE LAWS OF ANY OTHER JURISDICTION)**.

EUROFRESH, INC.


By:_____
Title:

B-2

EXHIBIT C

# FORM OF AFFILIATE GUARANTY

The Guarantor listed below (the "*Guarantor*") pursuant to that certain Subordinated PIK Note Purchase Agreement (the "*Agreement*") dated _____, 2009 by and among Eurofresh, Inc., a Delaware corporation (the "*Company*"), Eurofresh Holding Company, Inc., a Delaware corporation, Eurofresh Produce, Ltd., the Investing Noteholders and Bio Dynamics B.V./S.a.r.L., has guaranteed the Notes and the obligations of the Company under the Agreement, as set forth herein.

SECTION 1.1    Guaranty.

(a)    Guarantor hereby fully, unconditionally and irrevocably guarantees the Notes and obligations of the Company hereunder and thereunder, and guarantees to each holder of a Note that: (i) the principal of and interest on the Notes shall be paid in full when due, whether at stated maturity, by acceleration, call for redemption or otherwise (including, without limitation, the amount that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code), together with interest on the overdue principal, if any, and interest on any overdue interest, to the extent lawful, and all other obligations of the Company to the holders hereunder or thereunder shall be paid in full or performed, all in accordance with the terms hereof and thereof; (ii) in case of any extension of time of payment or renewal of any Notes or any such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise, and (iii) the payment of any and all costs and expenses (including reasonable attorneys' fees) incurred by any holder in enforcing any rights under this Affiliate Guaranty or the Agreement. This Affiliate Guaranty is a guarantee of payment and not of collection.

(b)    Guarantor hereby agrees that its obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes or the Agreement, the absence of any action to enforce the same, any waiver or consent by any holder of a Note with respect to any provisions hereof or thereof, the recovery of any judgment against the Company, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor.

(c)    Guarantor hereby waives the benefits of diligence, presentment, demand for payment, filing of claims with a court in the event of insolvency or bankruptcy of the Company, any right to require a proceeding first against the Company or any other Person, protest, notice and all demands whatsoever and covenants that this Affiliate Guaranty shall not be discharged as to any Note except by complete performance of the obligations contained in such Note and this Affiliate Guaranty or as provided for in the Agreement. Guarantor hereby agrees that, in the event of a default in payment of principal or interest on such Note, whether at its stated maturity, by acceleration, call for redemption, purchase or otherwise, legal proceedings may be instituted by the holder of such Note, subject to the terms and conditions set forth in the Agreement, directly against the Guarantor to enforce this Affiliate Guaranty without first proceeding against

C-1

the Company or any other Affiliate Guarantor. Guarantor agrees that if, after the occurrence and during the continuance of an Event of Default, any of the holders is prevented by applicable law from exercising its respective rights to accelerate the maturity of the Notes, to collect interest on the Notes, or to enforce or exercise any other right or remedy with respect to the Notes, Guarantor shall pay to such holders, upon demand therefor, the amount that would otherwise have been due and payable had such rights and remedies been permitted to be exercised by any of the holders of the Notes.

(d)     If any holder of a Note is required by any court or otherwise to return to the Company or the Guarantor, or any custodian, trustee, liquidator or other similar official acting in relation to the Company or the Guarantor, any amount paid by either of them to such holder, this Affiliate Guaranty, to the extent theretofore discharged, shall be reinstated in full force and effect. This paragraph (d) shall remain effective notwithstanding any contrary action which may be taken by any holder in reliance upon such amount required to be returned. This paragraph (d) shall survive the termination of this Affiliate Guaranty.

(e)     Guarantor further agrees that, as between such Guarantor, on the one hand, and the holders of the Notes, on the other hand, (x) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article VII of the Agreement for the purposes of this Affiliate Guaranty, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (y) in the event of any acceleration of such obligations as provided in Article VII of the Agreement, such obligations (whether or not due and payable) shall forthwith become due and payable by Guarantor for the purpose of this Affiliate Guaranty.

SECTION 1.2     Benefits Acknowledged.

(a)     Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by the Agreement and that its guarantee and waivers pursuant to this Affiliate Guaranty are knowingly made in contemplation of such benefits.

(b)     No stockholder, employee, officer, director or incorporator, as such, past, present or future of Guarantor shall have any liability under this Affiliate Guaranty by reason of his or its status as such stockholder, employee, officer, director or incorporator.

(c)     This is a continuing Affiliate Guaranty and shall remain in full force and effect and shall be binding upon Guarantor and its successors and assigns until full and final payment of all of the Company's obligations under the Notes and the Agreement and shall inure to the benefit of the successors and assigns of the holders of the Notes, and, in the event of any transfer or assignment of rights by any such holder, the rights and privileges herein conferred upon that party shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions hereof.

SECTION 1.3     Limitation of Guarantor's Liability.

Guarantor confirms that it is the intention of Guarantor that this Affiliate Guaranty not constitute a fraudulent transfer or conveyance for purposes of the Federal Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar

federal or state law or the provisions of its local law relating to fraudulent transfer or conveyance. To effectuate the foregoing intention, the obligations of Guarantor under this Affiliate Guaranty shall be limited to the maximum amount that will not, after giving effect to all other contingent and fixed liabilities of Guarantor and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Affiliate Guarantor in respect of the obligations of such other Affiliate Guarantor under its Affiliate Guaranty, result in the obligations of Guarantor under this Affiliate Guaranty constituting a fraudulent transfer or conveyance.

SECTION 1.4    Severability.

In case any provision of this Affiliate Guaranty shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

SECTION 1.5    Governing Law.

THIS AFFILIATE GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

SECTION 1.6    Forum Selection and Consent to Jurisdiction.

(a)    Guarantor hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Affiliate Guaranty, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such federal court. Guarantor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Affiliate Guaranty shall affect any right that Guarantor may otherwise have to bring any action or proceeding relating to this Affiliate Guaranty against the Company or their properties in the courts of any jurisdiction.

(b)    Guarantor hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Affiliate Guaranty in any court referred to in Section 1.6(a) above. Guarantor irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    Guarantor irrevocably consents to service of process in any action or proceeding arising out of or relating to this Affiliate Guaranty. Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

C-3

SECTION 1.7     Waiver of Jury Trial.

TO THE FULLEST EXTENT PERMITTED BY LAW THE GUARANTOR HERETO HEREBY WAIVES TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS AFFILIATE GUARANTY.

SECTION 1.8     Subordination Agreement.

The obligations in respect of the Notes and under this Affiliate Guaranty shall be subordinate and junior in right of payment to the prior payment in full of all Senior Obligations (as defined in the Subordination Agreement) and the rights and remedies available to the holders of the Notes are subject to the terms of the Subordination Agreement. The provisions of this Affiliate Guaranty shall be subject to the provisions of the Subordination Agreement.

Capitalized terms used herein have the same meanings given in the Agreement unless otherwise indicated.

Dated as of _____

[Guarantor]

By:_____
     Name:
     Title:

STATE OF _____ )
                            ): ss.:
COUNTY OF _____ )

On the _____ day of _____, 20__, before me personally came _____ to me known, who being by me duly sworn, did depose and say s/he is the _____ of _____., a[n] _____ corporation, the corporation described in and which executed the foregoing instrument; and that s/he signed her/his name thereto by order of the board of directors of said corporation.

_____
Notary Public

C-4

**[FORM OF SUBORDINATION AGREEMENT]**

# EUROFRESH, INC.

## SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT (this "**Agreement**") is made as of the __ day of _____, 2009 by and among Silver Point Finance, LLC, in its capacity as Administrative Agent under the Credit and Guaranty Agreement (together with its successors and assigns from time to time in such capacity, the "**Agent**"), the Investing Noteholders identified on <u>Exhibit A</u> hereto (the "**Investing Noteholders**"), Bio Dynamics B.V./S.à.r.L., a Luxembourg company ("**Bio Dynamics**"), and together with the Investing Noteholders and each of such parties respective successors and assigns from time to time, the "**Initial Purchasers**"), Eurofresh, Inc., a Delaware corporation (the "**Company**") and the Affiliate Guarantors party hereto. Capitalized terms used herein but not otherwise defined herein have the meanings set forth in <u>Section 1(a)</u> below.

## RECITALS

WHEREAS, pursuant to the terms and conditions of the Subordinated PIK Note Purchase Agreement, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified or as refinanced or replaced in accordance with the terms hereof, the "**Subordinated PIK Note Purchase Agreement**"), among the Company, the affiliate guarantors party thereto and the Initial Purchasers, the Initial Purchasers have agreed to purchase Notes from the Company in an aggregate initial principal amount not to exceed $35,000,000; and

WHEREAS, the execution and delivery of this Agreement is a condition to the Company's incurrence of the indebtedness evidenced by the Notes, under the terms of the Subordinated PIK Note Purchase Agreement and the Credit Agreement.

NOW THEREFORE, in consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

SECTION 1. **Definitions**. (a) As used in this Agreement, the following terms shall have the following meanings:

"**Affiliate Guarantors**" shall mean each affiliate of the Company which enters into a guaranty of the Senior Obligations.

"**Agent**" has the meaning set forth in the preamble hereto.

"**Agreement**" means this Subordination Agreement as amended or otherwise modified pursuant to the terms hereof.

"**Bankruptcy Code**" shall mean the Bankruptcy Reform Act of 1978, as codified under Title 11 of the United States Code, and the Bankruptcy Rules promulgated thereunder, as the same may be in effect from time to time.

"**Collateral**" means any and all property which now constitutes or hereafter will constitute collateral or other security for payment of any Senior Obligations.

"**Company**" has the meaning set forth in the preamble hereto.

"**Credit Agreement**" shall mean the Credit and Guaranty Agreement, dated as of [_____], 2009, among the Company, the guarantors party thereto, various lenders, and Silver Point Finance, LLC, as Administrative Agent, Collateral Agent, Syndication Agent, Documentation Agent and Lead Arranger, as amended, supplemented, amended and restated or otherwise modified or as refinanced, extended, renewed, defeased, restructured or replaced from time to time.

"**Credit Agreement Obligations**" shall mean all Obligations outstanding under the Credit Agreement.

"**Credit Party**" means the Company, each Affiliate Guarantor and any other guarantor of the Senior Obligations or the Subordinated Obligations. Such Persons shall be referred to collectively as the "**Credit Parties**."

"**Discharge of Senior Obligations**" shall mean, except pursuant to a Refinancing and subject to Section 7 hereof, (a) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest would be allowed in such Insolvency or Liquidation Proceeding) and premium, if any, on all Indebtedness outstanding under the Credit Agreement, and (b) payment in full of all other Credit Agreement Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest and premium, if any, are paid.

"**Indebtedness**" shall mean and includes all Obligations that constitute "**Indebtedness**" within the meaning of the Credit Agreement.

"**Initial Purchasers**" has the meaning set forth in the preamble hereto.

"**Insolvency or Liquidation Proceeding**" shall mean (a) any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Credit Party, (b) any other voluntary or involuntary insolvency, reorganization, arrangement or bankruptcy case or proceeding, or any receivership, liquidation, reorganization, arrangement or other similar case or proceeding with respect to such Credit Party or with respect to a material portion of its respective assets, (c) any liquidation, dissolution, reorganization or winding up of such Credit Party whether voluntary or involuntary and whether or not involving insolvency or bankruptcy or (d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of such Credit Party.

"**Lien**" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing,

and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Notes**" means the Subordinated Notes and the Subordinated PIK A Notes.

"**Obligations**" shall mean any and all obligations (including guaranty obligations) with respect to the payment and performance of (a) any principal of or interest or premium on any indebtedness, or any other liability, including interest that accrues after the commencement of any Insolvency or Liquidation Proceeding of any applicable Person at the rate provided for in the respective documentation, whether or not a claim for post-petition interest is allowed in any such Insolvency or Liquidation Proceeding, (b) any fees, indemnification obligations, expense reimbursement obligations or other liabilities payable under the documentation governing any indebtedness (including the retaking, holding, selling or otherwise disposing of or realizing on any collateral), (c) any obligation to post cash collateral in respect of letters of credit or any other obligations, and (d) all performance obligations under the documentation governing any indebtedness.

"**Permitted Refinancing**" shall mean, as to any Subordinated Obligations, the incurrence of other Subordinated Obligations to refinance, extend, renew, defease, restructure, replace or refund (collectively, "**refinance**") such existing Subordinated Obligations; provided that, in the case of such other Subordinated Obligations, the following conditions are satisfied:

> (a) the weighted average life to maturity of such refinancing Subordinated Obligations shall be greater than or equal to the weighted average life to maturity of the Subordinated Obligations being refinanced;

> (b) the principal amount of such refinancing Subordinated Obligations shall be less than or equal to the principal amount (including any accreted or capitalized amount) then outstanding of the Subordinated Obligations being refinanced, plus any required premiums and other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by any amount equal to any existing commitments unutilized thereunder;

> (c) the respective obligor or obligors shall be the same on the refinancing Subordinated Obligations as on the Subordinated Obligations being refinanced;

> (d) the refinancing Subordinated Obligations is unsecured and is subordinated to the Senior Obligations to the same degree, if any, or to a greater degree as the Subordinated Obligations being refinanced; and

> (e) no material terms applicable to such refinancing Subordinated Obligations or guarantees of such refinancing Subordinated Obligations (including without limitation covenants, events of default, remedies and acceleration rights) shall be, taken as a whole, materially more favorable to the refinancing lenders than the terms that are applicable under the instruments and documents governing the Subordinated Obligations being refinanced.

"**Person**" shall mean and include an individual, a partnership, a joint venture, a corporation, a trust, a limited liability company, an unincorporated organization and a government or any department or agency thereof.

"**Purchasers**" shall mean the Initial Purchasers and each other holder from time to time of a Note (whether held individually or through an agent, trustee, custodian, intermediary or otherwise).

"**Recovery**" has the meaning set forth in <u>Section 7(d)</u>.

"**Refinance**" means, in respect of any Indebtedness, to refinance, replace, refund or repay, or to issue other indebtedness, in exchange or replacement for, such Indebtedness in whole or in part, whether with the same or different lenders, agents, or arrangers. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Remedies**" means, with respect to an Event of Default under and as defined in the Subordinated Note Documents, the acceleration of any of the Notes or the exercise of any remedies in respect of such Event of Default (including any right of setoff or similar right, any right of collection, repayment, prepayment, repurchase, redemption or put right, the right to sue any Credit Party or to file or participate in any Insolvency or Liquidation Proceeding or take any other action under law, against any Credit Party, but excluding in any event the imposition of default rate interest as specified in the Subordinated Note Documents as of the date of this Agreement). For purposes of clarity, in no event shall the extension of the Subordinated PIK A Note Maturity Date or the conversion of any unpaid amount of any Subordinated PIK A Note pursuant to Section 2.4 of the Subordinated PIK Note Purchase Agreement constitute a "Remedy" for purposes of this Agreement.

"**Reorganization Subordinated Securities**" shall mean, in connection with any Insolvency or Liquidation Proceeding, (a) any equity security issued by the Company, and (b) any debt or other equity securities of the Company that (i) are distributed to a Purchaser in respect of Subordinated Obligations pursuant to a plan of reorganization or adjustment that is confirmed or otherwise authorized by an order or decree of a court of competent jurisdiction (or such other Person provided for by such plan of reorganization or adjustment) in such Insolvency or Liquidation Proceeding and (ii) (A) are subordinated in right of payment to the Senior Obligations to at least the same extent as the Subordinated Obligations are subordinated to the Senior Obligations pursuant to the terms of this Agreement, (B) do not have the benefit of any obligation of any Person (whether as issuer, guarantor or otherwise) unless the Senior Obligations have at least the same benefit of the obligation of such Person (with the obligation of such Person to the Purchasers to be subordinated to such Person's obligation to the Senior Creditors to at least the same extent as the Subordinated Obligations are subordinated to the Senior Obligations hereunder) and (C) do not have any terms, and are not subject to or entitled to the benefit of any agreement or instrument that has terms, that are more burdensome to the issuer of or other obligor on such debt or equity securities than are the terms of the Senior Obligations; <u>provided</u> that if such securities are debt securities, such securities shall not provide for amortization (including sinking fund and mandatory prepayment provisions) commencing prior to one year following the final scheduled maturity of the Senior Obligations (as they may be modified by such plan of reorganization or adjustment).

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Senior Creditors**" means, at any relevant time, the holders of Senior Obligations at such time.

"**Senior Facility Documents**" shall mean the Credit Agreement and the other Credit Documents (as defined in the Credit Agreement) and each of the other agreements, documents and instruments executed or delivered at any time in connection therewith, as each may be amended, supplemented, restated, renewed, replaced or otherwise modified from time to time, whether or not with the same agent or holders and irrespective of any changes in the terms and conditions thereof. Without limiting the generality of the foregoing, the term "**Senior Facility Documents**" shall include any amendment, amendment and restatement, renewal, extension, restructuring (pursuant to an Insolvency or Liquidation Proceeding or otherwise), supplement or modification to the Senior Facility Documents and all refundings, refinancing and replacements of any facility provided for therein, including any agreement (i) extending the maturity of any Indebtedness incurred thereunder or contemplated thereby, (ii) adding or deleting issuers or guarantors thereunder or (iii) increasing the amount of Indebtedness incurred thereunder or available to be issued thereunder.

"**Senior Obligations**" means the Credit Agreement Obligations. "**Senior Obligations**" shall in any event include: (a) all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding (and the effect of provisions such as Section 502(b)(2) of the Bankruptcy Code), accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the Credit Agreement, whether or not the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding, (b) any and all fees and expenses (including attorneys' and/or financial consultants' fees and expenses) incurred by the Senior Creditors in connection with the exercise or enforcement of any of the rights or interests of the Senior Creditors under this Agreement, or incurred by the Senior Creditors after the commencement of an Insolvency or Liquidation Proceeding, whether or not the claim for fees and expenses is allowed under Section 506(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code as a claim in such Insolvency or Liquidation Proceeding and (c) all obligations and liabilities of each Credit Party under each Senior Facility Document to which it is a party which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due.

"**Standstill Period**" has the meaning set forth in <u>Section 4</u> in respect thereof.

"**Subordinated Note Documents**" means the Subordinated PIK Note Purchase Agreement, the Affiliate Guaranty (as defined in the Subordinated PIK Note Purchase Agreement), the Subordinated Notes, the Subordinated PIK A Notes, this Agreement, and any

other agreement, certificate, instrument or document delivered in connection with any other Subordinated Note Document and executed by a Credit Party.

"**Subordinated Note Maturity Date**" means the seventh (7th) anniversary of the issue date of the Subordinated Notes.

"**Subordinated Notes**" means the subordinated unsecured promissory notes in the aggregate principal amount of $30,000,000, to be dated the date of issue thereof, to mature on the Subordinated Note Maturity Date, to bear interest as provided in Section 2.1 of the Subordinated PIK Note Purchase Agreement, and to be in the form of Exhibit A thereto. The term "**Subordinated Notes**" as used herein shall include each such subordinated unsecured promissory note delivered pursuant to the Subordinated PIK Note Purchase Agreement and each such subordinated unsecured promissory note delivered in substitution or exchange for, or otherwise in respect of, any other Subordinated Note pursuant to such agreement.

"**Subordinated Notes Payment**" means any payment or distribution of any kind or character, whether direct or indirect, by setoff or otherwise, from any source, whether in cash, property or securities, on or in respect of any Subordinated Obligations (including any interest accruing on or after the filing of any Insolvency or Liquidation Proceeding relating to the Company or any other Credit Party, whether or not allowed in such Insolvency or Liquidation Proceeding) or on account of any purchase, redemption, retirement, put, rescission of purchase, defeasance or other acquisition of Notes by any Credit Party; provided that Subordinated Notes Payments shall not include (a) a closing fee in an amount not to exceed 2.0% of the principal amount of the Subordinated PIK A Notes paid to holders of Subordinated PIK A Notes, (b) an expense reimbursement fee in an amount not to exceed $50,000 paid to holders of Subordinated PIK A Notes for reasonable and actual expenses incurred, and (c) reasonable fees of counsel to the Initial Purchasers, in each case due and payable as of the date of this Agreement, pursuant to terms set forth in the Subordinated PIK Note Purchase Agreement on the date hereof.

"**Subordinated Obligations**" means the unpaid principal of and interest on (including interest accruing after the maturity of the Notes and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Company or any guarantor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Notes and all other obligations and liabilities of the Company or any other Credit Party to any Purchaser, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, the Subordinated PIK Note Purchase Agreement, any other Subordinated Note Document or any other document made, delivered or given in connection therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to any Purchaser that are required to be paid by the Company or any other Credit Party pursuant to any Subordinated Note Document) or otherwise.

"**Subordinated PIK A Notes**" means the subordinated unsecured class A promissory notes in the aggregate principal amount of $5,000,000, to be dated the date of issue thereof, to mature on the Subordinated PIK A Note Maturity Date, to bear interest as provided in Section 2.1 of the Subordinated PIK Note Purchase Agreement, and to be in the form of Exhibit

<u>B</u> thereto.  The term "**Subordinated Notes**" as used herein shall include each such subordinated unsecured class A promissory note delivered pursuant to the Subordinated PIK Note Purchase Agreement and each such subordinated unsecured promissory note delivered in substitution or exchange for, or otherwise in respect of, any other Subordinated PIK A Note pursuant to such agreement.

"**Subordinated PIK A Note Maturity Date**" means March 31, 2010; provided that the Company shall pay the Subordinated PIK A Notes in whole or in part only to the extent that after payment its minimum cash is not less than $7.5 million.  If the Subordinated PIK A Notes are not paid in full on March 31, 2010 (or any subsequent maturity date), the "Subordinated PIK A Note Maturity Date" will be extended to March 31, 2011 (and annually thereafter), subject to the $7.5 million minimum cash threshold, unless converted pursuant to the terms and conditions of the Subordinated PIK Note Purchase Agreement.

"**Subordinated PIK Note Purchase Agreement**" has the meaning set forth in the recitals hereto.

"**UCC**" means the Uniform Commercial Code as from time to time in effect in the State of New York.

(b)     <u>Computation of Time Periods</u>.  For purposes of computation of periods of time hereunder, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding."

(c)     <u>Terms Generally</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "**include**", "**includes**" and "**including**" shall be deemed to be followed by the phrase "**without limitation**." The word "**will**" shall be construed to have the same meaning and effect as the word "**shall**". Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified, to the extent permitted hereunder, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "**herein**", "**hereof**" and "**hereunder**", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Sections or Annexes shall be construed to refer to Sections or Annexes of this Agreement, (v) the words "**asset**" and "**property**" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, (vi) reference to any law means such law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect on the date hereof, including rules, regulations, enforcement procedures and any interpretations promulgated thereunder and (vii) underscored references to Sections or clauses shall refer to those portions of this Agreement, and any underscored references to a clause shall, unless otherwise identified, refer to the appropriate clause within the same Section in which such reference occurs.

**SECTION 2.** **Subordinated Obligations Subordinate to Senior Obligations**. The Company and each Credit Party agrees, and each Purchaser by its acceptance of a Note agrees, that to the extent and in the manner hereinafter set forth in this Agreement, the payment of the Subordinated Obligations is hereby expressly made subordinate and subject in right of payment to all Senior Obligations. The Company and each Credit Party agrees, and each Purchaser by its acceptance of a Subordinated Note likewise agrees, that the Subordinated Obligations are and will remain unsecured.

**SECTION 3.** **Certain Permitted Payments; Permitted Refinancing.**

(a)    Prior to the Discharge of Senior Obligations, neither the Company nor any Credit Party shall be permitted to pay or make, nor shall any Purchaser be permitted to accept or receive, any Subordinated Notes Payment other than (i) regularly scheduled payments of interest on the Notes in an amount not in excess of the applicable amount (including, as applicable, default interest) set forth in the Subordinated PIK Note Purchase Agreement as of the date of this Agreement, which are paid in kind (and not in cash) on or after the due date therefor pursuant to the terms of the Subordinated PIK Note Purchase Agreement as of the date of this Agreement, (ii) Subordinated Notes Payments made on or following the Subordinated Note Maturity Date, with respect to Subordinated Notes, or the Subordinated PIK A Note Maturity Date with respect to Subordinated PIK A Notes, (iii) Subordinated Notes Payments made pursuant to a Permitted Refinancing and (iv) delivery of Reorganization Subordinated Securities to the Purchasers in accordance with the terms of this Agreement; provided that, notwithstanding the foregoing, the making of any Subordinated Notes Payment shall be subject to Sections 5 and 7 hereof. The Company and each other Credit Party agrees not to make any Subordinated Notes Payment or other payment in contravention of this Agreement or to deliver any notice, make any election, or take any other action in furtherance thereof.

(b)    The failure to make any Subordinated Notes Payment by reason of the provisions of this Section 3 will not be construed as preventing the occurrence of an Event of Default under the Subordinated PIK Note Purchase Agreement with respect to the Notes arising from any such failure to make payment. Upon the occurrence of the Discharge of Senior Obligations, the Company shall resume making any and all required Subordinated Notes Payments, including any missed payments, subject to the provisions of this Agreement.

**SECTION 4.** **Remedies Standstill**. No Purchaser shall exercise any Remedies in respect of any Subordinated Obligations prior to the occurrence of the Discharge of Senior Obligations (such period, the "**Standstill Period**"); provided, that the Standstill Period shall terminate upon the earliest to occur of: (i) 180 days after the acceleration of all Senior Obligations, (ii) such time as the Agent consents in writing to the termination of such Standstill Period, (iii) the occurrence of an Insolvency or Liquidation Proceeding, (iv) the Subordinated Note Maturity Date, with respect to the Subordinated Notes, or (v) the Subordinated PIK A Note Maturity Date, with respect to the Subordinated PIK A Notes. Upon the termination of the Standstill Period, the Purchasers may, at their sole election, exercise any and all Remedies (including acceleration of the maturity of the Subordinated Obligations) available to them under the Subordinated Note Documents, subject to the terms of this Agreement; provided that the provisions of Section 3 shall continue notwithstanding the termination of the Standstill Period; provided further that upon the occurrence of any event described under clauses (i), (iv) or (v), so

long as the Agent or the Senior Creditors (y) initiate an enforcement action during the Standstill Period and (z) diligently pursue their rights or remedies as a secured creditor after the Standstill Period to effect the collection, foreclosure, sale, or other realization upon or disposition of any or all of the Collateral, the Standstill Period shall continue as to such Collateral until the Agent or the Senior Creditors complete such rights and remedies. Notwithstanding the foregoing, if, following the acceleration of any Senior Obligations, such acceleration is rescinded (whether or not any existing event of default in respect of such Senior Obligations has been cured or waived), then all Remedies exercised by any Purchaser shall likewise be rescinded if such Remedy was permitted to occur solely due to clause (i) above (such rescission to be without prejudice to any future rights of such Purchaser).

**SECTION 5.** **Payments Held in Trust; Subrogation.**

(a) <u>Payments Held in Trust</u>. In the event that prior to the Discharge of Senior Obligations, any Purchaser shall have received any Subordinated Notes Payment at a time when it is not permitted to do so under this Agreement, then and in such event such Subordinated Notes Payment shall be paid over and delivered forthwith to the Agent in the same form as received and, until so turned over, the same shall be held in trust by such Purchaser as the property of the Senior Creditors, to the extent necessary to enable the Discharge of Senior Obligations.

(b) <u>Subrogation</u>. After the Discharge of Senior Obligations, the Purchasers shall be subrogated to the rights of the Senior Creditors to receive payments and distributions of cash, property and securities applicable to such Senior Obligations until the principal of (and premium, if any) and interest on the Notes shall be paid in full. For purposes of such subrogation, no payments or distributions to the Senior Creditors of any cash, property or securities to which the Purchasers would be entitled except for the provisions of this Agreement, and no payments pursuant to the provisions of this Agreement to the Senior Creditors by the Purchasers, as among the Credit Parties, their creditors (other than the Senior Creditors) and the Purchasers, shall be deemed to be a payment or distribution by such Credit Party to or on account of the Senior Obligations. The subrogation rights granted in this <u>Section 5(b)</u> shall not grant any Purchaser any right to vote, control or participate in the administration of any Senior Obligations.

**SECTION 6.** **No Prejudice or Impairment**. The provisions of this Agreement are, and are intended solely for, the purpose of defining the relative rights of the Purchasers on the one hand and the Senior Creditors on the other hand. None of the Credit Parties or any other creditor thereof shall have any rights hereunder. Nothing contained in this Agreement is intended to or shall (a) impair the obligations of the Company or any other Credit Party, which are absolute and unconditional, to pay the Senior Obligations as and when the same shall become due and payable in accordance with their terms, (b) impair the obligations of the Company or any other Credit Party, which are absolute and unconditional, to pay the Subordinated Obligations as and when the same shall become due and payable in accordance with their terms, subject to the rights under this Agreement of the Senior Creditors, which obligations are intended to rank equally with all other general unsecured obligations of the Company, or (c) affect the relative rights against the Credit Parties of the Purchasers and creditors of the Credit Parties other than the Senior Creditors.

**SECTION 7.**      **Insolvency or Liquidation Proceedings.**

(a)      In connection with any Insolvency or Liquidation Proceeding, this Agreement shall remain in full force and effect and enforceable pursuant to its terms, and all references herein to the Credit Parties shall be deemed to apply to such Credit Parties as debtor-in-possession and to any Person claiming through or on their behalf, including a trustee in bankruptcy, receiver, assignee for the benefit of creditors, liquidating trustee or agent for the estate of such Credit Parties, or otherwise.

(b)      In the event, and during the continuance, of any Insolvency or Liquidation Proceeding, the Senior Creditors shall first be entitled to the Discharge of Senior Obligations, before the Purchasers (or any Person claiming through or on their behalf, including a trustee in bankruptcy, receiver, assignee for the benefit of creditors, liquidating trustee or agent, or otherwise) are entitled to receive or accept any Subordinated Notes Payment (other than Reorganization Subordinated Securities), and to that end the Senior Creditors shall be entitled to receive from such Purchaser or other Person making such payment, and such Purchaser or other Person shall pay over and deliver forthwith to the Agent in the same form received, any Subordinated Notes Payment which may be payable or deliverable in respect of the Subordinated Obligations in any such Insolvency or Liquidation Proceeding, and until so turned over, the same shall be held in trust by such Purchaser or other Person as the property of the Senior Creditors remaining unpaid, to the extent necessary to enable the Discharge of Senior Obligations, after giving effect to all concurrent payments and distributions and all provisions therefor, to or for the Agent on behalf of the Senior Creditors.

(c)      The Agent shall have the right to request the Purchasers to file a claim or proof of debt in the form required in any Insolvency or Liquidation Proceeding for and on behalf of each Purchaser.  Upon the failure of any Purchaser to take any such action as of the 30th day preceding the bar date therefor, the Agent is hereby authorized to file such a claim and proof of debt on behalf of such Purchaser, and such Purchaser hereby appoints the Agent as its attorney in fact to do so, which appointment is irrevocable and coupled with an interest and such Purchaser agrees to provide such information and take such other action as may be reasonably necessary to effectuate the foregoing.  Notwithstanding the foregoing, each Purchaser shall retain the right to vote to accept or reject any plan of partial or complete liquidation, reorganization, arrangement, composition or extension; provided that such Purchaser shall not take any action or vote in any way so as to contest the enforceability of this Agreement or the Senior Obligations nor take any action or vote in a manner inconsistent with the terms of this Agreement.  The Agent and each Senior Creditor shall retain the right to vote its Senior Obligations to accept or reject any plan of partial or complete liquidation, reorganization, arrangement, composition or extension; provided that neither the Agent nor any Senior Creditor shall take any action or vote in a manner inconsistent with the terms of this Agreement.  Neither the Agent nor any Senior Creditor shall have any liability to any Purchaser in connection with any such filing or other action taken pursuant to this clause (c).

(d)      If any Senior Creditor or any Purchaser is required in any Insolvency or Liquidation Proceeding or otherwise to disgorge, turnover or otherwise pay any amount to the estate of any Credit Party, because such amount was avoided or ordered to be paid or disgorged for any reason including because it was found to be a fraudulent or preferential transfer (a

"**Recovery**"), whether received as proceeds of security, enforcement of any right of set-off or otherwise, then the Senior Obligations, or Subordinated Obligations, as applicable, shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the Senior Obligations or Subordinated Obligations, as applicable, shall be deemed not to have been paid (and the Discharge of Senior Obligations for all purposes of this Agreement shall be deemed not to have occurred). If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto. Any Subordinated Notes Payment received by any Purchaser after the termination of this Agreement and prior to the reinstatement of this Agreement, shall be delivered to the Agent in accordance with Section 5 for application to payment of the Senior Obligations; provided, however, that the Purchasers shall not be required to turn over such payments to the extent that the Purchasers had also been required to disgorge such Subordinated Note Payments as a Recovery. The Purchasers agree that none of them shall be entitled to benefit from any avoidance action affecting or otherwise related to any distribution or allocation made in accordance with this Agreement, whether by preference or otherwise, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

(e)    To the extent not inconsistent with the terms of this Agreement, any Purchaser may (i) file a claim or statement of interest with respect to the Subordinated Obligations in any applicable Insolvency or Liquidation Proceeding; (ii) file any proofs of claim, pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Company or another Credit Party arising under an Insolvency or Liquidation Proceeding, in each case in accordance with the terms of this Agreement; and (iii) vote on any plan of reorganization in accordance with the terms of this Agreement.

**SECTION 8.        Benefit of Agreement; Amendments to Certain Documents.**

(a)    This Agreement shall constitute a continuing inducement to all Persons who, in reliance upon the terms hereof, become a Senior Creditor and is made for the benefit of each subsequent Senior Creditor. The Agent, on behalf of the Senior Creditors, and each Purchaser may enforce such provisions.

(b)    Unless the Agent shall have given its prior written consent, neither the Subordinated Note Documents nor the terms of any Subordinated Obligations may be amended, modified, waived or otherwise changed, other than any such amendment, modification, waiver or other change that (i) would extend the maturity or reduce the amount of any payment of principal thereof or reduce the rate or extend any date for payment of interest thereon and (ii) does not involve the payment of a consent fee, or pursuant to a Permitted Refinancing.

(c)    The Notes shall always remain unsecured.

**SECTION 9.        Representations and Warranties**. Each of the Purchasers, the Company and each other Credit Party hereby represents and warrants that (a) it has full power,

authority and legal right to make and perform this Agreement, and (b) this Agreement is its legal, valid and binding obligation, enforceable against it in accordance with its terms.

SECTION 10.    **Amendment**.  Neither this Agreement nor any of the terms hereof may be amended, waived, discharged or terminated unless such amendment, waiver, discharge or termination is in writing signed by each of the Agent and the Purchasers.

SECTION 11.    **Instrument Legends**.  The faces of the Notes will be forthwith inscribed with a legend conspicuously indicating that payment thereon is subordinated to the claims of the Senior Creditors pursuant to the terms of this Agreement.  Any instrument evidencing any of the Subordinated Obligations or any portion thereof which is hereafter executed will, on the date thereof, be inscribed with the aforesaid legend.

SECTION 12.    **No Waiver of Subordination Provisions**.  No right of any Senior Creditor to enforce any term or provision of this Agreement or any of its rights hereunder shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Credit Party or by any act or failure to act by any such Senior Creditor, or by any noncompliance by any Credit Party with the terms, provisions and covenants of this Agreement, regardless of any knowledge thereof any such Senior Creditor may have or be otherwise charged with.  No Purchaser shall subordinate any Subordinated Obligations to any Indebtedness or obligation of any Credit Party other than Senior Obligations.

SECTION 13.    **Successors and Assigns**.  This Agreement and the terms hereof shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and assigns, and each Purchaser and any assignee or transferee of any Subordinated Obligations is hereby deemed to take such obligations subject to the terms and conditions of this Agreement.  Other than the Senior Creditors, no other Person shall have or be entitled to assert rights or benefits hereunder.  The Purchasers and the Agent, on behalf of the Senior Creditors, further agree between themselves and solely for their own collective benefit, that if any Credit Party is in the process of refinancing a portion of the Senior Obligations, or if the Company is in the process of refinancing all or a portion of the Subordinated Obligations pursuant to a Permitted Refinancing, and if the party who wishes to be refinanced makes a request of the other parties hereto, the Purchasers or the Agent, as the case may be, shall to the extent reasonably requested agree to enter into a new, substitute agreement with the refinancing lender or purchaser or its representative; provided that any such new, substitute agreement shall be in a form, and contain such terms and conditions, substantially the same as in this Agreement.

SECTION 14.    **Relationship Between Agents and Lenders;  Associated Estoppels**.  Each and every benefit accruing hereunder to the Agent shall be deemed to also accrue to the Senior Creditors.  Any proceeds or other amounts in respect of any Subordinated Notes Payment received by the Agent pursuant to the terms of this Agreement shall be allocated among the Senior Creditors by the Agent.  In no event shall any Purchaser institute, or join as a party in the institution of, or directly or indirectly assist in the prosecution of, any action, motion, defense, suit or proceeding (a) seeking a determination that any Lien of any Senior Creditor in any of the Collateral is invalid, unperfected or avoidable, (b) contesting or challenging the validity or enforceability of this Agreement or (c) contesting or challenging the validity or enforceability of the Senior Obligations or any guarantees or other obligations in respect thereof.

In no event shall the Agent or any Senior Creditor institute, or join as a party in the institution of, or directly or indirectly assist in the prosecution of, any action, motion, defense, suit or proceeding contesting or challenging the validity or enforceability of this Agreement or the validity or enforceability of the Subordinated Obligations.

SECTION 15.    **Effectuation of Subordination**.  Each Purchaser by accepting a Note authorizes and directs the Company on its behalf to take such action as may be necessary or appropriate to acknowledge or effectuate the subordination between the Purchasers and the Senior Creditors as provided in this Agreement.

**SECTION 16.    Governing Law.    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

SECTION 17.    **Forum Selection and Consent to Jurisdiction.**

(a)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  In furtherance of the foregoing, and not in limitation thereof, Bio Dynamics hereby irrevocably designates, appoints and empowers [_____] (the "**Process Agent**"), with offices on the date hereof at [_____], as its designee, appointee and agent with respect to any action or proceeding in New York to receive, accept and acknowledge for and on its behalf, and in respect of its property, service of any and all legal process, summons, notices and documents which may be served in any such action or proceeding, and Bio Dynamics hereby confirms and agrees that the Process Agent has been duly and irrevocably appointed as its agent and true and lawful attorney-in-fact in its name, place and stead to accept such service of any and all legal process, summons, notices and documents, and agrees that the failure of such Process Agent to give any advice of any such service of process to Bio Dynamics shall not impair or affect the validity of such service or of any judgment based thereon.  If for any reason such designee, appointee and agent shall cease to be available to act as such, Bio Dynamics agrees to designate a new designee, appointee and agent in New York City on the terms and for the purposes of this provision satisfactory to the representative.  Bio Dynamics further irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to Bio Dynamics and the Company, at the Company's address set forth on Annex I hereto, such service to become effective five days after such mailing.

(b)     Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in Section 16 above.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)     Each party hereto irrevocably consents to service of process in any action or proceeding arising out of or relating to this Agreement in the manner provided for notices in Section 19 hereof.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

SECTION 18.     **WAIVER OF JURY TRIAL**.     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 18.

SECTION 19.     **Notices**.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of electronic mail or four Business Days after deposit in the U.S. mail (registered or certified, with postage prepaid and properly addressed).  For the purposes hereof, the respective addresses of the parties hereto shall be as set forth on Annex I hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.  All notices to the Senior Creditors may be sent to Agent.  All notices to the Purchasers may be sent to the Initial Purchasers, subject to receipt from such other Purchaser of its notice for addresses pursuant to the terms of this Section 19.  In the event any Person becomes a Purchaser after the date hereof and such Person has not given written notice of its address pursuant to this Section 19 (or its address is not otherwise set forth on Annex I hereto), then the Initial Purchasers may designate to the other parties hereto that all notices hereunder to such Person shall be given (until written notice of its address for notices is given by such Purchaser pursuant to this Section 19) to the Company at the address provided for the Company pursuant to the terms hereof, and shall be deemed received by such Purchaser when received by the Company pursuant to the terms hereof, and the Company shall promptly (and in any event within 2 days) forward any such notice so received to the intended recipient using the last known address for such recipient in the Company's records (it being understood and agreed that any failure of the Company to do so shall not in any way affect the validity of any notice).  Notwithstanding the foregoing, if at any

time there are more than two Purchasers for whom the address for notices hereunder is different, the Purchasers shall promptly designate a representative for the purpose of receipt of notices to the Purchasers hereunder (which representative may be the Company, in the manner described in the immediately preceding sentence).

SECTION 20.        **Specific Performance**.  The Agent and each other Senior Creditor (including in its capacity as Agent) may demand specific performance of this Agreement against any Purchaser or Credit Party.  Each Purchaser and each Credit Party hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by the Agent or any other Senior Creditor (including in its capacity as Agent).

SECTION 21.        **Headings**.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

SECTION 22.        **Counterparts**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy or electronic (PDF) transmission shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

SECTION 23.        **Obligations Hereunder Not Affected**.  All rights and interests of the Agent and the Senior Creditors hereunder, and all agreements and obligations of the Purchasers and the Credit Parties hereunder, shall remain in full force and effect irrespective of:

(a)        any lack of validity or enforceability of any document evidencing Senior Obligations;

(b)        any change in the time, manner or place of payment of, or any other term of, all or any of the Senior Obligations, or any other amendment or waiver of or any consent to departure from any of the documents evidencing or relating to the Senior Obligations;

(c)        any exchange, release or non-perfection of any Collateral, or any release or amendment or waiver of or consent to departure from any guaranty or Senior Facility Documents for all or any of the Senior Obligations;

(d)        any failure of the Agent or any Senior Creditor to assert any claim or to enforce any right or remedy against any other party hereto under the provisions of this Agreement or any Senior Facility Document;

(e)        any reduction, limitation, impairment or termination of the Senior Obligations for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to (and the Company, each other Credit Party and the Purchasers hereby waive any right to or claim of) any defense (other than the defense of Discharge of Senior Obligations) or setoff, counterclaim, recoupment or termination whatsoever by reason of invalidity, illegality,

nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Senior Obligation; and

(f)     any other circumstance which might otherwise constitute a defense (other than the defense of Discharge of Senior Obligations) available to, or a discharge of, the Company or any other Credit Party in respect of the Senior Obligations or the Purchasers in respect of this Agreement.

**SECTION 24.     Further Assurances**.  The Purchasers will, at Company's expense and at any time and from time to time, promptly execute and deliver all further instruments and documents, and take all further action, that may be reasonably necessary or appropriate, or that the Agent may reasonably request, in order to protect any right or interest granted or purported to be granted by this Agreement or to enable the Senior Creditors or the Agent to exercise and enforce their rights and remedies hereunder.

**SECTION 25.     Effectiveness; Continuing Nature of this Agreement; Severability**.  This Agreement shall become effective when executed and delivered by the parties hereto.  This is a continuing agreement of subordination; the Senior Creditors may continue, at any time and without notice to the Purchasers, to extend credit and other financial accommodations and lend monies to or for the benefit of the Credit Parties constituting Senior Obligations in reliance hereof.  The Purchasers hereby waive any right they may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  Without limiting the generality of the foregoing, this Agreement is intended to constitute and shall be deemed to constitute a "subordination agreement" within the meaning of Section 510(a) of the Bankruptcy Code and is intended to be and shall be interpreted to be enforceable to the maximum extent permitted pursuant to applicable nonbankruptcy law.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references to the Company or any other Credit Party shall include the Company or such Credit Party as debtor and debtor-in-possession and any receiver or trustee for the Company or such Credit Party in any Insolvency or Liquidation Proceeding.  This Agreement shall terminate and be of no further force and effect upon the Discharge of Senior Obligations, subject to the rights of the Senior Creditors under <u>Section 7</u>.

**SECTION 26.     Credit Parties; Additional Credit Parties**.  It is understood and agreed that the Company and each Affiliate Guarantor on the date of this Agreement shall constitute the original Credit Parties party hereto.  The original Credit Parties hereby covenant and agree (a) that no Person shall provide any guarantee or other form of credit support in favor of any Purchaser in respect of any Subordinated Obligations, unless such Person is at all times also a guarantor in respect of all outstanding Senior Obligations, and that no material terms of such Person's guaranty or related documentation in favor of the Purchasers shall be more favorable to the Purchasers than the terms under such Person's guaranty or related documentation in favor of the Senior Creditors and (b) to cause each Subsidiary of the Parent which becomes a Affiliate Guarantor after the date hereof to contemporaneously become a party hereto (as a Credit Party) by executing and delivering a counterpart hereof to the Agent and each

of the Purchasers, or by executing and delivering an assumption agreement in form and substance reasonably satisfactory to the Agent. The parties hereto further agree that, notwithstanding any failure to take the actions required by the immediately preceding sentence, each Person which becomes a Credit Party at any time shall be subject to the provisions hereof as fully as if same constituted a Credit Party hereto and had complied with the requirements of the immediately preceding sentence.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their proper and duly authorized officers as of the day and year first above written.

SILVER POINT FINANCE, LLC,
as Agent

By: _____

Name: _____

Title: _____

BIO DYNAMICS B.V./S. à r.L.,
as Initial Purchaser and a Purchaser

By: _____
Name: _____
Title: _____

J.P. Morgan Investment Management Inc., as discretionary investment manager for Noteholders who are clients of its Cincinnati High Yield Group

By: _____

Name:

Title:

Scoggin Capital Management, LP II
By:  S&E Partners LP Its: General Partner
By:  Scoggin Inc. Its: General Partner

By: _____

Name:

Title:

Scoggin International Fund Ltd.

By: Scoggin LLC Its: Investment Manager

By: _____

Name:

Title:

Scoggin Worldwide Fund Ltd.
By: Old Bellows Partners LP Its: Investment Manager
By:  Old Bell Associates Its: General Partner

By: _____

Name:

Title:




Barclays Bank PLC




By: _____

Name:

Title:




CSAM Funding I




By: _____

Name:

Title:




CSAM Funding II




By: _____

Name:

Title:




CSAM Funding III




By: _____

Name:

Title:

CSAM Funding IV

By: _____

Name:

Title:


Atrium CDO

By: _____

Name:

Title:


Atrium II

By: _____

Name:

Title:


Atrium III

By: _____

Name:

Title:


Atrium IV

By: _____

Name:

Title:

Atrium V

By: Credit Suisse Alternative Capital, Inc.,
as collateral manager


By: _____
Name:
Title:



Credit Suisse Syndicated Loan Fund

By: Credit Suisse Alternative Capital, Inc. as
Agent (Subadvisor) for Credit Suisse Asset
Management (Australia) Limited, the
Responsible Entity for Credit Suisse
Syndicated Loan Fund


By: _____
Name:
Title:



Credit Suisse High Yield Fund

By: Credit Suisse Alternative Capital, Inc. as
Agent (Subadvisor) for Credit Suisse Asset
Management (Australia) Limited, the
Responsible Entity for Credit Suisse High
Yield Fund


By: _____
Name:
Title:

Policemen and Firemen Retirement System
of the City of Detroit

By: Credit Suisse Alternative Capital, Inc. as
subadvisor


By: _____

Name:

Title:


Castle Garden Funding


By: _____

Name:

Title:


Madison Park Funding II, Ltd.

By: Credit Suisse Alternative Capital, Inc.,
as collateral manager


By: _____

Name:

Title:


Madison Park Funding III, Ltd.

By: Credit Suisse Alternative Capital, Inc.,
as collateral manager

By: _____

Name:

Title:

Madison Park Funding V, Ltd.

By: Credit Suisse Alternative Capital, Inc., as collateral manager

By: _____

Name:

Title:

EUROFRESH HOLDING COMPANY, INC.

By: _____
Name: _____
Title: _____


EUROFRESH, INC.

By: _____
Name: _____
Title: _____


EUROFRESH PRODUCE, LTD.

By: _____
Name: _____
Title: _____

**ANNEX I**
**Addresses for Notices**


If to the Company or any other Credit Party:

_____
_____
_____

Attention: _____

Telecopy: _____

Telephone: _____

_____


If to the Agent or Senior Creditors (including in its capacity as Agent, if applicable):

_____
_____
_____

Attention of: _____

Telecopy: _____

Telephone: _____


with a copy to:


_____
_____
_____

Attention of: _____

Telecopy: _____

Telephone: _____

PHOENIX/505173.9

If to the Purchasers:

                              _____

                              _____

                              _____

Attention: _____

Telecopy: _____

With a copy to:

                              _____

                              _____

                              _____

Attention: _____

Telecopy: _____

Telephone: _____

                              _____

Annex I-2

**EXHIBIT A**

Barclays Bank PLC

Scoggin Capital Management

JP Morgan Investment Management

Credit Suisse Alternative Capital, Inc.

PHOENIX/505708.4

<u>EXHIBIT 11</u>

Eurofresh Subordinated PIK Note Purchase Agreement
(redline version)

**EUROFRESH, INC.**

[$5,000,000 20.00% SUBORDINATED PIK A NOTES

DUE MARCH 31, 2010]

[$12,000,000] / [$20,000,000]$30,000,000 15.00% SUBORDINATED PIK NOTES

DUE [_____ ___,] 2016

_____

**SUBORDINATED PIK NOTE PURCHASE AGREEMENT**

_____

**Dated as of [_____ ___,] 2009**

# TABLE OF CONTENTS

EXHIBIT A    --    FORM OF SUBORDINATED NOTE

EXHIBIT B    --    FORM OF SUBORDINATED PIK A NOTE

EXHIBIT C    --    FORM OF ~~SUBSIDIARY~~ AFFILIATE GUARANTY

EXHIBIT D    --    FORM OF SUBORDINATION AGREEMENT

# EUROFRESH, INC.
## SUBORDINATED PIK NOTE PURCHASE AGREEMENT

THIS SUBORDINATED PIK NOTE PURCHASE AGREEMENT (this "**Agreement**") is made as of the __ day of _____, 2009 by and among Eurofresh, Inc., a Delaware corporation (the "**Company**"), Eurofresh Holding Company, Inc., a Delaware corporation and the parent of the Company, as guarantor ("**Holdco**"), Eurofresh Produce, Ltd., a Delaware corporation and the wholly-owned subsidiary of Eurofresh, as guarantor ("**EPL**", and together with the Company, the "**Debtors**"), ~~[~~the Investing Noteholders identified on Exhibit A hereto (the "**Investing Noteholders**"),~~] [Option B only]~~ and Bio Dynamics B.V./S.a.r.L., a Luxembourg company ("**Bio Dynamics**" and together with its successors and permitted assigns~~[~~, and together with the Investing Noteholders,~~]~~ the "**New Investors**").

## RECITALS

A.      On April 21, 2009, the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, which are pending before the United States Bankruptcy Court for the District of Arizona (the "**Bankruptcy Court**").

B.      The Company had issued and outstanding $170,000,000 in aggregate principal amount of 11½ % Senior Notes Due in 2013 (the "**Senior Notes**") payable to the holders of the Senior Notes (the "**Senior Noteholders**") pursuant to an Indenture dated December 21, 2005 (the "**Senior Indenture**") among the ~~Debtors~~Company, EPL and U.S. Bank National Association, as successor trustee to Wells Fargo Bank, N.A.

C.      Pursuant to a joint plan of reorganization (the "**Plan**") confirmed by the Confirmation Order by the Bankruptcy Court entered on _____, 2009 (Doc. No. _____), the Debtors have undertaken a comprehensive financial restructuring and recapitalization of the Debtors (the "**Reorganization**").

D.      Following the effective date of the Plan, Holdco will own 100% of the capital stock of the Company.

~~[D.      [If Plan is rejected:]~~  E. Pursuant to the Plan, the New Investors have agreed, as part of the Reorganization, to invest an aggregate of $~~25,000,000~~35,000,000 in the Company (the "**New Money Investment**"), of which (i) $~~12,500,000~~20,000,000 will be invested by the Investing Noteholders (the "**Investing Noteholders Investment**") and (ii) $~~12,500,000~~15,000,000 of which will be invested by Bio Dynamics, as consideration for $~~20,000,000~~30,000,000 in subordinated unsecured promissory notes in substantially the form attached to this Agreement as Exhibit A (each, a "**Subordinated Note**" and together, the "**Subordinated Notes**"), and $5,000,000 senior subordinated unsecured promissory class A notes in substantially the form attached to this Agreement as Exhibit B (each a "**Subordinated PIK A Note**" and together the "**Subordinated PIK A Notes**," and together with the Subordinated Notes, the "**Notes**"), among other securities of the Company and Holdco.

EF. Pursuant to the Plan, in exchange for the New Money Investment, (i) each Investing Noteholder shall receive its pro rata share of the Subordinated Notes, in the principal amount of $15,000,000, in each case determined based on its proportionate share of the Investing Noteholders Investment, and its pro rata share of the Subordinated PIK A Notes in the principal amount of $2,500,0005,000,000 and (ii) Bio Dynamics shall receive its share of thea Subordinated Notes, determined based on its share of the New Money Investment and Subordinated PIK A NotesNote in the principal amount of $2,500,000.]15,000,000.

[D. [If Plan is accepted:] Pursuant to the Plan, Bio Dynamics has agreed, as part of the Reorganization, to invest an aggregate of $15,000,000 in the Company (the "**Bio Dynamics Purchase Price**"), as consideration for $12,000,000 in subordinated unsecured promissory notes in substantially the form attached to this Agreement as Exhibit A (each, a "**Subordinated Note**" and together, the "**Subordinated Notes**"), among other securities of the Company.] *[Note: If the Plan is accepted and no Subordinated PIK A Notes are issued, all references to "Subordinated Note" should be changed to "Note."]*

NOW, THEREFORE, in consideration of the mutual covenants and the agreements of the parties contained herein, and subject to the conditions specified herein, the parties hereto agree as follows:

# ARTICLE I

# DEFINITIONS

For the purpose of this Agreement, capitalized terms not otherwise defined herein shall have the respective meanings

"**Affiliate**" shall mean, with respect to any Person, (a) any other Person who is a partner, director, officer or stockholder of such Person; and (b) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such Person, and any partner, director, officer or stockholder of such other Person described. For purposes of this Agreement, control of a Person by another Person shall be deemed to exist if such other Person has the power, directly or indirectly, either to (i) vote twenty percent (20%) or more of the securities having the power to vote in an election of directors of such Person, or (ii) direct the management of such Person, whether by contract or otherwise and whether alone or in combination with others.

"**Affiliate Guarantor**" means each Affiliate that is party to the Affiliate Guaranty.

"**Anti-Dilution Shares**" shall mean, collectively, shares of New Common Stock issued to Senior Noteholders or added to the Reserved Shares Trust for the benefit of Senior Noteholders upon the issuance of Conversion Shares pursuant to Section 2.4.

"**Bankruptcy Code**" shall mean the Bankruptcy Reform Act of 1978, as codified under Title 11 of the United States Code, and the Bankruptcy Rules promulgated thereunder, as the same may be in effect from time to time.

"**Business Day**" shall mean any day other than a Saturday, a Sunday or a day on which commercial banks in New York City are required or authorized to be closed.

2

"**Change of Control**" shall mean:

(1)     any event occurs the result of which is that any Person becomes the beneficial owner, as defined in Rules 13d-3 and 13d-5 under the Exchange Act (except that a Person shall be deemed to have "beneficial ownership" of all shares that any such Person has the right to acquire within one year) directly or indirectly, of more than [50]% of the Voting Stock of ~~the Company~~Holdco or a Successor Company, including, without limitation, through a merger or consolidation or purchase of voting Capital Stock of ~~the Company~~Holdco; provided that the transfer of 100% of the Voting Stock of ~~the Company~~Holdco to a Person that has an ownership structure and beneficial owners identical to that of ~~the Company~~Holdco prior to such transfer, such that ~~the Company~~Holdco becomes a Wholly Owned Subsidiary of such Person, shall not be treated as a Change of Control for purposes of this Agreement;

(2)     during any period of two consecutive years occurring after the date of this Agreement, individuals who at the beginning of such period constituted the Board of Directors, together with any new directors whose election by such Board of Directors or whose nomination for election by the stockholders of ~~the Company~~Holdco was approved by a vote of a majority of the directors of ~~the Company~~Holdco then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved, cease for any reason to constitute a majority of the Board of Directors then in office;

(3)     the sale, lease, transfer, exchange, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries taken as a whole to any Person or group of related Persons; provided that the sale, lease, transfer, exchange, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company to a Person that has an ownership structure and beneficial owners identical to that of the Company prior to such sale, lease, transfer, exchange, conveyance or other disposition shall not be treated as a Change of Control for purposes of this Agreement; or

(4)     the approval, adoption or initiation of a plan or proposal relating to the liquidation or dissolution of the Company.

"**Closing**" or "**Closing Date**" shall have the meaning given in Section ~~2.6~~2.9 hereof.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Effective Date**" shall have the meaning set forth in the Plan.

"**Event of Default**" shall mean any of the events specified in Section 7.1, provided that there has been satisfied any requirement in connection with such event for the giving of notice, or the lapse of time, or the happening of any further condition, event or act.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

["**Existing Credit Facility**" shall mean that certain Credit and Guaranty Agreement dated as of March 25, 2008, as amended or otherwise modified to date, among the ~~Debtors~~Company, EPL and the financial institutions party thereto as lenders, including SP, as administrative agent, collateral agent, syndication agent, documentation agent and lead arranger.]

3

"**Governmental Authority**" shall mean any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government or any political subdivision thereof.

"**Individual Conversion Amount**" shall mean, for each holder of a Subordinated PIK A Note, the unpaid portion of such holder's Subordinated PIK A Note converted pursuant to Section 2.4.

"**Individual Initial Investment**" shall mean, for each holder of a Subordinated PIK A Note, the portion of the Investing Noteholders Investment invested by such Holder.

"**Individual Initial Shares**" shall mean, for each holder of a Subordinated PIK A Note, the shares of New Common Stock issued to such holder on the Effective Date in exchange for its portion of the Investing Noteholders Investment.

"**Individual Total Investment**" shall mean, for each holder of a Subordinated PIK A Note, the sum of such holder's Individual Initial Investment plus its Individual Conversion Amount.

"**Law**" shall mean any statute, rule, regulation, order, judgment, award or decree of any Governmental Authority.

"**Material Adverse Effect**" shall mean (i) a material adverse effect on the business, assets, liabilities, operations or condition, financial or otherwise, of the Company and its Subsidiaries, taken as a whole, (ii) material impairment of the Company's ability to perform any of its respective obligations under this Agreement, the Subordinated Notes or any other Transaction Document or (iii) material impairment of the validity or enforceability of the rights of, or the benefits available to, the holders of any of the Subordinated Notes under this Agreement, the Subordinated Notes or any other Transaction Document.

"**New Common Stock**" means the 20,000,000 shares of common stock of Holdco, of a single class, 4,000,000 shares of which will be issued to the Investing Noteholders on the Effective Date, 4,000,000 shares of which will be issued to Bio Dynamics on the Effective Date, 1,000,000 shares of which will be issued to the Senior Noteholders on the Effective Date, and 1,000,000 shares of which will be Reserved Shares, in each case pursuant to the Plan.

["**New Credit Facility**" shall mean the ~~Amended and Restated~~ Credit and Guaranty Agreement, dated as of [_____ __, 2009], among the Debtors ~~and SP~~, the various lenders party thereto and SP as Administrative Agent, Collateral Agent, Syndication Agent, Documentation Agent and Lead Arranger, and any related documents or agreements in connection therewith.]~~"New First Lien Facilities" shall mean the Term A Notes Facility and the Working Capital Facility.~~

"~~**Permitted Holder**" shall mean a holder of the Company's Common Stock as of the Closing Date.~~**Percentage Investment at Conversion**" shall mean, for each holder of a Subordinated PIK A Note, the quotient obtained by dividing such holder's Individual Total Investment by the Total Investment at Conversion.

"**Person**" shall mean and include an individual, a partnership, a joint venture, a corporation, a trust, a limited liability company, an unincorporated organization and a government or any department or agency thereof.

"**Reserved Shares**" means the shares of New Common Stock placed in the Reserved Shares Trust on the Effective Date, together with any additional shares of New Common Stock placed in the Reserved Shares Trust thereafter.

"**Reserved Shares Trust**" means the trust into which Holdco will place shares of New Common Stock for the benefit of the Senior Noteholders, as set forth in the Plan.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

[~~"~~**SP**" shall mean ~~SPCP Group, LLC and~~ Silver Point Finance, LLC.~~]~~

"**Stockholders Agreement**" means that certain Stockholders Agreement, dated on or about the Closing Date, by and among ~~the Company~~Holdco, the Persons to whom shares of New Common Stock of ~~the Company~~Holdco are first issued and the other parties listed thereto, as such agreement may be amended, supplemented, restated or otherwise modified from time to time.

"**Subordination Agreement**" shall mean the Subordination Agreement, dated as of the date of this Agreement, in substantially the form attached as Exhibit D hereto, by and among the Debtors, the New Investors, and ~~representatives of the New First Lien Facilities and the Term Loan B~~SP, as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms thereof.

"**Subsidiary**" of any Person shall mean any corporation or other entity all of the stock or other ownership interests of every class of which, except directors' qualifying shares, greater than fifty percent (50%) of the total combined voting power of all classes of Voting Stock or greater than fifty percent (50%) of the total outstanding ownership interests of all classes of which shall, at the time as of which any determination is being made, be owned by such Person either directly or through Subsidiaries of such Person. Unless the context otherwise clearly requires, any reference to a "Subsidiary" is a reference to a Subsidiary of the Company.

"~~**Subsidiary Guarantor**" means each Subsidiary that is party to the Subsidiary Guaranty.~~

"**Successor Company**" means ~~the Company~~Holdco's successor in the event of a merger, recapitalization or consolidation.

"~~**Term A Note Facility**" shall mean the Term A Note Purchase and Guaranty Agreement, dated as of [_____], 2009, among the Company, the guarantors party thereto, the purchasers from time to time party thereto, and Barclays Bank PLC, as administrative agent and collateral agent, as~~

amended, supplemented, amended and restated or otherwise modified or as refinanced, extended, renewed, defeased, restructured or replaced from time to time.

"**Term Loan B Facility**" shall mean the Term B Credit and Guaranty Agreement (Second Lien), dated as of [_____], 2009, among the Company, the guarantors party thereto, the lenders from time to time party thereto, [Silver Point Finance, LLC, as administrative agent and collateral agent], as amended, supplemented, amended and restated or otherwise modified or as refinanced, extended, renewed, defeased, restructured or replaced from time to time.

"**Total Conversion Amount**" shall mean the total unpaid portion of Subordinated PIK A Notes converted by holders of Subordinated PIK A Notes pursuant to Section 2.4.

"**Total Initial Investment**" shall mean $30,000,000.

"**Total Initial Shares**" shall mean the 8,000,000 shares of New Common Stock issued to such the Investing Noteholders on the Effective Date in exchange for the Investing Noteholders Investment.

"**Total Investment at Conversion**" shall mean the sum of the Total Initial Investment plus the Total Conversion Amount.

"**Transaction Documents**" shall mean this Agreement, the Notes, and any other agreements, documents, certificates and instruments now or hereafter executed or delivered by the Company or any Subsidiary or Affiliate in connection with this Agreement.

"**Voting Stock**" shall mean, with respect to any corporation, any shares of stock of such corporation whose holders are entitled under ordinary circumstances to vote for the election of directors of such corporation (irrespective of whether at the time stock of any other class or classes shall have or might have voting power by reason of the happening of any contingency).

"**Wholly-Owned Subsidiary**" shall mean any Subsidiary of which all of the outstanding capital stock of every class or outstanding ownership interests of every class is owned by the Company or another Wholly-Owned Subsidiary of the Company.

["**Working Capital Facility**" shall mean the Credit and Guaranty Agreement, dated as of [_____], 2009, among the Company, the guarantors party thereto, the lenders from time to time party thereto, and Barclays Bank PLC, as administrative agent and collateral agent, as amended, supplemented, amended and restated or otherwise modified or as refinanced, extended, renewed, defeased, restructured or replaced from time to time.]

## ARTICLE II

## THE NOTES

2.1     Authorization of the Notes.  The Company has authorized the issuance of the Subordinated Notes in the original aggregate principal amount of [$20,000,000 / $12,000,000] $30,000,000.  The Subordinated Notes will be dated as of the Closing Date (as defined herein) and will mature on the date which is seven (7) years from the Closing Date. [The

6

Company has authorized the issuance of the Subordinated PIK A Notes in the original aggregate principal amount of $5,000,000. The Subordinated PIK A Notes will be dated as of the Closing Date and will mature on March 31, ~~2010.~~2010, or such later date as provided herein. The Subordinated PIK A Notes will rank senior in right of payment to the Subordinated Notes. The Subordinated Notes shall bear interest on the unpaid balance thereof from the date thereof until the Interest Conversion Date at the rate of fifteen percent (15%) per annum and the Subordinated PIK A Notes shall bear interest on the unpaid balance thereof from the date thereof until the Interest Conversion Date at the rate of twenty percent (20%) per annum, plus two (2) additional basis points paid in cash on the Closing Date. The Company shall also pay to the holders of Subordinated PIK A Notes an expense reimbursement fee not to exceed $50,000 for reasonable and actual expenses incurred in connection with this Agreement on the Closing Date. Interest on the Notes shall be payable only in kind until the Discharge of Senior Obligations (as defined in the Subordination Agreement), and thereafter, interest on the Notes shall continue to be payable in kind until the first interest payment date following the adoption by the Board of Directors of the Company (the "**Board**") of a resolution authorizing the payment of cash interest on the Notes (the date of such resolution, the "**Interest Conversion Date**"). Notwithstanding the foregoing, however, all unpaid principal and interest due on any Note will be paid in cash upon the maturity of such Note. From and after the Interest Conversion Date, the Notes will bear interest on the unpaid balance at the rate of twelve and one-half percent (12.5%) per annum. Interest on the Notes shall be computed on the basis of a three hundred sixty (360)-day year comprised of twelve (12) thirty (30)-day months.

2.2 Maturity of the Subordinated PIK A Notes. The Subordinated PIK A Notes will mature on March 31, 2010 (the "**Initial Maturity Date**"), subject to the conditions set forth herein. On the Initial Maturity Date, the Company will determine its available cash as of such date. If the Company's available cash on the Initial Maturity Date equals or exceeds a sum equal to (i) the aggregate principal amount and unpaid interest due on Subordinated PIK A Notes on such date plus (ii) $7,500,000 (such sum, the "**Minimum Cash Threshold**"), the Company will pay in full the aggregate principal amount and unpaid interest due on the Subordinated PIK A Notes within five (5) days of the Initial Maturity Date. If the Company's available cash on the Initial Maturity Date is less than the Minimum Cash Threshold, the Company will pay a portion of the principal amount of all Subordinated PIK A Notes in amount equal to its available cash less $7,500,000, with such payment made pro rata among the holders on the basis of the principal amount of Subordinated PIK A Notes held by each such holder, within five (5) days of the Initial Maturity Date. The principal amount due on any Subordinated PIK A Note following any payment in part as provided herein shall be the amount recorded in the books and records of the Company, absent manifest error.

2.3 Extension of the Subordinated PIK A Note Maturity Date. In the event that on the Initial Maturity Date the Minimum Cash Threshold is not satisfied, the maturity of the unpaid portion of the principal amount of the Subordinated PIK A Notes will be extended to March 31, 2011 and annually thereafter (each, a "**Subsequent Maturity Date**") until the Minimum Cash Threshold is satisfied on any Subsequent Maturity Date, unless, pursuant to Section 2.4, the Company shall have received a Conversion Notice as described in Section 2.4.1.

2.4 Optional Conversion of Subordinated PIK A Notes. In the event that the Subordinated PIK A Notes are not paid in full on the Initial Maturity Date or any Subsequent

Maturity Date, each holder of a Subordinated PIK A Note shall have the option to cause the Company to convert all, but not less than all, of the unpaid portion of the Subordinated PIK A Note held by it (the "**Converted Amount**") into (i) a Subordinated Note in the principal amount of such holder's Converted Amount and (ii) a number of shares of New Common Stock ("**Conversion Shares**") equal to (A) such holder's Percentage Investment at Conversion multiplied by the product of (x) a fraction, the numerator of which is the Total Initial Shares and the denominator of which is the Total Initial Investment and (y) the Total Investment at Conversion, (B) less the Individual Initial Shares.

2.4.1 Any holder of a Subordinated PIK A Note who wishes to convert the unpaid principal amount of such Note as permitted in Section 2.4 above must deliver written notice (a "**Conversion Notice**") to the Company of its election within twenty (20) days of nonpayment in full of such Note on the Initial Maturity Date or any Subsequent Maturity Date, as applicable. Pursuant to Section 2.4 above, the Company will issue a Subordinated Note and Conversion Shares to each Converting Holder within thirty (30) days of the Company's receipt of all Converting Holders' Conversion Notices timely received by the Company with respect to such maturity date.

2.4.2 To prevent dilution to the Senior Noteholders, in the event that any Conversion Shares are issued by the Company pursuant to Section 2.4 above, (i) additional shares of New Common Stock will be issued pro rata to the Senior Noteholders in an amount sufficient to give such Senior Noteholders aggregate shares of New Common Stock representing ten percent (10%) of the sum of (a) the total New Common Stock issued on the Effective Date, (b) the Conversion Shares, (c) the portion of the Anti-Dilution Shares issued to Senior Noteholders and (d) the portion of the Anti-Dilution Shares added to the Reserved Shares Trust, and (ii) additional shares of New Common Stock will be placed in the Reserved Shares Trust in an amount sufficient such that the aggregate Reserved Shares will represent ten percent (10%) of the sum of (a) the total New Common Stock issued on the Effective Date, (b) the Conversion Shares, (c) the portion of the Anti-Dilution Shares issued to Senior Noteholders and (d) the portion of the Anti-Dilution Shares added to the Reserved Shares Trust.

2.5 ~~2.2~~ Issuance of the Notes. [Subject to the terms and conditions set forth herein and in the Plan, the Company hereby agrees to issue Notes to each ~~New Investor~~Investing Noteholder in the original principal amounts set forth opposite each ~~New Investor~~Investing Noteholder's name on Schedule A attached hereto.] [Subject to the terms and conditions set forth herein and in the Plan, the Company hereby agrees to issue to Bio Dynamics a Subordinated ~~Notes~~Note in the original principal amount of $~~12,000,000.~~15,000,000.

2.6 ~~2.3~~ Security Interest; Subordination. The indebtedness represented by the Notes shall be unsecured and shall be subordinated to claims under the [New Credit Facility] [New First Lien Facilities and Term Loan B] pursuant to the terms of the Subordination Agreement and to all indebtedness of the Company which, by its terms, is designated as senior in right of payment to the indebtedness evidenced by the Notes, whether existing as of the date hereof or incurred subsequent to the date hereof. [The Subordinated Notes will be subordinated in order of payment to claims under the Subordinated PIK A Notes.]

2.7 ~~2.4~~ Exemption from Securities Act Registration.  The Notes will not be registered or qualified under the Securities Act, or under any state securities laws.  As set forth in the Plan, although Section 1145 of the Bankruptcy Code may exempt the offer and sale by the Company of the Notes from the registration requirements of the Securities Act, the Company intends to rely on the exemption from registration provided by Section 4(2) and/or Regulation D promulgated thereunder.  The Notes will only be issued to "accredited investors," as defined in Rule 501(a) of Regulation D.

2.8 ~~2.5~~ Replacement Notes.  If any mutilated Note is surrendered to the Company, or the Company receives evidence to its satisfaction of the destruction, loss or theft of any Note, the Company shall issue a replacement Note.  If required by the Company, an indemnity bond must be supplied by the holder of the applicable Note that is sufficient in the judgment of the Company to protect the Company and any authenticating agent from any loss that any of them may suffer if a Note is replaced.  The Company may charge for its expenses in replacing a Note.  Every replacement Note is an additional obligation of the Company and shall be entitled to all of the benefits set forth herein equally and proportionately with all other Notes duly issued hereunder.

2.9 ~~2.6~~ Closings; Delivery.  The issuance of the Notes will take place at the offices of Squire, Sanders & Dempsey L.L.P. in Phoenix, Arizona, on _____ ____, 2009 (herein called the "**Closing**" or the "**Closing Date**").   The Company shall deliver [to each ~~New Investor~~Investing Noteholder such New Investor's Notes against payment of such ~~New Investor~~Investing Noteholders's portion of the ~~New Money~~Investing Noteholders Investment]~~[ and~~ to Bio Dynamics its Subordinated Note against payment of ~~the Bio Dynamics Purchase Price]~~its portion of the New Money Investment by certified or cashiers check or by wire transfer of immediately available funds to a bank account of the Company specified in writing by the Company.

2.10 ~~2.7~~ ~~Subsidiary~~Affiliate Guaranty.  The payment by the Company of all amounts due with respect to the Notes and the performance by the Company of its obligations under this Agreement will be absolutely and unconditionally guaranteed by the ~~Subsidiary~~Affiliate Guarantors pursuant to a ~~Subsidiary~~Affiliate Guaranty Agreement dated as of even date herewith, which shall be substantially in the form of Exhibit C attached hereto (the "~~Subsidiary~~**Affiliate Guaranty**") and which shall be subject to the terms of the Subordination Agreement.

**ARTICLE III**

**REDEMPTION**

3.1 Optional Redemption.

3.1.1 At any time after the Interest Conversion Date, the Company may, at its option, at any time and from time to time, redeem for cash all or any portion of the outstanding Notes upon not less than thirty (30) nor more than ninety (90) days' notice, for an amount equal to the principal amount of such Notes plus accrued and unpaid interest, if any, to, but not including, the redemption date.

9

3.1.2   The Company will send a written notice of redemption to each holder of Notes not less than thirty (30) days or more than ninety (90) days prior to the date fixed for such redemption.  Such notice shall specify (i) the date fixed for such redemption, (ii) the redemption price, (iii) if less than all of the Notes are being redeemed, the principal amount of Notes being redeemed, and (iv) that, unless the Company defaults in making such redemption payment, interest on the Notes called for redemption shall cease to accrue as of the date fixed for such redemption.

3.1.3   On and after a redemption date, unless the Company defaults in the payment of the applicable redemption price, interest will cease to accrue on Notes called for redemption and all rights of holders of such Notes will terminate (with respect to such Notes), except for the right to receive the redemption price.

3.1.4   All partial optional redemptions of Notes pursuant to this Section 3.1 shall be made pro rata among the holders on the basis of the principal amount of Notes held by each such holder.

3.1.5   Notwithstanding anything to the contrary herein, redemption of the Notes is subject to contractual and other restrictions with respect thereto and to the legal availability of funds therefore and the Notes shall not be redeemed pursuant to this Section 3.1 at any time that such redemption is expressly prohibited by the [New Credit Facility] [New First Lien Facilities and Term Loan B] or the Subordination Agreement.

3.2     Redemption Upon Change of Control.

3.2.1   In the event of any Change of Control, subject to Section 3.2.6 below, each holder of a Note or Notes shall have the right, at such holder's election as set forth below, to cause the Company to redeem for cash on the date such Change of Control occurs (the "**Change of Control Date**") all or any portion of such holder's Notes for a redemption price equal to the then outstanding principal amount of such Notes plus accrued and unpaid interest, if any, to, but not including, the redemption date.

3.2.2   The Company shall send to each holder a written notice at least fifteen (15) Business Days prior to any Change of Control, to the extent the circumstances of the Change of Control permit the Company to give advance notice, and if advance notice is not possible under the circumstances, as promptly as possible following such Change of Control (the "**Change of Control Notice**").  The Change of Control Notice shall set forth (a) a description of the nature of the Change of Control, (b) the circumstances and relevant facts and financial information regarding such Change of Control, (c) the date at which such Change of Control is anticipated to take place or did take place, as applicable, (d) a statement that each holder may elect to have any or all of its Notes redeemed as set forth below and subject to Section 3.2.6 below, (e) the place or places where such Notes are to be surrendered in the event redemption is elected; and (f) any other instructions consistent with this Section, that a holder must follow in order to have its Notes redeemed.

3.2.3   In the event that the Change of Control Notice is delivered prior to a Change of Control, the Company will, on or before the Change of Control Date, to the extent lawful, accept

for payment all Notes properly tendered and not withdrawn pursuant to the Change of Control Notice.

3.2.4     Within fifteen (15) Business Days following the Change of Control Date, or on the Change of Control Date if the Company has delivered the Change of Control Notice prior to such Change of Control, the Company shall pay to each holder of Notes properly tendered and not withdrawn the principal amount of such Notes plus accrued and unpaid interest, if any, to, but not including, the redemption date, and, if necessary, the Company will send to each holder a new Note equal to the unpurchased principal portion of the Notes surrendered, if any.  If the Company is in compliance with its obligations under this Section 3.2, interest will cease to accrue on Notes tendered for redemption and all rights of the holder of such Notes will terminate (with respect to such Notes), except for the right to receive the redemption price set forth in Section 3.2.1.

3.2.5     The Company shall neither consummate a Change of Control nor permit the consummation of a Change of Control until all of the requirements of this Section 3.2 have been satisfied.

3.2.6     If the terms of the [New Credit Facility] [New First Lien Facilities or Term Loan B] or the Subordination Agreement would prohibit the Company from honoring its obligations under this Agreement upon a Change of Control, then, prior to the performance of such obligations, the Company shall use its reasonable best efforts to obtain the necessary consents or waivers under the [New Credit Facility] [New First Lien Facilities and Term Loan B] to permit the Company to perform such obligations without breaching the terms of the [New Credit Facility] [New First Lien Facilities and Term Loan B]; provided, however, that if the Company is unable to obtain all necessary consents the Company shall have no obligation to redeem the Notes pursuant to this Section 3.2.

3.2.7     To the extent that the Company does not have sufficient funds to pay each holder of Notes the principal amount of its properly tendered Notes, plus accrued and unpaid interest, if any, the payment by the Company shall be made pro rata among the holders that properly tendered their Notes on the basis of the principal amount of Notes held by such holders. Thereafter, the Company will send to each such holder a new Note equal to the unpurchased principal portion of the Notes surrendered.

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

The Company hereby represents and warrants to the [New Investors] [Bio Dynamics] that:

4.1     Organization and Validity.

4.1.1     The Company is duly formed as a corporation and validly existing under the laws of its state of incorporation, is duly qualified, is validly existing and in good standing and, subject to the Bankruptcy Court's approval of the Plan, has lawful power and authority to engage in the business it conducts in each state and other jurisdiction where the nature and extent of its business requires qualification, except where the failure to so qualify would not reasonably be expected to have a Material Adverse Effect.

11

4.1.2 The making and performance of this Agreement and related agreements, and each document required by any Section hereof, will not violate or result in the default of (a) any law, government rule or regulation, (b) the charter, minutes, partnership agreement, operating agreement or bylaw provisions of the Company, or (c) (immediately or with the passage of time) under any contract, agreement or instrument to which the Company is a party, or by which the Company is bound, except, in the case of (a) and (c) above, for any such violations which would not reasonably be expected to have a Material Adverse Effect. The Company is not in violation of nor has knowingly caused any Person to violate any term of any agreement or instrument to which it or such Person is a party or by which it may be bound which violation could reasonably be expected to have a Material Adverse Effect, or of its or such Person's charter, articles of incorporation, minutes or bylaws.

4.1.3 Subject to the Bankruptcy Court's approval of the Plan, the Company has all requisite power and authority to enter into and perform this Agreement and to incur the obligations herein provided for, and has taken all proper and necessary corporate action to authorize the execution, delivery and performance of this Agreement.

4.1.4 This Agreement, the Notes and the Subordination Agreement, when delivered, will be valid and binding upon the Company as a party thereto and enforceable in accordance with their respective terms.

4.2 <u>Places of Business</u>. The Company's chief executive office and the only other places of business of the Company are located at the corresponding addresses set forth on Schedule 1. Except as disclosed on Schedule 1: (a) the Company has not changed any such location in the last five (5) years, (b) the Company has not changed its name in the last five years, and (c) during such period the Company has not used, nor does the Company now use, any fictitious or trade name.

4.3 <u>Operation of Facilities</u>. The Company has obtained all material licenses, accreditations and approvals of Governmental Authorities and all other Persons and certificates of need necessary for the Company to own its assets, to carry on its business and to execute, deliver and perform this Agreement, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. The Company has not been notified by such Governmental Authority or other person during the twenty-four (24)-month period immediately preceding the date of this Agreement that such party has rescinded or not renewed, or intends to rescind or not renew, any such license or approval, except for any rescission or non-renewal that would not be likely to have a Material Adverse Effect.

4.4 <u>Pending Litigation</u>. As of the date of this Agreement, there are no judgments or judicial or administrative orders, proceedings or investigations (civil or criminal) (collectively, "**Pending Claims**") pending, or to the knowledge of the Company, threatened, against the Company in any court or before any Governmental Authority or arbitration board or tribunal which, if adversely determined, would have a Material Adverse Effect, other than as set forth on Schedule 1 hereto. To the Company's knowledge, the Company is not in default with respect to any order of any court, Governmental Authority, regulatory agency or arbitration board or tribunal, except where any such default would not be likely to have a Material Adverse Effect. To the Company's knowledge, no stockholder or executive officer of the Company has been indicted or

convicted in connection with, or is currently subject to any lawsuit or proceeding in connection with, any anti-racketeering or other criminal conduct or activity.

4.5     Governmental Consent.  Neither the nature of the Company nor of the Company's business, nor any relationship between the Company and any other Person, nor any circumstance affecting the Company in connection with the issuance or delivery of the Notes, is such as to require a consent, approval or authorization of, or filing, registration or qualification with, any Governmental Authority on the part of the Company in connection with the execution and delivery of this Agreement or the issuance or delivery of the Notes.

4.6     Taxes.  All tax returns required to be filed by the Company in any jurisdiction have in fact been filed, and all taxes, assessments, fees and other governmental charges upon the Company or upon any of its Property, income or franchises, which are shown to be due and payable on such returns have been paid, except for those taxes being contested in good faith with due diligence by appropriate proceedings.  The Company is not aware of any proposed additional tax assessment or tax to be assessed against or applicable to the Company that might have a Material Adverse Effect.

4.7     Financial Statements.  The financial statements of the Company as of and for the fiscal year of the Company ending December 31, 2007 have been prepared by the Company.  To the Company's knowledge, such financial statements have been prepared in accordance with GAAP and fairly present in all material respects the financial condition of the Company and the results of operations and changes in financial condition of the business, as of the dates and for the periods referred to, and there are no material unrealized or anticipated liabilities, direct or indirect, fixed or contingent, of the Company as of the dates of such financial statements which are not reflected in such financial statements or in the notes to such financial statements.

4.8     Compliance with Laws.  The Company is not in violation of, has not received written notice that it is in violation of, and has not knowingly caused any Person to violate, any applicable statute, regulation or ordinance of the United States of America, or of any state, city, town, municipality, county or of any other jurisdiction, or of any agency, or department thereof (including environmental laws and regulations), except where any such violation would not reasonably be expected to result in a Material Adverse Effect, other than as set forth on Schedule 1 hereto.

# ARTICLE V

# COVENANTS

The Company covenants and agrees that so long as any of the Notes are outstanding:

5.1     Payment of Notes.  Subject to the terms of the Subordination Agreement, the Company shall pay or cause to be paid the principal of, premium, if any, and interest on the Notes on the dates and in the manner provided in the Notes.  The Company shall pay interest (including post-petition interest in any proceeding under the Bankruptcy Code) on overdue principal at the rate equal to [one percent (1%)] per annum in excess of the then applicable interest rate on the Notes to the extent lawful; it shall pay interest (including post-petition interest in any proceeding under the Bankruptcy Code on overdue installments of interest (without regard to any applicable grace period) at the same rate to the extent lawful.

5.2     Tax, Insurance.

5.2.1   The Company shall pay, and shall cause each of its Subsidiaries to pay, prior to delinquency all material taxes, assessments and governmental levies, except such as are contested in good faith and by appropriate proceedings and with respect to which appropriate reserves have been taken in accordance with GAAP or where the failure to effect such payment would not reasonably be expected to have a Material Adverse Effect.

5.2.2   The Company will maintain, and will cause each of its Subsidiaries to maintain, with financially sound and reputable insurance companies, or, in the case of flood insurance, the Federal Emergency Management Agency, insurance in such amounts and against such risks (including fire, business interruption, flood and other risks insured by extended coverage) as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations (as determined by the Board of Directors), including public liability insurance against claims for personal injury, death or property damage occurring upon, about or in connection with the use of any properties owned, occupied or controlled by it as well as such other insurance as may be required by law; provided that the Company may self-insure any risk for which insurance is required hereunder in an amount not to exceed $1,000,000 per occurrence and not more than $2,000,000 in the aggregate during any policy year.

5.3     Stay, Extension and Usury Laws.  The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Agreement or the Notes; and the Company and each of the Subsidiary Affiliate Guarantors (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to holders of the Notes.

5.4     [Limitation on Dividends and Distributions.  Until the Interest Conversion Date, the Company will not, and will not permit any of its Subsidiaries to, directly or indirectly declare, make or incur any liability to make any dividends or distributions to the holders of shares of the Company's Common Stock or Preferred Stock, other than Qualified Payments [to be defined].] [to be discussed; this should not be tighter than restricted payments covenant in the Credit Agreement.]set apart, any sum for any Restricted Junior Payment (as defined in the New Credit Facility), except (a) dividends and distributions by Subsidiaries of Company to Company or a Subsidiary of Company, (b) grants of options to purchase common stock of the Company, and the exercise of such options, pursuant to the Company's management incentive plan, to and by

14

directors, officers and executives of the Company or an employer with which the Company would be considered a single employer under Sections 414(b) and (c) of the Code, (c) scheduled interest payments payable in kind with respect to other Subordinated Indebtedness (as defined in the New Credit Facility) and (d) payments of dividends payable in kind with respect to the PIK Preferred Stock (as defined in the New Credit Facility). Notwithstanding anything to the contrary contained herein, the Board may issue additional Notes from time to time, whether as interest pursuant to the terms of this Agreement, or otherwise, and no vote of the holders of the Notes shall be required in connection therewith.

5.5    Corporate Existence.    The Company shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and the corporate, partnership, limited liability company or other existence of each of its Subsidiaries in accordance with the respective organizational documents (as the same may be amended from time to time) of the Company or any such Subsidiary and the rights (charter and statutory), licenses and franchises of the Company and its Subsidiaries; provided that the Company shall not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Subsidiaries, if the Board of Directors of the Company shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Subsidiaries, taken as a whole.

5.6    Additional SubsidiaryAffiliate Guarantors.    The Company will cause any Subsidiary which is required by the terms of the [New Credit Facility] [New First Lien Facilities and Term Loan B] to become a party to, or otherwise guarantee, indebtedness in respect of the [New Credit Facility] [New First Lien Facilities and Term Loan B] to enter into the SubsidiaryAffiliate Guaranty and the Subordination Agreement and to deliver to each of the holders of the Notes (concurrently with the incurrence of any such obligation pursuant to the [New Credit Facility] [New First Lien Facilities and Term Loan B] ) a joinder or supplemental agreement in respect of the SubsidiaryAffiliate Guaranty and the Subordination Agreement.

5.7    Compliance with Laws and Regulations.    Without limiting Article IV, the Company will, and will cause each of its Subsidiaries to, comply with all laws, ordinances or governmental rules or regulations to which each of them is subject, and will obtain and maintain in effect all licenses, certificates, permits, franchises and other governmental authorizations necessary to the ownership of their respective properties or to the conduct of their respective businesses, in each case to the extent necessary to ensure that non-compliance with such laws, ordinances or governmental rules or regulations or failures to obtain or maintain in effect such licenses, certificates, permits, franchises and other governmental authorizations would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.8    Books and Records.    The Company will, and will cause each of its Subsidiaries to, maintain proper books of record and account in conformity with GAAP and all applicable requirements of any governmental authority having legal or regulatory jurisdiction over the Company or such Subsidiary, as the case may be.

5.9    Terrorism Sanction Regulations.    The Company will not and will not permit any Subsidiary to (a) become a Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of Executive

15

Order No. 13,224 of October 24, 2001, Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism, 66 U.S. Fed. Reg. 49, 079 (2001), as amended, or (b) to the knowledge of the Company, engage in any dealings or transactions with any such Person.   The Company will, and will cause each Subsidiary to, comply with all respects with United States Public Law 107-56, Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF THE NEW INVESTORS ~~[BIO DYNAMICS]~~

Each New Investor, severally and not jointly, ~~[Bio Dynamics]~~ hereby represents and warrants to the Company that:

6.1    <u>Purchase Entirely for Own Account</u>.   The Notes to be acquired by such New Investor ~~[it]~~ will be acquired for investment for such New Investor's ~~[its]~~ own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and New Investor has no present intention of selling, granting any participation in, or otherwise distributing the same.   Such New Investor ~~[It]~~ has not been formed for the specific purpose of acquiring any of the Subordinated Notes.

6.2    <u>Knowledge</u>.   Such New Investor ~~[It]~~ is aware of the Debtors' business affairs and financial condition, has reviewed the First Amended Disclosure Statement in Support of Debtors' First Amended Joint Plan of Reorganization (the "**Disclosure Statement**"), and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Notes.

6.3    <u>Restricted Securities</u>.   Such New Investor ~~[It]~~ understands that the Notes have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of such New Investor's ~~[its]~~ representations as expressed herein.   Such New Investor ~~[It]~~ understands that the Notes are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, such New Investor ~~[It]~~ must hold the Notes indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available.   Such New Investor ~~[It]~~ acknowledges that the Company has no obligation, and does not intend, to register or qualify the Notes for resale.   Such New Investor ~~[It]~~ further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Notes, and on requirements relating to the Company which are outside of such New Investor ~~[its]~~ control, and which the Company is under no obligation and may not be able to satisfy.

16

6.4     No Public Market.  The Notes will not be listed on a national exchange and will not be registered under the Securities Act, by reason of certain exemptions from the registration provisions of the Securities Act.

6.5     Legends.  [Such New Investor] [It] understands that the Notes may bear one or all of the following legends:

6.5.1    "THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD OR TRANSFERRED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES OR THE SECURITIES ARE SOLD AND TRANSFERRED IN A TRANSACTION THAT IS EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT."

6.5.2    Any legend required by the Blue Sky laws of any state to the extent such laws are applicable to the Notes.

6.6     Accredited Investor.  [Such New Investor] [It] is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act acting for its own account (and not for the account of others) or as a fiduciary or agent for others (which others also are "accredited investors").

## ARTICLE VII

## DEFAULTS AND REMEDIES

7.1     Events of Default.  Each of the following constitutes an "**Event of Default**":

7.1.1    default in the payment in respect of the principal of (or premium, if any, on) any Note at its maturity (whether at its stated maturity or upon acceleration, optional redemption or otherwise); provided that in no event shall the nonpayment in full of any Subordinated PIK A Note on its maturity and the subsequent extension of such maturity or conversion of the unpaid amount of such Subordinated PIK A Note constitute an Event of Default hereunder;

7.1.2    default in the payment of any interest upon any Note when it becomes due and payable, and continuance of such default for a period of thirty (30) days;

7.1.3    default in the performance, or breach, of any covenant or agreement of the Company in this Agreement (other than a covenant or agreement a default in whose performance or whose breach is specifically dealt with in Section 7.1.1 or 7.1.2 above), and continuance of such default or breach for a period of sixty (60) days after written notice thereof has been given to the Company by the holders of at least twenty-five percent (25%) in aggregate principal amount of the outstanding Notes;

7.1.4    [Intentionally omitted];

17

7.1.5    the entry against the Company of a final judgment or final judgments for the payment of money (except to the extent such judgment is covered by insurance and the Company's insurer has not denied coverage) in an aggregate amount in excess of $10.0 million, by a court or courts of competent jurisdiction, which judgments remain undischarged, unwaived, unstayed, unbonded or unsatisfied for a period of sixty (60) consecutive days;

7.1.6    the Company, pursuant to or within the meaning of the Bankruptcy Code:

(a)    commences a voluntary case;

(b)    consents to the entry of an order for relief against it in an involuntary case;

(c)    consents to the appointment of a custodian of it or for all or substantially all of its property;

(d)    makes a general assignment for the benefit of its creditors, or

(e)    generally is not paying its debts as they become due; or

7.1.7    a court of competent jurisdiction enters an order or decree under the Bankruptcy Code that:

(a)    is for relief against the Company in an involuntary case;

(b)    appoints a custodian of the Company or for all or substantially all of the property of the Company; or

(c)    orders the liquidation of the Company and the order or decree remains unstayed and in effect for sixty (60) consecutive days.

7.2    Acceleration.  Subject to the terms of the Subordination Agreement:

7.2.1    If an Event of Default specified in Section 7.1.6 or 7.1.7 above occurs with respect to the Company, the principal of and any accrued interest on the Notes then outstanding shall automatically become immediately due and payable without any declaration or other act on the part of any holder.

7.2.2    If any other Event of Default has occurred and is continuing, any holder or holders of more than fifty percent (50%) in aggregate principal amount of the Notes at the time outstanding may at any time at its or their option, by notice or notices to the Company, declare all the Notes then outstanding to be immediately due and payable.

7.2.3    If an Event of Default specified in Section 7.1.1 or 7.1.2 above has occurred and is continuing with respect to any Notes, any holder or holders of Notes at the time outstanding affected by such Event of Default may at any time, at its or their option, by notice or notices to the Company, declare all the Notes held by such holder or holders to be immediately due and payable.

18

7.2.4    Upon any Note's becoming due and payable under this <u>Section 7.2</u>, whether automatically or by declaration, such Note will forthwith mature and the entire unpaid principal amount of such Note, plus all accrued and unpaid interest thereon, shall be immediately due and payable, in each and every case without presentment, demand, protest or further notice, all of which are hereby waived.  To the extent that the Company does not have sufficient funds to pay the unpaid principal amount of the Notes, plus all accrued and unpaid interest thereon, in full, any payment by the Company shall be made pro rata among the holders on the basis of the principal amount of Notes held by each holder (with the outstanding balance remaining due and payable).

7.3    <u>Other Remedies</u>.  If any Event of Default has occurred and is continuing, and irrespective of whether any Notes have become or have been declared immediately due and payable under <u>Section 7.2.1</u>, subject to the terms of the Subordination Agreement, the holder of any Note at the time outstanding may proceed to protect and enforce the rights of such holder by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement contained herein or in any Note, or for an injunction against a violation of any of the terms hereof or thereof, or in aid of the exercise of any power granted hereby or thereby or by law or otherwise.

7.4    <u>Rescission</u>.  At any time after any Notes have been declared due and payable pursuant to <u>Section 7.2.2</u> or <u>7.2.3</u>, the holders of more than fifty percent (50%) in aggregate principal amount of the Notes then outstanding, by written notice to the Company, may rescind and annul any such declaration and its consequences with respect to the Notes if (a) the Company has paid all overdue interest on the Notes, all principal, if any, on any Notes that are due and payable and are unpaid other than by reason of such declaration, and all interest on such overdue principal, if any, and (to the extent permitted by applicable law) any overdue interest in respect of the Notes, (b) neither the Company nor any other Person shall have paid any amounts which have become due solely by reason of such declaration, (c) all Events of Default, other than non-payment of amounts that have become due solely by reason of such declaration, have been cured or have been waived pursuant to this Agreement, and (d) no judgment or decree has been entered for the payment of any monies due pursuant hereto or to any Notes.  No rescission and annulment under this <u>Section 7.4</u> will extend to or affect any subsequent Event of Default or impair any right consequent thereon.

7.5    <u>No Waivers or Election of Remedies, Expenses, Etc.</u>  No course of dealing and no delay on the part of any holder of any Note in exercising any right, power or remedy shall operate as a waiver thereof or otherwise prejudice such holder's rights, powers or remedies.  No right, power or remedy conferred by this Agreement or by any Note upon any holder thereof shall be exclusive of any other right, power or remedy referred to herein or therein or now or hereafter available at law, in equity, by statute or otherwise.  Without limiting the obligations of the Company under this Agreement, the Company will pay to the holder of each Note on demand such further amount as shall be sufficient to cover all costs and expenses of such holder incurred in any enforcement or collection under this <u>Article VII</u>, including, without limitation, reasonable attorneys' fees, expenses and disbursements.

**ARTICLE VIII**

**MISCELLANEOUS**.

8.1     Notices.  All written communications provided for hereunder shall be sent by first class mail or nationwide overnight delivery service (with charges prepaid) (i) if to [any New Investor] [Bio Dynamics], addressed to [such New Investor] [it] at the address specified for such communications in the Schedule A attached hereto, or at such other address as [such New Investor] [it] shall have specified to the Company in writing, and (ii) if to the Company, addressed to it at:

If to the Company:

> Eurofresh, Inc.
> 26050 South Eurofresh Avenue
> Willcox, Arizona  85643
> Facsimile:  520-384-1771
> Attention:  Chief Executive Officer

With a copy to:

> Squire, Sanders & Dempsey L.L.P.
> 40 North Central Avenue
> Suite 2700
> Phoenix, Arizona 85004
> Facsimile:  602-253-8129
> Attention:  Christopher D. Johnson, Esq.

The Company, by notice to the other, may designate additional or different addresses for subsequent notices or communications.

All notices and communications delivered hereunder shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; five (5) Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if telecopied; and the next Business Day after timely delivery to the courier, if sent by overnight air courier promising next Business Day delivery.

8.2     Amendment, Supplement and Waiver.  Subject to the following paragraphs and subject to the Subordination Agreement, the Agreement and the Notes may be amended or supplemented only with the consent of the holders of at least a majority in aggregate principal amount of the then outstanding Notes.

8.2.1     Notwithstanding Section 8.2 above, and subject to the Subordination Agreement, without the consent of any holders of Notes, the Company, at any time and from time to time, may enter into one or more amendments supplemental to this Agreement or the Notes for any of the following purposes:

(a)     to evidence the succession of another Person to the Company and the assumption by any such successor of the covenants of the Company in the Agreement and in the Notes;

20

(b)　　to add to the covenants of the Company for the benefit of the holders, or to surrender any right or power herein conferred upon the Company;

(c)　　to add additional Events of Default;

(d)　　to provide for uncertificated Notes in addition to or in place of the certificated Notes; or

(e)　　to cure any ambiguity, to correct or supplement any provision in this Agreement which may be defective or inconsistent with any other provision in the Agreement, or to make any other provisions with respect to matters or questions arising under this Agreement, *provided* that such actions pursuant to this clause shall not adversely affect the interests of the holders in any material respect, as determined in good faith by the Board.

8.2.2　　With the consent of the holders of not less than a majority in aggregate principal amount of the outstanding Notes, and subject to the Subordination Agreement, the Company may enter into an amendment or amendments supplemental to this Agreement for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or of modifying in any manner the rights of the holders under the Agreement, including the definitions therein; *provided, however,* that no such supplemental amendments shall, without the consent of the holder of each outstanding Note affected thereby:

(a)　　change the stated maturity of any Note or of any installment of interest on any Note, or reduce the amount payable in respect of the principal thereof or the rate of interest thereon or any premium payable thereon, or reduce the amount that would be due and payable on acceleration of the maturity thereof, or change the place of payment where, or the coin or currency in which, any Note or any premium or interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the stated maturity thereof, or change the date on which any Notes may be subject to redemption or reduce the redemption price therefore,

(b)　　reduce the percentage in aggregate principal amount of the outstanding Notes, the consent of whose holders is required for any such supplemental amendment, or the consent of whose holders is required for any waiver (of compliance with certain provisions of this Agreement or certain defaults thereunder and their consequences) provided for in this Agreement,

(c)　　modify the obligations of the Company to redeem Notes upon a Change of Control, or

(d)　　modify any of the provisions of this Section or provisions relating to waiver of defaults or certain covenants, except to increase any such percentage required for such actions or to provide that certain other provisions of this Agreement cannot be modified or waived without the consent of the holder of each outstanding Note affected thereby.

8.3     Registration and Transfer of Notes.

8.3.1     The Company shall keep at its principal executive office a register for the registration and registration of transfers of Notes.  The name and address of each holder of one or more Notes, each transfer thereof and the name and address of each transferee of one or more Notes shall be registered in such register.  Prior to due presentment for registration of transfer, the Person in whose name any Note shall be registered shall be deemed and treated as the owner and holder thereof for all purposes hereof, and the Company shall not be affected by any notice or knowledge to the contrary.

8.3.2     Upon surrender of any Note to the Company at its principal executive office for registration of transfer or exchange (and in the case of a surrender for registration of transfer accompanied by a written instrument of transfer duly executed by the registered holder of such Note or such holder's attorney duly authorized in writing and accompanied by the relevant name, address and other information for notices of each transferee of such Note or part thereof), within fifteen (15) Business Days thereafter, the Company shall execute and deliver, at the Company's expense (except as provided below), one or more new Notes (as requested by the holder thereof) in exchange therefor, in an aggregate principal amount equal to the unpaid principal amount of the surrendered Note.  Each such new Note shall be payable to such Person as such holder may request and shall be substantially in the form of the Note originally issued hereunder or pursuant to any amendment or supplement hereto.  Each such new Note shall be dated and bear interest from the date to which interest shall have been paid on the surrendered Note or dated the date of the surrendered Note if no interest shall have been paid thereon.  The Company may require payment of a sum sufficient to cover any stamp tax or governmental charge imposed in respect of any such transfer of Notes.  Notes shall not be transferred in denominations of less than $100,000, *provided* that if necessary to enable the registration of transfer by a holder of its entire holding of Notes, one Note of such Series and tranche, if applicable, may be in a denomination of less than $100,000.  Notwithstanding the foregoing, the Notes have not been registered under the Securities Act or under the securities laws of any state and may not be transferred or resold unless registered under the Securities Act and all applicable state securities laws or unless an exemption from the requirement for such registration is available.

8.3.3     Upon receipt by the Company at its principal executive office of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note, and

(a)     in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it, or

(b)     in the case of mutilation, upon surrender and cancellation thereof,

the Company shall execute and deliver not more than fifteen (15) Business Days following satisfaction of such conditions, in lieu thereof, a new Note, dated and bearing interest from the date to which interest shall have been paid on such lost, stolen, destroyed or mutilated Note or dated the date of such lost, stolen, destroyed or mutilated Note if no interest shall have been paid thereon.

8.4    No Personal Liability of Directors, Officers, Employees and Stockholders.  No director, officer, employee, stockholder, general or limited partner or incorporator, past, present or future, of the Company or any of its Subsidiaries, as such or in such capacity, shall have any personal liability for any obligations of the Company under the Notes by reason of his, her or its status as such director, officer, employee, stockholder, general or limited partner or incorporator.

8.5    Governing Law.  **THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

8.6    Forum Selection and Consent to Jurisdiction.

8.6.1    The Company hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, the Notes, the ~~Subsidiary~~Affiliate Guaranty or the Subordination Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any New Investor may otherwise have to bring any action or proceeding relating to this Agreement, the Notes, the ~~Subsidiary~~Affiliate Guaranty or the Subordination Agreement against the Company or their properties in the courts of any jurisdiction.

8.6.2    The Company hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement, the Notes, the ~~Subsidiary~~Affiliate Guaranty or the Subordination Agreement in any court referred to in Section 8.6.2 above.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

8.6.3    The Company irrevocably consents to service of process in any action or proceeding arising out of or relating to this Agreement, the Notes, the ~~Subsidiary~~Affiliate Guaranty or the Subordination Agreement in the manner provided for notices in Section 8.1 hereof.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

8.7    Waiver of Jury Trial.  TO THE FULLEST EXTENT PERMITTED BY LAW THE PARTIES HERETO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION BROUGHT ON

23

OR WITH RESPECT TO THIS AGREEMENT, THE NOTES OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THEREWITH.

8.8     Successors.  All agreements of the Company in this Agreement and the Notes shall bind their respective successors and assigns.

8.9     Severability.  In case any provision in this Agreement or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

8.10     Counterpart Originals.  The parties may sign any number of copies of this Agreement.  Each signed copy shall be an original, but all of them together represent the same agreement.

8.11     Headings.  The headings of the Articles and Sections of this Agreement have been inserted for convenience of reference only, are not to be considered a part of this Agreement and shall in no way modify or restrict any of the terms or provisions hereof.

8.12     Subordination Agreement.  The obligations in respect of the Notes shall be subordinate and junior in right of payment to the prior payment in full of all Senior Obligations (as defined in the Subordination Agreement) and the rights and remedies available to the holders of the Notes are subject to the terms of the Subordination Agreement.  The provisions of this Agreement, the Notes and the ~~Subsidiary~~Affiliate Guaranty and the rights of the holders of the Notes hereunder and thereunder shall be subject to the provisions of the Subordination Agreement.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.
SIGNATURES ON THE FOLLOWING PAGE.]

PHOENIX/~~495776.5~~505708.4

IN WITNESS WHEREOF, this Agreement is executed as of the date first written above.

EUROFRESH, INC.

By:_____
Title:

[New investors' signatures]

SCHEDULE A

| Investor name and address | Subordinated Note Principal Amount | Subordinated PIK A Note Principal Amount | Proportion of New Money Investment Invested |
| --- | --- | --- | --- |

## [FORM OF SUBORDINATED NOTE]

THE INDEBTEDNESS EVIDENCED BY THIS INSTRUMENT IS SUBORDINATED TO THE PRIOR PAYMENT IN FULL OF THE SENIOR OBLIGATIONS (AS DEFINED IN THE SUBORDINATION AGREEMENT, DATED AS OF [_____], 2009) PURSUANT TO, AND TO THE EXTENT PROVIDED IN, SUCH SUBORDINATION AGREEMENT BY THE MAKER HEREOF AND PAYEE NAMED HEREIN IN FAVOR OF THE SENIOR CREDITORS AND ANY PERSON NOW OR HEREAFTER DESIGNATED AS THEIR REPRESENTATIVE.

EUROFRESH, INC.

15.00% SUBORDINATED UNSECURED NOTE DUE _____ ___, 2016

No. _____          [DATE]

$_____

FOR VALUE RECEIVED, the undersigned, EUROFRESH, INC., a corporation organized and existing under the laws of the State of Delaware (herein called the "Company"), hereby promises to pay to _____ _____, or registered assigns, on _____ __, 2016, the principal sum of _____ DOLLARS, with interest (computed on the basis of a 360-day year--30-day month) on the unpaid balance thereof at the rate of 15.00% per annum from the date hereof, payable quarterly on the ____ day of _____, _____, _____, and _____ in each year, commencing with the _____, _____, _____, or _____ next succeeding the date hereof, until the principal hereof shall have become due and payable.  Interest on this Subordinated Note shall be payable only in kind until the Discharge of Senior Obligations (as defined in the Subordination Agreement), and thereafter, interest on the Subordinated Notes shall continue to be payable in kind until the first interest payment date following the adoption by the Board of Directors of the Company of a resolution authorizing the payment of cash interest on the Notes, at which point the annual rate of interest going forward shall be reduced to 12.5%.

This Subordinated Note is one of a series of subordinated unsecured promissory notes (herein called the "Subordinated Notes") issued pursuant to a Note Purchase Agreement, dated as of _____ __, 2009 (herein called the "Agreement"), among the Company and the original purchasers of the Subordinated Notes named in Schedule A attached thereto and is entitled to the benefits thereof.  This Subordinated Note is subject to all terms set forth in the Agreement and the Subordination Agreement.

The Company agrees to make required prepayments of principal on the dates and in the amounts specified in the Agreement.  This Subordinated Note is also subject to optional

~~prepayment~~redemption, in whole or from time to time in part, on the terms specified in the Agreement.

In case an Event of Default, as defined in the Agreement, shall occur and be continuing, the principal of this Subordinated Note may be declared or otherwise become due and payable in the manner and with the effect provided in the Agreement.

**THIS SUBORDINATED NOTE IS INTENDED TO BE PERFORMED IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAW OF SUCH STATE (EXCLUDING ANY CONFLICTS OF LAW RULES WHICH WOULD OTHERWISE CAUSE THIS SUBORDINATED NOTE TO BE CONSTRUED OR ENFORCED IN ACCORDANCE WITH THE LAWS OF ANY OTHER JURISDICTION).**

EUROFRESH, INC.

By:_____
Title:

A-2

**[FORM OF SUBORDINATED PIK A NOTE]**

THE INDEBTEDNESS EVIDENCED BY THIS INSTRUMENT IS SUBORDINATED TO THE PRIOR PAYMENT IN FULL OF THE SENIOR OBLIGATIONS (AS DEFINED IN THE SUBORDINATION AGREEMENT, DATED AS OF [_____], 2009) PURSUANT TO, AND TO THE EXTENT PROVIDED IN, SUCH SUBORDINATION AGREEMENT BY THE MAKER HEREOF AND PAYEE NAMED HEREIN IN FAVOR OF THE SENIOR CREDITORS AND ANY PERSON NOW OR HEREAFTER DESIGNATED AS THEIR REPRESENTATIVE.

EUROFRESH, INC.

<s>15.00</s>20.00% SUBORDINATED UNSECURED CLASS A NOTE DUE MARCH 31, 2010

No. _____      [DATE]

$_____

      FOR VALUE RECEIVED, the undersigned, EUROFRESH, INC., a corporation organized and existing under the laws of the State of Delaware (herein called the "Company"), hereby promises to pay to _____, or registered assigns, on March 31, 2010 the principal sum of _____ DOLLARS, <u>or such lesser amount as may be recorded on the books and records of the Company,</u> with interest (computed on the basis of a 360-day year--30-day month) on the unpaid balance thereof at the rate of <s>15.00</s>20.00% per annum from the date hereof, payable quarterly on the ____ day of _____, _____, _____, and _____, until the principal hereof shall have become due and payable.  Interest on this Subordinated PIK A Note shall be payable only in kind until the Discharge of the Senior Obligations (as defined in the Subordination Agreement), and thereafter, interest on the Subordinated PIK A Notes shall continue to be payable in kind until the first interest payment date following the adoption by the Board of Directors of the Company of a resolution authorizing the payment of cash interest on the Notes, at which point the annual rate of interest going forward shall be reduced to 12.5%.

      This Subordinated PIK A Note is one of a series of senior subordinated unsecured promissory class A notes (herein called the "Subordinated PIK A Notes") issued pursuant to a Note Purchase Agreement, dated as of _____ __, 2009 (herein called the "Agreement"), among the Company and the original purchasers of the Subordinated PIK A Notes named in <u>Schedule A</u> attached thereto and is entitled to the benefits thereof.  This Subordinated PIK A Note is subject to all terms set forth in the Agreement and the Subordination Agreement.

      The Company agrees to make required prepayments of principal on the dates and in the amounts specified in the Agreement.  This Subordinated PIK A Note is also subject to optional

B-1

~~prepayment~~redemption, in whole or from time to time in part, on the terms specified in the Agreement.

In case an Event of Default, as defined in the Agreement, shall occur and be continuing, the principal of this Subordinated PIK A Note may be declared or otherwise become due and payable in the manner and with the effect provided in the Agreement.

**THIS SUBORDINATED PIK A NOTE IS INTENDED TO BE PERFORMED IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAW OF SUCH STATE (EXCLUDING ANY CONFLICTS OF LAW RULES WHICH WOULD OTHERWISE CAUSE THIS SUBORDINATED NOTE TO BE CONSTRUED OR ENFORCED IN ACCORDANCE WITH THE LAWS OF ANY OTHER JURISDICTION)**.

EUROFRESH, INC.

By:_____
Title:

PHOENIX/~~495776.5~~505708.4

EXHIBIT C

## FORM OF ~~SUBSIDIARY~~AFFILIATE GUARANTY

The Guarantor listed below (the "*Guarantor*") pursuant to that certain Subordinated PIK Note Purchase Agreement (the "*Agreement*") dated _____, 2009 by and among Eurofresh, Inc., a Delaware corporation (the "*Company*"), Eurofresh Holding Company, Inc., a Delaware corporation, Eurofresh Produce, Ltd., the Investing Noteholders and Bio Dynamics B.V./S.a.r.L., has guaranteed the Notes and the obligations of the Company under the Agreement, as set forth herein.

SECTION 1.1     Guaranty.

(a)     Guarantor hereby fully, unconditionally and irrevocably guarantees the Notes and obligations of the Company hereunder and thereunder, and guarantees to each holder of a Note that: (i) the principal of and interest on the Notes shall be paid in full when due, whether at stated maturity, by acceleration, call for redemption or otherwise (including, without limitation, the amount that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code), together with interest on the overdue principal, if any, and interest on any overdue interest, to the extent lawful, and all other obligations of the Company to the holders hereunder or thereunder shall be paid in full or performed, all in accordance with the terms hereof and thereof; (ii) in case of any extension of time of payment or renewal of any Notes or any such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise, and (iii) the payment of any and all costs and expenses (including reasonable attorneys' fees) incurred by any holder in enforcing any rights under this ~~Subsidiary~~Affiliate Guaranty or the Agreement. This ~~Subsidiary~~Affiliate Guaranty is a guarantee of payment and not of collection.

(b)     Guarantor hereby agrees that its obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes or the Agreement, the absence of any action to enforce the same, any waiver or consent by any holder of a Note with respect to any provisions hereof or thereof, the recovery of any judgment against the Company, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor.

(c)     Guarantor hereby waives the benefits of diligence, presentment, demand for payment, filing of claims with a court in the event of insolvency or bankruptcy of the Company, any right to require a proceeding first against the Company or any other Person, protest, notice and all demands whatsoever and covenants that this ~~Subsidiary~~Affiliate Guaranty shall not be discharged as to any Note except by complete performance of the obligations contained in such Note and this ~~Subsidiary~~Affiliate Guaranty or as provided for in the Agreement. Guarantor hereby agrees that, in the event of a default in payment of principal or interest on such Note, whether at its stated maturity, by acceleration, call for redemption, purchase or otherwise, legal proceedings may be instituted by the holder of such Note, subject to the terms and conditions set forth in the Agreement, directly against the Guarantor to enforce this ~~Subsidiary~~Affiliate Guaranty without first proceeding against the Company or any other ~~Subsidiary~~Affiliate Guarantor. Guarantor

C-1

agrees that if, after the occurrence and during the continuance of an Event of Default, any of the holders is prevented by applicable law from exercising its respective rights to accelerate the maturity of the Notes, to collect interest on the Notes, or to enforce or exercise any other right or remedy with respect to the Notes, Guarantor shall pay to such holders, upon demand therefor, the amount that would otherwise have been due and payable had such rights and remedies been permitted to be exercised by any of the holders of the Notes.

(d)     If any holder of a Note is required by any court or otherwise to return to the Company or the Guarantor, or any custodian, trustee, liquidator or other similar official acting in relation to the Company or the Guarantor, any amount paid by either of them to such holder, this ~~Subsidiary~~Affiliate Guaranty, to the extent theretofore discharged, shall be reinstated in full force and effect.  This paragraph (d) shall remain effective notwithstanding any contrary action which may be taken by any holder in reliance upon such amount required to be returned.  This paragraph (d) shall survive the termination of this ~~Subsidiary~~Affiliate Guaranty.

(e)     Guarantor further agrees that, as between such Guarantor, on the one hand, and the holders of the Notes, on the other hand, (x) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article VII of the Agreement for the purposes of this ~~Subsidiary~~Affiliate Guaranty, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (y) in the event of any acceleration of such obligations as provided in Article VII of the Agreement, such obligations (whether or not due and payable) shall forthwith become due and payable by Guarantor for the purpose of this ~~Subsidiary~~Affiliate Guaranty.

SECTION 1.2     Benefits Acknowledged.

(a)     Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by the Agreement and that its guarantee and waivers pursuant to this ~~Subsidiary~~Affiliate Guaranty are knowingly made in contemplation of such benefits.

(b)     No stockholder, employee, officer, director or incorporator, as such, past, present or future of Guarantor shall have any liability under this ~~Subsidiary~~Affiliate Guaranty by reason of his or its status as such stockholder, employee, officer, director or incorporator.

(c)     This is a continuing ~~Subsidiary~~Affiliate Guaranty and shall remain in full force and effect and shall be binding upon Guarantor and its successors and assigns until full and final payment of all of the Company's obligations under the Notes and the Agreement and shall inure to the benefit of the successors and assigns of the holders of the Notes, and, in the event of any transfer or assignment of rights by any such holder, the rights and privileges herein conferred upon that party shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions hereof.

SECTION 1.3     Limitation of Guarantor's Liability.

Guarantor confirms that it is the intention of Guarantor that this ~~Subsidiary~~Affiliate Guaranty not constitute a fraudulent transfer or conveyance for purposes of the Federal Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act

C-2

or any similar federal or state law or the provisions of its local law relating to fraudulent transfer or conveyance.   To effectuate the foregoing intention, the obligations of Guarantor under this ~~Subsidiary~~Affiliate Guaranty shall be limited to the maximum amount that will not, after giving effect to all other contingent and fixed liabilities of Guarantor and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other ~~Subsidiary~~Affiliate Guarantor in respect of the obligations of such other ~~Subsidiary~~Affiliate Guarantor under its ~~Subsidiary~~Affiliate Guaranty, result in the obligations of Guarantor under this ~~Subsidiary~~Affiliate Guaranty constituting a fraudulent transfer or conveyance.

SECTION 1.4    Severability.

In case any provision of this ~~Subsidiary~~Affiliate Guaranty shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

SECTION 1.5    Governing Law.

THIS ~~SUBSIDIARY~~AFFILIATE GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

SECTION 1.6    Forum Selection and Consent to Jurisdiction.

(a)    Guarantor hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this ~~Subsidiary~~Affiliate Guaranty, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such federal court.   Guarantor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.   Nothing in this ~~Subsidiary~~Affiliate Guaranty shall affect any right that Guarantor may otherwise have to bring any action or proceeding relating to this ~~Subsidiary~~Affiliate Guaranty against the Company or their properties in the courts of any jurisdiction.

(b)    Guarantor hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this ~~Subsidiary~~Affiliate Guaranty in any court referred to in Section 1.6(a) above.   Guarantor irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    Guarantor irrevocably consents to service of process in any action or proceeding arising out of or relating to this ~~Subsidiary~~Affiliate Guaranty.   Nothing in this Agreement will

C-3

affect the right of any party hereto to serve process in any other manner permitted by applicable law.

SECTION 1.7    Waiver of Jury Trial.

TO THE FULLEST EXTENT PERMITTED BY LAW THE GUARANTOR HERETO HEREBY WAIVES TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS ~~SUBSIDIARY~~AFFILIATE GUARANTY.

SECTION 1.8    Subordination Agreement.

The obligations in respect of the Notes and under this ~~Subsidiary~~Affiliate Guaranty shall be subordinate and junior in right of payment to the prior payment in full of all Senior Obligations (as defined in the Subordination Agreement) and the rights and remedies available to the holders of the Notes are subject to the terms of the Subordination Agreement.  The provisions of this ~~Subsidiary~~Affiliate Guaranty shall be subject to the provisions of the Subordination Agreement.

Capitalized terms used herein have the same meanings given in the Agreement unless otherwise indicated.

Dated as of _____

[Guarantor]

By:_____

    Name:
    Title:

STATE OF _____)
                          ): ss.:
COUNTY OF _____)

On the ____ day of _____, 20__, before me personally came _____ to me known, who being by me duly sworn, did depose and say s/he is the _____ of _____., a[n] _____ corporation, the corporation described in and which executed the foregoing instrument; and that s/he signed her/his name thereto by order of the board of directors of said corporation.

_____
Notary Public

C-4

**[FORM OF SUBORDINATION AGREEMENT]**

[Note: In the event of Option B, an agreement having substantially similar terms as that proposed for Option A will be prepared, including provisions addressing the payment priority of the Subordinated PIK A Notes over the Subordinated Notes.]

D-2

## EUROFRESH, INC.

## SUBORDINATION AGREEMENT[+]

THIS SUBORDINATION AGREEMENT (this "**Agreement**") is made as of the __ day of _____, 2009 by and among ~~Barclays Bank PLC, in its capacity as administrative agent under the Working Capital Loan Documents (together with its successors and assigns from time to time in such capacity, the "**Working Capital Administrative Agent**"), Barclays Bank PLC, in its capacity as administrative agent under the Term A Note Documents (together with its successors and assigns from time to time in such capacity, the "**Term A Note Administrative Agent**"), [~~Silver Point Finance, LLC~~, in its capacity as administrative agent, in its capacity as Administrative Agent under the ~~Term Loan B Documents~~Credit and Guaranty Agreement (together with its successors and assigns from time to time in such capacity, the "~~**Term Loan B Administrative** **Agent**~~"), the Investing Noteholders identified on Exhibit A hereto (the "**Investing Noteholders**"), Bio Dynamics B.V./S.à.r.L., a Luxembourg company ("**Bio Dynamics**"), and together with ~~its~~the Investing Noteholders and each of such parties respective successors and assigns from time to time, the "**Initial ~~Purchaser~~Purchasers**"), Eurofresh, Inc., a Delaware corporation (the "**Company**") and the ~~Subsidiary~~Affiliate Guarantors party hereto. Capitalized terms used herein but not otherwise defined herein have the meanings set forth in Section 1(a) below.

RECITALS

WHEREAS, pursuant to the terms and conditions of the Subordinated PIK Note Purchase Agreement, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified or as refinanced or replaced in accordance with the terms hereof, the "**Subordinated PIK Note Purchase Agreement**"), among the Company, the ~~subsidiary~~affiliate guarantors party thereto and the Initial ~~Purchaser~~Purchasers, the Initial ~~Purchaser has~~Purchasers have agreed to purchase ~~Subordinated~~ Notes from the Company in an aggregate initial principal amount not to exceed ~~[$12,000,000]~~$35,000,000; and

WHEREAS, the execution and delivery of this Agreement is a condition to the Company's incurrence of the indebtedness evidenced by the ~~Subordinated~~ Notes, under the terms of ~~each of~~ the Subordinated PIK Note Purchase Agreement~~, the Working Capital Facility, the Term A Note Facility and the Term Loan B Facility~~ and the Credit Agreement.

NOW THEREFORE, in consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**SECTION 1.**        **Definitions**.  (a)  As used in this Agreement, the following terms shall have the following meanings:

---

[+]   ~~Option A.~~

"**Affiliate Guarantors**" shall mean each affiliate of the Company which enters into a guaranty of the Senior Obligations.

"**Agent**" has the meaning set forth in the preamble hereto.

"**Agreement**" means this Subordination Agreement as amended or otherwise modified pursuant to the terms hereof.

"**Bankruptcy Code**" shall mean the Bankruptcy Reform Act of 1978, as codified under Title 11 of the United States Code, and the Bankruptcy Rules promulgated thereunder, as the same may be in effect from time to time.

"**Collateral**" means any and all property which now constitutes or hereafter will constitute collateral or other security for payment of any Senior Obligations.

"**Company**" has the meaning set forth in the preamble hereto.

"**Credit Agreement**" shall mean the Credit and Guaranty Agreement, dated as of [_____], 2009, among the Company, the guarantors party thereto, various lenders, and Silver Point Finance, LLC, as Administrative Agent, Collateral Agent, Syndication Agent, Documentation Agent and Lead Arranger, as amended, supplemented, amended and restated or otherwise modified or as refinanced, extended, renewed, defeased, restructured or replaced from time to time.

"**Credit Agreement Obligations**" shall mean all Obligations outstanding under the Credit Agreement.

"**Credit Party**" means the Company, each ~~Subsidiary~~Affiliate Guarantor and any other guarantor of the Senior Obligations or the Subordinated Obligations.  Such Persons shall be referred to collectively as the "**Credit Parties**."

"**Discharge** ~~of New First Lien Obligations~~" ~~shall mean the occurrence of each of the Discharge of Working Capital Obligations and the Discharge of Term A Note Obligations.~~

"~~**Discharge of Senior Obligations**~~" ~~means the occurrence of each of the Discharge of Term A Note Obligations, the Discharge of Working Capital Obligations and the Discharge of Term Loan B Obligations.~~"~~**Discharge of Term A Note**~~ **of Senior** Obligations" shall mean, except pursuant to a Refinancing and subject to Section 7 hereof, (a) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest would be allowed in such Insolvency or Liquidation Proceeding) and premium, if any, on all Indebtedness outstanding under the ~~Term A Note Documents~~Credit Agreement, and (b) payment in full of all other ~~Term A Note~~Credit Agreement Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest and premium, if any, are paid.

"~~**Discharge of Term Loan B Obligations**~~" ~~shall mean, except pursuant to a Refinancing (to the extent provided in the Intercreditor Agreement), and subject to Section 7 hereof, (a) payment in full in cash of the principal of and interest (including interest accruing on or~~

~~after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest would be allowed in such Insolvency or Liquidation Proceeding) and premium, if any, on all Indebtedness outstanding under the Term Loan B Documents and (b) payment in full of all other Term Loan B Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest and premium, if any, are paid.~~

~~"**Discharge of Working Capital Obligations**" shall mean, except pursuant to a Refinancing and subject to Section 7 hereof, (a) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest would be allowed in such Insolvency or Liquidation Proceeding) and premium, if any, on all Indebtedness outstanding under the Working Capital Credit Documents, (b) payment in full of all other Working Capital Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest and premium, if any, are paid, (c) expiration, cancellation (without any prior demand for payment thereunder having been made or, if made, with such demand having been fully reimbursed in cash), cash collateralization (in accordance with the Working Capital Facility) or backstopping with a letter of credit reasonably acceptable to the Issuing Bank (as such term is defined in the Working Capital Facility) of all letters of credit issued under the Working Capital Facility and (d) termination of all other revolving loan and letter of credit commitments of the Working Capital Creditors under the Working Capital Credit Documents.~~

"**Indebtedness**" shall mean and includes all Obligations that constitute "**Indebtedness**" within the meaning of the ~~Working Capital Facility, the Term A Note Facility or the Term Loan B Facility, as applicable~~<u>Credit Agreement</u>.

"**Initial ~~Purchaser~~<u>Purchasers</u>**" has the meaning set forth in the preamble hereto.

"**Insolvency or Liquidation Proceeding**" shall mean (a) any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Credit Party, (b) any other voluntary or involuntary insolvency, reorganization, arrangement or bankruptcy case or proceeding, or any receivership, liquidation, reorganization, arrangement or other similar case or proceeding with respect to such Credit Party or with respect to a material portion of its respective assets, (c) any liquidation, dissolution, reorganization or winding up of such Credit Party whether voluntary or involuntary and whether or not involving insolvency or bankruptcy or (d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of such Credit Party.

~~"**Intercreditor Agreement**" shall mean that certain Intercreditor Agreement dated as of [_____], 2009, by and among the Company, the subsidiary guarantors party thereto, the Working Capital Administrative Agent, the Term A Note Administrative Agent, the collateral agent under the New First Lien Facilities, the Term Loan B Administrative Agent, and the collateral agent under the Term Loan B Facility, as the same may be amended, restated, supplemented or otherwise modified from time to time.~~

"**Lien**" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any

option, trust or other preferential arrangement having the practical effect of any of the foregoing, and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"~~New First Lien Facilities~~**Notes**" means ~~each of the Working Capital Facility~~the Subordinated Notes and the ~~Term A Note Facility~~Subordinated PIK A Notes.

"**Obligations**" shall mean any and all obligations (including guaranty obligations) with respect to the payment and performance of (a) any principal of or interest or premium on any indebtedness, ~~including any reimbursement obligation in respect of any letter of credit,~~ or any other liability, including interest that accrues after the commencement of any Insolvency or Liquidation Proceeding of any applicable Person at the rate provided for in the respective documentation, whether or not a claim for post-petition interest is allowed in any such Insolvency or Liquidation Proceeding, (b) any fees, indemnification obligations, expense reimbursement obligations or other liabilities payable under the documentation governing any indebtedness (including the retaking, holding, selling or otherwise disposing of or realizing on any collateral), (c) any obligation to post cash collateral in respect of letters of credit or any other obligations, and (d) all performance obligations under the documentation governing any indebtedness.

"**Permitted Refinancing**" shall mean, as to any Subordinated Obligations, the incurrence of other Subordinated Obligations to refinance, extend, renew, defease, restructure, replace or refund (collectively, "**refinance**") such existing Subordinated Obligations; <u>provided</u> that, in the case of such other Subordinated Obligations, the following conditions are satisfied:

(a) the weighted average life to maturity of such refinancing Subordinated Obligations shall be greater than or equal to the weighted average life to maturity of the Subordinated Obligations being refinanced;

(b) the principal amount of such refinancing Subordinated Obligations shall be less than or equal to the principal amount (including any accreted or capitalized amount) then outstanding of the Subordinated Obligations being refinanced, plus any required premiums and other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by any amount equal to any existing commitments unutilized thereunder;

(c) the respective obligor or obligors shall be the same on the refinancing Subordinated Obligations as on the Subordinated Obligations being refinanced;

(d) the refinancing Subordinated Obligations is unsecured and is subordinated to the Senior Obligations to the same degree, if any, or to a greater degree as the Subordinated Obligations being refinanced; and

(e) no material terms applicable to such refinancing Subordinated Obligations or guarantees of such refinancing Subordinated Obligations (including without limitation covenants, events of default, remedies and acceleration rights) shall be, taken as a whole, materially more favorable to the refinancing lenders than

the terms that are applicable under the instruments and documents governing the Subordinated Obligations being refinanced.

"**Person**" shall mean and include an individual, a partnership, a joint venture, a corporation, a trust, a limited liability company, an unincorporated organization and a government or any department or agency thereof.

"~~**Purchaser**~~**Purchasers**" shall mean the Initial ~~Purchaser~~Purchasers and each other holder from time to time of a ~~Subordinated~~ Note (whether held individually or through an agent, trustee, custodian, intermediary or otherwise).

"**Recovery**" has the meaning set forth in <u>Section 7(d)</u>.

"**Refinance**" means, in respect of any Indebtedness, to refinance, replace, refund or repay, or to issue other indebtedness, in exchange or replacement for, such Indebtedness in whole or in part, whether with the same or different lenders, agents, or arrangers. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Remedies**" means, with respect to an Event of Default under and as defined in the Subordinated Note Documents, the acceleration of any of the ~~Subordinated~~ Notes or the exercise of any remedies in respect of such Event of Default (including any right of setoff or similar right, any right of collection, repayment, prepayment, repurchase, redemption or put right, the right to sue any Credit Party or to file or participate in any Insolvency or Liquidation Proceeding or take any other action under law, against any Credit Party, but excluding in any event the imposition of default rate interest as specified in the Subordinated Note Documents as of the date of this Agreement). For purposes of clarity, in no event shall the extension of the Subordinated PIK A Note Maturity Date or the conversion of any unpaid amount of any Subordinated PIK A Note pursuant to Section 2.4 of the Subordinated PIK Note Purchase Agreement constitute a "Remedy" for purposes of this Agreement.

"**Reorganization Subordinated Securities**" shall mean, in connection with any Insolvency or Liquidation Proceeding, (a) any equity security issued by the Company, and (b) any debt or other equity securities of the Company that (i) are distributed to a Purchaser in respect of Subordinated Obligations pursuant to a plan of reorganization or adjustment that is confirmed or otherwise authorized by an order or decree of a court of competent jurisdiction (or such other Person provided for by such plan of reorganization or adjustment) in such Insolvency or Liquidation Proceeding and (ii) (A) are subordinated in right of payment to the Senior Obligations to at least the same extent as the Subordinated Obligations are subordinated to the Senior Obligations pursuant to the terms of this Agreement, (B) do not have the benefit of any obligation of any Person (whether as issuer, guarantor or otherwise) unless the Senior Obligations have at least the same benefit of the obligation of such Person (with the obligation of such Person to the Purchasers to be subordinated to such Person's obligation to the Senior Creditors to at least the same extent as the Subordinated Obligations are subordinated to the Senior Obligations hereunder) and (C) do not have any terms, and are not subject to or entitled to the benefit of any agreement or instrument that has terms, that are more burdensome to the issuer of or other obligor on such debt or equity securities than are the terms of the Senior Obligations; <u>provided</u> that if such securities are debt securities, such securities shall not provide for amortization (including sinking fund and

mandatory prepayment provisions) commencing prior to one year following the final scheduled maturity of the Senior Obligations (as they may be modified by such plan of reorganization or adjustment).

"~~Representative~~" ~~means (i) prior to the Discharge of Working Capital Obligations, the Working Capital Administrative Agent, (ii) subject to clause (iii) below, following the Discharge of Working Capital Obligations, the Term A Note Administrative Agent and (iii) following the Discharge of New First Lien Obligations, the Term Loan B Administrative Agent; provided that if, and for so long as, the applicable Senior Obligations lack an administrative agent, then the Representative shall at all such times constitute the holders of a majority in outstanding principal amount and commitments of such applicable Senior Obligations.~~

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Senior Creditors**" means ~~the Term A Note Creditors, the Working Capital Creditors and the Term Loan B Creditors (including, as applicable, in the capacity of the Representative).~~

"~~**Senior Facility Documents**~~" ~~means the Working Capital Credit Documents, the Term A Note Documents and the Term Loan B Documents.~~, at any relevant time, the holders of Senior Obligations at such time.

"**Senior Facility Documents**" shall mean the Credit Agreement and the other Credit Documents (as defined in the Credit Agreement) and each of the other agreements, documents and instruments executed or delivered at any time in connection therewith, as each may be amended, supplemented, restated, renewed, replaced or otherwise modified from time to time, whether or not with the same agent or holders and irrespective of any changes in the terms and conditions thereof.  Without limiting the generality of the foregoing, the term "**Senior Facility Documents**" shall include any amendment, amendment and restatement, renewal, extension, restructuring (pursuant to an Insolvency or Liquidation Proceeding or otherwise), supplement or modification to the Senior Facility Documents and all refundings, refinancing and replacements of any facility provided for therein, including any agreement (i) extending the maturity of any Indebtedness incurred thereunder or contemplated thereby, (ii) adding or deleting issuers or guarantors thereunder or (iii) increasing the amount of Indebtedness incurred thereunder or available to be issued thereunder.

"**Senior Obligations**" means the ~~Working Capital Obligations, the Term A Note Obligations and the Term Loan B~~Credit Agreement Obligations.  "**Senior Obligations**" shall in any event include: (a) all interest accrued or accruing (or which would, absent commencement of

an Insolvency or Liquidation Proceeding (and the effect of provisions such as Section 502(b)(2) of the Bankruptcy Code), accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the ~~relevant Senior Facility Document~~Credit Agreement, whether or not the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding, (b) any and all fees and expenses (including attorneys' and/or financial consultants' fees and expenses) incurred by the Senior Creditors in connection with the exercise or enforcement of any of the rights or interests of the Senior Creditors under this Agreement, or incurred by the Senior Creditors after the commencement of an Insolvency or Liquidation Proceeding, whether or not the claim for fees and expenses is allowed under Section 506(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code as a claim in such Insolvency or Liquidation Proceeding and (c) all obligations and liabilities of each Credit Party under each Senior Facility Document to which it is a party which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due.

"**Standstill Period**" has the meaning set forth in <u>Section 4</u> in respect thereof.

"**Subordinated Note Documents**" means the Subordinated PIK Note Purchase Agreement, the ~~Subsidiary~~<u>Affiliate</u> Guaranty (as defined in the Subordinated PIK Note Purchase Agreement), the Subordinated Notes, <u>the Subordinated PIK A Notes,</u> this Agreement, and any other agreement, certificate, instrument or document delivered in connection with any other Subordinated Note Document and executed by a Credit Party.

"**Subordinated Note Maturity Date**" means ~~[_____], 2016.~~<u>the seventh (7th) anniversary of the issue date of the Subordinated Notes.</u>

"**Subordinated Notes**" means the subordinated unsecured promissory notes in the aggregate principal amount of ~~[$12,000,000],~~<u>$30,000,000,</u> to be dated the date of issue thereof, to mature on the Subordinated Note Maturity Date, to bear interest as provided in Section 2.1 of the Subordinated PIK Note Purchase Agreement, and to be in the form of <u>Exhibit A</u> thereto. The term "**Subordinated Notes**" as used herein shall include each such subordinated unsecured promissory note delivered pursuant to the Subordinated PIK Note Purchase Agreement and each such subordinated unsecured promissory note delivered in substitution or exchange for, or otherwise in respect of, any other Subordinated Note pursuant to such agreement.

"**Subordinated Notes Payment**" means any payment or distribution of any kind or character, whether direct or indirect, by setoff or otherwise, from any source, whether in cash, property or securities, on or in respect of any Subordinated Obligations (including any interest accruing on or after the filing of any Insolvency or Liquidation Proceeding relating to the Company or any other Credit Party, whether or not allowed in such Insolvency or Liquidation Proceeding) or on account of any purchase, redemption, retirement, put, rescission of purchase, defeasance or other acquisition of ~~Subordinated~~ Notes by any Credit Party; <u>provided</u> that Subordinated Notes Payments shall not include ~~closing fees and expenses of~~<u>(a) a closing fee in an amount not to exceed 2.0% of the principal amount of the Subordinated PIK A Notes paid to holders of Subordinated PIK A Notes, (b) an expense reimbursement fee in an amount not to exceed $50,000 paid to holders of Subordinated PIK A Notes for reasonable and actual expenses incurred, and (c) reasonable fees of counsel to</u> the Initial ~~Purchaser~~<u>Purchasers, in each case due</u>

and payable as of the date of this Agreement, pursuant to terms set forth in the Subordinated PIK Note Purchase Agreement on the date hereof.

"**Subordinated Obligations**" means the unpaid principal of and interest on (including interest accruing after the maturity of the Subordinated Notes and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Company or any guarantor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Subordinated Notes and all other obligations and liabilities of the Company or any other Credit Party to any Purchaser, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, the Subordinated PIK Note Purchase Agreement, any other Subordinated Note Document or any other document made, delivered or given in connection therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to any Purchaser that are required to be paid by the Company or any other Credit Party pursuant to any Subordinated Note Document) or otherwise.

"**Subordinated PIK A Notes**" means the subordinated unsecured class A promissory notes in the aggregate principal amount of $5,000,000, to be dated the date of issue thereof, to mature on the Subordinated PIK A Note Maturity Date, to bear interest as provided in Section 2.1 of the Subordinated PIK Note Purchase Agreement, and to be in the form of Exhibit B thereto.  The term "**Subordinated Notes**" as used herein shall include each such subordinated unsecured class A promissory note delivered pursuant to the Subordinated PIK Note Purchase Agreement and each such subordinated unsecured promissory note delivered in substitution or exchange for, or otherwise in respect of, any other Subordinated PIK A Note pursuant to such agreement.

"**Subordinated PIK A Note Maturity Date**" means March 31, 2010; provided that the Company shall pay the Subordinated PIK A Notes in whole or in part only to the extent that after payment its minimum cash is not less than $7.5 million.  If the Subordinated PIK A Notes are not paid in full on March 31, 2010 (or any subsequent maturity date), the "Subordinated PIK A Note Maturity Date" will be extended to March 31, 2011 (and annually thereafter), subject to the $7.5 million minimum cash threshold, unless converted pursuant to the terms and conditions of the Subordinated PIK Note Purchase Agreement.

"**Subordinated PIK Note Purchase Agreement**" has the meaning set forth in the recitals hereto.

"**Subsidiary Guarantors**" shall mean each subsidiary of the Company which enters into a guaranty of any Term A Note Obligations, Working Capital Obligations or Term Loan B Obligations.

"**Term A Note Administrative Agent**" has the meaning set forth in the preamble hereto.

"**Term A Note Creditors**" shall mean, at any relevant time, the holders of Term A Note Obligations at such time.

"**Term A Note Documents**" shall mean the Term A Note Facility and the other Note Documents (as defined in the Term A Note Facility) and each of the other agreements, documents and instruments executed or delivered at any time in connection therewith (including any intercreditor or joinder agreement among holders of Term A Note Obligations), as each may be amended, supplemented, restated, renewed, replaced or otherwise modified from time to time, whether or not with the same agent or holders and irrespective of any changes in the terms and conditions thereof. Without limiting the generality of the foregoing, the term "**Term A Note Documents**" shall include any amendment, amendment and restatement, renewal, extension, restructuring (pursuant to an Insolvency or Liquidation Proceeding or otherwise), supplement or modification to the Term A Note Documents and all refundings, refinancing and replacements of any facility provided for therein, including any agreement (i) extending the maturity of any Indebtedness incurred thereunder or contemplated thereby, (ii) adding or deleting issuers or guarantors thereunder or (iii) increasing the amount of Indebtedness incurred thereunder or available to be issued thereunder.

"**Term A Note Facility**" shall mean the Term A Note Purchase and Guaranty Agreement, dated as of [_____], 2009, among the Company, the guarantors party thereto, the purchasers from time to time party thereto, and Barclays Bank PLC, as administrative agent and collateral agent, as amended, supplemented, amended and restated or otherwise modified or as refinanced, extended, renewed, defeased, restructured or replaced from time to time.

"**Term A Note Obligations**" shall mean all Obligations outstanding under the Term A Note Facility and the other Term A Note Documents.

"**Term Loan B Administrative Agent**" has the meaning set forth in the preamble hereto.

"**Term Loan B Creditors**" shall mean, at any relevant time, the holders of Term Loan B Obligations at such time.

"**Term Loan B Documents**" shall mean the Term Loan B Facility and the other Credit Documents (as defined in the Term Loan B Facility) and each of the other agreements, documents and instruments executed or delivered at any time in connection therewith, as each may be amended, supplemented, restated, renewed, replaced or otherwise modified from time to time, whether or not with the same agent or lenders and irrespective of any changes in the terms and conditions thereof. Without limiting the generality of the foregoing, the term "**Term Loan B Documents**" shall include any amendment, amendment and restatement, renewal, extension, restructuring (pursuant to an Insolvency or Liquidation Proceeding or otherwise), supplement or modification to the Term Loan B Documents and all refundings, refinancing and replacements of any facility provided for therein, including any agreement (i) extending the maturity of any Indebtedness incurred thereunder or contemplated thereby, (ii) adding or deleting borrowers or guarantors thereunder or (iii) increasing the amount of Indebtedness incurred thereunder or available to be borrowed thereunder.

"**Term Loan B Facility**" shall mean the Term B Credit and Guaranty Agreement (Second Lien), dated as of [_____], 2009, among the Company, the guarantors party thereto, the lenders from time to time party thereto, [Silver Point Finance, LLC, as administrative agent and

collapse agent], as amended, supplemented, amended and restated or otherwise modified or as refinanced, extended, renewed, defeased, restructured or replaced from time to time.

"**Term Loan B Obligations**" shall mean all Obligations outstanding under the Term Loan B Facility and the other Term Loan B Documents.

"**UCC**" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"**Working Capital Administrative Agent**" has the meaning set forth in the preamble hereto.

"**Working Capital Creditors**" shall mean, at any relevant time, the holders of Working Capital Obligations at such time.

"**Working Capital Credit Documents**" shall mean the Working Capital Facility and the other Credit Documents (as defined in the Working Capital Facility) and each of the other agreements, documents and instruments executed or delivered at any time in connection therewith (including any intercreditor or joinder agreement among holders of Working Capital Obligations), as each may be amended, supplemented, restated, renewed, replaced or otherwise modified from time to time, whether or not with the same agent or lenders and irrespective of any changes in the terms and conditions thereof. Without limiting the generality of the foregoing, the term "**Working Capital Credit Documents**" shall include any amendment, amendment and restatement, renewal, extension, restructuring (pursuant to an Insolvency or Liquidation Proceeding or otherwise), supplement or modification to the Working Capital Credit Documents and all refundings, refinancing and replacements of any facility provided for therein, including any agreement (i) extending the maturity of any Indebtedness incurred thereunder or contemplated thereby, (ii) adding or deleting borrowers or guarantors thereunder or (iii) increasing the amount of Indebtedness incurred thereunder or available to be borrowed thereunder.

"**Working Capital Facility**" shall mean the Credit and Guaranty Agreement, dated as of [_____], 2009, among the Company, the guarantors party thereto, the lenders from time to time party thereto, and Barclays Bank PLC, as administrative agent and collateral agent, as amended, supplemented, amended and restated or otherwise modified or as refinanced, extended, renewed, defeased, restructured or replaced from time to time.

"**Working Capital Obligations**" shall mean all Obligations outstanding under the Working Capital Facility and the other Working Capital Credit Documents.

(b)     <u>Computation of Time Periods</u>. For purposes of computation of periods of time hereunder, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding."

(c)     <u>Terms Generally</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "**include**", "**includes**" and "**including**" shall be deemed to be followed by the phrase "**without limitation**." The word "**will**" shall be construed to have the same meaning and effect as the word "**shall**".

Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified, to the extent permitted hereunder, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "**herein**", "**hereof**" and "**hereunder**", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Sections or Annexes shall be construed to refer to Sections or Annexes of this Agreement, (v) the words "**asset**" and "**property**" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, (vi) reference to any law means such law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect on the date hereof, including rules, regulations, enforcement procedures and any interpretations promulgated thereunder and (vii) underscored references to Sections or clauses shall refer to those portions of this Agreement, and any underscored references to a clause shall, unless otherwise identified, refer to the appropriate clause within the same Section in which such reference occurs.

SECTION 2. **Subordinated Obligations Subordinate to Senior Obligations**. The Company and each Credit Party agrees, and each Purchaser by its acceptance of a ~~Subordinated~~ Note agrees, that to the extent and in the manner hereinafter set forth in this Agreement, the payment of the Subordinated Obligations is hereby expressly made subordinate and subject in right of payment to all Senior Obligations. The Company and each Credit Party agrees, and each Purchaser by its acceptance of a Subordinated Note likewise agrees, that the Subordinated Obligations are and will remain unsecured.

SECTION 3. **Certain Permitted Payments; Permitted Refinancing.**

(a) Prior to the Discharge of Senior Obligations, neither the Company nor any Credit Party shall be permitted to pay or make, nor shall any Purchaser be permitted to accept or receive, any Subordinated Notes Payment other than (i) regularly scheduled payments of interest on the ~~Subordinated~~ Notes in an amount not in excess of the applicable amount (including, as applicable, default interest) set forth in the Subordinated PIK Note Purchase Agreement as of the date of this Agreement, which are paid in kind (and not in cash) on or after the due date therefor pursuant to the terms of the Subordinated PIK Note Purchase Agreement as of the date of this Agreement, (ii) Subordinated Notes Payments made on or following the Subordinated Note Maturity Date, with respect to Subordinated Notes, or the Subordinated PIK A Note Maturity Date with respect to Subordinated PIK A Notes, (iii) Subordinated Notes Payments made pursuant to a Permitted Refinancing and (iv) delivery of Reorganization Subordinated Securities to the Purchasers in accordance with the terms of this Agreement; provided that, notwithstanding the foregoing, the making of any Subordinated Notes Payment shall be subject to Sections 5 and 7 hereof. The Company and each other Credit Party agrees not to make any Subordinated Notes Payment or other payment in contravention of this Agreement or to deliver any notice, make any election, or take any other action in furtherance thereof.

(b) The failure to make any Subordinated Notes Payment by reason of the provisions of this Section 3 will not be construed as preventing the occurrence of an Event of Default under the

Subordinated PIK Note Purchase Agreement with respect to the ~~Subordinated~~ Notes arising from any such failure to make payment.  Upon the occurrence of the Discharge of Senior Obligations, the Company shall resume making any and all required Subordinated Notes Payments, including any missed payments, subject to the provisions of this Agreement.

SECTION 4.        **Remedies Standstill**.  No Purchaser shall exercise any Remedies in respect of any Subordinated Obligations prior to the occurrence of the Discharge of Senior Obligations (such period, the "**Standstill Period**"); provided, that the Standstill Period shall terminate upon the earliest to occur of: (i) 180 days after the acceleration of all Senior Obligations, (ii) such time as ~~each of the Working Capital Administrative Agent, the Term A Note Administrative Agent and the Term Loan B Administrative~~the Agent consents in writing to the termination of such Standstill Period, (iii) the occurrence of an Insolvency or Liquidation Proceeding, ~~or~~(iv) the Subordinated Note Maturity Date, with respect to the Subordinated Notes, or (v) the Subordinated PIK A Note Maturity Date, with respect to the Subordinated PIK A Notes. Upon the termination of the Standstill Period, the Purchasers may, at their sole election, exercise any and all Remedies (including acceleration of the maturity of the Subordinated Obligations) available to them under the Subordinated Note Documents, subject to the terms of this Agreement; provided that the provisions of Section 3 shall continue notwithstanding the termination of the Standstill Period; provided further that upon the occurrence of any event described under clauses (i), (iv) or (v), so long as the Agent or the Senior Creditors (y) initiate an enforcement action during the Standstill Period and (z) diligently pursue their rights or remedies as a secured creditor after the Standstill Period to effect the collection, foreclosure, sale, or other realization upon or disposition of any or all of the Collateral, the Standstill Period shall continue as to such Collateral until the Agent or the Senior Creditors complete such rights and remedies.  Notwithstanding the foregoing, if, following the acceleration of any Senior Obligations, such acceleration is rescinded (whether or not any existing event of default in respect of such Senior Obligations has been cured or waived), then all Remedies exercised by any Purchaser shall likewise be rescinded if such Remedy was permitted to occur solely due to clause (i) above (such rescission to be without prejudice to any future rights of such Purchaser).

SECTION 5.        **Payments Held in Trust; Subrogation.**

(a)    Payments Held in Trust.  In the event that prior to the Discharge of Senior Obligations, any Purchaser shall have received any Subordinated Notes Payment at a time when it is not permitted to do so under this Agreement, then and in such event such Subordinated Notes Payment shall be paid over and delivered forthwith to the ~~Representative~~Agent in the same form as received and, until so turned over, the same shall be held in trust by such Purchaser as the property of the Senior Creditors, to the extent necessary to enable the Discharge of Senior Obligations.

(b)    Subrogation.  After the Discharge of Senior Obligations, the Purchasers shall be subrogated to the rights of the Senior Creditors to receive payments and distributions of cash, property and securities applicable to such Senior Obligations until the principal of (and premium, if any) and interest on the ~~Subordinated~~ Notes shall be paid in full.  For purposes of such subrogation, no payments or distributions to the Senior Creditors of any cash, property or securities to which the Purchasers would be entitled except for the provisions of this Agreement, and no payments pursuant to the provisions of this Agreement to the Senior Creditors by the

Purchasers, as among the Credit Parties, their creditors (other than the Senior Creditors) and the Purchasers, shall be deemed to be a payment or distribution by such Credit Party to or on account of the Senior Obligations. The subrogation rights granted in this Section 5(b) shall not grant any Purchaser any right to vote, control or participate in the administration of any Senior Obligations.

**SECTION 6.        No Prejudice or Impairment**. The provisions of this Agreement are, and are intended solely for, the purpose of defining the relative rights of the Purchasers on the one hand and the Senior Creditors on the other hand. None of the Credit Parties or any other creditor thereof shall have any rights hereunder. Nothing contained in this Agreement is intended to or shall (a) impair the obligations of the Company or any other Credit Party, which are absolute and unconditional, to pay the Senior Obligations as and when the same shall become due and payable in accordance with their terms, (b) impair the obligations of the Company or any other Credit Party, which are absolute and unconditional, to pay the Subordinated Obligations as and when the same shall become due and payable in accordance with their terms, subject to the rights under this Agreement of the Senior Creditors, which obligations are intended to rank equally with all other general unsecured obligations of the Company, or (c) affect the relative rights against the Credit Parties of the Purchasers and creditors of the Credit Parties other than the Senior Creditors.

**SECTION 7.        Insolvency or Liquidation Proceedings.**

(a)        In connection with any Insolvency or Liquidation Proceeding, this Agreement shall remain in full force and effect and enforceable pursuant to its terms, and all references herein to the Credit Parties shall be deemed to apply to such Credit Parties as debtor-in-possession and to any Person claiming through or on their behalf, including a trustee in bankruptcy, receiver, assignee for the benefit of creditors, liquidating trustee or agent for the estate of such Credit Parties, or otherwise.

(b)        In the event, and during the continuance, of any Insolvency or Liquidation Proceeding, the Senior Creditors shall first be entitled to the Discharge of Senior Obligations, before the Purchasers (or any Person claiming through or on their behalf, including a trustee in bankruptcy, receiver, assignee for the benefit of creditors, liquidating trustee or agent, or otherwise) are entitled to receive or accept any Subordinated Notes Payment (other than Reorganization Subordinated Securities), and to that end the Senior Creditors shall be entitled to receive from such Purchaser or other Person making such payment, and such Purchaser or other Person shall pay over and deliver forthwith to the ~~Representative~~Agent in the same form received, any Subordinated Notes Payment which may be payable or deliverable in respect of the Subordinated Obligations in any such Insolvency or Liquidation Proceeding, and until so turned over, the same shall be held in trust by such Purchaser or other Person as the property of the Senior Creditors remaining unpaid, to the extent necessary to enable the Discharge of Senior Obligations, after giving effect to all concurrent payments and distributions and all provisions therefor, to or for the ~~Representative~~Agent on behalf of the Senior Creditors.

(c)        The ~~Representative~~Agent shall have the right to request the Purchasers to file a claim or proof of debt in the form required in any Insolvency or Liquidation Proceeding for and on behalf of each Purchaser. Upon the failure of any Purchaser to take any such action as of the 30th day preceding the bar date therefor, the ~~Representative~~Agent is hereby authorized to file such a

claim and proof of debt on behalf of such Purchaser, and such Purchaser hereby appoints the ~~Representative~~Agent as its attorney in fact to do so, which appointment is irrevocable and coupled with an interest and such Purchaser agrees to provide such information and take such other action as may be reasonably necessary to effectuate the foregoing.  Notwithstanding the foregoing, each Purchaser shall retain the right to vote to accept or reject any plan of partial or complete liquidation, reorganization, arrangement, composition or extension; <u>provided</u> that such Purchaser shall not take any action or vote in any way so as to contest the enforceability of this Agreement or the Senior Obligations nor take any action or vote in a manner inconsistent with the terms of this Agreement.  The ~~Representative~~Agent and each Senior Creditor shall retain the right to vote its Senior Obligations to accept or reject any plan of partial or complete liquidation, reorganization, arrangement, composition or extension; <u>provided</u> that neither the ~~Representative~~Agent nor any Senior Creditor shall take any action or vote in a manner inconsistent with the terms of this Agreement.  Neither the ~~Representative~~Agent nor any Senior Creditor shall have any liability to any Purchaser in connection with any such filing or other action taken pursuant to this clause (c).

(d)     If any Senior Creditor or any Purchaser is required in any Insolvency or Liquidation Proceeding or otherwise to disgorge, turnover or otherwise pay any amount to the estate of any Credit Party, because such amount was avoided or ordered to be paid or disgorged for any reason including because it was found to be a fraudulent or preferential transfer (a "**Recovery**"), whether received as proceeds of security, enforcement of any right of set-off or otherwise, then the Senior Obligations, or Subordinated Obligations, as applicable, shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the Senior Obligations or Subordinated Obligations, as applicable, shall be deemed not to have been paid (and the Discharge of Senior Obligations for all purposes of this Agreement shall be deemed not to have occurred).  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto.  Any Subordinated Notes Payment received by any Purchaser after the termination of this Agreement and prior to the reinstatement of this Agreement, shall be delivered to the ~~Representative~~Agent in accordance with <u>Section 5</u> for application to payment of the Senior Obligations; provided, however, that the Purchasers shall not be required to turn over such payments to the extent that the Purchasers had also been required to disgorge such Subordinated Note Payments as a Recovery.  The Purchasers agree that none of them shall be entitled to benefit from any avoidance action affecting or otherwise related to any distribution or allocation made in accordance with this Agreement, whether by preference or otherwise, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

(e)     To the extent not inconsistent with the terms of this Agreement, any Purchaser may (i) file a claim or statement of interest with respect to the Subordinated Obligations in any applicable Insolvency or Liquidation Proceeding; (ii) file any proofs of claim, pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Company or another Credit Party arising under an Insolvency or Liquidation Proceeding, in each case in accordance with the terms of this Agreement; and (iii) vote on any plan of reorganization in accordance with the terms of this Agreement.

**SECTION 8.** **Benefit of Agreement; Amendments to Certain Documents.**

(a)     This Agreement shall constitute a continuing inducement to all Persons who, in reliance upon the terms hereof, become a Senior Creditor and is made for the benefit of each subsequent Senior Creditor. ~~Each of the Working Capital Administrative Agent, the Term A Note Administrative Agent and the Term Loan B Administrative~~The Agent, on behalf of the ~~respective~~ Senior Creditors, and each Purchaser may enforce such provisions.

(b)     Unless ~~each of the Working Capital Administrative Agent, the Term A Note Administrative Agent and the Term Loan B Administrative~~ the Agent shall have given ~~their~~its prior written consent, neither the Subordinated Note Documents nor the terms of any Subordinated Obligations may be amended, modified, waived or otherwise changed, other than any such amendment, modification, waiver or other change that (i) would extend the maturity or reduce the amount of any payment of principal thereof or reduce the rate or extend any date for payment of interest thereon and (ii) does not involve the payment of a consent fee, or pursuant to a Permitted Refinancing.

(c)     The Notes shall always remain unsecured.

**SECTION 9.** **Representations and Warranties**.  Each of the Purchasers, the Company and each other Credit Party hereby represents and warrants that (a) it has full power, authority and legal right to make and perform this Agreement, and (b) this Agreement is its legal, valid and binding obligation, enforceable against it in accordance with its terms.

**SECTION 10.** **Amendment**.  Neither this Agreement nor any of the terms hereof may be amended, waived, discharged or terminated unless such amendment, waiver, discharge or termination is in writing signed by each of the ~~Working Capital Administrative Agent, the Term A Note Administrative Agent, the Term Loan B Administrative~~ Agent and the Purchasers.

**SECTION 11.** **Instrument Legends**.  The faces of the ~~Subordinated~~ Notes will be forthwith inscribed with a legend conspicuously indicating that payment thereon is subordinated to the claims of the Senior Creditors pursuant to the terms of this Agreement.  Any instrument evidencing any of the Subordinated Obligations or any portion thereof which is hereafter executed will, on the date thereof, be inscribed with the aforesaid legend.

**SECTION 12.** **No Waiver of Subordination Provisions**.  No right of any Senior Creditor to enforce any term or provision of this Agreement or any of its rights hereunder shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Credit Party or by any act or failure to act by any such Senior Creditor, or by any noncompliance by any Credit Party with the terms, provisions and covenants of this Agreement, regardless of any knowledge thereof any such Senior Creditor may have or be otherwise charged with.  No Purchaser shall subordinate any Subordinated Obligations to any Indebtedness or obligation of any Credit Party other than Senior Obligations.

**SECTION 13.** **Successors and Assigns**.  This Agreement and the terms hereof shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and assigns, and each Purchaser and any assignee or transferee of any Subordinated Obligations is

hereby deemed to take such obligations subject to the terms and conditions of this Agreement. Other than the Senior Creditors, no other Person shall have or be entitled to assert rights or benefits hereunder. The Purchasers~~,~~ and ~~each of the Working Capital Administrative Agent, the Term A Note Administrative Agent and the Term Loan B Administrative~~the Agent, on behalf of the ~~respective~~ Senior Creditors, further agree between themselves and solely for their own collective benefit, that if any Credit Party is in the process of refinancing a portion of the Senior Obligations, or if the Company is in the process of refinancing all or a portion of the Subordinated Obligations pursuant to a Permitted Refinancing, and if the party who wishes to be refinanced makes a request of the other parties hereto, the Purchasers or ~~each of the Working Capital Administrative Agent, the Term A Note Administrative Agent and the Term Loan B Administrative~~the Agent, as the case may be, shall to the extent reasonably requested agree to enter into a new, substitute agreement with the refinancing lender or purchaser or its representative; <u>provided</u> that any such new, substitute agreement shall be in a form, and contain such terms and conditions, substantially the same as in this Agreement.

**SECTION 14. Relationship Between Agents and Lenders; Associated Estoppels**. Each and every benefit accruing hereunder to the ~~Representative and each of the Working Capital Administrative Agent, the Term A Note Administrative Agent and the Term Loan B Administrative~~ Agent shall be deemed to also accrue to ~~each applicable Senior Creditor (provided that only the applicable Representative may act in furtherance of such benefits accruing solely to the Representative)~~the Senior Creditors. Any proceeds or other amounts in respect of any Subordinated Notes Payment received by the ~~Representative~~Agent pursuant to the terms of this Agreement shall be allocated among the Senior Creditors ~~consistent with the terms of the Intercreditor Agreement and as otherwise agreed among the Working Capital Administrative Agent, the Term A Note Administrative Agent and the Term Loan B Administrative~~by the Agent. In no event shall any Purchaser institute, or join as a party in the institution of, or directly or indirectly assist in the prosecution of, any action, motion, defense, suit or proceeding (a) seeking a determination that any Lien of any Senior Creditor in any of the Collateral is invalid, unperfected or avoidable, (b) contesting or challenging the validity or enforceability of this Agreement or (c) contesting or challenging the validity or enforceability of the Senior Obligations or any guarantees or other obligations in respect thereof. In no event shall the ~~Representative~~Agent or any Senior Creditor institute, or join as a party in the institution of, or directly or indirectly assist in the prosecution of, any action, motion, defense, suit or proceeding contesting or challenging the validity or enforceability of this Agreement or the validity or enforceability of the Subordinated Obligations.

**SECTION 15. Effectuation of Subordination**. Each Purchaser by accepting a ~~Subordinated~~ Note authorizes and directs the Company on its behalf to take such action as may be necessary or appropriate to acknowledge or effectuate the subordination between the Purchasers and the Senior Creditors as provided in this Agreement.

**SECTION 16. Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

**SECTION 17.**     **Forum Selection and Consent to Jurisdiction.**

(a)     Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  In furtherance of the foregoing, and not in limitation thereof, ~~the Initial Purchaser~~Bio Dynamics hereby irrevocably designates, appoints and empowers **[_____]** (the "**Process Agent**"), with offices on the date hereof at **[_____]**, as its designee, appointee and agent with respect to any action or proceeding in New York to receive, accept and acknowledge for and on its behalf, and in respect of its property, service of any and all legal process, summons, notices and documents which may be served in any such action or proceeding, and ~~the Initial Purchaser~~Bio Dynamics hereby confirms and agrees that the Process Agent has been duly and irrevocably appointed as its agent and true and lawful attorney-in-fact in its name, place and stead to accept such service of any and all legal process, summons, notices and documents, and agrees that the failure of such Process Agent to give any advice of any such service of process to ~~the Initial Purchaser~~Bio Dynamics shall not impair or affect the validity of such service or of any judgment based thereon.  If for any reason such designee, appointee and agent shall cease to be available to act as such, ~~the Initial Purchaser~~Bio Dynamics agrees to designate a new designee, appointee and agent in New York City on the terms and for the purposes of this provision satisfactory to the representative.  ~~The Initial Purchaser~~Bio Dynamics further irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to ~~each of the Initial Purchaser~~Bio Dynamics and the Company, at the Company's address set forth on <u>Annex I</u> hereto, such service to become effective five days after such mailing.

(b)     Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in <u>Section 16</u> above.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)     Each party hereto irrevocably consents to service of process in any action or proceeding arising out of or relating to this Agreement in the manner provided for notices in <u>Section 19</u> hereof.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

**SECTION 18.**     **WAIVER OF JURY TRIAL**.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY

APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 18</u>.

SECTION 19.        **Notices**.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of electronic mail or four Business Days after deposit in the U.S. mail (registered or certified, with postage prepaid and properly addressed).  For the purposes hereof, the respective addresses of the parties hereto shall be as set forth on <u>Annex I</u> hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.  All notices to the ~~Working Capital Creditors, the Term A Note Creditors or the Term Loan B Creditors permitted or required under this Agreement~~<u>Senior Creditors</u> may be sent~~, respectively, to the Working Capital Administrative Agent, the Term A Note Administrative Agent or the Term Loan B Administrative to~~ Agent.  All notices to the Purchasers may be sent to the Initial ~~Purchaser~~<u>Purchasers</u>, subject to receipt from such other Purchaser of its notice for addresses pursuant to the terms of this <u>Section 19</u>.  In the event any Person becomes a Purchaser after the date hereof and such Person has not given written notice of its address pursuant to this <u>Section 19</u> (or its address is not otherwise set forth on <u>Annex I</u> hereto), then the Initial ~~Purchaser~~<u>Purchasers</u> may designate to the other parties hereto that all notices hereunder to such Person shall be given (until written notice of its address for notices is given by such Purchaser pursuant to this <u>Section 19</u>) to the Company at the address provided for the Company pursuant to the terms hereof, and shall be deemed received by such Purchaser when received by the Company pursuant to the terms hereof, and the Company shall promptly (and in any event within 2 days) forward any such notice so received to the intended recipient using the last known address for such recipient in the Company's records (it being understood and agreed that any failure of the Company to do so shall not in any way affect the validity of any notice).  Notwithstanding the foregoing, if at any time there are more than two Purchasers for whom the address for notices hereunder is different, the Purchasers shall promptly designate a representative for the purpose of receipt of notices to the Purchasers hereunder (which representative may be the Company, in the manner described in the immediately preceding sentence).

SECTION 20.        **Specific Performance**.  ~~Each of the Working Capital Administrative Agent, the Term A Note Administrative Agent, and the Term Loan B Administrative~~<u>The</u> Agent and each other Senior Creditor (including in ~~each case in~~ its capacity as ~~Representative~~<u>Agent</u>) may demand specific performance of this Agreement against any Purchaser or Credit Party.  Each Purchaser and each Credit Party hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the

remedy of specific performance in any action which may be brought by the ~~Working Capital Administrative Agent, the Term A Note Administrative Agent, the Term Loan B Administrative~~ Agent or any other Senior Creditor (including in ~~each case in~~ its capacity as ~~Representative~~Agent).

SECTION 21.        **Headings**.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

SECTION 22.        **Counterparts**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy or electronic (PDF) transmission shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

SECTION 23.        **Obligations Hereunder Not Affected**.  All rights and interests of the ~~Representative~~Agent and the Senior Creditors hereunder, and all agreements and obligations of the Purchasers and the Credit Parties hereunder, shall remain in full force and effect irrespective of:

(a)        any lack of validity or enforceability of any document evidencing Senior Obligations;

(b)        any change in the time, manner or place of payment of, or any other term of, all or any of the Senior Obligations, or any other amendment or waiver of or any consent to departure from any of the documents evidencing or relating to the Senior Obligations;

(c)        any exchange, release or non-perfection of any Collateral, or any release or amendment or waiver of or consent to departure from any guaranty or Senior Facility ~~Document,~~Documents for all or any of the Senior Obligations;

(d)        any failure of the ~~Representative~~Agent or any Senior Creditor to assert any claim or to enforce any right or remedy against any other party hereto under the provisions of this Agreement or any Senior Facility Document;

(e)        any reduction, limitation, impairment or termination of the Senior Obligations for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to (and the Company, each other Credit Party and the Purchasers hereby waive any right to or claim of) any defense (other than the defense of Discharge of Senior Obligations) or setoff, counterclaim, recoupment or termination whatsoever by reason of invalidity, illegality, nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Senior Obligation; and

(f)        any other circumstance which might otherwise constitute a defense (other than the defense of Discharge of Senior Obligations) available to, or a discharge of, the Company or any

other Credit Party in respect of the Senior Obligations or the Purchasers in respect of this Agreement.

SECTION 24. Expenses. The Purchasers agree to pay, upon demand, to the Representative or the Senior Creditors, as applicable, any and all reasonable costs and expenses, including reasonable attorneys' fees and disbursements which the Representative or the Senior Creditors may incur in connection with the exercise or enforcement of any of the rights or interest of the Representative or the Senior Creditors hereunder.

**SECTION 24.** SECTION 25. **Further Assurances**.  The Purchasers will, at Company's expense and at any time and from time to time, promptly execute and deliver all further instruments and documents, and take all further action, that may be reasonably necessary or appropriate, or that the ~~Representative~~Agent may reasonably request, in order to protect any right or interest granted or purported to be granted by this Agreement or to enable the Senior Creditors or the ~~Representative~~Agent to exercise and enforce their rights and remedies hereunder.

**SECTION 25.** SECTION 26. **Effectiveness; Continuing Nature of this Agreement; Severability**.  This Agreement shall become effective when executed and delivered by the parties hereto.  This is a continuing agreement of subordination; the Senior Creditors may continue, at any time and without notice to the Purchasers, to extend credit and other financial accommodations and lend monies to or for the benefit of the Credit Parties constituting Senior Obligations in reliance hereof.  The Purchasers hereby waive any right they may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  Without limiting the generality of the foregoing, this Agreement is intended to constitute and shall be deemed to constitute a "subordination agreement" within the meaning of Section 510(a) of the Bankruptcy Code and is intended to be and shall be interpreted to be enforceable to the maximum extent permitted pursuant to applicable nonbankruptcy law.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references to the Company or any other Credit Party shall include the Company or such Credit Party as debtor and debtor-in-possession and any receiver or trustee for the Company or such Credit Party in any Insolvency or Liquidation Proceeding.  This Agreement shall terminate and be of no further force and effect upon the Discharge of Senior Obligations, subject to the rights of the Senior Creditors under Section 7.

**SECTION 26.** SECTION 27. **Credit Parties; Additional Credit Parties**.  It is understood and agreed that the Company and each ~~Subsidiary~~Affiliate Guarantor on the date of this Agreement shall constitute the original Credit Parties party hereto.  The original Credit Parties hereby covenant and agree (a) that no Person shall provide any guarantee or other form of credit support in favor of any Purchaser in respect of any Subordinated Obligations, unless such Person is at all times also a guarantor in respect of all outstanding Senior Obligations, and that no material terms of such Person's guaranty or related documentation in favor of the Purchasers shall be more favorable to the Purchasers than the terms under such Person's guaranty or related documentation in favor of the Senior Creditors and (b) to cause each Subsidiary of the Parent which becomes a ~~Subsidiary~~Affiliate Guarantor after the date hereof to contemporaneously become a party hereto

(as a Credit Party) by executing and delivering a counterpart hereof to ~~each of the Working Capital Administrative Agent, the Term A Note Administrative Agent, the Term Loan B Administrative~~the Agent and each of the Purchasers, or by executing and delivering an assumption agreement in form and substance reasonably satisfactory to the ~~Representative~~Agent.  The parties hereto further agree that, notwithstanding any failure to take the actions required by the immediately preceding sentence, each Person which becomes a Credit Party at any time shall be subject to the provisions hereof as fully as if same constituted a Credit Party hereto and had complied with the requirements of the immediately preceding sentence.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their proper and duly authorized officers as of the day and year first above written.

BARCLAYS BANK PLC,
as Working Capital Administrative Agent

By: _____
Name: _____
Title: _____

BARCLAYS BANK PLC,
as Term A Note Administrative Agent

By: _____
Name: _____
Title: _____

[SILVER POINT FINANCE, LLC],
as ~~Term Loan B Administrative~~ Agent


By: _____
Name: _____
Title: _____

BIO DYNAMICS B.V./S. à r.L.,
as Initial Purchaser and a Purchaser

By: _____
Name: _____
Title: _____

J.P. Morgan Investment Management Inc., as discretionary investment manager for Noteholders who are clients of its Cincinnati High Yield Group

By: _____

_____ Name: _____

_____ Title: _____


Scoggin Capital Management, LP II
By:  S&E Partners LP Its: General Partner
By:  Scoggin Inc. Its: General Partner

By: _____

_____ Name: _____

_____ Title: _____


_____ Scoggin International Fund Ltd.

By: Scoggin LLC Its: Investment Manager

By: _____

_____ Name: _____

_____ Title: _____


Scoggin Worldwide Fund Ltd.
By: Old Bellows Partners LP Its: Investment Manager
By:  Old Bell Associates Its: General Partner

By: _____

Name: _____

Title: _____


Barclays Bank PLC


By: _____

Name: _____

Title: _____


CSAM Funding I


By: _____

Name: _____

Title: _____


CSAM Funding II


By: _____

Name: _____

Title: _____


CSAM Funding III


By: _____

_____ Name:

_____ Title:

CSAM Funding IV

By: _____
Name: _____
Title: _____

Atrium CDO

By: _____
Name: _____
Title: _____

Atrium II

By: _____
Name: _____
Title: _____

Atrium III

By: _____
Name: _____
Title: _____

Atrium IV

By: _____

Name: _____

Title: _____

Atrium V

By: Credit Suisse Alternative Capital, Inc.,
as collateral manager

By: _____
Name:
Title:

Credit Suisse Syndicated Loan Fund

By: Credit Suisse Alternative Capital, Inc. as
Agent (Subadvisor) for Credit Suisse Asset
Management (Australia) Limited, the
Responsible Entity for Credit Suisse
Syndicated Loan Fund

By: _____
Name:
Title:

Credit Suisse High Yield Fund

By: Credit Suisse Alternative Capital, Inc. as
Agent (Subadvisor) for Credit Suisse Asset
Management (Australia) Limited, the
Responsible Entity for Credit Suisse High
Yield Fund

By: _____
Name:
Title:

Policemen and Firemen Retirement System of the City of Detroit

By: Credit Suisse Alternative Capital, Inc. as subadvisor

By: _____

Name: _____

Title: _____

Castle Garden Funding

By: _____

Name: _____

Title: _____

Madison Park Funding II, Ltd.

By: Credit Suisse Alternative Capital, Inc., as collateral manager

By: _____

Name: _____

Title: _____

Madison Park Funding III, Ltd.

By: Credit Suisse Alternative Capital, Inc., as collateral manager

By: _____

Name: _____

Title: _____




Madison Park Funding V, Ltd.

By: Credit Suisse Alternative Capital, Inc.,
as collateral manager




By: _____

Name: _____

Title: _____

**EUROFRESH HOLDING COMPANY, INC.**

By: _____
Name: _____
Title: _____


EUROFRESH, INC.

By: _____
Name: _____
Title: _____


EUROFRESH PRODUCE, LTD.

By: _____
Name: _____
Title: _____

## ANNEX I
## Addresses for Notices


If to the Company or any other Credit Party:

_____

_____

_____

Attention: _____

Telecopy: _____

Telephone: _____

_____


If to the ~~Working Capital Administrative~~ Agent or ~~Working Capital~~ <u>Senior</u> Creditors (including in its capacity as ~~Representative~~ <u>Agent</u>, if applicable):

_____

_____

_____

Attention of: _____

Telecopy: _____

Telephone: _____


with a copy to:

_____

_____

_____

Attention of: _____

Telecopy: _____

Telephone: _____

809658.02 New York Server 2A                                        MSW - Draft August 28, 2009 - 1:24 AM
PHOENIX/499401.3505173.9

If to the Term A Note Administrative Agent or Term A Note Creditors (including in its capacity as Representative, if applicable):

_____
_____
_____
_____

Attention of: _____

Telecopy: _____

Telephone: _____

with a copy to:

_____
_____
_____
_____

Attention of: _____

Telecopy: _____

Telephone: _____

If to the Term Loan B Administrative Agent or Term Loan B Creditors (including in its capacity as Representative, if applicable):

_____
_____
_____

Attention of: _____

Telecopy: _____

Telephone: _____

with a copy to:

_____
_____
_____
_____

Attention: _____

Telecopy: _____

Telephone: _____

_____

Annex I-2

If to the Purchasers:

                                        _____

                                        _____

                                        _____

Attention:  _____

Telecopy:  _____

With a copy to:

                                        _____

                                        _____

                                        _____

Attention:  _____

Telecopy:  _____

Telephone:  _____

                                        _____

Annex I-3

# EXHIBIT A

Barclays Bank PLC

Scoggin Capital Management

JP Morgan Investment Management

Credit Suisse Alternative Capital, Inc.

PHOENIX/505708.4

<u>EXHIBIT 12</u>

Credit and Guaranty Agreement
(clean version)

**CREDIT AND GUARANTY AGREEMENT**

**dated as of _____ __, 2009**

**among**

**EUROFRESH, INC.,**
**as Borrower**

**EUROFRESH HOLDING COMPANY, INC. AND CERTAIN SUBSIDIARIES OF**
**EUROFRESH, INC.,**
**as Guarantors,**

**VARIOUS LENDERS,**

**and**

**SILVER POINT FINANCE, LLC,**
**as Administrative Agent, Collateral Agent, Syndication Agent,**
**Documentation Agent and Lead Arranger**

_____

**$[_____] Senior Secured Credit Facility**

_____

SECTION 1.    DEFINITIONS AND INTERPRETATION ................................................. 2
    1.1    Definitions ................................................................................................. 2
    1.2    Accounting Terms ..................................................................................... 32
    1.3    Interpretation, etc. .................................................................................... 33
SECTION 2.    LOANS ....................................................................................................... 33
    2.1    Loans .......................................................................................................... 33
    2.2    Pro Rata Shares ......................................................................................... 34
    2.3    Use of Proceeds ......................................................................................... 34
    2.4    Evidence of Debt; Register; Lenders' Books and Records; Notes ................... 34
    2.5    Interest on Loans ....................................................................................... 35
    2.6    Conversion/Continuation .......................................................................... 36
    2.7    Default Interest ......................................................................................... 37
    2.8    Administrative Agent and Collateral Management Fee ...................................... 37
    2.9    Scheduled Payments .................................................................................. 37
    2.10    Voluntary Prepayments ............................................................................. 37
    2.11    Mandatory Prepayments ........................................................................... 38
    2.12    Application of Prepayments ...................................................................... 40
    2.13    General Provisions Regarding Payments .................................................. 41
    2.14    Ratable Sharing ......................................................................................... 42
    2.15    Making or Maintaining LIBOR Rate Loans ............................................. 43
    2.16    Increased Costs; Capital Adequacy ......................................................... 44
    2.17    Taxes; Withholding, etc. ........................................................................... 46
    2.18    Obligation to Mitigate .............................................................................. 48
    2.19    Defaulting Lenders .................................................................................... 48
    2.20    Removal or Replacement of a Lender ...................................................... 49
SECTION 3.    CONDITIONS PRECEDENT ................................................................. 50
    3.1    Closing Date ............................................................................................... 50
SECTION 4.    REPRESENTATIONS AND WARRANTIES ...................................... 54
    4.1    Organization; Requisite Power and Authority; Qualification ................... 54
    4.2    Capital Stock and Ownership .................................................................... 55
    4.3    Due Authorization ..................................................................................... 55
    4.4    No Conflict ................................................................................................. 55
    4.5    Governmental Consents ............................................................................. 56
    4.6    Binding Obligation .................................................................................... 56
    4.7    Historical Financial Statements ................................................................ 56
    4.8    Projections .................................................................................................. 56
    4.9    No Material Adverse Change ..................................................................... 56
    4.10    No Restricted Junior Payments ................................................................ 56
    4.11    Adverse Proceedings, etc. ......................................................................... 56
    4.12    Payment of Taxes ...................................................................................... 57
    4.13    Properties ................................................................................................... 57
    4.14    Environmental Matters .............................................................................. 58
    4.15    No Defaults ................................................................................................ 58
    4.16    Material Contracts ..................................................................................... 58
    4.17    Governmental Regulation .......................................................................... 58
    4.18    Margin Stock .............................................................................................. 58

| | | |
|---|---|---|
| 4.19 | Employee Matters | 59 |
| 4.20 | Employee Benefit Plans | 59 |
| 4.21 | Certain Fees | 60 |
| 4.22 | Solvency | 60 |
| 4.23 | Compliance with Statutes, etc | 60 |
| 4.24 | Disclosure | 60 |
| 4.25 | Terrorism Laws and FCPA | 60 |
| 4.26 | Insurance | 61 |
| 4.27 | Common Enterprise | 61 |
| 4.28 | Security Interest in Collateral | 61 |
| 4.29 | Affiliate Transactions | 61 |
| 4.30 | Intellectual Property | 62 |
| 4.31 | Permits, etc | 62 |
| SECTION 5. | AFFIRMATIVE COVENANTS | 62 |
| 5.1 | Financial Statements and Other Reports | 62 |
| 5.2 | Existence | 67 |
| 5.3 | Payment of Taxes and Claims | 68 |
| 5.4 | Maintenance of Properties | 68 |
| 5.5 | Insurance | 68 |
| 5.6 | Books and Records; Inspections | 69 |
| 5.7 | Lenders Meetings | 69 |
| 5.8 | Compliance with Laws | 69 |
| 5.9 | Environmental | 69 |
| 5.10 | Subsidiaries | 72 |
| 5.11 | Additional Material Real Estate Assets | 72 |
| 5.12 | Further Assurances | 73 |
| 5.13 | Miscellaneous Business Covenants | 73 |
| 5.14 | Use of Proceeds | 73 |
| SECTION 6. | NEGATIVE COVENANTS | 74 |
| 6.1 | Indebtedness | 74 |
| 6.2 | Liens | 76 |
| 6.3 | No Further Negative Pledges | 78 |
| 6.4 | Restricted Junior Payments | 78 |
| 6.5 | Restrictions on Subsidiary Distributions | 78 |
| 6.6 | Investments | 79 |
| 6.7 | Financial Covenants | 80 |
| 6.8 | Fundamental Changes; Disposition of Assets; Acquisitions | 82 |
| 6.9 | Disposal of Subsidiary Interests | 83 |
| 6.10 | Sales and Leasebacks | 83 |
| 6.11 | Transactions with Shareholders and Affiliates | 83 |
| 6.12 | Conduct of Business | 83 |
| 6.13 | Permitted Activities | 83 |
| 6.14 | Amendments or Waivers of with respect to Subordinated Indebtedness | 84 |
| 6.15 | Fiscal Year | 84 |
| 6.16 | Deposit Accounts | 84 |
| 6.17 | Amendments to Organizational Agreements | 84 |

6.18     Prepayments of Certain Indebtedness ............................................................. 84
6.19     Issuance of Disqualified Capital Stock ......................................................... 85
6.20     Limitation on New Operating Leases .......................................................... 85
6.21     Limitations on Rabo Bank Account ............................................................ 85
SECTION 7.     GUARANTY ................................................................................ 85
7.1     Guaranty of the Obligations ......................................................................... 85
7.2     Contribution by Guarantors ......................................................................... 85
7.3     Payment by Guarantors ................................................................................ 86
7.4     Liability of Guarantors Absolute ................................................................. 86
7.5     Waivers by Guarantors ................................................................................. 88
7.6     Guarantors' Rights of Subrogation, Contribution, etc ...................................... 89
7.7     Subordination of Other Obligations ............................................................ 89
7.8     Continuing Guaranty .................................................................................... 90
7.9     Authority of Guarantors or Company ......................................................... 90
7.10     Financial Condition of Company .................................................................. 90
7.11     Bankruptcy, etc ............................................................................................ 90
7.12     Discharge of Guaranty Upon Sale of Guarantor .......................................... 91
7.13     Taxes ............................................................................................................. 91
SECTION 8.     EVENTS OF DEFAULT ........................................................... 91
8.1     Events of Default .......................................................................................... 91
SECTION 9.     AGENTS ..................................................................................... 94
9.1     Appointment of Agents ................................................................................ 94
9.2     Powers and Duties ........................................................................................ 95
9.3     General Immunity ......................................................................................... 95
9.4     Agents Entitled to Act as Lender ................................................................. 96
9.5     Lenders' Representations, Warranties and Acknowledgment ........................... 96
9.6     Right to Indemnity ....................................................................................... 97
9.7     Successor Administrative Agent ................................................................... 97
9.8     Collateral Documents and Guaranty ........................................................... 99
9.9     Posting of Approved Electronic Communications ....................................... 99
9.10     Proofs of Claim ............................................................................................ 101
9.11     Agents and Arrangers .................................................................................. 101
SECTION 10.     MISCELLANEOUS ................................................................... 102
10.1     Notices .......................................................................................................... 102
10.2     Expenses ....................................................................................................... 102
10.3     Indemnity ...................................................................................................... 103
10.4     Set Off .......................................................................................................... 104
10.5     Amendments and Waivers ............................................................................ 104
10.6     Successors and Assigns; Participations ....................................................... 105
10.7     Special Purpose Funding Vehicles .............................................................. 108
10.8     Independence of Covenants ......................................................................... 109
10.9     Survival of Representations, Warranties and Agreements ........................... 109
10.10     No Waiver; Remedies Cumulative .............................................................. 109
10.11     Marshalling; Payments Set Aside ................................................................ 109
10.12     Severability .................................................................................................. 110
10.13     Obligations Several; Independent Nature of Lenders' Rights ....................... 110

10.14 Headings ................................................................................................ 110
10.15 Applicable Law ...................................................................................... 110
10.16 Consent to Jurisdiction ......................................................................... 110
10.17 Waiver of Jury Trial .............................................................................. 111
10.18 Confidentiality ....................................................................................... 111
10.19 Usury Savings Clause ........................................................................... 112
10.20 Counterparts ........................................................................................... 113
10.21 Effectiveness .......................................................................................... 113
10.22 Patriot Act .............................................................................................. 113
10.23 Disclosure ............................................................................................... 113
10.24 Appointment for Perfection ................................................................... 113
10.25 Advertising and Publicity ...................................................................... 113
10.26 Entire Agreement ................................................................................... 113

**APPENDICES:**    A    Loan Amounts
    B    Notice Addresses

**SCHEDULES:**    1.1(a)  Certain Material Contracts
    1.1(b)  Certain Material Real Estate Assets
    4.1    Jurisdictions of Organization and Qualification
    4.2    Capital Stock and Ownership
    4.11   Adverse Proceedings
    4.12   Pending Property Tax Matters
    4.13   Real Property
    4.16   Material Contracts
    4.26   Insurance
    4.29   Affiliate Transactions
    4.30   Intellectual Property
    6.1    Certain Permitted Indebtedness
    6.2(j)   Certain Permitted Liens
    6.6    Certain Permitted Investments
    6.16   Closing Date Control Agreements

**EXHIBITS:**    A-1   Exchange Offer Letter
    A-2   Assignment Agreement
    B    Form of Bailee Letter
    C    Certificate Regarding Non-Bank Status
    D    Closing Date Certificate
    E    Compliance Certificate
    F    Conversion / Continuation Notice
    G    Counterpart Agreement
    H    Funding Notice
    I    Landlord Collateral Access Agreement
    J    Form of Mortgage

| K | Collateral Questionnaire |
| L | Form of Security Agreement |
| M | Promissory Note |
| N | Opinions of Counsel |
| O | Pending 401(k) Catch-Up Payment Amounts |
| P | Pending Investigation Settlement Amounts |

# CREDIT AND GUARANTY AGREEMENT

This **CREDIT AND GUARANTY AGREEMENT**, dated as of [_____ ___], 2009, is entered into by and among **EUROFRESH, INC.**, a Delaware corporation ("**Company**"), **EUROFRESH HOLDING COMPANY, INC.** ("**HoldCo**") as a Guarantor and **CERTAIN SUBSIDIARIES OF COMPANY**, as Guarantors, **SPCP GROUP LLC**, as a Lender, the other Lenders party hereto from time to time, **SILVER POINT FINANCE, LLC** ("**Silver Point**"), as Administrative Agent (in such capacity, "**Administrative Agent**"), Collateral Agent (in such capacity, "**Collateral Agent**"), Lead Arranger (in such capacity, the "**Lead Arranger**"), Syndication Agent (in such capacity, "**Syndication Agent**"), and Documentation Agent (in such capacity, "**Documentation Agent**").

## RECITALS:

**WHEREAS**, capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS**, Company, Eurofresh Produce Ltd. ("**EPL**")as Guarantor, SPCP Group LLC, the other Lenders party thereto (the "**Existing Lenders**"), and Silver Point, as administrative agent (in such capacity, the "**Existing Administrative Agent**") have previously executed that certain Credit and Guaranty Agreement dated as of March 25, 2008, as amended by (i) that certain Amendment No. 1 to Credit and Guaranty Agreement dated as of March 31, 2008 and effective March 25, 2008, (ii) that certain Amendment No. 2 to Credit Agreement and Waiver dated as of July 14, 2008 and (iii) that certain Amendment No. 3 to Credit and Guaranty Agreement and Waiver dated as of September [__], 2008 (collectively, the "**Prior Agreement**" or "**Existing Agreement**");

**WHEREAS**, on April 21, 2009, Company and Eurofresh Produce Ltd commenced bankruptcy proceedings, Case No. 2:09-bk-07970-CGC and Case No. 2:09-bk-07971-CGC (jointly, the "**Bankruptcy Case**") before the United States Bankruptcy Court for the District of Arizona (the "**Bankruptcy Court**") under Chapter 11 of the United States Bankruptcy Code; and

**WHEREAS**, as part of the Bankruptcy Case, Company and EPL proposed that Joint Plan of Reorganization (the "**Plan**") for confirmation by the Bankruptcy Court.

**WHEREAS**, Company has offered and the Lenders party hereto have agreed to exchange the Indebtedness constituting the Obligations under the Existing Agreement for the right to receive, in full satisfaction and replacement of such existing Indebtedness owing to such Lender under the Existing Agreement and all accrued and unpaid interest thereon, the Loans contemplated by and to be evidenced and governed by this Agreement and the Loan Documents as defined hereunder (all as more particularly described and in accordance with the Exchange Offer Letter attached hereto as Exhibit A-1 (the "**Exchange Offer**")) (such exchange and all transactions incidental to and performed in connection with such exchange being hereinafter referred to in their integrated entirety as the "**Debt Exchange**").

**NOW**, **THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

# SECTION 1.  DEFINITIONS AND INTERPRETATION.

**1.1** **Definitions**.  The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**Adjusted LIBOR Rate**" means, for any Interest Rate Determination Date with respect to an Interest Period for a LIBOR Rate Loan, the greater of (A) three and a half percent (3.5%) per annum and (B) the rate per annum obtained by dividing (and rounding upward to the next whole multiple of one-sixteenth of one percent (1/16 of 1%)) (i) (a) the rate per annum (rounded to the nearest one-hundredth of one percent (1/100 of 1%)) equal to the rate determined by Administrative Agent to be the offered rate which appears on Reuters Screen LIBOR01 Page for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (b) in the event the rate referenced in the preceding clause (a) does not appear on such page or service or if such page or service shall cease to be available, the rate per annum (rounded to the nearest one-hundredth of one percent (1/100 of 1%)) equal to the rate determined by Administrative Agent to be the offered rate on such other page or other service which displays an average British Bankers Association Interest Settlement Rate for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (c) in the event the rates referenced in the preceding clauses (a) and (b) are not available, the rate per annum (rounded to the nearest one-hundredth of one percent (1/100 of 1%)) equal to the offered quotation rate to first class banks in the London interbank market for deposits (for delivery on the first day of the relevant period) in Dollars of amounts in same day funds comparable to the principal amount of the applicable Loan, for which the Adjusted LIBOR Rate is then being determined with maturities comparable to such period as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date as determined by Administrative Agent in accordance with its customary practices, by (ii) an amount equal to (a) one, minus (b) the Applicable Reserve Requirement.

"**Administrative Agent**" as defined in the preamble hereto.

"**Administrative Agent's Account**" means a Deposit Account at a bank designated by Administrative Agent from time to time as the account into which Credit Parties shall make all payments to Administrative Agent for the benefit of Agent and Lenders under this Agreement and the other Credit Documents.

"**Adverse Proceeding**" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Company or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims) or other regulatory body or any arbitrator whether pending or, to the best knowledge of Company or any of its Subsidiaries, threatened against or affecting Company or any of its Subsidiaries or any property of Company or any of its Subsidiaries.

"**Affected Lender**" as defined in Section 2.15(b).

"**Affected Loans**" as defined in Section 2.15(b).

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote five percent (5%) or more of the Securities having ordinary voting power for the election of directors of such Person, or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise. Notwithstanding anything to the contrary herein, in no event shall any Agent or Lender be considered an "Affiliate" of any Credit Party by virtue of its holding of Loans.

"**Agent**" means each of Administrative Agent, Collateral Agent, Syndication Agent, and Documentation Agent.

"**Aggregate Amounts Due**" as defined in Section 2.14.

"**Aggregate Payments**" as defined in Section 7.2.

"**Agreement**" means this Credit and Guaranty Agreement, dated as of [_____ ___], 2009, as it may be amended, supplemented or otherwise modified from time to time and any annexes, exhibits, schedules to any of the foregoing.

"**Applicable Margin**" means, with respect to Loans that are Base Rate Loans, a percentage, per annum, equal to six and one-quarter percent (6.25%) and, with respect to Loans that are LIBOR Rate Loans, a percentage, per annum, equal to seven and one-quarter percent (7.25%).

"**Applicable Reserve Requirement**" means, at any time, for any LIBOR Rate Loan, the maximum rate, expressed as a decimal, at which reserves (including any basic marginal, special, supplemental, emergency or other reserves) are required to be maintained with respect thereto against "Eurocurrency Liabilities" (as such term is defined in Regulation D) under regulations issued from time to time by the Board of Governors of the Federal Reserve System or other applicable banking regulator. Without limiting the effect of the foregoing, the Applicable Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to (i) any category of liabilities which includes deposits by reference to which the applicable Adjusted LIBOR Rate or any other interest rate of a Loan is to be determined, or (ii) any category of extensions of credit or other assets which include LIBOR Rate Loans. A LIBOR Rate Loan shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to reserve requirements without benefits of credit for proration, exceptions or offsets that may be available from time to time to the applicable Lender. The rate of interest on LIBOR Rate Loans shall be adjusted automatically on and as of the effective date of any change in the Applicable Reserve Requirement.

"**Asset Sale**" means a sale, lease or sub lease (as lessor or sublessor), sale and leaseback, assignment, conveyance, license, transfer or other disposition to, or any exchange of property with, any Person, in one transaction or a series of related transactions, of all or any part

of Company's or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including the Capital Stock of any of Company's Subsidiaries, other than (i) inventory sold or leased in the ordinary course of business and (ii) obsolete equipment and fixtures with a fair market value not exceeding $500,000 in the aggregate in any Fiscal Year and $1,000,000 in the aggregate until payment in full in cash of all Obligations.

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Exhibit A, with such amendments or modifications as may be approved by Administrative Agent.

"**Attributable Debt**" means as of the date of determination thereof, without duplication, (i) in connection with a sale and leaseback transaction, the net present value (discounted according to GAAP at the cost of debt implied in the lease) of the obligations of the lessee for rental payments during the then-remaining term of any applicable lease, and (ii) the principal balance outstanding under any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product to which such Person is a party, where such transaction is considered borrowed money indebtedness for tax purposes but is classified as an operating lease in accordance with GAAP.

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president, chief financial officer or treasurer, in each case, whose signatures and incumbency have been certified to Administrative Agent.

"**Bailee's Letter**" means a Bailee Letter substantially in the form of Exhibit B with such amendments or modifications as may be approved by Collateral Agent.

"**Bankruptcy Case**" means Case No. 2:09-bk-07970-CGC and Case No. 2:09-bk-07971-CGC before the Bankruptcy Court.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" means the United State Bankruptcy Court for the District of Arizona.

"**Base Rate**" means, for any day, the higher of (i) the Prime Rate, and (ii) the Federal Funds Effective Rate from time to time *plus* three percent (3%). For purposes of computing interest payments on the Loans, the Base Rate shall not be less than four and one-half percent (4.5%). Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively

"**Base Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Base Rate.

"**Beneficiary**" means each Agent and Lender.

"**Business Day**" means (i) any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close, and (ii) with respect to all notices, determinations, fundings and payments in connection with the Adjusted LIBOR Rate or any LIBOR Rate Loans, the term "**Business Day**" shall mean any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"**Business Trade Secrets**" as defined in Section 1.4.

"**Capital Lease**" means, as applied to any Person, any lease of (or other arrangement conveying the right to use) any property (whether real, personal or mixed) by that Person as lessee (or the equivalent) that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing, including without limitation shares of PIK Preferred Stock and any other class of preferred stock.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account.

"**Cash Equivalents**" means, as at any date of determination, (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States government, or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one (1) year after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one (1) year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iii) commercial paper maturing no more than one (1) year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within one (1) year after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator), and (b) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and (v) shares of any money market mutual fund that (a) has at least ninety-five percent (95%) of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (b) has net assets of not less than $500,000,000, and (c) has the highest rating obtainable from either S&P or Moody's.

"**Certificate Regarding Non-Bank Status**" means a certificate substantially in the form of Exhibit C.

"**Change of Control**" means, at any time, either (i) (A) Equity Investors shall cease to collectively and beneficially own and control, free and clear of all Liens or other encumbrances, more than fifty percent (50%), on a fully diluted basis, of the voting and/or economic interests in the outstanding Capital Stock of HoldCo, (B) one or more Van Den Berg Persons shall cease, to beneficially own and control on an aggregate basis, either directly or through Biodynamics, free and clear of all Liens or other encumbrances, more than 50%, on a fully diluted basis, of the voting interests in the outstanding Capital Stock of HoldCo beneficially held by Johan van den Berg (either directly or through Biodynamics) on the Closing Date, or more than 50%, on a fully diluted basis, of the economic interests in the outstanding Capital Stock of HoldCo beneficially held by Johan van den Berg (either directly or through Biodynamics) collectively on the Closing Date or (C) any Person or group of Persons shall enter into a contract or agreement that would result in the foregoing; or (ii) the majority of the seats (other than vacant seats) on the board of directors (or similar governing body) of HoldCo or Company cease to be occupied by Persons who either (a) were members of the board of directors of Company on the Closing Date, or (b) were nominated for election or appointed by the board of directors of Company, a majority of whom were directors on the Closing Date or whose election or nomination for election was previously approved (either by a specific vote or by approval of a proxy statement in which such individual is named as a nominee for election as a director) by a majority of such directors; (iii) any "change of control" or similar event under the Subordinated Note Documents or the PIK Preferred Stock shall occur; (iv) any event, transaction or occurrence as a result of which Johan van den Berg shall for any reason cease to be actively engaged in the management of the Company, unless an interim or permanent successor reasonably acceptable to Administrative Agent and the Requisite Lenders is promptly appointed; or (v) HoldCo shall cease to be the legal and beneficial owner of 100% of the Capital Stock of the Company.

"**Closing Date**" means the date on which the Debt Exchange shall be deemed consummated upon the satisfaction or waiver in writing in accordance with Section 10.5 of the conditions precedent set forth in Section 3.1 .

"**Closing Date Certificate**" means a Closing Date Certificate substantially in the form of Exhibit D.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Capital Stock) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Obligations.

"**Collateral Agent**" as defined in the preamble hereto.

"**Collateral Documents**" means the Security Agreement, the Subordination Agreement, each Control Agreement, the Mortgages, the Landlord Collateral Access Agreement and Bailee's Letters, if any, and all other instruments, documents and agreements delivered by any Credit Party pursuant to this Agreement or the Prior Agreement or any of the other Credit Documents in order to grant to Collateral Agent, for the benefit of Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

"**Collateral Questionnaire**" means a certificate substantially in the form of Exhibit K that provides information with respect to the personal or mixed property of each Credit Party.

"**Commodity Hedge Agreement**" means any agreement entered into by a Credit party in respect of a Commodity Hedge Transaction.

"**Commodity Hedge Transaction**" means any transaction (including an agreement with respect thereto) now existing or hereafter entered into by any Credit Party which is a commodity swap, commodity option, cap transaction, floor transaction, collar transaction, forward transaction or any other similar transaction (including any option with respect to any of these transactions) in each case that constitutes a fully effective cash flow hedge according to GAAP and that provides protection against fluctuations in commodity prices, either generally or under specific contingencies, and in each case not entered into or traded for speculative purposes.

"**Communications**" as defined in Section 9.9(a).

"**Company**" as defined in the preamble hereto.

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of Exhibit E.

"**Confirmation Date**" means the date of entry of the Confirmation Order by the Bankruptcy Court

"**Confirmation Order**" means the order by the Bankruptcy Court entered on [October __], 2009, confirming the Plan.

"**Consolidated Adjusted EBITDA**" means, for any period, an amount determined for Company and its Subsidiaries on a consolidated basis equal to: (i) the sum, without duplication, of the amounts for such period of:

(a)     Consolidated Net Income, plus

(b)     to the extent deducted in the calculation of Consolidated Net Income:

(1)     Consolidated Interest Expense, plus

(2)     provisions for taxes based on income, plus

(3)     total depreciation expense, plus

(4)     total amortization expense, plus

(5)     non-cash management stock option expense, plus

(6)     all Restructuring Costs; plus

(7)     extraordinary non-Cash losses (as determined in accordance with GAAP) not to exceed $500,000 in any Fiscal Quarter, plus

(8)     all actual Pending Investigation Settlement Amounts (not to exceed $650,000 for the portion thereof applicable to the DOJ Investigation and not to exceed $950,000 for the portion thereof attributable to the DOL Investigation, in each case in the aggregate for all periods) during such period plus

(9)     all actual Pending 401(k) Catch-Up Payment Amounts paid during such period not to exceed $83,000 in the aggregate; plus

(10)     all actual Pending Property Tax Dispute Settlement Amounts (not to exceed $700,000 in the aggregate for all periods);

minus (ii) the sum, without duplication of the amounts for such period to the extent included in the calculation of Consolidated Net Income of:

(a)     other non-recurring items increasing Consolidated Net Income for such period (excluding any such non-recurring item to the extent it represents the reversal of an accrual or reserve for a potential Cash item in any prior period), plus

(b)     interest income, plus

(c)     extraordinary and non-recurring Cash gains and other extraordinary and non-recurring Cash income.

"**Consolidated Capital Expenditures**" means, for any period, the aggregate of all expenditures of Company and its Subsidiaries during such period determined on a consolidated basis that, in accordance with GAAP, are or should be included in "purchase of property and equipment (including the portion of liabilities under any Capital Lease that is or should be capitalized in accordance with GAAP) or which should otherwise be capitalized" or similar items reflected in the consolidated statement of cash flows of Company and its Subsidiaries.

"**Consolidated Cash Interest Expense**" means, for any period, Consolidated Interest Expense for such period, excluding any amount not payable in Cash.

"**Consolidated Excess Cash Flow**" means, for any period, an amount (if positive) determined for Company and its Subsidiaries on a consolidated basis equal to:

(i) the sum, without duplication, of the amounts for such period of:

(a)     Consolidated Adjusted EBITDA, plus

(b)     interest income, plus

(c)     cash generated from changes in Working Capital as set forth on the Company's balance sheet subject to, for purposes of determining Consolidated Excess Cash Flow, a cap of $3,000,000 in any Fiscal Year, plus

(d)     Cash received from a hedging counter party with respect to expired Commodity Hedge Agreements, to the extent not recognized in Consolidated Net Income for such period, plus

(e)     the amount that was recognized by the Company in calculating Consolidated Net Income for such period that relates to Cash paid in a prior testing period to a hedging counter party with respect to Commodity Hedge Transactions in satisfaction of amounts owed under expired Commodity Hedge Agreements, plus

(f)     extraordinary Cash gains and extraordinary cash other income, minus

(ii)    the sum, without duplication, of the amounts for such period of (provided that for each category below such deduction may be taken only to the extent that such payment below was permitted under the terms of this Agreement during such period):

(a)     voluntary repayments of Obligations arising under this Agreement and scheduled repayments of Capital Leases, in each case to the extent permitted under this Agreement; plus

(b)     repayments of Subordinated PIK A Notes permitted under this Agreement, plus

(c)     Consolidated Capital Expenditures paid in Cash net of (x) any Net Asset Sale Proceeds to the extent reinvested in accordance with Section 2.11(a), (y) Net Insurance/Condemnation Proceeds to the extent reinvested in accordance with Section 2.11(b), and (z) any proceeds of related financings with respect to such expenditures, plus

(d)     Consolidated Cash Interest Expense, plus

(e)     provisions for current taxes based on income of Company and its Subsidiaries and paid in Cash with respect to such period, plus

(f)     to the extent that such payment was included in the calculation of Consolidated Adjusted EBITDA, all Restructuring Costs paid in cash, plus

(g)     to the extent that such payment was included in the calculation of Consolidated Adjusted EBITDA, any (x) Pending Investigation Settlement Amounts and (y) any other cash payments in respect of any settlement of pending or threatened claims against Company or indemnified by Company for violation of law (not to exceed, with respect to amounts described in clause (y), $750,000 in any Fiscal Year or such amount as would result in an Event of Default pursuant to Section 8.1(h)), plus

(h)      cash payments in respect of any Prepayment Premium required to be paid by Company to the Lenders pursuant to this Agreement, plus

(i)      Cash paid to a hedging counter party with respect to expired Commodity Hedge Agreements, to the extent not recognized in Consolidated Net Income for such period, plus

(j)      the amount that was recognized by the Company in calculating Consolidated Net Income for such period that relates to Cash received from to a hedging counter party during a prior testing period with respect to Commodity Hedge Transactions in satisfaction of amounts owed under expired Commodity Hedge Agreements, plus

(k)      investments in Working Capital as set forth on the Company's balance sheet, subject to, for purposes of determining Consolidated Excess Cash Flow, a maximum total investment in Working Capital of $3,000,000 in any Fiscal Year.

"**Consolidated Interest Expense**" means, for any period, total interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) of Company and its Subsidiaries on a consolidated basis with respect to all outstanding Indebtedness including all commissions, discounts and other fees and charges owed with respect to letters of credit and net costs under Interest Rate Agreements, but excluding, however, any Closing Fees payable on or before the Closing Date.

"**Consolidated Net Income**" means, for any period:

(i)      the net income (or loss) of Company and its Subsidiaries on a consolidated basis for such period taken as a single accounting period determined in conformity with GAAP, minus

(ii)      the sum of:

(a) the income (or loss) of any Person (other than a Subsidiary of Company) in which any other Person (other than Company or any of its Subsidiaries) has a joint interest, except to the extent of the amount of dividends or other distributions actually paid to Company or any of its Subsidiaries by such Person during such period, plus

(b) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of Company or is merged into or consolidated with Company or any of its Subsidiaries or that Person's assets are acquired by Company or any of its Subsidiaries, plus

(c) the income of any Subsidiary of Company to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary, plus

(d) any after tax gains or losses attributable to Asset Sales or returned surplus assets of any Pension Plan.

"**Consolidated Total Secured Debt**" means, as at any date of determination: the sum of (a) the aggregate stated balance sheet amount of all Indebtedness of Company and its Subsidiaries determined on a consolidated basis in accordance with GAAP, plus (b) the aggregate outstanding amount, without duplication, of Attributable Debt of Company and its Subsidiaries determined on a consolidated basis, minus (c) the aggregate stated balance sheet amount of Subordinated Notes.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Contributing Guarantors**" as defined in Section 7.2.

"**Control Agreements**" means a control agreement, in form and substance satisfactory to Administrative Agent, entered into with the bank or securities intermediary at which any Deposit Account or Securities Account is maintained by any Credit Party as required under the terms of Section 6.16 or the Security Agreement. Schedule 6.16 identifies all of the Control Agreements that are required to be in effect on Closing Date.

"**Conversion/Continuation Date**" means the effective date of a continuation or conversion, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"**Conversion/Continuation Notice**" means a Conversion/Continuation Notice substantially in the form of Exhibit F.

"**Counterpart Agreement**" means a Counterpart Agreement substantially in the form of Exhibit G delivered by a Credit Party pursuant to Section 5.10.

"**Credit Date**" means the date of a Credit Extension.

"**Credit Document**" means any of this Agreement, the Notes, if any, the Collateral Documents, and all other certificates, documents, instruments or agreements executed and delivered by a Credit Party for the benefit of any Agent, or any Lender in connection herewith.

"**Credit Extension**" means the making, conversion or continuance of a Loan.

"**Credit Party**" means each Person (other than any Agent or any Lender or any representative thereof) from time to time party to a Credit Document.

"**Cure Date**" as defined in Section 6.7(e).

"**Cure Right**" as defined in Section 6.7(e).

"**Cure Shortfall Amount**" means, for any Fiscal Quarter, with respect to any cure of a financial covenant as set forth is Section 6.7(a) or (b) for any measurement period, the amount of Net Cure Proceeds required to enable Company to be in compliance with the financial covenant that would otherwise be breached through an increase in the amount of Consolidated Adjusted EBITDA for such Fiscal Quarter.

"**Currency Agreement**" means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with Company's and its Subsidiaries' operations and not for speculative purposes.

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Default Excess**" means, with respect to any Defaulting Lender, the excess, if any, of such Defaulting Lender's Pro Rata Share of the aggregate outstanding principal amount of Loans of all Lenders (calculated as if all Defaulting Lenders (other than such Defaulting Lender) had funded all of their respective Defaulted Loans) over the aggregate outstanding principal amount of all Loans of such Defaulting Lender.

"**Default Period**" means, with respect to any Defaulting Lender, the period commencing on the date of the applicable Funding Default and ending on the earliest of the following dates: (i) the date on which the Obligations are declared or become immediately due and payable, (ii) the date on which the Default Excess with respect to such Defaulting Lender shall have been reduced to zero (whether by the funding by such Defaulting Lender of any Defaulted Loans of such Defaulting Lender or by the non-pro rata application of any voluntary or mandatory prepayments of the Loans in accordance with the terms of Section 2.10 or Section 2.11 or by a combination thereof), and (iii) the date on which Company, Administrative Agent and Requisite Lenders waive all Funding Defaults of such Defaulting Lender in writing.

"**Default Rate**" means any interest payable pursuant to Section 2.7.

"**Defaulted Loan**" as defined in Section 2.19.

"**Defaulting Lender**" as defined in Section 2.19.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Disqualified Capital Stock**" means Capital Stock that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the first anniversary of the Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Capital Stock referred to in clause (a) above, in each case at any time prior to the first anniversary of the

Maturity Date, (c) contains any repurchase obligation that may come into effect prior to payment in full of all Obligations, (d) requires Cash dividend payments prior to one (1) year after the Maturity Date, (e) does not provide that any claims of any holder of such Capital Stock may have against Company or any other Credit Party (including any claims as judgment creditor or other creditor in respect of claims for the breach of any covenant contained therein) shall be fully subordinated (including a full remedy bar) to the Obligations in a manner satisfactory to Administrative Agent, (f) provides the holders of such Capital Stock thereof with any rights to receive any Cash upon the occurrence of a change of control prior to the first anniversary date on which the Obligations have been irrevocably paid in full, unless the rights to receive such Cash are contingent upon the Obligations being irrevocably paid in full, or (g) is prohibited by the terms of this Agreement; provided, however, that notwithstanding the foregoing, neither the PIK Preferred Stock nor the Subordinated Notes shall constitute Disqualified Capital Stock.

"**Documentation Agent**" as defined in the preamble hereto.

"**DOJ Investigation**" means, collectively, any and all investigations of the Credit Parties by any unit of the U.S. Department of Justice (including the United States Attorney and/or U.S. Immigration and Customs Enforcement that are settled, adjudicated, or ongoing as of the Closing Date.

"**DOL Investigation**" means, collectively, any and all investigations of the Credit Parties by any unit of the U.S. Department of Labor that are settled as of the Closing Date.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Domestic Subsidiary**" means any Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia.

"**Effective Date**" [shall have the meaning provided in the Plan.]

"**Eligible Assignee**" means (i) (a) any Lender, any Affiliate of any Lender and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), and (b) any commercial bank, finance company, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans as one of its businesses, or (ii) any other Person (other than a natural Person) approved by Administrative Agent; provided, neither (A) Company nor any Affiliate of Company nor (B) Biodynamics and/or any Van Den Berg Person or any Affiliate of Biodynamics and/or any Van Den Berg Person, shall, in any event, be an Eligible Assignee. Until a Default has occurred, none of Village Farms Income Fund, Mastronardi Produce, Ltd., Backyard Farms, LLC, or their respective Subsidiaries shall be an Eligible Assignee.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed by, Company, any of its Subsidiaries or any of their respective ERISA Affiliates.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all current or future foreign or domestic, federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities relating to (i) public health and safety, protection of the environment or other environmental matters, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare.

"**EPL**" has the meaning set forth in the Recitals.

"**Equity Investors**" means Bio Dynamics B.V./S.a.r.L. ("**Biodynamics**") (for so long as Biodynamics is under the control of a Van Den Berg Person), Barclays Bank PLC, Scoggin Capital Management, JP Morgan Asset Management and Credit-Suisse Alternative Capital, Inc., and the respective Affiliates of each of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto, in each case together with the regulations thereunder.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of Company or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of Company or any such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of Company or such Subsidiary and with respect to liabilities arising after such period for which Company or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for thirty (30)-day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance

with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) notice of intent to terminate a Pension Plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by Company, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two (2) or more non-related contributing sponsors or the termination of any such Pension Plan resulting in liability to Company, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might reasonably constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on Company, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of Company, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any liability or potential liability therefor, or the receipt by Company, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission which could give rise to the imposition on Company, any of its Subsidiaries or any of their respective ERISA Affiliates of material fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan or the assets thereof, or against Company, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (xi) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"**Event of Default**" means each of the conditions or events set forth in Section 8.1.

"**Extraordinary Receipts**" means any Cash received by or paid to or for the account of Company or any of its Subsidiaries not in the ordinary course of business, including any foreign, United States, state or local tax refunds, pension plan reversions, judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustment received in connection with any purchase agreement and proceeds of insurance (excluding, however, any Net Insurance/Condemnation Proceeds which are subject to Section 2.11(b)).

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by Company or any of its Subsidiaries or any of their respective predecessors or Affiliates.

"**Fair Share**" as defined in Section 7.2.

"**Fair Share Contribution Amount**" as defined in Section 7.2.

"**Federal Funds Effective Rate**" means for any day, the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to the next higher one-hundredth of one percent (1/100 of 1%)) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average of the quotations on such day received by Administrative Agent from three federal funds brokers of recognized standing selected by it.

"**Financial Covenants**" means, collectively, the requirements of Section 6.7.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer of Company that such financial statements fairly present, in all material respects, the financial condition of Company and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, in each case in conformity with GAAP applied on a consistent basis, subject, in the case of interim financial statements, to changes resulting from normal audit and year-end adjustments.

"**Financial Plan**" as defined in Section 5.1(i).

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the only Lien to which such Collateral is subject, other than any Permitted Lien.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Company and its Subsidiaries ending on December 31 of each calendar year.

"**Flood Hazard Property**" means any Real Estate Asset subject to a mortgage in favor of Collateral Agent, for the benefit of the Secured Parties, and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**Foreign Subsidiary**" means any Subsidiary that is not a Domestic Subsidiary.

"**Funding Default**" as defined in Section 2.19.

"**Funding Guarantor**" as defined in Section 7.2.

"**Funding Notice**" means a notice substantially in the form of Exhibit H.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, United States generally accepted accounting principles in effect as of the date of determination thereof.

"**Governmental Acts**" means any act or omission, whether rightful or wrongful, of any present or future de jure or de facto government or Governmental Authority.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government or any political subdivision thereof.

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Granting Lender**" as defined in Section 10.7.

"**Grantor**" as defined in the Security Agreement.

"**Guarantee**" means, with respect to any Person, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, that is (a) an obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; or (b) a liability of such Person for an obligation of another through any agreement (contingent or otherwise) (i) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (ii) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (i) or (ii) of this clause (b), the primary purpose or intent thereof is as described in clause (a) above.

"**Guaranteed Obligations**" as defined in Section 7.1.

"**Guarantor**" means HoldCo and each Domestic Subsidiary of Company.

"**Guarantor Subsidiary**" means each Guarantor that is a Domestic Subsidiary.

"**Guaranty**" means the guaranty of each Guarantor set forth in Section 7.

"**Hazardous Materials**" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Environmental Law or Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Facility or to the indoor or outdoor environment.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender in respect of the credit facilities provided to Company under this Agreement which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"**Historical Financial Statements**" means as of the Closing Date, (i) audited financial statements of Company and its Subsidiaries for the Fiscal Year ended 2007 and unaudited financial statements of Company and its Subsidiaries for the Fiscal Year ended 2008, each consisting of balance sheets and the related consolidated statements of income, stockholders' equity and cash flows for such Fiscal Year, and (ii) for the interim period from January 1, 2009 to the Closing Date, internally prepared, unaudited financial statements of Company and its Subsidiaries, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for each quarterly period completed prior to ninety (90) days before the Closing Date and for each monthly period completed prior to forty-five (45) days prior to the Closing Date, certified by the chief financial officer of Company that they fairly present, in all material respects, the financial condition of Company and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject, if applicable, to changes resulting from audit and normal year end adjustments.

"**Increased Cost Lender**" as defined in Section 2.20.

"**Indebtedness**," as applied to any Person, means, without duplication, (i) all indebtedness for borrowed money; (ii) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP; (iii) all obligations of such Person evidenced by notes, bonds or similar instruments or upon which interest payments are customarily paid and all obligations in respect of drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (iv) any obligation owed for all or any part of the deferred purchase price of property or services (excluding trade payables incurred in the ordinary course of business that have a term of less than six (6) months and that are not overdue by more than sixty (60) days which purchase price

is (a) due more than six (6) months from the date of incurrence of the obligation in respect thereof or (b) evidenced by a note or similar written instrument; (v) all obligations created or arising under any conditional sale or other title retention agreement with respect to property acquired by such person; (vi) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (vii) the face amount of any letter of credit or letter of guaranty issued, bankers' acceptances facilities, surety bond and similar credit transactions for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings or drafts; (viii) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another; (ix) any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (x) any liability of such Person for an obligation of another through any agreement (contingent or otherwise) (a) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (b) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (a) or (b) of this clause (x), the primary purpose or intent thereof is as described in clause (ix) above; (xi) all obligations of such Person in respect of any exchange traded or over the counter derivative transaction, including any Interest Rate Agreement, Currency Agreement and any other Rate Management Transaction, whether entered into for hedging or speculative purposes; (xii) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person and (xiii) all Attributable Debt of such Person. Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or joint venturer, unless such Indebtedness is expressly non-recourse to such Person. The amount of Indebtedness under any Interest Rate Agreement, Currency Agreement or any other Rate Management Transactions outstanding at any time shall be the Net Mark-to-Market Exposure of such Person under such arrangement at such time.

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Credit

Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Credit Extensions or the use or intended use of the proceeds thereof, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)); (ii) the statements contained in the commitment letter or proposal letter delivered by any Lender to Company with respect to the transactions contemplated by this Agreement; or (iii) any Environmental Claim against or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Company or any of its Subsidiaries, except, as to any such Person, any of the foregoing that arise from the willful misconduct of such Person.

"**Indemnitee**" as defined in Section 10.3.

"**Indemnitee Agent Party**" as defined in Section 9.6.

"**Interest Payment Date**" means with respect to (i) any Base Rate Loan, (a) the last day of each month, commencing on the first such date to occur after the Closing Date; and (b) the final maturity date of such Loan; and (ii) any LIBOR Rate Loan, the last day of each Interest Period applicable to such Loan, and (iii) any interest payable in-kind as provided in Section 2.5(a)(ii), the last day of each month, commencing on the first such date to occur after the Closing Date, and the final maturity date of such Loan.

"**Interest Period**" means, in connection with a LIBOR Rate Loan, an interest period of one, two or three months, as selected by Company in the applicable Funding Notice or Conversion/Continuation Notice, (i) initially, commencing on the Credit Date or Conversion/Continuation Date thereof, as the case may be; and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (c) of this definition, end on the last Business Day of a calendar month; and (c) no Interest Period with respect to any portion of any Loans shall extend beyond such Class's Maturity Date.

"**Interest Rate Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement  or other similar agreement or arrangement, each of which is (i) for the purpose of hedging the interest rate exposure associated with Company's and its Subsidiaries' operations, (ii) approved by Administrative Agent in its reasonable discretion, and (iii) not for speculative purposes.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two (2) Business Days prior to the first day of such Interest Period.

"**Internal Control Event**" means a material weakness in, or fraud that involves management of, Company, which fraud has a material effect on Company's internal controls

over financial and other reporting, in each case as described in the Securities Laws, whether or not Company is subject thereto.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by Company or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person; (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of Company from any Person, of any Capital Stock of such Person; (iii) any direct or indirect loan, advance or capital contributions by Company or any of its Subsidiaries to any other Person, including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business; and (iv) any direct or indirect Guarantee of any obligations of any other Person. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; provided, in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"**Landlord Collateral Access Agreement**" means a Landlord Waiver and Consent Agreement substantially in the form of Exhibit I with such amendments or modifications as may be approved by Collateral Agent in its reasonable discretion.

"**Lead Arranger**" as defined in the preamble hereto.

"**Leasehold Property**" means any leasehold interest of any Credit Party as lessee under any lease of real property, other than any such leasehold interest designated from time to time by Collateral Agent in its sole discretion as not being required to be included in the Collateral.

"**Lender**" means each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement other than any such Person that ceases to be a party hereto pursuant to an Assignment Agreement.

"**LIBOR Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Adjusted LIBOR Rate.

"**Lien**" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Loan**" means a term loan made by a Lender to Company pursuant to Section 2.1(a).

"**Loan Allocation**" means, with respect to a Lender, the amount of Loans set forth on Appendix A opposite such Lender's name (or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof), into which such Lender has agreed to exchange and convert the outstanding principal balance of its holdings under and as defined in the Existing Agreement, in accordance with the terms of Section 2.1 hereof.

"**Loan Commitment**" means the commitment of a Lender to exchange its holdings under the Existing Agreement for a Loan hereunder in accordance with the terms of the Exchange Offer; and "**Loan Commitments**" means such commitments of all Lenders in the aggregate. The amount of each Lender's Loan Commitment, if any, is such Lender's Loan Allocation.

"**Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Loans of such Lender.

"**Margin Stock**" as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (i) the business operations, properties, assets, condition (financial or otherwise) or prospects of Company and its Subsidiaries taken as a whole; (ii) a significant portion of the industry or business segment in which Company or its Subsidiaries operate or rely upon if such effect or development is reasonably likely to have a material adverse effect on Company and its Subsidiaries taken as a whole; (iii) the ability of any Credit Party to fully and timely perform its Obligations; (iv) the legality, validity, binding effect, or enforceability against a Credit Party of a Credit Document to which it is a party; (v) the Collateral or Collateral Agent's Liens (on behalf of itself and the Secured Parties) on the Collateral or the priority of such Liens; or (vi) the rights, remedies and benefits available to, or conferred upon, any Agent and any Lender or any Secured Party under any Credit Document.

"**Material Contract**" means, collectively, (i) any contract or agreement listed in Schedule 1.1(a), (ii) any contract or agreement requiring payments to be made or providing for payments to be received, in each case in excess of $1,000,000 per annum or $2,000,000 over the term of such agreement, (iii) any other contract or other arrangement to which Company or any of its Subsidiaries is a party (other than the Credit Documents) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect and (iv) any agreement or instrument evidencing or governing Indebtedness.

"**Material Real Estate Asset**" means (i) (a) any individual fee-owned Real Estate Asset having a fair market value in excess of $250,000 as of any date of determination, (b) all fee-owned Real Estate Assets having an aggregate fair market value in excess of $500,000 as of any date of determination, and (c) all Leasehold Properties other than those with respect to which

the aggregate payments under the term of the lease are less than $150,000 per annum, or (ii) any Real Estate Asset that the Requisite Lenders have determined is material to the business, operations, properties, assets, condition (financial or otherwise) or prospects of Company or any Subsidiary thereof, including any listed on Schedule 1.1(b).

"**Maturity Date**" means the earlier of (i) _____, 20__, (being the fourth (4th) anniversary of the Effective Date), and (ii) the date that all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"**Moody's**" means Moody's Investor Services, Inc.

"**Mortgage**" means an amended and restated deed of trust substantially in the form of Exhibit J, as it may be amended, supplemented or otherwise modified from time to time.

"**Mortgaged Property**" means all real and personal property constituting the "Premises" or otherwise identified as collateral in the Mortgages or any other Collateral Document.

"**Multiemployer Plan**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"**NAIC**" means The National Association of Insurance Commissioners, and any successor thereto.

"**Narrative Report**" means, with respect to the financial statements for which such narrative report is required, a narrative report describing the operations of Company and its Subsidiaries in the form prepared for presentation to senior management thereof for the applicable month, Fiscal Quarter or Fiscal Year and for the period from the beginning of the then current Fiscal Year to the end of such period to which such financial statements relate with comparison to and variances from the immediately preceding period and budget.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to: (i) the sum of Cash payments and Cash Equivalents received by Company or any of its Subsidiaries from such Asset Sale (including any Cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received), minus (ii) any bona fide direct costs incurred in connection with such Asset Sale, including (a) commissions, Other Taxes, and reasonable counsel fees and expenses, (b) income or gains Taxes paid or payable by the seller as a result of any gain recognized in connection with such Asset Sale during the tax period the sale occurs (after taking into account any available tax credits or deductions and any tax-sharing arrangements), (c) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale, and (d) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by Company or any of its Subsidiaries in connection with such Asset Sale; provided, that upon release of any such reserve, the amount released shall be considered Net Asset Sale Proceeds).

"**Net Cure Proceeds**" means, with respect to any exercise of the Company's cure rights under Section 6.7(e), the net cash proceeds received by the Company, net of all underwriting commissions and fees and legal, investment banking, brokerage and accounting and other professional fees, sales commissions, disbursements and out-of-pocket expenses actually incurred in connection with such sale, issuance or contribution.

"**Net Income Tax**" of a Person means any Tax imposed by the jurisdiction in which a Person is organized or in which that Person's applicable principal office (and/or, in the case of a Lender, its applicable lending office) is located or in which that Person (and/or, in the case of a Lender, its applicable lending office) is deemed to be doing business (other than a jurisdiction in which such Person is treated as doing business solely as a result of its entering into any Credit Document or its participation in the transactions governed thereby) on all or part of the net income, profits or gains of that Person (and/or, in the case of a Lender, its applicable lending office) and any branch profits tax or similar tax imposed by any such jurisdiction.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to: (i) any Cash payments or proceeds received by Company or any of its Subsidiaries (a) under any casualty, business interruption or "key man" insurance policies in respect of any covered loss thereunder, or (b) as a result of the taking of any assets of Company or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (ii) (a) any actual and reasonable costs incurred by Company or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Company or such Subsidiary in respect thereof, and (b) any actual and reasonable costs incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition, including income taxes paid or payable as a result of any gain recognized in connection therewith (after taking into account any available tax credits or deductions and any tax-sharing arrangements).

"**Net Mark-to-Market Exposure**" of a Person means, as of any date of determination, the excess (if any) of all unrealized losses over all unrealized profits of such Person arising from all Rate Management Transactions or Commodity Hedge Transactions in effect as of such date. As used in this definition, "unrealized losses" means the fair market value of the cost to such Person of replacing such Rate Management Transaction or Commodity Hedge Transactions as of the date of determination (assuming the Rate Management Transaction or Commodity Hedge Transactions were to be terminated as of that date), and "unrealized profits" means the fair market value of the gain to such Person of replacing such Rate Management Transaction or Commodity Hedge Transactions as of the date of determination (assuming such Rate Management Transaction or Commodity Hedge Transactions were to be terminated as of that date).

"**Non-Consenting Lender**" as defined in Section 2.20.

"**Non-U.S. Lender**" as defined in Section 2.17(d).

"**Note**" means a promissory note in the form of <u>Exhibit M</u>, as it may be amended, supplemented or otherwise modified from time to time.

"**Obligations**" means all liabilities and obligations of every nature of each Credit Party and its Subsidiaries from time to time owed to the Agents (including former Agents), the Lenders or any of them, under any Credit Document, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise and whether primary, secondary, direct, indirect, contingent, fixed or otherwise (including obligations of performance).

"**Obligee Guarantor**" as defined in Section 7.7.

"**Organizational Documents**" means (i) with respect to any corporation, its certificate or articles of incorporation or organization, or any certificates of designation, as amended, and its by laws, as amended, (ii) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, and (iv) with respect to any limited liability company, its articles of organization, or any certificates of designation (or similar), as amended, and its operating agreement, as amended. In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**Other Taxes**" means any and all present or future stamp, registration, recording, filing, transfer, documentary, excise or property Taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to or in connection with, any Credit Document.

"**Participant**" as defined in Section 10.6(g).

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001).

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pending 401(k) Catch-Up Payment Amounts**" means any amounts paid by or on behalf of any of the Credit Parties in connection with the settlement or other resolution of certain pending 401(k) catch-up payment matters identified on <u>Schedule O</u>, but in every event not to exceed the aggregate amount set forth on such <u>Schedule O</u>.

"**Pending Investigation Settlement Amounts**" means any amounts paid by or on behalf of any of the Credit Parties under any money judgment, writ or warrant of attachment, agreement of settlement, stipulated judgment or similar process related to or arising out of the DOJ Investigation or the DOL Investigation, in each case not to exceed the aggregate amounts set forth in <u>Schedule P</u> with respect to the DOJ Investigation and with respect to the DOL Investigation.

"**Pending Property Tax Dispute Settlement Amounts**" means any amounts paid by or on behalf of any of the Credit Parties in connection with the settlement or other resolution of certain pending property tax matters identified on Schedule 4.12 in an aggregate amount set forth on Schedule 4.12.

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Phase I Report**" means, with respect to any Facility, a report that (i) conforms to the ASTM Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process, E 1527, (ii) was conducted no more than six (6) months prior to the date such report is required to be delivered hereunder, by one or more environmental consulting firms reasonably satisfactory to Administrative Agent, (iii) includes an assessment of asbestos-containing materials at such Facility, (iv) is accompanied by (a) an estimate of the reasonable worst-case cost of investigating and remediating any Hazardous Materials Activity identified in the Phase I Report as giving rise to an actual or potential material violation of any Environmental Law or as presenting a material risk of giving rise to a material Environmental Claim, and (b) a current compliance audit setting forth an assessment of Company's, its Subsidiaries' and such Facility's current and past compliance with Environmental Laws and an estimate of the cost of rectifying any non compliance with current Environmental Laws identified therein and the cost of compliance with reasonably anticipated future Environmental Laws identified therein.

"**PIK Preferred Stock**" means the shares of preferred stock of HoldCo, par value $0.001 per share, issued on or after the Effective Date on substantially the same terms, conditions and subordination as the PIK Preferred Stock issued on the Effective Date or otherwise pursuant to Organizational Documents in form and substance reasonably acceptable to the Administrative Agent.

"**Plan**" is defined in the Recitals hereto.

"**Platform**" as defined in Section 9.9(b).

"**Prepayment Date**" as defined in Section 2.12(c).

"**Prepayment Premium**" means, with respect to any prepayment of any Loans, a fee payable on the amount so prepaid as follows:

| Relevant period (number of months elapsed since the Closing Date) | Prepayment Premium as a percentage of the amount so prepaid |
|---|---|

| Relevant period (number of months elapsed since the Closing Date) | Prepayment Premium as a percentage of the amount so prepaid |
|---|---|
| prior to the 12 month anniversary | 2.0% |
| on or after the 12 month anniversary but prior to the 24 month anniversary | 1.0% |
| on or after the 24 month anniversary | 0.0% |

"**Prime Rate**" means the prime lending rate as publicly announced from time to time by JPMorgan Chase Bank, N.A.

"**Prior Agreement**" is defined in the Recitals hereto.

"**Principal Office**" means, for any Person, such Person's "Principal Office" as set forth on Appendix B, or such other office as such Person may from time to time designate in writing to Company, Administrative Agent and each Lender.

"**Projections**" as defined in Section 4.8.

"**Pro Rata Share**" means with respect to all payments, computations and other matters relating to the Loan of any Lender, the percentage obtained by dividing (a) the Loan Exposure of that Lender, by (b) the aggregate Loan Exposure of all Lenders.

"**Rabo Bank Account**" means account no. _____ established by the Company at Rabo Bank in its _____ branch, located in [Amsterdam], The Netherlands.

"**Rate Management Agreement**" means any agreement entered into by a Credit Party in respect of a Rate Management Transaction.

"**Rate Management Transaction**" means any transaction (including an agreement with respect thereto) now existing or hereafter entered by any Credit Party which is a rate swap, cap transaction, floor transaction, collar transaction, forward transaction or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether linked to one or more interest rates or other financial measures.

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Credit Party in any real property.

"**Record Document**" means, with respect to any Leasehold Property, (i) the lease evidencing such Leasehold Property or a memorandum thereof, executed and acknowledged by the owner of the affected real property, as lessor, or (ii) if such Leasehold Property was acquired

or subleased from the holder of a Recorded Leasehold Interest, the applicable assignment or sublease document, executed and acknowledged by such holder, in each case in form sufficient to give such constructive notice upon recordation and otherwise in form reasonably satisfactory to Collateral Agent.

"**Recorded Leasehold Interest**" means a Leasehold Property with respect to which a Record Document has been recorded in all places necessary or desirable, in Administrative Agent's reasonable judgment, to give constructive notice of such Leasehold Property to third-party purchasers and encumbrancers of the affected real property.

"**Register**" as defined in Section 2.4(b).

"**Regulation D**" means Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"**Related Fund**" means, with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor. With respect to Silver Point, Related Fund shall also include any swap, special purpose vehicles purchasing or acquiring security interests in collateralized loan obligations or any other vehicle through which Silver Point may leverage its investments from time to time.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Replacement Lender**" as defined in Section 2.20.

"**Requisite Lenders**" means one or more Lenders having or holding Loan Exposure representing more than fifty percent (50%) of the aggregate Loan Exposure of all Lenders.

"**Restricted Junior Payment**" means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of Company now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class; (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of Company now or hereafter outstanding; (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of Capital Stock of Company now or hereafter outstanding; (iv) any prepayment (whether voluntary or mandatory) of principal of, premium, if any, or any pre-payment of interest on, or early redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar early payment with respect to, any Subordinated Indebtedness; (v) any management fees or consulting fees payable to any Equity Investor or any Affiliate of any Equity Investor (provided that consulting fees paid to Johan van den Berg pursuant to an agreement permitted under Section

6.11 of this Agreement shall not constitute Restricted Junior Payments); and (vi) any payment (whether voluntary or mandatory) of principal of, liquidation preference, premium, if any, or interest on, or redemption, purchase, retirement of, PIK Preferred Stock and other Disqualified Stock. For avoidance of doubt, no scheduled repayment of Subordinated PIK A Notes pursuant to the terms of the Subordinated Note Documents (including without limitation a repayment of up to $5,000,000 in original principal amount of Subordinated PIK A Notes plus all capitalized and accrued interest thereon on March 31, 2010 and each anniversary thereof to the extent not previously repaid in full) shall constitute a Restricted Junior Payment hereunder.

"**Restructuring Costs**" means for the period ending on the Effective Date, all fees, costs and other expenses incurred by the Company or any of its Subsidiaries in connection with the Bankruptcy Case, the Plan and financial restructuring contemplated thereby, including, without limitation, all professional fees, fresh start accounting expenses of KPMG or Accuval (or any replacement firm), employee severance or termination payments and other costs and expenses in each case in the maximum amounts approved by the Bankruptcy Court (to the extent subject to Bankruptcy Court approval), and for the period commencing on the first day after the Effective Date and ending on March 31, 2010, costs and expenses of the type and in amounts not to exceed the amounts set forth on Schedule Q.

"**S&P**" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc.

"**Secured Parties**" has the meaning assigned to that term in the Security Agreement.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Account**" means any "securities account" as defined in the UCC.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Securities Laws**" means the Securities Act, the Exchange Act, Sarbanes-Oxley Act of 2002 and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the Securities and Exchange Commission or the Public Company Accounting Oversight Board, as each of the foregoing may be amended and in effect on any applicable date hereunder.

"**Security Agreement**" means a security agreement executed by HoldCo, Company and each Subsidiary of Company that executes this Agreement as a Guarantor substantially in the form of Exhibit L, as it may be amended, supplemented or otherwise modified from time to time.

"**Silver Point**" as defined in the preamble hereto.

"**Solvent**" means, with respect to any Credit Party, that as of the date of determination, both (i) (a) the sum of such Credit Party's debt and liabilities (including contingent liabilities) does not exceed the present fair saleable value of such Credit Party's present assets; (b) such Credit Party's capital is not unreasonably small in relation to its business as contemplated on the Closing Date and reflected in the Projections or with respect to any transaction contemplated or undertaken after the Closing Date; and (c) such Person has not incurred and does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise); and (ii) such Person is "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"**SPC**" as defined in Section 10.7.

"**Subject Transaction**" as defined in Section 6.7(d).

"**Subordinated Notes**" means the Subordinated PIK Notes and the Subordinated PIK A Notes, collectively and without differentiation, in each case as amended, restated, refinanced, or otherwise modified from time to time to the extent permitted in this Agreement.

"**Subordinated Note Documents**" means the Subordinated PIK Note Purchase Agreement, each of the Subordinated Notes, the Subordination Agreement and **[_____]**.

"**Subordinated PIK Note Purchase Agreement**" means the Subordinated PIK Note Purchase Agreement, dated as of **[_____]**, 2009, by and among Eurofresh, Inc. and the purchasers party thereto, as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms hereof and thereof.

"**Subordinated PIK A Notes**" means the Subordinated PIK A Notes defined in the Subordinated PIK Note Purchase Agreement, as amended, restated, refinanced or otherwise modified from time to time to the extent permitted in this Agreement.

"**Subordinated PIK Notes**" means the Subordinated PIK Notes defined in the Subordinated PIK Note Purchase Agreement, as amended, restated, refinanced or otherwise modified from time to time to the extent permitted in this Agreement.

"**Subordinated Indebtedness**" means (i) the Subordinated Notes and (ii) other subordinated indebtedness of the Company permitted pursuant to Sections 6.1(m), 6.1(m) and 6.1(o).

"**Subordination Agreement**" means the Subordination Agreement, dated as of **[_____]**, 2009, by and among Eurofresh, Inc. and the purchasers under the Subordinated

PIK Note Purchase Agreement, the Administrative Agent, and the Lenders party thereto, as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms hereof and thereof.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, partnership, limited liability company, association, joint venture or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Syndication Agent**" as defined in the preamble hereto.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed, and any interest, penalties or additional amounts thereon.

"**Tax-Related Person**" means any Person (including a beneficial owner of an interest in a pass-through entity) who is required to include in income amounts received, whether or not distributed, by an Agent, a Lender or Participant or any Tax Related Person of any of the foregoing.

"**Terminated Lender**" as defined in Section 2.20.

"**Terrorism Laws**" means any of the following (a) Executive Order 13224 issued by the President of the United States, (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations), (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), (d) the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), (e) the Patriot Act (as it may be subsequently codified), (f) all other present and future legal requirements of any Governmental Authority addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and (g) any regulations promulgated pursuant thereto or pursuant to any legal requirements of any Governmental Authority governing terrorist acts or acts of war.

"**Total Secured Leverage Ratio**" means the ratio as of the last day of any Fiscal Quarter or other date of determination of:

(i) Consolidated Total Secured Debt as of such day, to

(ii)   Consolidated Adjusted EBITDA for the four (4)-Fiscal Quarter period ending on such date (or if such date of determination is not the last day of a Fiscal Quarter, for the four (4)-Fiscal Quarter period ending as of the most recently concluded Fiscal Quarter).

"**Transaction Documents**" means the Plan, the Confirmation Order, the Organizational Documents, the Subordinated Note Documents and the PIK Preferred Stock.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"**Unadjusted LIBOR Rate Component**" means that component of the interest costs to Company in respect of a LIBOR Rate Loan that is based upon the rate obtained pursuant to clause (B)(i) of the definition of Adjusted LIBOR Rate.

"**Van Den Berg Person**" means Johan van den Berg and his wholly owned and controlled personal investment companies, spouse, siblings, lineal descendants (including adopted children and their lineal descendants) and any trust or entity owned, controlled by or established for the benefit of, or the estate of, any of the foregoing.

"**Waivable Prepayment**" as defined in Section 2.12(c).

"**Working Capital**" means all current assets determined in accordance with GAAP (excluding Cash and any asset which has arisen as a result of Commodity Hedging Transactions) minus all current liabilities determined in accordance with GAAP (excluding the current portion of long-term debt and any liability which has arisen as a result of Commodity Hedging Transactions).

## 1.2    Accounting Terms.

Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Credit Document, and Company or Administrative Agent shall so request, Administrative Agent and Company shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of Requisite Lenders), provided that, until so amended, such ratio or requirement (and the Credit Parties' compliance therewith) shall continue to be computed in accordance with GAAP prior to such change therein and Company shall provide to Administrative Agent and Lenders reconciliation statements requested by Administrative Agent (reconciling the computations of such financial ratios and requirements from the then-current GAAP computations to the computations under GAAP prior to such change) in connection therewith. Financial statements and other information required to be delivered by Company to Lenders pursuant to Sections 5.1(a), 5.1(b) and 5.1(c) shall be prepared in accordance with GAAP as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in Section 5.1(e), if applicable).  Subject to the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements.

**1.3    Interpretation**, **etc**.  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided.  The use herein of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not no limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  Unless otherwise indicated, any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

## SECTION 2.  LOANS.

**2.1    Loans**.

(a)    <u>Loans of Each Lender</u>.  Subject to the terms and conditions hereof, each Lender with a Loan Commitment severally agrees that on the Closing Date the outstanding principal amount of "Obligations" owing to such Lender under the Existing Agreement shall automatically and without further action be exchanged for and converted into a Loan deemed made by such Lender hereunder in an amount equal to such Lender's Loan Allocation, in accordance with the Exchange Offer.  Without limiting or qualifying the foregoing, and for avoidance of doubt, Company hereby acknowledges, confirms and agrees that the "Obligations" outstanding under the Existing Agreement as of the Closing Date constitute Loans made hereunder by Lenders on the Closing Date in the aggregate outstanding amount equal to [$52,047,507.64][1].  There shall be only one borrowing (or deemed borrowing) with respect to the Loan Commitments which shall be on the Closing Date in accordance with this Section 2.1.  For avoidance of doubt, all Loans shall be deemed fully funded (by virtue of the Debt Exchange in accordance with Section 2.1).  Each Lender's Loan Commitment shall terminate immediately and without further action on the Closing Date.  The Loans borrowed under this Section 2.1(a) and subsequently repaid or prepaid may not be reborrowed.  Subject to Sections 2.9, 2.10 and 2.11, all amounts owed hereunder with respect to the Loans shall be paid in full no later than the Maturity Date.

(b)    <u>Funding Notice; Replacement of Prior Agreement</u>.

(i)    Company shall deliver to Administrative Agent a fully executed Funding Notice no later than 12:00 noon (New York City time) three (3) Business Days

---

[1] Amount (based on principal, accrued interest, and default interest, including satisfaction of $200,000 in advisory fees) is an estimate as of October 31, 2009 and after giving effect to the $20,000,000 payment contemplated in the Plan.  Any amount thereafter should be calculated accordingly.  This footnote will be deleted when the amount is finally determined.

prior to the anticipated Closing Date. For the avoidance of doubt, the parties acknowledge and agree that this Agreement is intended to be a refinancing and replacement of the Prior Agreement, and that the total amount of Loans initially outstanding hereunder, and to be reflected in such Funding Notice, shall be equal in amount to the total aggregate amount outstanding under the Prior Agreement as of the Closing Date (after giving effect to the partial repayment of amounts outstanding under the Prior Agreement as set forth in the Plan). Promptly upon receipt by Administrative Agent of such Funding Notice, Administrative Agent shall notify each Lender of the anticipated Closing Date.

(ii)     Upon satisfaction or waiver of the conditions precedent specified herein, this Agreement shall refinance and replace, in its entirety, the Prior Agreement and all amounts outstanding thereunder shall become Loans under this Agreement.

**2.2     Pro Rata Shares**.  All Loans shall be made, and all participations purchased, by Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby.

**2.3     Use of Proceeds**.  The proceeds of the Loans made on the Closing Date shall be applied by Company to refinance all amounts outstanding under the Prior Agreement, as contemplated by the terms of the Plan.  No portion of the proceeds of any Credit Extension shall be used in any manner that causes or might cause such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation thereof or to violate the Exchange Act.

**2.4     Evidence of Debt; Register; Lenders' Books and Records; Notes**.

(a)     <u>Lenders' Evidence of Debt</u>.  Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of Company to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on Company, absent manifest error; <u>provided</u>, that the failure to make any such recordation, or any error in such recordation, shall not affect any Company's Obligations in respect of any applicable Loans; and provided further, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)     <u>Register</u>.  Administrative Agent shall maintain at its Principal Office a register for the recordation of the names and addresses of Lenders and the Loans of each Lender from time to time (the "**Register**").  The Register shall be available for inspection by Company, and a redacted version of the Register showing the entries with respect to any Lender shall be available for inspection by such Lender, at any reasonable time and from time to time upon reasonable prior notice.  Administrative Agent shall record in the Register the Loans, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on Company and each Lender, absent manifest error; <u>provided</u>, failure to make any such recordation, or any error in such recordation, shall not affect Company's Obligations in respect of any Loan.  Company hereby designates the entity serving

as Administrative Agent to serve as Company's agent solely for purposes of maintaining the Register as provided in this Section 2.4, and Company hereby agrees that, to the extent such entity serves in such capacity, the entity serving as Administrative Agent and its officers, directors, employees, agents and affiliates shall constitute "Indemnitees."

(c)     Notes.  If so requested by any Lender by written notice to Company (with a copy to Administrative Agent) at least two (2) Business Days prior to the Closing Date, or at any time thereafter, Company shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to Section 10.6) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after Company's receipt of such notice) a Note or Notes to evidence such Lender's Loans.

**2.5     Interest on Loans**.

(a)     Except as otherwise set forth herein, each Loan shall bear

(i)     cash interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof, at a rate per annum equal to (A) if a Base Rate Loan, at the Base Rate plus the Applicable Margin or (B), if a LIBOR Rate Loan, at the Adjusted LIBOR Rate plus the Applicable Margin, <u>plus</u>

(ii)     interest payable in-kind on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof, at a rate of three percent (3%) per annum, with such amount to be paid by an automatic increase in the outstanding principal amount of the Loans as of each Interest Payment Date.

(b)     The basis for determining the rate of cash interest with respect to any Loan, and the Interest Period with respect to any LIBOR Rate Loan, shall be selected by Company and notified to Administrative Agent and Lenders pursuant to the applicable Funding Notice or Conversion/Continuation Notice, as the case may be.  If on any day a LIBOR Rate Loan is outstanding with respect to which a Funding Notice or Conversion/Continuation Notice has not been delivered to Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then for that day such Loan shall be a Base Rate Loan.

(c)     In connection with LIBOR Rate Loans there shall be no more than two (2) Interest Periods outstanding at any time.  In the event Company fails to specify between a Base Rate Loan or a LIBOR Rate Loan in the applicable Funding Notice or Conversion/Continuation Notice, such Loan (if outstanding as a LIBOR Rate Loan) will be automatically converted into a Base Rate Loan on the last day of the then current Interest Period for such Loan (or if outstanding as a Base Rate Loan will remain as, or (if not then outstanding) will be made as, a Base Rate Loan).  In the event Company fails to specify an Interest Period for any LIBOR Rate Loan in the applicable Conversion/Continuation Notice, Company shall be deemed to have selected an Interest Period of one month.  As soon as practicable after 12:00 noon.  (New York City time) on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all

parties) the interest rate that shall apply to the LIBOR Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to Company and each Lender.

(d) Interest payable pursuant to Section 2.5(a) shall be computed on the basis of a three hundred sixty (360) day year with respect to LIBOR Rate Loans and a three hundred sixty-five/sixty-six (365/66) day year with respect to Base Rate Loans, in each case for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted from a LIBOR Rate Loan, the date of conversion of such LIBOR Rate Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a LIBOR Rate Loan, the date of conversion of such Base Rate Loan to such LIBOR Rate Loan, as the case may be, shall be excluded; provided, if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(e) Except as otherwise set forth herein, interest on each Loan shall be payable in arrears (i) on each Interest Payment Date applicable to that Loan; (ii) upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) at maturity, including final maturity.

**2.6 Conversion/Continuation**.

(a) Subject to Section 2.15 and so long as no Default or Event of Default shall have occurred and then be continuing, Company shall have the option:

(i) to convert at any time all or any part of any Loan equal to $500,000 and integral multiples of $100,000 in excess of that amount from one Type of Loan to another Type of Loan; provided, a LIBOR Rate Loan may only be converted on the expiration of the Interest Period applicable to such LIBOR Rate Loan unless Company shall pay all amounts due under Section 2.15 in connection with any such conversion; or

(ii) upon the expiration of any Interest Period applicable to any LIBOR Rate Loan, to continue all or any portion of such Loan equal to $500,000 and integral multiples of $100,000 in excess of that amount as a LIBOR Rate Loan.

(b) Company shall deliver a Conversion/Continuation Notice to Administrative Agent no later than 12:00 noon (New York City time) at least one Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan) and at least three (3) Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, a LIBOR Rate Loan). Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, any LIBOR Rate Loans (or telephonic notice in lieu thereof) shall be irrevocable on and after the related Interest Rate Determination Date, and Company shall be bound to effect a conversion or continuation in accordance therewith.

**2.7**    **Default Interest**.  Upon the occurrence and during the continuance of an Event of Default, the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder, shall thereafter bear interest (including post petition interest in any proceeding under the Bankruptcy Code or other applicable bankruptcy laws, whether or not allowed in such a proceeding) payable on demand at a rate that is two percent (2%) per annum in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is two percent (2.0%) per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans); provided, in the case of LIBOR Rate Loans, upon the expiration of the Interest Period in effect at the time any such increase in interest rate is effective such LIBOR Rate Loans shall thereupon become Base Rate Loans and shall thereafter bear interest payable upon demand at a rate which is two percent (2.0%) per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans.  Payment or acceptance of the increased rates of interest provided for in this Section 2.7 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent or any Lender.

**2.8**    **Administrative Agent and Collateral Management Fee**.  On the Closing Date and on each anniversary of Closing Date until all Obligations have been paid and performed in full, the Company shall pay to the Administrative Agent for its own account an annual Administrative Agent and Collateral Management Fee in an amount equal to 0.25% (25 bps) of the total outstanding balance of Obligations on such date. The Administrative Agent and Collateral Management Fee shall be fully earned when paid and non-refundable.  For avoidance of doubt, no "closing fee" shall be due in respect of the consummation of the Debt Exchange.

**2.9**    **Scheduled Payments**.  The principal amounts of the Loans shall be repaid in one (1) installment on the Maturity Date.

**2.10**    **Voluntary Prepayments**.

(a)    Any time and from time to time:

(i)    with respect to Base Rate Loans, Company may prepay any such Loans on any Business Day in whole or in part, in an aggregate minimum amount of $500,000 and integral multiples of $100,000 in excess of that amount; and

(ii)    with respect to LIBOR Rate Loans, Company may prepay any such Loans on any Business Day in whole or in part (together with any amounts due pursuant to Section 2.15(c)) in an aggregate minimum amount of $500,000 and integral multiples of $100,000 in excess of that amount.

(b)    All such prepayments shall be made:

(i)    upon not less than one Business Day's prior written or telephonic notice in the case of Base Rate Loans; and

(ii)    upon not less than three (3) Business Days' prior written or telephonic notice in the case of LIBOR Rate Loans,

in each case given to Administrative Agent by 1:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed in writing to Administrative Agent (and Administrative Agent will promptly transmit such telephonic or original notice by telefacsimile or telephone to each Lender). Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein. Any such voluntary prepayment shall be applied as specified in Section 2.12(a).

**2.11 Mandatory Prepayments**.

(a) <u>Asset Sales</u>. No later than the first (1st) Business Day following the date of receipt by Company or any of its Subsidiaries of any Net Asset Sale Proceeds, Company shall prepay the Loans in an aggregate amount equal to such Net Asset Sale Proceeds; <u>provided</u>, (i) so long as no Default or Event of Default shall have occurred and be continuing, and (ii) to the extent that aggregate Net Asset Sale Proceeds from the Closing Date through the applicable date of determination do not exceed $750,000, Company shall have the option, directly or through one or more of its Subsidiaries, to invest Net Asset Sale Proceeds within one hundred eighty (180) days of receipt thereof in long term productive assets of the general type used in the business of Company and its Subsidiaries; <u>provided further</u>, pending any such investment all such Net Asset Sale Proceeds shall be placed in a blocked Securities Account or blocked Deposit Account governed by a Control Agreement in favor of the Collateral Agent.

(b) <u>Insurance/Condemnation Proceeds</u>. No later than the first (1st) Business Day following the date of receipt by Company or any of its Subsidiaries, or Administrative Agent as loss payee, of any Net Insurance/Condemnation Proceeds, Company shall prepay the Loans in an aggregate amount equal to such Net Insurance/Condemnation Proceeds; <u>provided</u>, (i) so long as no Default or Event of Default shall have occurred and be continuing, and (ii) to the extent that aggregate Net Insurance/Condemnation Proceeds from the Closing Date through the applicable date of determination do not exceed $750,000, Company shall have the option, directly or through one or more of its Subsidiaries to invest such Net Insurance/Condemnation Proceeds within one hundred eighty (180) days of receipt thereof in the repair, restoration or replacement of the applicable assets thereof; <u>provided further</u>, pending any such investment all such Net Insurance/Condemnation Proceeds, as the case may be, shall be placed in a blocked Securities Account governed by a Control Agreement in favor of the Collateral Agent.

(c) <u>Issuance of Equity Securities</u>. On the date of receipt by a Credit Party of any Cash proceeds from a capital contribution to, or the issuance of any Capital Stock of, HoldCo, Company or any of its Subsidiaries (other than Capital Stock issued pursuant to any employee stock or stock option compensation plan), Company shall prepay the Loans in an aggregate amount equal to (i) one hundred percent (100%) of such proceeds if such Capital Stock is issued pursuant to Section 6.7(e) hereof, and (ii) fifty percent (50%) of such proceeds for any issuance of Capital Stock other than pursuant to Section 6.7(e) hereof, in each case net of any applicable underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses. For avoidance of doubt, so long as no cash consideration is provided in connection therewith, no issuance of Capital Stock of HoldCo or the Company in whole or partial repayment of Subordinated Notes in accordance with the Subordinated Note Documents shall be deemed to generate Cash proceeds for purposes of this Section.

(d)  Issuance of Debt.  On the date of receipt by Company or any of its Subsidiaries of any Cash proceeds from the incurrence of any Indebtedness of Company or any of its Subsidiaries (other than with respect to any Indebtedness permitted to be incurred pursuant to Sections 6.1(a)-(j) or 6.1(o) hereof), including any issuance of Subordinated Indebtedness issued in connection with the exercise of cure rights pursuant to Section 6.7(e), Company shall prepay the Loans in an aggregate amount equal to one hundred percent (100%) of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(e)  Consolidated Excess Cash Flow.  In the event that there shall be Consolidated Excess Cash Flow for any Fiscal Year (commencing with Fiscal Year ending December 31, 2010), Company shall, no later than the earlier of (i) ninety-five (95) days after the end of such Fiscal Year and (ii) the delivery of annual financial statements pursuant to Section 5.1(c) with respect to such Fiscal Year, prepay the Loans in an aggregate amount equal to seventy-five percent (75%) of such Consolidated Excess Cash Flow.  The payment obligation in the preceding sentence shall be reduced in whole or in part to the extent necessary, but only to the extent necessary, to provide that Company shall have, after giving effect to such payment of Consolidated Excess Cash Flow, Cash and Cash Equivalents in an aggregate amount equal to at least $7,500,000 in cash as determined by the balance sheet as at the last day of the Fiscal Year with respect to which the applicable payment is being made, after giving effect to the mandatory prepayment required under this subclause (e).

(f)  Extraordinary Receipts.  No later than the first (1st) Business Day following the date of receipt by Company or any of its Subsidiaries of any Extraordinary Receipts, Company shall prepay the Loans in an aggregate amount equal to such Extraordinary Receipts.

(g)  Prepayment Certificate.  Concurrently with any prepayment of the Loans pursuant to Sections 2.11(a)-(f), Company shall deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable net proceeds, Consolidated Excess Cash Flow or other applicable financial tests or proceeds giving rise to the prepayment, as the case may be.  In the event that Company shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, Company shall promptly make an additional prepayment of the Loans in an amount equal to such excess, and Company shall concurrently therewith deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the derivation of such excess.

(h)  Prepayment Premium.  If Company prepays, for any reason, voluntarily or as required by this Agreement (including any mandatory prepayment pursuant to Section 2.11 other than payments or mandatory prepayments made pursuant to Section 2.11(e)) whether as a result of an acceleration following an Event of Default or otherwise, all or any part of the principal balance of any Loan, then Company shall pay to Administrative Agent, for the benefit of all Lenders entitled to a portion of such prepayment, together with the principal balance being repaid or prepaid, the applicable Prepayment Premium, if any.

**2.12** **Application of Prepayments**.

(a) <u>Application of Voluntary Prepayments of Loans</u>. Any voluntary prepayment of any Loan pursuant to Section 2.10, shall be applied first, to the payment of the Prepayment Premium, if any, applicable to such repayment, and thereafter, to repay outstanding Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof).

(b) <u>Application of Mandatory Prepayments</u>. Any mandatory prepayment of any Loan pursuant to Section 2.11 shall be applied as follows:

*first*, to the payment of all expenses and fees to the full extent thereof;

*second*, to the payment of any accrued interest at the Default Rate, if any;

*third*, to the payment of the Prepayment Premium, if any, on any Loan;

*fourth*, to the payment of any accrued interest (including interest paid in kind) (other than that calculated at the Default Rate and paid in clause "*second*" above);

*fifth,* to prepay Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof).

(c) <u>Waiver of Certain Prepayments</u>. Anything contained herein to the contrary notwithstanding, in the event Company is required to make any mandatory prepayment (a "**Waivable Prepayment**"), not less than three (3) Business Days prior to the date (the "**Prepayment Date**") on which Company is required to make such Waivable Prepayment, Company shall notify Administrative Agent of the amount of such prepayment, and Administrative Agent will promptly thereafter notify each Lender holding an outstanding Loan of the amount of such Lender's Pro Rata Share of such Waivable Prepayment and such Lender's option to refuse such amount. Each such Lender may exercise such option by giving written notice to Company and Administrative Agent of its election to do so on or before the first Business Day prior to the Prepayment Date (it being understood that any Lender which does not notify Company and Administrative Agent of its election to exercise such option on or before the first Business Day prior to the Prepayment Date shall be deemed to have elected, as of such date, not to exercise such option). On the Prepayment Date, Company shall pay to Administrative Agent the amount of the Waivable Prepayment, which amount shall be applied (i) in an amount equal to that portion of the Waivable Prepayment payable to those Lenders that have elected not to exercise such option, to prepay the Loans of such Lenders (which prepayment shall be applied to the scheduled installments of principal of the Loans in accordance with Section 2.12(b)), and (ii) to the extent of any excess, to Company for working capital and general corporate purposes.

(d) <u>Application of Prepayments of Loans to Base Rate Loans and LIBOR Rate Loans</u>. Considering each Class of Loans being prepaid separately, any prepayment thereof shall be applied first to Base Rate Loans to the full extent thereof before application to LIBOR Rate Loans, in each case in a manner which minimizes the amount of any payments required to be made by Company pursuant to Section 2.15(c).

**2.13    General Provisions Regarding Payments**.

(a)      All payments by Company of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without, recoupment, setoff, counterclaim or other defense free of any restriction or condition, and delivered to Administrative Agent not later than 1:00 p.m. (New York City time) on the date due to Administrative Agent's Account for the account of Lenders; funds received by Administrative Agent after that time on such due date shall be deemed to have been paid by Company on the next Business Day.

(b)      All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid and any Prepayment Premium payable in connection therewith.

(c)      Administrative Agent shall promptly distribute to each Lender at such address as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including all fees payable with respect thereto, to the extent received by Administrative Agent.

(d)      Notwithstanding the foregoing provisions hereof, if any Conversion/ Continuation Notice is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its Pro Rata Share of any LIBOR Rate Loans, Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(e)      Subject to the proviso set forth in the definition of "Interest Period," whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder.

(f)      Administrative Agent shall deem any payment by or on behalf of Company hereunder that is not made in same day funds prior to 1:00 p.m. (New York City time) to be a non conforming payment.  Any such payment shall not be deemed to have been received by Administrative Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day.  Interest shall continue to accrue on any principal outstanding as to which a nonconforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the Default Rate determined pursuant to Section 2.7 from the date such amount was due and payable until the date such amount is paid in full.

(g)      If an Event of Default shall have occurred and not otherwise been waived, all payments or proceeds received by Agents hereunder in respect of any of the Obligations shall be applied:

*first,* to pay any costs and expenses then due Collateral Agent in connection with the foreclosure or realization upon, the disposal, storage, maintenance or otherwise dealing with any of, the Collateral or otherwise, and

indemnities and other amounts then due to Collateral Agent under the Credit Documents until paid in full,

*second,* to pay any costs, expenses, indemnities, fees or premiums then due to Administrative Agent under the Credit Documents until paid in full,

*third,* ratably to pay any expenses or indemnities then due to any of the Lenders under the Credit Documents, until paid in full,

*fourth,* ratably to pay interest due in respect of the Loans (including interest paid in kind) until paid in full,

*fifth,* ratably to pay any Prepayment Premium then due to the Lenders until paid in full,

*sixth,* ratably to pay the principal amount of the Loans (applied to installments due thereunder in the inverse order of maturity) then outstanding until paid in full, and

*seventh,* to pay ratably any other Obligations then due and payable.

**2.14    Ratable Sharing**.   Lenders hereby agree among themselves that, except as otherwise provided in the Collateral Documents with respect to amounts realized from the exercise of rights with respect to Liens on the Collateral, if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender hereunder or under the other Credit Documents (collectively, the "**Aggregate Amounts Due**" to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (a) notify Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; provided, if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of Company or otherwise, those purchases to that extent shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest.  Company expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set off or counterclaim with respect to any and all monies owing by Company to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

**2.15** **Making or Maintaining LIBOR Rate Loans**.

(a)     Inability to Determine Applicable Interest Rate.  In the event that Administrative Agent shall have determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any LIBOR Rate Loans, that by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such LIBOR Rate Loans on the basis provided for in the definition of Adjusted LIBOR Rate, Administrative Agent shall on such date give notice (by telefacsimile or by telephone confirmed in writing) to Company and each Lender of such determination, whereupon (i) no Loans may be made as, or converted to, LIBOR Rate Loans until such time as Administrative Agent notifies Company and Lenders that the circumstances giving rise to such notice no longer exist, and (ii) any Funding Notice or Conversion/Continuation Notice given by Company with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by Company.

(b)     Illegality or Impracticability of LIBOR Rate Loans.  In the event that on any date any Lender shall have determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with Company and Administrative Agent) that the making, maintaining or continuation of its LIBOR Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful), or (ii) has become impracticable, as a result of contingencies occurring after the date hereof which materially and adversely affect the London interbank market or the position of such Lender in that market, then, and in any such event, such Lender shall be an "**Affected Lender**" and it shall on that day give notice (by telefacsimile or by telephone confirmed in writing) to Company and Administrative Agent of such determination (which notice Administrative Agent shall promptly transmit to each other Lender).  Thereafter (1) the obligation of the Affected Lender to make Loans as, or to convert Loans to, LIBOR Rate Loans shall be suspended until such notice shall be withdrawn by the Affected Lender, (2) to the extent such determination by the Affected Lender relates to a LIBOR Rate Loan then being requested by Company pursuant to a Funding Notice or a Conversion/Continuation Notice, the Affected Lender shall make such Loan as (or continue such Loan as or convert such Loan to, as the case may be) a Base Rate Loan, (3) the Affected Lender's obligation to maintain its outstanding LIBOR Rate Loans (the "**Affected Loans**") shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (4) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination.  Company shall pay accrued interest on the amount so converted and all amounts due under Section 2.15(c) in accordance with the terms thereof due to such conversion.  Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a LIBOR Rate Loan then being requested by Company pursuant to a Funding Notice or a Conversion/Continuation Notice, Company shall have the option, subject to the provisions of Section 2.15(c), to rescind such Funding Notice or Conversion/Continuation Notice as to all Lenders by giving notice (by telefacsimile or by telephone confirmed in writing) to Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission Administrative Agent shall promptly transmit to each other Lender).

Except as provided in the immediately preceding sentence, nothing in this Section 2.15(b) shall affect the obligation of any Lender other than an Affected Lender to make or maintain Loans as, or to convert Loans to, LIBOR Rate Loans in accordance with the terms hereof.

(c)     Compensation for Breakage or Non Commencement of Interest Periods. Company shall compensate each Lender, upon written request by such Lender (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including any interest paid or calculated to be due and payable by such Lender to lenders of funds borrowed by it to make or carry its LIBOR Rate Loans and any loss, expense or liability sustained by such Lender in connection with the liquidation or re employment of such funds but excluding loss of anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by such Lender) a borrowing of any LIBOR Rate Loan does not occur on a date specified therefor in a Funding Notice or a telephonic request for borrowing, or a conversion to or continuation of any LIBOR Rate Loan does not occur on a date specified therefor in a Conversion/Continuation Notice or a telephonic request for conversion or continuation; (ii) if any prepayment or other principal payment of, or any conversion of, any of its LIBOR Rate Loans occurs on any day other than the last day of an Interest Period applicable to that Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise); or (iii) if any prepayment of any of its LIBOR Rate Loans is not made on any date specified in a notice of prepayment given by Company.

(d)     Booking of LIBOR Rate Loans. Any Lender may make, carry or transfer LIBOR Rate Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of such Lender.

(e)     Assumptions Concerning Funding of LIBOR Rate Loans. Calculation of all amounts payable to a Lender under this Section 2.15 and under Section 2.16 shall be made as though such Lender had actually funded each of its relevant LIBOR Rate Loans through the purchase of a LIBOR deposit bearing interest at the rate obtained pursuant to clause (i) of the definition of Adjusted LIBOR Rate in an amount equal to the amount of such LIBOR Rate Loan and having a maturity comparable to the relevant Interest Period and through the transfer of such LIBOR deposit from an offshore office of such Lender to a domestic office of such Lender in the United States of America; provided, however, each Lender may fund each of its LIBOR Rate Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 2.15 and under Section 2.16.

**2.16    Increased Costs; Capital Adequacy.**

(a)     Compensation For Increased Costs and Taxes. Subject to the provisions of Section 2.17 (which shall be controlling with respect to the matters covered thereby), in the event that any Lender shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that any law, treaty or governmental rule, regulation or order, or any change therein or in the interpretation, administration or application thereof (including the introduction of any new law, treaty or governmental rule, regulation or order), or any determination of a court or governmental authority, in each case that becomes effective after the date hereof, or compliance by such Lender with any guideline, request or directive issued or made after the date hereof by any central bank or other governmental or quasi

governmental authority (whether or not having the force of law): (i) subjects such Lender (or its applicable lending office) to any additional Tax (other than any Net Income Tax of such Lender) with respect to this Agreement or any of the other Credit Documents or any of its obligations hereunder or thereunder or any payments to such Lender (or its applicable lending office) of principal, interest, fees or any other amount payable hereunder; (ii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender other than any such reserve or other requirements with respect to LIBOR Rate Loans that are reflected in the definition of Adjusted LIBOR Rate; or (iii) imposes any other condition (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) or its obligations hereunder or the London interbank market; and the result of any of the foregoing is to increase the cost to such Lender of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto; then, in any such case, Company shall promptly pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder. Such Lender shall deliver to Company (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.16(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b) <u>Capital Adequacy Adjustment</u>. In the event that any Lender shall have determined that the adoption, effectiveness, phase in or applicability after the Closing Date of any law, rule or regulation (or any provision thereof) regarding capital adequacy, or any change therein or in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender (or its applicable lending office) with any guideline, request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of, or with reference to, such Lender's Loans, or participations therein or other obligations hereunder with respect to the Loans to a level below that which such Lender or such controlling corporation could have achieved but for such adoption, effectiveness, phase in, applicability, change or compliance (taking into consideration the policies of such Lender or such controlling corporation with regard to capital adequacy), then from time to time, within five (5) Business Days after receipt by Company from such Lender of the statement referred to in the next sentence, Company shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling corporation on an after tax basis for such reduction. Such Lender shall deliver to Company (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this Section 2.16(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

**2.17    Taxes**; **Withholding**, etc.

(a)    <u>Payments to Be Free and Clear</u>.  All sums payable by any Credit Party hereunder and under the other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax imposed, levied, collected, withheld or assessed by the United States of America or any political subdivision in or of the United States of America or any other jurisdiction from, through, or to which a payment is made by or on behalf of any Credit Party or by any federation or organization of which the United States of America or any such jurisdiction is a member at the time of payment.

(b)    <u>Withholding of Taxes</u>.  If any Credit Party or any other Person is required by law to make any deduction or withholding on account of any Tax (other than Net Income Tax) from any sum paid or payable under any of the Credit Documents:  (i) Company shall notify Administrative Agent of any such requirement or any change in any such requirement as soon as Company becomes aware of it; (ii) Company shall pay any such Tax to the relevant Governmental Authority before the date on which penalties attach thereto; (iii) the sum payable by such Credit Party in respect of which the relevant deduction or withholding is required shall be increased to the extent necessary to ensure that after any such deduction or withholding, Administrative Agent or such Lender, as the case may be, and each of their Tax Related Persons receives on the due date a net sum equal to what it would have received had no such deduction or withholding been required; and (iv) within thirty (30) days after making any such deduction or withholding, Company shall deliver to Administrative Agent an official receipt or other evidence satisfactory to the other affected parties of such deduction or withholding and of the remittance thereof to the relevant taxing or other authority; <u>provided</u>, no such additional amount shall be required to be paid to any Lender under clause (iii) above except to the extent that any change after the date hereof (in the case of each Lender listed on the signature pages hereof on the Closing Date) or after the effective date of the Assignment Agreement pursuant to which such Lender became a Lender (in the case of each other Lender) in any such requirement for a deduction or withholding shall result in an increase in the rate of such deduction or withholding from that in effect at the date hereof or at the date of such Assignment Agreement, as the case may be, in respect of payments to such Lender.

(c)    <u>Other Taxes</u>.  In addition, the Credit Parties shall pay all Other Taxes to the relevant Governmental Authorities in accordance with applicable law.  The Credit Parties shall deliver to Administrative Agent official receipts or other evidence of such payment reasonably satisfactory to Administrative Agent in respect of any Other Taxes payable hereunder promptly after payment of such Other Taxes.

(d)    <u>Indemnification</u>.  The Credit Parties shall indemnify each Agent and each Lender, within ten (10) days after written demand therefor, for the full amount of any Taxes paid or incurred by such Agent or such Lender or their respective Tax Related Persons, as the case may be, relating to, arising out of, or in connection with any Credit Document or any payment or transaction contemplated hereby or thereby, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority and all reasonable costs and expenses incurred in enforcing the provisions of this Section 2.16; <u>provided</u>, <u>however</u>, that the Credit Parties shall not be required to indemnify the Agents, Lenders and Participants (i) for any

Taxes that would be excluded from a gross-up under the proviso to Section 2.17(b), (ii) in duplication of Taxes covered by Sections 2.17(b) or (c), or (iii) for Net Income Taxes, other than in the case of (A) any matters addressed in Section 2.17(c) and any indemnification therefor and (B) any payments of expenses and costs made pursuant to this Section 2.17(d), in which instances such indemnification shall be made on an after-Tax basis, such that after all required deductions and payments of all Taxes (including Net Income Taxes applicable to amounts covered by this Section 2.17(d)(iii)(A) or (B)), the Agents, the Lenders and each of their respective Tax Related Persons receives and retains an amount equal to the sum it would have received and retained had it not paid or incurred or been subject to such Taxes or expenses and costs. A certificate from the relevant Lender or Agent, setting forth in reasonable detail the basis and calculation of such Taxes shall be conclusive, absent manifest error.

(e)     Evidence of Exemption From U.S. Withholding Tax. Each Lender that is not a United States Person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for U.S. federal income tax purposes (a "**Non-U.S. Lende**r") shall deliver to Administrative Agent for transmission to Company, on or prior to the Closing Date (in the case of each Lender listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Lender (in the case of each other Lender), and at such other times as may be necessary in the determination of Company or Administrative Agent (each in the reasonable exercise of its discretion), (i) two (2) original copies of Internal Revenue Service Form W-8BEN, W-8IMY or W-8ECI (or any successor forms), properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by Company to establish that such Lender is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Lender of principal, interest, fees or other amounts payable under any of the Credit Documents or is subject to deduction or withholding at a reduced rate, or (ii) if such Lender is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue Code and cannot deliver Internal Revenue Service Form W 8ECI pursuant to clause (i) above, a Certificate Regarding Non-Bank Status together with two (2) original copies of Internal Revenue Service Form W-8BEN (or any successor form), properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by Company to establish that such Lender is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Lender of interest payable under any of the Credit Documents. Each Lender required to deliver any forms, certificates or other evidence with respect to United States federal income tax withholding matters pursuant to this Section 2.17(e) hereby agrees, from time to time after the initial delivery by such Lender of such forms, certificates or other evidence, whenever a lapse in time or change in circumstances renders such forms, certificates or other evidence obsolete or inaccurate in any material respect, that such Lender shall promptly deliver to Administrative Agent for transmission to Company two (2) new original copies of Internal Revenue Service Form W-8BEN, W-8IMY or W-8ECI, or a Certificate Regarding Non Bank Status and two (2) original copies of Internal Revenue Service Form W-8BEN (or any successor form), as the case may be, properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by Company to confirm or establish that such Lender is not subject to deduction or withholding of United States federal income tax with respect to payments to such Lender under the Credit Documents or is subject to deduction or withholding at a reduced rate, or notify Administrative Agent and Company of its inability to

deliver any such forms, certificates or other evidence. Company shall not be required to pay any additional amount to any Non-U.S. Lender under Section 2.17(b)(iii), or be subject to an indemnification obligation under Section 2.17(d), if such Lender shall have failed to deliver the forms, certificates or other evidence referred to in the second sentence of this Section 2.17(e) that it is legally entitled to deliver; provided, if such Lender shall have satisfied the requirements of the first sentence of this Section 2.17(e) on the Closing Date or on the date of the Assignment Agreement pursuant to which it became a Lender, as applicable, nothing in this last sentence of Section 2.17(e) shall relieve Company of its obligation to pay any additional amounts pursuant this Section 2.17 in the event that, as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof, such Lender is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing the fact that such Lender is not subject to withholding as described herein. Nothing in this Section 2.17 shall be construed to require a Lender, Agent or Participant to provide any forms or documentation that it is not legally entitled to provide. In those circumstances as shall be necessary to allow payments hereunder to be made free of (or at a reduced rate of) taxes, each Agent shall provide to Company two (2) original copies of Internal Revenue Service form W-8IMY (or any successor form), properly completed and duly executed by each Agent, together with all documentation required to be supplied therewith.

2.18    **Obligation to Mitigate**.  Each Lender agrees that, as promptly as practicable after the officer of such Lender responsible for administering its Loans becomes aware of the occurrence of an event or the existence of a condition that would cause such Lender to become an Affected Lender or that would entitle such Lender to receive payments under Section 2.16 or 2.17, it will, to the extent not inconsistent with the internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Credit Extensions, including any Affected Loans, through another office of such Lender, or (b) take such other measures as such Lender may deem reasonable, if as a result thereof the circumstances which would cause such Lender to be an Affected Lender would cease to exist or the additional amounts which would otherwise be required to be paid to such Lender pursuant to Section 2.16 or 2.17 would be materially reduced and if, as determined by such Lender in its sole discretion, the making, issuing, funding or maintaining of such Loans through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Loans or the interests of such Lender; provided, such Lender will not be obligated to utilize such other office pursuant to this Section 2.18 unless Company agrees to pay all costs and expenses incurred by such Lender as a result of utilizing such other office as described above.  A certificate as to the amount of any such expenses payable by Company pursuant to this Section 2.18 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Lender to Company (with a copy to Administrative Agent) shall be conclusive absent manifest error.

2.19    **Defaulting Lenders**.  Anything contained herein to the contrary notwithstanding, in the event that any Lender, other than at the direction or request of any regulatory agency or authority, defaults (a "**Defaulting Lender**") in its obligation to fund (a "**Funding Default**") any Loan (a "**Defaulted Loan**"), then (a) during any Default Period with respect to such Defaulting Lender, such Defaulting Lender shall be deemed not to be a "Lender" for purposes of voting on any matters (including the granting of any consents or waivers) with respect to any of the Credit

Documents; and (b) to the extent permitted by applicable law, until such time as the Default Excess with respect to such Defaulting Lender shall have been reduced to zero, (i) any voluntary prepayment of the Loans shall, if Administrative Agent so directs at the time of making such voluntary prepayment, be applied to the Loans of other Lenders as if such Defaulting Lender had no Loans outstanding and the outstanding Loans of such Defaulting Lender were zero, and (ii) any mandatory prepayment of the Loans shall, if Administrative Agent so directs at the time of making such mandatory prepayment, be applied to the Loans of other Lenders (but not to the Loans of such Defaulting Lender) as if such Defaulting Lender had funded all Defaulted Loans of such Defaulting Lender, it being understood and agreed that Company shall be entitled to retain any portion of any mandatory prepayment of the Loans that is not paid to such Defaulting Lender solely as a result of the operation of the provisions of this clause (b).  Except as otherwise expressly provided in this Section 2.19, performance by Company of its obligations hereunder and the other Credit Documents shall not be excused or otherwise modified as a result of any Funding Default or the operation of this Section 2.19.   The rights and remedies against a Defaulting Lender under this Section 2.19 are in addition to other rights and remedies which Company may have against such Defaulting Lender with respect to any Funding Default and which Administrative Agent or any Lender may have against such Defaulting Lender with respect to any Funding Default.

**2.20    Removal or Replacement of a Lender**.   Anything contained herein to the contrary notwithstanding, in the event that: (a) (i) any Lender (an "**Increased Cost Lender**") shall give notice to Company that such Lender is an Affected Lender or that such Lender is entitled to receive payments under Section 2.16 or 2.17, (ii) the circumstances which have caused such Lender to be an Affected Lender or which entitle such Lender to receive such payments shall remain in effect, and (iii) such Lender shall fail to withdraw such notice within five (5) Business Days after Company's request for such withdrawal; or (b) (i) any Lender shall become a Defaulting Lender, (ii) the Default Period for such Defaulting Lender shall remain in effect, and (iii) such Defaulting Lender shall fail to cure the default as a result of which it has become a Defaulting Lender within five (5) Business Days after Company's request that it cure such default; or (c) in connection with any proposed amendment, modification, termination, waiver or consent with respect to any of the provisions hereof as contemplated by Section 10.5(b), the consent of Administrative Agent and Requisite Lenders shall have been obtained but the consent of one or more of such other Lenders (each a "**Non-Consenting Lender**") whose consent is required shall not have been obtained; then, with respect to each such Increased Cost Lender, Defaulting Lender or Non-Consenting Lender (the "**Terminated Lender**"), Administrative Agent may (which, in the case of an Increased-Cost Lender, only after receiving written request from Company to remove such Increased-Cost Lender (which notice may not be given by Company if any Default or Event of Default is then continuing)), by giving written notice to Company and any Terminated Lender of its election to do so, elect to cause such Terminated Lender (and such Terminated Lender hereby irrevocably agrees) to assign its outstanding Loans, if any, in full to one or more Eligible Assignees (each a "**Replacement Lender**") in accordance with the provisions of Section 10.6 and Terminated Lender shall pay any fees payable thereunder in connection with such assignment; <u>provided</u>, (1) on the date of such assignment, the Replacement Lender shall pay to Terminated Lender an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the Terminated Lender; (2) on the date of such assignment, Company shall pay any amounts payable to such Terminated Lender pursuant to Section 2.16 or 2.17; and (3) in the event such Terminated Lender is a Non-

Consenting Lender, each Replacement Lender shall consent, at the time of such assignment, to each matter in respect of which such Terminated Lender was a Non-Consenting Lender. Upon the prepayment of all amounts owing to any Terminated, such Terminated Lender shall no longer constitute a "Lender" for purposes hereof; provided, any rights of such Terminated Lender to indemnification hereunder shall survive as to such Terminated Lender. Each Replacement Lender shall cure any existing Funding Default of the applicable Defaulting Lender.

## SECTION 3.  CONDITIONS PRECEDENT.

**3.1    Closing Date**.  Effectiveness of this Agreement and the Debt Exchange contemplated hereunder is subject to the satisfaction, or waiver in accordance with Section 10.5, of the following conditions on or before the Closing Date:

(a)    <u>Credit Documents</u>.  Administrative Agent shall have received sufficient copies of each Credit Document originally executed and delivered by each applicable Credit Party for each Lender.

(b)    <u>Organizational Documents; Incumbency</u>.  Administrative Agent shall have received (i) sufficient copies of each Organizational Document of each Credit Party, as applicable, and, to the extent applicable, certified as of a recent date by the appropriate governmental official, for each Lender, each dated the Closing Date or a recent date prior thereto; (ii) signature and incumbency certificates of the officers of such Person executing the Credit Documents to which it is a party; (iii) resolutions of the Board of Directors or similar governing body of each Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment; (iv) a good standing certificate from the applicable Governmental Authority of each Credit Party's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Closing Date; and (v) such other documents as Administrative Agent may reasonably request.

(c)    <u>Organizational and Capital Structure</u>.  The organizational structure and capital structure of Company and its Subsidiaries shall be as set forth on Schedule 4.2.

(d)    <u>Restructuring Costs</u>.  At least three (3) Business Days prior to the Closing Date, Company shall have delivered to Administrative Agent Company's reasonable best estimate of the Restructuring Costs (other than fees payable to any Agent).

(e)    <u>Governmental Authorizations and Consents</u>.  Each Credit Party shall have obtained all Governmental Authorizations and all consents of other Persons, in each case that are necessary or advisable in connection with the transactions contemplated by the Credit Documents and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to Administrative Agent.  All applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the

Credit Documents or the financing thereof and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired.

(f)      Real Estate Assets.  In order to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid and, subject to any filing and/or recording referred to herein, perfected First Priority security interest in certain Real Estate Assets, Administrative Agent and Collateral Agent shall have received from Company and each applicable Guarantor:

(i)      fully executed and notarized Mortgages, in proper form for recording in all appropriate places in all applicable jurisdictions, encumbering each Real Estate Asset listed in Schedule 3.1(f) (each, a "**Closing Date Mortgaged Property**");

(ii)      an opinion of counsel (which counsel shall be reasonably satisfactory to Collateral Agent) in each state in which a Closing Date Mortgaged Property is located with respect to the enforceability of the form(s) of Mortgages to be recorded in such state and such other matters as Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to Collateral Agent;

(iii)      in the case of each Leasehold Property that is a Closing Date Mortgaged Property, (1) a Landlord Consent and Estoppel and (2) evidence that such Leasehold Property is a Recorded Leasehold Interest;

(iv)      (a) [CLTA 110.5 endorsements in respect of the previously issued] ALTA mortgagee title insurance policies or unconditional commitments therefor issued by each of the co-insuring title companies reasonably satisfactory to Collateral Agent with respect to each Closing Date Mortgaged Property (each, a "**Title Policy**"), in amounts not less than the fair market value of each Closing Date Mortgaged Property, together with a title report issued by a title company with respect thereto, dated not more than thirty (30) days prior to the Closing Date and copies of all recorded documents listed as exceptions to title or otherwise referred to therein, each in form and substance reasonably satisfactory to Collateral Agent and (B) evidence satisfactory to Collateral Agent that such Credit Party has paid to the title company or to the appropriate governmental authorities all expenses and premiums of the title company and all other sums required in connection with the issuance of each Title Policy and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Mortgages for each Closing Date Mortgaged Property in the appropriate real estate records; and

(v)      evidence of flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board

of Governors of the Federal Reserve System, in form and substance reasonably satisfactory to Collateral Agent.

(g)     Personal Property Collateral.  In order to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid, perfected First Priority security interest in the personal property Collateral, Collateral Agent shall have received:

(i)     evidence satisfactory to Collateral Agent of the compliance by each Credit Party of their obligations under the Security Agreement and the other Collateral Documents (including their obligations to execute and deliver UCC financing statements, originals of securities, instruments and chattel paper and any agreements governing deposit and/or securities accounts as provided therein);

(ii)     A completed Collateral Questionnaire dated the Closing Date and executed by an Authorized Officer of each Credit Party, together with all attachments contemplated thereby, including (A) the results of a recent search, by a Person satisfactory to Collateral Agent, of all effective UCC financing statements (or equivalent filings) made with respect to any personal or mixed property of any Credit Party in the jurisdictions specified in the Collateral Questionnaire, together with copies of all such filings disclosed by such search, and (B) UCC termination statements (or similar documents) duly executed by all applicable Persons for filing in all applicable jurisdictions as may be necessary to terminate any effective UCC financing statements (or equivalent filings) disclosed in such search (other than any such financing statements in respect of Permitted Liens);

(iii)     opinions of counsel (which counsel shall be reasonably satisfactory to Collateral Agent) with respect to the creation and perfection of the security interests in favor of Collateral Agent in such Collateral and such other matters governed by the laws of each jurisdiction in which any Credit Party or any personal property Collateral is located as Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to Collateral Agent; and

(iv)     evidence that each Credit Party shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument (including without limitation, (i) a Landlord Collateral Access Agreement, Bailee's Letter and/or similar collateral access agreements executed by the landlord of any Leasehold Property and by the applicable Credit Party, and (ii) any intercompany notes evidencing Indebtedness permitted to be incurred pursuant to Section 6.1(b)) and made or caused to be made any other filing and recording (other than as set forth herein) in each case as reasonably required by Collateral Agent.

(h)     Control Agreements.  Administrative Agent shall have received a duly executed Control Agreement covering each Deposit Account and each Securities Account, other than the Rabo Bank Account.

(i) <u>Financial Statements; Projections</u>. Lenders shall have received from Company (i) the Historical Financial Statements, (ii) pro forma consolidated and consolidating financial statements of Company and its Subsidiaries as at the Closing Date, and reflecting the consummation of the related financings and the other transactions contemplated by the Credit Documents to occur on or prior to the Closing Date, which pro forma financial statements shall be in form and substance satisfactory to Administrative Agent, and (iii) the Projections; <u>provided</u>, that the parties acknowledge that the Disclosure Statement filed by the Company in connection with the Bankruptcy Case shall be sufficient to satisfy this condition.

(j) <u>Evidence of Insurance</u>. Collateral Agent shall have received a certificate from Company's insurance broker or other evidence satisfactory to it that all insurance required to be maintained pursuant to Section 5.5 is in full force and effect, together with endorsements naming Collateral Agent, for the benefit of Secured Parties, as additional insured and loss payee thereunder to the extent required under Section 5.5.

(k) <u>Opinions of Counsel to Credit Parties</u>. Lenders and their respective counsel shall have received originally executed copies of the favorable written opinions of Squire, Sanders & Dempsey LLP, counsel for Credit Parties, in the form of <u>Exhibit N</u>, dated as of the Closing Date and covering such matters as Administrative Agent may request and otherwise in form and substance satisfactory to Administrative Agent (and each Credit Party hereby instructs such counsel to deliver such opinions to Agents and Lenders).

(l) <u>Accrued Fees</u>. Company shall have paid to Administrative Agent in cash (i) the fees payable on the Closing Date referred to in Section 2.8, (ii) all actual and reasonable fees and expenses of the Administrative Agent's outside counsel Milbank, Tweed, Hadley & McCloy, LLP incurred through the Effective Date, (iii) all actual and reasonable monthly fees incurred through October 31, 2009 and expenses incurred through the Effective Date of the Administrative Agent's financial advisor Broadpoint Gleacher Securities Group, Inc., invoiced as of the Effective Date, and (iv) to the extent approved by the Bankruptcy Court prior to the Effective Date, a success fee to Broadpoint Gleacher Securities Group, Inc. in cash in an amount of $575,000.

(m) <u>Solvency Certificate</u>. On the Closing Date, Administrative Agent shall have received a Solvency Certificate from Company dated as of the Closing Date and addressed to Administrative Agent and Lenders, and in form, scope and substance satisfactory to Administrative Agent, with appropriate attachments and demonstrating that after giving effect to the consummation of the transactions contemplated by the Credit Documents, Company and each of its Subsidiaries is and will be Solvent.

(n) <u>Closing Date Certificate</u>. Company shall have delivered to Administrative Agent an originally executed Closing Date Certificate, together with all attachments thereto.

(o) <u>Closing Date.</u> Lenders shall have made the Loans to Company on or before the Closing Date.

(p) <u>No Litigation</u>. There shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened in any

court or before any arbitrator or Governmental Authority that, in the reasonable opinion of Administrative Agent, singly or in the aggregate, materially impairs any of the transactions contemplated by the Credit Documents, or that could have a Material Adverse Effect.

(q) <u>Completion of Proceedings</u>. All partnership, corporate and other proceedings taken or to be taken in connection with the transactions contemplated hereby and all documents incidental thereto not previously found acceptable by Administrative Agent and its counsel shall be satisfactory in form and substance to Administrative Agent and such counsel, and Administrative Agent, and such counsel shall have received all such counterpart originals or certified copies of such documents as Administrative Agent may reasonably request.

(r) <u>Confirmation of Plan</u>. The Plan shall have been confirmed by the United States Bankruptcy Court for the District of Arizona in substantially the form upon which Administrative Agent shall have affirmatively voted and the Effective Date shall occur on, or substantially contemporaneously with, the Closing Date. On the Effective Date, Company shall have as of the close of business a "book balance" of cash and cash equivalents in an aggregate amount of at least six million ($6,000,000) on deposit in a Deposit Account or Securities Account that is subject to a Control Agreement.

(s) <u>No Material Adverse Change</u>. Since the date of confirmation of the Plan by the Bankruptcy Court, no event, circumstance or change shall have occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, and no disruption, adverse change or condition in the financial, banking or capital markets generally shall have occurred.

(t) <u>Funds Flow</u>. Administrative Agent shall receive at least three (3) Business Days prior to the Closing Date a funds flow memorandum, in form and substance reasonably satisfactory to it.

Each Lender, by delivering its signature page to this Agreement and funding a Loan on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable on the Closing Date.

## SECTION 4. REPRESENTATIONS AND WARRANTIES.

In order to induce Lenders to enter into this Agreement and to make each Credit Extension to be made thereby, each Credit Party represents and warrants to each Lender on the Closing Date and on each Credit Date, that the following statements are true and correct (it being understood and agreed that the representations and warranties made on the Closing Date are deemed to be made concurrently with the consummation of the Debt Exchange contemplated hereby):

**4.1  Organization**; **Requisite Power and Authority; Qualification**. Each Credit Party (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as identified in Schedule 4.1, (b) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the

transactions contemplated thereby and, in the case of Company, to make the borrowings hereunder, and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations.

**4.2     Capital Stock and Ownership**.  The Capital Stock of each of Company and its Subsidiaries has been duly authorized and validly issued and is fully paid and non-assessable. Except as set forth on Schedule 4.2, as of the date hereof, there is no existing option, warrant, call, right, commitment or other agreement to which Company or any of its Subsidiaries is a party requiring, and there is no membership interest or other Capital Stock of Company or any of its Subsidiaries outstanding which upon conversion or exchange would require, the issuance by Company or any of its Subsidiaries of any additional membership interests or other Capital Stock of Company or any of its Subsidiaries or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Capital Stock of Company or any of its Subsidiaries.  Schedule 4.2 sets forth a true, complete and correct list as of the Closing Date, both before and after giving effect to the transactions contemplated by the Credit Documents, of the name of Company and each of its Subsidiaries and indicates for each such Person its ownership (by holder and percentage interest) and the type of entity of each of them, and the number and class of authorized and issued Capital Stock of such Subsidiary. Schedule 4.2 sets forth a true, complete and correct list as of the Closing Date, both before and after giving effect to the transactions contemplated by the Credit Documents, of the name of Company and each of its Subsidiaries and indicates for each such Person its ownership (by holder and percentage interest) and the type of entity of each of them, and the number and class of authorized and issued Capital Stock of such Subsidiary.  Except as set forth on Schedule 4.2, as of the Closing Date, neither Company nor any of its Subsidiaries has any equity investments in any other corporation or entity.

**4.3     Due Authorization**.  The execution, delivery and performance of the Credit Documents have been duly authorized by all necessary action on the part of each Credit Party that is a party thereto.

**4.4     No Conflict**.  The execution, delivery and performance by each of the Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate any provision of any law or any governmental rule or regulation applicable to Company or any of its Subsidiaries, any of the Organizational Documents of Company or any of its Subsidiaries, or any order, judgment or decree of any court or other agency of government binding on Company or any of its Subsidiaries; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of Company or any of its Subsidiaries; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of Company or any of its Subsidiaries (other than any Liens created under any of the Credit Documents in favor of Collateral  Agent, on behalf of Secured Parties); (d) result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to its operations or any of its properties or (e) require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of Company or any of its Subsidiaries, except for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to Lenders.

**4.5** **Governmental Consents**. The execution, delivery and performance by each of the Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to Collateral Agent for filing and/or recordation, as of the Closing Date.

**4.6** **Binding Obligation**. Each Credit Document has been duly executed and delivered by each Credit Party that is a party thereto and is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability (whether enforcement is sought in equity or at law).

**4.7** **Historical Financial Statements**. The Historical Financial Statements were prepared in conformity with GAAP and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments. As of the Closing Date, neither Company nor any of its Subsidiaries has any contingent liability or liability for taxes, long term lease or unusual forward or long term commitment that is not reflected in the Historical Financial Statements or the notes thereto and which in any such case is material in relation to the business, operations, properties, assets, condition (financial or otherwise) or prospects of Company and any of its Subsidiaries taken as a whole. Since the date of the audited Historical Financial Statements, no Internal Control Event has occurred.

**4.8** **Projections**. On and as of the Closing Date, the Projections of Company and its Subsidiaries for the period of Fiscal Year 2009 through and including Fiscal Year 2011, including monthly projections for each month during the Fiscal Year in which the Closing Date takes place, (the "**Projections**") are based on good faith estimates and assumptions made by the management of Company and as of the Closing Date, management of Company believed that the Projections were reasonable and attainable.

**4.9** **No Material Adverse Change**. Since the Confirmation Date, no event, circumstance or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

**4.10** **No Restricted Junior Payments**. Since the Confirmation Date, neither Company nor any of its Subsidiaries has directly or indirectly declared, ordered, paid or made, or set apart any sum or property for, any Restricted Junior Payment or agreed to do so except as permitted pursuant to Section 6.4.

**4.11** **Adverse Proceedings, etc**. Other than as described on Schedule 4.11, There are no Adverse Proceedings, individually or in the aggregate, that (a) relate to any Credit Document or the transactions contemplated hereby or thereby or (b) could reasonably be expected to have a Material Adverse Effect. Neither Company nor any of its Subsidiaries (i) is in violation of any

applicable laws (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (ii) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**4.12    Payment of Taxes**.  Except as otherwise permitted under Section 5.3, all tax returns and reports of Company and its Subsidiaries required to be filed by any of them have been timely filed, and all taxes shown on such tax returns to be due and payable and all assessments, fees and other governmental charges upon Company and its Subsidiaries and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable.  Company knows of no proposed tax assessment against Company or any of its Subsidiaries which is not being actively contested by Company or such Subsidiary in good faith and by appropriate proceedings; provided, such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

**4.13    Properties**.

(a)    Title.  Each of Company and its Subsidiaries has (i) good, sufficient and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (iii) good title to (in the case of all other personal property), all of their respective properties and assets reflected in their respective Historical Financial Statements referred to in Section 4.7 and in the most recent financial statements delivered pursuant to Section 5.1, in each case except for assets disposed of since the date of such financial statements in the ordinary course of business or as otherwise permitted under Section 6.8.  All such properties and assets are in working order and condition, ordinary wear and tear excepted, and except as permitted by this Agreement, all such properties and assets are free and clear of Liens.

(b)    Real Estate.  As of the Closing Date, Schedule 4.13 contains a true, accurate and complete list of (i) all Real Estate Assets, and (ii) all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Estate Asset of any Credit Party, regardless of whether such Credit Party is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment, and the termination date and annual base rent under each of them.  Each agreement listed in clause (ii) of the immediately preceding sentence is in full force and effect and no default has occurred and is continuing thereunder.  Each such agreement constitutes the legally valid and binding obligation of each applicable Credit Party, enforceable against such Credit Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.  To the best knowledge of each Credit Party, no other party to any such agreement is in default of its obligations thereunder, and no Credit Party (or any other party to any such agreement) has at any time delivered or received any notice of default which remains uncured under any such Lease

and, as of the Closing Date, no event has occurred which, with the giving of notice or the passage of time or both, would constitute a default under any such agreement.

**4.14    Environmental Matters**.  Neither Company nor any of its Subsidiaries nor any of their respective Facilities or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  There are and, to each of Company's and its Subsidiaries' knowledge, have been, no conditions, occurrences, or Hazardous Materials Activities which could reasonably be expected to form the basis of an Environmental Claim against Company or any of its Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Compliance with all current or reasonably foreseeable future requirements pursuant to or under Environmental Laws could not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.  No event or condition has occurred or is occurring with respect to Company or any of its Subsidiaries relating to any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activity which individually or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect.

**4.15    No Defaults**.  Neither Company nor any of its Subsidiaries is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations, and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, could not reasonably be expected to have a Material Adverse Effect.  After giving effect to the Debt Exchange, no Default has occurred and is continuing.

**4.16    Material Contracts**.  Schedule 4.16 contains a true, correct and complete list of all the Material Contracts in effect on the Closing Date after giving effect to the Debt Exchange.  All such Material Contracts, together with any updates provided pursuant to Section 5.1(l), are in full force and effect and no defaults currently exist thereunder (other than as described in Schedule 4.16 or in such updates).

**4.17    Governmental Regulation**.  Neither Company nor any of its Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.  Neither Company nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

**4.18    Margin Stock**.  Neither Company nor any of its Subsidiaries is engaged in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the Loans made to such Credit Party will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

**4.19    Employee Matters**.  Company and each of its Subsidiaries has good labor relations.  Company, its Subsidiaries, and their respective employees, agents and representatives have not committed any material unfair labor practice as defined in the National Labor Relations Act.  Neither Company nor any of its Subsidiaries has been or is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.  There has been and is (a) no unfair labor practice charge or complaint pending against Company or any of its Subsidiaries, or to the best knowledge of Company, threatened against any of them before the National Labor Relations Board or any other Governmental Authority and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement or similar agreement that is so pending against Company or any of its Subsidiaries or to the best knowledge of Company, threatened against any of them, (b) no labor dispute, strike, lockout, slowdown or work stoppage in existence or threatened against, involving or affecting Company or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect, (c) no labor union, labor organization, trade union, works council, or group of employees of Company or any of its Subsidiaries has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened to be brought or filed with the National Labor Relations Board or any other Governmental Authority, and (d) to the best knowledge of Company, no union representation question existing with respect to any of the employees of Company or any of its Subsidiaries and, to the best knowledge of Company, no labor union organizing activity with respect to any employees of Company or any of its Subsidiaries that is taking place, except (with respect to any matter specified in clause (a), (b), (c) or (d) above, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect.

**4.20    Employee Benefit Plans**.  Company, each of its Subsidiaries and each of their respective ERISA Affiliates are in compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations in all material respects under each Employee Benefit Plan.  Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service (or is entitled to rely upon a favorable determination letter issued to a sponsor of a prototype plan document) indicating that such Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter which would cause such Employee Benefit Plan to lose its qualified status.  No liability to the PBGC (other than required premium payments) or the Internal Revenue Service has been or is expected to be incurred by Company, any of its Subsidiaries or any of their ERISA Affiliates with respect to any Employee Benefit Plan.  No ERISA Event has occurred or is reasonably expected to occur.  Except to the extent required under Section 4980B of the Internal Revenue Code or similar state laws, or otherwise funded entirely by the participants thereof, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of Company, any of its Subsidiaries or any of their respective ERISA Affiliates.  The present value of the aggregate benefit liabilities under each Pension Plan sponsored, maintained or contributed to by Company, any of its Subsidiaries or any of their ERISA Affiliates (determined as of the end of the most recent plan year on the basis of the actuarial assumptions specified for funding purposes in the most recent actuarial valuation for such Pension Plan), did not exceed the aggregate current value of the assets of such Pension Plan.  As of the most recent valuation date for each

Multiemployer Plan for which the actuarial report is available, the potential liability of Company, its Subsidiaries and their respective ERISA Affiliates for a complete or partial withdrawal from such Multiemployer Plan (within the meaning of Section 4203 or Section 4205 of ERISA), when aggregated with such potential liability for a complete or partial withdrawal from all Multiemployer Plans, is zero. Company, each of its Subsidiaries and each of their ERISA Affiliates have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

**4.21    Certain Fees**.  No broker's or finder's fee or commission will be payable by the Company or any of its Subsidiaries with respect hereto or any of the transactions contemplated hereby.

**4.22    Solvency**.  Each Credit Party is and, upon the incurrence of any Credit Extension by such Credit Party on any date on which this representation and warranty is made, will be, Solvent.

**4.23    Compliance with Statutes, etc**.  Each of Company and its Subsidiaries is in compliance with its organizational documents and all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property (including compliance with all applicable Environmental Laws with respect to any Real Estate Asset or governing its business and the requirements of any permits issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of Company or any of its Subsidiaries), except such non compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**4.24    Disclosure**.  No representation or warranty of any Credit Party contained in any Credit Document and none of the reports, financial statements or other documents, certificates or written statements furnished to Lenders by or on behalf of Company or any of its Subsidiaries for use in connection with the transactions contemplated hereby contains any untrue statement of a material fact or omits to state a material fact (known to Company, in the case of any document not furnished by either of them) necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made.  Any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by Company to be reasonable at the time made.  There are no agreements, instruments and corporate or other restrictions to which any Credit Party is subject and there are no facts known (or which should upon the reasonable exercise of diligence be known) to Company (other than matters of a general economic nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and statements furnished to Lenders for use in connection with the transactions contemplated hereby.

**4.25    Terrorism Laws and FCPA**.  Each Credit Party is in compliance, in all material respects, with the Terrorism Laws.  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of

a political party, candidate for political office, or anyone else acting in an official capacity in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**4.26  Insurance**.  The properties of Company and each of its Subsidiaries are adequately insured with financially sound and reputable insurers and in such amounts, with such deductibles and covering such risks and otherwise on terms and conditions as are customarily carried or maintained by Persons of established reputation of similar size and engaged in similar businesses and such insurance complies with the requirements of Section 5.5.  Schedule 4.26 sets forth a list of all insurance maintained by or on behalf of the Credit Parties and each of their Subsidiaries as of the Closing Date and, as of the Closing Date, all premiums in respect of such insurance have been paid.

**4.27  Common Enterprise**.  The successful operation and condition of each of the Credit Parties is dependent on the continued successful performance of the functions of the group of the Credit Parties as a whole and the successful operation of each of the Credit Parties is dependent on the successful performance and operation of each other Credit Party.  Each Credit Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (a) successful operations of each of the other Credit Parties and (b) the credit extended by the Lenders to the Company hereunder, both in their separate capacities and as members of the group of companies.  Each Credit Party has determined that execution, delivery, and performance of this Agreement and any other Credit Documents to be executed by such Credit Party is within its purpose, will be of direct and indirect benefit to such Credit Party, and is in its best interest.

**4.28  Security Interest in Collateral**.  The provisions of this Agreement and the other Credit Documents create legal and valid Liens on all the Collateral in favor of Collateral Agent, for the benefit of Collateral Agent and the Lenders, and such Liens constitute perfected and continuing Liens on the Collateral, securing the Obligations, enforceable against the applicable Credit Party and all third parties, and having priority over all other Liens on the Collateral except in the case of (a) Permitted Liens, to the extent any such Permitted Liens would have priority over the Liens in favor of Collateral Agent pursuant to any applicable law or agreement and (b) Liens perfected only by possession (including possession of any certificate of title) to the extent Collateral Agent has not obtained or does not maintain possession of such Collateral.

**4.29  Affiliate Transactions**.  Except as set forth on Schedule 4.29, as of the date of this Agreement, there are no existing or proposed agreements, arrangements, understandings, or transactions between any Credit Party and any of the officers, members, managers, directors, stockholders, parents, other interest holders, employees, or Affiliates (other than Subsidiaries) of any Credit Party or any members of their respective immediate families, and none of the foregoing Persons are directly or indirectly indebted to or have any direct or indirect ownership, partnership, or voting interest in any Affiliate of any Credit Party or any Person with which any Credit Party has a business relationship or which competes with any Credit Party (except that any such Persons may own stock in (but not exceeding two percent (2%) of the outstanding Capital Stock of) any publicly traded company that may compete with a Credit Party.

**4.30   Intellectual Property**.  Each Credit Party and its Subsidiaries owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property necessary to its business as currently conducted, a correct and complete list of which, as of the date of this Agreement, is set forth on Schedule 4.30, and the use thereof by the Credit Parties and its Subsidiaries does not infringe in any material respect upon the rights of any other Person, and the Credit Parties rights thereto are not subject to any licensing agreement or similar arrangement. Each Credit Party has taken reasonable measures to protect the secrecy, confidentiality and value of all trade secrets used in its business (collectively, the "**Business Trade Secrets**").  To the best knowledge of each Credit Party, none of the Business Trade Secrets have been disclosed to any Person other than employees or contractors of the Credit Parties who had a need to know and use such Business Trade Secrets in the ordinary course of employment or contract performance and who executed appropriate confidentiality agreements prohibiting the unauthorized use or disclosure of such Business Trade Secrets and containing other terms reasonably necessary or appropriate for the protection and maintenance of such Business Trade Secrets.  To the best knowledge of each Credit Party, no unauthorized disclosure of any Business Trade Secrets has been made.

**4.31   Permits, etc**.  Each Credit Party has, and is in compliance with, all permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business currently owned, leased, managed or operated, or to be acquired, by such Person, which, if not obtained, could not reasonably be expected to have a Material Adverse Effect.  No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, and there is no claim that any thereof is not in full force and effect, except, to the extent any such condition, event or claim could not be reasonably be expected to have a Material Adverse Effect.

**SECTION 5.  AFFIRMATIVE COVENANTS.**

Each Credit Party covenants and agrees that until payment in full of all Obligations, each Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 5.

**5.1   Financial Statements and Other Reports**.  Unless otherwise provided below, Company will deliver to Administrative Agent and Lenders:

(a)   <u>Monthly Reports</u>.  As soon as available, and in any event within thirty (30) days after the end of each month (including months which began prior to the Closing Date), consolidated and consolidating balance sheet of Company and its Subsidiaries as at the end of such month and the related consolidated (and with respect to statements of income, consolidating) statements of income, stockholders' equity and cash flows of Company and its Subsidiaries for such month and for the period from the beginning of the then current Fiscal Year to the end of such month, setting forth in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the Financial Plan for the current Fiscal Year, all in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto and any other operating reports

prepared by management for such period (<u>provided</u>, that the parties acknowledge and agree that any such financial statements relating to the first six (6) months following the Effective Date will be subject to change, in the Company's discretion, in order to reflect "fresh start" accounting adjustments and other restructuring related adjustments);

(b)     <u>Quarterly Financial Statements</u>.  As soon as available, and in any event within forty-five (45) days after the end of each Fiscal Quarter of each Fiscal Year (including, commencing with Fiscal Year 2010, the fourth Fiscal Quarter), the consolidated and consolidating balance sheets of Company and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated (and with respect to statements of income, consolidating) statements of income, stockholders' equity and cash flows of Company and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the Financial Plan for the current Fiscal Year, all in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto;

(c)     <u>Annual Financial Statements</u>.  As soon as available, and, with respect to the items described in clause (i), in any event within one hundred twenty (120) days after the end of the Fiscal Year ending December 31, 2009 and within 90 days of the end of each Fiscal Year ending on or after December 31, 2010, (i) the consolidated and consolidating balance sheets of Company and its Subsidiaries as at the end of Fiscal Years 2008 and 2009, with respect to the Fiscal Year ending December 31, 2009, and such Fiscal Year with respect to each Fiscal Year ending thereafter and the related consolidated (and with respect to statements of income, consolidating) statements of income, stockholders' equity and cash flows of Company and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year and the corresponding figures from the Financial Plan for the Fiscal Year covered by such financial statements, in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto; and (ii) with respect to such financial statements a report thereon of independent certified public accountants of recognized national standing selected by Company, and reasonably satisfactory to Administrative Agent (which report shall for each Fiscal Year subsequent to the 2008 Fiscal Year be unqualified as to going concern and scope of audit and shall not contain any explanatory paragraph or paragraph of emphasis with respect to going concern), and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of Company and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards) together with a written statement by such independent certified public accountants stating (1) that their audit examination has included a review of the terms of the Credit Documents and (2) that nothing has come to their attention that causes them to believe that the information contained in any Compliance Certificate is not correct or that the matters set forth in such Compliance Certificate are not stated in accordance with the terms hereof;

(d)     Compliance Certificate.     Together with each delivery of financial statements of Company and its Subsidiaries pursuant to Sections 5.1(a), 5.1(b) and 5.1(c), a duly executed and completed Compliance Certificate;

(e)     Statements of Reconciliation after Change in Accounting Principles.  If, as a result of any change in accounting principles and policies (or the application thereof) from those used in the preparation of the Historical Financial Statements, the consolidated financial statements of Company and its Subsidiaries delivered pursuant to Section 5.1(b) or 5.1(c) will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance satisfactory to Administrative Agent;

(f)     Notice of Default.  Prompt written notice (but, in any event, within three (3) Business Days) (i) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to Company with respect thereto; (ii) that any Person has given any notice to Company or any of its Subsidiaries with respect to any event or condition set forth in Section 8.1(b); (iii) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect; or (iv) the occurrence of any Internal Control Event of which any officer of Company has knowledge, which notice shall be accompanied by a certificate of its Authorized Officers specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action Company has taken, is taking and proposes to take with respect thereto;

(g)     Notice of Litigation.  Prompt written notice (but, in any event, within three (3) Business Days) of (i) the institution of, or threat of, any Adverse Proceeding not previously disclosed in writing by Company to Lenders, or (ii) any development in any Adverse Proceeding that, in the case of either clause (i) or (ii) if adversely determined, could be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, or which arises  in respect of any material Indebtedness of Company or its Subsidiaries or alleges any criminal misconduct by any Credit Party together in each case with such other information as may be reasonably available to Company to enable Lenders and their counsel to evaluate such matters;

(h)     ERISA.  (i) The occurrence of or forthcoming occurrence of any ERISA Event, a prompt written notice (but, in any event, within three (3) Business Days) specifying the nature thereof, what action Company, any of its Subsidiaries or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness (but, in any event, within three (3) Business Days), copies of (1) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by Company, any of its Subsidiaries or any of their respective ERISA Affiliates with the Internal Revenue Service with respect to each Pension Plan; (2) all notices

received by Company, any of its Subsidiaries or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event; and (3) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as Administrative Agent shall reasonably request;

(i) <u>Financial Plan</u>. As soon as practicable and in any event no later than January 31, 2010 with respect to the 2010 Fiscal Year and, with respect to each subsequent Fiscal Year, no later than thirty (30) days prior to the beginning of each such subsequent Fiscal Year, a consolidated plan and financial forecast for such Fiscal Year and each Fiscal Year (or portion thereof) through the final maturity date of the Loans (a "**Financial Plan**"), including (i) a forecasted consolidated and consolidating balance sheet and forecasted consolidated and consolidating statements of income and cash flows of Company and its Subsidiaries for each such Fiscal Year, together with a pro forma Compliance Certificate, for each such Fiscal Year and an explanation of the assumptions on which such forecasts are based, (ii) forecasted consolidated statements of income and cash flows of Company and its Subsidiaries for each month of each such Fiscal Year, (iii) forecasts demonstrating projected compliance with the requirements of Section 6.7 through the final maturity date of the Loans, and (iv) forecasts demonstrating adequate liquidity through the final maturity date of the Loans, together, in each case, with an explanation of the assumptions on which such forecasts are based, all in form and substance reasonably satisfactory to the Agents and accompanied by a certificate from the chief financial officer of Company certifying that the projections contained therein are based upon good faith estimates and assumptions believed by Company to be reasonable at the time made and at the time of delivery thereof;

(j) <u>Insurance Report</u>. As soon as practicable and in any event by the last day of each Fiscal Year, a report in form and substance satisfactory to Administrative Agent outlining all material insurance coverage maintained as of the date of such report by Company and its Subsidiaries and all material insurance coverage planned to be maintained by Company and its Subsidiaries in the immediately succeeding Fiscal Year;

(k) <u>Notice of Change in Board of Directors</u>. With reasonable promptness, written notice of any change in the board of directors (or similar governing body) of Company;

(l) <u>Notice Regarding Material Contracts</u>. Promptly, and in any event within ten (10) Business Days (i) after any Material Contract of Company or any of its Subsidiaries is terminated or amended in a manner that is materially adverse to Company or such Subsidiary, as the case may be, or that any Credit Party determines in good faith to be material to Administrative Agent or the Lenders and (ii) after any new Material Contract is entered into, a written statement describing such event, with copies of such material amendments or new contracts, delivered to Administrative Agent (to the extent such delivery is permitted by the terms of any such Material Contract, <u>provided</u>, no such prohibition on delivery shall be effective if it were bargained for by Company or its applicable Subsidiary with the intent of avoiding compliance with this Section 5.1(l)), and an explanation of any actions being taken with respect thereto;

(m) <u>Environmental Reports and Audits</u>. As soon as practicable (but, in any event, within three (3) Business Days) following receipt thereof, copies of all environmental

audits and reports with respect to environmental matters at any Facility or which relate to any environmental liabilities of Company or its Subsidiaries which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(n)    Information Regarding Collateral.    Company will furnish to Collateral Agent written notice at least thirty (30) days prior to the occurrence of any change (i) in any Credit Party's corporate name, (ii) in any Credit Party's identity or corporate structure, or (iii) in any Credit Party's Federal Taxpayer Identification Number.   Company agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral and for the Collateral at all times following such change to have a valid, legal and perfected security interest as contemplated in the Collateral Documents.   Company will furnish to Administrative Agent prompt written notice of any Lien (other than Permitted Liens) or claims made or asserted against any Collateral or interest therein.   Company also agrees promptly to notify Collateral Agent in writing if any material portion of the Collateral is lost, damaged or destroyed;

(o)    Annual Collateral Verification.    Each year, at the time of delivery of annual financial statements with respect to the preceding Fiscal Year pursuant to Section 5.1(c), Company shall deliver to Collateral Agent an Officer's Certificate (i) either confirming that there has been no change in such information since the date of the Collateral Questionnaire delivered on the Closing Date or the date of the most recent certificate delivered pursuant to this Section and/or identifying such changes, or (ii) certifying that all Uniform Commercial Code financing statements (including fixture filings, as applicable) or other appropriate filings, recordings or registrations, have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction identified in the Collateral Questionnaire or pursuant to clause (i) above to the extent necessary to protect and perfect the security interests under the Collateral Documents for a period of not less than eighteen (18) months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period);

(p)    Aging Reports.    Together with each delivery of financial statements of Company and each other Credit Party pursuant to Sections 5.1(a), 5.1(b) and 5.1(c), (i) a summary of the accounts receivable aging report of each Credit Party as of the end of such period, and (ii) a summary of accounts payable aging report of each Credit Party as of the end of such period, in each case in form and substance satisfactory to Administrative Agent;

(q)    Violations of Terrorism Laws.    Promptly (i) if any Credit Party obtains knowledge that any Credit Party or any Person which owns, directly or indirectly, any Capital Stock of any Credit Party, or any other holder at any time of any direct or indirect equitable, legal or beneficial interest therein is the subject of any of the Terrorism Laws, such Credit Party will notify Administrative Agent and (ii) upon the request of any Lender, such Credit Party will provide any information such Lender believes is reasonably necessary to be delivered to comply with the Patriot Act;

(r)     Water Reporting.  On each anniversary of the Closing Date, Company shall deliver to Administrative Agent an annual report with respect to water usage and water facilities for Company which includes (i) water usage at each facility broken down by source (well, municipal or other water service), (ii) water facility status as of the end of the year (including the number and type of active wells, abandoned or capped wells and shut in wells and water service interconnections) and (iii) a schedule of expected water facility capital expenditures for the following year, all prepared in sufficient detail and otherwise in form and substance acceptable to the Administrative Agent.  The Administrative may in addition request, no more than once every forty-eight (48) months, that the Company cause a hydrogeologic study with respect to water supply and water rights of the Company covering all wells operated by the Company or located on or serving the Company's facilities to be prepared by an independent hydrogeologic consultant approved by Administrative Agent, at the expense of the Company, and delivered to the Administrative Agent;

(s)     Rabo Bank Account.  Concurrently with the delivery of each monthly financial statement required in sub-clause (a) above, Company shall deliver a certificate of the chief financial officer of the Company that certifies the following information:  (i) the total amount of deposits in the Rabo Bank Account stated in dollars (based upon the dollar equivalent of Euros deposited in such account as determined using the exchange rate in effect on the date of such deposits) during the prior twelve consecutive months (including the immediately preceding month); and (ii) the highest daily closing balance of the Rabo Bank Account (on a book basis) during the preceding month stated in dollars (determined based upon the exchange rate in effect on each corresponding date); and

(t)     Other Information.  (i) Promptly upon their becoming available, all financial statements, reports, notices and proxy statements sent or made available generally by Company to the Equity Investors and/or the holders of the Subordinated Notes (but excluding any such materials that may be provided to a Person in his or her capacity as a director and/or officer of the Company) and copies of all press releases and other statements made available generally by Company or any of its Subsidiaries to the public concerning material developments in the business of Company or any of its Subsidiaries, (ii) promptly after submission to any Governmental Authority, all documents and information furnished to such Governmental Authority in connection with any investigation of any Credit Party (other than any routine inquiry), provided that settlement discussions or confidential personal information regarding individuals need not be delivered, (iii) promptly upon receipt thereof, copies of all financial reports submitted to any Credit Party by its auditors in connection with any audit of the books thereof and (iv) such other information and data with respect to Company or any of its Subsidiaries as from time to time may be reasonably requested by Administrative Agent.

**5.2**     **Existence**.  Except as otherwise permitted under Section 6.8, each Credit Party will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect its existence and all rights and governmental authorizations, qualifications, franchises, licenses and permits material to its business and to conduct its business in each jurisdiction in which its business is conducted; provided, no Credit Party other than Company or any of its Subsidiaries shall be required to preserve any such existence, right or governmental authorizations, qualifications, franchise, licenses and permits if such Person's board of directors (or similar governing body) shall determine that the preservation thereof is no longer desirable in

the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to Lenders.

5.3    **Payment of Taxes and Claims**.  Each Credit Party will, and will cause each of its Subsidiaries to, pay all Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon, and all claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and/or that by law have or may become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; underlined_provided, no such Tax or claim need be paid if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserve or other appropriate provision, as shall be required in conformity with GAAP shall have been made therefor, and (b) in the case of a Tax or claim which has or may become a Lien against any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such Tax or claim.  No Credit Party will, nor will it permit any of its Subsidiaries to, file or consent to the filing of any consolidated income tax return with any Person (other than Company or any of its Subsidiaries).

5.4    **Maintenance of Properties**.  Each Credit Party will, and will cause each of its Subsidiaries to, (a) maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material assets used in the business of Company and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof and (b) comply at all times with the provisions of all material leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder.

5.5    **Insurance**.  Company will maintain or cause to be maintained, with financially sound and reputable insurers, (a) business interruption insurance reasonably satisfactory to Administrative Agent, and (b) casualty insurance, such public liability insurance, third party property damage insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of Company and its Subsidiaries as are customarily carried or maintained under similar circumstances by Persons of established reputation of similar size and engaged in similar businesses, in each case in such amounts (giving effect to self insurance which comports with the requirements of this Section and provided that adequate reserves therefor are maintained in accordance with GAAP), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons.  Without limiting the generality of the foregoing, Company will maintain or cause to be maintained (c) flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System, and (d) replacement value casualty insurance on the Collateral under such policies of insurance, with such insurance companies, in such amounts, with such deductibles, and covering such risks as are at all times carried or maintained under similar circumstances by Persons of established reputation of similar size and engaged in similar businesses.  Each such policy of insurance shall (i) name Collateral Agent, on behalf of Lenders as an additional insured thereunder as its interests may appear, and (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, satisfactory in form and substance to Collateral Agent, that names

Collateral Agent, on behalf of Secured Parties, as the loss payee thereunder and provides for at least thirty (30) days' prior written notice to Collateral Agent of any modification or cancellation of such policy and that no act or default of Company or any other Person shall affect the right of Collateral Agent to recover under such policy or policies in case of loss or damage.

**5.6  Books and Records; Inspections**.  Each Credit Party will, and will cause each of its Subsidiaries to, (a) keep adequate books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by Administrative Agent or any Lender (including employees of Administrative Agent, any Lender or any consultants, accountants, lawyers and appraisers retained by Administrative Agent) to visit and inspect any of the properties of any Credit Party and any of its respective Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent accountants, all upon reasonable notice and at such reasonable times during normal business hours (so long as no Default or Event of Default has occurred and is continuing) and as often as may reasonably be requested and by this provision the Credit Parties authorize such accountants to discuss with Administrative Agent and Lender and such representatives the affairs, finances and accounts of Company and its Subsidiaries.  The Credit Parties acknowledge that Administrative Agent, after exercising its rights of inspection, may prepare and distribute to the Lenders certain reports pertaining to the Credit Parties' assets for internal use by Administrative Agent and the Lenders.  After the occurrence and during the continuance of any Event of Default, each Credit Party shall provide Administrative Agent and each Lender with reasonable access to its customers and suppliers.

**5.7  Lenders Meetings**.  Company will, upon the request of Administrative Agent or Requisite Lenders, participate in a meeting of Administrative Agent and Lenders once during each Fiscal Year to be held at Company's corporate offices (or at such other location as may be agreed to by Company and Administrative Agent) at such time as may be agreed to by Company and Administrative Agent.

**5.8  Compliance with Laws**.  Each Credit Party will comply, and shall cause each of its Subsidiaries and all other Persons, if any, on or occupying any Facilities to comply, with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including all Environmental Laws).  Each Credit Party shall take all reasonable and necessary actions to ensure that no portion of the Loans will be used, disbursed or distributed for any purpose, or to any Person, directly or indirectly, in violation of any of the Terrorism Laws and shall take all reasonable and necessary action to comply in all material respects with all Terrorism Laws with respect thereto.

**5.9  Environmental**.

(a)  <u>Environmental Disclosure</u>.  Company will deliver to Administrative Agent and Lenders:

(i)  as soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of Company or any of its Subsidiaries or by independent

consultants, governmental authorities or any other Persons, with respect to material environmental matters at any Facility or with respect to any material Environmental Claims;

(ii)     promptly upon the occurrence thereof, written notice describing in reasonable detail (1) any Release required to be reported to any federal, state or local governmental or regulatory agency under any applicable Environmental Laws, (2) any remedial action taken by Company or any other Person in response to (A) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, or (B) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of resulting in a Material Adverse Effect, and (3) Company's discovery of any occurrence or condition on any real property adjoining or in the vicinity of any Facility that could reasonably be expected. cause such Facility or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws;

(iii)    as soon as practicable following the sending or receipt thereof by Company or any of its Subsidiaries, a copy of any and all written communications with respect to (1) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of giving rise to a Material Adverse Effect, (2) any Release required to be reported to any federal, state or local governmental or regulatory agency, and (3) any request for information from any governmental agency that suggests such agency is investigating whether Company or any of its Subsidiaries may be potentially responsible for any Hazardous Materials Activity;

(iv)     prompt written notice describing in reasonable detail (1) any proposed acquisition of stock, assets, or property by Company or any of its Subsidiaries that could reasonably be expected to (A) expose Company or any of its Subsidiaries to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (B) affect the ability of Company or any of its Subsidiaries to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations and (2) any proposed action to be taken by Company or any of its Subsidiaries to modify current operations in a manner that could reasonably be expected to subject Company or any of its Subsidiaries to any additional material obligations or requirements under any Environmental Laws; and

(v)      with reasonable promptness, such other documents and information as from time to time may be reasonably requested by Administrative Agent in relation to any matters disclosed pursuant to this Section 5.9(a).

(b)     Hazardous Materials Activities, etc.  Each Credit Party shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by such Credit Party or its Subsidiaries that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (ii) make an appropriate response to any Environmental Claim against such Credit

Party or any of its Subsidiaries and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    Right of Access and Inspection.  With respect to any event described in Section 5.9(a), or if an Event of Default has occurred and is continuing, or if Administrative Agent reasonably believes that Company or any Subsidiary has breached any representation, warranty or covenant related to environmental matters (including those contained in Sections 4.14, 5.8 or 5.9):

(i)    Administrative Agent and its representatives shall have the right, but not the obligation or duty, to enter the Facilities at reasonable times for the purposes of observing the Facilities.  Such access shall include, at the reasonable request of Administrative Agent, access to relevant documents and employees of Company and its Subsidiaries and to their outside representatives, to the extent necessary to obtain necessary information related to the event at issue.  If an Event of Default has occurred and is continuing, the Credit Parties shall conduct such tests and investigations on the Facilities or relevant portion thereof, as reasonably requested by Administrative Agent, including the preparation of a Phase I Report or such other sampling or analysis as determined to be necessary under the circumstances by a qualified environmental engineer or consultant.  If an Event of Default has occurred and is continuing, and if a Credit Party does not undertake such tests and investigations in a reasonably timely manner following the request of Administrative Agent, Administrative Agent may hire an independent engineer, at the Credit Parties' expense, to conduct such tests and investigations.  Administrative Agent will make all reasonable efforts to conduct any such tests and investigations so as to avoid interfering with the operation of the Facility; and

(ii)    Any observations, tests or investigations of the Facilities by or on behalf of Administrative Agent shall be solely for the purpose of protecting the Lenders security interests and rights under the Credit Documents.  The exercise of Administrative Agent's rights under this Subsection (c) shall not constitute a waiver of any default of any Credit Party or impose any liability on Administrative Agent or any of the Lenders.  In no event will any observation, test or investigation by or on behalf of Administrative Agent be a representation that Hazardous Materials are or are not present in, on or under any of the Facilities, or that there has been or will be compliance with any Environmental Law and Administrative Agent shall not be deemed to have made any representation or warranty to any party regarding the truth, accuracy or completeness of any report or findings with regard thereto.  Neither any Credit Party nor any other party is entitled to rely on any observation, test or investigation by or on behalf of Administrative Agent.  Administrative Agent and the Lenders owe no duty of care to protect any Credit Party or any other party against, or to inform any Credit Party or any other party of, any Hazardous Materials or any other adverse condition affecting any of the Facilities.  Administrative Agent may, in its sole discretion, disclose to the applicable Credit Party, or to any other party if so required by law, any report or findings made as a result of, or in connection with, its observations, tests or investigations.  If a request is made of Administrative Agent to disclose any such report or finding to any third party, then Administrative Agent shall endeavor to give the applicable Credit Party prior notice of such disclosure and afford such

Credit Party the opportunity to object or defend against such disclosure at its own and sole cost; <u>provided</u>, that the failure of Administrative Agent to give any such notice or afford such Credit Party the opportunity to object or defend against such disclosure shall not result in any liability to Administrative Agent. Each Credit Party acknowledges that it may be obligated to notify relevant Governmental Authorities regarding the results of any observation, test or investigation disclosed to such Credit Party, and that such reporting requirements are site and fact-specific and are to be evaluated by such Credit Party without advice or assistance from Administrative Agent.

(d)     If counsel to Company or any of its Subsidiaries reasonably determines that provision to Administrative Agent of a document otherwise required to be provided pursuant to this Section 5.9 (or any other provision of this Agreement or any other Credit Document relating to environmental matters) would jeopardize an applicable attorney-client or work product privilege pertaining to such document, then Company or its Subsidiary shall not be obligated to deliver such document to Administrative Agent but shall provide Administrative Agent with a notice identifying the author and recipient of such document and generally describing the contents of the document. Upon request of Administrative Agent, Company and its Subsidiaries shall take all reasonable steps necessary to provide Administrative Agent with the factual information contained in any such privileged document.

**5.10     Subsidiaries**. In the event that any Person becomes a Domestic Subsidiary of Company, Company shall (a) concurrently with such Person becoming a Domestic Subsidiary cause such Domestic Subsidiary to become a Guarantor hereunder and a Grantor under the Security Agreement by executing and delivering to Administrative Agent and Collateral Agent a Counterpart Agreement, and (b) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates as are similar to those described in Sections 3.1(b), 3.1(h) and 3.1(k). In the event that any Person becomes a Foreign Subsidiary of Company, and the ownership interests of such Foreign Subsidiary are owned by Company or by any Domestic Subsidiary thereof, Company shall, or shall cause such Domestic Subsidiary to, deliver, all such documents, instruments, agreements, and certificates as are similar to those described in Sections 3.1(b), and Company shall take, or shall cause such Domestic Subsidiary to take, all of the actions referred to in Section 3.1(g) necessary to grant and to perfect a First Priority Lien in favor of Collateral Agent, for the benefit of Secured Parties, under the Security Agreement in sixty five percent (65%) of such ownership interests. With respect to each such Subsidiary, Company shall promptly send to Administrative Agent written notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary of Company, and (ii) all of the data required to be set forth in Schedules 4.1 and 4.2 with respect to all Subsidiaries of Company; <u>provided</u>, such written notice shall be deemed to supplement Schedule 4.1 and 4.2 for all purposes hereof.

**5.11     Additional Material Real Estate Assets**. In the event that any Credit Party acquires a Material Real Estate Asset after the Closing Date or a Real Estate Asset owned or leased on the Closing Date becomes a Material Real Estate Asset and such interest has not otherwise been made subject to the Lien of the Collateral Documents in favor of Collateral Agent, for the benefit of Secured Parties, then such Credit Party, contemporaneously with acquiring such Material Real Estate Asset, or promptly after a Real Estate Asset owned or leased on the Closing Date becomes a Material Real Estate Asset, shall take all such actions and

execute and deliver, or cause to be executed and delivered, all such mortgages, documents, instruments, agreements, opinions and certificates similar to those executed in connection with the Prior Agreement with respect to each such Material Real Estate Asset that Collateral Agent shall reasonably request to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid and, subject to any filing and/or recording referred to herein, perfected First Priority security interest in such Material Real Estate Assets. In addition to the foregoing, Company shall, at the request of Requisite Lenders, deliver, from time to time, to Administrative Agent such appraisals as are required by law or regulation of Real Estate Assets with respect to which Collateral Agent has been granted a Lien.

5.12 **Further Assurances**. At any time or from time to time upon the request of Administrative Agent, each Credit Party will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as Administrative Agent or Collateral Agent may reasonably request in order to effect fully the purposes of the Credit Documents, including providing Lenders with any information reasonably requested pursuant to Section 10.2. In furtherance and not in limitation of the foregoing, each Credit Party shall take such actions as Administrative Agent or Collateral Agent may reasonably request from time to time to ensure that the Obligations are guarantied by the Guarantors and are secured by substantially all of the assets of Company and its Subsidiaries and all of the outstanding Capital Stock of Company and its Subsidiaries (subject to limitations contained in the Credit Documents with respect to Foreign Subsidiaries), and shall give Collateral Agent prompt written notice of its acquisition of any asset or assets with a value in excess of $100,000 to the extent that Collateral Agent's security interest therein to secure the Obligations will not be perfected by the Uniform Commercial Code filings currently in effect at such time.

5.13 **Miscellaneous Business Covenants**. Unless otherwise consented to by Agents and Requisite Lenders:

(a) <u>Non-Consolidation</u>. Company will and will cause each of its Subsidiaries to: (i) maintain entity records and books of account separate from those of any other entity which is an Affiliate of such entity; (ii) not commingle its funds or assets with those of any other entity which is an Affiliate of such entity; and (iii) provide that its board of directors or other analogous governing body will hold all appropriate meetings to authorize and approve such entity's actions, which meetings will be separate from those of other entities.

(b) <u>Cash Management Systems</u>. Company and its Subsidiaries shall establish and maintain cash management systems reasonably acceptable to Administrative Agent, including with respect to blocked account arrangements. As of the Closing Date, Company shall have two (2) cash management accounts which shall, at all times, remain open and subject to Control Agreements.

5.14 **Use of Proceeds**. The proceeds of the Loans will be used only as permitted under Section 2.3. No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that entails a violation of any law, including Regulations T, U and X of the Board of Governors of the Federal Reserve System.

## SECTION 6.  NEGATIVE COVENANTS.

Each Credit Party covenants and agrees that, until payment in full of all Obligations, such Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.

**6.1    Indebtedness**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(a)    the Obligations;

(b)    Indebtedness of any Guarantor Subsidiary to Company or to any other Guarantor Subsidiary, or of Company to any Guarantor Subsidiary; provided, (i) all such Indebtedness shall be evidenced by promissory notes and all such notes shall be subject to a First Priority Lien in favor of the Administrative Agent pursuant to the Security Agreement, (ii) all such Indebtedness shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, is reasonably satisfactory to Administrative Agent, and (iii) any payment by any such Guarantor Subsidiary under any guaranty of the Obligations shall result in a *pro tanto* reduction of the amount of any Indebtedness owed by such Subsidiary to Company or to any of its Subsidiaries for whose benefit such payment is made;

(c)    Indebtedness incurred by Company or any of its Subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations incurred in connection dispositions of any business, assets or Subsidiary of Company or any of its Subsidiaries permitted hereunder;

(d)    Indebtedness which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

(e)    Indebtedness in respect of netting services, overdraft protections and otherwise in connection with customary Deposit Accounts maintained by a Credit Party as part of its ordinary cash management program;

(f)    performance guaranties in the ordinary course of business and consistent with historic practices of the obligations of suppliers, customers, franchisees and licensees of Company and its Subsidiaries;

(g)    guaranties by Company of Indebtedness of a Guarantor Subsidiary or guaranties by a Subsidiary of Company of Indebtedness of Company or a Guarantor Subsidiary with respect, in each case, to Indebtedness otherwise permitted to be incurred pursuant to this Section 6.1;

(h)    Indebtedness described in Schedule  6.1, but not any extensions, renewals or replacements of such Indebtedness except (i) renewals and extensions expressly provided for in the agreements evidencing any such Indebtedness as the same are in effect on the date of this

Agreement, and (ii) refinancings and extensions of any such Indebtedness if the terms and conditions thereof, including those relating to amortization, maturity, collateral and subordination, are not less favorable to the obligor thereon or to the Lenders than the Indebtedness being refinanced or extended and are otherwise on prevailing market terms and conditions, and the average life to maturity thereof is greater than or equal to that of the Indebtedness being refinanced or extended; provided, such Indebtedness permitted under the immediately preceding clause (i) or (ii) above shall not (A) include Indebtedness of an obligor that was not an obligor with respect to the Indebtedness being extended, renewed or refinanced, (B) exceed in a principal amount the Indebtedness being renewed, extended or refinanced, or (C) be incurred, created or assumed if any Default or Event of Default has occurred and is continuing or would result therefrom;

(i)     Indebtedness of Company or any of its Subsidiaries with respect to Capital Leases; provided, the principal amount of such Indebtedness, when aggregated with the principal amount of all Indebtedness incurred under clause (j) below, shall not exceed at any time $4,000,000 in the aggregate for all Credit Parties;

(j)     purchase money Indebtedness of Company or any of its Subsidiaries; provided, (i) any such Indebtedness (A) shall be secured only by the asset acquired in connection with the incurrence of such Indebtedness, and (B) shall not exceed the fair market value of such asset at the time acquired, and (ii) the aggregate amount of all such Indebtedness, when aggregated with the principal amount of all Indebtedness incurred under clause (i) above, shall not exceed at any time $4,000,000 in the aggregate for all Credit Parties;

(k)     (i) Indebtedness consisting of Subordinated Notes issued on the Closing Date pursuant to the Plan, including any increases in the principal amount attributable to interest paid in-kind, (ii) Indebtedness consisting of Subordinated Indebtedness, incurred following the Closing Date in connection with the exercise of the Cure Right pursuant to Section 6.7(e) hereof (provided that such Indebtedness shall be subordinated to the Obligations arising under this Agreement on the same terms and conditions that the Subordinated PIK Notes are subordinated to such Obligations) and (iii) Indebtedness consisting of Subordinated PIK Notes issued in connection with the conversion, repayment or other satisfaction of Subordinated PIK A Notes having the same original principal amount, provided in each case that such Subordinated PIK Notes and other Subordinated Indebtedness provide that interest shall be paid solely in-kind and that scheduled maturity date shall be not less than one (1) year following the Maturity Date, and in each case including all payment-in-kind amounts added to the principal amount thereof;

(l)     Rate Management Agreements of Company or any of its Subsidiaries entered into in the ordinary course of business and for non-speculative purposes, provided that the Net Mark-to-Market Exposure of Company and its Subsidiaries in respect of such Rate Management Agreements shall not in the aggregate at any one time outstanding exceed $1,000,000;

(m)     Commodity Hedge Agreements of the Company or any of its Subsidiaries entered into in the ordinary course of business and for non-speculative purposes, provided that (i) the notional amount of such Commodity Hedge Agreements shall not in the aggregate at any time exceed $8,000,000, (i) such Commodity Hedge Agreements shall not require the Company

or any of its Subsidiaries to provide cash security in excess of $2,000,000 in the aggregate at any one time, provided that such $2,000,000 aggregate amount shall be reduced from time to time in an amount equal to the amount of any application of any cash to pay amounts due to the applicable counter parties in respect of such Commodity Hedge Agreements from time to time.

(n)    provided that such settlement does not result in an Event of Default under Section 8.1, settlements of claims against Company; and

(o)    Subordinated PIK Notes issued following the Closing Date (other than and in addition to any Subordinated PIK Notes issued pursuant to Section 6.1(k) hereof) in the aggregate original principal amount not to exceed $5,000,000 at any time outstanding, provided such Subordinated PIK Notes provide that interest shall be paid solely in-kind and that scheduled maturity date shall be not less than one (1) year following the Maturity Date, together with all payment-in-kind amounts added to the principal amount thereof; further provided that such post Closing Date Subordinated PIK Notes shall be subordinated to the Obligations arising under this Agreement on the same terms and conditions that the Subordinated PIK Notes are subordinated to such Obligations).

 provided, that no Indebtedness otherwise permitted by clauses (h), (i), (j), (l) or (m), shall be assumed, created, or otherwise refinanced if a Default or Event of Default has occurred or would result therefrom.

6.2    **Liens**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable and any Security) of Company or any of its Subsidiaries, whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset, income or profits under the UCC of any State or under any similar recording or notice statute, except:

(a)    Liens in favor of Collateral Agent for the benefit of Secured Parties granted pursuant to any Credit Document;

(b)    Liens for Taxes if obligations with respect to such Taxes are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts, for Taxes not yet due and payable, or for Taxes constituting the Pending Property Tax Dispute Settlement Amounts.

(c)    statutory Liens of landlords, banks (and rights of set off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or by ERISA), in each case incurred in the ordinary course of business (i) for amounts not yet overdue, or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of five (5) days) are being contested in good faith by

appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

(d)     Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other Indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof;

(e)     easements, rights of way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the value or use of the property to which such Lien is attached or with the ordinary conduct of the business of Company or any of its Subsidiaries;

(f)     any interest or title of a lessor or sublessor under any lease of real estate permitted hereunder;

(g)     Liens solely on any Cash earnest money deposits made by Company or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder, but only to the extent unrelated to Commodity Hedging Transactions or Rate Management Transactions.

(h)     purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(i)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)     any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property, in each case which do not and will not interfere with or affect in any material respect the use, value or operations of any Mortgaged Property or Material Real Estate Asset or the ordinary conduct of the business of Company or such Subsidiary;

(k)     licenses of patents, trademarks and other intellectual property rights granted by Company or any of its Subsidiaries in the ordinary course of business and not interfering in any respect with the ordinary conduct of the business of Company or such Subsidiary;

(l)     Liens described in Schedule 6.2(l);

(m)     Liens securing Indebtedness permitted pursuant to Section 6.1(i) or (j); provided, any such Lien shall encumber only the asset acquired with the proceeds of such Indebtedness;

(n)     Guarantees otherwise permitted pursuant to Sections 6.1(f) and (g);

(o)     Liens on Cash or Cash Equivalents posted as security for Commodity Hedging Transactions provided that (i) such posted Cash security shall not exceed $2,000,000 in the aggregate at any one time, provided that such $2,000,000 aggregate amount shall be reduced from time to time in an amount equal to the amount of any application of any cash to pay amounts due to the applicable counter parties in respect of such Commodity Hedge Agreements from time to time; and

(p)     Liens on Cash collateral accounts in an aggregate amount not to exceed $25,000 at any time incurred by Company in the ordinary course of business in connection with the processing of foreign currency transactions.

6.3     **No Further Negative Pledges**.  Except with respect to (a) specific property encumbered to secure payment of particular Indebtedness permitted hereby or to be sold pursuant to an executed agreement with respect to an Asset Sale permitted under Section 6.8, and (b) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (provided that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be), no Credit Party shall, nor shall it permit any of its Subsidiaries to, enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired..

6.4     **Restricted Junior Payments**.  No Credit Party shall, nor shall it permit any of its Subsidiaries or Affiliates through any manner or means or through any other Person to, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any sum for any Restricted Junior Payment, except (a) dividends and distributions by Subsidiaries of Company to Company or a Subsidiary of Company, (b) grants of options to purchase common stock of HoldCo, and the exercise of such options, pursuant to the Company's management incentive plan, to and by directors, officers and executives of the Company or an employer with which the Company would be considered a single employer under Sections 414(b) and (c) of the Code, (c) scheduled interest payments paid in kind with respect to other Subordinated Indebtedness, (d) payments of dividends paid in kind with respect to PIK Preferred Stock (if any), (e) issuance of common Equity Securities of HoldCo in exchange for Subordinated Indebtedness or PIK Preferred Stock, and (f) issuance of Subordinated Notes and common Equity Securities of HoldCo in exchange for Subordinated PIK A Notes as set forth in the Subordinated PIK Note Purchase Agreement.

6.5     **Restrictions on Subsidiary Distributions**.  Except as provided herein, no Credit Party shall, nor shall it permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of Company to (a) pay dividends or make any other distributions on any of such Subsidiary's Capital Stock owned by Company or any other Subsidiary of Company, (b) repay or prepay any Indebtedness owed by such Subsidiary to Company or any other Subsidiary of Company, (c) make loans or advances to Company or any other Subsidiary of Company, or (d) transfer any of its property or assets to Company or any other Subsidiary of Company other than

restrictions (i) in agreements evidencing Indebtedness permitted by Section 6.1(j) that impose restrictions on the property so acquired, (ii) by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses, joint venture agreements and similar agreements entered into in the ordinary course of business, and (iii) on the disposition of assets contained in agreements relating to the sale of assets, provided such restrictions and conditions apply only to the assets that are to be sold and such sale is permitted hereunder. No Credit Party shall, nor shall it permit its Subsidiaries to, enter into any Contractual Obligation which would prohibit a Subsidiary of Company from becoming a Credit Party.

6.6 **Investments**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, make or own any Investment in any Person, including without limitation any Joint Venture, except:

(a) Investments in Cash and Cash Equivalents;

(b) equity Investments owned as of the Closing Date in any Subsidiary and Investments made after the Closing Date in any wholly owned Guarantor Subsidiaries of Company;

(c) Investments (i) in any Securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors, and (ii) constituting deposits, prepayments and other credits to suppliers made in the ordinary course of business consistent with the past practices of Company and its Subsidiaries;

(d) intercompany loans to the extent permitted under Section 6.1(b);

(e) Consolidated Capital Expenditures permitted by Section 6.7(d);

(f) loans and advances to employees of Company and its Subsidiaries (i) made in the ordinary course of business and described on Schedule 6.6, and (ii) any refinancings of such loans after the Closing Date in an aggregate amount not to exceed $[250,000], provided that any such loans or advances made under this provision do not violate Section 402 of the Sarbanes-Oxley Act;

(g) Investments described in Schedule 6.6;

(h) other Investments (other than of the type described in clauses (b) and (e) above) in an aggregate amount not to exceed at any time $500,000; and

(i) Notwithstanding the foregoing, in no event shall any Credit Party make any Investment which results in or facilitates in any manner any Restricted Junior Payment not otherwise permitted under the terms of Section 6.4. Notwithstanding the foregoing, no Investment otherwise permitted by clause (d), (f), or (g) shall be permitted if any Default or Event of Default has occurred and is continuing or would result therefrom.

### 6.7 Financial Covenants.

(a) Total Secured Leverage Ratio. Company shall not permit the Total Secured Leverage Ratio as of the last day of any Fiscal Quarter, beginning with the Fiscal Quarter ending December 31, 2009, to exceed the correlative ratio indicated:

| Fiscal Quarter Ending | Total Secured Leverage Ratio |
|---|---|
| December 31, 2009 | 3.85:1.00 |
| March 31, 2010 | 3.85:1.00 |
| June 30, 2010 | 3.50:1.00 |
| September 30, 2010 | 3.50:1.00 |
| December 31, 2010 | 3.25:1.00 |
| March 31, 2011 | 2.70:1.00 |
| June 30, 2011 | 2.70:1.00 |
| September 30, 2011 | 2.60:1.00 |
| December 31, 2011 | 2.60:1.00 |
| March 31, 2012 | 2.45:1.00 |
| June 30, 2012 | 2.45:1.00 |
| September 30, 2012 | 2.45:1.00 |
| December 31, 2012 | 2.45:1.00 |
| March 31, 2013 | 2.25:1.00 |
| June 30, 2013 | 2.25:1.00 |
| September 30, 2013 | 2.25:1.00 |

(b) Consolidated Adjusted EBITDA. Company shall not permit Consolidated Adjusted EBITDA as at the end of any Fiscal Quarter, beginning with the Fiscal Quarter ending December 31, 2009, for the four Fiscal Quarter period then ended to be less than the correlative amount indicated:

| Fiscal Quarter | Consolidated Adjusted EBITDA |
|---|---|
| December 31, 2009 | $14,500,000 |
| March 31, 2010 | $14,500,000 |
| June 30, 2010 | $16,000,000 |
| September 30, 2010 | $17,000,000 |
| December 31, 2010 | $17,500,000 |
| March 31, 2011 | $20,000,000 |
| June 30, 2011 | $20,000,000 |
| September 30, 2011 | $21,000,000 |
| December 31, 2011 | $21,000,000 |
| March 31, 2012 | $21,000,000 |
| June 30, 2012 | $21,000,000 |
| September 30, 2012 | $21,000,000 |
| December 31, 2012 | $21,000,000 |

| Fiscal Quarter | Consolidated Adjusted EBITDA |
|---|---|
| March 31, 2013 | $21,000,000 |
| June 30, 2013 | $21,000,000 |
| September 30, 2013 | $21,000,000 |

(c)    _Maximum Consolidated Capital Expenditures_.  Company shall not make or incur any Consolidated Capital Expenditures, and Company shall not permit its Subsidiaries to, make or incur Consolidated Capital Expenditures, (i) in the Fiscal Quarter ending December 31, 2009 in an amount exceeding $1,300,000 or (ii) in any Fiscal Year beginning with the Fiscal Year 2010 in an amount exceeding $6,000,000; _provided_, _however_, that to the extent Consolidated Capital Expenditures of the Company are less than $6,000,000 in any Fiscal Year beginning with the Fiscal Year 2010, an amount not to exceed fifty percent (50%) of the amount of such deficiency may be carried forward by the Company and applied to increase the maximum permitted amount of Consolidated Capital Expenditures hereunder for the immediately succeeding Fiscal Year (provided, that for the avoidance of doubt, not more than $3,000,000 may be carried forward from any Fiscal Year to the succeeding Fiscal Year).

(d)    _Certain Calculations_.  With respect to any period during which an Asset Sale has occurred (each, a "**Subject Transaction**"), for purposes of determining compliance with the financial covenants set forth in this Section 6.7, Consolidated Adjusted EBITDA shall be calculated with respect to such period on a pro forma basis (including pro forma adjustments approved by Administrative Agent in its sole discretion) using the historical audited financial statements of any business so acquired or to be acquired or sold or to be sold and the consolidated financial statements of Company and its Subsidiaries which shall be reformulated as if such Subject Transaction, and any Indebtedness incurred or repaid in connection therewith, had been consummated or incurred or repaid at the beginning of such period (and assuming that such Indebtedness bears interest during any portion of the applicable measurement period prior to the relevant acquisition at the weighted average of the interest rates applicable to outstanding Loans incurred during such period).

(e)    _Cure Rights_.  In the event that Company would otherwise fail to comply with the financial covenants set forth in Section 6.7(a) or (b) for any measurement period, it shall have the right (the "**Cure Right**"), within ten (10) days after the date on which a Compliance Certificate must be delivered for the end of the earlier of a Fiscal Quarter or Fiscal Year including such measurement period (as applicable, the "**Cure Date**"), to issue additional Subordinated PIK Notes, PIK Preferred Stock or other Capital Stock (other than Disqualified Capital Stock), so long as the Maximum Remaining Cure is in excess of the Cure Shortfall Amount, in a minimum amount of Net Cure Proceeds per issuance equal to the greater of (i) $2,500,000 or (ii) the Cure Shortfall Amount.  For purposes of determining compliance with the financial covenants as set forth in Section 6.7(a) or (b) at any time following the Fiscal Quarter for which the Cure Right was exercised, the Consolidated Adjusted EBITDA for the Fiscal Quarter for which the Cure Right was exercised shall be deemed to be increased only by the minimum amount that would have been required to enable Company to be in compliance with the minimum Consolidated Adjusted EBITDA level as set forth in 6.7(b) in the Fiscal Quarter for which the Cure Right was exercised, provided that such Net Cure Proceeds are actually

received by the Company on or prior to the Cure Date and the Company shall have confirmed the receipt of such Net Cure Proceeds to the Administrative Agent in writing (the "**Applied Cure Proceeds**"). For purposes hereof, the "**Maximum Remaining Cure**" as determined with respect to any issuance under this Section 6.7(e) shall be an amount equal to $5,000,000 minus the aggregate amount of Applied Cure Proceeds prior to such issuance.

        **6.8**    **Fundamental Changes; Disposition of Assets; Acquisitions**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, enter into any transaction of merger or consolidation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sub lease (as lessor or sublessor), exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, or acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment and Capital Expenditures permitted hereunder in the ordinary course of business) the business, property or fixed assets of, or stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person, except:

        (a)    any Subsidiary of Company may be merged with or into Company or any Guarantor Subsidiary, or be liquidated, wound up or dissolved, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions, to Company or any Guarantor Subsidiary; provided, in the case of such a merger, Company or such Guarantor Subsidiary, as applicable, shall be the continuing or surviving Person;

        (b)    sales or other dispositions of assets (i) that do not constitute Asset Sales or (ii) made to Company or any Guarantor Subsidiary;

        (c)    Asset Sales, the proceeds of which (i) are less than $250,000 with respect to any single Asset Sale or series of related Asset Sales, and (ii) when aggregated with the proceeds of all other Asset Sales from the Closing Date to the date of determination, are less than $1,000,000; provided (1) the consideration received for such assets shall be in an amount at least equal to the fair market value thereof (determined in good faith by the board of directors of Company (or similar governing body)), (2) no less than one hundred percent (100%) thereof shall be paid in Cash, and (3) the Net Asset Sale Proceeds thereof shall be applied as required by Section 2.11(a);

        (d)    disposals of obsolete or worn out property, the proceeds of which are less than $100,000 with respect to any such property in any single disposition or series of related dispositions and when aggregated with all other dispositions made pursuant to this clause (d) from the Closing Date to the date of determination are less than $500,000; provided that the consideration received for such assets shall be in an amount at least equal to the fair market value thereof (determined in good faith by the board of directors of Company (or similar governing body); and

        (e)    Investments made in accordance with Section 6.6.

**6.9     Disposal of Subsidiary Interests**.  Except for any sale of all of its interests in the Capital Stock of any of its Subsidiaries in compliance with the provisions of Section 6.8, no Credit Party shall, nor shall it permit any of its Subsidiaries to, (a) directly or indirectly sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except to qualified directors if required by applicable law; or (b) directly or indirectly to sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except to another Credit Party (subject to the restrictions on such disposition otherwise imposed hereunder), or to qualified directors if required by applicable law.

**6.10     Sales and Leasebacks**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Credit Party (a) has sold or transferred or is to sell or to transfer to any other Person (other than Company or any of its Subsidiaries) or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Credit Party to any Person (other than Company or any of its Subsidiaries) in connection with such lease.

**6.11     Transactions with Shareholders and Affiliates**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any holder of five percent (5%) or more of any class of Capital Stock of Company or any of its Subsidiaries or with any Affiliate of Company or of any such holder, on terms that are less favorable to Company or that Subsidiary, as the case may be, than those that might be obtained at the time from a Person who is not such a holder or Affiliate; provided, the foregoing restriction shall not apply to (a) any transaction between Company and any Guarantor Subsidiary; (b) reasonable and customary fees paid to members of the board of directors (or similar governing body) of Company and its Subsidiaries; (c) consulting arrangements for Johan van den Berg pursuant to a written agreement and any amendments thereto, consistent with Schedule R to this Agreement or otherwise in form and substance reasonably acceptable to the Administrative Agent entered into in the ordinary course of business, including, without limitation, pursuant to the Company's management incentive plan; (d) compensation for officers and employees of the Company and its Subsidiaries other than Johan van den berg entered into in the ordinary course of business, including, without limitation, pursuant to the Company's management incentive plan; and (e) the transactions contemplated by the Transaction Documents.

**6.12     Conduct of Business**.  From and after the Closing Date, no Credit Party shall, nor shall it permit any of its Subsidiaries to, engage in any business other than the businesses engaged in by such Credit Party on the Closing Date.

**6.13     Permitted Activities**.  Company shall not (a) incur, directly or indirectly, any Indebtedness or any other obligation or liability whatsoever other than the Indebtedness permitted pursuant to Section 6.1; (b) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than the Liens created under the Collateral Documents to which it is a party or permitted pursuant to Section 6.2; (c) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any Person;

(d) sell or otherwise dispose of any Capital Stock of any of its Subsidiaries; (e) create or acquire any Subsidiary or make or own any Investment in any Person other than Company; (f) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons; or (g) issue Capital Stock of the Company except to HoldCo subject to the Lien of the Security Agreement.

**6.14 Amendments or Waivers of with respect to Subordinated Indebtedness**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, amend or otherwise change the terms of any Subordinated Indebtedness, PIK Preferred Stock, or make any payment consistent with an amendment thereof or change thereto, if the effect of such amendment or change is to increase the interest rate or yield on such Subordinated Indebtedness, PIK Preferred Stock, change (to earlier dates) any dates upon which payments of principal or cash or PIK interest are due thereon, change any event of default or condition to an event of default with respect thereto (other than to eliminate any such event of default or increase any grace period related thereto), change the redemption, prepayment or defeasance provisions thereof, change the subordination provisions of such Subordinated Indebtedness, PIK Preferred Stock (or of any guaranty thereof), or if the effect of such amendment or change, together with all other amendments or changes made, is to increase materially the obligations of the obligor thereunder or to confer any additional rights on the holders of such Subordinated Indebtedness (or a trustee or other representative on their behalf) which would be adverse to any Credit Party or Lenders.

**6.15 Fiscal Year**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to change its Fiscal Year end from December 31.

**6.16 Deposit Accounts**.  No Credit Party shall establish or maintain a Deposit Account or Securities Account that is not subject to a Control Agreement and no Credit Party will deposit Collateral (including the proceeds thereof) or the proceeds of Loans in a Deposit Account or Securities Account that is not subject to a Control Agreement.

**6.17 Amendments to Organizational Agreements and Material Contracts**.  No Credit Party shall (a) amend or permit any amendments to any Credit Party's Organizational Documents, or (b) amend or permit any amendments to, or terminate or waive any provision of, any Material Contract, if any such amendment, termination or waiver (under either clause (a) or (b) above) would be adverse to Administrative Agent or the Lenders.

**6.18 Prepayments of Certain Indebtedness**.  No Credit Party shall, directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness prior to its scheduled maturity, other than (i) the Obligations and (ii) Indebtedness secured by a Permitted Lien if the asset securing such Indebtedness has been sold or otherwise disposed of.  Notwithstanding anything to the contrary contained in this Agreement, (x) payments in kind (and not in cash) permitted under this Agreement in respect of Subordinated Indebtedness, (y) dividends and distributions paid in kind (and not in cash) permitted under this Agreement in respect of PIK Preferred Stock and (z) the scheduled repayment of Subordinated Notes pursuant to the terms of the Subordinated Note Documents (including without limitation a repayment of up to $5,000,000 in Subordinated PIK A Notes on March 31, 2010) shall not be prohibited hereunder.

**6.19    Issuance of Disqualified Capital Stock**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, issue or sell any Disqualified Capital Stock, other than (a) PIK Preferred Stock issued on the Closing Date pursuant to the Plan, (b) PIK Preferred Stock issued in connection with the exercise of cure rights as provided in Section 6.7(e) hereof and (c) additional shares of PIK Preferred Stock issued as a dividend or distribution paid in-kind thereon.

**6.20    Limitation on New Operating Leases**.  No Credit Party shall, nor shall it permit its Subsidiaries to, enter into any new operating lease if, after giving effect to such new operating lease, the total amount of operating leases entered into after the Closing Date (excluding replacements for or extensions of operating leases in effect prior to the Closing Date), when valued according to GAAP as if the same were capital leases, exceeds $2,000,000 at any one time outstanding.

**6.21    Limitations on Rabo Bank Account**.  Credit Parties may maintain the Rabo Bank Account, provided that (i) the aggregate amount of deposits by the Credit Parties into the Rabo Bank Account shall not exceed the euro equivalent of [US$300,000] (determined based upon the exchange rate in effect on the date of such deposits) in any consecutive twelve month period and (ii)  the balance on deposit in the Rabo Bank Account determined on a "book basis" at the close of business shall not on any day exceed the euro equivalent of [US$30,000] (determined based upon the exchange rate in effect on each date of determination).

## SECTION 7.  GUARANTY.

**7.1    Guaranty of the Obligations**.   Subject to the provisions of Section 7.2, Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Administrative Agent for the ratable benefit of the Beneficiaries the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code , 11 U.S.C. §362(a)) (collectively, the "**Guaranteed Obligations**").

**7.2    Contribution by Guarantors**.   All Guarantors desire to allocate among themselves (collectively, the "**Contributing Guarantors**"), in a fair and equitable manner, their obligations arising under this Guaranty.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "**Funding Guarantor**") under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date.  "**Fair Share**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor, to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors multiplied by, (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the obligations Guaranteed.  "**Fair Share Contribution Amount**" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its

obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of the Bankruptcy Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the Fair Share Contribution Amount with respect to any Contributing Guarantor for purposes of this Section 7.2, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor.  "**Aggregate Payments**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including in respect of this Section 7.2), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 7.2.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor.  The allocation among Contributing Guarantors of their obligations as set forth in this Section 7.2 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 7.2.

      **7.3**    **Payment by Guarantors**.  Subject to Section 7.2, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of Company to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)), Guarantors will upon demand pay, or cause to be paid, in Cash, to Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for Company's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against Company for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

      **7.4**    **Liability of Guarantors Absolute**.  Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

      (a)    this Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

      (b)    Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between Company and any Beneficiary with respect to the existence of such Event of Default;

(c)     the obligations of each Guarantor hereunder are independent of the obligations of Company and the obligations of any other guarantor (including any other Guarantor) of the obligations of Company, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against Company or any of such other guarantors and whether or not Company is joined in any such action or actions;

(d)     payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid; and without limiting the generality of the foregoing, if Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)     any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith or the applicable Interest Rate Agreement and Currency Agreement and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against Company or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents or Interest Rate Agreements and Currency Agreements; and

(f)     this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or

otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents or any Interest Rate Agreement or Currency Agreement, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents, any of the Interest Rate Agreements or Currency Agreements or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document, such Interest Rate Agreement or Currency Agreement or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or any of the Interest Rate Agreements or Currency Agreements or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of Company or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set offs or counterclaims which Company may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

**7.5    Waivers by Guarantors.**  Each Guarantor hereby waives, for the benefit of Beneficiaries: (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against Company, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Company, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of any Beneficiary in favor of Company or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Company or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Company or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's

obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, the Interest Rate Agreements or Currency Agreements or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Company and notices of any of the matters referred to in Section 7.4 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

**7.6     Guarantors' Rights of Subrogation, Contribution, etc**.  Until the Guaranteed Obligations shall have been indefeasibly paid in full, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against Company or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including without limitation (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against Company with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against Company, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary.  In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by Section 7.2.  Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Company or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against Company, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full, such amount shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

**7.7     Subordination of Other Obligations**.  Any Indebtedness of Company or any Guarantor now or hereafter held by any Guarantor (the "**Obligee Guarantor**") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is

continuing shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

**7.8** **Continuing Guaranty**. This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

**7.9** **Authority of Guarantors or Company**. It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or Company or the officers, directors or any agents acting or purporting to act on behalf of any of them.

**7.10** **Financial Condition of Company**. Any Credit Extension may be made to Company or continued from time to time, and any Interest Rate Agreements or Currency Agreements may be entered into from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of Company at the time of any such grant or continuation or at the time such Interest Rate Agreements or Currency Agreement is entered into, as the case may be. No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of Company. Each Guarantor has adequate means to obtain information from Company on a continuing basis concerning the financial condition of Company and its ability to perform its obligations under the Credit Documents and the Interest Rate Agreements and Currency Agreements, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Company and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of Company now known or hereafter known by any Beneficiary.

**7.11** **Bankruptcy, etc**.

(a) So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of Administrative Agent acting pursuant to the instructions of Requisite Lenders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against Company or any other Guarantor or admit in writing or in any legal proceeding that it is unable to pay its debts as they become due. The obligations of Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Company or any other Guarantor or by any defense which Company or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b) Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding

referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and Beneficiaries that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve Company of any portion of such Guaranteed Obligations. Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay Administrative Agent, or allow the claim of Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)     In the event that all or any portion of the Guaranteed Obligations are paid by Company, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

**7.12    Discharge of Guaranty Upon Sale of Guarantor**.  If all of the Capital Stock of any Subsidiary Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions hereof, the Guaranty of such Subsidiary Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Beneficiary or any other Person effective as of the time of such Asset Sale.

**7.13    Taxes**.  The provision of Section 2.17 shall apply, *mutatis mutandi*, to the Guarantors and payments thereby.

**SECTION 8.  EVENTS OF DEFAULT.**

**8.1    Events of Default**.  If any one or more of the following conditions or events shall occur:

(a)     <u>Failure to Make Payments When Due</u>.  Failure by Company to pay (i) when due the principal of and premium, if any, on any Loan whether at stated maturity, by acceleration or otherwise; (ii) when due any installment of principal of any Loan, by notice of voluntary prepayment, by mandatory prepayment or otherwise; (iii) when due any interest on any Loan or any fee or any other amount due hereunder.

(b)     <u>Default in Other Agreements</u>.  (i) Failure of any Credit Party or any of their respective Subsidiaries to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 8.1(a)) in an individual principal amount of $500,000 or more with an aggregate principal amount of $1,000,000 or more; or (ii) breach or default by any Credit Party or any of their respective Subsidiaries with respect to any other material term of (1) one or more items of Indebtedness in the individual or aggregate principal amount referred to in clause (i) above, or

(2) any loan agreement, mortgage, indenture or other agreement relating to Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redeemable) or to require the prepayment, redemption, repurchase or defeasance of, or to cause Company or any of its Subsidiaries to make any offer to prepay, redeem, repurchase or defease such Indebtedness, prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

(c)     Breach of Certain Covenants.  Failure of any Credit Party to perform or comply with any term or condition contained in Section 2.3, Section 5.1, Section 5.2, or Section 6; provided, however, that within ten (10) days after timely delivery by Company of a Compliance Certificate to Administrative Agent that discloses of a failure to perform or comply with any term or condition contained in Section 6.7(a) or (b), such Credit Party shall have the right to cure any such failure as provided in Section 6.7(e) and such failure shall not constitute an Event of Default unless it remains uncured after passage of the applicable time period set forth therein; or

(d)     Breach of Representations, etc.  Any representation, warranty, certification or other statement made or deemed made by any Credit Party in any Credit Document or in any statement or certificate at any time given by any Credit Party or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(e)     Other Defaults Under Credit Documents.  Any Credit Party shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other Section of this Section 8.1, and such default shall not have been remedied or waived within thirty (30) days after receipt by Company of notice from Administrative Agent or any Lender of such default; or

(f)     Involuntary Bankruptcy; Appointment of Receiver, etc.  (i) A court of competent jurisdiction shall enter a decree or order for relief in respect of Company or any of its Subsidiaries in an involuntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal or state law; or (ii) an involuntary case shall be commenced against Company or any of its Subsidiaries under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over Company or any of its Subsidiaries, or over all or a substantial part of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of Company or any of its Subsidiaries for all or a substantial part of its property; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of Company or any of its Subsidiaries, and any such event described in this clause (ii) shall continue for sixty (60) days without having been dismissed, bonded or discharged; or

(g)     Voluntary Bankruptcy; Appointment of Receiver, etc.  (i) Company or any of its Subsidiaries shall have an order for relief entered with respect to it or shall commence a voluntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or Company or any of its Subsidiaries shall make any assignment for the benefit of creditors; or (ii) Company or any of its Subsidiaries shall be unable, or shall fail generally, or shall admit in writing its inability, to pay its debts as such debts become due; or the board of directors (or similar governing body) of Company or any of its Subsidiaries (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to herein or in Section 8.1(f); or

(h)     Judgments, Settlements and Attachments.  Any money judgment, writ or warrant of attachment, agreement of settlement, stipulated judgment or similar process, excluding any Pending Investigation Settlement Amount, any Pending Property Tax Dispute Settlement Amounts and any Pending 401(k) Catch-Up Payment Amounts, involving in any individual case or in the aggregate an amount in excess of $750,000 in any Fiscal Year or $2,000,000 from the Closing Date through the date of determination (in either case to the extent not fully covered by insurance (less any deductible) as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered into by, or entered or filed against, Company or any of its Subsidiaries or any of their respective assets and, in the case of an event other than an agreement of settlement or stipulated judgment (to which no grace period shall apply), shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days (or in any event later than the date that enforcement proceedings shall have been commenced by any creditor upon such judgment order or five (5) days prior to the date of any proposed sale thereunder); or

(i)     Dissolution.  Any order, judgment or decree shall be entered against any Credit Party decreeing the dissolution or split up of such Credit Party and such order shall remain undischarged or unstayed for a period in excess of thirty (30) days; or

(j)     Employee Benefit Plans.  (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or might reasonably be expected to result in liability of Company, any of its Subsidiaries or any of their respective ERISA Affiliates in excess of $500,000 during the term hereof; or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest under Section 401(a)(29) or 412(n) of the Internal Revenue Code or under ERISA; or

(k)     Change of Control.  A Change of Control shall occur.

(l)     Guaranties, Collateral Documents and other Credit Documents.  At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the

terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of Collateral Agent or any Secured Party to take any action within its control, or (iii) any Credit Party shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Credit Document to which it is a party; or

(m)     <u>Material Adverse Change</u>.  There shall occur any condition, act, event or development that has resulted in or could reasonably be expected to result in a Material Adverse Effect; or

(n)     <u>Material Contracts</u>.  Any party thereto shall default in the performance of any of their material obligations under any Material Contract, or any Material Contract shall be terminated or not renewed by any party thereto; or

(o)     <u>Senior Indebtedness</u>.  At any time that the Obligations evidenced by this Agreement cease to be treated as senior first lien secured debt under any agreements governing Subordinated Indebtedness; or

THEN, (1) upon the occurrence of any Event of Default described in Section 8.1(f) or 8.1(g), automatically, and (2)  upon the occurrence of any other Event of Default, upon notice to Company, Administrative Agent may (or at the direction of the Requisite Lenders, Administrative Agent shall) take any of the following actions, (A)  each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Credit Party: (I) the unpaid principal amount of and accrued interest on the Loans, and (II) all other Obligations; (B) Administrative Agent may cause Collateral Agent to enforce any and all Liens and security interests created pursuant to Collateral Documents; and (C) Administrative Agent may, at its election, immediately convert any or all LIBOR Rate Loans then outstanding into Base Rate Loans (it being understood that Company shall be liable for any amounts payable under Section 2.15(c) in connection with such conversion).

## SECTION 9.  AGENTS

**9.1     Appointment of Agents**.  Silver Point is hereby appointed Administrative Agent and Collateral Agent hereunder and under the other Credit Documents and each Lender hereby authorizes Silver Point, in such capacity, to act as its agent in accordance with the terms hereof and the other Credit Documents.  Silver Point is hereby appointed Syndication Agent hereunder, and each Lender hereby authorizes Syndication Agent to act as its agent in accordance with the terms hereof and the other Credit Documents.  Silver Point is hereby appointed Documentation Agent hereunder, and each Lender hereby authorizes Documentation Agent to act as its agent in accordance with the terms hereof and the other Credit Documents.  Each Agent hereby agrees to act upon the express conditions contained herein and the other Credit Documents, as applicable. The provisions of this Section 9 are solely for the benefit of Agents and Lenders and no Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof.  In

performing its functions and duties hereunder, each Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Company or any of its Subsidiaries. Each of Syndication Agent and Documentation Agent, without consent of or notice to any party hereto, may assign any and all of its rights or obligations hereunder to any of its Affiliates. As of the Closing Date, neither Silver Point, in its capacity as Syndication Agent, nor Silver Point, in its capacity as Documentation Agent, shall have any obligations but shall be entitled to all benefits of this Section 9.

**9.2    Powers and Duties**.  Each Lender irrevocably authorizes each Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies and perform such duties hereunder and under the other Credit Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such actions, powers, rights and remedies as are reasonably incidental thereto. Each Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents. Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees. No Agent shall have or be deemed to have, by reason hereof or any of the other Credit Documents, a fiduciary relationship in respect of any Lender; and nothing herein or any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or any of the other Credit Documents except as expressly set forth herein or therein.

**9.3    General Immunity**.

(a)    <u>No Responsibility for Certain Matters</u>.  No Agent shall be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Credit Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to Lenders or by or on behalf of any Credit Party to any Agent or any Lender in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, nor shall any Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing.  Anything contained herein to the contrary notwithstanding, Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Loan or the component amounts thereof.

(b)    <u>Exculpatory Provisions</u>.  No Agent nor any of its officers, partners, directors, employees or agents shall be liable to Lenders for any action taken or omitted by any Agent under or in connection with any of the Credit Documents except to the extent caused by such Agent's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, nonappealable order. Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested

in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5) or, in the case of Collateral Agent, in accordance with the Security Agreement or other applicable Collateral Document, and, upon receipt of such instructions from Requisite Lenders (or such other Lenders, as the case may be), or in accordance with the Security Agreement or other applicable Collateral Document, as the case may be, such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions. Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected and free from liability in relying on opinions and judgments of attorneys (who may be attorneys for the Credit Parties), accountants, experts and other professional advisors selected by it; and (ii) no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5) or, in the case of Collateral Agent, in accordance with the Security Agreement or other applicable Collateral Document.

(c)      Notice of Default.  Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to Events of Default in the payment of principal, interest and fees required to be paid to Administrative Agent for the account of the Lenders, unless Administrative Agent shall have received written notice from a Lender or the Company referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." Administrative Agent will notify the Lenders of its receipt of any such notice.  Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable or in the best interest of the Lenders.

**9.4      Agents Entitled to Act as Lender**.  The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Lender hereunder.  With respect to its participation in the Loans, each Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity.  Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with Company or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from Company for services in connection herewith and otherwise without having to account for the same to Lenders.

**9.5      Lenders' Representations, Warranties and Acknowledgment**.

(a)      Each Lender represents and warrants to the Agents that it has made its own independent investigation of the financial condition and affairs of Company and its

Subsidiaries, without reliance upon any Agent or any other Lender and based on such documents and information as it has deemed appropriate, in connection with the Debt Exchange and Credit Extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Company and its Subsidiaries. No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

(b) Each Lender, by delivering its signature page to this Agreement and funding its Loan on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable on the Closing Date.

**9.6     Right to Indemnity**.  Each Lender, in proportion to its Pro Rata Share, severally agrees to indemnify each Agent, their Affiliates and their respective officers, partners, directors, trustees, employees, representatives and agents of each Agent (each, an "**Indemnitee Agent Party**"), to the extent that such Indemnitee Agent Party shall not have been reimbursed by any Credit Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Indemnitee Agent Party in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Indemnitee Agent Party in any way relating to or arising out of this Agreement or the other Credit Documents, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH AGENT**; provided, no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Indemnitee Agent Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, nonappealable order.  If any indemnity furnished to any Indemnitee Agent Party for any purpose shall, in the opinion of such Indemnitee Agent Party, be insufficient or become impaired, such Indemnitee Agent Party may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Lender to indemnify any Indemnitee Agent Party against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof; and provided further, this sentence shall not be deemed to require any Lender to indemnify any Indemnitee Agent Party against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

**9.7     Successor Administrative Agent**.

(a) Administrative Agent and Collateral Agent may resign at any time by giving thirty (30) days' prior written notice thereof to Lenders and Company.  Upon any such notice of resignation, Requisite Lenders shall have the right, upon five (5) Business Days' notice

to Company, to appoint a successor Administrative Agent and Collateral Agent. If no successor shall have been so appointed by the Requisite Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent and Collateral Agent gives notice of its resignation, then the retiring Administrative Agent and Collateral Agent may, on behalf of the Lenders, appoint a successor Administrative Agent and Collateral Agent from among the Lenders. Upon the acceptance of any appointment as Administrative Agent and Collateral Agent hereunder by a successor Administrative Agent and Collateral Agent, that successor Administrative Agent and Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent and Collateral Agent and the retiring Administrative Agent and Collateral Agent shall promptly (i) transfer to such successor Administrative Agent and Collateral Agent all sums, Securities and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent and Collateral Agent under the Credit Documents, and (ii) execute and deliver to such successor Administrative Agent and Collateral Agent such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Administrative Agent and Collateral Agent of the security interests created under the Collateral Documents, whereupon such retiring Administrative Agent and Collateral Agent shall be discharged from its duties and obligations hereunder. After any retiring Administrative Agent's and Collateral Agent's resignation hereunder as Administrative Agent and Collateral Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent hereunder.

(b)     Notwithstanding anything herein to the contrary, Administrative Agent may assign its rights and duties as Administrative Agent hereunder to an Affiliate of Silver Point, any other financing source of Silver Point or Affiliate of Silver Point or to any Lender without the prior written consent of, or prior written notice to, Company or the Lenders; provided that Company and the Lenders may deem and treat such assigning Administrative Agent as Administrative Agent for all purposes hereof, unless and until such assigning Administrative Agent provides written notice to Company and the Lenders of such assignment. Upon such assignment such Affiliate shall succeed to and become vested with all rights, powers, privileges and duties as Administrative Agent hereunder and under the other Credit Documents.

(c)     <u>Delegation of Duties</u>. Administrative Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Credit Document by or through any one or more sub-agents appointed by Administrative Agent. Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory, indemnification and other provisions of Section 9.3 and Section 9.6 shall apply to any the Affiliates of Administrative Agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. All of the rights, benefits and privileges (including the exculpatory and indemnification provisions) of Section 9.3 and of Section 9.6 shall apply to any such sub-agent and to the Affiliates of any such sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and Affiliates were named herein. Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by Administrative Agent, (i) such sub-agent

shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory and rights to indemnification) and shall have all of the rights, benefits and privileges of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of the Credit Parties and the Lenders, (ii) such rights, benefits and privileges (including exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent, and (iii) such sub-agent shall only have obligations to Administrative Agent and not to any Credit Party, Lender or any other Person and no Credit Party, Lender or any other Person shall have the rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent.

**9.8    Collateral Documents and Guaranty**.

(a)    <u>Agents under Collateral Documents and Guaranty</u>.  Each Lender hereby further irrevocably authorizes Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of Lenders, to be the agent for and representative of Lenders with respect to the Guaranty, the Collateral and the Collateral Documents.  Subject to Section 10.5, without further written consent or authorization from Lenders, Administrative Agent or Collateral Agent, as applicable, may execute any documents or instruments necessary to (i) release any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets permitted hereby or to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented, or (ii) release any Guarantor from the Guaranty pursuant to Section 7.12 or with respect to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented.

(b)    <u>Right to Realize on Collateral and Enforce Guaranty.</u>  Anything contained in any of the Credit Documents to the contrary notwithstanding, Company, Administrative Agent, Collateral Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by Administrative Agent, on behalf of Lenders in accordance with the terms hereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by Collateral Agent, and (ii) in the event of a foreclosure by Collateral Agent on any of the Collateral pursuant to a public or private sale, Collateral Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and Collateral Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Requisite Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by Collateral Agent at such sale.

**9.9    Posting of Approved Electronic Communications**.

(a)    Delivery of Communications.  Each Credit Party hereby agrees, unless directed otherwise by Administrative Agent or unless the electronic mail address referred to

below has not been provided by Administrative Agent to such Credit Party that it will, or will cause its Subsidiaries to, provide to Administrative Agent all information, documents and other materials that it is obligated to furnish to Administrative Agent or to the Lenders pursuant to the Credit Documents, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Funding Notice, or a Conversion/Continuation Notice, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or any other Credit Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Loan or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to Administrative Agent to an electronic mail address as directed by Administrative Agent. In addition, each Credit Party agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to Administrative Agent or the Lenders, as the case may be, in the manner specified in the Credit Documents but only to the extent requested by Administrative Agent.

(b)     Platform. Each Credit Party further agrees that Administrative Agent may make the Communications available to the Lenders by posting the Communications on IntraLinks or a substantially similar electronic transmission system (the "**Platform**").

(c)     No Warranties as to Platform. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE INDEMNITEES DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE INDEMNITEES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE INDEMNITEES HAVE ANY LIABILITY TO ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY INDEMNITEES IS FOUND IN A FINAL, NONAPPEALABLE ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH INDEMNITEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)     Delivery Via Platform. Administrative Agent agrees that the receipt of the Communications by Administrative Agent at its electronic mail address set forth above shall constitute effective delivery of the Communications to Administrative Agent for purposes of the Credit Documents. Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute

effective delivery of the Communications to such Lender for purposes of the Credit Documents. Each Lender agrees to notify Administrative Agent in writing (including by electronic communication) from time to time of such Lender's electronic mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such electronic mail address.

(e)      No Prejudice to Notice Rights.  Nothing herein shall prejudice the right of Administrative Agent or any Lender to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

**9.10    Proofs of Claim**.  The Lenders and Company hereby agree that after the occurrence of an Event of Default pursuant to Sections 8.1(f) or (g), in case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to Company or any of the Guarantors, Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on any of Company or any of the Guarantors) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)      to file and prove a claim for the whole amount of principal and interest owing and unpaid in respect of the Loans and any other Obligations that are owing and unpaid and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Lenders, Administrative Agent and other Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, Administrative Agent and other agents and their agents and counsel and all other amounts due Lenders, Administrative Agent and other agents hereunder) allowed in such judicial proceeding; and

(b)      to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent and other agents hereunder.  Nothing herein contained shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lenders or to authorize Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.  Further, nothing contained in this Section 9.10 shall affect or preclude the ability of any Lender to (i) file and prove such a claim in the event that Administrative Agent has not acted within ten (10) days prior to any applicable bar date and (ii) require an amendment of the proof of claim to accurately reflect such Lender's outstanding Obligations.

**9.11    Agents and Arrangers**.  Except as otherwise set forth herein, Syndication Agent, Documentation Agent and any arrangers shall not have any right, power, obligation, liability,

responsibility or duty under this Agreement (or any other Credit Document) other than those applicable to all Lenders as such. Without limiting the foregoing, Syndication Agent, Documentation Agent and such arrangers shall not have or be deemed to have any fiduciary relationship with any other Lender. Each Lender acknowledges that it has not relied, and will not rely, on Syndication Agent, Documentation Agent or any arranger in deciding to enter into this Agreement and each other Credit Document to which it is a party or in taking or not taking action hereunder or thereunder.

## SECTION 10. MISCELLANEOUS

**10.1 Notices**. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given to a Credit Party or an Agent, shall be sent to such Person's address as set forth on Appendix B or in the other relevant Credit Document, and in the case of any Lender, the address as indicated on Appendix B or otherwise indicated to Administrative Agent in writing. Each notice hereunder shall be in writing and may be personally served, telexed or sent by telefacsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telefacsimile or telex, or three (3) Business Days after depositing it in the United States mail with postage prepaid and properly addressed; provided, no notice to any Agent shall be effective until received by such Agent.

**10.2 Expenses**.

(a) Whether or not the transactions contemplated hereby shall be consummated, Company agrees to pay promptly, and in any event within five (5) days after written demand therefor, (a) all the actual and reasonable costs and expenses of preparation of the Credit Documents and any consents, amendments, waivers or other modifications thereto; (b) the actual costs of furnishing all opinions by counsel for Company and the other Credit Parties; (c) the fees, expenses and disbursements of counsel to Agents (including allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the Credit Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Company; (d) all the actual costs and expenses of creating and perfecting Liens in favor of Collateral Agent, for the benefit of Secured Parties pursuant hereto, including filing and recording fees, expenses and amounts owed pursuant to Sections 2.17(c) and (d), search fees, title insurance premiums and fees, expenses and disbursements of counsel to each Agent and of counsel providing any opinions that any Agent or Requisite Lenders may request in respect of the Collateral or the Liens created pursuant to the Collateral Documents; (e) the actual costs and fees, expenses and disbursements of any auditors, accountants, consultants or appraisers whether internal or external; (f) the actual costs and expenses (including the fees, expenses and disbursements of counsel (including allocated costs of internal counsel) and of any appraisers, consultants, advisors and agents employed or retained by Collateral Agent and its counsel) in connection with the custody or preservation of any of the Collateral; (g) all other actual costs and expenses incurred by each Agent in connection with the syndication of the Loans and the negotiation, preparation and execution of the Credit Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (h) after the occurrence of a Default or an Event of Default, all the actual costs and expenses, including attorneys' fees (including allocated costs of internal

counsel) and costs of settlement, incurred by any Agent and Lenders in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings.

(b)    Company agrees to pay the Broadpoint Gleacher Securities Group, Inc. in the amount of $575,000 (to the extent approved by the Bankruptcy Court) as follows: (i) if and to the extent such fee has been approved by the Bankruptcy Court prior to the Effective Date, on the Effective Date; or (ii) if the fee has not been approved by the Bankruptcy Court prior to the Effective Date, then within two (2) Business Day of the entry of an order by the Bankruptcy Court approving such fee.  The Company shall support the Bankruptcy Court's approval of the Broadpoint Gleacher Securities Group, Inc. success fee in the amount of $575,000.

**10.3    Indemnity**.

(a)    In addition to the payment of expenses pursuant to Section 10.2, whether or not the transactions contemplated hereby shall be consummated, each Credit Party agrees to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless, each Agent and Lender, their Affiliates and their respective officers, partners, directors, trustees, employees, representatives and agents of each Agent and each Lender (each, an "**Indemnitee**"), from and against any and all Indemnified Liabilities, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH AGENT**; <u>provided</u>, no Credit Party shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities if such Indemnified Liabilities arise solely from the gross negligence or willful misconduct of that Indemnitee as determined by a court of competent jurisdiction in a final, nonappealable order.  To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.3 may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

(b)    To the extent permitted by applicable law, no Credit Party shall assert, and each Credit Party hereby waives, any claim against Lenders, Agents and their respective Affiliates, directors, employees, attorneys or agents, on any theory of liability, for special, indirect, consequential or punitive damages  (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Credit Party hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

**10.4    Set Off**.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence of any Event of Default each Lender and its respective Affiliates is hereby authorized by each Credit Party at any time or from time to time subject to the consent of Administrative Agent (such consent not to be unreasonably withheld or delayed), without notice to any Credit Party or to any other Person (other than Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts (in whatever currency)) and any other Indebtedness at any time held or owing by such Lender to or for the credit or the account of any Credit Party (in whatever currency) against and on account of the obligations and liabilities of any Credit Party to such Lender hereunder and under the other Credit Documents, including all claims of any nature or description arising out of or connected hereto or with any other Credit Document, irrespective of whether or not (a) such Lender shall have made any demand hereunder, (b) the principal of or the interest on the Loans or any other amounts due hereunder shall have become due and payable pursuant to Section 2 and although such obligations and liabilities, or any of them, may be contingent or unmatured or (c) such obligation or liability is owed to a branch or office of such Lender different from the branch or office holding such deposit or obligation or such Indebtedness.

**10.5    Amendments and Waivers**.

(a)    Requisite Lenders' Consent.  Subject to Sections 10.5(b) and 10.5(c), no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of (i) in the case of this Agreement, Administrative Agent and the Requisite Lenders or (ii) in the case of any other Credit Document, Administrative Agent and, if party thereto, Collateral Agent, with the consent of the Requisite Lenders.

(b)    <u>Affected Lenders' Consent</u>.  Without the written consent of each Lender (other than a Defaulting Lender) that would be affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i)    extend the scheduled final maturity of any Loan or Note of such Lender;

(ii)    waive, reduce or postpone any scheduled repayment due such Lender (but not prepayment);

(iii)    reduce the rate of interest on any Loan of such Lender (other than any amendment to the definition of "Default Rate" (which may be affected by consent of the Requisite Lenders) and any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.7) or any fee payable hereunder;

(iv)    extend the time for payment of any such interest or fees to such Lender;

(v)    reduce the principal amount of any Loan;

(vi)     amend, modify, terminate or waive any provision of this Section 10.5(b) or Section 10.5(c);

(vii)     amend the definition of "Requisite Lenders" or "Pro Rata Share"; <u>provided</u>, with the consent of Administrative Agent and the Requisite Lenders, additional extensions of credit pursuant hereto may be included in the determination of "Requisite Lenders" or "Pro Rata Share" on substantially the same basis as the Loans are included on the Closing Date;

(viii)     release all or substantially all of the Collateral or all or substantially all of the Guarantors from the Guaranty except as expressly provided in the Credit Documents; or

consent to the assignment or transfer by any Credit Party of any of its rights and obligations under any Credit Document.

(c)     <u>Other Consents</u>.  No amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall amend, modify, terminate or waive any provision of Section 9 as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case without the consent of such Agent.

(d)     <u>Defaulting Lenders</u>.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, modification, waiver or consent hereunder.

(e)     <u>Execution of Amendments, etc</u>.  Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this 10.5 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Credit Party, on such Credit Party.

**10.6     Successors and Assigns**; **Participations**.

(a)     <u>Generally</u>.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders.  No Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party without the prior written consent of all Lenders (and any attempted assignment or transfer by any Credit Party without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of the Agents and Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Register.  Company, Administrative Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Loans listed therein for all purposes hereof, and no assignment or transfer of any such Loan shall be effective, in each case, unless and until an Assignment Agreement effecting the assignment or transfer thereof shall have been delivered to and accepted by Administrative Agent and recorded in the Register as provided in Section 10.6(e).  Prior to such recordation, all amounts owed with respect to the applicable Loan shall be owed to the Lender listed in the Register as the owner thereof, and any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Loans.  Solely for the purposes of maintaining the Register and for tax purposes only Administrative Agent shall be deemed to be acting on behalf of the Credit Parties.

(c)     Right to Assign.  Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including all or a portion of its Loans owing to it or other Obligations (provided, however, that each such assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any Loan:

(i)     to any Person meeting the criteria of clause (i)(a) or clause (ii)(a) of the definition of the term of "Eligible Assignee" upon the giving of notice to Company and Administrative Agent; or

(ii)     to any Person otherwise constituting an Eligible Assignee with the consent of Administrative Agent; provided, each such assignment pursuant to this Section 10.6(c)(ii) shall be in an aggregate amount of not less than $1,000,000 (or such lesser amount as may be agreed to by Company and Administrative Agent or as shall constitute the aggregate amount of the Loans of the assigning Lender) with respect to the assignment of Loans, provided that the foregoing minimum assignment amount shall not apply (x) to any assignment of all or any portion of a Loan to a Lender, an Affiliate of a Lender or a Related Fund of the assignor or (y) if any Event of Default shall have occurred and is continuing.

(d)     Mechanics.  The assigning Lender and the assignee thereof shall execute and deliver to Administrative Agent an Assignment Agreement, together with such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver to Administrative Agent pursuant to Section 2.17(e).

(e)     Notice of Assignment.  Upon its receipt and acceptance of a duly executed and completed Assignment Agreement, any forms, certificates or other evidence required by this Agreement in connection therewith, Administrative Agent shall record the information contained in such Assignment Agreement in the Register, shall give prompt notice thereof to Company and shall maintain a copy of such Assignment Agreement.

(f)     Representations and Warranties of Assignee.  Each Lender, upon execution and delivery hereof or upon executing and delivering an Assignment Agreement, as

the case may be, represents and warrants as of the Closing Date or as of the applicable "effective date" (as defined in the applicable Assignment Agreement) that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in loans such as the applicable Loans, as the case may be; and (iii) it will make or invest in, as the case may be, its Loans for its own account in the ordinary course of its business and without a view to distribution of such Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 10.6, the disposition of such or Loans or any interests therein shall at all times remain within its exclusive control).

(g)     <u>Effect of Assignment</u>.     Subject to the terms and conditions of this Section 10.6, as of the "effective date" specified in the applicable Assignment Agreement: (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent such rights and obligations hereunder have been assigned to it pursuant to such Assignment Agreement and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned thereby pursuant to such Assignment Agreement, relinquish its rights (other than any rights which survive the termination hereof under Section 10.8) and be released from its obligations hereunder (and, in the case of an Assignment Agreement covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto; <u>provided</u>, anything contained in any of the Credit Documents to the contrary notwithstanding, such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder); and (iii) if any such assignment occurs after the issuance of any Note hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to Administrative Agent for cancellation, and thereupon Company shall issue and deliver new Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the outstanding Loans of the assignee and/or the assigning Lender.

(h)     <u>Participations</u>.     Each Lender shall have the right at any time to sell one or more participations to any Person (other than Company, any of its Subsidiaries or any of its Affiliates) in all or any part of its Loans or in any other Obligation.  The holder of any such participation (a "**Participant**"), other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (i) extend the final scheduled maturity of any Loan or Note in which such Participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except any amendment to the definition of "Default Rate" or in connection with a waiver of applicability of any post default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the Participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default shall not constitute a change in the terms of such participation, and that an increase in any Loan shall be permitted without the consent of any Participant if the Participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement, or (iii) release all or substantially all of the Collateral under the Collateral Documents or all or substantially all of the Guarantors from the Guaranty (in each case, except as expressly provided

in the Credit Documents) supporting the Loans hereunder in which such Participant is participating. Company agrees that each Participant shall be entitled, through the participating Lender, to the benefits of Sections 2.16 and 2.17 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to this Section 10.6; provided, (1) a Participant shall not be entitled to receive any greater payment under Section 2.16 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with Company's prior written consent, and (2) a Participant that would be a Non-U.S. Lender if it were a Lender shall not be entitled to the benefits of Section 2.17 unless Company is notified of the participation sold to such Participant and such Participant agrees, for the benefit of Company, to comply with Section 2.17 as though it were a Lender. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.4 as though it were a Lender, provided such Participant agrees to be subject to Section 2.14 as though it were a Lender.

(i)     Certain Other Assignments. In addition to any other assignment permitted pursuant to this Section 10.6, any Lender may assign, pledge and/or grant a security interest in, all or any portion of its Loans, the other Obligations owed by or to such Lender, and its Notes, if any, to secure obligations of such Lender including any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any operating circular issued by such Federal Reserve Bank; provided, no Lender, as between Company and such Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge, and provided further, in no event shall the applicable Federal Reserve Bank, pledgee or trustee be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

**10.7     Special Purpose Funding Vehicles**. Notwithstanding anything to the contrary contained herein, any Lender ("**Granting Lender**") may grant to a special purpose funding vehicle (an "**SPC**"), identified as such in writing from time to time by the Granting Lender to Administrative Agent and Company, the option to provide to Company all or any part of any Loan that such Granting Lender would otherwise be obligated to make to Company pursuant to this Agreement; provided that (x) nothing herein shall constitute a commitment by any SPC to make any Loans and (y) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one (1) year and one (1) day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this clause, any SPC may (a) with notice to, but without the prior written consent of, Company or Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by Company and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (b) disclose on a confidential basis any non-public

information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC. This Section may not be amended without the written consent of the SPC. Company acknowledges and agrees, subject to the next sentence, that, to the fullest extent permitted under applicable law, each SPC, for purposes of Sections 2.14, 2.16, 2.17, 10.2, 10.3 and 10.4, shall be considered a Lender. Company shall not be required to pay any amount under Sections 2.14, 2.16, 2.17, 10.2, 10.3 and 10.4 that is greater than the amount which it would have been required to pay had no grant been made by a Granting Lender to a SPC.

**10.8 Independence of Covenants**. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**10.9 Survival of Representations, Warranties and Agreements**. All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension. Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Sections 2.14, 2.16, 2.17, 10.2, 10.3 and 10.4 and the agreements of Lenders set forth in Sections 2.14, 9.3(b) and 9.6 shall survive the payment of the Loans and the termination hereof.

**10.10 No Waiver; Remedies Cumulativ**e. No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. The rights, powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents or any of the Interest Rate Agreements and Currency Agreements. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

**10.11 Marshalling**; **Payments Set Aside**. Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations. To the extent that any Credit Party makes a payment or payments to Administrative Agent or Lenders (or to Administrative Agent, on behalf of Lenders), or Administrative Agent, Collateral Agent or Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and

continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

      **10.12  Severability**.  In case any provision in or obligation hereunder or any Note or other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

      **10.13  Obligations Several; Independent Nature of Lenders' Rights**.  The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations of any other Lender hereunder.  Nothing contained herein or in any other Credit Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity.  The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

      **10.14  Headings**.  Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

      **10.15  Applicable Law**.    THIS  AGREEMENT  AND  THE  RIGHTS  AND OBLIGATIONS  OF  THE  PARTIES  HEREUNDER  SHALL  BE  GOVERNED  BY,  AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

      **10.16  Consent** t**o Jurisdiction**.    ALL  JUDICIAL  PROCEEDINGS  BROUGHT AGAINST ANY CREDIT PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER CREDIT DOCUMENT, OR ANY OF THE OBLIGATIONS, MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK.  BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH CREDIT PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (a) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (b) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (c) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED  OR  CERTIFIED  MAIL,  RETURN  RECEIPT  REQUESTED,  TO  THE APPLICABLE CREDIT PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 10.2 AND TO ANY PROCESS AGENT SELECTED IN ACCORDANCE WITH SECTION 3.1(b) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE CREDIT PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (d) AGREES THAT AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY CREDIT PARTY IN THE COURTS OF ANY OTHER JURISDICTION.

**10.17  Waiver of Jury Trial**.  EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/COMPANY RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.   THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 10.17 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.   IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**10.18  Confidentiality**.  Each Lender shall hold all non-public information regarding Company and its Subsidiaries and their businesses clearly identified as such by Company and obtained by such Lender pursuant to the requirements hereof  in accordance with such Lender's customary procedures for handling confidential information of  such nature, it being understood and agreed by Company that, in any event, a Lender may make (i) disclosures of such information to Affiliates of such Lender and to their directors, officers, employees, agents and advisors (and to other persons authorized by a Lender or Agent to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 10.18), (ii) disclosures of such information reasonably required by any bona fide or potential assignee, transferee or participant in connection with the contemplated assignment, transfer or participation by such Lender of any Loans or any participations therein or by any direct or indirect contractual counterparties (or the professional advisors thereto) in Interest Rate Agreements and Currency Agreements (provided, such counterparties and advisors are advised of and agree to be bound by the provisions of this Section 10.18), (iii) disclosure to any rating agency when required by it, provided that, prior to any disclosure, such rating agency shall undertake in writing to preserve the confidentiality of any confidential information relating to the Credit Parties received by it from any of the Agents or any Lender, (iv) disclosures to any Lender's financing sources, provided that prior to any disclosure, such financing source is informed of the confidential nature of the information, (v) disclosure of information which (1) becomes publicly available other than as a result of a breach of this Section 10.18 or (2) becomes

available to Administrative Agent or any Lender on a non-confidential basis from a source other than Company, and (vi) disclosures required or requested by any governmental agency or representative thereof or by the NAIC or pursuant to legal or judicial process; provided, unless specifically prohibited by applicable law or court order, each Lender shall make reasonable efforts to notify Company of any request by any governmental agency or representative thereof (other than any such request in connection with any examination of the financial condition or other routine examination of such Lender by such governmental agency) for disclosure of any such non-public information prior to disclosure of such information. Notwithstanding the foregoing, on or after the Closing Date, Administrative Agent may, at its own expense, issue news releases and publish "tombstone" advertisements and other announcements relating to this transaction in newspapers, trade journals and other appropriate media. Notwithstanding any other provision of this Section 10.18, the parties (and each employee, representative, or other agent of the parties) may disclose to any and all Persons, without limitation of any kind, the Tax treatment and any facts that may be relevant to the Tax structure of the transactions contemplated by this Agreement and the other Credit Documents; provided, however, that no party (and no employee, representative, or other agent thereof) shall disclose any other information that is not relevant to an understanding of the Tax treatment and Tax structure of the transaction (including the identity of any party and any information that could lead another to determine the identity of any party), or any other information to the extent that such disclosure could reasonably result in a violation of any applicable securities law.

**10.19 Usury Savings Clause**. Notwithstanding any other provision herein, the aggregate interest rate charged or agreed to be paid with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Company shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lenders and Company to conform strictly to any applicable usury laws. Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to Company. In determining whether the interest contracted for, charged, or received by Administrative Agent or a Lender exceeds the Highest Lawful Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest, throughout the contemplated term of the Obligations hereunder.

**10.20 Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

**10.21 Effectiveness**. This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by Company and Administrative Agent of written or telephonic notification of such execution and authorization of delivery thereof.

**10.22 Patriot Act**. Each Lender and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Company that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies Company, which information includes the name and address of Company and other information that will allow such Lender or Administrative Agent, as applicable, to identify Company in accordance with the Patriot Act.

**10.23 Disclosure**. Each Credit Party and each Lender hereby acknowledges and agrees that Administrative Agent and/or its Affiliates and their respective Related Funds from time to time may hold investments in, and make other loans to, or have other relationships with any of the Credit Parties and their respective Affiliates, including the ownership, purchase and sale of equity interests in HoldCo or the Company, and each Credit Party and each Lender hereby expressly consents to such relationships.

**10.24 Appointment for Perfection**. Each Lender hereby appoints each other Lender as its agent for the purpose of perfecting Liens, for the benefit of Administrative Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable law can be perfected only by possession. Should any Lender (other than Administrative Agent) obtain possession of any such Collateral, such Lender shall notify Administrative Agent thereof, and, promptly upon Administrative Agent's request therefore shall deliver such Collateral to Administrative Agent or otherwise deal with such Collateral in accordance with Administrative Agent's instructions.

**10.25 Advertising and Publicity**. No Credit Party shall issue or disseminate to the public (by advertisement, including without limitation any "tombstone" advertisement, press release or otherwise), submit for publication or otherwise cause or seek to publish any information describing the credit or other financial accommodations made available by Lenders pursuant to this Agreement and the other Credit Documents without the prior written consent of Administrative Agent. Nothing in the foregoing shall be construed to prohibit any Credit Party from making any submission or filing which it is required to make by applicable law or pursuant to judicial process; provided, that, (i) such filing or submission shall contain only such information as is necessary to comply with applicable law or judicial process and (ii) unless specifically prohibited by applicable law or court order, Company shall promptly notify Administrative Agent of the requirement to make such submission or filing and provide Administrative Agent with a copy thereof.

**10.26 Entire Agreement**. This Agreement and the other Credit Documents represent the final agreement among the parties and may not be contradicted by evidence of prior,

contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements among the parties.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**EUROFRESH, INC.**

By: _____
 Name:
 Title:

**EUROFRESH PRODUCE, LTD.**

By: _____
 Name:
 Title:

**EUROFRESH HOLDING COMPANY, INC.**

By: _____
 Name:
 Title:

**SILVER POINT FINANCE, LLC,** as
Administrative Agent and Collateral Agent

By: _____
      Name:
      Title:


**SPCP GROUP LLC,**
As a Lender


By: _____
      Name:
      Title:


**FIELD POINT III, LTD.**


By: _____
      Name:
      Title:


**FIELD POINT IV, LTD.**


By: _____
      Name:
      Title:

**Loan Amounts**

| Lender | Loan Amount | Pro Rata Share |
|--------|-------------|----------------|
| SPCP Group LLC | $ | __% |
| Total | $ | 100% |

**Notice Addresses**

**EUROFRESH, INC.**

_____
_____
_____
Attention:
Telecopier:

**[NAME OF SUBSIDIARY]**

_____
_____
_____
Attention:
Telecopier:

in each case, with a copy to:

_____
_____
_____
Attention:
Telecopier:

SILVER POINT FINANCE, LLC,
as Administrative Agent, Collateral Agent and Documentation Agent


with a copy to

Silver Point Finance, LLC
2 Greenwich Plaza
1st Floor
Greenwich, CT 06830
Attn:    Nancy Weir
Phone:  203-542-4469
Fax:     203-286-2139
Email:   bladmin@silverpointcapital.com


[LENDER]


[LENDER]

<u>EXHIBIT 13</u>

Credit and Guaranty Agreement
(redline version)

~~AMENDED AND RESTATED~~
**CREDIT AND GUARANTY AGREEMENT**

**dated as of _____ __, 2009**

**among**

**EUROFRESH, INC.,**
**as Borrower**

**EUROFRESH HOLDING COMPANY, INC. AND CERTAIN SUBSIDIARIES OF**
**EUROFRESH, INC.,**
**as Guarantors,**

**VARIOUS LENDERS,**

**and**

**SILVER POINT FINANCE, LLC,**
**as Administrative Agent, Collateral Agent, Syndication Agent,**
**Documentation Agent and Lead Arranger**

---

**$[~~61,100,000~~_____] Senior Secured Credit Facility**

---

Section 1.        DEFINITIONS AND INTERPRETATION ............................................. 1̶2
   1.1   Definitions ..................................................................................................... 1̶2
   1.2   Accounting Terms ..................................................................................... 2̶7̶32
   1.3   Interpretation, etc 2̶7̶ ................................................................................ 33
SECTION 2.        LOANS ................................................................................... 2̶8̶33
   2.1   Loans .......................................................................................................... 2̶8̶33
   2.2   Pro Rata Shares ......................................................................................... 2̶8̶34
   2.3   Use of Proceeds......................................................................................... 2̶8̶34
   2.4   Evidence of Debt; Register; Lenders' Books and Records; Notes ................ 2̶8̶34
   2.5   Interest on Loans ....................................................................................... 2̶9̶35
   2.6   Conversion/Continuation ......................................................................... 36
   2.7   Default Interest ......................................................................................... 2̶9̶37
   2.8   Administrative Agent and Collateral Management Fee ............................ 37
   2̶.̶7̶2.9   Scheduled Payments ............................................................................ 3̶0̶37
   2̶.̶8̶2.10 ...........................................................................Voluntary Prepayments 3̶0̶37
   2̶.̶9̶2.11 ......................................................................... Mandatory Prepayments 3̶0̶38
   2̶.̶1̶0̶2.12 ...................................................................Application of Prepayments 3̶2̶40
   2̶.̶1̶1̶2.13 ...........................................................General Provisions Regarding Payments 3̶3̶41
   2̶.̶1̶2̶2.14 ............................................................................................. Ratable Sharing 3̶3̶42
   2.15   Making or Maintaining LIBOR Rate Loans .......................................... 43
   2̶.̶1̶3̶2.16 ........................................................... Increased Costs; Capital Adequacy 3̶4̶44
   2̶.̶1̶4̶2.17 ..................................................................... Taxes; Withholding, etc 3̶5̶46
   2̶.̶1̶5̶2.18 ...............................................................................Obligation to Mitigate 3̶8̶48
   2̶.̶1̶6̶2.19 .............................................................................. Defaulting Lenders 3̶8̶48
   2̶.̶1̶7̶2.20 ......................................................... Removal or Replacement of a Lender 3̶9̶49
SECTION 3.        CONDITIONS PRECEDENT ................................................. 3̶9̶50
   3.1   Closing Date .............................................................................................. 3̶9̶50
SECTION 4.        REPRESENTATIONS AND WARRANTIES...................................... 4̶1̶54
   4.1   Organization; Requisite Power and Authority; Qualification........................ 4̶2̶54
   4.2   Capital Stock and Ownership..................................................................... 4̶2̶55
   4.3   Due Authorization ..................................................................................... 4̶2̶55
   4.4   No Conflict ................................................................................................. 4̶2̶55
   4.5   Governmental Consents.............................................................................. 4̶3̶56
   4.6   Binding Obligation ..................................................................................... 4̶3̶56
   4.7   Historical Financial Statements ................................................................. 4̶3̶56
   4.8   Projections ................................................................................................. 4̶3̶56
   4.9   No Material Adverse Change....................................................................... 56
   4.10   No Restricted Junior Payments ............................................................... 56
   4.11   Adverse Proceedings, etc ......................................................................... 4̶3̶56
   4̶.̶1̶0̶4.12 ...................................................................................... Payment of Taxes 4̶4̶57
   4̶.̶1̶1̶4.13 ................................................................................................. Properties 4̶4̶57
   4̶.̶1̶2̶4.14 ...............................................................................Environmental Matters 4̶5̶58
   4̶.̶1̶3̶4.15 ................................................................................................ No Defaults 4̶5̶58
   4̶.̶1̶4̶4.16 ........................................................................................ Material Contracts 4̶5̶58
   4̶.̶1̶5̶4.17 ................................................................................... Governmental Regulation 4̶5̶58

4.16/4.18 ................................................................................ Margin Stock 45/58
4.17/4.19 ..............................................................................Employee Matters 45/59
4.18/4.20 .......................................................................Employee Benefit Plans 46/59
4.19/4.21 ...............................................................................Certain Fees 47/60
4.20/4.22 .....................................................................................Solvency 47/60
4.21/4.23 .................................................................Compliance with Statutes, etc 47/60
4.22/4.24 ..................................................................................Disclosure 47/60
4.23/4.25 ...............................................................Terrorism Laws and FCPA 47/60
4.24/4.26 ................................................................................. Insurance 47/61
4.25/4.27 ....................................................................Common Enterprise 48/61
4.26/4.28 .....................................................Security Interest in Collateral 48/61
4.27/4.29 .............................................................. Affiliate Transactions 48/61
4.28/4.30 ...............................................................Intellectual Property 48/62
4.29/4.31 ....................................................................Permits, etc 49/62

SECTION 5.        AFFIRMATIVE COVENANTS ......................................... 49/62
5.1        Financial Statements and Other Reports ........................ 49/62
5.2        Existence .......................................................... 53/67
5.3        Payment of Taxes and Claims ..................................... 53/68
5.4        Maintenance of Properties ........................................ 53/68
5.5        Insurance .......................................................... 53/68
5.6        Books and Records; Inspections .................................. 54/69
5.7        Lenders Meetings .................................................. 54/69
5.8        Compliance with Laws ............................................. 54/69
5.9        Environmental ..................................................... 55/69
5.10       Subsidiaries ...................................................... 56/72
5.11       Additional Material Real Estate Assets ........................ 57/72
5.12       Further Assurances ................................................ 57/73
5.13       Miscellaneous Business Covenants ............................... 73
5.14       Use of Proceeds ................................................... 57/73

SECTION 6.        NEGATIVE COVENANTS ............................................. 57/74
6.1        Indebtedness ...................................................... 57/74
6.2        Liens .............................................................. 59/76
6.3        No Further Negative Pledges ...................................... 61/78
6.4        Restricted Junior Payments ....................................... 61/78
6.5        Restrictions on Subsidiary Distributions ....................... 61/78
6.6        Investments ....................................................... 62/79
6.7        Financial Covenants ............................................... 63/80
6.8        Fundamental Changes; Disposition of Assets; Acquisitions ....... 63/82
6.9        Disposal of Subsidiary Interests ................................ 64/83
6.10       Sales and Leasebacks ............................................. 65/83
6.11       Transactions with Shareholders and Affiliates .................. 65/83
6.12       Conduct of Business .............................................. 65/83
6.13       Permitted Activities ............................................. 65/83
6.14       Amendments or Waivers of with respect to Subordinated Indebtedness ........ 65/84
6.15       Fiscal Year ....................................................... 66/84

| | | |
|---|---|---|
| 6.16 | Deposit Accounts | 6684 |
| 6.17 | Amendments to Organizational Agreements | 6684 |
| 6.18 | Prepayments of Certain Indebtedness | 6684 |
| 6.19 | Issuance of Disqualified Capital Stock | 6685 |
| 6.20 | Limitation on New Operating Leases | 85 |
| 6.21 | Limitations on Rabo Bank Account | 85 |
| SECTION 7. | GUARANTY | 6685 |
| 7.1 | Guaranty of the Obligations | 6685 |
| 7.2 | Contribution by Guarantors | 6785 |
| 7.3 | Payment by Guarantors | 6786 |
| 7.4 | Liability of Guarantors Absolute | 6886 |
| 7.5 | Waivers by Guarantors | 6988 |
| 7.6 | Guarantors' Rights of Subrogation, Contribution, etc | 7089 |
| 7.7 | Subordination of Other Obligations | 7189 |
| 7.8 | Continuing Guaranty | 7190 |
| 7.9 | Authority of Guarantors or Company | 7190 |
| 7.10 | Financial Condition of Company | 7190 |
| 7.11 | Bankruptcy, etc | 7290 |
| 7.12 | Discharge of Guaranty Upon Sale of Guarantor | 7291 |
| 7.13 | Taxes | 7291 |
| SECTION 8. | EVENTS OF DEFAULT | 7391 |
| 8.1 | Events of Default | 7391 |
| SECTION 9. | AGENTS | 7594 |
| 9.1 | Appointment of Agents | 7594 |
| 9.2 | Powers and Duties | 7695 |
| 9.3 | General Immunity | 7695 |
| 9.4 | Agents Entitled to Act as Lender | 7796 |
| 9.5 | Lenders' Representations, Warranties and Acknowledgment | 7896 |
| 9.6 | Right to Indemnity | 7897 |
| 9.7 | Successor Administrative Agent | 7997 |
| 9.8 | Collateral Documents and Guaranty | 8099 |
| 9.9 | Posting of Approved Electronic Communications | 8199 |
| 9.10 | Proofs of Claim | 82101 |
| 9.11 | Agents and Arrangers | 83101 |
| SECTION 10. | MISCELLANEOUS | 83102 |
| 10.1 | Notices | 83102 |
| 10.2 | Expenses | 83102 |
| 10.3 | Indemnity | 84103 |
| 10.4 | Set Off | 84104 |
| 10.5 | Amendments and Waivers | 85104 |
| 10.6 | Successors and Assigns; Participations | 86105 |
| 10.7 | Special Purpose Funding Vehicles | 89108 |
| 10.8 | Independence of Covenants | 90109 |
| 10.9 | Survival of Representations, Warranties and Agreements | 90109 |
| 10.10 | No Waiver; Remedies Cumulative | 90109 |

## TABLE OF CONTENTS

(continued)

Page

| | | |
|---|---|---|
| 10.11 | Marshalling; Payments Set Aside ........................................................... | ~~90~~109 |
| 10.12 | Severability ........................................................................................... | ~~90~~110 |
| 10.13 | Obligations Several; Independent Nature of Lenders' Rights ...................... | ~~91~~110 |
| 10.14 | Headings ................................................................................................ | ~~91~~110 |
| 10.15 | Applicable Law ...................................................................................... | ~~91~~110 |
| 10.16 | Consent to Jurisdiction .......................................................................... | ~~91~~110 |
| 10.17 | Waiver of Jury Trial ............................................................................... | ~~91~~111 |
| 10.18 | Confidentiality ....................................................................................... | ~~92~~111 |
| 10.19 | Usury Savings Clause ............................................................................. | ~~93~~112 |
| 10.20 | Counterparts ........................................................................................... | ~~93~~113 |
| 10.21 | Effectiveness .......................................................................................... | ~~93~~113 |
| 10.22 | Patriot Act ............................................................................................. | ~~94~~113 |
| 10.23 | Disclosure .............................................................................................. | ~~94~~113 |
| 10.24 | Appointment for Perfection ..................................................................... | ~~94~~113 |
| 10.25 | Advertising and Publicity ....................................................................... | ~~94~~113 |
| 10.26 | Entire Agreement ................................................................................... | ~~94~~113 |

**APPENDICES:** A  Loan Amounts
        B  Notice Addresses

**SCHEDULES:** 1.1(a) Certain Material Contracts
       1.1(b) Certain Material Real Estate Assets
       4.1  Jurisdictions of Organization and Qualification
       4.2  Capital Stock and Ownership
       <u>4.11  Adverse Proceedings</u>
       <u>4.12  Pending Property Tax Matters</u>
       <u>4.13  Real Property</u>
       ~~4.14~~<u>4.16</u>  Material Contracts
       ~~4.24~~<u>4.26</u>  Insurance
       ~~4.27~~<u>4.29</u>  Affiliate Transactions
       <u>4.30  Intellectual Property</u>
       6.1  Certain<u> Permitted</u> Indebtedness
       6.2<u>(j)</u> Certain<u> Permitted</u> Liens
       6.6  Certain<u> Permitted</u> Investments
       ~~6.11  Certain Affiliate Transactions~~
       ~~6.15~~<u>6.16</u>  Closing Date Control Agreements

**EXHIBITS:** A~~ Funding Notice~~<u> 1  Exchange Offer Letter</u>
      ~~B  Note~~
      ~~C  Compliance Certificate~~
      ~~D  Opinions of Counsel~~
~~E  A-2~~Assignment Agreement
      <u>B  Form of Bailee Letter</u>

# TABLE OF CONTENTS

(continued)

C        Certificate Regarding Non-Bank Status

F  D     Closing Date Certificate

E        Compliance Certificate

F        Conversion / Continuation Notice

G        Counterpart Agreement

H        Funding Notice

I        Landlord Collateral Access Agreement

I        Form of Mortgage

         Form of Pledge Agreement

K        Collateral Questionnaire

L        Form of Security Agreement

M        Promissory Note

N        Opinions of Counsel

O        Pending 401(k) Catch-Up Payment Amounts

P        Pending Investigation Settlement Amounts

AMENDED AND RESTATED CREDIT AND GUARANTY AGREEMENT

This AMENDED AND RESTATED CREDIT AND GUARANTY AGREEMENT, dated as of [_____ __], 2009, is entered into by and among EUROFRESH, INC., a Delaware corporation ("Company"), EUROFRESH HOLDING COMPANY, INC. ("HoldCo") as a Guarantor and CERTAIN SUBSIDIARIES OF COMPANY, as Guarantors, SPCP GROUP LLC, as a Lender, the other Lenders party hereto from time to time, SILVER POINT FINANCE, LLC ("Silver Point"), as Administrative Agent (in such capacity, "Administrative Agent"), Collateral Agent (in such capacity, "Collateral Agent"), Lead Arranger (in such capacity, the "Lead Arranger"), Syndication Agent (in such capacity, "Syndication Agent"), and Documentation Agent (in such capacity, "Documentation Agent").

## RECITALS:

WHEREAS, capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

WHEREAS, Company, Eurofresh Produce Ltd. ("EPL")as Guarantor, SPCP Group LLC, the other Lenders party thereto (the "Existing Lenders"), and Silver Point, as administrative agent (in such capacity, the "Existing Administrative Agent") have previously executed that certain Credit and Guaranty Agreement dated as of March 25, 2008, as amended by (i) that certain Amendment No. 1 to Credit and Guaranty Agreement dated as of March 31, 2008 and effective March 25, 2008, (ii) that certain Amendment No. 2 to Credit Agreement and Waiver dated as of July 14, 2008 and (iii) that certain Amendment No. 3 to Credit and Guaranty Agreement and Waiver dated as of September [__], 2008 (collectively, the "Prior Agreement" or "Existing Agreement");

WHEREAS, on April 21, 2009, Company and Eurofresh Produce Ltd commenced bankruptcy proceedings, Case No. 2:09-bk-07970-CGC and Case No. 2:09-bk-0797007971-CGC (jointly, the "Bankruptcy Case") before the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court") under Chapter 11 of the United States Bankruptcy Code; and

WHEREAS, as part of the Bankruptcy Case, Company and EPL proposed that Joint Plan of Reorganization (the "Plan") for confirmation by the Bankruptcy Court. Among other things, the Plan provides for the amendment and restatement of the Prior Agreement, as set forth herein.

WHEREAS, Company has offered and the Lenders party hereto have agreed to exchange the Indebtedness constituting the Obligations under the Existing Agreement for the right to receive, in full satisfaction and replacement of such existing Indebtedness owing to such Lender under the Existing Agreement and all accrued and unpaid interest thereon, the Loans contemplated by and to be evidenced and governed by this Agreement and the Loan Documents as defined hereunder (all as more particularly described and in accordance with the Exchange Offer Letter attached hereto as Exhibit A-1 (the "Exchange Offer")) (such exchange and all transactions

incidental to and performed in connection with such exchange being hereinafter referred to in their integrated entirety as the "**Debt Exchange**").

NOW, **THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1.  DEFINITIONS AND INTERPRETATION.

**1.1 Definitions**. The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**Adjusted LIBOR Rate**" means, for any Interest Rate Determination Date with respect to an Interest Period for a LIBOR Rate Loan, the greater of (A) three and a half percent (3.5%) per annum and (B) the rate per annum obtained by dividing (and rounding upward to the next whole multiple of one-sixteenth of one percent (1/16 of 1%)) (i) (a) the rate per annum (rounded to the nearest one-hundredth of one percent (1/100 of 1%)) equal to the rate determined by Administrative Agent to be the offered rate which appears on Reuters Screen LIBOR01 Page for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (b) in the event the rate referenced in the preceding clause (a) does not appear on such page or service or if such page or service shall cease to be available, the rate per annum (rounded to the nearest one-hundredth of one percent (1/100 of 1%)) equal to the rate determined by Administrative Agent to be the offered rate on such other page or other service which displays an average British Bankers Association Interest Settlement Rate for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (c) in the event the rates referenced in the preceding clauses (a) and (b) are not available, the rate per annum (rounded to the nearest one-hundredth of one percent (1/100 of 1%)) equal to the offered quotation rate to first class banks in the London interbank market for deposits (for delivery on the first day of the relevant period) in Dollars of amounts in same day funds comparable to the principal amount of the applicable Loan, for which the Adjusted LIBOR Rate is then being determined with maturities comparable to such period as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date as determined by Administrative Agent in accordance with its customary practices, by (ii) an amount equal to (a) one, minus (b) the Applicable Reserve Requirement.

"**Administrative Agent**" as defined in the preamble hereto.

"**Administrative Agent's Account**" means a Deposit Account at a bank designated by Administrative Agent from time to time as the account into which Credit Parties shall make all payments to Administrative Agent for the benefit of Agent and Lenders under this Agreement and the other Credit Documents.

"**Adverse Proceeding**" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Company or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims) or other

regulatory body or any arbitrator whether pending or, to the best knowledge of Company or any of its Subsidiaries, threatened against or affecting Company or any of its Subsidiaries or any property of Company or any of its Subsidiaries.

"**Affected Lender**" as defined in Section 2.15(b).

"**Affected Loans**" as defined in Section 2.15(b).

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote five percent (5%) or more of the Securities having ordinary voting power for the election of directors of such Person, or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.  Notwithstanding anything to the contrary herein, in no event shall any Agent or ~~Holder~~Lender be considered an "Affiliate" of any Credit Party by virtue of its holding of Loans.

"**Agent**" means each of Administrative Agent, Collateral Agent, Syndication Agent, and Documentation Agent.

"**Aggregate Amounts Due**" as defined in Section ~~2.12~~ 2.14.

"**Aggregate Payments**" as defined in Section 7.2.

"**Agreemen**t" means this ~~Amended and Restated~~ Credit and Guaranty Agreement, dated as of [_____    ], 2009, as it may be amended, supplemented or otherwise modified from time to time and any annexes, exhibits, schedules to any of the foregoing.

"**Applicable Margin**" means ~~a percentage, per annum, equal to five percent (5%).~~, with respect to Loans that are Base Rate Loans, a percentage, per annum, equal to six and one-quarter percent (6.25%) and, with respect to Loans that are LIBOR Rate Loans, a percentage, per annum, equal to seven and one-quarter percent (7.25%).

"**Applicable Reserve Requirement**" means, at any time, for any LIBOR Rate Loan, the maximum rate, expressed as a decimal, at which reserves (including any basic marginal, special, supplemental, emergency or other reserves) are required to be maintained with respect thereto against "Eurocurrency Liabilities" (as such term is defined in Regulation D) under regulations issued from time to time by the Board of Governors of the Federal Reserve System or other applicable banking regulator.  Without limiting the effect of the foregoing, the Applicable Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to (i) any category of liabilities which includes deposits by reference to which the applicable Adjusted LIBOR Rate or any other interest rate of a Loan is to be determined, or (ii) any category of extensions of credit or other assets which include LIBOR Rate Loans.  A LIBOR Rate Loan shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed

subject to reserve requirements without benefits of credit for proration, exceptions or offsets that may be available from time to time to the applicable Lender.  The rate of interest on LIBOR Rate Loans shall be adjusted automatically on and as of the effective date of any change in the Applicable Reserve Requirement.

"**Asset Sale**" means a sale, lease or sub lease (as lessor or sublessor), sale and leaseback, assignment, conveyance, license, transfer or other disposition to, or any exchange of property with, any Person, in one transaction or a series of related transactions, of all or any part of Company's or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including the Capital Stock of any of Company's Subsidiaries, other than (i) inventory sold or leased in the ordinary course of business and (ii) obsolete equipment and fixtures with a fair market value not exceeding $500,000 in the aggregate in any Fiscal Year and $1,000,000 in the aggregate ~~in any Fiscal Year~~until payment in full in cash of all Obligations.

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Exhibit ~~E~~A, with such amendments or modifications as may be approved by Administrative Agent.

"**Attributable Debt**" means as of the date of determination thereof, without duplication, (i) in connection with a sale and leaseback transaction, the net present value (discounted according to GAAP at the cost of debt implied in the lease) of the obligations of the lessee for rental payments during the then-remaining term of any applicable lease, and (ii) the principal balance outstanding under any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product to which such Person is a party, where such transaction is considered borrowed money indebtedness for tax purposes but is classified as an operating lease in accordance with GAAP.

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president, chief financial officer or treasurer, in each case, whose signatures and incumbency have been certified to Administrative Agent.

"**Bailee's Letter**" means a Bailee Letter substantially in the form of Exhibit ~~M~~B with such amendments or modifications as may be approved by Collateral Agent.

"**Bankruptcy Case**" means Case No. 2:09-bk-07970-CGC and Case No. 2:09-bk-07971-CGC before the Bankruptcy Court.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

~~"**Base Rate**" means the yield to maturity on five (5) year United States Treasury Notes, as reported by [the United States Department of the Treasury, Office of Debt Management, as the "Constant Maturity Treasury" rate] or [Bloomberg L.P.], as of the close of market on the trading day immediately preceding the Closing.~~

"**Bankruptcy Court**" means the United State Bankruptcy Court for the District of Arizona.

"**Base Rate**" means, for any day, the higher of (i) the Prime Rate, and (ii) the Federal Funds Effective Rate from time to time *plus* three percent (3%). For purposes of computing interest payments on the Loans, the Base Rate shall not be less than four and one-half percent (4.5%). Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively

"**Base Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Base Rate.

"**Beneficiary**" means each Agent and Lender.

"**Business Day**" means (i) any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close, and (ii) with respect to all notices, determinations, fundings and payments in connection with the Adjusted LIBOR Rate or any LIBOR Rate Loans, the term "Business Day" shall mean any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"**Business Trade Secrets**" as defined in Section 4.28.1.4.

"**Capital Lease**" means, as applied to any Person, any lease of (or other arrangement conveying the right to use) any property (whether real, personal or mixed) by that Person as lessee (or the equivalent) that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing, including without limitation shares of PIK Preferred Stock and any other class of preferred stock.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account.

"**Cash Equivalents**" means, as at any date of determination, (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States government, or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one (1) year after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one (1) year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iii) commercial paper

maturing no more than one (1) year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within one (1) year after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator), and (b) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and (v) shares of any money market mutual fund that (a) has at least ninety-five percent (95%) of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (b) has net assets of not less than $500,000,000, and (c) has the highest rating obtainable from either S&P or Moody's.

"**Certificate Regarding Non-Bank Status**" means a certificate substantially in the form of Exhibit ~~F~~C.

"**Change of Control**" means, at any time, either (i~~)~~ (A) Equity Investors shall cease to collectively and beneficially own and control, free and clear of all Liens or other encumbrances, more than fifty percent (50%), on a fully diluted basis, of the voting and/or economic interests in the outstanding Capital Stock of ~~Company~~HoldCo, (B) one or more Van Den Berg Persons shall cease, to beneficially own and control on an aggregate basis, either directly or through Biodynamics, free and clear of all Liens or other encumbrances, more than 50%, on a fully diluted basis, of the voting interests in the outstanding Capital Stock of HoldCo beneficially held by Johan van den Berg (either directly or through Biodynamics) on the Closing Date, or more than 50%, on a fully diluted basis, of the economic interests in the outstanding Capital Stock of HoldCo beneficially held by Johan van den Berg (either directly or through Biodynamics) collectively on the Closing Date or (C) any Person or group of Persons shall enter into a contract or agreement that would result in the foregoing; or (ii) the majority of the seats (other than vacant seats) on the board of directors (or similar governing body) of HoldCo or Company cease to be occupied by Persons who either (a) were members of the board of directors of Company on the Closing Date, or (b) were nominated for election or appointed by the board of directors of Company, a majority of whom were directors on the Closing Date or whose election or nomination for election was previously approved (either by a specific vote or by approval of a proxy statement in which such individual is named as a nominee for election as a director) by a majority of such directors; (iii) any "change of control" or similar event under the Subordinated Note Documents or the PIK Preferred Stock shall occur; (iv) any event, transaction or occurrence as a result of which Johan van den Berg shall for any reason cease to be actively engaged in the management of the Company, unless an interim or permanent successor reasonably acceptable to Administrative Agent and the Requisite Lenders is promptly appointed; or (v) HoldCo shall cease to be the legal and beneficial owner of 100% of the Capital Stock of the Company.

"**Closing Date**" means the date on which ~~each~~the Debt Exchange shall be deemed consummated upon the satisfaction or waiver in writing in accordance with Section 10.5 of the conditions precedent set forth in Section 3.1 ~~is satisfied or waived in writing in accordance with Section 10.5.~~.

"**Closing Date Certificate**" means a Closing Date Certificate substantially in the form of Exhibit ~~F~~D.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Capital Stock) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Obligations.

"**Collateral Agent**" as defined in the preamble hereto.

"**Collateral Documents**" means the ~~Pledge~~Security Agreement, the ~~Security~~Subordination Agreement, each Control Agreement, the Mortgages, the Landlord Collateral Access Agreement and Bailee's Letters, if any, and all other instruments, documents and agreements delivered by any Credit Party pursuant to this Agreement or the Prior Agreement or any of the other Credit Documents in order to grant to Collateral Agent, for the benefit of Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

"**Collateral Questionnaire**" means a certificate substantially in the form of Exhibit K that provides information with respect to the personal or mixed property of each Credit Party.

"**Commodity Hedge Agreement**" means any agreement entered into by a Credit party in respect of a Commodity Hedge Transaction.

"**Commodity Hedge Transaction**" means any transaction (including an agreement with respect thereto) now existing or hereafter entered into by any Credit Party which is a commodity swap, commodity option, cap transaction, floor transaction, collar transaction, forward transaction or any other similar transaction (including any option with respect to any of these transactions) in each case that constitutes a fully effective cash flow hedge according to GAAP and that provides protection against fluctuations in commodity prices, either generally or under specific contingencies, and in each case not entered into or traded for speculative purposes.

"**Communications**" as defined in Section 9.9(a).

"**Company**" as defined in the preamble hereto.

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of Exhibit ~~C~~E.

"**Confirmation ~~Orders~~Date**" means the date of entry of the Confirmation Order by the Bankruptcy Court

"**Confirmation Order**" means the order by the Bankruptcy Court entered on [October __], 2009, confirming the Plan.

7

"**Consolidated Adjusted EBITDA**" means, for any period, an amount determined for Company and its Subsidiaries on a consolidated basis equal to: (i) the sum, without duplication, of the amounts for such period of:

(a) Consolidated Net Income, plus

(b) to the extent deducted in the calculation of Consolidated Net Income:

(1) Consolidated Interest Expense, plus

(2) provisions for taxes based on income, plus

(3) total depreciation expense, plus

(4) total amortization expense, plus

(5) non-cash management stock option expense~~ not to exceed $[_____] in any Fiscal Quarter~~, plus

(6) all Restructuring Costs ~~(provided that the amount of Transaction Costs included under this clause shall not exceed $[3,000,000])~~.~~,~~ plus

(7) extraordinary non-Cash losses (as determined in accordance with GAAP) not to exceed $~~1,000,000~~500,000 in any Fiscal Quarter, plus

(8) ~~cash payments in respect of any settlement of pending or threatened claims against Company or indemnified by Company for violation of law not to exceed $3,000,000 in any Fiscal Year and not to exceed $6,000,000 in the aggregate~~all actual Pending Investigation Settlement Amounts (not to exceed $650,000 for the portion thereof applicable to the DOJ Investigation and not to exceed $950,000 for the portion thereof attributable to the DOL Investigation, in each case in the aggregate for all periods) during such period plus

(9) all actual Pending 401(k) Catch-Up Payment Amounts paid during such period not to exceed $83,000 in the aggregate; plus

(10) all actual Pending Property Tax Dispute Settlement Amounts (not to exceed $700,000 in the aggregate for all periods);

minus (ii) the sum, without duplication of the amounts for such period to the extent included in the calculation of Consolidated Net Income of:

(a)     other non-~~Cash~~recurring items increasing Consolidated Net Income for such period (excluding any such non-~~Cash~~recurring item to the extent it represents the reversal of an accrual or reserve for a potential Cash item in any prior period), plus

(b)     interest income, plus

(c)     extraordinary and non-recurring Cash gains and other extraordinary and non-recurring Cash income ~~(as determined in accordance with GAAP).~~ .

"**Consolidated Capital Expenditures**" means, for any period, the aggregate of all expenditures of Company and its Subsidiaries during such period determined on a consolidated basis that, in accordance with GAAP, are or should be included in "purchase of property and equipment (including the portion of liabilities under any Capital Lease that is or should be capitalized in accordance with GAAP) or which should otherwise be capitalized" or similar items reflected in the consolidated statement of cash flows of Company and its Subsidiaries.

"**Consolidated Cash Interest Expense**" means, for any period, Consolidated Interest Expense for such period, excluding any amount not payable in Cash.

"**Consolidated Excess Cash Flow**" means, for any period, an amount (if positive) determined for Company and its Subsidiaries on a consolidated basis equal to:

(i)  the sum, without duplication, of the amounts for such period of:

(a)     Consolidated Adjusted EBITDA, plus

(b)     interest income, plus

(c)     cash generated from changes in Working Capital as set forth on the Company's balance sheet subject to, for purposes of determining Consolidated Excess Cash Flow, a cap of $3,000,000 in any Fiscal Year, plus

(d)     Cash received from a hedging counter party with respect to expired Commodity Hedge Agreements, to the extent not recognized in Consolidated Net Income for such period, plus

(e)     the amount that was recognized by the Company in calculating Consolidated Net Income for such period that relates to Cash paid in a prior testing period to a hedging counter party with respect to Commodity Hedge Transactions in satisfaction of amounts owed under expired Commodity Hedge Agreements, plus

(f)     extraordinary Cash gains and extraordinary cash other income, minus

(ii)  the sum, without duplication, of the amounts for such period of (provided that for each category below such deduction may be taken only to the extent that such payment below was permitted under the terms of this Agreement during such period):

(a)     ~~voluntary and scheduled repayments of Consolidated Total Net Debt permitted hereunder and (solely to the extent such proceeds result in extraordinary Cash gains or extraordinary Cash income for such period) mandatory payment resulting from Asset Sales, insurance proceeds and Extraordinary Receipts (excluding repayments of any revolving credit indebtedness except to the extent the obligation of the relevant lenders to make such revolving credit available is permanently reduced or terminated in connection with such repayments, to the extent of such reduction or termination), plus~~

(a)     voluntary repayments of Obligations arising under this Agreement and scheduled repayments of Capital Leases, in each case to the extent permitted under this Agreement; plus

(b)     repayments of Subordinated PIK A Notes permitted under this Agreement, plus

(~~b~~c)     Consolidated Capital Expenditures paid in Cash net of (x) any Net Asset Sale Proceeds to the extent reinvested in accordance with Section ~~2.9~~2.11(a), (y) Net Insurance/Condemnation Proceeds to the extent reinvested in accordance with Section ~~2.9~~2.11(b), and (z) any proceeds of related financings with respect to such expenditures, plus

(~~c~~d)     Consolidated Cash Interest Expense, plus

(~~d~~e)     provisions for current taxes based on income of Company and its Subsidiaries and ~~payable~~paid in Cash with respect to such period, plus

(e)     ~~to the extent that such payment was included in the calculation of Consolidated Adjusted EBITDA, all Restructuring Costs paid in cash (provided, that the amount of Transaction Costs included under this clause shall not exceed $[3,000,000], plus~~

(f)     to the extent that such payment was included in the calculation of Consolidated Adjusted EBITDA, ~~cash payments in respect of any settlement of pending or threatened claims against Company or indemnified by Company for violation of law not to exceed $3,000,000 in any Fiscal Year~~all Restructuring Costs paid in cash, plus

(g)     to the extent that such ~~amount~~payment was included in the calculation of Consolidated Adjusted EBITDA, ~~extraordinary non Cash losses (as determined in accordance with GAAP) not to exceed $[1,000,000] in any Fiscal Quarter~~any (x) Pending Investigation Settlement Amounts and (y) any other cash payments in respect of any settlement of pending or threatened claims against Company or indemnified by Company for violation of law (not to exceed, with respect to amounts described in clause (y), $750,000 in any Fiscal Year or such amount as would result in an Event of Default pursuant to Section 8.1(h)), plus

(h)     cash payments in respect of any Prepayment Premium required to be paid by Company to the Lenders pursuant to this Agreement, plus

(i)      Cash paid to a hedging counter party with respect to expired Commodity Hedge Agreements, to the extent not recognized in Consolidated Net Income for such period, plus

(j)      the amount that was recognized by the Company in calculating Consolidated Net Income for such period that relates to Cash received from to a hedging counter party during a prior testing period with respect to Commodity Hedge Transactions in satisfaction of amounts owed under expired Commodity Hedge Agreements, plus

(k)      investments reflected in crop development cost balancesin Working Capital as set forth on the Company's balance sheet, subject to, for purposes of determining Consolidated Excess Cash Flow, a maximum total investment in Working Capital of $3,000,000 in any Fiscal Year.

"**Consolidated Interest Expense**" means, for any period, total interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) of Company and its Subsidiaries on a consolidated basis with respect to all outstanding Consolidated Total Net Debt,Indebtedness including all commissions, discounts and other fees and charges owed with respect to letters of credit and net costs under Interest Rate Agreements, but excluding, however, any Closing Fees payable on or before the Closing Date.

"**Consolidated Net Income**" means, for any period:

(i)      the net income (or loss) of Company and its Subsidiaries on a consolidated basis for such period taken as a single accounting period determined in conformity with GAAP, minus

(ii)      the sum of:

(a) the income (or loss) of any Person (other than a Subsidiary of Company) in which any other Person (other than Company or any of its Subsidiaries) has a joint interest, except to the extent of the amount of dividends or other distributions actually paid to Company or any of its Subsidiaries by such Person during such period, plus

(b) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of Company or is merged into or consolidated with Company or any of its Subsidiaries or that Person's assets are acquired by Company or any of its Subsidiaries, plus

(c) the income of any Subsidiary of Company to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary, plus

(d) any after tax gains or losses attributable to Asset Sales or returned surplus assets of any Pension Plan.

"**Consolidated Total ~~Net~~Secured Debt**" means, as at any date of determination: the sum of (~~i)~~ (a) the aggregate stated balance sheet amount of all Indebtedness of Company and its Subsidiaries determined on a consolidated basis in accordance with GAAP, plus (b) the aggregate outstanding amount, without duplication, of Attributable Debt of Company and its Subsidiaries determined on a consolidated basis~~, minus (ii) the sum (which shall not be less than zero) of (a) unrestricted Cash of the Company and its Subsidiaries to the extent such unrestricted Cash is on deposit in one or more accounts with respect to which the Collateral Agent has a first priority perfected Lien, minus (b~~, minus (c) the aggregate stated balance sheet amount of ~~all Net Cure Proceeds received by the Company with respect to the applicable measurement period, minus (iii) solely for purposes of determining the Total Leverage Ratio, Indebtedness consisting of, or evidenced by, the Subordinated and Capital Leases Indebtedness or Capital Leases (it being understood that for all other purposes, such Subordinated Indebtedness shall constitute Indebtedness and be included in Consolidated Total Net Debt)~~Subordinated Notes.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Contributing Guarantors**" as defined in Section 7.2.

"**Control Agreements**" means a control agreement, in form and substance satisfactory to Administrative Agent, entered into with the bank or securities intermediary at which any Deposit Account or Securities Account is maintained by any Credit Party as required under the terms of Section ~~6.16, the Pledge Agreement~~6.16 or the Security Agreement. Schedule ~~6.15~~6.16 identifies all of the Control Agreements that are required to be in effect on Closing Date.

"**Conversion/Continuation Date**" means the effective date of a continuation or conversion, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"**Conversion/Continuation Notice**" means a Conversion/Continuation Notice substantially in the form of Exhibit F.

"**Counterpart Agreement**" means a Counterpart Agreement substantially in the form of Exhibit G delivered by a Credit Party pursuant to Section 5.10.

"**Credit Date**" means the date of a Credit Extension.

"**Credit Document**" means any of this Agreement, the Notes, if any, the Collateral Documents, and all other certificates, documents, instruments or agreements executed and delivered by a Credit Party for the benefit of any Agent, or any Lender in connection herewith.

"**Credit Extension**" means the making, conversion or continuance of a Loan.

"**Credit Party**" means each Person (other than any Agent or any Lender or any representative thereof) from time to time party to a Credit Document.

"**Cure Date**" as defined in Section 6.7(~~d)~~e).

"**Cure Right**" as defined in Section 6.7(e).

"**Cure Shortfall Amount**" means, for any Fiscal Quarter, with respect to any cure of a financial covenant as set forth is Section 6.7(a) or (b) for any measurement period, the amount of Net Cure Proceeds required to enable Company to be in compliance with the financial covenant that would otherwise be breached through an increase in the amount of Consolidated Adjusted EBITDA for such Fiscal Quarter.

"**Currency Agreement**" means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with Company's and its Subsidiaries' operations and not for speculative purposes.

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Default Excess**" means, with respect to any Defaulting Lender, the excess, if any, of such Defaulting Lender's Pro Rata Share of the aggregate outstanding principal amount of Loans of all Lenders (calculated as if all Defaulting Lenders (other than such Defaulting Lender) had funded all of their respective Defaulted Loans) over the aggregate outstanding principal amount of all Loans of such Defaulting Lender.

"**Default Period**" means, with respect to any Defaulting Lender, the period commencing on the date of the applicable Funding Default and ending on the earliest of the following dates: (i) the date on which the Obligations are declared or become immediately due and payable, (ii) the date on which the Default Excess with respect to such Defaulting Lender shall have been reduced to zero (whether by the funding by such Defaulting Lender of any Defaulted Loans of such Defaulting Lender or by the non-pro rata application of any voluntary or mandatory prepayments of the Loans in accordance with the terms of Section 2.82.10 or Section 2.92.11 or by a combination thereof), and (iii) the date on which Company, Administrative Agent and Requisite Lenders waive all Funding Defaults of such Defaulting Lender in writing.

"**Default Rate**" means any interest payable pursuant to Section 2.6.2.7.

"**Defaulted Loan**" as defined in Section 2.16.2.19.

"**Defaulting Lender**" as defined in Section 2.16.2.19.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Disqualified Capital Stock**" means Capital Stock that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the first anniversary of the Final Maturity Date, (b) is convertible into or exchangeable

(unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Capital Stock referred to in clause (a) above, in each case at any time prior to the first anniversary of the ~~Final~~ Maturity Date, (c) contains any repurchase obligation that may come into effect prior to payment in full of all Obligations, (d) requires Cash dividend payments prior to one (1) year after the ~~Final~~ Maturity Date, (e) does not provide that any claims of any holder of such Capital Stock may have against Company or any other Credit Party (including any claims as judgment creditor or other creditor in respect of claims for the breach of any covenant contained therein) shall be fully subordinated (including a full remedy bar) to the Obligations in a manner satisfactory to Administrative Agent, (f) provides the holders of such Capital Stock thereof with any rights to receive any Cash upon the occurrence of a change of control prior to the first anniversary date on which the Obligations have been irrevocably paid in full, unless the rights to receive such Cash are contingent upon the Obligations being irrevocably paid in full, or (g) is prohibited by the terms of this Agreement; provided, however, that notwithstanding the foregoing, neither the ~~Series A~~PIK Preferred Stock nor the Subordinated ~~PIK~~ Notes shall constitute Disqualified Capital Stock. ~~As used in this definition "Final Maturity Date" means of [_____], 2014.~~

"**Documentation Agent**" as defined in the preamble hereto.

"**DOJ Investigation**" means, collectively, any and all investigations of the Credit Parties by any unit of the U.S. Department of Justice (including the United States Attorney and/or U.S. Immigration and Customs Enforcement that are settled, adjudicated, or ongoing as of the Closing Date.

"**DOL Investigation**" means, collectively, any and all investigations of the Credit Parties by any unit of the U.S. Department of Labor that are settled as of the Closing Date.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Domestic Subsidiary**" means any Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia.

"**Effective Date**" [shall have the meaning provided in the Plan.]

"**Eligible Assignee**" means (i) (a) any Lender ~~or~~, any Affiliate ~~(other than a natural person) of a Lender, (b) a commercial bank organized under the laws of the United States, or any state thereof, (c) a commercial bank organized under the laws of any other country which is a member of the Organization for Economic Cooperation and Development or a political subdivision of any such country, provided that such bank is acting through a branch or agency located in the United States, and (d) a~~of any Lender and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), and (b) any commercial bank, finance company, insurance company, ~~or other financial institution or fund that is engaged in making, purchasing, or otherwise investing in commercial revolving loans in the ordinary course of its business~~investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans as one of its businesses, or (~~e~~ii) any other Person (other than a natural Person) approved by Administrative Agent; [provided, neither (A) Company nor any Affiliate of Company ~~(other than the Equity Investors and their respective Affiliates, other than Company and its Subsidiaries)~~ nor

(B) Biodynamics and/or any Van Den Berg Person or any Affiliate of Biodynamics and/or any Van Den Berg Person, shall, in any event, be an Eligible Assignee.] [Until a Default has occurred, none of Village Farms Income Fund, Mastronardi Produce, Ltd., Backyard Farms, LLC, or their respective subsidiaries Subsidiaries shall be an Eligible Assignee.]

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed by, Company, any of its Subsidiaries or any of their respective ERISA Affiliates.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all current or future foreign or domestic, federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities relating to (i) public health and safety, protection of the environment or other environmental matters, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare.

"**EPL**" has the meaning set forth in the Recitals.

"**Equity Investors**" means Bio Dynamics B.V./S.a.r.L. ("**Biodynamics**") (for so long as Biodynamics is under the control of a Van Den Berg Person), Barclays Bank PLC or its affiliate, Scoggin Capital Management, JP Morgan Asset Management and Credit-Suisse Alternative Capital, Inc., and the respective Affiliates of each of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto, in each case together with the regulations thereunder.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of Company or any of its Subsidiaries shall continue to be considered an ERISA Affiliate of Company or any such Subsidiary within the meaning of this definition with respect to the period

such entity was an ERISA Affiliate of Company or such Subsidiary and with respect to liabilities arising after such period for which Company or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for thirty (30)-day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) notice of intent to terminate a Pension Plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by Company, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two (2) or more non-related contributing sponsors or the termination of any such Pension Plan resulting in liability to Company, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might reasonably constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on Company, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of Company, any of its Subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any liability or potential liability therefor, or the receipt by Company, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission which could give rise to the imposition on Company, any of its Subsidiaries or any of their respective ERISA Affiliates of material fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan or the assets thereof, or against Company, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (xi) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"**Event of Default**" means each of the conditions or events set forth in Section 8.1.

"**Extraordinary Receipts**" means any Cash received by or paid to or for the account of Company or any of its Subsidiaries not in the ordinary course of business, including any foreign, United States, state or local tax refunds, pension plan reversions, judgments, proceeds of

settlements or other consideration of any kind in connection with any cause of action, condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustment received in connection with any purchase agreement and proceeds of insurance (excluding, however, any Net Insurance/Condemnation Proceeds which are subject to Section 2.92.11(b)).

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by Company or any of its Subsidiaries or any of their respective predecessors or Affiliates.

"**Fair Share**" as defined in Section 7.2.

"**Fair Share Contribution Amount**" as defined in Section 7.2.

"**Federal Funds Effective Rate**" means for any day, the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to the next higher one-hundredth of one percent (1/100 of 1%)) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average of the quotations on such day received by Administrative Agent from three federal funds brokers of recognized standing selected by it.

"**Financial Covenants**" means, collectively, the requirements of Section 6.7.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer of Company that such financial statements fairly present, in all material respects, the financial condition of Company and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, in each case in conformity with GAAP applied on a consistent basis, subject, in the case of interim financial statements, to changes resulting from normal audit and year-end adjustments.

"**Financial Plan**" as defined in Section 5.1(i).

"**First Lien Mortgage**" means that certain [Mortgage and Security Agreement] dated _____, 2009, entered into by the Company for the benefit of the holders from time to time of the First Lien Mortgage Notes.

"**First Lien Mortgage Note**" means that certain First Lien Mortgage Note dated _____, 2009 in the original principal amount of $_____, issued by the Company pursuant to the Plan. "**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the most senioronly Lien to

which such Collateral is subject, other than any Permitted Lien ~~that ranks prior to such Lien by operation of applicable law~~.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Company and its Subsidiaries ending on December 31 of each calendar year.

"**Flood Hazard Property**" means any Real Estate Asset subject to a mortgage in favor of Collateral Agent, for the benefit of the Secured Parties, and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**Foreign Subsidiary**" means any Subsidiary that is not a Domestic Subsidiary.

"**Funding Default**" as defined in Section ~~2.16.~~2.19.

"**Funding Guarantor**" as defined in Section 7.2.

"**Funding Notice**" means a notice substantially in the form of Exhibit ~~A-1~~H.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, United States generally accepted accounting principles in effect as of the date of determination thereof.

"**Governmental Acts**" means any act or omission, whether rightful or wrongful, of any present or future de jure or de facto government or Governmental Authority.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government or any political subdivision thereof.

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Granting Lender**" as defined in Section 10.7.

"**Grantor**" as defined in the Security Agreement.

"**Guarantee**" means, with respect to any Person, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, that is (a) an obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in

respect thereof; or (b) a liability of such Person for an obligation of another through any agreement (contingent or otherwise) (i) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (ii) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (i) or (ii) of this clause (b), the primary purpose or intent thereof is as described in clause (a) above.

"**Guaranteed Obligations**" as defined in Section 7.1.

"**Guarantor**" means HoldCo and each Domestic Subsidiary of Company.

"**Guarantor Subsidiary**" means each Guarantor that is a Domestic Subsidiary.

"**Guaranty**" means the guaranty of each Guarantor set forth in Section 7.

"**Hazardous Materials**" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Environmental Law or Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Facility or to the indoor or outdoor environment.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender in respect of the credit facilities provided to Company under this Agreement which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"**Historical Financial Statements**" means as of the Closing Date, (i) audited financial statements of Company and its Subsidiaries for the Fiscal Year ended 2007 and unaudited financial statements of Company and its Subsidiaries for the Fiscal Year ended 2008, each consisting of balance sheets and the related consolidated statements of income, stockholders' equity and cash flows for such Fiscal Year, and (ii) for the interim period from January 1, 2009 to the Closing Date, internally prepared, unaudited financial statements of Company and its Subsidiaries, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for each quarterly period completed prior to ninety (90) days before the Closing Date and for each monthly period completed prior to forty-five (45) days prior to the Closing Date, certified by the chief financial officer of Company that they fairly present, in all material respects, the financial condition of Company and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject, if applicable, to changes resulting from audit and normal year end adjustments.

"**Increased Cost Lender**" as defined in Section ~~2.17~~2.20.

"**Indebtedness**," as applied to any Person, means, without duplication, (i) all indebtedness for borrowed money; (ii) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP; (iii) all obligations of such Person evidenced by notes, bonds or similar instruments or upon which interest payments are customarily paid and all obligations in respect of drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (iv) any obligation owed for all or any part of the deferred purchase price of property or services (excluding trade payables incurred in the ordinary course of business that have a term of less than six (6) months and that are not overdue by more than sixty (60) days which purchase price is (a) due more than six (6) months from the date of incurrence of the obligation in respect thereof or (b) evidenced by a note or similar written instrument; (v) all obligations created or arising under any conditional sale or other title retention agreement with respect to property acquired by such person; (vi) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (vii) the face amount of any letter of credit or letter of guaranty issued, bankers' acceptances facilities, surety bond and similar credit transactions for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings or drafts; (viii) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another; (ix) any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (x) any liability of such Person for an obligation of another through any agreement (contingent or otherwise) (a) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (b) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (a) or (b) of this clause (x), the primary purpose or intent thereof is as described in clause (ix) above; (xi) all obligations of such Person in respect of any exchange traded or over the counter derivative transaction, including any Interest Rate Agreement, Currency Agreement and any other Rate Management Transaction, whether entered into for hedging or speculative purposes; (xii) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person and (xiii) all Attributable Debt of such Person. Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or joint venturer, unless such Indebtedness is expressly non-recourse to such Person. The amount of Indebtedness under any Interest Rate Agreement, Currency Agreement or any other Rate Management Transactions outstanding at any time shall be the Net Mark-to-Market Exposure of such Person under such arrangement at such time.

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up

or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Credit Extensions or the use or intended use of the proceeds thereof, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)); (ii) the statements contained in the commitment letter or proposal letter delivered by any Lender to Company with respect to the transactions contemplated by this Agreement; or (iii) any Environmental Claim against or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Company or any of its Subsidiaries, except, as to any such Person, any of the foregoing that arise from the willful misconduct of such Person.

"**Indemnitee**" as defined in Section 10.3.

"**Indemnitee Agent Party**" as defined in Section 9.6.

"**Interest Payment Date**" means ~~(i~~with respect to (i) any Base Rate Loan, (a) the last day of each month, commencing on the first such date to occur after the Closing Date; and ~~(ii) the final Maturity Date.~~ b) the final maturity date of such Loan; and (ii) any LIBOR Rate Loan, the last day of each Interest Period applicable to such Loan, and (iii) any interest payable in-kind as provided in Section 2.5(a)(ii), the last day of each month, commencing on the first such date to occur after the Closing Date, and the final maturity date of such Loan.

"**Interest Period**" means, in connection with a LIBOR Rate Loan, an interest period of one, two or three months, as selected by Company in the applicable Funding Notice or Conversion/Continuation Notice, (i) initially, commencing on the Credit Date or Conversion/Continuation Date thereof, as the case may be; and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (c) of this definition, end on the last Business Day of a calendar month; and (c) no Interest Period with respect to any portion of any Loans shall extend beyond such Class's Maturity Date.

"**Interest Rate Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is (i) for the purpose of hedging the interest rate exposure associated with Company's and its Subsidiaries' operations, (ii) approved by Administrative Agent in its reasonable discretion, and (iii) not for speculative purposes.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two (2) Business Days prior to the first day of such Interest Period.

"**Internal Control Event**" means a material weakness in, or fraud that involves management of, Company, which fraud has a material effect on Company's internal controls over financial and other reporting, in each case as described in the Securities Laws, whether or not Company is subject thereto.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by Company or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person; (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of Company from any Person, of any Capital Stock of such Person; (iii) any direct or indirect loan, advance or capital contributions by Company or any of its Subsidiaries to any other Person, including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business; and (iv) any direct or indirect Guarantee of any obligations of any other Person. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; provided, in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"**Landlord Collateral Access Agreement**" means a Landlord Waiver and Consent Agreement substantially in the form of Exhibit KI with such amendments or modifications as may be approved by Collateral Agent in its reasonable discretion.

"**Lead Arranger**" as defined in the preamble hereto.

"**Leasehold Property**" means any leasehold interest of any Credit Party as lessee under any lease of real property, other than any such leasehold interest designated from time to time by Collateral Agent in its sole discretion as not being required to be included in the Collateral.

"**Lender**" means each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement other than any such Person that ceases to be a party hereto pursuant to an Assignment Agreement.

"**LIBOR Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Adjusted LIBOR Rate.

"**Lien**" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, and (ii) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Loan**" means a term loan made by a Lender to Company pursuant to Section 2.1(a).

"**Loan Allocation**" means, with respect to a Lender, the amount of Loans set forth on Appendix A opposite such Lender's name (or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof), into which such Lender has agreed to exchange and convert the outstanding principal balance of its holdings under and as defined in the Existing Agreement, in accordance with the terms of Section 2.1 hereof.

"**Loan Commitment**" means the commitment of a Lender to exchange its holdings under the Existing Agreement for a Loan hereunder in accordance with the terms of the Exchange Offer; and "**Loan Commitments**" means such commitments of all Lenders in the aggregate. The amount of each Lender's Loan Commitment, if any, is such Lender's Loan Allocation.

"**Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Loans of such Lender.

"**Margin Stock**" as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (i) the business operations, properties, assets ~~or~~, condition (financial or otherwise) or prospects of Company and its Subsidiaries taken as a whole; (ii) a significant portion of the industry or business segment in which Company or its Subsidiaries operate or rely upon if such effect or development is reasonably likely to have a material adverse effect on Company and its Subsidiaries taken as a whole; (iii) the ability of any Credit Party to fully and timely perform its Obligations; (~~iii~~iv) the legality, validity, binding effect, or enforceability against a Credit Party of a Credit Document to which it is a party; (~~iv~~v) the Collateral or Collateral Agent's Liens (on behalf of itself and the Secured Parties) on the Collateral or the priority of such Liens; or (~~v~~vi) the rights, remedies and benefits available to, or conferred upon, any Agent and any Lender or any Secured Party under any Credit Document.

"**Material Contract**" means, collectively, (i) any contract or  agreement listed in Schedule 1.1(a), (ii) any contract or agreement requiring payments to be made or providing for payments to be received, in each case in excess of $1,000,000 per annum or $2,000,000 over the term of such agreement, (iii) any other contract or other arrangement to which Company or any of its Subsidiaries is a party (other than the Credit Documents) for which breach, nonperformance,

cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect and (iv) any agreement or instrument evidencing or governing Indebtedness.

"**Material Real Estate Asset**" means (i) (a) any individual fee-owned Real Estate Asset having a fair market value in excess of $~~500,000~~250,000 as of any date of determination, (b) all fee-owned Real Estate Assets having an aggregate fair market value in excess of $~~1,000,000~~500,000 as of any date of determination, and (c) all Leasehold Properties other than those with respect to which the aggregate payments under the term of the lease are less than $~~500,000~~150,000 per annum, or (ii) any Real Estate Asset that the Requisite Lenders have determined is material to the business, operations, properties, assets, condition (financial or otherwise) or prospects of Company or any Subsidiary thereof, including any listed on Schedule 1.1(b).

"**Maturity Date**" means the earlier of (i) _____~~, 2014~~, 20___, (being the fourth (4th) anniversary of the Effective Date), and (ii) the date that all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"**Moody's**" means Moody's Investor Services, Inc.

"**Mortgage**" means ~~a mortgage~~an amended and restated deed of trust substantially in the form of Exhibit ~~[___]~~J, as it may be amended, supplemented or otherwise modified from time to time.

"**Mortgaged Property**" means all real and personal property constituting the "Premises" or otherwise identified as collateral in the Mortgages or any other Collateral Document.

"**Multiemployer Plan**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"**NAIC**" means The National Association of Insurance Commissioners, and any successor thereto.

"**Narrative Report**" means, with respect to the financial statements for which such narrative report is required, a narrative report describing the operations of Company and its Subsidiaries in the form prepared for presentation to senior management thereof for the applicable month, Fiscal Quarter or Fiscal Year and for the period from the beginning of the then current Fiscal Year to the end of such period to which such financial statements relate with comparison to and variances from the immediately preceding period and budget.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to: (i) the sum of Cash payments and Cash Equivalents received by Company or any of its Subsidiaries from such Asset Sale (including any Cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received), minus (ii) any bona fide direct costs incurred in connection with such Asset Sale, including (a) commissions, Other Taxes, and reasonable counsel fees and expenses, (b) income or gains Taxes paid or payable by the seller as a result of any gain recognized in connection with such Asset Sale during the tax period the sale occurs (after taking into account any available

tax credits or deductions and any tax-sharing arrangements), (c) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale, and (d) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by Company or any of its Subsidiaries in connection with such Asset Sale; provided, that upon release of any such reserve, the amount released shall be considered Net Asset Sale Proceeds); provided, that Net Asset Sale Proceeds shall not include any amounts received by the Company or any of its Subsidiaries with respect to any Asset Sale to the extent that such amounts are required to be paid to the holders of the First Lien Mortgage Notes in accordance with Section 2(l)(i) thereof (as in effect on the Closing Date).

"**Net Cure Proceeds**" means, with respect to any exercise of the Company's cure rights under Section 6.7(d̶e̶), the net cash proceeds received by the Company, net of all c̶u̶s̶t̶o̶m̶a̶r̶y̶ underwriting commissions and fees and legal, investment banking, brokerage and accounting and other professional fees, sales commissions, disbursements and out-of-pocket expenses actually incurred in connection with such sale, issuance or contribution.

"**Net Income Tax**" of a Person means any Tax imposed by the jurisdiction in which a Person is organized or in which that Person's applicable principal office (and/or, in the case of a Lender, its applicable lending office) is located or in which that Person (and/or, in the case of a Lender, its applicable lending office) is deemed to be doing business (other than a jurisdiction in which such Person is treated as doing business solely as a result of its entering into any Credit Document or its participation in the transactions governed thereby) on all or part of the net income, profits or gains of that Person (and/or, in the case of a Lender, its applicable lending office) and any branch profits tax or similar tax imposed by any such jurisdiction.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to: (i) any Cash payments or proceeds received by Company or any of its Subsidiaries (a) under any casualty, business interruption or "key man" insurance policies in respect of any covered loss thereunder, or (b) as a result of the taking of any assets of Company or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (ii) (a) any actual and reasonable costs incurred by Company or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Company or such Subsidiary in respect thereof, and (b) any actual and reasonable costs incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition, including income taxes paid or payable as a result of any gain recognized in connection therewith (after taking into account any available tax credits or deductions and any tax-sharing arrangements); provided, that Net Insurance/Condemnation Proceeds shall not include any amounts received by the Company or any of its Subsidiaries with respect to any Insurance/Condemnation to the extent that such amounts are required to be paid to the holders of the First Lien Mortgage Notes in accordance with Section 2(l)(i) thereof (as in effect on the Closing Date).

"**Net Mark-to-Market Exposure**" of a Person means, as of any date of determination, the excess (if any) of all unrealized losses over all unrealized profits of such Person

arising from all Rate Management Transactions or Commodity Hedge Transactions in effect as of such date. As used in this definition, "unrealized losses" means the fair market value of the cost to such Person of replacing such Rate Management Transaction or Commodity Hedge Transactions as of the date of determination (assuming the Rate Management Transaction or Commodity Hedge Transactions were to be terminated as of that date), and "unrealized profits" means the fair market value of the gain to such Person of replacing such Rate Management Transaction or Commodity Hedge Transactions as of the date of determination (assuming such Rate Management Transaction or Commodity Hedge Transactions were to be terminated as of that date).

"**Non-Consenting Lender**" as defined in Section ~~2.17~~2.20.

"**Non-U.S. Lender**" as defined in Section ~~2.14~~2.17(d).

"**Note**" means a promissory note in the form of Exhibit ~~B~~M, as it may be amended, supplemented or otherwise modified from time to time.

"**Obligations**" means all liabilities and obligations of every nature of each Credit Party and its Subsidiaries from time to time owed to the Agents (including former Agents), the Lenders or any of them, under any Credit Document, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise and whether primary, secondary, direct, indirect, contingent, fixed or otherwise (including obligations of performance).

"**Obligee Guarantor**" as defined in Section 7.7.

"**Organizational Documents**" means (i) with respect to any corporation, its certificate or articles of incorporation or organization, or any certificates of designation, as amended, and its by laws, as amended, (ii) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, and (iv) with respect to any limited liability company, its articles of organization, or any certificates of designation (or similar), as amended, and its operating agreement, as amended. In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**Other Taxes**" means any and all present or future stamp, registration, recording, filing, transfer, documentary, excise or property Taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to or in connection with, any Credit Document.

"**Participant**" as defined in Section 10.6(g).

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001).

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pending 401(k) Catch-Up Payment Amounts**" means any amounts paid by or on behalf of any of the Credit Parties in connection with the settlement or other resolution of certain pending 401(k) catch-up payment matters identified on Schedule O, but in every event not to exceed the aggregate amount set forth on such Schedule O.

"**Pending Investigation Settlement Amounts**" means any amounts paid by or on behalf of any of the Credit Parties under any money judgment, writ or warrant of attachment, agreement of settlement, stipulated judgment or similar process related to or arising out of the DOJ Investigation or the DOL Investigation, in each case not to exceed the aggregate amounts set forth in Schedule P with respect to the DOJ Investigation and with respect to the DOL Investigation.

"**Pending Property Tax Dispute Settlement Amounts**" means any amounts paid by or on behalf of any of the Credit Parties in connection with the settlement or other resolution of certain pending property tax matters identified on Schedule 4.12 in an aggregate amount set forth on Schedule 4.12.

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Phase I Report**" means, with respect to any Facility, a report that (i) conforms to the ASTM Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process, E 1527, (ii) was conducted no more than six (6) months prior to the date such report is required to be delivered hereunder, by one or more environmental consulting firms reasonably satisfactory to Administrative Agent, (iii) includes an assessment of asbestos-containing materials at such Facility, (iv) is accompanied by (a) an estimate of the reasonable worst-case cost of investigating and remediating any Hazardous Materials Activity identified in the Phase I Report as giving rise to an actual or potential material violation of any Environmental Law or as presenting a material risk of giving rise to a material Environmental Claim, and (b) a current compliance audit setting forth an assessment of Company's, its Subsidiaries' and such Facility's current and past compliance with Environmental Laws and an estimate of the cost of rectifying any non compliance with current Environmental Laws identified therein and the cost of compliance with reasonably anticipated future Environmental Laws identified therein.

"**PIK Preferred Stock**" means the shares of preferred stock of HoldCo, par value $0.001 per share, issued on or after the Effective Date on substantially the same terms, conditions and subordination as the PIK Preferred Stock issued on the Effective Date or otherwise pursuant to

Organizational Documents in form and substance reasonably acceptable to the Administrative Agent.

"**Plan**" is defined in the Recitals hereto.

"**Platform**" as defined in Section 9.9(b).

"~~**Pledge Agreement**~~" ~~means a pledge agreement substantially in the form of Exhibit [___], as it may be amended, supplemented or otherwise modified from time to time.~~

"**Prepayment Date**" as defined in Section ~~2.10~~2.12(c).

"**Prepayment Premium**" means, with respect to any prepayment of any Loans, a fee payable on the amount so prepaid as follows:

| Relevant period (number of months elapsed since the Closing Date) | Prepayment Premium as a percentage of the amount so prepaid |
|---|---|
| prior to the 12 month anniversary | 2.0% |
| on or after the 12 month anniversary but prior to the 24 month anniversary | 1.0% |
| on or after the 24 month anniversary | 0.0% |

"**Prime Rate**" means the prime lending rate as publicly announced from time to time by JPMorgan Chase Bank, N.A.

"**Prior Agreement**" is defined in the Recitals hereto.

"**Principal Office**" means, for any Person, such Person's "Principal Office" as set forth on Appendix B, or such other office as such Person may from time to time designate in writing to Company, Administrative Agent and each Lender.

"**Projections**" as defined in Section 4.8.

"**Pro Rata Share**" means with respect to all payments, computations and other matters relating to the Loan of any Lender, the percentage obtained by dividing (a) the Loan Exposure of that Lender, by (b) the aggregate Loan Exposure of all Lenders.

"**Rabo Bank Account**" means account no. _____ established by the Company at Rabo Bank in its _____ branch, located in [Amsterdam], The Netherlands.

"**Rate Management Agreement**" means any agreement entered into by a Credit Party in respect of a Rate Management Transaction.

"**Rate Management Transaction**" means any transaction (including an agreement with respect thereto) now existing or hereafter entered by any Credit Party which is a rate swap, ~~basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction,~~ cap transaction, floor transaction, collar transaction, forward transaction~~, currency swap transaction, cross-currency rate swap transaction, currency option~~ or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether linked to one or more interest rates~~, foreign currencies, commodity prices, equity prices~~ or other financial measures.

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Credit Party in any real property.

"**Record Document**" means, with respect to any Leasehold Property, (i) the lease evidencing such Leasehold Property or a memorandum thereof, executed and acknowledged by the owner of the affected real property, as lessor, or (ii) if such Leasehold Property was acquired or subleased from the holder of a Recorded Leasehold Interest, the applicable assignment or sublease document, executed and acknowledged by such holder, in each case in form sufficient to give such constructive notice upon recordation and otherwise in form reasonably satisfactory to Collateral Agent.

"**Recorded Leasehold Interest**" means a Leasehold Property with respect to which a Record Document has been recorded in all places necessary or desirable, in Administrative Agent's reasonable judgment, to give constructive notice of such Leasehold Property to third-party purchasers and encumbrancers of the affected real property.

"**Register**" as defined in Section 2.4(b).

"**Regulation D**" means Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"**Related Fund**" means, with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor. With respect to Silver Point, Related Fund shall also include any swap, special purpose vehicles purchasing or acquiring security interests in collateralized loan obligations or any other vehicle through which Silver Point may leverage its investments from time to time.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Replacement Lender**" as defined in Section ~~2.17~~2.20.

"**Requisite Lenders**" means one or more Lenders having or holding Loan Exposure representing more than fifty percent (50%) of the aggregate Loan Exposure of all Lenders.

"**Restricted Junior Payment**" means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of Company now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class; (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of Company now or hereafter outstanding; (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of Capital Stock of Company now or hereafter outstanding; (iv) any prepayment (whether voluntary or mandatory) of principal of, premium, if any, or any pre-payment of interest on, or early redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar early payment with respect to, any Subordinated Indebtedness; and (v) any management fees or consulting fees payable to any Equity Investor or any Affiliate of any Equity Investor (provided that consulting fees paid to Johan van den Berg pursuant to an agreement permitted under Section 6.11 of this Agreement shall not constitute Restricted Junior Payments); and (vi) any payment (whether voluntary or mandatory) of principal of, liquidation preference, premium, if any, or interest on, or redemption, purchase, retirement of, Series APIK Preferred Stock, and other Disqualified Stock. For avoidance of doubt, no scheduled repayment of Subordinated PIK A Notes pursuant to the terms of the Subordinated Note Documents (including without limitation a repayment of up to $5,000,000 in original principal amount of Subordinated PIK A Notes plus all capitalized and accrued interest thereon on March 31, 2010 and each anniversary thereof to the extent not previously repaid in full) shall constitute a Restricted Junior Payment hereunder.

"**Restructuring Costs**" means for the period ending on the Effective Date, all fees, costs and other expenses incurred by the Company or any of its Subsidiaries in connection with the Bankruptcy Case, the Plan and the financial restructuring contemplated thereby, including, without limitation, all Transaction Costs, professional fees, fresh start accounting expenses of KPMG or Accuval (or any replacement firm), employee severance or termination payments and other costs and expenses, in each case in the maximum amounts approved by the Bankruptcy Court (to the extent subject to Bankruptcy Court approval), and for the period commencing on the first day after the Effective Date and ending on March 31, 2010, costs and expenses of the type and in amounts not to exceed the amounts set forth on Schedule Q.

"**S&P**" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc.

"**Secured Parties**" has the meaning assigned to that term in the Pledge Agreement or the Security Agreement, as the context requires.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim

certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Account**" means any "securities account" as defined in the UCC.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Securities Laws**" means the Securities Act, the Exchange Act, Sarbanes-Oxley Act of 2002 and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the Securities and Exchange Commission or the Public Company Accounting Oversight Board, as each of the foregoing may be amended and in effect on any applicable date hereunder.

"**Security Agreement**" means a security agreement executed by HoldCo, Company and each Subsidiary of Company that executes this Agreement as a Guarantor substantially in the form of Exhibit [    ]L, as it may be amended, supplemented or otherwise modified from time to time.

"**Series A Preferred Stock**" means the shares of Series A preferred stock, par value $0.001 per share, issued by the Company and outstanding from time to time.

"**Silver Point**" as defined in the preamble hereto.

"**Snowflake Personal Property**" means all of the personal property located at Company's Snowflake facility in which the Company has granted a first-priority security interest for the benefit of the holders of the First Lien Mortgage Notes securing the obligations represented thereby.

"**Solvent**" means, with respect to any Credit Party, that as of the date of determination, both (i) (a) the sum of such Credit Party's debt and liabilities (including contingent liabilities) does not exceed the present fair saleable value of such Credit Party's present assets; (b) such Credit Party's capital is not unreasonably small in relation to its business as contemplated on the Closing Date and reflected in the Projections or with respect to any transaction contemplated or undertaken after the Closing Date; and (c) such Person has not incurred and does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise); and (ii) such Person is "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"**SP Eurofresh**" means SP Eurofresh LLC, a Delaware limited liability company that is affiliated with Silver Point.

"**SPC**" as defined in Section 10.7.

"**Subject Transaction**" as defined in Section 6.7(e̶d).

"**Subordinated** ~~PIK~~Notes" means the Subordinated PIK Notes and the Subordinated PIK A Notes, collectively and without differentiation, in each case as amended, restated, refinanced, or otherwise modified from time to time to the extent permitted in this Agreement.

"**Subordinated** Note Documents" means the Subordinated PIK Note Purchase Agreement, each of the Subordinated ~~PIK~~ Notes, the Subordination Agreement and [_____].

"**Subordinated PIK Note Purchase Agreement**" means the Subordinated PIK Note Purchase Agreement, dated as of [_____], 2009, by and among Eurofresh, Inc. and the purchasers party thereto, as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms hereof and thereof.

"**Subordinated PIK A Notes**" means the Subordinated PIK A Notes defined in the Subordinated PIK Note Purchase Agreement, as amended, restated, refinanced or otherwise modified from time to time to the extent permitted in this Agreement.

"**Subordinated PIK Notes**" means the Subordinated PIK ~~A~~ Notes ~~and~~defined in the Subordinated PIK ~~Notes, as each such term is defined in the Plan~~Note Purchase Agreement, as amended, restated, refinanced or otherwise modified from time to time to the extent permitted in this Agreement.

"**Subordinated Indebtedness**" means (i) the Subordinated ~~PIK~~ Notes and (ii) other subordinated indebtedness of the Company permitted pursuant to ~~Section~~Sections 6.1(n̶m), 6.1(m) and 6.1(o).

"**Subordination Agreement**" means the Subordination Agreement, dated as of [_____], 2009, by and among Eurofresh, Inc. and the purchasers under the Subordinated PIK Note Purchase Agreement, the Administrative Agent, and the Lenders party thereto, as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms hereof and thereof.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, partnership, limited liability company, association, joint venture or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Syndication Agent**" as defined in the preamble hereto.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed, and any interest, penalties or additional amounts thereon.

"**Tax-Related Person**" means any Person (including a beneficial owner of an interest in a pass-through entity) who is required to include in income amounts received, whether or not distributed, by an Agent, a Lender or Participant or any Tax Related Person of any of the foregoing.

"**Terminated Lender**" as defined in Section ~~2.17~~2.20.

"**Terrorism Laws**" means any of the following (a) Executive Order 13224 issued by the President of the United States, (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations), (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), (d) the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), (e) the Patriot Act (as it may be subsequently codified), (f) all other present and future legal requirements of any Governmental Authority addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and (g) any regulations promulgated pursuant thereto or pursuant to any legal requirements of any Governmental Authority governing terrorist acts or acts of war.

"**Total Secured Leverage Ratio**" means the ratio as of the last day of any Fiscal Quarter or other date of determination of:

(i) Consolidated Total ~~Net~~Secured Debt as of such day, to

(ii) Consolidated Adjusted EBITDA for the four (4)-Fiscal Quarter period ending on such date (or if such date of determination is not the last day of a Fiscal Quarter, for the four (4)-Fiscal Quarter period ending as of the most recently concluded Fiscal Quarter).

~~"**Transaction Costs**" means the fees, costs and expenses incurred by Company or any of Company's Subsidiaries on or before the Closing Date in connection with the transactions contemplated by the Credit Documents and paid in full within seventy-five (75) days after the Closing Date.~~

"**Transaction Documents**" means the Plan, the Confirmation Order, the Organizational Documents, the Subordinated Note Documents and the PIK ~~Notes Documents, the Series A~~ Preferred Stock~~, the First Lien Mortgage Notes and [_____]~~.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"**Unadjusted LIBOR Rate Component**" means that component of the interest costs to Company in respect of a LIBOR Rate Loan that is based upon the rate obtained pursuant to clause (B)(i) of the definition of Adjusted LIBOR Rate.

"**Van Den Berg Person**" means Johan van den Berg and his wholly owned and controlled personal investment companies, spouse, siblings, lineal descendants (including adopted children and their lineal descendants) and any trust or entity owned, controlled by or established for the benefit of, or the estate of, any of the foregoing.

"**Waivable Prepayment**" as defined in Section 2.102.12(c).

"**Working Capital**" means (a) the sum of Accounts Receivable, Inventories, Crop Development Costs and Prepaid & Other Current Assets, minus (b) the sum of Accounts Payable and Accrued Expenses.all current assets determined in accordance with GAAP (excluding Cash and any asset which has arisen as a result of Commodity Hedging Transactions) minus all current liabilities determined in accordance with GAAP (excluding the current portion of long-term debt and any liability which has arisen as a result of Commodity Hedging Transactions).

1.2     **Accounting Terms**.

Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Credit Document, and Company or Administrative Agent shall so request, Administrative Agent and Company shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of Requisite Lenders), provided that, until so amended, such ratio or requirement (and the Credit Parties' compliance therewith) shall continue to be computed in accordance with GAAP prior to such change therein and Company shall provide to Administrative Agent and Lenders reconciliation statements requested by Administrative Agent (reconciling the computations of such financial ratios and requirements from the then-current GAAP computations to the computations under GAAP prior to such change) in connection therewith.  Financial statements and other information required to be delivered by Company to Lenders pursuant to Sections 5.1(a), 5.1(b) and 5.1(c) shall be prepared in accordance with GAAP as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in Section 5.1(e), if applicable).  Subject to the foregoing, calculations in connection with the definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements.

1.3     **Interpretation**, **etc**.  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided.  The use herein of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not no limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  Unless otherwise indicated, any definition of or reference to any agreement, instrument or other document herein

shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

## SECTION 2.  LOANS.

### 2.1  **Loans**.

(a)  <u>Loans of Each Lender</u>.  Subject to the terms and conditions hereof, each Lender with a Loan Commitment severally agrees ~~to make, on the Closing Date, a Loan to Company in an amount set forth in  Exhibit A~~that on the Closing Date the outstanding principal amount of "Obligations" owing to such Lender under the Existing Agreement shall automatically and without further action be exchanged for and converted into a Loan deemed made by such Lender hereunder in an amount equal to such Lender's Loan Allocation, in accordance with the Exchange Offer.  Without limiting or qualifying the foregoing, and for avoidance of doubt, Company hereby acknowledges, confirms and agrees that the "Obligations" outstanding under the Existing Agreement as of the Closing Date constitute Loans made hereunder by Lenders on the Closing Date in the aggregate outstanding amount equal to [$52,047,507.64][1].  There shall be only one borrowing (or deemed borrowing) with respect to the Loan Commitments which shall be on the Closing Date in accordance with this Section 2.1.  For avoidance of doubt, all Loans shall be deemed fully funded (by virtue of the Debt Exchange in accordance with Section 2.1).  Each Lender's Loan Commitment shall terminate immediately and without further action on the Closing Date.  The Loans borrowed under this Section 2.1(a) and subsequently repaid or prepaid may not be reborrowed.  Subject to Sections ~~2.7, 2.8~~2.9, 2.10 and ~~2.9~~2.11, all amounts owed hereunder with respect to the Loans shall be paid in full no later than the Maturity Date.

(b)  <u>Funding Notice; Replacement of Prior Agreement</u>.

(i)  Company shall deliver to Administrative Agent a fully executed Funding Notice no later than ~~one (1~~12:00 noon (New York City time) three (3) Business ~~Day~~Days prior to the anticipated Closing Date.  For the avoidance of doubt, the parties acknowledge and agree that this Agreement is intended to be a refinancing and replacement of the Prior Agreement, and that the total amount of Loans initially outstanding hereunder, and to be reflected in such Funding Notice, shall be equal in amount to the total aggregate amount outstanding under the Prior Agreement as of the Closing Date (after giving effect to the partial repayment of amounts outstanding under the Prior Agreement as set forth in the Plan).  Promptly upon receipt by Administrative Agent of such Funding Notice, Administrative Agent shall notify each Lender of the anticipated Closing Date.

---

[1]  Amount (based on principal, accrued interest, and default interest, including satisfaction of $200,000 in advisory fees) is an estimate as of October 31, 2009 and after giving effect to the $20,000,000 payment contemplated in the Plan.  Any amount thereafter should be calculated accordingly.  This footnote will be deleted when the amount is finally determined.

(ii)     Upon satisfaction or waiver of the conditions precedent specified herein, this Agreement shall refinance and replace, in its entirety, the Prior Agreement and all amounts outstanding thereunder shall become Loans under this Agreement.

**2.2     Pro Rata Shares**.  All Loans shall be made, and all participations purchased, by Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby.

**2.3     Use of Proceeds**.  The proceeds of the Loans made on the Closing Date shall be applied by Company to refinance all amounts outstanding under the Prior Agreement, as contemplated by the terms of the Plan.  No portion of the proceeds of any Credit Extension shall be used in any manner that causes or might cause such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation thereof or to violate the Exchange Act.

**2.4     Evidence of Debt; Register; Lenders' Books and Records; Notes**.

(a)     <u>Lenders' Evidence of Debt</u>.  Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of Company to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on Company, absent manifest error; <u>provided</u>, that the failure to make any such recordation, or any error in such recordation, shall not affect any Company's Obligations in respect of any applicable Loans; and provided further, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)     <u>Register</u>.  Administrative Agent shall maintain at its Principal Office a register for the recordation of the names and addresses of Lenders and the Loans of each Lender from time to time (the "**Register**").  The Register shall be available for inspection by Company, and a redacted version of the Register showing the entries with respect to any Lender shall be available for inspection by such Lender, at any reasonable time and from time to time upon reasonable prior notice.  Administrative Agent shall record in the Register the Loans, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on Company and each Lender, absent manifest error; <u>provided</u>, failure to make any such recordation, or any error in such recordation, shall not affect Company's Obligations in respect of any Loan.  Company hereby designates the entity serving as Administrative Agent to serve as Company's agent solely for purposes of maintaining the Register as provided in this Section 2.4, and Company hereby agrees that, to the extent such entity serves in such capacity, the entity serving as Administrative Agent and its officers, directors, employees, agents and affiliates shall constitute "Indemnitees."

(c)     <u>Notes</u>.  If so requested by any Lender by written notice to Company (with a copy to Administrative Agent) at least two (2) Business Days prior to the Closing Date, or at any time thereafter, Company shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to Section 10.6)

on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after Company's receipt of such notice) a Note or Notes to evidence such Lender's Loans.

**2.5** **Interest on Loans**.

(a) Except as otherwise set forth herein, each Loan shall bear

(i) (a) Except as otherwise set forth herein, each Loan shall bear cash interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof, at a rate per annum equal to the higher of (A) if a Base Rate Loan, at the Base Rate plus the Applicable Margin, or (B) the minimum rate necessary to comply with Section 1129 of the Bankruptcy Code (as determined by the Bankruptcy Court in connection with the Bankruptcy Case)., if a LIBOR Rate Loan, at the Adjusted LIBOR Rate plus the Applicable Margin, plus

(ii) interest payable in-kind on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof, at a rate of three percent (3%) per annum, with such amount to be paid by an automatic increase in the outstanding principal amount of the Loans as of each Interest Payment Date.

(b) The basis for determining the rate of cash interest with respect to any Loan, and the Interest Period with respect to any LIBOR Rate Loan, shall be selected by Company and notified to Administrative Agent and Lenders pursuant to the applicable Funding Notice or Conversion/Continuation Notice, as the case may be. If on any day a LIBOR Rate Loan is outstanding with respect to which a Funding Notice or Conversion/Continuation Notice has not been delivered to Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then for that day such Loan shall be a Base Rate Loan.

(c) In connection with LIBOR Rate Loans there shall be no more than two (2) Interest Periods outstanding at any time. In the event Company fails to specify between a Base Rate Loan or a LIBOR Rate Loan in the applicable Funding Notice or Conversion/Continuation Notice, such Loan (if outstanding as a LIBOR Rate Loan) will be automatically converted into a Base Rate Loan on the last day of the then current Interest Period for such Loan (or if outstanding as a Base Rate Loan will remain as, or (if not then outstanding) will be made as, a Base Rate Loan). In the event Company fails to specify an Interest Period for any LIBOR Rate Loan in the applicable Conversion/Continuation Notice, Company shall be deemed to have selected an Interest Period of one month. As soon as practicable after 12:00 noon. (New York City time) on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the LIBOR Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to Company and each Lender.

(d) (b) Interest payable pursuant to Section 2.5(a) shall be computed on the basis of a three hundred sixty (360) day year with respect to LIBOR Rate Loans and a three hundred sixty-five/sixty-six (365/66) day year with respect to Base Rate Loans, in each case for

the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted from a LIBOR Rate Loan, the date of conversion of such LIBOR Rate Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan ~~shall be excluded~~or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a LIBOR Rate Loan, the date of conversion of such Base Rate Loan to such LIBOR Rate Loan, as the case may be, shall be excluded; provided, if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(e) ~~(c)~~ Except as otherwise set forth herein, interest on each Loan shall be payable in arrears (i) on each Interest Payment Date applicable to that Loan; (ii) upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) at maturity, including final maturity.

**2.6** **Conversion/Continuation**.

(a) Subject to Section 2.15 and so long as no Default or Event of Default shall have occurred and then be continuing, Company shall have the option:

(i) to convert at any time all or any part of any Loan equal to $500,000 and integral multiples of $100,000 in excess of that amount from one Type of Loan to another Type of Loan; provided, a LIBOR Rate Loan may only be converted on the expiration of the Interest Period applicable to such LIBOR Rate Loan unless Company shall pay all amounts due under Section 2.15 in connection with any such conversion; or

(ii) upon the expiration of any Interest Period applicable to any LIBOR Rate Loan, to continue all or any portion of such Loan equal to $500,000 and integral multiples of $100,000 in excess of that amount as a LIBOR Rate Loan.

(b) Company shall deliver a Conversion/Continuation Notice to Administrative Agent no later than 12:00 noon (New York City time) at least one Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan) and at least three (3) Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, a LIBOR Rate Loan). Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, any LIBOR Rate Loans (or telephonic notice in lieu thereof) shall be irrevocable on and after the related Interest Rate Determination Date, and Company shall be bound to effect a conversion or continuation in accordance therewith.

**2.7** ~~2.6~~ **Default Interest**. Upon the occurrence and during the continuance of an Event of Default, the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder, shall thereafter bear interest (including post petition interest in any proceeding under the Bankruptcy Code or other applicable bankruptcy laws, whether or not allowed in such a proceeding) payable on demand at a rate that is two percent (2%) per annum in excess of the interest rate otherwise payable hereunder with respect to ~~Loans hereunder~~the applicable Loans (or, in the case of any such

fees and other amounts, at a rate which is two percent (2.0%) per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans); provided, in the case of LIBOR Rate Loans, upon the expiration of the Interest Period in effect at the time any such increase in interest rate is effective such LIBOR Rate Loans shall thereupon become Base Rate Loans and shall thereafter bear interest payable upon demand at a rate which is two percent (2.0%) per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans. Payment or acceptance of the increased rates of interest provided for in this Section 2.62.7 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent or any Lender.

**2.8    Administrative Agent and Collateral Management Fee.**  On the Closing Date and on each anniversary of Closing Date until all Obligations have been paid and performed in full, the Company shall pay to the Administrative Agent for its own account an annual Administrative Agent and Collateral Management Fee in an amount equal to 0.25% (25 bps) of the total outstanding balance of Obligations on such date. The Administrative Agent and Collateral Management Fee shall be fully earned when paid and non-refundable.  For avoidance of doubt, no "closing fee" shall be due in respect of the consummation of the Debt Exchange.

**2.9    2.7 Scheduled Payments**.  The principal amounts of the Loans shall be repaid in one (1) installment on the Maturity Date.

**2.10    2.8 Voluntary Prepayments**.

(a)    Any time and from time to time, with respect to any Loan:

(i)    with respect to Base Rate Loans, Company may prepay any such Loans on any Business Day in whole or in part, in any amount, without fee, charge or penalty of any kind.  an aggregate minimum amount of $500,000 and integral multiples of $100,000 in excess of that amount; and

(ii)    with respect to LIBOR Rate Loans, Company may prepay any such Loans on any Business Day in whole or in part (together with any amounts due pursuant to Section 2.15(c)) in an aggregate minimum amount of $500,000 and integral multiples of $100,000 in excess of that amount.

(b)    All such prepayments shall be made upon not less than one (1):

(i)    upon not less than one Business Day's prior written or telephonic notice in the case of Base Rate Loans; and

(ii)    upon not less than three (3) Business Days' prior written or telephonic notice in the case of LIBOR Rate Loans,

in each case given to Administrative Agent by 1:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed in writing to Administrative Agent (and Administrative Agent will promptly transmit such telephonic or original notice for Loans by telefacsimile or telephone to each Lender).  Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date

specified therein.  Any such voluntary prepayment shall be applied as specified in Section ~~2.10~~2.12(a).

**2.11** ~~2.9~~ **Mandatory Prepayments**.

(a)    Asset Sales.  No later than the ~~fifteenth (15th~~first (1^(st)) Business Day following the date of receipt by Company or any of its Subsidiaries of any Net Asset Sale Proceeds, Company shall prepay the Loans in an aggregate amount equal to such Net Asset Sale Proceeds; provided, (i) so long as no Default or Event of Default shall have occurred and be continuing, and (ii) to the extent that aggregate Net Asset Sale Proceeds from the Closing Date through the applicable date of determination do not exceed $~~1,500,000,~~750,000, Company shall have the option, directly or through one or more of its Subsidiaries, to invest Net Asset Sale Proceeds within one hundred eighty (180) days of receipt thereof in long term productive assets of the general type used in the business of Company and its Subsidiaries; provided further, pending any such investment all such Net Asset Sale Proceeds shall be placed in a blocked Securities Account or blocked Deposit Account governed by a Control Agreement in favor of the Collateral Agent.

(b)    Insurance/Condemnation Proceeds.  No later than the ~~fifteenth (15th~~first (1^(st)) Business Day following the date of receipt by Company or any of its Subsidiaries, or Administrative Agent as loss payee, of any Net Insurance/Condemnation Proceeds, Company shall prepay the Loans in an aggregate amount equal to such Net Insurance/Condemnation Proceeds; provided, (i) so long as no Default or Event of Default shall have occurred and be continuing, and (ii) to the extent that aggregate Net Insurance/Condemnation Proceeds from the Closing Date through the applicable date of determination do not exceed $~~1,500,000,~~750,000, Company shall have the option, directly or through one or more of its Subsidiaries to invest such Net Insurance/Condemnation Proceeds within one hundred eighty (180) days of receipt thereof in the repair, restoration or replacement of the applicable assets thereof; provided further, pending any such investment all such Net Insurance/Condemnation Proceeds, as the case may be, shall be placed in a blocked Securities Account governed by a Control Agreement in favor of the Collateral Agent.

(c)    Issuance of Equity Securities.  ~~No later than the fifteenth (15th) Business Day following~~On the date of receipt by ~~Company~~a Credit Party of any Cash proceeds from a capital contribution to, or the issuance of any Capital Stock of, HoldCo, Company or any of its Subsidiaries (other than Capital Stock issued pursuant to any employee stock or stock option compensation plan ~~or Capital Stock issued in accordance with Section 6.7(d) hereof~~), Company shall prepay the Loans in an aggregate amount equal to (i) one hundred percent (100%) of such proceeds if such Capital Stock is issued pursuant to Section 6.7(e) hereof, and (ii) fifty percent (50%) of such proceeds, for any issuance of Capital Stock other than pursuant to Section 6.7(e) hereof, in each case net of any applicable underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses. For avoidance of doubt, so long as no cash consideration is provided in connection therewith, no issuance of Capital Stock of HoldCo or the Company in whole or partial repayment of Subordinated Notes in accordance with the Subordinated Note Documents shall be deemed to generate Cash proceeds for purposes of this Section.

(d) <u>Issuance of Debt</u>. ~~No later than the fifteenth (15th) Business Day following~~On the date of receipt by Company or any of its Subsidiaries of any Cash proceeds from the incurrence of any Indebtedness of Company or any of its Subsidiaries (other than with respect to any Indebtedness permitted to be incurred pursuant to Sections 6.1(a)-~~(m) or 6.7(d) hereof~~l) or 6.1(o) hereof), including any issuance of Subordinated Indebtedness issued in connection with the exercise of cure rights pursuant to Section 6.7(e), Company shall prepay the Loans in an aggregate amount equal to one hundred percent (100%) of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(e) <u>Consolidated Excess Cash Flow</u>. In the event that there shall be Consolidated Excess Cash Flow for any Fiscal Year (commencing with ~~the first full~~ Fiscal Year ~~following the Closing Date~~ending December 31, 2010), Company shall, no later than the ~~anniversary of the Closing Date immediately following~~earlier of (i) ninety-five (95) days after the end of such Fiscal Year and (ii) the delivery of annual financial statements pursuant to Section 5.1(c) with respect to such Fiscal Year, prepay the Loans in an aggregate amount equal to ~~fifty~~seventy-five percent (~~50~~75%) of such Consolidated Excess Cash Flow. The payment obligation in the preceding sentence shall be reduced in whole or in part to the extent necessary, but only to the extent necessary, to provide that Company shall have, after giving effect to such payment of Consolidated Excess Cash Flow, Cash and Cash Equivalents in an aggregate amount equal to at least $~~[10,000,000]~~7,500,000 in cash as determined by the balance sheet as at the last day of the Fiscal Year with respect to which the applicable payment is being made, after giving effect to the mandatory prepayment required under this subclause (e).

(f) <u>Extraordinary Receipts</u>. No later than the ~~fifteenth (15th~~first (1st) Business Day following the date of receipt by Company or any of its Subsidiaries of any Extraordinary Receipts, Company shall prepay the Loans in an aggregate amount equal to such Extraordinary Receipts.

(g) <u>Prepayment Certificate</u>. Concurrently with any prepayment of the Loans pursuant to Sections ~~2.9~~2.11(a)-(f), Company shall deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable net proceeds, Consolidated Excess Cash Flow or other applicable financial tests or proceeds giving rise to the prepayment, as the case may be. In the event that Company shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, Company shall promptly make an additional prepayment of the Loans in an amount equal to such excess, and Company shall concurrently therewith deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the derivation of such excess.

(h) ~~Mandatory Prepayments under First Lien Mortgage Notes. In the event that Company or any of its Subsidiaries is required to make a mandatory prepayment pursuant to Sections 2.9(a)-(f), Company shall also prepay amounts outstanding under the First Lien Mortgage Note in an amount equal to the portion of such aggregate prepayment amount as shall be allocable to the obligations thereunder as provided herein. For purposes of this provision, the portion of any prepayment amount allocable to obligations under the First Lien Mortgage Note and to the Loans, respectively, shall be determined pro rata based on the aggregate amounts outstanding under thereunder and hereunder, respectively, at the time of determination, and the making of such~~

~~prepayment on a pro rata basis be deemed to constitute full performance of all prepayment obligations arising under this Agreement in respect of such event. In the event that prepayment amount allocable to the First Lien Mortgage Note in respect of a mandatory prepayment exceeds the amount required to repay in full all obligations outstanding thereunder, or such obligations under the First Lien Mortgage Notes previously shall have been paid in full, the remaining or entire amount of mandatory prepayment proceeds, as the case may be, shall be applied to prepay the Loans.~~ Prepayment Premium. If Company prepays, for any reason, voluntarily or as required by this Agreement (including any mandatory prepayment pursuant to Section 2.11 other than payments or mandatory prepayments made pursuant to Section 2.11(e)) whether as a result of an acceleration following an Event of Default or otherwise, all or any part of the principal balance of any Loan, then Company shall pay to Administrative Agent, for the benefit of all Lenders entitled to a portion of such prepayment, together with the principal balance being repaid or prepaid, the applicable Prepayment Premium, if any.

**2.12** ~~2.10~~ **Application of Prepayments**.

(a) Application of Voluntary Prepayments of Loans. Any voluntary prepayment of any Loan pursuant to Section ~~2.8,~~ 2.10, shall be applied first, to the payment of the Prepayment Premium, if any, applicable to such repayment, and thereafter, to repay outstanding Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof).

(b) Application of Mandatory Prepayments. Any mandatory prepayment of any Loan pursuant to Section ~~2.9~~ 2.11 shall be applied as follows:

*first*, to the payment of all expenses and fees to the full extent thereof;

*second*, to the payment of any accrued interest at the Default Rate, if any;

*third*, to the payment of the Prepayment Premium, if any, on any Loan;

*fourth*, to the payment of any accrued interest ~~and~~(including interest paid in kind) (other than that calculated at the Default Rate and paid in clause "*second*" above);

*fifth,* and~~*fourth,*~~ to prepay Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof).

(c) Waiver of Certain Prepayments. Anything contained herein to the contrary notwithstanding, in the event Company is required to make any mandatory prepayment (a "**Waivable Prepayment**"), not less than three (3) Business Days prior to the date (the "**Prepayment Date**") on which Company is required to make such Waivable Prepayment, Company shall notify Administrative Agent of the amount of such prepayment, and Administrative Agent will promptly thereafter notify each Lender holding an outstanding Loan of the amount of such Lender's Pro Rata Share of such Waivable Prepayment and such Lender's option to refuse such amount. Each such Lender may exercise such option by giving written notice to Company and Administrative Agent of its election to do so on or before the first Business Day prior to the Prepayment Date (it being understood that any Lender which does not notify Company

and Administrative Agent of its election to exercise such option on or before the first Business Day prior to the Prepayment Date shall be deemed to have elected, as of such date, not to exercise such option). On the Prepayment Date, Company shall pay to Administrative Agent the amount of the Waivable Prepayment, which amount shall be applied (i) in an amount equal to that portion of the Waivable Prepayment payable to those Lenders that have elected not to exercise such option, to prepay the Loans of such Lenders (which prepayment shall be applied to the scheduled installments of principal of the Loans in accordance with Section 2.102.12(b)), and (ii) to the extent of any excess, to Company for working capital and general corporate purposes.

(d) Application of Prepayments of Loans to Base Rate Loans and LIBOR Rate Loans. Considering each Class of Loans being prepaid separately, any prepayment thereof shall be applied first to Base Rate Loans to the full extent thereof before application to LIBOR Rate Loans, in each case in a manner which minimizes the amount of any payments required to be made by Company pursuant to Section 2.15(c).

**2.13** 2.11 **General Provisions Regarding Payments**.

(a) All payments by Company of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without, recoupment, setoff, counterclaim or other defense free of any restriction or condition, and delivered to Administrative Agent not later than 1:00 p.m. (New York City time) on the date due to Administrative Agent's Account for the account of Lenders; funds received by Administrative Agent after that time on such due date shall be deemed to have been paid by Company on the next Business Day.

(b) All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid and any Prepayment Premium payable in connection therewith.

(c) Administrative Agent shall promptly distribute to each Lender at such address as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including all fees payable with respect thereto, to the extent received by Administrative Agent.

(d) Notwithstanding the foregoing provisions hereof, if any Conversion/ Continuation Notice is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its Pro Rata Share of any LIBOR Rate Loans, Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(e) Subject to the proviso set forth in the definition of "Interest Period," whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder.

(f) (d) Administrative Agent shall deem any payment by or on behalf of Company hereunder that is not made in same day funds prior to 1:00 p.m. (New York City time) to be a non conforming payment. Any such payment shall not be deemed to have been received by

Administrative Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day.  Interest shall continue to accrue on any principal outstanding as to which a nonconforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the Default Rate determined pursuant to Section ~~2.6~~2.7 from the date such amount was due and payable until the date such amount is paid in full.

(g)     If an Event of Default shall have occurred and not otherwise been waived, all payments or proceeds received by Agents hereunder in respect of any of the Obligations shall be applied:

~~(e)     If an Event of Default shall have occurred and not otherwise been waived, all payments or proceeds received by Agents hereunder in respect of any of the Obligations shall be applied~~ *first,* to pay any costs and expenses then due Collateral Agent in connection with the foreclosure or realization upon, the disposal, storage, maintenance or otherwise dealing with any of, the Collateral or otherwise, and indemnities and other amounts then due to Collateral Agent under the Credit Documents until paid in full, ~~second, to pay any costs, expenses, indemnities, fees or premiums then due to Administrative Agent under the Credit Documents until paid in full, third, ratably to pay any expenses or indemnities then due to any of the Lenders under the Credit Documents, until paid in full, fourth, ratably to pay interest due in respect of the Loans~~ until paid in full, ~~fifth,~~ ratably to pay the principal amount of the Loans (applied to installments due thereunder in the inverse order of maturity) then outstanding until paid in full, and ~~sixth~~, to pay ratably any other Obligations then due and payable.

*second,* to pay any costs, expenses, indemnities, fees or premiums then due to Administrative Agent under the Credit Documents until paid in full,

*third,* ratably to pay any expenses or indemnities then due to any of the Lenders under the Credit Documents, until paid in full,

*fourth,* ratably to pay interest due in respect of the Loans (including interest paid in kind) until paid in full,

*fifth,* ratably to pay any Prepayment Premium then due to the Lenders until paid in full,

*sixth,* ratably to pay the principal amount of the Loans (applied to installments due thereunder in the inverse order of maturity) then outstanding until paid in full, and

*seventh,* to pay ratably any other Obligations then due and payable.

**2.14**   ~~2.12~~ **Ratable Sharing**.  Lenders hereby agree among themselves that, except as otherwise provided in the Collateral Documents with respect to amounts realized from the exercise of rights with respect to Liens on the Collateral, if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the

terms hereof), through the exercise of any right of set off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender hereunder or under the other Credit Documents (collectively, the "**Aggregate Amounts Due**" to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (a) notify Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; <u>provided</u>, if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of Company or otherwise, those purchases to that extent shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest. Company expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set off or counterclaim with respect to any and all monies owing by Company to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

### 2.15    Making or Maintaining LIBOR Rate Loans.

(a)    Inability to Determine Applicable Interest Rate. In the event that Administrative Agent shall have determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any LIBOR Rate Loans, that by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such LIBOR Rate Loans on the basis provided for in the definition of Adjusted LIBOR Rate, Administrative Agent shall on such date give notice (by telefacsimile or by telephone confirmed in writing) to Company and each Lender of such determination, whereupon (i) no Loans may be made as, or converted to, LIBOR Rate Loans until such time as Administrative Agent notifies Company and Lenders that the circumstances giving rise to such notice no longer exist, and (ii) any Funding Notice or Conversion/Continuation Notice given by Company with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by Company.

(b)    Illegality or Impracticability of LIBOR Rate Loans. In the event that on any date any Lender shall have determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with Company and Administrative Agent) that the making, maintaining or continuation of its LIBOR Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful), or (ii) has become impracticable, as a result of contingencies occurring after the date hereof which materially and adversely affect the London interbank market or the position of such Lender in that market, then, and in any such event, such

Lender shall be an "**Affected Lender**" and it shall on that day give notice (by telefacsimile or by telephone confirmed in writing) to Company and Administrative Agent of such determination (which notice Administrative Agent shall promptly transmit to each other Lender). Thereafter (1) the obligation of the Affected Lender to make Loans as, or to convert Loans to, LIBOR Rate Loans shall be suspended until such notice shall be withdrawn by the Affected Lender, (2) to the extent such determination by the Affected Lender relates to a LIBOR Rate Loan then being requested by Company pursuant to a Funding Notice or a Conversion/Continuation Notice, the Affected Lender shall make such Loan as (or continue such Loan as or convert such Loan to, as the case may be) a Base Rate Loan, (3) the Affected Lender's obligation to maintain its outstanding LIBOR Rate Loans (the "**Affected Loans**") shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (4) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination. Company shall pay accrued interest on the amount so converted and all amounts due under Section 2.15(c) in accordance with the terms thereof due to such conversion. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a LIBOR Rate Loan then being requested by Company pursuant to a Funding Notice or a Conversion/Continuation Notice, Company shall have the option, subject to the provisions of Section 2.15(c), to rescind such Funding Notice or Conversion/Continuation Notice as to all Lenders by giving notice (by telefacsimile or by telephone confirmed in writing) to Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission Administrative Agent shall promptly transmit to each other Lender). Except as provided in the immediately preceding sentence, nothing in this Section 2.15(b) shall affect the obligation of any Lender other than an Affected Lender to make or maintain Loans as, or to convert Loans to, LIBOR Rate Loans in accordance with the terms hereof.

(c)     Compensation for Breakage or Non Commencement of Interest Periods. Company shall compensate each Lender, upon written request by such Lender (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including any interest paid or calculated to be due and payable by such Lender to lenders of funds borrowed by it to make or carry its LIBOR Rate Loans and any loss, expense or liability sustained by such Lender in connection with the liquidation or re employment of such funds but excluding loss of anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by such Lender) a borrowing of any LIBOR Rate Loan does not occur on a date specified therefor in a Funding Notice or a telephonic request for borrowing, or a conversion to or continuation of any LIBOR Rate Loan does not occur on a date specified therefor in a Conversion/Continuation Notice or a telephonic request for conversion or continuation; (ii) if any prepayment or other principal payment of, or any conversion of, any of its LIBOR Rate Loans occurs on any day other than the last day of an Interest Period applicable to that Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise); or (iii) if any prepayment of any of its LIBOR Rate Loans is not made on any date specified in a notice of prepayment given by Company.

(d)     Booking of LIBOR Rate Loans. Any Lender may make, carry or transfer LIBOR Rate Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of such Lender.

(e)     Assumptions Concerning Funding of LIBOR Rate Loans.  Calculation of all amounts payable to a Lender under this Section 2.15 and under Section 2.16 shall be made as though such Lender had actually funded each of its relevant LIBOR Rate Loans through the purchase of a LIBOR deposit bearing interest at the rate obtained pursuant to clause (i) of the definition of Adjusted LIBOR Rate in an amount equal to the amount of such LIBOR Rate Loan and having a maturity comparable to the relevant Interest Period and through the transfer of such LIBOR deposit from an offshore office of such Lender to a domestic office of such Lender in the United States of America; provided, however, each Lender may fund each of its LIBOR Rate Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 2.15 and under Section 2.16.

**2.16**     ~~2.13~~ Increased Costs; Capital Adequacy.

(a)     Compensation For Increased Costs and Taxes.  Subject to the provisions of Section ~~2.14~~2.17 (which shall be controlling with respect to the matters covered thereby), in the event that any Lender shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that any law, treaty or governmental rule, regulation or order, or any change therein or in the interpretation, administration or application thereof (including the introduction of any new law, treaty or governmental rule, regulation or order), or any determination of a court or governmental authority, in each case that becomes effective after the date hereof, or compliance by such Lender with any guideline, request or directive issued or made after the date hereof by any central bank or other governmental or quasi governmental authority (whether or not having the force of law):  (i) subjects such Lender (or its applicable lending office) to any additional Tax (other than any Net Income Tax of such Lender) with respect to this Agreement or any of the other Credit Documents or any of its obligations hereunder or thereunder or any payments to such Lender (or its applicable lending office) of principal, interest, fees or any other amount payable hereunder; (ii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender other than any such reserve or other requirements with respect to LIBOR Rate Loans that are reflected in the definition of Adjusted LIBOR Rate; or (iii) imposes any other condition (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) or its obligations hereunder or the London interbank market; and the result of any of the foregoing is to increase the cost to such Lender of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto; then, in any such case, Company shall promptly pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder.  Such Lender shall deliver to Company (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section ~~2.13~~2.16(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b)     Capital Adequacy Adjustment.  In the event that any Lender shall have determined that the adoption, effectiveness, phase in or applicability after the Closing Date of any law, rule or regulation (or any provision thereof) regarding capital adequacy, or any change therein or in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender (or its applicable lending office) with any guideline, request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of, or with reference to, such Lender's Loans, or participations therein or other obligations hereunder with respect to the Loans to a level below that which such Lender or such controlling corporation could have achieved but for such adoption, effectiveness, phase in, applicability, change or compliance (taking into consideration the policies of such Lender or such controlling corporation with regard to capital adequacy), then from time to time, within five (5) Business Days after receipt by Company from such Lender of the statement referred to in the next sentence, Company shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling corporation on an after tax basis for such reduction.  Such Lender shall deliver to Company (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this Section 2.132.16(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

2.17    2.14 Taxes; **Withholding**, etc.

(a)     Payments to Be Free and Clear.  All sums payable by any Credit Party hereunder and under the other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax imposed, levied, collected, withheld or assessed by the United States of America or any political subdivision in or of the United States of America or any other jurisdiction from, through, or to which a payment is made by or on behalf of any Credit Party or by any federation or organization of which the United States of America or any such jurisdiction is a member at the time of payment.

(b)     Withholding of Taxes.  If any Credit Party or any other Person is required by law to make any deduction or withholding on account of any Tax (other than Net Income Tax) from any sum paid or payable under any of the Credit Documents: (i) Company shall notify Administrative Agent of any such requirement or any change in any such requirement as soon as Company becomes aware of it; (ii) Company shall pay any such Tax to the relevant Governmental Authority before the date on which penalties attach thereto; (iii) the sum payable by such Credit Party in respect of which the relevant deduction or withholding is required shall be increased to the extent necessary to ensure that after any such deduction or withholding, Administrative Agent or such Lender, as the case may be, and each of their Tax Related Persons receives on the due date a net sum equal to what it would have received had no such deduction or withholding been required; and (iv) within thirty (30) days after making any such deduction or withholding, Company shall deliver to Administrative Agent an official receipt or other evidence satisfactory to the other affected parties of such deduction or withholding and of the remittance thereof to the relevant taxing or other authority; provided, no such additional amount shall be required to be paid to any Lender under clause (iii) above except to the extent that any change after the date hereof (in the

case of each Lender listed on the signature pages hereof on the Closing Date) or after the effective date of the Assignment Agreement pursuant to which such Lender became a Lender (in the case of each other Lender) in any such requirement for a deduction or withholding shall result in an increase in the rate of such deduction or withholding from that in effect at the date hereof or at the date of such Assignment Agreement, as the case may be, in respect of payments to such Lender.

(c)     Other Taxes.  In addition, the Credit Parties shall pay all Other Taxes to the relevant Governmental Authorities in accordance with applicable law.  The Credit Parties shall deliver to Administrative Agent official receipts or other evidence of such payment reasonably satisfactory to Administrative Agent in respect of any Other Taxes payable hereunder promptly after payment of such Other Taxes.

(d)     Indemnification.  The Credit Parties shall indemnify each Agent and each Lender, within ten (10) days after written demand therefor, for the full amount of any Taxes paid or incurred by such Agent or such Lender or their respective Tax Related Persons, as the case may be, relating to, arising out of, or in connection with any Credit Document or any payment or transaction contemplated hereby or thereby, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority and all reasonable costs and expenses incurred in enforcing the provisions of this Section ~~2.13~~2.16; provided, however, that the Credit Parties shall not be required to indemnify the Agents, Lenders and Participants (i) for any Taxes that would be excluded from a gross-up under the proviso to Section ~~2.14~~2.17(b), (ii)  in duplication of Taxes covered by Sections ~~2.14~~2.17(b) or (c), or (iii) for Net Income Taxes, other than in the case of (A) any matters addressed in Section ~~2.14~~2.17(c) and any indemnification therefor and (B) any payments of expenses and costs made pursuant to this Section ~~2.14~~2.17(d), in which instances  such indemnification shall be made on an after-Tax basis, such that after all required deductions and payments of all Taxes (including Net Income Taxes applicable to amounts covered by this Section ~~2.14~~2.17(d)(iii)(A) or (B)), the Agents, the Lenders and each of their respective Tax Related Persons receives and retains an amount equal to the sum it would have received and retained had it not paid or incurred or been subject to such Taxes or expenses and costs.  A certificate from the relevant Lender or Agent, setting forth in reasonable detail the basis and calculation of such Taxes shall be conclusive, absent manifest error.

(e)     Evidence of Exemption From U.S.  Withholding Tax.  Each Lender that is not a United States Person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for U.S.   federal income tax purposes (a "Non-U.S. Lender") shall deliver to Administrative Agent for transmission to Company, on or prior to the Closing Date (in the case of each Lender listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Lender (in the case of each other Lender), and at such other times as may be necessary in the determination of Company or Administrative Agent (each in the reasonable exercise of its discretion), (i) two (2) original copies of Internal Revenue Service Form W-8BEN, W-8IMY or W-8ECI (or any successor forms), properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by Company to establish that such Lender is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Lender of principal, interest, fees or other amounts payable under any of the Credit Documents or is subject to deduction or withholding at a reduced rate, or (ii) if such Lender is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue

Code and cannot deliver Internal Revenue Service Form W 8ECI pursuant to clause (i) above, a Certificate Regarding Non-Bank Status together with two (2) original copies of Internal Revenue Service Form W-8BEN (or any successor form), properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by Company to establish that such Lender is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Lender of interest payable under any of the Credit Documents.  Each Lender required to deliver any forms, certificates or other evidence with respect to United States federal income tax withholding matters pursuant to this Section ~~2.14~~2.17(e) hereby agrees, from time to time after the initial delivery by such Lender of such forms, certificates or other evidence, whenever a lapse in time or change in circumstances renders such forms, certificates or other evidence obsolete or inaccurate in any material respect, that such Lender shall promptly deliver to Administrative Agent for transmission to Company two (2) new original copies of Internal Revenue Service Form W-8BEN, W-8IMY or W-8ECI, or a Certificate Regarding Non Bank Status and two (2) original copies of Internal Revenue Service Form W-8BEN (or any successor form), as the case may be, properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by Company to confirm or establish that such Lender is not subject to deduction or withholding of United States federal income tax with respect to payments to such Lender under the Credit Documents or is subject to deduction or withholding at a reduced rate, or notify Administrative Agent and Company of its inability to deliver any such forms, certificates or other evidence.  Company shall not be required to pay any additional amount to any Non-U.S. Lender under Section ~~2.14~~2.17(b)(iii), or be subject to an indemnification obligation under Section ~~2.14~~2.17(d), if such Lender shall have failed to deliver the forms, certificates or other evidence referred to in the second sentence of this Section ~~2.14~~2.17(e) that it is legally entitled to deliver; provided, if such Lender shall have satisfied the requirements of the first sentence of this Section ~~2.14~~2.17(e) on the Closing Date or on the date of the Assignment Agreement pursuant to which it became a Lender, as applicable, nothing in this last sentence of this Section ~~2.14~~2.17(e) shall relieve Company of its obligation to pay any additional amounts pursuant this Section ~~2.14~~2.17 in the event that, as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof, such Lender is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing the fact that such Lender is not subject to withholding as described herein.  Nothing in this Section ~~2.14~~2.17 shall be construed to require a Lender, Agent or Participant to provide any forms or documentation that it is not legally entitled to provide.  In those circumstances as shall be necessary to allow payments hereunder to be made free of (or at a reduced rate of) taxes, each Agent shall provide to Company two (2) original copies of Internal Revenue Service form W-8IMY (or any successor form), properly completed and duly executed by each Agent, together with all documentation required to be supplied therewith.

**2.18** ~~2.15~~**Obligation to Mitigate**.  Each Lender agrees that, as promptly as practicable after the officer of such Lender responsible for administering its Loans becomes aware of the occurrence of an event or the existence of a condition that would cause such Lender to become an Affected Lender or that would entitle such Lender to receive payments under Section ~~2.13~~2.16 or ~~2.14,~~2.17, it will, to the extent not inconsistent with the internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Credit Extensions, including any Affected Loans, through another office of such Lender, or (b) take such other measures as such Lender may deem reasonable, if as a result thereof

the circumstances which would cause such Lender to be an Affected Lender would cease to exist or the additional amounts which would otherwise be required to be paid to such Lender pursuant to Section ~~2.13~~2.16 or ~~2.14~~2.17 would be materially reduced and if, as determined by such Lender in its sole discretion, the making, issuing, funding or maintaining of such Loans through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Loans or the interests of such Lender; provided, such Lender will not be obligated to utilize such other office pursuant to this Section ~~2.15~~2.18 unless Company agrees to pay all costs and expenses incurred by such Lender as a result of utilizing such other office as described above. A certificate as to the amount of any such expenses payable by Company pursuant to this Section ~~2.15~~2.18 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Lender to Company (with a copy to Administrative Agent) shall be conclusive absent manifest error.

**2.19** ~~2.16~~ **Defaulting Lenders**. Anything contained herein to the contrary notwithstanding, in the event that any Lender, other than at the direction or request of any regulatory agency or authority, defaults (a "**Defaulting Lender**") in its obligation to fund (a "**Funding Default**") any Loan (a "**Defaulted Loan**"), then (a) during any Default Period with respect to such Defaulting Lender, such Defaulting Lender shall be deemed not to be a "Lender" for purposes of voting on any matters (including the granting of any consents or waivers) with respect to any of the Credit Documents; and (b) to the extent permitted by applicable law, until such time as the Default Excess with respect to such Defaulting Lender shall have been reduced to zero, (i) any voluntary prepayment of the Loans shall, if Administrative Agent so directs at the time of making such voluntary prepayment, be applied to the Loans of other Lenders as if such Defaulting Lender had no Loans outstanding and the outstanding Loans of such Defaulting Lender were zero, and (ii) any mandatory prepayment of the Loans shall, if Administrative Agent so directs at the time of making such mandatory prepayment, be applied to the Loans of other Lenders (but not to the Loans of such Defaulting Lender) as if such Defaulting Lender had funded all Defaulted Loans of such Defaulting Lender, it being understood and agreed that Company shall be entitled to retain any portion of any mandatory prepayment of the Loans that is not paid to such Defaulting Lender solely as a result of the operation of the provisions of this clause (b). Except as otherwise expressly provided in this Section ~~2.16~~2.19, performance by Company of its obligations hereunder and the other Credit Documents shall not be excused or otherwise modified as a result of any Funding Default or the operation of this Section ~~2.16~~2.19. The rights and remedies against a Defaulting Lender under this Section ~~2.16~~2.19 are in addition to other rights and remedies which Company may have against such Defaulting Lender with respect to any Funding Default and which Administrative Agent or any Lender may have against such Defaulting Lender with respect to any Funding Default.

**2.20** ~~2.17~~ **Removal or Replacement of a Lender**. Anything contained herein to the contrary notwithstanding, in the event that: (a) (i) any Lender (an "**Increased Cost Lender**") shall give notice to Company that such Lender is an Affected Lender or that such Lender is entitled to receive payments under Section ~~2.13~~2.16 or ~~2.14~~2.17, (ii) the circumstances which have caused such Lender to be an Affected Lender or which entitle such Lender to receive such payments shall remain in effect, and ~~(iii)~~(iii) such Lender shall fail to withdraw such notice within five (5) Business Days after Company's request for such withdrawal; or (b) (i) any Lender shall become a Defaulting Lender, (ii) the Default Period for such Defaulting Lender shall remain in effect, and ~~(iii)~~(iii) such Defaulting Lender shall fail to cure the default as a result of which it has become a

Defaulting Lender within five (5) Business Days after Company's request that it cure such default; or (c) in connection with any proposed amendment, modification, termination, waiver or consent with respect to any of the provisions hereof as contemplated by Section 10.5(b), the consent of Administrative Agent and Requisite Lenders shall have been obtained but the consent of one or more of such other Lenders (each a "**Non-Consenting Lender**") whose consent is required shall not have been obtained; then, with respect to each such Increased Cost Lender, Defaulting Lender or Non-Consenting Lender (the "**Terminated Lender**"), Administrative Agent may (which, in the case of an Increased-Cost Lender, only after receiving written request from Company to remove such Increased-Cost Lender (which notice may not be given by Company if any Default or Event of Default is then continuing)), by giving written notice to Company and any Terminated Lender of its election to do so, elect to cause such Terminated Lender (and such Terminated Lender hereby irrevocably agrees) to assign its outstanding Loans, if any, in full to one or more Eligible Assignees (each a "**Replacement Lender**") in accordance with the provisions of Section 10.6 and Terminated Lender shall pay any fees payable thereunder in connection with such assignment; provided, (1) on the date of such assignment, the Replacement Lender shall pay to Terminated Lender an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the Terminated Lender; (2) on the date of such assignment, Company shall pay any amounts payable to such Terminated Lender pursuant to Section ~~2.13~~2.16 or ~~2.14~~2.17; and (3) in the event such Terminated Lender is a Non-Consenting Lender, each Replacement Lender shall consent, at the time of such assignment, to each matter in respect of which such Terminated Lender was a Non-Consenting Lender. Upon the prepayment of all amounts owing to any Terminated, such Terminated Lender shall no longer constitute a "Lender" for purposes hereof; provided, any rights of such Terminated Lender to indemnification hereunder shall survive as to such Terminated Lender. Each Replacement Lender shall cure any existing Funding Default of the applicable Defaulting Lender.

## SECTION 3. CONDITIONS PRECEDENT.

**3.1 Closing Date**. ~~The obligation of each Lender to make any Loan on the Closing Date~~Effectiveness of this Agreement and the Debt Exchange contemplated hereunder is subject to the satisfaction, or waiver in accordance with Section 10.5, of the following conditions on or before the Closing Date:

(a) Credit ~~Documents and Eurofresh Sale/Lease~~ Documents. Administrative Agent shall have received sufficient copies of each Credit Document originally executed and delivered by each applicable Credit Party for each Lender~~, and copies of the fully executed Eurofresh Sale Lease Documents~~.

(b) Organizational Documents; Incumbency. Administrative Agent shall have received (i) sufficient copies of each Organizational Document of each Credit Party, as applicable, and, to the extent applicable, certified as of a recent date by the appropriate governmental official, for each Lender, each dated the Closing Date or a recent date prior thereto; (ii) signature and incumbency certificates of the officers of such Person executing the Credit Documents to which it is a party; (iii) resolutions of the Board of Directors or similar governing body of each Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in

full force and effect without modification or amendment; (iv) a good standing certificate from the applicable Governmental Authority of each Credit Party's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Closing Date; and (v) such other documents as Administrative Agent may reasonably request.

(c) <u>Organizational and Capital Structure</u>. The organizational structure and capital structure of Company and its Subsidiaries shall be as set forth on Schedule 4.2.

(d) <u>Restructuring Costs</u>. At least three (3) Business Days prior to the Closing Date, Company shall have delivered to Administrative Agent Company's reasonable best estimate of the Restructuring Costs (other than fees payable to any Agent).

(e) (d) <u>Governmental Authorizations and Consents</u>. Each Credit Party shall have obtained all Governmental Authorizations and all consents of other Persons, in each case that are necessary or advisable in connection with the transactions contemplated by the Credit Documents and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to Administrative Agent. All applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the Credit Documents or the financing thereof and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired.

(f) <u>Real Estate Assets</u>. In order to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid and, subject to any filing and/or recording referred to herein, perfected First Priority security interest in certain Real Estate Assets, Administrative Agent and Collateral Agent shall have received from Company and each applicable Guarantor:

(i) fully executed and notarized Mortgages, in proper form for recording in all appropriate places in all applicable jurisdictions, encumbering each Real Estate Asset listed in Schedule 3.1(f) (each, a "**Closing Date Mortgaged Property**"):

(ii) an opinion of counsel (which counsel shall be reasonably satisfactory to Collateral Agent) in each state in which a Closing Date Mortgaged Property is located with respect to the enforceability of the form(s) of Mortgages to be recorded in such state and such other matters as Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to Collateral Agent;

(iii) in the case of each Leasehold Property that is a Closing Date Mortgaged Property, (1) a Landlord Consent and Estoppel and (2) evidence that such Leasehold Property is a Recorded Leasehold Interest;

(iv)     (a) [CLTA 110.5 endorsements in respect of the previously issued] ALTA mortgagee title insurance policies or unconditional commitments therefor issued by each of the co-insuring title companies reasonably satisfactory to Collateral Agent with respect to each Closing Date Mortgaged Property (each, a "**Title Policy**"), in amounts not less than the fair market value of each Closing Date Mortgaged Property, together with a title report issued by a title company with respect thereto, dated not more than thirty (30) days prior to the Closing Date and copies of all recorded documents listed as exceptions to title or otherwise referred to therein, each in form and substance reasonably satisfactory to Collateral Agent and (B) evidence satisfactory to Collateral Agent that such Credit Party has paid to the title company or to the appropriate governmental authorities all expenses and premiums of the title company and all other sums required in connection with the issuance of each Title Policy and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Mortgages for each Closing Date Mortgaged Property in the appropriate real estate records; and

(v)     evidence of flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System, in form and substance reasonably satisfactory to Collateral Agent.

(g)     Personal Property Collateral.  In order to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid, perfected First Priority security interest in the personal property Collateral, Collateral Agent shall have received:

(i)     evidence satisfactory to Collateral Agent of the compliance by each Credit Party of their obligations under the Security Agreement and the other Collateral Documents (including their obligations to execute and deliver UCC financing statements, originals of securities, instruments and chattel paper and any agreements governing deposit and/or securities accounts as provided therein);

(ii)     A completed Collateral Questionnaire dated the Closing Date and executed by an Authorized Officer of each Credit Party, together with all attachments contemplated thereby, including (A) the results of a recent search, by a Person satisfactory to Collateral Agent, of all effective UCC financing statements (or equivalent filings) made with respect to any personal or mixed property of any Credit Party in the jurisdictions specified in the Collateral Questionnaire, together with copies of all such filings disclosed by such search, and (B) UCC termination statements (or similar documents) duly executed by all applicable Persons for filing in all applicable jurisdictions as may be necessary to terminate any effective UCC financing statements (or equivalent filings) disclosed in such search (other than any such financing statements in respect of Permitted Liens);

(iii)     opinions of counsel (which counsel shall be reasonably satisfactory to Collateral Agent) with respect to the creation and perfection of the security

interests in favor of Collateral Agent in such Collateral and such other matters governed by the laws of each jurisdiction in which any Credit Party or any personal property Collateral is located as Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to Collateral Agent; and

(iv)     evidence that each Credit Party shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument (including without limitation, (i) a Landlord Collateral Access Agreement, Bailee's Letter and/or similar collateral access agreements executed by the landlord of any Leasehold Property and by the applicable Credit Party, and (ii) any intercompany notes evidencing Indebtedness permitted to be incurred pursuant to Section 6.1(b)) and made or caused to be made any other filing and recording (other than as set forth herein) in each case as reasonably required by Collateral Agent.

(h)     (e)  Control Agreements.  Administrative Agent shall have received a duly executed Control Agreement covering each Deposit Account and each Securities Account, other than the Rabo Bank Account.

(i)     (f)  Financial Statements; Projections.  Lenders shall have received from Company (i) the Historical Financial Statements, (ii) pro forma consolidated and consolidating financial statements of Company and its Subsidiaries as at the Closing Date, and reflecting the consummation of the related financings and the other transactions contemplated by the Credit Documents to occur on or prior to the Closing Date, which pro forma financial statements shall be in form and substance satisfactory to Administrative Agent, and (iii) the Projections; provided, that the parties acknowledge that the Disclosure Statement filed by the Company in connection with the Bankruptcy Case shall be sufficient to satisfy this condition.

(j)     (g)  Evidence of Insurance.  Collateral Agent shall have received a certificate from Company's insurance broker or other evidence satisfactory to it that all insurance required to be maintained pursuant to Section 5.5 is in full force and effect, together with endorsements naming Collateral Agent, for the benefit of Secured Parties, as additional insured and loss payee thereunder to the extent required under Section 5.5.

(k)     (h)  Opinions of Counsel to Credit Parties.  Lenders and their respective counsel shall have received originally executed copies of the favorable written opinions of Squire, Sanders & Dempsey LLP, counsel for Credit Parties, in the form of Exhibit DN, dated as of the Closing Date and covering such matters as Administrative Agent may request and otherwise in form and substance satisfactory to Administrative Agent (and each Credit Party hereby instructs such counsel to deliver such opinions to Agents and Lenders).

(l)     Accrued Fees.  Company shall have paid to Administrative Agent in cash (i) the fees payable on the Closing Date referred to in Section 2.8, (ii) all actual and reasonable fees and expenses of the Administrative Agent's outside counsel Milbank, Tweed, Hadley & McCloy, LLP incurred through the Effective Date, (iii) all actual and reasonable monthly fees incurred through October 31, 2009 and expenses incurred through the Effective Date of the Administrative Agent's financial advisor Broadpoint Gleacher Securities Group, Inc., invoiced as of the Effective

Date, and (iv) to the extent approved by the Bankruptcy Court prior to the Effective Date, a success fee to Broadpoint Gleacher Securities Group, Inc. in cash in an amount of $575,000.

(m) Solvency Certificate. On the Closing Date, Administrative Agent shall have received a Solvency Certificate from Company dated as of the Closing Date and addressed to Administrative Agent and Lenders, and in form, scope and substance satisfactory to Administrative Agent, with appropriate attachments and demonstrating that after giving effect to the consummation of the transactions contemplated by the Credit Documents, Company and each of its Subsidiaries is and will be Solvent.

(n) (i) Closing Date Certificate. Company shall have delivered to Administrative Agent an originally executed Closing Date Certificate, together with all attachments thereto.

(o) (j) Closing Date. Lenders shall have made the Loans to Company on or before the Closing Date.

(p) (k) No Litigation. There shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Authority that, in the reasonable opinion of Administrative Agent, singly or in the aggregate, materially impairs any of the transactions contemplated by the Credit Documents, or that could have a Material Adverse Effect.

(q) (l) Completion of Proceedings. All partnership, corporate and other proceedings taken or to be taken in connection with the transactions contemplated hereby and all documents incidental thereto not previously found acceptable by Administrative Agent and its counsel shall be satisfactory in form and substance to Administrative Agent and such counsel, and Administrative Agent, and such counsel shall have received all such counterpart originals or certified copies of such documents as Administrative Agent may reasonably request.

(r) (m) Confirmation of Plan. The Plan shall have been confirmed by the United States Bankruptcy Court for the District of Arizona in substantially the form upon which Administrative Agent shall have affirmatively voted and the Effective Date (as such term is defined in the Plan) shall occur on, or substantially contemporaneously with, the Closing Date. On the Effective Date, Company shall have as of the close of business a "book balance" of cash and cash equivalents in an aggregate amount of at least six million ($6,000,000) on deposit in a Deposit Account or Securities Account that is subject to a Control Agreement.

(s) No Material Adverse Change. Since the date of confirmation of the Plan by the Bankruptcy Court, no event, circumstance or change shall have occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, and no disruption, adverse change or condition in the financial, banking or capital markets generally shall have occurred.

(t) Funds Flow. Administrative Agent shall receive at least three (3) Business Days prior to the Closing Date a funds flow memorandum, in form and substance reasonably satisfactory to it.

(n)    Each Lender, by delivering its signature page to this Agreement and funding a Loan on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable on the Closing Date.

## SECTION 4.    REPRESENTATIONS AND WARRANTIES.

In order to induce Lenders to enter into this Agreement and to make each Credit Extension to be made thereby, each Credit Party represents and warrants to each Lender on the Closing Date and on each Credit Date, that the following statements are true and correct (it being understood and agreed that the representations and warranties made on the Closing Date are deemed to be made concurrently with the consummation of the Debt Exchange contemplated hereby):

**4.1    Organization; Requisite Power and Authority; Qualification.**    Each Credit Party (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as identified in Schedule 4.1, (b) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby and, in the case of Company, to make the borrowings hereunder, and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations.

**4.2    Capital Stock and Ownership.**    The Capital Stock of each of Company and its Subsidiaries has been duly authorized and validly issued and is fully paid and non-assessable. Except as set forth on Schedule 4.2, as of the date hereof, there is no existing option, warrant, call, right, commitment or other agreement to which Company or any of its Subsidiaries is a party requiring, and there is no membership interest or other Capital Stock of Company or any of its Subsidiaries outstanding which upon conversion or exchange would require, the issuance by Company or any of its Subsidiaries of any additional membership interests or other Capital Stock of Company or any of its Subsidiaries or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Capital Stock of Company or any of its Subsidiaries.  Schedule 4.2 sets forth a true, complete and correct list as of the Closing Date, both before and after giving effect to the transactions contemplated by the Credit Documents, of the name of Company and each of its Subsidiaries and indicates for each such Person its ownership (by holder and percentage interest) and the type of entity of each of them, and the number and class of authorized and issued Capital Stock of such Subsidiary.  Schedule 4.2 sets forth a true, complete and correct list as of the Closing Date, both before and after giving effect to the transactions contemplated by the Credit Documents, of the name of Company and each of its Subsidiaries and indicates for each such Person its ownership (by holder and percentage interest) and the type of entity of each of them, and the number and class of authorized and issued Capital Stock of such Subsidiary.  Except as set forth on Schedule 4.2, as of the Closing Date, neither Company nor any of its Subsidiaries has any equity investments in any other corporation or entity.

**4.3    Due Authorization.**    The execution, delivery and performance of the Credit Documents have been duly authorized by all necessary action on the part of each Credit Party that is a party thereto.

**4.4** **No Conflict**.  The execution, delivery and performance by each of the Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate any provision of any law or any governmental rule or regulation applicable to Company or any of its Subsidiaries, any of the Organizational Documents of Company or any of its Subsidiaries, or any order, judgment or decree of any court or other agency of government binding on Company or any of its Subsidiaries; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of Company or any of its Subsidiaries; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of Company or any of its Subsidiaries (other than any Liens created under any of the Credit Documents in favor of Collateral Agent, on behalf of Secured Parties); (d) result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to its operations or any of its properties or (e) require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of Company or any of its Subsidiaries, except for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to Lenders.

**4.5** **Governmental Consents**.  The execution, delivery and performance by each of the Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to Collateral Agent for filing and/or recordation, as of the Closing Date.

**4.6** **Binding Obligation**.  Each Credit Document has been duly executed and delivered by each Credit Party that is a party thereto and is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability (whether enforcement is sought in equity or at law).

**4.7** **Historical Financial Statements**.  The Historical Financial Statements were prepared in conformity with GAAP and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments. As of the Closing Date, neither Company nor any of its Subsidiaries has any contingent liability or liability for taxes, long term lease or unusual forward or long term commitment that is not reflected in the Historical Financial Statements or the notes thereto and which in any such case is material in relation to the business, operations, properties, assets, condition (financial or otherwise) or prospects of Company and any of its Subsidiaries taken as a whole.  Since the date of the audited Historical Financial Statements, no Internal Control Event has occurred.

**4.8** **Projections**.  On and as of the Closing Date, the Projections of Company and its Subsidiaries for the period of Fiscal Year 2009 through and including Fiscal Year 2011, including monthly projections for each month during the Fiscal Year in which the Closing Date takes place,

(the "**Projections**") are based on good faith estimates and assumptions made by the management of Company and as of the Closing Date, management of Company believed that the Projections were reasonable and attainable.

**4.9    No Material Adverse Change**.  Since the Confirmation Date, no event, circumstance or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

**4.10    No Restricted Junior Payments**.  Since the Confirmation Date, neither Company nor any of its Subsidiaries has directly or indirectly declared, ordered, paid or made, or set apart any sum or property for, any Restricted Junior Payment or agreed to do so except as permitted pursuant to Section 6.4.

**4.11    ~~4.9~~ Adverse Proceedings, etc**.  Other than as described on Schedule ~~4.9~~4.11, There are no Adverse Proceedings, individually or in the aggregate, that (a) relate to any Credit Document or the transactions contemplated hereby or thereby or (b) could reasonably be expected to have a Material Adverse Effect.  Neither Company nor any of its Subsidiaries (i) is in violation of any applicable laws (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (ii) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**4.12    ~~4.10~~ Payment of Taxes**.  Except as otherwise permitted under Section 5.3, all tax returns and reports of Company and its Subsidiaries required to be filed by any of them have been timely filed, and all taxes shown on such tax returns to be due and payable and all assessments, fees and other governmental charges upon Company and its Subsidiaries and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable.  Company knows of no proposed tax assessment against Company or any of its Subsidiaries which is not being actively contested by Company or such Subsidiary in good faith and by appropriate proceedings; provided, such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

**4.13    ~~4.11~~ Properties**.

(a)    Title.  Each of Company and its Subsidiaries has (i) good, sufficient and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (iii) good title to (in the case of all other personal property), all of their respective properties and assets reflected in their respective Historical Financial Statements referred to in Section 4.7 and in the most recent financial statements delivered pursuant to Section 5.1, in each case except for assets disposed of since the date of such financial statements in the ordinary course of business or as otherwise permitted under Section 6.8.  All such properties and assets are in working order and condition, ordinary wear and tear excepted, and except as permitted by this Agreement, all such properties and assets are free and clear of Liens.

(b)    Real Estate.  As of the Closing Date, Schedule 4.13 contains a true, accurate and complete list of (i) all Real Estate Assets, and (ii) all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Estate Asset of any Credit Party, regardless of whether such Credit Party is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment, and the termination date and annual base rent under each of them.  Each agreement listed in clause (ii) of the immediately preceding sentence is in full force and effect and no default has occurred and is continuing thereunder.  Each such agreement constitutes the legally valid and binding obligation of each applicable Credit Party, enforceable against such Credit Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.  To the best knowledge of each Credit Party, no other party to any such agreement is in default of its obligations thereunder, and no Credit Party (or any other party to any such agreement) has at any time delivered or received any notice of default which remains uncured under any such Lease and, as of the Closing Date, no event has occurred which, with the giving of notice or the passage of time or both, would constitute a default under any such agreement.

**4.14**    ~~4.12~~ Environmental Matters.  Neither Company nor any of its Subsidiaries nor any of their respective Facilities or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  There are and, to each of Company's and its Subsidiaries' knowledge, have been, no conditions, occurrences, or Hazardous Materials Activities which could reasonably be expected to form the basis of an Environmental Claim against Company or any of its Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Compliance with all current or reasonably foreseeable future requirements pursuant to or under Environmental Laws could not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.  No event or condition has occurred or is occurring with respect to Company or any of its Subsidiaries relating to any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activity which individually or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect.

**4.15**    ~~4.13~~ No Defaults.  Neither Company nor any of its Subsidiaries is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations, and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, could not reasonably be expected to have a Material Adverse Effect.  ~~No~~ After giving effect to the Debt Exchange, no Default has occurred and is continuing.

**4.16**    ~~4.14~~ Material Contracts.  Schedule ~~4.14~~ 4.16 contains a true, correct and complete list of all the Material Contracts in effect on the Closing Date after giving effect to the Debt Exchange.  All such Material Contracts, together with any updates provided pursuant to Section 5.1(l), are in full force and effect and no defaults currently exist thereunder (other than as described in Schedule ~~4.14~~ 4.16 or in such updates).

**4.17** ~~4.15~~ **Governmental Regulation**.  Neither Company nor any of its Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.  Neither Company nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

**4.18** ~~4.16~~ **Margin Stock**.  Neither Company nor any of its Subsidiaries is engaged in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the Loans made to such Credit Party will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

**4.19** ~~4.17~~ **Employee Matters**.  Company and each of its Subsidiaries has good labor relations.  Company, its Subsidiaries, and their respective employees, agents and representatives have not committed any material unfair labor practice as defined in the National Labor Relations Act.  Neither Company nor any of its Subsidiaries has been or is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.  There has been and is (a) no unfair labor practice charge or complaint pending against Company or any of its Subsidiaries, or to the best knowledge of Company, threatened against any of them before the National Labor Relations Board or any other Governmental Authority and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement or similar agreement that is so pending against Company or any of its Subsidiaries or to the best knowledge of Company, threatened against any of them, (b) no labor dispute, strike, lockout, slowdown or work stoppage in existence or threatened against, involving or affecting Company or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect, (c) no labor union, labor organization, trade union, works council, or group of employees of Company or any of its Subsidiaries has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened to be brought or filed with the National Labor Relations Board or any other Governmental Authority, and (d) to the best knowledge of Company, no union representation question existing with respect to any of the employees of Company or any of its Subsidiaries and, to the best knowledge of Company, no labor union organizing activity with respect to any employees of Company or any of its Subsidiaries that is taking place, except (with respect to any matter specified in clause (a), (b), (c) or (d) above, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect.

**4.20** ~~4.18~~ **Employee Benefit Plans**.  Company, each of its Subsidiaries and each of their respective ERISA Affiliates are in compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations in all material respects under each Employee Benefit Plan.  Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service (or is entitled to rely upon a favorable determination letter issued to a sponsor of a prototype plan document) indicating that such

Employee Benefit Plan is so qualified and nothing has occurred subsequent to the issuance of such determination letter which would cause such Employee Benefit Plan to lose its qualified status. No liability to the PBGC (other than required premium payments) or the Internal Revenue Service has been or is expected to be incurred by Company, any of its Subsidiaries or any of their ERISA Affiliates with respect to any Employee Benefit Plan. No ERISA Event has occurred or is reasonably expected to occur. Except to the extent required under Section 4980B of the Internal Revenue Code or similar state laws, or otherwise funded entirely by the participants thereof, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of Company, any of its Subsidiaries or any of their respective ERISA Affiliates. The present value of the aggregate benefit liabilities under each Pension Plan sponsored, maintained or contributed to by Company, any of its Subsidiaries or any of their ERISA Affiliates (determined as of the end of the most recent plan year on the basis of the actuarial assumptions specified for funding purposes in the most recent actuarial valuation for such Pension Plan), did not exceed the aggregate current value of the assets of such Pension Plan. As of the most recent valuation date for each Multiemployer Plan for which the actuarial report is available, the potential liability of Company, its Subsidiaries and their respective ERISA Affiliates for a complete or partial withdrawal from such Multiemployer Plan (within the meaning of Section 4203 or Section 4205 of ERISA), when aggregated with such potential liability for a complete or partial withdrawal from all Multiemployer Plans, is zero. Company, each of its Subsidiaries and each of their ERISA Affiliates have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

**4.21** ~~4.19~~ **Certain Fees**. No broker's or finder's fee or commission will be payable by the Company or any of its Subsidiaries with respect hereto or any of the transactions contemplated hereby.

**4.22** ~~4.20~~ **Solvency**. Each Credit Party is and, upon the incurrence of any Credit Extension by such Credit Party on any date on which this representation and warranty is made, will be, Solvent.

**4.23** ~~4.21~~ **Compliance with Statutes, etc**. Each of Company and its Subsidiaries is in compliance with its organizational documents and all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property (including compliance with all applicable Environmental Laws with respect to any Real Estate Asset or governing its business and the requirements of any permits issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of Company or any of its Subsidiaries), except such non compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**4.24** ~~4.22~~ **Disclosure**. No representation or warranty of any Credit Party contained in any Credit Document and none of the reports, financial statements or other documents, certificates or written statements furnished to Lenders by or on behalf of Company or any of its Subsidiaries for use in connection with the transactions contemplated hereby contains any untrue statement of a material fact or omits to state a material fact (known to Company, in the case of any document not furnished by either of them) necessary in order to make the statements contained herein or therein

not misleading in light of the circumstances in which the same were made. Any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by Company to be reasonable at the time made. There are no agreements, instruments and corporate or other restrictions to which any Credit Party is subject and there are no facts known (or which should upon the reasonable exercise of diligence be known) to Company (other than matters of a general economic nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and statements furnished to Lenders for use in connection with the transactions contemplated hereby.

**4.25** ~~4.23~~ **Terrorism Laws and FCPA**. Each Credit Party is in compliance, in all material respects, with the Terrorism Laws. No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**4.26** ~~4.24~~ **Insurance**. The properties of Company and each of its Subsidiaries are adequately insured with financially sound and reputable insurers and in such amounts, with such deductibles and covering such risks and otherwise on terms and conditions as are customarily carried or maintained by Persons of established reputation of similar size and engaged in similar businesses and such insurance complies with the requirements of Section 5.5. Schedule ~~4.27~~4.26 sets forth a list of all insurance maintained by or on behalf of the Credit Parties and each of their Subsidiaries as of the Closing Date and, as of the Closing Date, all premiums in respect of such insurance have been paid.

**4.27** ~~4.25~~ **Common Enterprise**. The successful operation and condition of each of the Credit Parties is dependent on the continued successful performance of the functions of the group of the Credit Parties as a whole and the successful operation of each of the Credit Parties is dependent on the successful performance and operation of each other Credit Party. Each Credit Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (a) successful operations of each of the other Credit Parties and (b) the credit extended by the Lenders to the ~~Borrower~~Company hereunder, both in their separate capacities and as members of the group of companies. Each Credit Party has determined that execution, delivery, and performance of this Agreement and any other Credit Documents to be executed by such Credit Party is within its purpose, will be of direct and indirect benefit to such Credit Party, and is in its best interest.

**4.28** ~~4.26~~ **Security Interest in Collateral**. The provisions of this Agreement and the other Credit Documents create legal and valid Liens on all the Collateral in favor of Collateral Agent, for the benefit of Collateral Agent and the Lenders, and such Liens constitute perfected and continuing Liens on the Collateral, securing the Obligations, enforceable against the applicable Credit Party and all third parties, and having priority over all other Liens on the Collateral except in the case of (a) Permitted Liens, to the extent any such Permitted Liens would have priority over the Liens in favor of Collateral Agent pursuant to any applicable law or agreement and (b) Liens perfected only by possession (including possession of any certificate of title) to the extent Collateral Agent has not obtained or does not maintain possession of such Collateral.

**4.29** ~~4.27~~ **Affiliate Transactions**.  Except as set forth on Schedule ~~4.27,~~4.29, as of the date of this Agreement, there are no existing or proposed agreements, arrangements, understandings, or transactions between any Credit Party and any of the officers, members, managers, directors, stockholders, parents, other interest holders, employees, or Affiliates (other than Subsidiaries) of any Credit Party or any members of their respective immediate families, and none of the foregoing Persons are directly or indirectly indebted to or have any direct or indirect ownership, partnership, or voting interest in any Affiliate of any Credit Party or any Person with which any Credit Party has a business relationship or which competes with any Credit Party (except that any such Persons may own stock in (but not exceeding two percent (2%) of the outstanding ~~Equity Interests~~Capital Stock of) any publicly traded company that may compete with a Credit Party.

**4.30** ~~4.28~~ **Intellectual Property**.  Each Credit Party and its Subsidiaries owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property necessary to its business as currently conducted, a correct and complete list of which, as of the date of this Agreement, is set forth on Schedule ~~4.28,~~4.30, and the use thereof by the Credit Parties and its Subsidiaries does not infringe in any material respect upon the rights of any other Person, and the Credit Parties rights thereto are not subject to any licensing agreement or similar arrangement. Each Credit Party has taken reasonable measures to protect the secrecy, confidentiality and value of all trade secrets used in its business (collectively, the "**Business Trade Secrets**").  To the best knowledge of each Credit Party, none of the Business Trade Secrets have been disclosed to any Person other than employees or contractors of the Credit Parties who had a need to know and use such Business Trade Secrets in the ordinary course of employment or contract performance and who executed appropriate confidentiality agreements prohibiting the unauthorized use or disclosure of such Business Trade Secrets and containing other terms reasonably necessary or appropriate for the protection and maintenance of such Business Trade Secrets.  To the best knowledge of each Credit Party, no unauthorized disclosure of any Business Trade Secrets has been made.

**4.31** ~~4.29~~ **Permits, etc**.  Each Credit Party has, and is in compliance with, all permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business currently owned, leased, managed or operated, or to be acquired, by such Person, which, if not obtained, could not reasonably be expected to have a Material Adverse Effect.  No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, and there is no claim that any thereof is not in full force and effect, except, to the extent any such condition, event or claim could not be reasonably be expected to have a Material Adverse Effect.

**SECTION 5.  AFFIRMATIVE COVENANTS.**

Each Credit Party covenants and agrees that until payment in full of all Obligations, each Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 5.

**5.1    Financial Statements and Other Reports.**

**5.1    Financial Statements and Other Reports.**  Unless otherwise provided below, Company will deliver to Administrative Agent and Lenders:

(a)    Monthly Reports.  As soon as available, and in any event within thirty (30) days after the end of each month (including ~~the month in~~months which began prior to the Closing Date ~~occurs~~), consolidated and consolidating ~~statements of income~~balance sheet of Company and its Subsidiaries as at the end of such month and the related consolidated (and with respect to statements of income, consolidating) statements of income, stockholders' equity and cash flows of Company and its Subsidiaries for such month and for the period from the beginning of the then current Fiscal Year to the end of such month, setting forth in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and~~, if the Financial Plan has been completed for such Fiscal Year,~~ the corresponding figures from the Financial Plan for the current Fiscal Year, all in reasonable detail, together with a Financial Officer Certification ~~with respect thereto~~ and a Narrative Report with respect thereto and any other operating reports prepared by management for such period (provided, that the parties acknowledge and agree that any such financial statements relating to the first six (6) months following the Effective Date will be subject to change, in the Company's discretion, in order to reflect "fresh start" accounting adjustments and other restructuring related adjustments);

(b)    Quarterly Financial Statements.  As soon as available, and in any event within forty-five (45) days after the end of each ~~of the first three (3)~~ Fiscal ~~Quarters~~Quarter of each Fiscal Year (including, commencing with Fiscal Year 2010, the fourth Fiscal Quarter), the consolidated and consolidating balance sheets of Company and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated (and with respect to statements of income, consolidating) statements of income, stockholders' equity and cash flows of Company and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the Financial Plan for the current Fiscal Year, all in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto;

(c)    Annual Financial Statements.  As soon as available, and, with respect to the items described in clause (i), in any event within one hundred twenty (120) days after the end of the Fiscal Year ending December 31, 2009 and within 90 days of the end of each Fiscal Year~~,~~ ending on or after December 31, 2010, (i) the consolidated and consolidating balance sheets of Company and its Subsidiaries as at the end of Fiscal Years 2008 and 2009, with respect to the Fiscal Year ending December 31, 2009, and such Fiscal Year with respect to each Fiscal Year ending thereafter and the related consolidated (and with respect to statements of income, consolidating) statements of income, stockholders' equity and cash flows of Company and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year and the corresponding figures from the Financial Plan for the Fiscal Year covered by such financial statements, in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto; and (ii) with respect to such financial statements a report thereon of independent certified public accountants of recognized national standing selected by Company, and reasonably satisfactory to Administrative Agent

(which report shall for each Fiscal Year subsequent to the 2008 Fiscal Year be unqualified as to going concern and scope of audit and shall not contain any explanatory paragraph or paragraph of emphasis with respect to going concern), and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of Company and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards) together with a written statement by such independent certified public accountants stating (1) that their audit examination has included a review of the terms of the Credit Documents and (2) that nothing has come to their attention that causes them to believe that the information contained in any Compliance Certificate is not correct or that the matters set forth in such Compliance Certificate are not stated in accordance with the terms hereof;

(d) <u>Compliance Certificate</u>. Together with each delivery of financial statements of Company and its Subsidiaries pursuant to Sections 5.1(a), 5.1(b) and 5.1(c), a duly executed and completed Compliance Certificate;

(e) <u>Statements of Reconciliation after Change in Accounting Principles</u>. If, as a result of any change in accounting principles and policies (or the application thereof) from those used in the preparation of the Historical Financial Statements, the consolidated financial statements of Company and its Subsidiaries delivered pursuant to Section 5.1(b) or 5.1(c) will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance satisfactory to Administrative Agent;

(f) <u>Notice of Default</u>. Prompt written notice (but, in any event, within ~~ten~~three (~~10~~3) Business Days) (i) of any condition or event that constitutes a Default or an Event of Default or that ~~written~~ notice has been given to Company with respect thereto; (ii) that any Person has given any notice to Company or any of its Subsidiaries with respect to any event or condition set forth in Section 8.1(b); (iii) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect; or (iv) the occurrence of any Internal Control Event of which any officer of Company has knowledge, which notice shall be accompanied by a certificate of its Authorized Officers specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action Company has taken, is taking and proposes to take with respect thereto;

(g) <u>Notice of Litigation</u>. Prompt written notice (but, in any event, within ~~ten~~three (~~10~~3) Business Days) of (i) the institution of, or threat of, any Adverse Proceeding not previously disclosed in writing by Company to Lenders, or (ii) any development in any Adverse Proceeding that, in the case of either clause (i) or (ii) if adversely determined, could be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions

contemplated hereby, or which arises in respect of any material Indebtedness of Company or its Subsidiaries or alleges any criminal misconduct by any Credit Party together in each case with such other information as may be reasonably available to Company to enable Lenders and their counsel to evaluate such matters;

(h)     ERISA.  (i) The occurrence of or forthcoming occurrence of any ERISA Event, a prompt written notice (but, in any event, within ~~ten~~three (~~10~~3) Business Days) specifying the nature thereof, what action Company, any of its Subsidiaries or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness (but, in any event, within ~~ten~~three (~~10~~3) Business Days), copies of (1) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by Company, any of its Subsidiaries or any of their respective ERISA Affiliates with the Internal Revenue Service with respect to each Pension Plan; (2) all notices received by Company, any of its Subsidiaries or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event; and (3) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as Administrative Agent shall reasonably request;

(i)     Financial Plan.  As soon as practicable and in any event no later than ~~June 30~~January 31, 2010 with respect to the 2010 Fiscal Year and, with respect to each subsequent Fiscal Year, no later than thirty (30) days prior to the beginning of each such subsequent Fiscal Year, a consolidated plan and financial forecast for such Fiscal Year and each Fiscal Year (or portion thereof) through the final maturity date of the Loans (a "**Financial Plan**"), including (i) a forecasted consolidated and consolidating balance sheet and forecasted consolidated and consolidating statements of income and cash flows of Company and its Subsidiaries for each such Fiscal Year, together with a pro forma Compliance Certificate, for each such Fiscal Year and an explanation of the assumptions on which such forecasts are based, (ii) forecasted consolidated statements of income and cash flows of Company and its Subsidiaries for each month of each such Fiscal Year, ~~and~~ (iii) forecasts demonstrating projected compliance with the requirements of Section 6.7 through the final maturity date of the Loans, and (iv) forecasts demonstrating adequate liquidity through the ~~end of such Fiscal Year~~final maturity date of the Loans, together, in each case, with an explanation of the assumptions on which such forecasts are based, ~~in each case~~all in form and substance reasonably satisfactory to the Agents and accompanied by a certificate from the chief financial officer of Company certifying that the projections contained therein are based upon good faith estimates and assumptions believed by Company to be reasonable at the time made and at the time of delivery thereof;

(j)     Insurance Report.  As soon as practicable and in any event ~~within ninety (90) days following~~by the ~~end~~last day of each Fiscal Year, a report in form and substance satisfactory to Administrative Agent outlining all material insurance coverage maintained as of the date of such report by Company and its Subsidiaries and all material insurance coverage planned to be maintained by Company and its Subsidiaries in the immediately succeeding Fiscal Year;

(k)     Notice of Change in Board of Directors.  With reasonable promptness, written notice of any change in the board of directors (or similar governing body) of Company;

(l)     Notice Regarding Material Contracts.  Promptly, and in any event within ten (10) Business Days (i) after any Material Contract of Company or any of its Subsidiaries is terminated or amended in a manner that is materially adverse to Company or such Subsidiary, as the case may be, or that any Credit Party determines in good faith to be material to Administrative Agent or the Lenders and (ii) after any new Material Contract is entered into, a written statement describing such event, with copies of such material amendments or new contracts, delivered to Administrative Agent (to the extent such delivery is permitted by the terms of any such Material Contract, provided, no such prohibition on delivery shall be effective if it were bargained for by Company or its applicable Subsidiary with the intent of avoiding compliance with this Section 5.1(l)), and an explanation of any actions being taken with respect thereto;

(m)     Environmental Reports and Audits.  As soon as practicable (but, in any event, within ~~ten~~three (~~10~~3) Business Days) following receipt thereof, copies of all environmental audits and reports with respect to environmental matters at any Facility or which relate to any environmental liabilities of Company or its Subsidiaries which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(n)     Information Regarding Collateral.  Company will furnish to Collateral Agent written notice at least thirty (30) days prior to the occurrence of any change (i) in any Credit Party's corporate name, (ii) in any Credit Party's identity or corporate structure, or (iii) in any Credit Party's Federal Taxpayer Identification Number.  Company agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral and for the Collateral at all times following such change to have a valid, legal and perfected security interest as contemplated in the Collateral Documents.  Company will furnish to Administrative Agent prompt written notice of any Lien (other than Permitted Liens) or claims made or asserted against any Collateral or interest therein.  Company also agrees promptly to notify Collateral Agent in writing if any material portion of the Collateral is lost, damaged or destroyed;

(o)     Annual Collateral Verification.  Each year, at the time of delivery of annual financial statements with respect to the preceding Fiscal Year pursuant to Section 5.1(c), Company shall deliver to Collateral Agent an Officer's Certificate (i) either confirming that there has been no change in such information since the date of the Collateral Questionnaire delivered on the Closing Date or the date of the most recent certificate delivered pursuant to this Section and/or identifying such changes, or (ii) certifying that all Uniform Commercial Code financing statements (including fixture filings, as applicable) or other appropriate filings, recordings or registrations, have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction identified in the Collateral Questionnaire or pursuant to clause (i) above to the extent necessary to protect and perfect the security interests under the Collateral Documents for a period of not less than eighteen (18) months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period); ~~and~~

(p)     Aging Reports.  Together with each delivery of financial statements of Company and each other Credit Party pursuant to Sections 5.1(a), 5.1(b) and 5.1(c), (i) a summary of the accounts receivable aging report of each Credit Party as of the end of such period, and (ii) a

summary of accounts payable aging report of each Credit Party as of the end of such period, in each case in form and substance satisfactory to Administrative Agent;

(q)    (p) Violations of Terrorism Laws.  Promptly (i) if any Credit Party obtains knowledge that any Credit Party or any Person which owns, directly or indirectly, any Capital Stock of any Credit Party, or any other holder at any time of any direct or indirect equitable, legal or beneficial interest therein is the subject of any of the Terrorism Laws, such Credit Party will notify Administrative Agent and (ii) upon the request of any Lender, such Credit Party will provide any information such Lender believes is reasonably necessary to be delivered to comply with the Patriot Act;

(r)    Water Reporting.  On each anniversary of the Closing Date, Company shall deliver to Administrative Agent an annual report with respect to water usage and water facilities for Company which includes (i) water usage at each facility broken down by source (well, municipal or other water service), (ii) water facility status as of the end of the year (including the number and type of active wells, abandoned or capped wells and shut in wells and water service interconnections) and (iii) a schedule of expected water facility capital expenditures for the following year, all prepared in sufficient detail and otherwise in form and substance acceptable to the Administrative Agent.  The Administrative may in addition request, no more than once every forty-eight (48) months, that the Company cause a hydrogeologic study with respect to water supply and water rights of the Company covering all wells operated by the Company or located on or serving the Company's facilities to be prepared by an independent hydrogeologic consultant approved by Administrative Agent, at the expense of the Company, and delivered to the Administrative Agent;

(s)    Rabo Bank Account.  Concurrently with the delivery of each monthly financial statement required in sub-clause (a) above, Company shall deliver a certificate of the chief financial officer of the Company that certifies the following information:  (i) the total amount of deposits in the Rabo Bank Account stated in dollars (based upon the dollar equivalent of Euros deposited in such account as determined using the exchange rate in effect on the date of such deposits) during the prior twelve consecutive months (including the immediately preceding month); and (ii) the highest daily closing balance of the Rabo Bank Account (on a book basis) during the preceding month stated in dollars (determined based upon the exchange rate in effect on each corresponding date); and

(t)    Other Information.  (i) Promptly upon their becoming available, all financial statements, reports, notices and proxy statements sent or made available generally by Company to the Equity Investors and/or the holders of the Subordinated Notes (but excluding any such materials that may be provided to a Person in his or her capacity as a director and/or officer of the Company) and copies of all press releases and other statements made available generally by Company or any of its Subsidiaries to the public concerning material developments in the business of Company or any of its Subsidiaries, (ii) promptly after submission to any Governmental Authority, all documents and information furnished to such Governmental Authority in connection with any investigation of any Credit Party (other than any routine inquiry), provided that settlement discussions or confidential personal information regarding individuals need not be delivered, (iii) promptly upon receipt thereof, copies of all financial reports submitted to any Credit Party by its auditors in connection with any audit of the books thereof and (iv) such other

information and data with respect to Company or any of its Subsidiaries as from time to time may be reasonably requested by Administrative Agent.

5.2    **Existence**.  Except as otherwise permitted under Section 6.8, each Credit Party will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect its existence and all rights and governmental authorizations, qualifications, franchises, licenses and permits material to its business and to conduct its business in each jurisdiction in which its business is conducted; <u>provided</u>, no Credit Party other than Company or any of its Subsidiaries shall be required to preserve any such existence, right or governmental authorizations, qualifications, franchise, licenses and permits if such Person's board of directors (or similar governing body) shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to Lenders.

5.3    **Payment of Taxes and Claims**.  Each Credit Party will, and will cause each of its Subsidiaries to, pay all Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon, and all claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and/or that by law have or may become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; <u>provided</u>, no such Tax or claim need be paid if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserve or other appropriate provision, as shall be required in conformity with GAAP shall have been made therefor, and (b) in the case of a Tax or claim which has or may become a Lien against any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such Tax or claim.  No Credit Party will, nor will it permit any of its Subsidiaries to, file or consent to the filing of any consolidated income tax return with any Person (other than Company or any of its Subsidiaries).

5.4    **Maintenance of Properties**.  Each Credit Party will, and will cause each of its Subsidiaries to, (a) maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material assets used in the business of Company and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof and (b) comply at all times with the provisions of all material leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder.

5.5    **Insurance**.  Company will maintain or cause to be maintained, with financially sound and reputable insurers, (a) business interruption insurance reasonably satisfactory to Administrative Agent, and (b) casualty insurance, such public liability insurance, third party property damage insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of Company and its Subsidiaries as are customarily carried or maintained under similar circumstances by Persons of established reputation of similar size and engaged in similar businesses, in each case in such amounts (giving effect to self insurance which comports with the requirements of this Section and provided that adequate reserves therefor are maintained in accordance with GAAP), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons.  Without limiting the

generality of the foregoing, Company will maintain or cause to be maintained (c) flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System, and (d) replacement value casualty insurance on the Collateral under such policies of insurance, with such insurance companies, in such amounts, with such deductibles, and covering such risks as are at all times carried or maintained under similar circumstances by Persons of established reputation of similar size and engaged in similar businesses. Each such policy of insurance shall (i) name Collateral Agent, on behalf of Lenders as an additional insured thereunder as its interests may appear, and (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, satisfactory in form and substance to Collateral Agent, that names Collateral Agent, on behalf of Secured Parties, as the loss payee thereunder and provides for at least thirty (30) days' prior written notice to Collateral Agent of any modification or cancellation of such policy and that no act or default of Company or any other Person shall affect the right of Collateral Agent to recover under such policy or policies in case of loss or damage.

**5.6    Books and Records; Inspections**. Each Credit Party will, and will cause each of its Subsidiaries to, (a) keep adequate books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by Administrative Agent or any Lender (including employees of Administrative Agent, any Lender or any consultants, accountants, lawyers and appraisers retained by Administrative Agent) to visit and inspect any of the properties of any Credit Party and any of its respective Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent accountants, all upon reasonable notice and at such reasonable times during normal business hours (so long as no Default or Event of Default has occurred and is continuing) and as often as may reasonably be requested and by this provision the Credit Parties authorize such accountants to discuss with Administrative Agent and Lender and such representatives the affairs, finances and accounts of Company and its Subsidiaries. The Credit Parties acknowledge that Administrative Agent, after exercising its rights of inspection, may prepare and distribute to the Lenders certain reports pertaining to the Credit Parties' assets for internal use by Administrative Agent and the Lenders. After the occurrence and during the continuance of any Event of Default, each Credit Party shall provide Administrative Agent and each Lender with reasonable access to its customers and suppliers.

**5.7    Lenders Meetings**. Company will, upon the request of Administrative Agent or Requisite Lenders, participate in a meeting of Administrative Agent and Lenders once during each Fiscal Year to be held at Company's corporate offices (or at such other location as may be agreed to by Company and Administrative Agent) at such time as may be agreed to by Company and Administrative Agent.

**5.8    Compliance with Laws**. Each Credit Party will comply, and shall cause each of its Subsidiaries and all other Persons, if any, on or occupying any Facilities to comply, with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including all Environmental Laws). Each Credit Party shall take all reasonable and necessary actions to ensure that no portion of the Loans will be used, disbursed or distributed for any purpose, or to any Person, directly or indirectly, in violation of any of the Terrorism Laws and shall take all

reasonable and necessary action to comply in all material respects with all Terrorism Laws with respect thereto.

**5.9 Environmental**.

(a) <u>Environmental Disclosure</u>. Company will deliver to Administrative Agent and Lenders:

(i) as soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of Company or any of its Subsidiaries or by independent consultants, governmental authorities or any other Persons, with respect to material environmental matters at any Facility or with respect to any material Environmental Claims;

(ii) promptly upon the occurrence thereof, written notice describing in reasonable detail (1) any Release required to be reported to any federal, state or local governmental or regulatory agency under any applicable Environmental Laws, (2) any remedial action taken by Company or any other Person in response to (A) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, or (B) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of resulting in a Material Adverse Effect, and (3) Company's discovery of any occurrence or condition on any real property adjoining or in the vicinity of any Facility that could reasonably be expected. cause such Facility or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws;

(iii) as soon as practicable following the sending or receipt thereof by Company or any of its Subsidiaries, a copy of any and all written communications with respect to (1) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of giving rise to a Material Adverse Effect, (2) any Release required to be reported to any federal, state or local governmental or regulatory agency, and (3) any request for information from any governmental agency that suggests such agency is investigating whether Company or any of its Subsidiaries may be potentially responsible for any Hazardous Materials Activity;

(iv) prompt written notice describing in reasonable detail (1) any proposed acquisition of stock, assets, or property by Company or any of its Subsidiaries that could reasonably be expected to (A) expose Company or any of its Subsidiaries to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (B) affect the ability of Company or any of its Subsidiaries to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations and (2) any proposed action to be taken by Company or any of its Subsidiaries to modify current operations in a manner that could reasonably be expected to subject Company or any of its Subsidiaries to any additional material obligations or requirements under any Environmental Laws; and

(v)    with reasonable promptness, such other documents and information as from time to time may be reasonably requested by Administrative Agent in relation to any matters disclosed pursuant to this Section 5.9(a).

(b)    <u>Hazardous Materials Activities, etc.</u>  Each Credit Party shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by such Credit Party or its Subsidiaries that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (ii) make an appropriate response to any Environmental Claim against such Credit Party or any of its Subsidiaries and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    <u>Right of Access and Inspection.</u>  With respect to any event described in Section 5.9(a), or if an Event of Default has occurred and is continuing, or if Administrative Agent reasonably believes that Company or any Subsidiary has breached any representation, warranty or covenant related to environmental matters (including those contained in Sections 4.14, 5.8 or 5.9):

(i)    Administrative Agent and its representatives shall have the right, but not the obligation or duty, to enter the Facilities at reasonable times for the purposes of observing the Facilities.  Such access shall include, at the reasonable request of Administrative Agent, access to relevant documents and employees of Company and its Subsidiaries and to their outside representatives, to the extent necessary to obtain necessary information related to the event at issue.  If an Event of Default has occurred and is continuing, the Credit Parties shall conduct such tests and investigations on the Facilities or relevant portion thereof, as reasonably requested by Administrative Agent, including the preparation of a Phase I Report or such other sampling or analysis as determined to be necessary under the circumstances by a qualified environmental engineer or consultant.  If an Event of Default has occurred and is continuing, and if a Credit Party does not undertake such tests and investigations in a reasonably timely manner following the request of Administrative Agent, Administrative Agent may hire an independent engineer, at the Credit Parties' expense, to conduct such tests and investigations.  Administrative Agent will make all reasonable efforts to conduct any such tests and investigations so as to avoid interfering with the operation of the Facility; and

(ii)    Any observations, tests or investigations of the Facilities by or on behalf of Administrative Agent shall be solely for the purpose of protecting the Lenders security interests and rights under the Credit Documents.  The exercise of Administrative Agent's rights under this Subsection (c) shall not constitute a waiver of any default of any Credit Party or impose any liability on Administrative Agent or any of the Lenders.  In no event will any observation, test or investigation by or on behalf of Administrative Agent be a representation that Hazardous Materials are or are not present in, on or under any of the Facilities, or that there has been or will be compliance with any Environmental Law and Administrative Agent shall not be deemed to have made any representation or warranty to any party regarding the truth, accuracy or completeness of any report or findings with regard thereto.  Neither any Credit Party nor any other party is entitled to rely on any observation, test or investigation by or on behalf of Administrative Agent.  Administrative Agent and the

Lenders owe no duty of care to protect any Credit Party or any other party against, or to inform any Credit Party or any other party of, any Hazardous Materials or any other adverse condition affecting any of the Facilities. Administrative Agent may, in its sole discretion, disclose to the applicable Credit Party, or to any other party if so required by law, any report or findings made as a result of, or in connection with, its observations, tests or investigations. If a request is made of Administrative Agent to disclose any such report or finding to any third party, then Administrative Agent shall endeavor to give the applicable Credit Party prior notice of such disclosure and afford such Credit Party the opportunity to object or defend against such disclosure at its own and sole cost; provided, that the failure of Administrative Agent to give any such notice or afford such Credit Party the opportunity to object or defend against such disclosure shall not result in any liability to Administrative Agent. Each Credit Party acknowledges that it may be obligated to notify relevant Governmental Authorities regarding the results of any observation, test or investigation disclosed to such Credit Party, and that such reporting requirements are site and fact-specific and are to be evaluated by such Credit Party without advice or assistance from Administrative Agent.

(d) (c) If counsel to Company or any of its Subsidiaries reasonably determines that provision to Administrative Agent of a document otherwise required to be provided pursuant to this Section 5.9 (or any other provision of this Agreement or any other Credit Document relating to environmental matters) would jeopardize an applicable attorney-client or work product privilege pertaining to such document, then Company or its Subsidiary shall not be obligated to deliver such document to Administrative Agent but shall provide Administrative Agent with a notice identifying the author and recipient of such document and generally describing the contents of the document. Upon request of Administrative Agent, Company and its Subsidiaries shall take all reasonable steps necessary to provide Administrative Agent with the factual information contained in any such privileged document.

**5.10    Subsidiaries**.  In the event that any Person becomes a Domestic Subsidiary of Company, Company shall (a) concurrently with such Person becoming a Domestic Subsidiary cause such Domestic Subsidiary to become a Guarantor hereunder and a Grantor under the Security Agreement by executing and delivering to Administrative Agent and Collateral Agent a Counterpart Agreement, and (b) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates as are similar to those described in Sections 3.1(b), 3.1(e̶h̶) and 3.1(h̶k̶).  In the event that any Person becomes a Foreign Subsidiary of Company, and the ownership interests of such Foreign Subsidiary are owned by Company or by any Domestic Subsidiary thereof, Company shall, or shall cause such Domestic Subsidiary to, deliver, all such documents, instruments, agreements, and certificates as are similar to those described in ~~Section 3.1(b)~~Sections 3.1(b), and Company shall take, or shall cause such Domestic Subsidiary to take, all of the actions referred to in Section 3.1(g) necessary to grant and to perfect a First Priority Lien in favor of Collateral Agent, for the benefit of Secured Parties, under the Security Agreement in sixty five percent (65%) of such ownership interests.  With respect to each such Subsidiary, Company shall promptly send to Administrative Agent written notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary of Company, and (ii) all of the data required to be set forth in Schedules 4.1 and 4.2 with respect to all Subsidiaries of Company; provided, such written notice shall be deemed to supplement Schedule 4.1 and 4.2 for all purposes hereof.

**5.11     Additional Material Real Estate Assets**.  In the event that any Credit Party acquires a Material Real Estate Asset after the Closing Date or a Real Estate Asset owned or leased on the Closing Date becomes a Material Real Estate Asset and such interest has not otherwise been made subject to the Lien of the Collateral Documents in favor of Collateral Agent, for the benefit of Secured Parties, then such Credit Party, contemporaneously with acquiring such Material Real Estate Asset, or promptly after a Real Estate Asset owned or leased on the Closing Date becomes a Material Real Estate Asset, shall take all such actions and execute and deliver, or cause to be executed and delivered, all such mortgages, documents, instruments, agreements, opinions and certificates similar to those executed in connection with the Prior Agreement with respect to each such Material Real Estate Asset that Collateral Agent shall reasonably request to create in favor of Collateral Agent, for the benefit of Secured Parties, a valid and, subject to any filing and/or recording referred to herein, perfected First Priority security interest in such Material Real Estate Assets.  In addition to the foregoing, Company shall, at the request of Requisite Lenders, deliver, from time to time, to Administrative Agent such appraisals as are required by law or regulation of Real Estate Assets with respect to which Collateral Agent has been granted a Lien.

**5.12     Further Assurances**.  At any time or from time to time upon the request of Administrative Agent, each Credit Party will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as Administrative Agent or Collateral Agent may reasonably request in order to effect fully the purposes of the Credit Documents, including providing Lenders with any information reasonably requested pursuant to Section 10.2.  In furtherance and not in limitation of the foregoing, each Credit Party shall take such actions as Administrative Agent or Collateral Agent may reasonably request from time to time to ensure that the Obligations are guarantied by the Guarantors and are secured by substantially all of the assets of Company and its Subsidiaries and all of the outstanding Capital Stock of Company and its Subsidiaries (subject to limitations contained in the Credit Documents with respect to Foreign Subsidiaries), and shall give Collateral Agent prompt written notice of its acquisition of any asset or assets with a value in excess of $~~250,000~~100,000 to the extent that Collateral Agent's security interest therein to secure the Obligations will not be perfected by the Uniform Commercial Code filings currently in effect at such time.

**5.13     Miscellaneous Business Covenants**.  Unless otherwise consented to by Agents and Requisite Lenders:

(a)     Non-Consolidation.  Company will and will cause each of its Subsidiaries to:  (i) maintain entity records and books of account separate from those of any other entity which is an Affiliate of such entity; (ii) not commingle its funds or assets with those of any other entity which is an Affiliate of such entity; and (iii) provide that its board of directors or other analogous governing body will hold all appropriate meetings to authorize and approve such entity's actions, which meetings will be separate from those of other entities.

(b)     Cash Management Systems.  Company and its Subsidiaries shall establish and maintain cash management systems reasonably acceptable to Administrative Agent, including with respect to blocked account arrangements.  As of the Closing Date, Company shall have two (2) cash management accounts which shall, at all times, remain open and subject to Control Agreements.

**5.14** ~~5.13~~ **Use of Proceeds**.  The proceeds of the Loans will be used only as permitted under Section 2.3.  No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that entails a violation of any law, including Regulations T, U and X of the Board of Governors of the Federal Reserve System.

## SECTION 6.  NEGATIVE COVENANTS.

Each Credit Party covenants and agrees that, until payment in full of all Obligations, such Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.

**6.1** **Indebtedness**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(a) the Obligations;

(b) Indebtedness of any Guarantor Subsidiary to Company or to any other Guarantor Subsidiary, or of Company to any Guarantor Subsidiary; <u>provided</u>, (i) all such Indebtedness shall be evidenced by promissory notes and all such notes shall be subject to a First Priority Lien <u>in favor of the Administrative Agent</u> pursuant to the ~~Pledge Agreement and~~ Security Agreement, (ii) all such Indebtedness shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, is reasonably satisfactory to Administrative Agent, and (iii) any payment by any such Guarantor Subsidiary under any guaranty of the Obligations shall result in a *pro tanto* reduction of the amount of any Indebtedness owed by such Subsidiary to Company or to any of its Subsidiaries for whose benefit such payment is made;

~~(c)     Indebtedness with respect to the First Lien Mortgage Note, in an aggregate amount not to exceed at any time $[_____];~~

<u>(c)</u> ~~(d)~~ Indebtedness incurred by Company or any of its Subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations incurred in connection dispositions of any business, assets or Subsidiary of Company or any of its Subsidiaries permitted hereunder;

<u>(d)</u> ~~(e)~~ Indebtedness which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

<u>(e)</u> ~~(f)~~ Indebtedness in respect of netting services, overdraft protections and otherwise in connection with customary Deposit Accounts maintained by a Credit Party as part of its ordinary cash management program;

<u>(f)</u> ~~(g)~~ performance guaranties in the ordinary course of business and consistent with historic practices of the obligations of suppliers, customers, franchisees and licensees of Company and its Subsidiaries;

(g) (h) guaranties by Company of Indebtedness of a Guarantor Subsidiary or guaranties by a Subsidiary of Company of Indebtedness of Company or a Guarantor Subsidiary with respect, in each case, to Indebtedness otherwise permitted to be incurred pursuant to this Section 6.1;

(h) (i) Indebtedness described in Schedule 6.1, but not any extensions, renewals or replacements of such Indebtedness except (i) renewals and extensions expressly provided for in the agreements evidencing any such Indebtedness as the same are in effect on the date of this Agreement, and (ii) refinancings and extensions of any such Indebtedness if the terms and conditions thereof, including those relating to amortization, maturity, collateral and subordination, are not less favorable to the obligor thereon or to the Lenders than the Indebtedness being refinanced or extended and are otherwise on prevailing market terms and conditions, and the average life to maturity thereof is greater than or equal to that of the Indebtedness being refinanced or extended; provided, such Indebtedness permitted under the immediately preceding clause (i) or (ii) above shall not (A) include Indebtedness of an obligor that was not an obligor with respect to the Indebtedness being extended, renewed or refinanced, (B) exceed in a principal amount the Indebtedness being renewed, extended or refinanced, or (C) be incurred, created or assumed if any Default or Event of Default has occurred and is continuing or would result therefrom;

(i) (j) Indebtedness of Company or any of its Subsidiaries with respect to Capital Leases; provided, the principal amount of such Indebtedness, when aggregated with the principal amount of all Indebtedness incurred under clause (kj) below, shall not exceed at any time $4,000,000 in the aggregate for all Credit Parties;

(j) (k) purchase money Indebtedness of Company or any of its Subsidiaries; provided, (i) any such Indebtedness (A) shall be secured only by the asset acquired in connection with the incurrence of such Indebtedness, and (B) shall not exceed the fair market value of such asset at the time acquired, and (ii) the aggregate amount of all such Indebtedness, when aggregated with the principal amount of all Indebtedness incurred under clause (ji) above, shall not exceed at any time $4,000,000 in the aggregate for all Credit Parties;

(k) (l) (i) Indebtedness consisting of Subordinated PIK Notes issued on the Closing Date pursuant to the Plan, including any increases in the principal amount attributable to interest paid in-kind, and(ii) Indebtedness consisting of Subordinated Indebtedness incurred following the Closing Date in connection with the exercise of cure rights as provided in Section 6.7(d) hereof, in each case including payment the Cure Right pursuant to Section 6.7(e) hereof (provided that such Indebtedness shall be subordinated to the Obligations arising under this Agreement on the same terms and conditions that the Subordinated PIK Notes are subordinated to such Obligations) and (iii) Indebtedness consisting of Subordinated PIK Notes issued in connection with the conversion, repayment or other satisfaction of Subordinated PIK A Notes having the same original principal amount, provided in each case that such Subordinated PIK Notes and other Subordinated Indebtedness provide that interest shall be paid solely in-kind and that scheduled maturity date shall be not less than one (1) year following the Maturity Date, and in each case including all payment-in -kind amounts added to the principal amount thereof;

(l) (m) Rate Management Agreements of Company or any of its Subsidiaries entered into in the ordinary course of business and for non-speculative purposes, provided that the

Net Mark-to-Market Exposure of Company and its Subsidiaries in respect of such Rate Management Agreements shall not in the aggregate at any one time outstanding exceed $4,000,0001,000,000;

(n) other Subordinated Indebtedness of Company and its Subsidiaries, in an aggregate amount not to exceed at any time $45,000,000 (exclusive of any increases in the principal amount thereof attributable to interest paid in-kind), which in any case shall be subordinated to the Obligations on substantially the same subordination terms and conditions as are applicable to the Subordinated PIK Notes or on such other terms and conditions as may be reasonably satisfactory to the Agent;

(m) Commodity Hedge Agreements of the Company or any of its Subsidiaries entered into in the ordinary course of business and for non-speculative purposes, provided that (i) the notional amount of such Commodity Hedge Agreements shall not in the aggregate at any time exceed $8,000,000, (i) such Commodity Hedge Agreements shall not require the Company or any of its Subsidiaries to provide cash security in excess of $2,000,000 in the aggregate at any one time, provided that such $2,000,000 aggregate amount shall be reduced from time to time in an amount equal to the amount of any application of any cash to pay amounts due to the applicable counter parties in respect of such Commodity Hedge Agreements from time to time.

(n) (o) provided that such settlement does not result in an Event of Default under Section 8.1, settlements of claims against Company; and

(p) other unsecured Indebtedness in an aggregate principal amount not exceeding $1,000,000 at any time outstanding.

(o) Subordinated PIK Notes issued following the Closing Date (other than and in addition to any Subordinated PIK Notes issued pursuant to Section 6.1(k) hereof) in the aggregate original principal amount not to exceed $5,000,000 at any time outstanding, provided such Subordinated PIK Notes provide that interest shall be paid solely in-kind and that scheduled maturity date shall be not less than one (1) year following the Maturity Date, together with all payment-in-kind amounts added to the principal amount thereof; further provided that such post Closing Date Subordinated PIK Notes shall be subordinated to the Obligations arising under this Agreement on the same terms and conditions that the Subordinated PIK Notes are subordinated to such Obligations).

 provided, that no Indebtedness otherwise permitted by clauses (h), (i), (j), (k), (ml) or (nm), shall be assumed, created, or otherwise refinanced if a Default or Event of Default has occurred or would result therefrom.

**6.2 Liens**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable and any Security) of Company or any of its Subsidiaries, whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset,

income or profits under the UCC of any State or under any similar recording or notice statute, except:

(a) Liens in favor of Collateral Agent for the benefit of Secured Parties granted pursuant to any Credit Document;

(b) ~~Liens in favor of the holders of the First Lien Mortgage Notes pursuant to the First Lien Mortgage as in effect on the Closing Date.~~

<u>(b)</u> ~~(c)~~ Liens for Taxes if obligations with respect to such Taxes are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts, ~~or~~ for Taxes not yet due and ~~payables or for Taxes which are payable after the effective date of the Plan pursuant to the Plan;~~<u>payable, or for Taxes constituting the Pending Property Tax Dispute Settlement Amounts.</u>

<u>(c)</u> ~~(d)~~ statutory Liens of landlords, banks (and rights of set off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or by ERISA), in each case incurred in the ordinary course of business (i) for amounts not yet overdue, or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of five (5) days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

<u>(d)</u> ~~(e)~~ Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other Indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof;

<u>(e)</u> ~~(f)~~ easements, rights of way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the value or use of the property to which such Lien is attached or with the ordinary conduct of the business of Company or any of its Subsidiaries;

<u>(f)</u> ~~(g)~~ any interest or title of a lessor or sublessor under any lease of real estate permitted hereunder;

<u>(g)</u> ~~(h)~~ Liens solely on any Cash earnest money deposits made by Company or any of its Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder~~;~~<u>, but only to the extent unrelated to Commodity Hedging Transactions or Rate Management Transactions.</u>

(h)    (i) (purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(i)    (j) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)    (k) any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property, in each case which do not and will not interfere with or affect in any material respect the use, value or operations of any Mortgaged Property or Material Real Estate Asset or the ordinary conduct of the business of Company or such Subsidiary;

(k)    (l) licenses of patents, trademarks and other intellectual property rights granted by Company or any of its Subsidiaries in the ordinary course of business and not interfering in any respect with the ordinary conduct of the business of Company or such Subsidiary;

(l)    (m) Liens described in Schedule 6.2(jl)];

(m)    (n) Liens securing Indebtedness permitted pursuant to Section 6.1(ji) or (kj); provided, any such Lien shall encumber only the asset acquired with the proceeds of such Indebtedness; and

(n)    (o) Guarantees otherwise permitted pursuant to Sections 6.1(f) and (g) and (h);.

(o)    Liens on Cash or Cash Equivalents posted as security for Commodity Hedging Transactions provided that (i) such posted Cash security shall not exceed $2,000,000 in the aggregate at any one time, provided that such $2,000,000 aggregate amount shall be reduced from time to time in an amount equal to the amount of any application of any cash to pay amounts due to the applicable counter parties in respect of such Commodity Hedge Agreements from time to time; and

(p)    Liens on Cash collateral accounts in an aggregate amount not to exceed $25,000 at any time incurred by Company in the ordinary course of business in connection with the processing of foreign currency transactions.

6.3    **No Further Negative Pledges**.   Except with respect to (a) specific property encumbered to secure payment of particular Indebtedness permitted hereby or to be sold pursuant to an executed agreement with respect to an Asset Sale permitted under Section 6.8,  and (b) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (provided that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be) and . properties or assets which are subject to Liens in favor of the holders of the First Lien Mortgage Notes, no Credit Party shall, nor shall it permit any of its Subsidiaries to, enter into any agreement

prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired..

6.4 **Restricted Junior Payments**. No Credit Party shall, nor shall it permit any of its Subsidiaries or Affiliates through any manner or means or through any other Person to, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any sum for any Restricted Junior Payment, except (a) dividends and distributions by Subsidiaries of Company to Company or a Subsidiary of Company, (b) grants of options to purchase common stock of ~~the Company~~HoldCo, and the exercise of such options, pursuant to the Company's management incentive plan, to and by directors, officers and executives of the Company or an employer with which the Company would be considered a single employer under Sections 414(b) and (c) of the Code, (c) scheduled interest payments ~~payable~~paid in kind with respect to ~~the~~other Subordinated Indebtedness ~~and~~, (d) payments of dividends ~~payable~~paid in kind with respect to ~~the PIK Preferred Stock.~~ PIK Preferred Stock (if any), (e) issuance of common Equity Securities of HoldCo in exchange for Subordinated Indebtedness or PIK Preferred Stock, and (f) issuance of Subordinated Notes and common Equity Securities of HoldCo in exchange for Subordinated PIK A Notes as set forth in the Subordinated PIK Note Purchase Agreement.

6.5 **Restrictions on Subsidiary Distributions**. Except as provided herein, no Credit Party shall, nor shall it permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of Company to (a) pay dividends or make any other distributions on any of such Subsidiary's Capital Stock owned by Company or any other Subsidiary of Company, (b) repay or prepay any Indebtedness owed by such Subsidiary to Company or any other Subsidiary of Company, (c) make loans or advances to Company or any other Subsidiary of Company, or (d) transfer any of its property or assets to Company or any other Subsidiary of Company other than restrictions (i) in agreements evidencing Indebtedness permitted by Section 6.1(~~k~~j) that impose restrictions on the property so acquired, (ii) by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses, joint venture agreements and similar agreements entered into in the ordinary course of business, and (iii) on the disposition of assets contained in agreements relating to the sale of assets, provided such restrictions and conditions apply only to the assets that are to be sold and such sale is permitted hereunder. No Credit Party shall, nor shall it permit its Subsidiaries to, enter into any Contractual Obligation which would prohibit a Subsidiary of Company from becoming a Credit Party.

6.6 **Investments**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, make or own any Investment in any Person, including without limitation any Joint Venture, except:

(a) Investments in Cash and Cash Equivalents;

(b) equity Investments owned as of the Closing Date in any Subsidiary and Investments made after the Closing Date in any wholly owned Guarantor Subsidiaries of Company;

(c) Investments (i) in any Securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors, and (ii) constituting deposits,

prepayments and other credits to suppliers made in the ordinary course of business consistent with the past practices of Company and its Subsidiaries;

(d)     intercompany loans to the extent permitted under Section 6.1(b);

(e)     Consolidated Capital Expenditures permitted by Section 6.7(ed);

(f)     loans and advances to employees of Company and its Subsidiaries (i) made in the ordinary course of business and described on Schedule 6.6, and (ii) any refinancings of such loans after the Closing Date in an aggregate amount not to exceed $[250,000], provided that any such loans or advances made under this provision do not violate Section 402 of the Sarbanes-Oxley Act;

(g)     Investments described in Schedule 6.6; and

(h)     other Investments (other than of the type described in clauses (b) and (e) above) in an aggregate amount not to exceed at any time $500,000.500,000; and

(i)     Notwithstanding the foregoing, in no event shall any Credit Party make any Investment which results in or facilitates in any manner any Restricted Junior Payment not otherwise permitted under the terms of Section 6.4.  Notwithstanding the foregoing, no Investment otherwise permitted by clause (d), (f), or (g) shall be permitted if any Default or Event of Default has occurred and is continuing or would result therefrom.

**6.7     Financial Covenants**.

(a)     <u>Total Secured Leverage Ratio</u>.  Company shall not permit the Total Secured Leverage Ratio as of the last day of any Fiscal Quarter, beginning with the Fiscal Quarter ending December 31, 2009, to exceed the correlative ratio of 5.00 to 1.00.indicated:

| **Fiscal Quarter Ending** | **Total Secured Leverage Ratio** |
|---|---|
| December 31, 2009 | 3.85:1.00 |
| March 31, 2010 | 3.85:1.00 |
| June 30, 2010 | 3.50:1.00 |
| September 30, 2010 | 3.50:1.00 |
| December 31, 2010 | 3.25:1.00 |
| March 31, 2011 | 2.70:1.00 |
| June 30, 2011 | 2.70:1.00 |
| September 30, 2011 | 2.60:1.00 |
| December 31, 2011 | 2.60:1.00 |
| March 31, 2012 | 2.45:1.00 |
| June 30, 2012 | 2.45:1.00 |
| September 30, 2012 | 2.45:1.00 |
| December 31, 2012 | 2.45:1.00 |
| March 31, 2013 | 2.25:1.00 |
| June 30, 2013 | 2.25:1.00 |

| | |
|---|---|
| September 30, 2013 | 2.25:1.00 |

(b)   Consolidated Adjusted EBITDA.  Company shall not permit Consolidated Adjusted EBITDA as at the end of any Fiscal Quarter, beginning with the Fiscal Quarter ending December 31, 2009, for the four Fiscal Quarter period then ended to be less than the correlative amount indicated:

| Fiscal Quarter | Consolidated Adjusted EBITDA |
|---|---|
| December 31, 2009 | $14,500,000 |
| March 31, 2010 | $14,500,000 |
| June 30, 2010 | $16,000,000 |
| September 30, 2010 | $17,000,000 |
| December 31, 2010 | $17,500,000 |
| March 31, 2011 | $20,000,000 |
| June 30, 2011 | $20,000,000 |
| September 30, 2011 | $21,000,000 |
| December 31, 2011 | $21,000,000 |
| March 31, 2012 | $21,000,000 |
| June 30, 2012 | $21,000,000 |
| September 30, 2012 | $21,000,000 |
| December 31, 2012 | $21,000,000 |
| March 31, 2013 | $21,000,000 |
| June 30, 2013 | $21,000,000 |
| September 30, 2013 | $21,000,000 |

(c)   (b)  Maximum Consolidated Capital Expenditures.  Company shall not make or incur any Consolidated Capital Expenditures, and Company shall not permit its Subsidiaries to, make or incur Consolidated Capital Expenditures, (i) in the Fiscal Quarter ending December 31, 2009 in an amount exceeding $1,300,000 or (ii) in any Fiscal Year beginning with the Fiscal Year 2010, 2010 in an amount exceeding $7,000,0006,000,000; provided, however, that to the extent Consolidated Capital Expenditures of the Company are less than $7,000,0006,000,000 in any Fiscal Year, beginning with the Fiscal Year 2010, an amount not to exceed fifty percent (50%) of the amount of such deficiency may be carried forward by the Company and applied to increase the maximum permitted amount of Consolidated Capital Expenditures hereunder for anythe immediately succeeding Fiscal Year (provided, that for the avoidance of doubt, not more than $7,000,0003,000,000 may be carried forward to from any Fiscal Year to the succeeding Fiscal YearsYear).

(d)   (e) Certain Calculations.  With respect to any period during which an Asset Sale has occurred (each, a "**Subject Transaction**"), for purposes of determining compliance with the financial covenants set forth in this Section 6.7, Consolidated Adjusted EBITDA shall be calculated with respect to such period on a pro forma basis (including pro forma adjustments approved by Administrative Agent in its sole discretion) using the historical audited financial statements of any business so acquired or to be acquired or sold or to be sold and the consolidated

financial statements of Company and its Subsidiaries which shall be reformulated as if such Subject Transaction, and any Indebtedness incurred or repaid in connection therewith, had been consummated or incurred or repaid at the beginning of such period (and assuming that such Indebtedness bears interest during any portion of the applicable measurement period prior to the relevant acquisition at the weighted average of the interest rates applicable to outstanding Loans incurred during such period).

(e) ~~(d)~~ Cure Rights.  In the event that Company ~~fails~~would otherwise fail to comply with the financial ~~covenant~~covenants set forth in Section 6.7(a) or (b) for any measurement period, it shall have the right ~~at any time prior to the earlier of : one hundred thirty-five (135) days following the end of~~(the "**Cure Right**"), within ten (10) days after the date on which a Compliance Certificate must be delivered for the end of the earlier of a Fiscal Quarter or Fiscal Year including such measurement period ~~or : forty-five (45) days following receipt of written notice from Administrative Agent or any Holder of such non-compliance~~ (as applicable, the "**Cure Date**"), to issue additional Subordinated ~~Indebtedness~~PIK Notes, PIK Preferred Stock or other Capital Stock (other than Disqualified Capital Stock) ~~in such amount as the Company may reasonably determine is necessary to cure such non-compliance, and the amount of~~, so long as the Maximum Remaining Cure is in excess of the Cure Shortfall Amount, in a minimum amount of Net Cure Proceeds per issuance equal to the greater of (i) $2,500,000 or (ii) the Cure Shortfall Amount.  For purposes of determining compliance with the financial covenants as set forth in Section 6.7(a) or (b) at any time following the Fiscal Quarter for which the Cure Right was exercised, the Consolidated Adjusted EBITDA for ~~such measurement period (and for each subsequent measurement period which includes the fiscal quarter with respect to which such cure is made) shall be deemed to have been~~the Fiscal Quarter for which the Cure Right was exercised shall be deemed to be increased only by the minimum amount ~~of Net Cure Proceeds received by Company in respect of any such issuance of Subordinated Indebtedness, PIK Preferred Stock or other Capital Stock (other than Disqualified Capital Stock):~~that would have been required to enable Company to be in compliance with the minimum Consolidated Adjusted EBITDA level as set forth in 6.7(b) in the Fiscal Quarter for which the Cure Right was exercised, provided that such Net Cure Proceeds are actually received by the Company on or prior to the Cure Date ~~(~~and the Company shall have confirmed the receipt of such Net Cure Proceeds to the Administrative Agent in writing~~)~~. (the "**Applied Cure Proceeds**"). For purposes hereof, the "**Maximum Remaining Cure**" as determined with respect to any issuance under this Section 6.7(e) shall be an amount equal to $5,000,000 minus the aggregate amount of Applied Cure Proceeds prior to such issuance.

**6.8    Fundamental Changes; Disposition of Assets; Acquisitions**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, enter into any transaction of merger or consolidation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sub lease (as lessor or sublessor), exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, or acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment and Capital Expenditures permitted hereunder in the ordinary course of business) the business, property or fixed assets of, or stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person, except:

(a)      any Subsidiary of Company may be merged with or into Company or any Guarantor Subsidiary, or be liquidated, wound up or dissolved, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions, to Company or any Guarantor Subsidiary; provided, in the case of such a merger, Company or such Guarantor Subsidiary, as applicable, shall be the continuing or surviving Person;

(b)      sales or other dispositions of assets (i) that do not constitute Asset Sales or (ii) made to Company or any Guarantor Subsidiary;

(c)      Asset Sales, the proceeds of which (i) are less than $~~500,000~~250,000 with respect to any single Asset Sale or series of related Asset Sales, and (ii) when aggregated with the proceeds of all other Asset Sales from the Closing Date to the date of determination, are less than $~~5,000,000~~1,000,000; provided (1) the consideration received for such assets shall be in an amount at least equal to the fair market value thereof (determined in good faith by the board of directors of Company (or similar governing body)), (2) no less than one hundred percent (100%) thereof shall be paid in Cash, and (3) the Net Asset Sale Proceeds thereof shall be applied as required by Section ~~2.9~~2.11(a);

(d)      disposals of obsolete or worn out property, the proceeds of which are less than $~~250,000~~100,000 with respect to any such property in any single disposition or series of related dispositions and when aggregated with all other dispositions made pursuant to this clause (d) from the Closing Date to the date of determination are less than $~~1,000,000~~500,000; provided that the consideration received for such assets shall be in an amount at least equal to the fair market value thereof (determined in good faith by the board of directors of Company (or similar governing body); and

(e)      Investments made in accordance with Section 6.6.

**6.9      Disposal of Subsidiary Interests**.  Except for any sale of all of its interests in the Capital Stock of any of its Subsidiaries in compliance with the provisions of Section 6.8, no Credit Party shall, nor shall it permit any of its Subsidiaries to, (a) directly or indirectly sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except to qualified directors if required by applicable law; or (b) directly or indirectly to sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except to another Credit Party (subject to the restrictions on such disposition otherwise imposed hereunder), or to qualified directors if required by applicable law.

**6.10      Sales and Leasebacks**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Credit Party (a) has sold or transferred or is to sell or to transfer to any other Person (other than Company or any of its Subsidiaries) or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Credit Party to any Person (other than Company or any of its Subsidiaries) in connection with such lease.

**6.11 Transactions with Shareholders and Affiliates**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any holder of five percent (5%) or more of any class of Capital Stock of Company or any of its Subsidiaries or with any Affiliate of Company or of any such holder, on terms that are less favorable to Company or that Subsidiary, as the case may be, than those that might be obtained at the time from a Person who is not such a holder or Affiliate; provided, the foregoing restriction shall not apply to (a) any transaction between Company and any Guarantor Subsidiary; (b) reasonable and customary fees paid to members of the board of directors (or similar governing body) of Company and its Subsidiaries; (c) ~~compensation and~~ consulting arrangements for <u>Johan van den Berg pursuant to a written agreement and any amendments thereto, consistent with Schedule R to this Agreement or otherwise in form and substance reasonably acceptable to the Administrative Agent entered into in the ordinary course of business, including, without limitation, pursuant to the Company's management incentive plan; (d) compensation for</u> officers and ~~other~~ employees of <u>the</u> Company and its Subsidiaries <u>other than Johan van den berg</u> entered into in the ordinary course of business, including, without limitation, pursuant to the Company's management incentive plan; and (e) the transactions contemplated by the Transaction Documents.

**6.12 Conduct of Business**. From and after the Closing Date, no Credit Party shall, nor shall it permit any of its Subsidiaries to, engage in any business other than the businesses engaged in by such Credit Party on the Closing Date.

**6.13 Permitted Activities**. Company shall not (a) incur, directly or indirectly, any Indebtedness or any other obligation or liability whatsoever other than the Indebtedness permitted pursuant to Section 6.1; (b) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than the Liens created under the Collateral Documents to which it is a party or permitted pursuant to Section 6.2; (c) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any Person; (d) sell or otherwise dispose of any Capital Stock of any of its Subsidiaries; (e) create or acquire any Subsidiary or make or own any Investment in any Person other than Company; ~~or~~ (f) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons~~.~~<u>; or (g) issue Capital Stock of the Company except to HoldCo subject to the Lien of the Security Agreement.</u>

**6.14 Amendments or Waivers of with respect to Subordinated Indebtedness**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, amend or otherwise change the terms of any Subordinated Indebtedness, <u>PIK Preferred Stock,</u> or make any payment consistent with an amendment thereof or change thereto, if the effect of such amendment or change is to increase the interest rate <u>or yield</u> on such Subordinated Indebtedness, <u>PIK Preferred Stock,</u> change (to earlier dates) any dates upon which payments of principal or<u> cash or PIK</u> interest are due thereon, change any event of default or condition to an event of default with respect thereto (other than to eliminate any such event of default or increase any grace period related thereto), change the redemption, prepayment or defeasance provisions thereof, change the subordination provisions of such Subordinated Indebtedness,<u> PIK Preferred Stock</u> (or of any guaranty thereof), or if the effect of such amendment or change, together with all other amendments or changes made, is to increase materially the obligations of the obligor thereunder or to confer any additional rights on the holders of such Subordinated Indebtedness (or a trustee or other representative on their behalf) which would be adverse to any Credit Party or Lenders.

**6.15** **Fiscal Year**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to change its Fiscal Year end from December 31.

**6.16** **Deposit Accounts**.  No Credit Party shall establish or maintain a Deposit Account or Securities Account that is not subject to a Control Agreement and no Credit Party will deposit Collateral (including the proceeds thereof) or the proceeds of Loans in a Deposit Account or Securities Account that is not subject to a Control Agreement.

**6.17** **Amendments to Organizational Agreements and Material Contracts**.  No Credit Party shall (a) amend or permit any amendments to any Credit Party's Organizational Documents if, or (b) amend or permit any amendments to, or terminate or waive any provision of, any Material Contract, if any such amendment, termination or waiver (under either clause (a) or (b) above) would be materially adverse to Administrative Agent or the Lenders.

**6.18** **Prepayments of Certain Indebtedness**.  No Credit Party shall, directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness prior to its scheduled maturity, other than (i) the Obligations, and (ii) Indebtedness (other than First Lien Mortgage Notes) secured by a Permitted Lien if the asset securing such Indebtedness has been sold or otherwise disposed of. . Indebtedness constituting First Lien Mortgage Notes solely in connection with a prepayment required by the terms thereof upon a sale, casualty event or condemnation with respect to the Snowflake Personal Property, . Notwithstanding anything to the contrary contained in this Agreement, (x) payments in kind (and not in cash) permitted under this Agreement in respect of Subordinated Indebtedness, .(y) dividends and distributions paid in kind (and not in cash) permitted under this Agreement in respect of PIK Preferred Stock. and vi) pro rata prepayments of the First Lien Mortgage Notes pursuant to Section 2.9(h) hereofz) the scheduled repayment of Subordinated Notes pursuant to the terms of the Subordinated Note Documents (including without limitation a repayment of up to $5,000,000 in Subordinated PIK A Notes on March 31, 2010) shall not be prohibited hereunder.

**6.19** **Issuance of Disqualified Capital Stock**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, issue or sell any Disqualified Capital Stock, other than (a) PIK Preferred Stock issued on the Closing Date pursuant to the Plan, (b) PIK Preferred Stock issued in connection with the exercise of cure rights as provided in Section 6.7(dg) hereof and (c) additional shares of PIK Preferred Stock issued as a dividend or distribution paid in-kind thereon.

**6.20** **Limitation on New Operating Leases**.  No Credit Party shall, nor shall it permit its Subsidiaries to, enter into any new operating lease if, after giving effect to such new operating lease, the total amount of operating leases entered into after the Closing Date (excluding replacements for or extensions of operating leases in effect prior to the Closing Date), when valued according to GAAP as if the same were capital leases, exceeds $2,000,000 at any one time outstanding.

**6.21** **Limitations on Rabo Bank Account**.  Credit Parties may maintain the Rabo Bank Account, provided that (i) the aggregate amount of deposits by the Credit Parties into the Rabo Bank Account shall not exceed the euro equivalent of [US$300,000] (determined based upon the exchange rate in effect on the date of such deposits) in any consecutive twelve month period and (ii)

the balance on deposit in the Rabo Bank Account determined on a "book basis" at the close of business shall not on any day exceed the euro equivalent of [US$30,000] (determined based upon the exchange rate in effect on each date of determination).

## SECTION 7. GUARANTY.

**7.1    Guaranty of the Obligations**.  Subject to the provisions of Section 7.2, Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Administrative Agent for the ratable benefit of the Beneficiaries the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code , 11 U.S.C. §362(a)) (collectively, the "**Guaranteed Obligations**").

**7.2    Contribution by Guarantors**.    All Guarantors desire to allocate among themselves (collectively, the "**Contributing Guarantors**"), in a fair and equitable manner, their obligations arising under this Guaranty.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "**Funding Guarantor**") under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date. "**Fair Share**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor, to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors multiplied by, (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the obligations Guaranteed.   "**Fair Share Contribution Amount**" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of the Bankruptcy Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the Fair Share Contribution Amount with respect to any Contributing Guarantor for purposes of this Section 7.2, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor.  "**Aggregate Payments**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including in respect of this Section 7.2), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 7.2.   The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor.  The allocation among Contributing Guarantors of their obligations as set forth in this Section 7.2 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder.  Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 7.2.

**7.3     Payment by Guarantors**.  Subject to Section 7.2, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of Company to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)), Guarantors will upon demand pay, or cause to be paid, in Cash, to Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for Company's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against Company for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

**7.4     Liability of Guarantors Absolute**.  Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)     this Guaranty is a guaranty of payment when due and not of collectability.  This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)     Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between Company and any Beneficiary with respect to the existence of such Event of Default;

(c)     the obligations of each Guarantor hereunder are independent of the obligations of Company and the obligations of any other guarantor (including any other Guarantor) of the obligations of Company, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against Company or any of such other guarantors and whether or not Company is joined in any such action or actions;

(d)     payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid; and without limiting the generality of the foregoing, if Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)     any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time

to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith or the applicable Interest Rate Agreement and Currency Agreement and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against Company or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents or Interest Rate Agreements and Currency Agreements; and

(f)    this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents or any Interest Rate Agreement or Currency Agreement, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents, any of the Interest Rate Agreements or Currency Agreements or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document, such Interest Rate Agreement or Currency Agreement or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or any of the Interest Rate Agreements or Currency Agreements or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the

corporate structure or existence of Company or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set offs or counterclaims which Company may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

7.5 **Waivers by Guarantors**. Each Guarantor hereby waives, for the benefit of Beneficiaries: (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against Company, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Company, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of any Beneficiary in favor of Company or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Company or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Company or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, the Interest Rate Agreements or Currency Agreements or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Company and notices of any of the matters referred to in Section 7.4 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

7.6 **Guarantors' Rights of Subrogation, Contribution, etc**. Until the Guaranteed Obligations shall have been indefeasibly paid in full, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against Company or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including without limitation (a) any right of subrogation, reimbursement or indemnification that

such Guarantor now has or may hereafter have against Company with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against Company, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary.  In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by Section 7.2.  Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Company or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against Company, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full, such amount shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

7.7     **Subordination of Other Obligations**.  Any Indebtedness of Company or any Guarantor now or hereafter held by any Guarantor (the "**Obligee Guarantor**") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

7.8     **Continuing Guaranty**.  This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full.  Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

7.9     **Authority of Guarantors or Company**.  It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or Company or the officers, directors or any agents acting or purporting to act on behalf of any of them.

7.10     **Financial Condition of Company**.  Any Credit Extension may be made to Company or continued from time to time, and any Interest Rate Agreements or Currency Agreements may be entered into from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of Company at the time of any such grant or continuation or at the time such Interest Rate Agreements or Currency Agreement is entered into, as the case may be.  No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of

Company. Each Guarantor has adequate means to obtain information from Company on a continuing basis concerning the financial condition of Company and its ability to perform its obligations under the Credit Documents and the Interest Rate Agreements and Currency Agreements, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Company and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of Company now known or hereafter known by any Beneficiary.

**7.11   Bankruptcy, etc**.

(a)   So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of Administrative Agent acting pursuant to the instructions of Requisite Lenders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against Company or any other Guarantor or admit in writing or in any legal proceeding that it is unable to pay its debts as they become due. The obligations of Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Company or any other Guarantor or by any defense which Company or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)   Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and Beneficiaries that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve Company of any portion of such Guaranteed Obligations. Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay Administrative Agent, or allow the claim of Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)   In the event that all or any portion of the Guaranteed Obligations are paid by Company, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

**7.12   Discharge of Guaranty Upon Sale of Guarantor**. If all of the Capital Stock of any Subsidiary Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions

hereof, the Guaranty of such Subsidiary Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Beneficiary or any other Person effective as of the time of such Asset Sale.

**7.13** **Taxes**. The provision of Section ~~2.14~~2.17 shall apply, *mutatis mutandi*, to the Guarantors and payments thereby.

## SECTION 8. EVENTS OF DEFAULT.

**8.1** **Events of Default**. If any one or more of the following conditions or events shall occur:

(a) <u>Failure to Make Payments When Due</u>. Failure by Company to pay (i) when due the principal of and premium, if any, on any Loan whether at stated maturity, by acceleration or otherwise; (ii) when due any installment of principal of any Loan, by notice of voluntary prepayment, by mandatory prepayment or otherwise; (iii) when due any interest on any Loan or any fee or any other amount due hereunder.

(b) <u>Default in Other Agreements</u>. (i) Failure of any Credit Party or any of their respective Subsidiaries to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 8.1(a)) in an individual principal amount of $~~2,000,000~~500,000 or more with an aggregate principal amount of $~~5,000,000~~1,000,000 or more; or (ii) breach or default by any Credit Party or any of their respective Subsidiaries with respect to any other material term of (1) one or more items of Indebtedness in the individual or aggregate principal amount referred to in clause (i) above, or (2) any loan agreement, mortgage, indenture or other agreement relating to Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redeemable) or to require the prepayment, redemption, repurchase or defeasance of, or to cause Company or any of its Subsidiaries to make any offer to prepay, redeem, repurchase or defease such Indebtedness, prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

(c) <u>Breach of Certain Covenants</u>. Failure of any Credit Party to perform or comply with any term or condition contained in Section 2.3, Section 5.1, Section 5.2, or Section 6; <u>provided</u>, however, that ~~upon receipt by any Credit Party of written notice from~~within ten (10) days after timely delivery by Company of a Compliance Certificate to Administrative Agent ~~or any Lender~~that discloses of a failure to perform or comply with any term or condition contained in Section ~~6.7,~~6.7(a) or (b), such Credit Party shall have the right to cure any such failure as provided in Section 6.7(~~d~~e) and such failure shall not constitute an Event of Default unless it remains uncured after passage of the applicable time period set forth therein; or

(d) <u>Breach of Representations, etc</u>. Any representation, warranty, certification or other statement made or deemed made by any Credit Party in any Credit Document or in any statement or certificate at any time given by any Credit Party or any of its Subsidiaries in writing

pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(e)     Other Defaults Under Credit Documents.  Any Credit Party shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other Section of this Section 8.1, and such default shall not have been remedied or waived within thirty (30) days after receipt by Company of notice from Administrative Agent or any Lender of such default; or

(f)     Involuntary Bankruptcy; Appointment of Receiver, etc.  (i) A court of competent jurisdiction shall enter a decree or order for relief in respect of Company or any of its Subsidiaries in an involuntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal or state law; or (ii) an involuntary case shall be commenced against Company or any of its Subsidiaries under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over Company or any of its Subsidiaries, or over all or a substantial part of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of Company or any of its Subsidiaries for all or a substantial part of its property; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of Company or any of its Subsidiaries, and any such event described in this clause (ii) shall continue for sixty (60) days without having been dismissed, bonded or discharged; or

(g)     Voluntary Bankruptcy; Appointment of Receiver, etc.  (i) Company or any of its Subsidiaries shall have an order for relief entered with respect to it or shall commence a voluntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or Company or any of its Subsidiaries shall make any assignment for the benefit of creditors; or (ii) Company or any of its Subsidiaries shall be unable, or shall fail generally, or shall admit in writing its inability, to pay its debts as such debts become due; or the board of directors (or similar governing body) of Company or any of its Subsidiaries (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to herein or in Section 8.1(f); or

(h)     Judgments, Settlements and Attachments.  Any money judgment, writ or warrant of attachment, agreement of settlement, stipulated judgment or similar process, excluding any Pending Investigation Settlement Amount, any Pending Property Tax Dispute Settlement Amounts and any Pending 401(k) Catch-Up Payment Amounts, involving – in any individual case or in the aggregate at any time an amount in excess of $3,000,000750,000 in any Fiscal Year or $10,000,000 in the aggregate2,000,000 from the Closing Date through the date of determination (in either case to the extent not fully covered by insurance (less any deductible) as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered into by,

or entered or filed against, Company or any of its Subsidiaries or any of their respective assets and, in the case of an event other than an agreement of settlement or stipulated judgment (to which no grace period shall apply), shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days (or in any event later than the date that enforcement proceedings shall have been commenced by any creditor upon such judgment order or five (5) days prior to the date of any proposed sale thereunder); or

(i)　　Dissolution.  Any order, judgment or decree shall be entered against any Credit Party decreeing the dissolution or split up of such Credit Party and such order shall remain undischarged or unstayed for a period in excess of thirty (30) days; or

(j)　　Employee Benefit Plans.  (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or might reasonably be expected to result in liability of Company, any of its Subsidiaries or any of their respective ERISA Affiliates in excess of $~~1,000,000~~500,000 during the term hereof; or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest under Section 401(a)(29) or 412(n) of the Internal Revenue Code or under ERISA; or

(k)　　Change of Control.  A Change of Control shall occur.

(l)　　~~(k)~~ Guaranties, Collateral Documents and other Credit Documents.  At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of Collateral Agent or any Secured Party to take any action within its control, or (iii) any Credit Party shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Credit Document to which it is a party; or

~~(l)　　First Lien Mortgage Notes.  A default or event of default has occurred and is continuing under the First Lien Mortgage Note documents and all cure periods provided in the applicable First Lien Mortgage documents with respect to such default or event of default shall have expired;~~

(m)　　Material Adverse Change.  There shall occur any condition, act, event or development that has resulted in or could reasonably be expected to result in a Material Adverse Effect; or

(n)　　Material Contracts.  Any party thereto shall default in the performance of any of their material obligations under any Material Contract, or any Material Contract shall be terminated or not renewed by any party thereto; or

(o)    Senior Indebtedness.  At any time that the Obligations evidenced by this Agreement cease to be treated as senior first lien secured debt under any agreements governing Subordinated Indebtedness; or

THEN, (1) upon the occurrence of any Event of Default described in Section 8.1(f) or 8.1(g), automatically, and (2)  upon the occurrence of any other Event of Default, upon written notice to Company, Administrative Agent may (or at the direction of the Requisite Lenders, Administrative Agent shall) take any of the following actions, (A)  each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Credit Party: (I) the unpaid principal amount of and accrued interest on the Loans, and (II) all other Obligations; and (B) Administrative Agent may cause Collateral Agent to enforce any and all Liens and security interests created pursuant to Collateral Documents; and (C) Administrative Agent may, at its election, immediately convert any or all LIBOR Rate Loans then outstanding into Base Rate Loans (it being understood that Company shall be liable for any amounts payable under Section 2.15(c) in connection with such conversion).

## SECTION 9.  AGENTS

**9.1    Appointment of Agents**.  Silver Point is hereby appointed Administrative Agent and Collateral Agent hereunder and under the other Credit Documents and each Lender hereby authorizes Silver Point, in such capacity, to act as its agent in accordance with the terms hereof and the other Credit Documents.  Silver Point is hereby appointed Syndication Agent hereunder, and each Lender hereby authorizes Syndication Agent to act as its agent in accordance with the terms hereof and the other Credit Documents.  Silver Point is hereby appointed Documentation Agent hereunder, and each Lender hereby authorizes Documentation Agent to act as its agent in accordance with the terms hereof and the other Credit Documents.  Each Agent hereby agrees to act upon the express conditions contained herein and the other Credit Documents, as applicable. The provisions of this Section 9 are solely for the benefit of Agents and Lenders and no Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof.   In performing its functions and duties hereunder, each Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Company or any of its Subsidiaries.  Each of Syndication Agent and Documentation Agent, without consent of or notice to any party hereto, may assign any and all of its rights or obligations hereunder to any of its Affiliates.  As of the Closing Date, neither Silver Point, in its capacity as Syndication Agent, nor Silver Point, in its capacity as Documentation Agent, shall have any obligations but shall be entitled to all benefits of this Section 9.

**9.2    Powers and Duties**.  Each Lender irrevocably authorizes each Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies and perform such duties hereunder and under the other Credit Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such actions, powers, rights and remedies as are reasonably incidental thereto.  Each Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents.  Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees.  No Agent shall have or be deemed to have, by reason hereof or any of the other Credit

Documents, a fiduciary relationship in respect of any Lender; and nothing herein or any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or any of the other Credit Documents except as expressly set forth herein or therein.

**9.3    General Immunity**.

(a)    <u>No Responsibility for Certain Matters</u>.  No Agent shall be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Credit Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to Lenders or by or on behalf of any Credit Party to any Agent or any Lender in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, nor shall any Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing.  <u>Anything contained herein to the contrary notwithstanding, Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Loan or the component amounts thereof.</u>

(b)    <u>Exculpatory Provisions</u>.  No Agent nor any of its officers, partners, directors, employees or agents shall be liable to Lenders for any action taken or omitted by any Agent under or in connection with any of the Credit Documents except to the extent caused by such Agent's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, nonappealable order.  Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5) or, in the case of Collateral Agent, in accordance with ~~the Pledge Agreement,~~ the Security Agreement or other applicable Collateral Document, and, upon receipt of such instructions from Requisite Lenders (or such other Lenders, as the case may be), or in accordance with the ~~Pledge Agreement or~~ Security Agreement or other applicable Collateral Document, as the case may be, such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions.  Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected and free from liability in relying on opinions and judgments of attorneys (who may be attorneys for the Credit Parties), accountants, experts and other professional advisors selected by it; and (ii) no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5) or,

in the case of Collateral Agent, in accordance with the ~~Pledge Agreement,~~ Security Agreement or other applicable Collateral Document.

(c)    <u>Notice of Default</u>.    Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to Events of Default in the payment of principal, interest and fees required to be paid to Administrative Agent for the account of the Lenders, unless Administrative Agent shall have received written notice from a Lender or the ~~Borrower~~Company referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." Administrative Agent will notify the Lenders of its receipt of any such notice.    Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable or in the best interest of the Lenders.

9.4    **Agents Entitled to Act as Lender**.  The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Lender hereunder.  With respect to its participation in the Loans, each Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity.  Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with Company or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from Company for services in connection herewith and otherwise without having to account for the same to Lenders.

9.5    **Lenders' Representations, Warranties and Acknowledgment**.

(a)    Each Lender represents and warrants to the Agents that it has made its own independent investigation of the financial condition and affairs of Company and its Subsidiaries, without reliance upon any Agent or any other Lender and based on such documents and information as it has deemed appropriate, in connection with the Debt Exchange and Credit Extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Company and its Subsidiaries.  No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

(b)    Each Lender, by delivering its signature page to this Agreement and funding its Loan on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable on the Closing Date.

9.6    **Right to Indemnity**.  Each Lender, in proportion to its Pro Rata Share, severally agrees to indemnify each Agent, their Affiliates and their respective officers, partners, directors,

trustees, employees, representatives and agents of each Agent (each, an "**Indemnitee Agent Party**"), to the extent that such Indemnitee Agent Party shall not have been reimbursed by any Credit Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Indemnitee Agent Party in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Indemnitee Agent Party in any way relating to or arising out of this Agreement or the other Credit Documents, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH AGENT**; provided, no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Indemnitee Agent Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, nonappealable order. If any indemnity furnished to any Indemnitee Agent Party for any purpose shall, in the opinion of such Indemnitee Agent Party, be insufficient or become impaired, such Indemnitee Agent Party may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Lender to indemnify any Indemnitee Agent Party against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof; and provided further, this sentence shall not be deemed to require any Lender to indemnify any Indemnitee Agent Party against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

### 9.7 Successor Administrative Agent.

(a) Administrative Agent and Collateral Agent may resign at any time by giving thirty (30) days' prior written notice thereof to Lenders and Company. Upon any such notice of resignation, Requisite Lenders shall have the right, upon five (5) Business Days' notice to Company, to appoint a successor Administrative Agent and Collateral Agent. If no successor shall have been so appointed by the Requisite Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent and Collateral Agent gives notice of its resignation, then the retiring Administrative Agent and Collateral Agent may, on behalf of the Lenders, appoint a successor Administrative Agent and Collateral Agent from among the Lenders. Upon the acceptance of any appointment as Administrative Agent and Collateral Agent hereunder by a successor Administrative Agent and Collateral Agent, that successor Administrative Agent and Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent and Collateral Agent and the retiring Administrative Agent and Collateral Agent shall promptly (i) transfer to such successor Administrative Agent and Collateral Agent all sums, Securities and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent and Collateral Agent under the Credit Documents, and (ii) execute and deliver to such successor Administrative Agent and Collateral Agent such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Administrative Agent and Collateral Agent of the security interests created

under the Collateral Documents, whereupon such retiring Administrative Agent and Collateral Agent shall be discharged from its duties and obligations hereunder. After any retiring Administrative Agent's and Collateral Agent's resignation hereunder as Administrative Agent and Collateral Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent hereunder.

(b)  Notwithstanding anything herein to the contrary, Administrative Agent may assign its rights and duties as Administrative Agent hereunder to an Affiliate of Silver Point, any other financing source of Silver Point or Affiliate of Silver Point or to any Lender without the prior written consent of, or prior written notice to, Company or the Lenders; provided that Company and the Lenders may deem and treat such assigning Administrative Agent as Administrative Agent for all purposes hereof, unless and until such assigning Administrative Agent provides written notice to Company and the Lenders of such assignment. Upon such assignment such Affiliate shall succeed to and become vested with all rights, powers, privileges and duties as Administrative Agent hereunder and under the other Credit Documents.

(c)  <u>Delegation of Duties</u>.  Administrative Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Credit Document by or through any one or more sub-agents appointed by Administrative Agent. Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory, indemnification and other provisions of Section 9.3 and Section 9.6 shall apply to any the Affiliates of Administrative Agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. All of the rights, benefits and privileges (including the exculpatory and indemnification provisions) of Section 9.3 and of Section 9.6 shall apply to any such sub-agent and to the Affiliates of any such sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and Affiliates were named herein. Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by Administrative Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory and rights to indemnification) and shall have all of the rights, benefits and privileges of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of the Credit Parties and the Lenders, (ii) such rights, benefits and privileges (including exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent, and (iii) such sub-agent shall only have obligations to Administrative Agent and not to any Credit Party, Lender or any other Person and no Credit Party, Lender or any other Person shall have the rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent.

**9.8**     **Collateral Documents and Guaranty**.

(a)  <u>Agents under Collateral Documents and Guaranty</u>.  Each Lender hereby further irrevocably authorizes Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of Lenders, to be the agent for and representative of Lenders with respect to the Guaranty, the Collateral and the Collateral Documents. Subject to Section 10.5, without further written consent or authorization from Lenders, Administrative Agent or Collateral Agent,

as applicable, may execute any documents or instruments necessary to (i) release any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets permitted hereby or to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented, or (ii) release any Guarantor from the Guaranty pursuant to Section 7.12 or with respect to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented.

(b)        <u>Right to Realize on Collateral and Enforce Guaranty.</u>  Anything contained in any of the Credit Documents to the contrary notwithstanding, Company, Administrative Agent, Collateral Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by Administrative Agent, on behalf of Lenders in accordance with the terms hereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by Collateral Agent, and (ii) in the event of a foreclosure by Collateral Agent on any of the Collateral pursuant to a public or private sale, Collateral Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and Collateral Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Requisite Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by Collateral Agent at such sale.

**9.9     Posting of Approved Electronic Communications**.

(a)        Delivery of Communications.  Each Credit Party hereby agrees, unless directed otherwise by Administrative Agent or unless the electronic mail address referred to below has not been provided by Administrative Agent to such Credit Party that it will, or will cause its Subsidiaries to, provide to Administrative Agent all information, documents and other materials that it is obligated to furnish to Administrative Agent or to the Lenders pursuant to the Credit Documents, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Funding Notice, or a Conversion/Continuation Notice, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or any other Credit Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Loan or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to Administrative Agent to an electronic mail address as directed by Administrative Agent.  In addition, each Credit Party agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to Administrative Agent or the Lenders, as the case may be, in the manner specified in the Credit Documents but only to the extent requested by Administrative Agent.

(b)        Platform.  Each Credit Party further agrees that Administrative Agent may make the Communications available to the Lenders by posting the Communications on IntraLinks or a substantially similar electronic transmission system (the "**Platform**").

(c)    No Warranties as to Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE INDEMNITEES DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE INDEMNITEES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE INDEMNITEES HAVE ANY LIABILITY TO ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY INDEMNITEES IS FOUND IN A FINAL, NONAPPEALABLE ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH INDEMNITEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)    Delivery Via Platform.  Administrative Agent agrees that the receipt of the Communications by Administrative Agent at its electronic mail address set forth above shall constitute effective delivery of the Communications to Administrative Agent for purposes of the Credit Documents.  Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Credit Documents.  Each Lender agrees to notify Administrative Agent in writing (including by electronic communication) from time to time of such Lender's electronic mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such electronic mail address.

(e)    No Prejudice to Notice Rights.  Nothing herein shall prejudice the right of Administrative Agent or any Lender to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

**9.10    Proofs of Claim**.  The Lenders and Company hereby agree that after the occurrence of an Event of Default pursuant to Sections 8.1(f) or (g), in case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to Company or any of the Guarantors, Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on any of Company or any of the Guarantors) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of principal and interest owing and unpaid in respect of the Loans and any other Obligations that are owing and unpaid and to file such other papers or documents as may be necessary or advisable in order to have the claims

of the Lenders, Administrative Agent and other Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, Administrative Agent and other agents and their agents and counsel and all other amounts due Lenders, Administrative Agent and other agents hereunder) allowed in such judicial proceeding; and

(b)     to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent and other agents hereunder. Nothing herein contained shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lenders or to authorize Administrative Agent to vote in respect of the claim of any Lender in any such proceeding. Further, nothing contained in this Section 9.10 shall affect or preclude the ability of any Lender to (i) file and prove such a claim in the event that Administrative Agent has not acted within ten (10) days prior to any applicable bar date and (ii) require an amendment of the proof of claim to accurately reflect such Lender's outstanding Obligations.

**9.11    Agents and Arrangers**.  Except as otherwise set forth herein, Syndication Agent, Documentation Agent and any arrangers shall not have any right, power, obligation, liability, responsibility or duty under this Agreement (or any other Credit Document) other than those applicable to all Lenders as such.  Without limiting the foregoing, Syndication Agent, Documentation Agent and such arrangers shall not have or be deemed to have any fiduciary relationship with any other Lender.  Each Lender acknowledges that it has not relied, and will not rely, on Syndication Agent, Documentation Agent or any arranger in deciding to enter into this Agreement and each other Credit Document to which it is a party or in taking or not taking action hereunder or thereunder.

## SECTION 10.  MISCELLANEOUS

**10.1    Notices**.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given to a Credit Party or an Agent, shall be sent to such Person's address as set forth on Appendix B or in the other relevant Credit Document, and in the case of any Lender, the address as indicated on Appendix B or otherwise indicated to Administrative Agent in writing.  Each notice hereunder shall be in writing and may be personally served, telexed or sent by telefacsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telefacsimile or telex, or three (3) Business Days after depositing it in the United States mail with postage prepaid and properly addressed; <u>provided</u>, no notice to any Agent shall be effective until received by such Agent.

**10.2    Expenses**.

(a)     Whether or not the transactions contemplated hereby shall be consummated, Company agrees to pay promptly, and in any event within five (5) days after written demand therefor, (a) all the actual and reasonable costs and expenses of preparation of the Credit Documents and any consents, amendments, waivers or other modifications thereto; (b) the actual ~~and reasonable~~ costs of furnishing all opinions by counsel for Company and the other Credit Parties; (c) the fees, expenses and disbursements of counsel to Agents (including allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the Credit Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Company; (d) all the actual costs and expenses of creating and perfecting Liens in favor of Collateral Agent, for the benefit of Secured Parties pursuant hereto, including filing and recording fees, expenses and amounts owed pursuant to Sections ~~2.14~~2.17(c) and (d), search fees, title insurance premiums and fees, expenses and disbursements of counsel to each Agent and of counsel providing any opinions that any Agent or Requisite Lenders may request in respect of the Collateral or the Liens created pursuant to the Collateral Documents; (e) the actual ~~and reasonable~~ costs and fees, expenses and disbursements of any auditors, accountants, consultants or appraisers whether internal or external; (f) the ~~actual and reasonable~~ actual costs and expenses (including the fees, expenses and disbursements of counsel (including allocated costs of internal counsel) and of any appraisers, consultants, advisors and agents employed or retained by Collateral Agent and its counsel) in connection with the custody or preservation of any of the Collateral; (g) all other actual ~~and reasonable~~ costs and expenses incurred by each Agent in connection with the syndication of the Loans and the negotiation, preparation and execution of the Credit Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (h) after the occurrence of a Default or an Event of Default, all the actual ~~and reasonable~~ costs and expenses, including attorneys' fees (including allocated costs of internal counsel) and costs of settlement, incurred by any Agent and Lenders in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings.

(b)     Company agrees to pay the Broadpoint Gleacher Securities Group, Inc. in the amount of $575,000 (to the extent approved by the Bankruptcy Court) as follows: (i) if and to the extent such fee has been approved by the Bankruptcy Court prior to the Effective Date, on the Effective Date; or (ii) if the fee has not been approved by the Bankruptcy Court prior to the Effective Date, then within two (2) Business Day of the entry of an order by the Bankruptcy Court approving such fee.  The Company shall support the Bankruptcy Court's approval of the Broadpoint Gleacher Securities Group, Inc. success fee in the amount of $575,000.

**10.3    Indemnity**.

(a)     In addition to the payment of expenses pursuant to Section 10.2, whether or not the transactions contemplated hereby shall be consummated, each Credit Party agrees to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless, each Agent and Lender, their Affiliates and their respective officers, partners, directors, trustees, employees, representatives and agents of each Agent and each Lender (each, an "**Indemnitee**"),

from and against any and all Indemnified Liabilities, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH AGENT**; provided, no Credit Party shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities if such Indemnified Liabilities arise solely from the gross negligence or willful misconduct of that Indemnitee as determined by a court of competent jurisdiction in a final, nonappealable order. To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.3 may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

(b)     To the extent permitted by applicable law, no Credit Party shall assert, and each Credit Party hereby waives, any claim against Lenders, Agents and their respective Affiliates, directors, employees, attorneys or agents, on any theory of liability, for special, indirect, consequential or punitive damages  (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Credit Party hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

**10.4    Set Off**.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence of any Event of Default each Lender and its respective Affiliates is hereby authorized by each Credit Party at any time or from time to time subject to the consent of Administrative Agent (such consent not to be unreasonably withheld or delayed), without notice to any Credit Party or to any other Person (other than Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts (in whatever currency)) and any other Indebtedness at any time held or owing by such Lender to or for the credit or the account of any Credit Party (in whatever currency) against and on account of the obligations and liabilities of any Credit Party to such Lender hereunder and under the other Credit Documents, including all claims of any nature or description arising out of or connected hereto or with any other Credit Document, irrespective of whether or not (a) such Lender shall have made any demand hereunder, (b) the principal of or the interest on the Loans or any other amounts due hereunder shall have become due and payable pursuant to Section 2 and although such obligations and liabilities, or any of them, may be contingent or unmatured or (c) such obligation or liability is owed to a branch or office of such Lender different from the branch or office holding such deposit or obligation or such Indebtedness.

**10.5    Amendments and Waivers**.

(a)     Requisite Lenders' Consent.  Subject to Sections 10.5(b) and 10.5(c), no amendment, modification, termination or waiver of any provision of the Credit Documents, or

consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of (i) in the case of this Agreement, Administrative Agent and the Requisite Lenders or (ii) in the case of any other Credit Document, Administrative Agent and, if party thereto, Collateral Agent, with the consent of the Requisite Lenders.

(b)     Affected Lenders' Consent.  Without the written consent of each Lender (other than a Defaulting Lender) that would be affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i)     extend the scheduled final maturity of any Loan or Note of such Lender;

(ii)     waive, reduce or postpone any scheduled repayment due such Lender (but not prepayment);

(iii)     reduce the rate of interest on any Loan of such Lender (other than any amendment to the definition of "Default Rate" (which may be affected by consent of the Requisite Lenders) and any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.62.7) or any fee payable hereunder;

(iv)     extend the time for payment of any such interest or fees to such Lender;

(v)     reduce the principal amount of any Loan;

(vi)     amend, modify, terminate or waive any provision of this Section 10.5(b) or Section 10.5(c);

(vii)     amend the definition of "Requisite Lenders" or "Pro Rata Share"; provided, with the consent of Administrative Agent and the Requisite Lenders, additional extensions of credit pursuant hereto may be included in the determination of "Requisite Lenders" or "Pro Rata Share" on substantially the same basis as the Loans are included on the Closing Date;

(viii)     release all or substantially all of the Collateral or all or substantially all of the Guarantors from the Guaranty except as expressly provided in the Credit Documents; or

(ix)     consent to the assignment or transfer by any Credit Party of any of its rights and obligations under any Credit Document.

(c)     Other Consents.  No amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall amend, modify, terminate or waive any provision of Section 9 as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case without the consent of such Agent.

(d)    Defaulting Lenders.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, modification, waiver or consent hereunder.

(e)    Execution of Amendments, etc.  Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this 10.5 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Credit Party, on such Credit Party.

**10.6    Successors and Assigns**; **Participations**.

(a)    Generally.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders.  No Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party without the prior written consent of all Lenders (and any attempted assignment or transfer by any Credit Party without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of the Agents and Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Register.  Company, Administrative Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Loans listed therein for all purposes hereof, and no assignment or transfer of any such Loan shall be effective, in each case, unless and until an Assignment Agreement effecting the assignment or transfer thereof shall have been delivered to and accepted by Administrative Agent and recorded in the Register as provided in Section 10.6(e).  Prior to such recordation, all amounts owed with respect to the applicable Loan shall be owed to the Lender listed in the Register as the owner thereof, and any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Loans.  Solely for the purposes of maintaining the Register and for tax purposes only Administrative Agent shall be deemed to be acting on behalf of the Credit Parties.

(c)    Right to Assign.  Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including all or a portion of its Loans owing to it or other Obligations (provided, however, that each such assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any Loan:

(i)    to any Person meeting the criteria of clause (i)(a) or clause (ii)(a) of the definition of the term of "Eligible Assignee" upon the giving of notice to Company and Administrative Agent; or

(ii)     to any Person otherwise constituting an Eligible Assignee with the consent of Administrative Agent; provided, each such assignment pursuant to this Section 10.6(c)(ii) shall be in an aggregate amount of not less than $1,000,000 (or such lesser amount as may be agreed to by Company and Administrative Agent or as shall constitute the aggregate amount of the Loans of the assigning Lender) with respect to the assignment of Loans, provided that the foregoing minimum assignment amount shall not apply (x) to any assignment of all or any portion of a Loan to a Lender, an Affiliate of a Lender or a Related Fund of the assignor or (y) if any Event of Default shall have occurred and is continuing.

(d)     Mechanics.  The assigning Lender and the assignee thereof shall execute and deliver to Administrative Agent an Assignment Agreement, together with such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver to Administrative Agent pursuant to Section ~~2.14~~2.17(e).

(e)     Notice of Assignment.  Upon its receipt and acceptance of a duly executed and completed Assignment Agreement, any forms, certificates or other evidence required by this Agreement in connection therewith, Administrative Agent shall record the information contained in such Assignment Agreement in the Register, shall give prompt notice thereof to Company and shall maintain a copy of such Assignment Agreement.

(f)     Representations and Warranties of Assignee.  Each Lender, upon execution and delivery hereof or upon executing and delivering an Assignment Agreement, as the case may be, represents and warrants as of the Closing Date or as of the applicable ~~Effective Date~~"effective date" (as defined in the applicable Assignment Agreement) that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in loans such as the applicable Loans, as the case may be; and (iii) it will make or invest in, as the case may be, its Loans for its own account in the ordinary course of its business and without a view to distribution of such Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 10.6, the disposition of such or Loans or any interests therein shall at all times remain within its exclusive control).

(g)     Effect of Assignment.  Subject to the terms and conditions of this Section 10.6, as of the "~~Effective Date~~effective date" specified in the applicable Assignment Agreement: (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent such rights and obligations hereunder have been assigned to it pursuant to such Assignment Agreement and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned thereby pursuant to such Assignment Agreement, relinquish its rights (other than any rights which survive the termination hereof under Section 10.8) and be released from its obligations hereunder (and, in the case of an Assignment Agreement covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto; provided, anything contained in any of the Credit Documents to the contrary notwithstanding, such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder); and (iii) if any such assignment occurs after the issuance of any Note hereunder, the assigning Lender shall, upon the effectiveness

of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to Administrative Agent for cancellation, and thereupon Company shall issue and deliver new Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the outstanding Loans of the assignee and/or the assigning Lender.

(h)     Participations.  Each Lender shall have the right at any time to sell one or more participations to any Person (other than Company, any of its Subsidiaries or any of its Affiliates) in all or any part of its Loans or in any other Obligation.  The holder of any such participation (a "**Participant**"), other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (i) extend the final scheduled maturity of any Loan or Note in which such Participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except any amendment to the definition of "Default Rate" or in connection with a waiver of applicability of any post default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the Participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default shall not constitute a change in the terms of such participation, and that an increase in any Loan shall be permitted without the consent of any Participant if the Participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement, or (iii) release all or substantially all of the Collateral under the Collateral Documents or all or substantially all of the Guarantors from the Guaranty (in each case, except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such Participant is participating.  Company agrees that each Participant shall be entitled, through the participating Lender, to the benefits of Sections ~~2.13~~2.16 and ~~2.14~~2.17 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to ~~clause 10.6 of~~ this Section 10.6; provided, (1) a Participant shall not be entitled to receive any greater payment under Section ~~2.13~~2.16 or ~~2.14~~2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with Company's prior written consent, and (2) a Participant that would be a Non-U.S. Lender if it were a Lender shall not be entitled to the benefits of Section ~~2.14~~2.17 unless Company is notified of the participation sold to such Participant and such Participant agrees, for the benefit of Company, to comply with Section ~~2.14~~2.17 as though it were a Lender.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.4 as though it were a Lender, provided such Participant agrees to be subject to Section ~~2.12~~2.14 as though it were a Lender.

(i)     Certain Other Assignments.  In addition to any other assignment permitted pursuant to this Section 10.6, any Lender may assign, pledge and/or grant a security interest in, all or any portion of its Loans, the other Obligations owed by or to such Lender, and its Notes, if any, to secure obligations of such Lender including any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any operating circular issued by such Federal Reserve Bank; provided, no Lender, as between Company and such Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge, and provided further, in no event shall the applicable Federal Reserve Bank, pledgee or trustee be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

**10.7    Special Purpose Funding Vehicles**.  Notwithstanding anything to the contrary contained herein, any Lender ("**Granting Lender**") may grant to a special purpose funding vehicle (an "**SPC**"), identified as such in writing from time to time by the Granting Lender to Administrative Agent and Company, the option to provide to Company all or any part of any Loan that such Granting Lender would otherwise be obligated to make to Company pursuant to this Agreement; provided that (x) nothing herein shall constitute a commitment by any SPC to make any Loans and (y) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).    In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one (1) year and one (1) day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this clause, any SPC may (a) with notice to, but without the prior written consent of, Company or Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by Company and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (b) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC.  This Section may not be amended without the written consent of the SPC.  Company acknowledges and agrees, subject to the next sentence, that, to the fullest extent permitted under applicable law, each SPC, for purposes of Sections ~~2.12, 2.13,~~ 2.14, 2.16, 2.17, 10.2, 10.3 and 10.4, shall be considered a Lender.  Company shall not be required to pay any amount under Sections ~~2.12, 2.13,~~ 2.14, 2.16, 2.17, 10.2, 10.3 and 10.4 that is greater than the amount which it would have been required to pay had no grant been made by a Granting Lender to a SPC.

**10.8    Independence of Covenants**.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**10.9    Survival of Representations, Warranties and Agreements**.  All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension.  Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Sections ~~2.12, 2.13,~~ 2.14, 2.16, 2.17, 10.2, 10.3 and 10.4 and the agreements of Lenders set forth in Sections ~~2.12,~~ 2.14, 9.3(b) and 9.6 shall survive the payment of the Loans and the termination hereof.

**10.10    No Waiver; Remedies Cumulativ**e.  No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default

or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. The rights, powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents or any of the Interest Rate Agreements and Currency Agreements. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

**10.11 Marshalling**; **Payments Set Aside**. Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations. To the extent that any Credit Party makes a payment or payments to Administrative Agent or Lenders (or to Administrative Agent, on behalf of Lenders), or Administrative Agent, Collateral Agent or Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**10.12 Severability**. In case any provision in or obligation hereunder or any Note or other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**10.13 Obligations Several; Independent Nature of Lenders' Rights**. The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations of any other Lender hereunder. Nothing contained herein or in any other Credit Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**10.14 Headings**. Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

**10.15 Applicable Law**. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

**10.16 Consent to Jurisdiction**.  ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY CREDIT PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER CREDIT DOCUMENT, OR ANY OF THE OBLIGATIONS, MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK.  BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH SUCH CREDIT PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (a) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (b) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (c) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE CREDIT PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 10.2 AND TO ANY PROCESS AGENT SELECTED IN ACCORDANCE WITH SECTION 3.1(b) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE CREDIT PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (d) AGREES THAT AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY CREDIT PARTY IN THE COURTS OF ANY OTHER JURISDICTION.

**10.17 Waiver of Jury Trial**. EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/~~BORROWER~~COMPANY RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.   THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 10.17 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.  IN THE EVENT OF LITIGATION,

THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**10.18  Confidentiality**.  Each Lender shall hold all non-public information regarding Company and its Subsidiaries and their businesses clearly identified as such by Company and obtained by such Lender pursuant to the requirements hereof  in accordance with such Lender's customary procedures for handling confidential information of  such nature, it being understood and agreed by Company that, in any event, a Lender may make (i) disclosures of such information to Affiliates of such Lender and to their directors, officers, employees, agents and advisors (and to other persons authorized by a Lender or Agent to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 10.18), (ii) disclosures of such information reasonably required by any bona fide or potential assignee, transferee or participant in connection with the contemplated assignment, transfer or participation by such Lender of any Loans or any participations therein or by any direct or indirect contractual counterparties (or the professional advisors thereto) in Interest Rate Agreements and Currency Agreements (provided, such counterparties and advisors are advised of and agree to be bound by the provisions of this Section 10.18), (iii) disclosure to any rating agency when required by it, provided that, prior to any disclosure, such rating agency shall undertake in writing to preserve the confidentiality of any confidential information relating to the Credit Parties received by it from any of the Agents or any Lender, (iv) disclosures to any Lender's financing sources, provided that prior to any disclosure, such financing source is informed of the confidential nature of the information, (v) disclosure of information which (1) becomes publicly available other than as a result of a breach of this Section 10.18 or (2) becomes available to Administrative Agent or any Lender on a non-confidential basis from a source other than Company, and (vi) disclosures required or requested by any governmental agency or representative thereof or by the NAIC or pursuant to legal or judicial process; provided, unless specifically prohibited by applicable law or court order, each Lender shall make reasonable efforts to notify Company of any request by any governmental agency or representative thereof (other than any such request in connection with any examination of the financial condition or other routine examination of such Lender by such governmental agency) for disclosure of any such non-public information prior to disclosure of such information.  Notwithstanding the foregoing, on or after the Closing Date, Administrative Agent may, at its own expense, issue news releases and publish "tombstone" advertisements and other announcements relating to this transaction in newspapers, trade journals and other appropriate media.  Notwithstanding any other provision of this Section 10.18, the parties (and each employee, representative, or other agent of the parties) may disclose to any and all Persons, without limitation of any kind, the Tax treatment and any facts that may be relevant to the Tax structure of the transactions contemplated by this Agreement and the other Credit Documents; provided, however, that no party (and no employee, representative, or other agent thereof) shall disclose any other information that is not relevant to an understanding of the Tax treatment and Tax structure of the transaction (including the identity of any party and any information that could lead another to determine the identity of any party), or any other information to the extent that such disclosure could reasonably result in a violation of any applicable securities law.

**10.19  Usury Savings Clause**.  Notwithstanding any other provision herein, the aggregate interest rate charged or agreed to be paid with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the

preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Company shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lenders and Company to conform strictly to any applicable usury laws. Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to Company. In determining whether the interest contracted for, charged, or received by Administrative Agent or a Lender exceeds the Highest Lawful Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest, throughout the contemplated term of the Obligations hereunder.

**10.20 Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

**10.21 Effectiveness**. This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by Company and Administrative Agent of written or telephonic notification of such execution and authorization of delivery thereof.

**10.22 Patriot Act**. Each Lender and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Company that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies Company, which information includes the name and address of Company and other information that will allow such Lender or Administrative Agent, as applicable, to identify Company in accordance with the Patriot Act.

**10.23 Disclosure**. Each Credit Party and each Lender hereby acknowledges and agrees that Administrative Agent and/or its Affiliates and their respective Related Funds from time to time may hold investments in, and make other loans to, or have other relationships with any of the Credit Parties and their respective Affiliates, including the ownership, purchase and sale of equity interests in HoldCo or the Company, and each Credit Party and each Lender hereby expressly consents to such relationships.

**10.24 Appointment for Perfection**. Each Lender hereby appoints each other Lender as its agent for the purpose of perfecting Liens, for the benefit of Administrative Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable law can be perfected only by possession. Should any Lender (other than Administrative Agent) obtain

possession of any such Collateral, such Lender shall notify Administrative Agent thereof, and, promptly upon Administrative Agent's request therefore shall deliver such Collateral to Administrative Agent or otherwise deal with such Collateral in accordance with Administrative Agent's instructions.

**10.25  Advertising and Publicity**.  No Credit Party shall issue or disseminate to the public (by advertisement, including without limitation any "tombstone" advertisement, press release or otherwise), submit for publication or otherwise cause or seek to publish any information describing the credit or other financial accommodations made available by Lenders pursuant to this Agreement and the other Credit Documents without the prior written consent of Administrative Agent.  Nothing in the foregoing shall be construed to prohibit any Credit Party from making any submission or filing which it is required to make by applicable law or pursuant to judicial process; <u>provided</u>, that, (i) such filing or submission shall contain only such information as is necessary to comply with applicable law or judicial process and (ii) unless specifically prohibited by applicable law or court order, Company shall promptly notify Administrative Agent of the requirement to make such submission or filing and provide Administrative Agent with a copy thereof.

**10.26  Entire Agreement**.  This Agreement and the other Credit Documents represent the final agreement among the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.  There are no unwritten oral agreements among the parties.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**EUROFRESH, INC.**

By: _____
      Name:
      Title:

**EUROFRESH PRODUCE, LTD.**

By: _____
      Name:
      Title:

**EUROFRESH HOLDING COMPANY, INC.**

By: _____
      Name:
      Title:

**SILVER POINT FINANCE, LLC,** as
Administrative Agent and Collateral Agent

By: _____
    Name:
    Title:


**SPCP GROUP LLC,**
 As a Lender


By: _____
    Name:
    Title:


**FIELD POINT III, LTD.**


By: _____
    Name:
    Title:


**FIELD POINT IV, LTD.**


By: _____
    Name:
    Title:

# APPENDIX A

## TO CREDIT AND GUARANTY AGREEMENT

**Loan Amounts**

| Lender | Loan Amount | Pro Rata Share |
|--------|-------------|----------------|
| **SPCP Group LLC** | $ | __% |
| **Total** | **$** | **100%** |

**Notice Addresses**

**EUROFRESH, INC.**

_____
_____
_____
Attention:
Telecopier:

**[NAME OF SUBSIDIARY]**

_____
_____
_____
Attention:
Telecopier:

in each case, with a copy to:

_____
_____
_____
Attention:
Telecopier:

SILVER POINT FINANCE, LLC,
as Administrative Agent, Collateral Agent and Documentation Agent


with a copy to

Silver Point Finance, LLC
2 Greenwich Plaza
1st Floor
Greenwich, CT 06830
Attn:    Nancy Weir
Phone:  203-542-4469
Fax:      203-286-2139
Email:   bladmin@silverpointcapital.com


[LENDER]


[LENDER]

Appendix B-2